# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., | ) | Case No. 18-05665 |
| Amory Regional Medical Center, Inc., | ) | Case No. 18-05675 |
| Batesville Regional Medical Center, Inc., | ) | Case No. 18-05676 |
| Clarksdale Regional Medical Center, Inc. | ) | Case No. 18-05678 |
| Amory Regional Physicians, LLC | ) | Case No. 18-05680 |
| Batesville Regional Physicians, LLC | ) | Case No. 18-05681 |
| Clarksdale Regional Physicians, LLC | ) | Case No. 18-05682 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Joint Administration Pending |

## MOTION FOR EXPEDITED HEARING ON FIRST DAY MOTIONS

The above-captioned debtors and debtors in possession (the "**Debtors**") move this Court

pursuant to Rule 9075-1 of the Local Rules of Court for the United States Bankruptcy Court for

the Middle District of Tennessee (the "**Local Rules**") to set an expedited hearing as provided in

detail herein (this "**Expedited Motion**"). In support of the Expedited Motion, the Debtors rely

upon the *Declaration of Stephen N. Clapp, Chief Executive Officer of Curae Health, Inc., in*

*Support of Chapter 11 Petitions and First Day Pleadings*, attached hereto as <u>Exhibit B</u> (the

"**First Day Declaration**"). In further support of the Expedited Motion, the Debtors, by and

through their undersigned counsel, respectfully represent:

## BACKGROUND

### A.  The Debtors' Chapter 11 Cases

1.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary

petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the

"**Chapter 11 Cases**"). The factual background regarding the Debtors, including their business

operations, their capital and debt structures, and the events leading to the filing of the Chapter 11

Cases, is set forth in detail in the First Day Declaration and fully incorporated herein by reference.

2. Concurrently with the filing of this Expedited Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been requested in the Chapter 11 Cases and no committees have yet been appointed.

## REQUEST FOR EXPEDITED MOTION UNDER LOCAL RULE 9075-1

3. <u>Relief Requested</u>. Local Rule 9075-1 allows the Court to grant emergency orders for expedited motions. Pursuant to Local Rule 9075-1(b), the Debtors request expedited relief in each of the following motions (collectively, the "**First Day Pleadings**"), filed simultaneously herewith:

(a) *Expedited Motion of Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases and Approving Case Management Procedures [Docket No. 3]* (the "**Joint Administration Motion**").

(b) *Expedited Motion of the Debtors for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 507(a)(I) Authorizing, but not Directing, the Debtor to Pay Prepetition Wages, Salaries, and Other Compensation and Benefits, (II) Authorizing, but not Directing, the Debtor to Continue Employee Benefits Programs and Payment of Related Administrative Obligations and (III) Directing Applicable Banks and Other Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests [Docket No. 6]* (the "**Employees and Wages Motion**").

(c) *Expedited Motion of Debtors for Entry of an Order Authorizing Procedures to Maintain and Protect Confidential Patient Information [Docket No. 4]* (the "**Patient Confidentiality Motion**").

(d) *Expedited Motion of the Debtors for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Providers from Discontinuing, Altering or Refusing Service on Account of Prepetition Invoices, (II) Deeming Utility Providers to Have Adequate Assurance of*

*Future Payment, and (III) Establishing Procedures for Resolving Requests for Additional Assurance [Docket No. 8] (the "**Utility Motion**").*

(e)    *Expedited Motion of the Debtors for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a), 345(a) and 363(c)(1), Fed. R. Bankr. P. 6003 and 6004 (I) Approving Continued Use of Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Existing Checks, and (III) Granting an Interim Waiver of the Requirements under 11 U.S.C. § 345(b) [Docket No. 7 ] (the "**Cash Management Motion**").*

(f)    *Expedited Motion of Debtors for an Order (I) Authorizing Continuation of and Payment of Obligations Incurred in the Ordinary Course of Business in Connection with Carious Insurance Policies, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, And (III) Preventing Insurance Companies from Giving any Notice of Termination or Otherwise Modifying any Insurance Policy without Obtaining Relief From the Automatic Stay [Docket No. 9 ] (the "**Insurance Motion**").*

(g)    *Expedited Motion of Debtors for Entry of an Order Extending Time for Filing Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket No. 16 ] (the "**Schedule Extension Motion**").*

(h)    *Expedited Motion of Debtors for Entry of an Order Authorizing Consolidated Largest Unsecured Creditor List [Docket No. 5] (the "**Consolidated Creditor List Motion**").*

(i)    *Expedited Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Secured Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Setting a Final Hearing, and (VI) Granting Related Relief [Docket No. 10](the "**Cash Collateral and DIP Motion**")*

(j)    *Application of Debtors for Authority to Employ and Retain Polsinelli PC as Counsel to the Debtors Nunc Pro Tunc to the Petition Date [Docket No. 11] (the "**Polsinelli Retention Application**").*

(k)    *Application of Debtors for Authority to Employ and Retain Glass Ratner as Financial Advisors to the Debtors Nunc Pro Tunc to the Petition Date [Docket No. 12] (the "**Glass Ratner Retention Application**").*

(l)    *Expedited Motion of Debtors for Authority to Employ and Retain Egerton McAfee as Special Counsel to the Debtors Nunc Pro Tunc to the Petition Date [Docket No. 15 ] (the "**Egerton Retention Application**").*

(m)    *Expedited Motion of the Debtors for an Order Appointing BMC Group as Claims and Noticing Agent for the Debtor, Pursuant to 28 U.S.C. § 156(c)*

3

*and 11 U.S.C. § 105(a) [Docket No. 14]* (the "**Claims and Noticing Agent Application**").

Debtors further request that the First Day Pleadings be heard by the Court at an expedited hearing

4.    <u>Need for Expedited Hearing</u>. The Chapter 11 Cases were filed on Friday, August 24, 2018. The Debtors need an expedited hearing on the First Day Pleadings as set forth in each respective motion and summarized in the First Day Declaration.

5.    <u>Notice</u>. Notice of the First Day Pleadings and this Expedited Motion will be given to: (a) the Office of the United States Trustee for the Middle District of Tennessee; (b) the Centers for Medicare and Medicaid Services; (c) the State of Tennessee Department of Health Division of Licensure and Regulation Office of Health Care Facilities; (d) the Mississippi State Department of Health; (e) those parties listed on the consolidated list of creditors holding the thirty (30) largest unsecured claims against the Debtors; (f) counsel to any official committee(s) establish in these cases pursuant to Section 1102 of the Bankruptcy Code; (g) ServisFirst Bank and its counsel; (h) Midcap Financial Trust and its counsel; (i) CHS/Community Health Systems, Inc. and its counsel; (j) all Tennessee local counsel having entered a notice of appearance in these cases; (k) the Internal Revenue Service; (l) the Tennessee Attorney General's Office; (m) the Mississippi Attorney General's Office; (n) the Tennessee Secretary of State; (o) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (p) applicable parties in interest as provided in each First Day Pleading. The Debtors submit that, under the circumstances, no other or further notice is required and such notice complies with Local Rule 9075-1.

6.    <u>Requested Hearing Date</u>. Debtors request this Court schedule an expedited hearing on these First Day Pleadings on **<u>Tuesday, August 28, 2018</u>**.

4

7.     <u>Support for Expedited Hearing</u>.  The First Day Declaration is attached hereto in support of Debtors' request for an expedited hearing on the First Day Pleadings.


Dated: August 24, 2018
       Nashville, Tennessee

Respectfully submitted,

**POLSINELLI PC**

*/s/ Michael Malone*
Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (*Pro Hac Vice* Pending)
Caryn E. Wang (*Pro Hac Vice* Pending)
1201 West Peachtree Street NW
Atlanta, Georgia
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and Debtors in Possession*

5

**<u>EXHIBIT A</u>**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., | ) | Case No. 18-05665 |
| Amory Regional Medical Center, Inc., | ) | Case No. 18-05675 |
| Batesville Regional Medical Center, Inc., | ) | Case No. 18-05676 |
| Clarksdale Regional Medical Center, Inc. | ) | Case No. 18-05678 |
| Amory Regional Physicians, LLC | ) | Case No. 18-05680 |
| Batesville Regional Physicians, LLC | ) | Case No. 18-05681 |
| Clarksdale Regional Physicians, LLC | ) | Case No. 18-05682 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Joint Administration Pending |

## EXPEDITED ORDER SETTING EXPEDITED HEARING ON FIRST DAY MOTIONS

Upon the joint expedited motion (the "**Expedited Motion**")[1] of the above-captioned

Chapter 11 Debtors for entry of an order setting an expedited hearing on the First Day Pleadings

filed by the Debtors regarding certain immediate issues involving the administration of these

Chapter 11 Cases. It appearing to the satisfaction of the Court that cause exists to grant this

Expedited Motion, it is hereby

### ORDERED, ADJUDGED AND DECREED THAT:

1. The Expedited Motion is GRANTED, as set forth herein.

2. The Court will hold a hearing on the First Day Motions filed by the Debtors on

August __, 2018, commencing at _____, Courtroom ___, 701 Broadway, Nashville, TN:

> (a) *Expedited Motion of Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases and Approving Case Management Procedures [Docket No. 3]* (the "**Joint Administration Motion**").

---

[1] All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Expedited Motion.

(b)     *Expedited Motion of the Debtors for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 507(a)(I) Authorizing, but not Directing, the Debtor to Pay Prepetition Wages, Salaries, and Other Compensation and Benefits, (II) Authorizing, but not Directing, the Debtor to Continue Employee Benefits Programs and Payment of Related Administrative Obligations and (III) Directing Applicable Banks and Other Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests [Docket No. 6]* (the "**Employees and Wages Motion**").

(c)     *Expedited Motion of Debtors for Entry of an Order Authorizing Procedures to Maintain and Protect Confidential Patient Information [Docket No. 4]* (the "**Patient Confidentiality Motion**").

(d)     *Expedited Motion of the Debtors for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Providers from Discontinuing, Altering or Refusing Service on Account of Prepetition Invoices, (II) Deeming Utility Providers to Have Adequate Assurance of Future Payment, and (III) Establishing Procedures for Resolving Requests for Additional Assurance [Docket No. 8]* (the "**Utility Motion**").

(e)     *Expedited Motion of the Debtors for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a), 345(a) and 363(c)(1), Fed. R. Bankr. P. 6003 and 6004 (I) Approving Continued Use of Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Existing Checks, and (III) Granting an Interim Waiver of the Requirements under 11 U.S.C. § 345(b) [Docket No. 7 ]* (the "**Cash Management Motion**").

(f)     *Expedited Motion of Debtors for an Order (I) Authorizing Continuation of and Payment of Obligations Incurred in the Ordinary Course of Business in Connection with Carious Insurance Policies, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, And (III) Preventing Insurance Companies from Giving any Notice of Termination or Otherwise Modifying any Insurance Policy without Obtaining Relief From the Automatic Stay [Docket No. 9 ]* (the "**Insurance Motion**").

(g)     *Expedited Motion of Debtors for Entry of an Order Extending Time for Filing Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket No. 16 ]* (the "**Schedule Extension Motion**").

(h)     *Expedited Motion of Debtors for Entry of an Order Authorizing Consolidated Largest Unsecured Creditor List [Docket No. 5]* (the "**Consolidated Creditor List Motion**").

(i)     *Expedited Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Secured Postpetition Financing, (II)*

*Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Setting a Final Hearing, and (VI) Granting Related Relief [Docket No. 10]*(the "**Cash Collateral and DIP Motion**")

(j)     *Application of Debtors for Authority to Employ and Retain Polsinelli PC as Counsel to the Debtors Nunc Pro Tunc to the Petition Date [Docket No. 11]* (the "**Polsinelli Retention Application**").

(k)     *Application of Debtors for Authority to Employ and Retain Glass Ratner as Financial Advisors to the Debtors Nunc Pro Tunc to the Petition Date [Docket No. 12]* (the "**Glass Ratner Retention Application**").

(l)     *Expedited Motion of Debtors for Authority to Employ and Retain Egerton McAfee as Special Counsel to the Debtors Nunc Pro Tunc to the Petition Date [Docket No. 15 ]* (the "**Egerton Retention Application**").

(m)     *Expedited Motion of the Debtors for an Order Appointing BMC Group as Claims and Noticing Agent for the Debtor, Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a) [Docket No. 14]* (the "**Claims and Noticing Agent Application**").

**This Order Was Signed And Entered Electronically As Indicated At The Top Of The First Page**

APPROVED FOR ENTRY:

**POLSINELLI PC**

*/s/ Michael Malone*
Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (*Pro Hac Vice* Pending)
Caryn E. Wang (*Pro Hac Vice* Pending)
1201 West Peachtree Street NW
Atlanta, Georgia
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

3

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

64912264.1

# EXHIBIT B

**First Day Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., | ) | Case No. 18-05665 |
| Amory Regional Medical Center, Inc., | ) | Case No. 18-05675 |
| Batesville Regional Medical Center, Inc., | ) | Case No. 18-05676 |
| Clarksdale Regional Medical Center, Inc. | ) | Case No. 18-05678 |
| Amory Regional Physicians, LLC | ) | Case No. 18-05680 |
| Batesville Regional Physicians, LLC | ) | Case No. 18-05681 |
| Clarksdale Regional Physicians, LLC | ) | Case No. 18-05682 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Joint Administration Pending |

**DECLARATION OF STEPHEN N. CLAPP,
CHIEF EXECUTIVE OFFICER OF CURAE HEALTH, INC., IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Pursuant to 28 U.S.C. § 1764, Stephen N. Clapp, declares as follows under the penalty of perjury:

1.      I am the President and Chief Executive Officer ("**CEO**") of Curae Health, Inc. ("**Curae**" or "**the Company**"), a Tennessee nonprofit corporation. Curae is the sole member and sponsoring organization of Amory Regional Medical Center, Inc. ("**Amory**"); Batesville Regional Medical Center, Inc. ("**Batesville**"); Clarksdale Regional Medical Center, Inc. ("**Clarksdale**"). Amory, Batesville, and Clarksdale are each the sole member of a physician entity as follows: Amory is the sole member of Amory Regional Physicians, LLC ("**Amory Physicians**"); Batesville is the sole member of Batesville Regional Physicians, LLC ("**Batesville Physicians**"); Clarksdale is the sole member of Clarksdale Regional Physicians, LLC ("**Clarksdale Physicians**"). Curae, Amory, Batesville, Clarksdale, Amory Physicians, Batesville Physicians, and Clarksdale Physicians are the debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") and shall be collectively referred to herein

as the "**Debtors**" or the "**Company**". I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

2.          I have served as President and CEO of Curae since it was formed in 2014. Prior to serving as President and CEO of Curae, I served as President and CEO of Restoration Healthcare, LLC ("**Restoration**"), a for-profit rural hospital company that was focused on helping to save struggling rural hospitals. I served as President and CEO of Restoration from the time it was formed in 2006 until 2013 when Restoration divested its last hospital. Prior to forming Restoration, I worked for Baptist Health System of East Tennessee ("**Baptist**") from 1995 to 2006. For several years, I served as Senior Vice President of Baptist, and during that time I was responsible for overseeing: (a) the hospital and other operating entities; (b) strategic planning; (c) business development; (d) physician recruitment; and (e) real estate.

3.          I am familiar with the Debtors' business operations, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from other employees, agents, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this First Day Declaration.

4.          References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

5.          On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition in the United States Bankruptcy Court for the Middle District of Tennessee (the "**Court**") commencing a case for relief under chapter 11 of the Bankruptcy Code (the

2

"**Bankruptcy Code**"). The Debtors will continue to operate their business and manage their properties as debtors in possession.

6.      I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[1] The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on the Debtors' operations and to continue operating the medical facilities for the benefit of the communities they serve. I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' hospitals and other medical facilities for the benefit of the communities in which they are located, as well as the Debtors' employees, creditors, and other parties in interest.

7.      This First Day Declaration first provides an overview of: (a) the Debtors' operations; (b) the medical facilities owned and operated by the Debtors; (c) certain affiliates of Debtors not currently filing voluntary petitions for relief in this Court; and (d) the significant prepetition indebtedness of the Debtors. The First Day Declaration then provides a discussion of the Debtors' financial performance and the events leading to the filing of Debtors' Chapter 11 Cases. Finally, the First Day Declaration sets forth the relevant facts in support of the First Day Pleadings.

---

[1]  Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

3

## I. COMPANY AND BUSINESS OVERVIEW

### A. Overview of Business Operations

7. The Company was formed in 2014 as a 501(c)(3) not-for-profit health system whose mission was to acquire rural hospitals and operate them to address the needs of rural healthcare. Focusing on rural community hospitals in the Southeastern United States, the Company collaborates with medical staff and communities to add new services and upgrade medical facilities, alleviating the need for patients to travel long distances for their healthcare needs. This effort reverses patient departures to other communities and ultimately adds new jobs at the local level.

8. As rural healthcare profitability has declined, fewer of the large existing hospital companies have been willing to acquire rural hospitals for a variety of reasons. As in previous years, startup hospital companies focused exclusively on acquiring rural hospitals were not emerging. Therefore, the Company's management saw the opportunity to start a company focused exclusively on rural markets to help ensure residents of rural counties continued to have access to quality healthcare services.

9. The Company's operating model was a lower corporate overhead and hospital level expense model. Additionally, when acquiring for profit owned hospitals, the Company would convert the hospitals to nonprofit status resulting in, *inter alia*, property and sales tax savings and potential higher reimbursement for Medicaid patients (in select states) that could not be realized under a for profit model.

10. The Company's primary goals are to: (a) own and operate community hospitals; (b) provide high quality care to the communities served; and (c) seek strategic affiliations to ensure the success of its hospitals. All of the medical facilities operated by the Company are

community oriented and offer a variety of medical specialties and services through affiliated physicians and medical clinics with the intent to care for people close to their homes.

## B. Overview of the Debtors' Facilities

11. In 2017, the Company acquired three hospitals in Mississippi from Community Health Systems, Inc. ("**CHS**"). The Company currently owns and operates the following Mississippi facilities.

Amory

12. Amory is a Tennessee nonprofit corporation that owns and operates a 95-bed hospital, located in Amory, Mississippi, which provides emergency care, intensive care, a wound care center, diagnostics, surgery, and many other inpatient & outpatient medical services, treatments and programs (the "**Amory Facilities**"). Amory is the sole member of Amory Physicians. Amory Physicians employs some of the physicians that work in the Amory Facilities.

Batesville

13. Batesville is a Tennessee nonprofit corporation that owns and operates a 112-bed hospital and certain other healthcare related facilities located in Batesville, Mississippi, offering services in emergency care, surgery, radiology, labor and delivery, cardiopulmonary services, physical therapy, cardiac rehab, pharmacy, primary care, pediatrics, sleep, adult medicine and women's health clinics (the "**Batesville Facilities**"). Batesville is the sole member of Batesville Physicians. Batesville Physicians employs some of the physicians that work in the Batesville Facilities.

Clarksdale

14. Clarksdale is a Tennessee nonprofit corporation that leases and operates a 181-bed regional medical center located in Clarksdale, Mississippi, which includes the following facilities: 10-bed ICU; 33-bed telemetry stepdown unit; 20 ambulatory surgery beds, 10-bed

5

emergency department; 7-room operating suite; 12-bed recovery room; labor and delivery suite (2 labor and delivery rooms, 5 regular labor rooms, 2 delivery rooms, and a 23-bassinet newborn and intensive care nursery); pavilion dedicated for women and children; wound healing center; and medical and surgical units (the "**Clarksdale Facilities**", together with the Batesville Facilities and the Amory Facilities, the "**Facilities**"). Clarksdale leases the Clarksdale Facilities from Coahoma County. Clarksdale is the sole member of Clarksdale Physicians. Clarksdale Physicians employs some of the physicians that work in the Clarksdale Facilities. Clarksdale Physicians, Batesville Physicians, and Amory Physicians is each a "**Physician Entity**" and collectively the "**Physician Entities**".

15.    The physicians and employees of each Physician Entity work at and generate income for their respective Facilities. That income is then passed up to Curae pursuant to the Cash Management System. Curae then pays the salaries of the physicians and employees of each Physician Entity.

16.    The Debtors' goal in these Chapter 11 Cases is the continued operation of the Facilities for the benefit of the communities they serve.

**C.    Overview of Affiliates Not Currently Filing Voluntary Petitions for Relief**

17.    Curae is also the sole member and organizational sponsor of Russellville Hospital Inc. ("**Russellville**"), a Tennessee nonprofit corporation that owns and operates a 100-bed acute care facility in Russellville, Alabama, offering the following services: a 24-hour emergency room; intensive care unit; cardiac care unit; respiratory therapy; inpatient and outpatient diagnostic and treatment services; rehabilitation services; cardiac catheterization; ambulatory surgery; laboratory; and home health (the "**Russellville Facilities**"). Russellville has not filed a voluntary petition for relief and seeks to continue owning and operating the Russellville

6

Facilities uninterrupted by these Chapter 11 Cases for the benefit of the community in which it is located.

18.     The debts and obligations of Russellville are separate and distinct from those of Debtors Amory, Batesville, and Clarksdale, and none of the Debtors' obligations are cross-collateralized or cross-defaulted with those of Russellville. Funds generated by Russellville are passed up to Debtor Curae, however, such funds are kept separate and segregated from funds generated for Curae by Debtors Amory, Batesville, and Clarksdale. Curae uses these funds to pay the payroll of the employees of Russellville.

19.     Russellville is the sole member of Russellville Physicians, LLC ("**Russellville Physicians**", together with Russellville, the "**Affiliates**"). Russellville Physicians employs some of the physicians that work in the Russellville Facilities. Russellville Physicians has not filed a voluntary petition for relief and seeks to continue operating uninterrupted by these Chapter 11 Cases for the benefit of the community in which it is located.

20.     Debtor Curae pays the payroll for the physicians and other employees of the Affiliates. The physicians and employees of Russellville Physicians work at the Russellville Facilities and generate income for Russellville. That income is then passed up to Curae pursuant to the Cash Management System. Curae then pays the salaries of the physicians and employees of the Affiliates.

21.     The Company desires to keep the Affiliates out of bankruptcy. Should these Chapter 11 Cases interrupt the ability of the Affiliates to maintain their operations, however, the Debtors are prepared to have each of the Affiliates file petitions for relief in this Court.

**D.     Financial Overview of the Company**

7

22.     As of the Petition Date, the Debtors had approximately $3.4 million of cash and cash equivalents. The Debtors' aggregate liabilities as of the Petition Date are approximately $96 million.

Prepetition First Priority Real Estate Liens

23.     On May 1, 2017, Amory and Batesville, with Curae as guarantor, entered into that certain Loan Agreement (as amended, restated or otherwise modified from time to time, the ("**Loan Agreement**") with ServisFirst Bank, an Alabama state banking corporation ("**ServisFirst**", or the "**Prepetition First Lien Lender**"), whereby ServisFirst agreed to, *inter alia*: (a) make advances to Amory and Batesville on a revolving credit basis up to $5,000,000.00 pursuant to the Revolving Credit Note (defined below); and (b) make a single advance to Amory and Batesville in the principal amount of $14,000,000.00 as evidenced by the Term Note (as defined below). In connection with the Loan Agreement, Amory and Batesville executed that certain Revolving Credit Note in favor of ServisFirst (as amended, restated or otherwise modified from time to time, the "**Revolving Credit Note**"), whereby Amory and Batesville jointly and severally agreed to pay ServisFirst the amounts advanced up to $5,000,000.00 together with variable interest rate equal to LIBOR plus 450 basis points per annum. Amory and Batesville also executed that certain Term Note in favor of ServisFirst (as amended, restated or otherwise modified from time to time, the "**Term Note**"), whereby Amory and Batesville jointly and severally agreed to pay ServisFirst the principal sum of $14,000,000.00 together with interest at a fixed rate equal to six percent per annum. On December 13, 2017, the parties to the Loan Agreement agreed to, *inter alia*, (a) amend the Term Note and Loan Agreement by joining Clarksdale as a borrower under the Loan Agreement and the Term Note; (b) the balance of the Revolving Credit Note was converted to the Term Note (cancelling the Revolving Credit Note);

64929802.4

and (c) increase the principal amount of the Term Note by $5,000,000.00 for a total outstanding principal balance of $18,783,000.00 as of December 13, 2017. The Debtors' collective repayment obligations under the Revolving Credit Note and Term Note are referred to herein as the "**First Lien Obligations**".

24. In connection with the Loan Agreement and Term Note, Curae agreed to, *inter alia*, pay the First Lien Obligations in the event that the First Lien Obligations are not timely paid as more specifically provided in that certain Guaranty dated April 28, 2017 (as amended, restated or otherwise modified from time to time, the "**Guaranty**"). In connection therewith, Curae granted ServisFirst a security interest in substantially all of Curae's assets and personal property as more specifically provided in that certain Guarantor Security Agreement dated April 28, 2017 (as amended, restated or otherwise modified from time to time, the "**Guarantor Security Agreement**").

25. In connection with the Loan Agreement, Amory, Batesville, and Clarksdale each executed a Mississippi Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing in favor of Robert C. Hannon as trustee, for the use and benefit of ServisFirst to secure repayment of the First Lien Obligations. The First Lien Obligations are secured by first-priority liens on substantially all of the Debtors' real estate assets (the "**Prepetition First Priority RE Liens**").

26. As of the Petition Date, ServisFirst is owed the outstanding balance of principal, interest, and fees in the aggregate of $18,783,000.00 all of which is secured by a first priority security interest in and lien on the Company's real estate assets.

Prepetition Subordinated RE Liens

27.     In connection with the purchase and sale of the Amory and Batesville Facilities, Amory and Batesville, with Curae as guarantor, entered into that certain Loan Agreement dated May 1, 2017 with CHS, whereby CHS agreed to advance $14,200,000.00 to be used as part of the purchase price of the Amory and Batesville Facilities (as amended, restated or otherwise modified from time to time, the "**CHS Loan Agreement**"). Amory and Batesville executed that certain Term Note dated May 1, 2017 in favor of CHS in the principal amount of $14,200,000.00 (the "**CHS Term Note**"). On November 1, 2017, the parties to the CHS Loan Agreement agreed to, *inter alia*, amend the CHS Loan Agreement by joining Clarksdale as a borrower under the CHS Loan Agreement. In connection therewith, Clarksdale executed that certain Promissory Note dated November 1, 2017 in favor of CHS in the principal amount of $13,133,839.64 (the "**Clarksdale Note**"). The Debtors' obligations under the CHS Loan Agreement and CHS Term Note are collectively referred to as the "**CHS Debt Obligations**".

28.     In connection with the CHS Loan Agreement and CHS Term Note, Curae agreed to, *inter alia*, pay the CHS Debt Obligations in the event that the CHS Lien Obligations are not timely paid as more specifically provided in that certain Guaranty dated May 1, 2017 (as amended, restated or otherwise modified from time to time, the "**Guaranty**"). In connection therewith, Curae granted CHS a security interest in substantially all of Curae's assets and personal property as more specifically provided in that certain Guarantor Security Agreement dated May 1, 2017 (as amended, restated or otherwise modified from time to time, the "**CHS Guarantor Security Agreement**").

29.     In connection with the CHS Loan Agreement, the CHS Term Note, and the Clarksdale Note, CHS agreed to subordinate its liens securing the CHS Debt Obligations to the

10

Prepetition First Priority RE Liens pursuant to that certain Debt Subordination Agreement dated May 1, 2017 (as amended, restated or otherwise modified from time to time, the "**CHS Subordination Agreement**").

30.     As of the Petition Date, CHS is owed the outstanding balance of principal, interest, and fees in the aggregate of $28,609,419.00, all of which is secured by a security interest in and lien on the Company's real estate assets subordinate to the Prepetition First Priority RE Liens.

Midcap Accounts Receivable Revolving Facility

31.     On December 13, 2017, Amory, Batesville, and Clarksdale entered into that certain Credit and Security Agreement with Midcap Financial Trust ("**Midcap**"), whereby Midcap agreed to make advances to Amory, Batesville, and Clarksdale on a revolving credit basis up to $13,000,000.00 (as amended, restated or otherwise modified from time to time, the "**Midcap Credit Agreement**"). Pursuant to the Midcap Credit Agreement, Amory, Batesville, Clarksdale, and the Physician Entities granted Midcap liens on and security interests in certain of their personal property. In connection with the Midcap Credit Agreement, Amory, Batesville, and Clarksdale executed that certain Revolving Loan Note in favor of Midcap (as amended, restated or otherwise modified from time to time, the "**Midcap Revolving Loan Note**"), whereby Amory, Batesville, and Clarksdale jointly and severally agreed to pay Midcap the amounts advanced up to $13,000,000.00. Debtors' obligations under the Midcap Credit Agreement and Midcap Revolving Loan Note are referred to as the "**Midcap Obligations**".

32.     As of the Petition Date, Midcap is owed the outstanding balance of principal, interest, and fees in the aggregate of approximately $10,188,139.00, all of which is secured by a

security interest in and lien on substantially all of the Company's assets except the Company's real estate.

33.     ServisFirst, CHS, and MidCap (together, the "**Prepetition Secured Lenders**") are parties to a number of subordination and intercreditor agreements.

34.     On December 13, 2017, ServisFirst and MidCap executed that certain Intercreditor and Lien Subordination Agreement (the "**Intercreditor Agreement**"). The Intercreditor Agreement sets forth the relative priorities of ServisFirst and Midcap with regard to their respective liens on and security interests in Debtors' collateral. Under the Intercreditor Agreement, ServisFirst and Midcap each have first priority liens on certain assets of the Debtors. The Intercreditor Agreement also sets forth the parties' rights with regard to postpetition financing and other bankruptcy-related rights.

35.     On December 17, 2017, CHS and MidCap executed that certain Subordination Agreement (the "**Subordination Agreement**"). Pursuant to the Subordination Agreement, CHS and Midcap agreed to establish the relative priorities of the parties, namely, the senior priority of Midcap's liens securing the Midcap Obligations over CHS' liens securing the CHS Debt Obligations. The Subordination Agreement also sets forth the parties' rights with regard to postpetition financing and other bankruptcy-related rights.

Unsecured Debt and Trade Creditors

36.     As of the Petition Date, the aggregate amount owed to the Debtors' prepetition unsecured creditors is approximately $24 million.

## II.     EVENTS LEADING TO THE CHAPTER 11 FILINGS

37.     In early 2016, Curae was approached about acquiring the Facilities from CHS. In

64929802.4

May 2016, Curae entered into a letter of intent to acquire the Facilities.[2] On September 28, 2016, Curae and CHS entered into that certain asset purchase agreement (as amended, the "**APA**"), whereby Curae and its affiliates, including Amory, Batesville, and Clarksdale, purchased, *inter alia*, the Facilities.

38.     The Facilities' performance from 2013 to 2015 was sufficient to warrant the asking price of approximately $51,000,000 (the "**Purchase Price**") based on industry utilized multiples of net revenue and EBITDA. The following table reflects the financial summary and operating statistics for the hospitals from 2013–2018 YTD.

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 Annualized | 2018 TTM |
|---|---|---|---|---|---|---|---|
| Net Revenue | $150,930 | $138,028 | $143,037 | $144,504 | $135,900 | $127,446 | $129,438 |
| EBITDA | $16,471 | $7,552 | $13,448 | $7,010 | ($466) | ($4,331) | ($3,497) |
|  |  |  |  |  |  |  |  |
| **Statistics** |  |  |  |  |  |  |  |
| Admissions | 10,367 | 9,451 | 8,694 | 8,351 | 7,781 | 7,630 |  |
| Surgeries | 10,149 | 9,277 | 9,021 | 9,437 | 8,856 | 8,486 |  |
| ER Visits | 61,001 | 61,111 | 64,872 | 65,559 | 67,972 | 65,430 |  |

39.     The Purchase Price was based on the 2013–2015 historical numbers and the first quarter of 2016. At the time, the Facilities had positive EBITDA sufficient enough to support the purchase price and corresponding debt. Moreover, the transition to the Curae operating model would improve financial performance by reducing operating expenses by 1–3%. Unfortunately, the dramatic decline in net revenue of $23 million between 2013 and 2018 annualized more than offset the expense savings that were realized.

40.     In addition to the dramatic decrease in net revenues, the Company incurred higher than anticipated information systems costs than projected. This was a result of using CHS

---

[2] A hospital in Florida was also included in the letter of intent; however, the Florida hospital was subsequently removed from the letter of intent.

information systems longer than anticipated and the inability to secure permanent information system financing (outside of vendor financing).

41.     Given the poor performance of the Facilities, accounts payable continued to grow. Several of the Facilities' large vendors began to request payment plans for the older invoices. Some vendors moved to requiring payment before they would deliver supplies or services.

42.     All of these factors created a significant cash crunch, and the Debtors recognized the need to seek relief by filing petitions for relief under Chapter 11 of the Bankruptcy Code to ensure the Facilities can continue to operate for the benefit of their respective communities.

43.     The Debtors have filed these Chapter 11 Cases so that the communities served by the Facilities will continue to have access to local healthcare services. As part of these Chapter 11 Cases, the Debtors propose to sell each of the Facilities and their respective Physician Entity as going concerns to arms-length third parties that are able to keep them in operation so that they can continue to serve their communities. The Company has been working with various interested parties to assist them in their review of the Facilities. The Company anticipates filing a motion with the Court to authorize the sale of the Facilities in the near term.

## III.     FIRST DAY PLEADINGS

44.     In furtherance of the objective of keeping the Facilities operating for the benefit of their respective communities and value-maximizing the sale of the Debtors' assets, the Debtors seek approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully request that the Court enter the Proposed Orders granting such First Day Pleadings. For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Pleadings.

14

45.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to their business or loss of productivity or value; and (b) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

**A.      *Motion of Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases and Approving Case Management Procedures* (the "Joint Administration Motion")**

46.     Pursuant to the Joint Administration Motion, the Debtors seek the joint administration of their Chapter 11 Cases, seven (7) in total, for procedural purposes only. Many of the motions, hearings and other matters involved in the Chapter 11 Cases will affect all of the Debtors. Therefore, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates. Accordingly, I believe the Court should approve the joint administration of these Chapter 11 Cases.

**B.      *Motion of Debtors for Entry of an Order Extending Time for Filing Schedules of Assets and Liabilities and Statement of Financial Affairs* (the "Schedules Extension Motion")**

47.     Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order extending the deadline to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules and Statements**") by an additional fourteen (14) days, from the date such Schedules and

15

Statements are otherwise required to be filed, for a total of twenty-eight (28) days from the Petition Date.

48.     I believe cause exists to extend the deadline for filing the Schedules and Statements for the following reasons: (a) the size and complexity of the Debtors' business; (b) the number of creditors; (c) the number of Debtors; and (d) the burden which would be imposed on the Debtors to file schedules and statements within the allotted next 14 days. To completely and accurately file the Schedules and Statements, the Debtors must collect, review, and analyze a substantial amount of information.

49.     Prior to the Petition Date, the Debtors, their advisors, counsel, and other parties in interest focused extensively on preparing for the filing and transitioning the business into the chapter 11 process. This included extensive negotiations among the multiple tranches of creditors and other creditor constituencies. The Debtors are working expeditiously to prepare and file their Schedules and Statements, and I believe, considering the expedited sale procedures being sought, that Schedules and Statements will be filed as soon as possible.  Notwithstanding, in an abundance of caution, it is in the best interests of the Debtors to respectfully request an extension of fourteen days.

**C.     *Motion of Debtors for Entry of an Order Authorizing Procedures to Maintain and Protect Confidential Patient Information* (the "Patient Confidentiality Motion")**

50.     Pursuant to the Patient Confidentiality Motion, the Debtors seek entry of an order authorizing the implementation of procedures to protect confidential information of the Debtors' Patients (as defined below), as required by the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**").

51.     As detailed herein, the Debtors are in the business of owning and operating facilities that provide various medical services to individuals (the "**Patients**"). In the ordinary

16

course of their business, the Debtors have access to and receive "protected health information" and data relating to Patients, which the Debtors are required to confidentially maintain pursuant to HIPAA. Notwithstanding, some of these Patients could potentially hold actual or contingent claims against the Debtors' estates, and as such, under the Bankruptcy Code, the Debtors have a duty to list all such creditors on the Debtors' mailing matrices and bankruptcy schedules.

52.     In an effort to comply with both federal statutes, the Debtors propose certain procedures to maintain client confidentiality during the pendency of these Chapter 11 Cases (the "**Privacy Procedures**").

53.     I believe that Privacy Procedures and the relief requested in the Patient Confidentiality Motion appropriately balance the need to maintain confidential patient information under HIPAA with the need for adequate disclosure under the Bankruptcy Code. Given the nature of any information that may reveal even the identity of Patients, confidentiality in this context is of paramount importance.

**D.      *Motion of Debtors for Entry of an Order Authorizing Consolidated Largest Unsecured Creditor List* (the "<u>Consolidated Creditor List Motion</u>")**

54.     Pursuant to the Consolidated Creditor List Motion, These Chapter 11 Cases involve seven Debtors with over one thousand creditors. Many of the creditors, however, are relatively small in amount. On the other hand, the thirty largest creditors on the consolidated list of creditors in these Chapter 11 Cases represent claims exceeding $100,000.00. Many of the largest creditors are creditors of each of the Debtors. Accordingly, in lieu of filing a separate list of the creditors holding the twenty largest unsecured claims in each of the Chapter 11 Cases, the Debtors request authority to file a consolidated list of the thirty (30) largest unsecured creditors (the "**Consolidated Creditor List**").

17

55.     I believe that filing the Consolidated Creditor List is in the best interest of the Debtors' estates and will facilitate the efficient and orderly administration of the Chapter 11 Cases.

**E.      *Motion of Debtors for an Order Authorizing (I) Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, and (II) Continuation of Existing Deposit Practices* (the "<u>Cash Management Motion</u>")**

56.     Pursuant to the Cash Management Motion, the Debtors seek entry of an orders: (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing Cash Management System (defined below), including maintenance of the Debtor Bank Accounts (defined below) and existing checks and business forms; (ii) granting the Debtors a suspension of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with the Debtors' practices under their Cash Management System or other actions described herein; (iii) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices; and (iv) authorizing and directing all banks with which the Debtors maintain accounts to continue to maintain, service, and administer such accounts and authorize third-party payroll and benefits administrators and providers to prepare and issue checks on behalf of the Debtors.

57.     In the ordinary course of their business, the Debtors maintain a cash management system (the "**Cash Management System**") that is integral to the operation and administration of their business. The Cash Management System allows the Debtors to (i) monitor and control all of the Debtors' cash receipts and disbursements, (ii) identify the cash requirements of the Debtors, and (iii) transfer cash as needed to respond to the cash requirements of the Debtors.

58.     The Cash Management System is managed by the Debtors at their headquarters in Knoxville, Tennessee, where they oversee the administration of the various bank accounts to

effectuate the collection, disbursement, and movement of cash. The Debtors' oversight facilitates accurate cash forecasting and reporting and the monitoring of the collection and disbursement of funds to and from the Debtor Bank Accounts (as defined below).

59.     As of the Petition Date, the Debtors maintain 24 bank accounts (the "**Debtor Bank Accounts**") in the United States. A schedule of the Debtor Bank Accounts is annexed to the Cash Management Motion as <u>Attachment 1</u>. As reflected in Attachment 1, the Debtor Bank Accounts are held in the names of various Debtor entities.

60.     The Debtor Bank Accounts are primarily used to (i) pay operating expenses, and (ii) receive payments from insurance providers, patients, and other parties. Certain Debtor Bank Accounts also facilitate the movement of funds to other accounts of the Debtors. The Debtors routinely deposit, withdraw, and otherwise transfer money to, from, and between certain of the Debtor Bank Accounts by various methods, including by wire transfer, internal transfer, automatic clearing house transfer, and checks (collectively, the "**Ordinary Transfer Methods**").

61.     A diagram reflecting the flow of funds through the Debtor Bank Accounts in the Cash Management System is annexed to the Cash Management Motion as <u>Attachment 2</u>. The diagram also includes the bank accounts of Russellville Hospital, Inc. ("**Russellville**"), reflecting the flow of funds from the Russellville bank accounts to the Curae Operating Account (defined below). As set forth above, Russellville is a non-Debtor Affiliate of the Debtors that operates a hospital in Russellville, Alabama.

62.     <u>Cash Collection and Distribution Process</u>. Debtors maintain certain deposit accounts (collectively, the "**Deposit Accounts**"), which receive funds from various external sources, including, *inter alia*, funds from patients and insurers. Each night, the Deposit Accounts are swept into three Wells Fargo master accounts, which are then swept into an account (the

19

"**Midcap Account**") controlled by Midcap Financial Trust ("**Midcap**"). Debtors also maintain various local deposit accounts, which cannot exceed a balance of $150,000.00 (the "**Local Deposit Accounts**"). The Local Deposit Accounts are swept approximately one time per week into the Midcap Account. Debtors draw on a line of credit provided by Midcap based on the funds swept into the Midcap Account. Funds drawn down from the Midcap line of credit are transferred into a Wells Fargo operating account and then into an operating account of Curae (the "**Curae Operating Account**"). The Curae Operating Account is used to pay Debtors' operating expenses, including: vendors, landlords, payroll, clients, and other parties. The Curae Operating Account also provides funds to pay the operating expenses of Debtors' Affiliates that have not filed voluntary petitions for relief in this or any other bankruptcy court.

63.     Payment transactions involving credit cards are processed by TYS Merchant Solutions – Omaha (the "**Credit Card Processor**"). Funds from the credit card transactions processed by the Credit Card Processor are deposited into Debtors' Bank of America bank accounts.

64.     As the foregoing overview reflects, I believe the Cash Management System is specifically designed for administering the Debtors' businesses, and cannot be altered without significant disruption to the Debtors' business operations and material distraction to the Debtors' management. Therefore, I believe it is in the best interests of the Debtors to request that the Court authorize them to continue using the existing Cash Management System, and to transfer funds into, out of, and through the Cash Management System using the Ordinary Transfer Methods in accordance with the agreements governing the Debtor Bank Accounts, including, without limitation, any prepetition cash management agreements, bank account terms and conditions, or treasury services agreements (collectively, the "**Bank Account Agreements**").

64929802.4

65.     The Cash Management System is an ordinary course, customary and essential business practice, the continued use of which is essential to the Debtors' business operations during the Chapter 11 Cases and their goal of maximizing value for the benefit of all parties in interest. I believe that requiring the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption. Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value. Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of the Debtors' knowledge, the majority of the Debtor Bank Accounts are held at financially stable institutions insured in the United States by the Federal Deposit Insurance Corporation ("**FDIC**"). For the aforementioned reasons, I believe that maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and all interested parties. Accordingly, the Debtors request that they be allowed to maintain and continue to use the Cash Management System, including maintenance of their existing Debtor Bank Accounts.

**F.**     ***Motion of Debtors for Entry of an Order Authorizing Payment of (I) Certain Prepetition Workforce Claims, Including Wages, Salaries, and Other Compensation, (II) Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Reimbursement to Employees for Prepetition Expenses, (IV) Withholding and Payroll-Related Taxes, (V) Workers' Compensation Obligations, and (VI) Prepetition Claims Owing to Administrators and Third-Party Providers* (the "<u>Employees and Wages Motion</u>")**

66.     Pursuant to the Employees and Wages Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to (i) pay prepetition claims and honor obligations incurred or related to compensation obligations, withholding obligations, incentive programs,

vacation policies, reimbursable expense obligations, employee benefits obligations, workers' compensation claims, and all fees and costs incident to the foregoing, including amounts owed to third-party administrators (including administrative fee obligations) (collectively, the "**Employee Obligations**") and (ii) maintain, continue, and honor, in the ordinary course of business, incentive programs, vacation policies, sick leave, and holiday pay policies, postpetition reimbursable expense obligations, employee benefits plans, and workers' compensation claims (collectively, the "**Employee Plans and Programs**").

67.     In connection with the operation of their business, the Debtors currently employ approximately 1,245 employees, including: 969 full-time employees, 29 part-time employees, and 247 PRN employees (the "**Employees**"). The Employees consist of 152 exempt employees that are paid a fixed salary and 1,093 non-exempt employees that are paid on an hourly basis. The Employees are employed at the Debtors' Facilities located in Mississippi (each, a "**Facility**") and in the central business office in Tennessee (the "**CBO**"). All Employees are paid out of Debtor Curae. In the ordinary course of business, the Debtors incur payroll obligations to their Employees, comprised generally of salaries and wages. Approximately 341 Employees are paid a fixed salary and approximately 623 Employees are paid on an hourly basis.

68.     The Debtors also regularly utilize the services of temporary and locums workers ("**Contractors**" and, together with the Employees, the "**Workforce**") to provide a variety of services. The Contractors are employed by third party staffing agencies and outsourced to the Debtors. As of the Petition Date, there are approximately 15 Contractors, all of which are highly skilled doctors, nurse practitioners, and nurses. As of August 20, 2018, the Debtors have spent approximately $1,313,068.56 on account of wages and compensation owed to Contractors in 2018.

22

69.     Employees are paid on a bi-weekly basis out of a Curae operating account. The Debtors' average payroll obligation is approximately $2,477,283.29. The Debtors have two payroll cycles. The first payroll cycle consists of all of the Debtors' Employees that are employed at the Facilities (the "**First Payroll Cycle**"). The second payroll cycle consists of the Employees that are employed at the CBO (the "**Second Payroll Cycle**"). The last date on which the First Payroll Cycle was compensated prior to the Petition Date was August 17, 2018 for the pay period from July 29, 2018 to August 11, 2018. The last date on which the Second Payroll Cycle was compensated prior to the Petition Date was August 24, 2018 for the pay period from August 5, 2018 to August 18, 2015. The Debtors estimate that as of the Petition Date, approximately $2,048,443.33 has accrued and remains unpaid on account of the First Payroll Cycle and the Second Payroll Cycle (collectively, the "**Employee Compensation Obligations**"). To the extent that any Employee is owed more than $12,850, the Debtors will seek authority to pay such amounts by separate motion pursuant to Bankruptcy Code section 502.

70.     The Employees are critical to the Debtors' business, and their value cannot be overstated. To a significant extent, the long-term prognosis of the Debtors' patients depends on the Debtors' ability to attract and retain qualified personnel. I believe that the loss of certain Employees will impede the Debtors' business and seriously harm the ability to successfully implement their bankruptcy strategy. Furthermore, replacing Employees can be difficult for the Debtors given the limited number of individuals in their region with the breadth of skills and experience required to provide quality patient care.

71.     If the Debtors cannot assure their Employees that they will promptly pay prepetition Employee Obligations to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Employee Benefits Obligations, certain Employees will

64929802.4

likely seek employment elsewhere. The loss of Employees at this critical juncture would have a material adverse impact on the Debtors' business and ability to maximize value through these Chapter 11 Cases.

72.     The Contractors fill certain critical and immediate business needs of the Debtors and allow the Debtors to have a flexible workforce to meet their operational needs in a cost-effective manner. The Contractors are a reliable and cost-efficient component of the Debtors' operations. Thus, as with the Debtors' regular Employees, if the Debtors fail to honor their prepetition compensation obligations to the Contractors, I believe that it is likely that the Debtors will lose such individuals' valuable services to the detriment of the Debtors' ongoing business operations.

73.     The Debtors regularly use the Contractors in the ordinary course of business. As of the Petition Date, the Debtors estimate that the aggregate amount owing on account of the Contractors for services performed prior to the Petition Date is approximately $318,000 (the **"Contractor Obligations"** and together, with the Employee Compensation Obligations, the **"Compensation Obligations"**). The Debtors would be irreparably harmed without the services of the Contractors because such parties play a critical role in the Debtors' day-to-day operations, and, as such, the Debtors request authorization, but not direction, to honor and pay any unpaid Contractor Obligations.

74.     In connection with payroll processing, the Debtors pay certain administrative fees. Such administrative fees include amounts owed to LBMC for payroll administration services (approximately $ 7,951.21 per month) and Kronos for essential timekeeping services ($7,410.00 per month) (collectively, the **"Administrative Fee Obligations"**).

75.     Pursuant to the Employee and Wages Motion, the Debtors seek authorization, but not direction, to pay all unpaid Administrative Fee Obligations and to continue paying the Administrative Fee Obligations postpetition in the ordinary course of business. In addition, the Debtors seek authority to cause any prepetition checks or electronic payment requests that were given in payment of Administrative Fee Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

76.     For each applicable pay period, the Debtors routinely deduct certain amounts directly from Employees' paychecks, including, without limitation, pre- and after-tax deductions payable pursuant to certain of the Employees' benefit plans, including any health care benefits, insurance premiums, 401(k) contributions, legally-ordered deductions, and other miscellaneous deductions (collectively, the **"Deductions"**). The Debtors withhold the Deductions from Employees' wages, which the Debtors remit to the appropriate third-party recipients and/or retain on account of benefit programs as further described below.

77.     In connection with the salaries and wages paid to Employees, the Debtors are required by law to withhold amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes from Employees' wages (collectively, the **"Employee Withholding Taxes"**) and to remit the same to the applicable taxing authorities. In addition, the Debtors are required to make matching payments from their own funds for, among other things, social security,  Medicare taxes, and state taxes (the "**Employer Payroll Tax Obligations**," and together with Employee Withholding Taxes, the "**Payroll Tax Obligations**"). Each pay cycle, the Debtors withhold any applicable Employee Withholding Taxes from the Employees' wages, and LBMC remits the same to the applicable taxing authorities. The Debtors withhold

64929802.4

approximately $449,587.84 per pay cycle in Employee Withholding Taxes for the First Payroll Cycle, and the Debtors' average payment for Employer Payroll Tax Obligations per pay cycle for the First Payroll cycle is approximately $142,384.03. The Debtors withhold approximately $35,104.46 per pay cycle in Employee Withholding Taxes for the Second Payroll Cycle, and the Debtors' average payment for Employer Payroll Tax Obligations per pay cycle for the Second Payroll cycle is approximately $11,775.59. LBMC debits the amounts of the Payroll Tax Obligations in advance of the relevant payroll processing day.

78.     Pursuant to the Employees and Wages Motion, the Debtors seek authorization, but not direction, to continue to make the Deductions and satisfy the Payroll Tax Obligations and Deductions (collectively, the "**Withholding Obligations**") and to remit amounts withheld on behalf of third parties postpetition in the ordinary course of business.

79.     The Debtors maintain four Incentive Programs: a clinical advancement program in place at Amory; a nursing director bonus shift program only in place at Clarksdale; a C-suite level annual incentive program, applicable to Employees at Amory, Clarksdale, Batesville, and Russellville; and an incentive plan for billing and collections employees to continue collections at or above historical collection percentages. Curae also provides a severance program to certain executives as discussed in more detail in the Employees and Wages Motion. For those Employees who receive them, bonuses earned under the Incentive Programs are an important aspect of their overall compensation. I believe that maintaining historical prepetition practices with regard to the Incentive Programs is essential to ensuring that the Debtors can retain their Employees and continue to operate their business and maximize value through the duration of these Chapter 11 Cases. Therefore, the Debtors seek authority, but not direction, to honor their

obligations under the Incentive Programs and to maintain the Incentive Programs in the ordinary course of the Debtors' business.

80.     The Debtors offer their Employees vacation time ("**Vacation**"), holiday pay ("**Holiday Pay**"), and paid sick days ("**Sick Leave**"). I believe that these programs are typical and customary, and continuing to offer them is necessary for the Debtors to retain Employees during the reorganization or sale process. Thus, pursuant to the Employees and Wages Motion, the Debtors request that they be authorized, but not directed, to continue to honor their Vacation, Holiday Pay, and Sick Leave policies going forward, including during the administration of these Chapter 11 Cases. The Debtors also request authority to pay any Vacation that accrued prepetition.

81.     Prior to the Petition Date, in the ordinary course of business, the Debtors reimbursed Employees for reasonable and legitimate expenses incurred on behalf of the Debtors in the scope of the Employee's employment ("**Reimbursable Expense Obligations**"). Reimbursable Expense Obligations typically include expenses for, among other things, air travel, meals, parking, mileage, and certain other business and travel related expenses. All such expenses are incurred with the applicable Employee's understanding that he or she will be reimbursed by the Debtors in accordance with the Debtors' reimbursement policy. In all cases, reimbursement is contingent on the Debtors' determination that the charges are for legitimate, reimbursable business expenses. As of the Petition Date, I estimate that the total amount of unpaid prepetition Reimbursable Expense Obligations will not exceed $2,855.34.

82.     Lastly, in the ordinary course of business, the Debtors implement various benefit plans and policies for their Employees that can be divided into the following categories, all as are described in more detail below: (a) medical and prescription benefits (the "**Medical Plans**"),

27

dental care (the "**Dental Plan**"), and vision care (the "**Vision Plan**", and collectively, with the Medical Plans and the Dental Plan the "**Health Plans**"); (b) employer paid basic life and accidental death and dismemberment insurance, optional life and accidental death and dismemberment insurance, short and long term disability insurance, and other voluntary insurance plans (collectively, the "**Income Protection Plans**"); (c) retirement savings 401(k) plan (the "**401(k) Plan**"); (d) flexible spending account plan (the "**FSA Plan**"); (e) an employee assistance program (the "**EAP**"); (f) voluntary accident and critical illness plans (the "**Accident and Illness Plans**"); (g) the severance program ("**Severance Program**"); and (h) the bonus programs (the "**Incentive Programs**", and together with the Health Plans, Income Protection Plans, the 401(k) Plan, FSA Plan, EAP, Accident and Illness Plans, Severance Program, the "**Employee Benefits Plans**"). In certain instances, the Debtors deduct specified amounts from the participating Employees' wages in connection with the Employee Benefits Plans. All obligations with respect to the Employee Benefits Plans are hereinafter referred to as the "**Employee Benefits Obligations**."

83.    The Debtors' ability to successfully operate is contingent on a reliable and loyal Workforce. Competition for qualified employees is intense in the Debtors' industry and in Debtors' locations. Thus, it is essential to assure the Employees that the Debtors will honor the Employee Obligations and continue and maintain the Employee Plans and Programs in the ordinary course of business throughout these Chapter 11 Cases. I believe that a failure to promptly do so will create concern and discontent among the Employees and could lead to resignations or, in the case of Contractors, the decision to not complete work for the Debtors or accept future hiring proposals. I believe that the loss of even a few key personnel would

64929802.4

immediately and irreparably harm the Debtors' ability to maintain operations to the detriment of their communities and other interested parties.

G. **_Motion of Debtors for Entry of an Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services, and (II) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment_ (the "Utilities Motion")**

84.     Pursuant to the Utilities Motion, the Debtors seek entry of an order (i) prohibiting Utility Providers (as defined below) from (a) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtors on account of any outstanding amounts for services rendered prepetition; (ii) determining that adequate assurance of payment for postpetition utility services has been furnished to the Utility Providers providing services to the Debtors; and (iii) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

85.     In conjunction with their day-to-day operations, the Debtors receive traditional utility services from various utility providers (each, a "**Utility Provider**" and collectively, the "**Utility Providers**") for, among other things, water, sewer, electricity, gas, telecommunications, waste disposal, and similar utility products and services (collectively, the "**Utility Services**"). The Utility Providers include, without limitation, the entities set forth on the list annexed to the Utilities Motion as Exhibit B (the "**Utility Providers List**").

86.     The Debtors paid an average of approximately $274,163.93 per month on account of all Utility Services during 2017. As "adequate assurance," the Debtors propose to segregate on their books and records, within 20 days of the Petition Date, an amount equal to the estimated cost for two weeks of Utility Services (*i.e.,* approximately $137,081.96), calculated based on the historical data for 2017 (the "**Adequate Assurance Deposit**") into one segregated bank account

29

designated for the Adequate Assurance Deposit (the "**Adequate Assurance Deposit Account**") for the benefit of all Utility Providers.

87.     I believe that uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these Chapter 11 Cases. Should any Utility Provider alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be disrupted, and such disruption could jeopardize the Debtors' ability to consummate a sale through chapter 11. Therefore, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Providers without hindering the Debtors' ability to maintain operations. I am informed and believe that the proposed Adequate Assurance Procedures (as defined in the Utilities Motion) are consistent with procedures that are typically approved in chapter 11 cases in this District. Accordingly, based on the foregoing and those additional reasons set forth in the Utilities Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**H.**     ***Motion of Debtors for Order (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with, Various Insurance Policies, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, (III) Preventing Insurance Companies From Giving Any Notice of Termination or Otherwise Modifying Any Insurance Policy Without Obtaining Relief From the Automatic Stay* (the "<u>Insurance Motion</u>")**

88.     Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to (i) continue and renew their Insurance Policies (defined below), or obtain new insurance policies, as needed in the ordinary course of business, and (ii) honor all of their prepetition and postpetition obligations, including payment of all outstanding prepetition Insurance Obligations (defined below), under and in connection with the Insurance Policies on an uninterrupted basis and in accordance with the same practices and procedures as were in

30

effect before the Petition Date, including premiums arising under the Insurance Policies and the Broker Fees (defined below). Additionally, pursuant to the Insurance Motion, the Debtors also seek entry of an order (i) authorizing the Banks (defined below) to receive, process, honor, and pay checks or electronic transfers used by the Debtors to pay the foregoing and to rely on the representations of the Debtors as to which checks are issued and authorized to be paid in accordance with this Motion, and (ii) preventing the Insurers (defined below) from giving any notice of termination or otherwise modifying or cancelling any Insurance Policies without obtaining relief form the automatic stay.

89.     In the ordinary course of their business, the Debtors maintain approximately 10 insurance policies with various insurance providers (collectively, the "**Insurers**") that provide coverage for, *inter alia*, professional liability, general liability, employee benefits liability, workers compensation liability, cyber breach liability, executive liability, automobile liability, pollution liability, and property liability (each, an "**Insurance Policy**" and collectively, the "**Insurance Policies**"), as summarized in Exhibit B annexed to the Insurance Motion.

90.     The Debtors have incurred a total of approximately $3.35 million in the aggregate in premiums under the terms of their existing Insurance Policies (collectively, the "**Insurance Obligations**").

91.     The Debtors seek authority to pay premiums under the Insurance Policies as needed in the ordinary course of business pursuant to the payment terms of each Insurance Policy.

92.     The Debtors' Insurance Broker Services. The Debtors retain the services of USI Insurance Services and Cate-Russell Insurance, Inc. (the "**Brokers**") to assist them with the procurement and negotiation of certain Insurance Policies. The Brokers assist the Debtors in

31

obtaining comprehensive insurance coverage for their operations. The Broker also provides ongoing support through the policy periods. The Debtors pay the Brokers certain commissions for services rendered (the "**Broker Fees**"). As of the Petition Date, I do not believe that the Debtors owe any amounts to the Broker on account of fees, commissions, or any other prepetition obligations. Out of an abundance of caution, however, the Debtors seek authority to honor any amounts owed to the Broker to ensure uninterrupted coverage under their Insurance Policies.

93.     The coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations. If the Debtors fail to perform their obligations under the Insurance Policies, their coverage thereunder could be voided. Such a disruption of the Debtors' insurance coverage could expose the Debtors to serious risks, including but not limited to: (i) direct liability for the payment of claims that otherwise would have been payable by the Insurers; (ii) material costs and other losses that otherwise would have been reimbursed by the Insurers under the Insurance Policies; (iii) the loss of good standing certification in jurisdictions that require the Debtors to maintain certain levels of insurance coverage; (iv) the inability to obtain similar types of insurance coverage; and (v) higher costs for re-establishing lapsed policies or obtaining new insurance coverage. I believe that any or all of these consequences could cause serious harm to the Debtors' business. Granting the relief requested in the Insurance Motion will enhance the likelihood of the Debtors' successful rehabilitation or sale process.

64929802.4

**I.** ***Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Secured Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Setting a Final Hearing, and (VI) Granting Related Relief (the "Cash Collateral and DIP Motion")***

94.     Pursuant to the Cash Collateral and DIP Motion, the Debtors seek authority to obtain postpetition financing pursuant to Bankruptcy Code section 364 in the form of the DIP Facility by entering into the DIP Credit Agreement, including the authority to use Cash Collateral; enter into the DIP Credit Agreement (as defined in the Cash Collateral and DIP Motion); grant the DIP Lender certain liens upon the Debtors' estates; provide adequate Assurance to the Prepetition First Lien Lender and Prepetition Second Lien Lender; and use Cash Collateral.

95.     Given the Debtors' current financial condition and financing arrangements, the Debtors have an immediate need to obtain the DIP Facility and to use Cash Collateral to permit the Debtors to, among other things, continue operating the Facilities for the benefit of the communities they serve, continue the orderly operation of their businesses, maximize and preserve their going concern value, make payroll, satisfy other working capital and general corporate purposes, and pay other costs, fees and expenses associated with administration of the Chapter 11 Cases. In the absence of the authority of this Court to borrow under the DIP Credit Agreement and use Cash Collateral, the Debtors' estates would suffer immediate and irreparable harm.

96.     As provided more fully in the Cash Collateral and DIP Motion and the DIP Credit Agreement,[3] MidCap will provide the Debtors with a $15 million Revolving Credit Facility. The

---

[3] The description in the DIP Facility set forth herein is qualified in its entirety by reference to the DIP Credit Agreement attached hereto as Exhibit B. In the event of any conflict between the description of the DIP Facility set forth herein and the terms of the DIP Credit Agreement, the DIP Credit Agreement shall control.

33

Revolving Credit Facility shall be secured by, among other things, a first priority lien on substantially all of the Debtor's assets and an allowed superpriority administrative claim with priority over all other administrative and unsecured claims, subject only to the Carve Out.

97.     Under the DIP Facility, and provided that certain conditions are met, the Debtors shall be entitled to new money "Overadvances" in an aggregate amount of up to $4 million. The Revolving Credit Facility shall be used to, among other things, repay the Midcap Obligations in its entirety and fund the Debtors' operations during the Chapter 11 Cases. As consideration for providing the DIP Facility, including the $4 million in new money "Overadvances", the Midcap Obligations will be "rolled-up" into the DIP Facility and secured by a first priority lien on substantially all of the Debtors' assets and superpriority administrative claim. As additional security for the DIP Facility, MidCap shall be granted a first priority lien in certain sales proceeds expected to be generated by the Debtors, all as described more fully in the DIP Credit Agreement.

98.     The Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Credit Agreement. I firmly believe that no other lender would provide financing to the Debtors on more favorable terms at this time.

99.     I submit that it is within the Debtors' sound and prudent business judgment to obtain the postpetition financing set forth in the Cash Collateral and DIP Motion. The Debtors have exercised their sound business judgment by entering into the DIP Credit Agreement. The terms and conditions set forth the DIP Credit Agreement are fair and reasonable. Further, the DIP Loan benefits the Debtors by allowing the use of Cash Collateral, thereby reducing the amount which must be borrowed.

34

100.    While the Debtors are not required to seek credit from every source, the Debtors and their professionals nevertheless undertook an extensive process to evaluate other potential sources of postpetition financing, finding none obtainable on better terms.

101.    The terms and conditions of the DIP Credit Agreement were negotiated by the parties in good faith and at arm's length. The Debtors will require a significant postpetition financing to support operations and restructuring. Only the DIP Lender was able and willing to provide a facility which was adequate, reasonable, and fair under the circumstances.

102.    I have determined, in sound business judgment, based upon analysis and the recommendations of the Debtors' professionals, that the DIP Credit Agreement provides the best opportunity for postpetition financing on the most favorable terms available. I believe it is necessary to preserve the administrative of the Chapter 11 Cases, and therefore, will benefit all parties in interest. The DIP Facility allows the Debtors to continue operations and maintain the value of the estates for an anticipated sale of all or substantially all of their assets under Bankruptcy Code section 363.

103.    I believe that the Debtors will face immediate and irreparable harm without the entry of an interim order approving the Cash Collateral and DIP Motion.

## IV.    DEBTORS' RETENTION APPLICATIONS

104.    In addition to the First Day Pleadings, Debtors have contemporaneously filed applications to retain certain professionals (collectively, the "**Retention Applications**") as follows:

(i)     *Application of Debtors for Authority to Employ and Retain Polsinelli PC as Counsel to the Debtors Nunc Pro Tunc to the Petition Date* (the "**Polsinelli Retention Application**").

(ii)    *Motion of Debtors for Authority to Employ and Retain Glass Ratner as Financial Advisors to the Debtors Nunc Pro Tunc to the Petition Date* (the "**Glass Ratner Retention Application**").

35

(iii)    *Application of Debtors for Authority to Employ and Retain Egerton McAfee as Special Counsel to the Debtors Nunc Pro Tunc to the Petition* (the "**Egerton Retention Application**").

(iv)    *Motion of the Debtors for an Order Appointing BMC Group as Claims and Noticing Agent for the Debtor, Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a)* (the "**Claims and Noticing Agent Application**").

105.    In furtherance of the objective of keeping the Facilities operating for the benefit of their respective communities and value-maximizing the sale of the Debtors' assets, the Debtors seek approval of the Retention Applications and related orders (the "**Retention Orders**"), and respectfully request that the Court consider entering the Retention Orders granting such Retention Applications.

106.    I believe that retention of the professionals as provided in the Retention Applications is necessary, advisable, and in the best interests of the Debtors and their estates.

## IV.    CONCLUSION

107.    The Debtors' goal in these Chapter 11 Cases is the continued operation of the Facilities for the benefit of the communities they serve and preserving value for the Debtors' creditors, employees, and other parties-in-interest. In the near term, however, the Debtors' immediate objective is to continue operating their business during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives will be substantially enhanced.

108.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

64929802.4

Executed this 24th day of August, 2018.

**Curae Health, Inc.**
**Amory Regional Medical Center, Inc.,**
**Batesville Regional Medical Center, Inc.,**
**Clarksdale Regional Medical Center, Inc.**
**Amory Regional Physicians, LLC**
**Batesville Regional Physicians, LLC**
**Clarksdale Regional Physicians, LLC**

Debtors and Debtors in Possession

_____
Stephen N. Clapp
President and Chief Executive Officer of Curae
Health, Inc.

64929802.4