IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 18-05665 |
| Curae Health, Inc., *et al.*[1] | ) | |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

---

**THE DEADLINE FOR FILING A TIMELY RESPONSE IS: September 18, 2018**
**THE HEARING WILL BE: September 25, 2018 at 11:00 AM Central Standard Time in Courtroom 2, 2nd Floor Customs House, 701 Broadway, Nashville, TN 37203.**

---

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that on August 31, 2018, the above-captioned debtors and debtors in possession (the "**Debtors**") filed their **MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING BIDDING PROCEDURES FOR THE SALE OF GILMORE MEDICAL CENTER, (II) AUTHORIZING THE SALE OF GILMORE MEDICAL CENTER FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (III) APPROVING STALKING HORSE PURCHASER, BREAK-UP FEE, AND OVERBID PROTECTIONS, (IV) ESTABLISHING CERTAIN PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (V) SCHEDULING AN AUCTION, (VI) SCHEDULING A HEARING AND OBJECTION DEADLINES WITH RESPECT TO THE SALE OF GILMORE MEDICAL CENTER,**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

**(VII) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (VIII) GRANTING RELATED RELIEF** (the "**Motion**"), attached hereto.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held on **September 25, 2018 at 11:00 AM Central Standard Time** in Courtroom 2, 2nd Floor Customs House, 701 Broadway, Nashville, TN 37203.

**YOUR RIGHTS MAY BE AFFECTED.** If you do not want the court to grant the Motion by entering the proposed final order, attached hereto, or if you want the court to consider your views on the Motion, then on or before **September 18, 2018**, you or your attorney must:

1.  File with the court your response or objection explaining your position. Please note: the Bankruptcy Court for the Middle District of Tennessee requires electronic filing. Any response or objection you wish to file must be submitted electronically. To file electronically, you or your attorney must go to the court website and follow the instructions at: <https://ecf.tnmb.uscourts.gov>.

If you need assistance with Electronic Filing you may call the Bankruptcy Court at (615) 736-5584. You may also visit the Bankruptcy Court in person at: 701 Broadway, 1st Floor, Nashville, TN (Monday - Friday, 8:00 A.M. - 4:00 P.M.).

2.  Your response must state the deadline for filing responses, the date of the scheduled hearing and the motion to which you are responding.

**THERE WILL BE NO FURTHER NOTICE OF THE HEARING DATE.** You may check whether a timely response has been filed by viewing the case on the court's website at <https://ecf.tnmb.uscourts.gov>. If you or your attorney does not take these steps, the court may decide that you do not oppose the relief sought in the Motion and may enter the attached final order granting that relief.

65097262.1

Dated: August 31, 2018
      Nashville, Tennessee

**POLSINELLI PC**
 */s/ Michael Malone*
Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (*Admitted Pro Hac Vice*)
Caryn E. Wang (*Admitted Pro Hac Vice*)
1201 West Peachtree Street NW
Atlanta, Georgia
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

65097262.1

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING BIDDING PROCEDURES FOR THE SALE OF GILMORE MEDICAL CENTER, (II) AUTHORIZING THE SALE OF GILMORE MEDICAL CENTER FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (III) APPROVING STALKING HORSE PURCHASER, BREAK-UP FEE, AND OVERBID PROTECTIONS, (IV) ESTABLISHING CERTAIN PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (V) SCHEDULING AN AUCTION, (VI) SCHEDULING A HEARING AND OBJECTION DEADLINES WITH RESPECT TO THE SALE OF GILMORE MEDICAL CENTER, (VII) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (VIII) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***") file this motion pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 6003, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 9013-1 of the Local Court Rules of the United States Bankruptcy Court for the Middle District of Tennessee (the "***Local Rules***"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "***Sale Procedures Order***"), (i) approving bidding procedures for the sale of the Gilmore Medical Center, a 95 bed acute care hospital and related healthcare operations and facilities located in Amory, Mississippi, owned by Debtor Amory Regional Medical Center, Inc. (the "***Gilmore Hospital***"),

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

65035107.4

(ii) authorizing the sale of the Gilmore Hospital free and clear of all liens, claims, encumbrances and other interests, (iii) approving stalking horse purchaser, break-up fee, and overbid protections, (iv) establishing certain procedures for the assumption and assignment of executory contracts and unexpired leases, (v) scheduling an auction, (vi) scheduling a hearing and objection deadlines with respect to the sale of the Hospital and assumption and assignment of executory contracts and unexpired leases, (vii) approving the form and manner of notice, and (vii) granting related relief. In support of the motion, the Debtors rely on and incorporate by reference the *Declaration of Stephen N. Clapp, Chief Executive Officer of Curae Health Inc., in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 49] (the "***First Day Declaration***") and, respectfully, state as follows:

## JURISDICTION AND VENUE

1. This court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. Venue is proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for the relief sought are 11 U.S.C. §§ 105(a), 363(b) and (f) and 365.

## SUMMARY OF REQUESTED RELIEF

5. On August 24, 2018 (the "***Petition Date***"), Amory Regional Medical Center, Inc. ("***Amory***") commenced a case under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Case***").

6. The Debtors are operating their businesses and managing their property as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2

7.      No request for the appointment of a trustee or examiner has been made in the Chapter 11 Case, and no committees have been appointed or designated.

8.      After exploring their alternatives, the Debtors have determined in their business judgment that the sale of the Gilmore Hospital is in the best interests of the Debtors' chapter 11 estates and their creditors.

9.      The Debtors have identified North Mississippi Health Services or its designee (the "*Proposed Stalking Horse*") as the prospective purchaser with the current best and highest offer for the Gilmore Hospital at $15,000,000.00 (the "*Initial Bid*") (subject to certain adjustments as set forth more specifically in the Gilmore APA (as defined below)).

10.     The Debtors intend to market-test the Initial Bid, to determine whether higher or better offers for the Gilmore Hospital can be obtained.

11.     The Debtors and the Proposed Stalking Horse have negotiated the terms of the asset purchase agreement for the Gilmore Hospital (the "*Gilmore APA*"), which sets forth the Proposed Purchased Assets (defined below) to be sold.

12.     The Gilmore APA contains certain protections the Proposed Stalking Horse and the Debtors have negotiated, to incentivize and compensate the Proposed Stalking Horse for continuing to expend money, time, and effort in connection with purchasing the Gilmore Hospital (the "*Bid Protections*"), notwithstanding that the Initial Bid will be subjected to higher or better offers.

13.     In addition, the Debtors and the Proposed Stalking Horse have negotiated certain bidding and auction procedures (the "*Bidding Procedures*"), to enable the Debtors to continue to market the Gilmore Hospital for sale, qualify additional bidders, govern submission of competing bids, and establish a date and location to conduct an auction for the Gilmore Hospital.

65035107.4

14.     Once a party is determined to be the successful bidder at the auction, the Debtors will then request final approval from the court for the sale (free and clear of all liens, claims, and encumbrances, which all such liens, claims, and encumbrances attaching to the proceeds of such sale in the same order of validity, priority, and enforceability) to the successful bidder on such terms as may be agreed upon by the Debtors and the successful bidder.

15.     To that end, the Debtors seek entry of the proposed "*Sale Procedures Order*" attached to this motion as **Exhibit A** and the proposed "*Sale Order*" attached to this motion as **Exhibit B** (the form of which it has negotiated with the Proposed Stalking Horse) providing for, among other things:

   a.     approving the Debtors' selection of the Proposed Stalking Horse as the stalking horse purchaser for the Gilmore Hospital;

   b.     approving the Gilmore APA;

   c.     approving the proposed bidding procedures attached as **Schedule 1** to the proposed Sale Procedures Order (the "*Bidding Procedures*") in connection with a sale of the Gilmore Hospital;

   d.     establishing procedures for the assumption and assignment of executory contracts, pursuant to section 365 of the Bankruptcy Code, in connection with the sale of the Gilmore Hospital;

   e.     approving the Bid Protections;

   f.     scheduling an auction (the "*Auction*");

   g.     approving the form and manner of notice of the Auction attached to this Motion as **Exhibit C** (the "*Auction Notice*");

   h.     scheduling an objection deadline and setting a hearing date to consider final approval of the sale of the Gilmore Hospital; and

   i.     granting any related relief.

<u>INTRODUCTION</u>

16.     On the Petition Date, each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11**

4

Cases"). The factual background regarding the Debtors, including their business operations and the events leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration and fully incorporated herein by reference.

17.     Amory is a Tennessee nonprofit corporation that owns and operates the Gilmore Hospital. The Gilmore Hospital is a 95-bed hospital, located in Amory, Mississippi, which provides emergency care, intensive care, a wound care center, diagnostics, surgery, and many other inpatient & outpatient medical services, treatments and programs.

18.     Debtor Curae Health, Inc. ("*Curae*") acquired the Gilmore Hospital from Community Health Systems, Inc. ("*CHS*") in 2017. Following the acquisition, the Gilmore Hospital suffered a dramatic decline in reported net revenue and incurred higher than anticipated operating costs.

19.     Given the Gilmore Hospital's poor performance, accounts payable continued to grow.  Several of the Gilmore Hospital's large vendors began to request payment plans for the older invoices.  Some vendors moved to requiring payment before they would deliver supplies or services. Given an impending complete lack of liquidity, the Gilmore Hospital filed for Chapter 11 on the Petition Date along with its debtor affiliates to accomplish an orderly sale of their assets in order to maximize their value and ensure the continued operation of the Gilmore Hospital and the other hospitals for the benefit of the communities they serve.  As of the Petition Date, the Debtors had approximately $3.4 million of cash and cash equivalents. The Debtors' aggregate liabilities as of the Petition Date are approximately $96 million.

20.     The Debtors engaged in diligent efforts prior to the Petition Date to locate a buyer willing to acquire the Gilmore Hospital and the other hospitals operated by the Debtors. In the Spring of 2018 the Debtors provided marketing materials to numerous parties, including the

65035107.4

Proposed Stalking Horse, and engaged in discussions with those parties regarding a sale of the Gilmore Hospital. Unfortunately, given the Gilmore Hospital's financial distress and stretched payables, no buyer other than the Proposed Stalking Horse was willing enter into a purchase agreement for the Gilmore Hospital, and the Proposed Stalking Horse was only willing to purchase the Gilmore Hospital via a sale pursuant to Section 363 of the Bankruptcy Code. Given the Gilmore Hospital's financial condition and the Sale Milestones (as defined below), Debtors believe it is in the best interests of the estate to proceed with a sale process as soon as possible.

21.     On September 29, 2018, the Court entered its *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing* [Docket No. 60] (the "***Interim DIP Order***"). The Interim DIP Order established certain milestones and deadlines that the Debtors must meet with respect to the sale of the Gilmore Hospital, including the following (collectively, the "*Sale Milestones*"):

    a.  Delivery of a signed Asset Purchase Agreement for the Gilmore Hospital within 7 days of the Petition Date (August 31, 2018);

    b.  The filing of this Motion within 10 days of the Petition Date (September 3, 2018);

    c.  Entry of the Sale Procedures Order within 35 days of the Petition Date (September 28, 2018);

    d.  The occurrence of an auction for the Gilmore Hospital within 90 days of the Petition Date (November 22, 2018);

    e.  Entry of a sale order for the Gilmore Hospital within 100 days of the Petition Date (December 2, 2018); and

    f.  The closing of a sale of the Gilmore Hospital within 110 days of the Petition Date (December 12, 2018).

6

65035107.465035107.4

Case 3:18-bk-05665    Doc 79    Filed 08/31/18    Entered 08/31/18 18:22:55    Desc Main
                              Document      Page 9 of 177Case 3:18-bk-05665    Doc 79    Filed 08/31/18    Entered 08/31/18 18:22:55    Desc Main
                              Document      Page 9 of 177

In accordance with the Interim DIP Order and the Sale Milestones imposed upon the Debtors, the Debtors file this Motion.

## PROPOSED STALKING HORSE AND GILMORE APA

22.     As a result of the Debtors' marketing efforts, the Debtors recently executed the Gilmore APA with the Proposed Stalking Horse for the purchase of the Gilmore Hospital and certain assets necessary for or related to the operation of the Gilmore Hospital (as more fully set forth in the Gilmore APA, the "***Proposed Purchased Assets***").

23.     A true and correct copy of the Gilmore APA is attached to this motion as **Exhibit D** and is incorporated in this paragraph by reference.

24.     The Debtors propose to sell the Proposed Purchased Assets to the Proposed Stalking Horse (or such other purchaser as determined in accordance with the Bidding Procedures) free and clear of all liens, claims, encumbrances, and other interests.

25.     The key terms of the Gilmore APA are as follows:

    a.     **Purchase Price:** $15,000,000 (including $2,000,000 the Proposed Stalking Horse is placing into an escrow account at Closing), subject to certain adjustments as set forth more specifically in the Gilmore APA

    b.     **Proposed Purchased Assets:** Substantially all assets and operations of the Gilmore Hospital

    c.     **Closing Date:** On or before December 12, 2018 or the date on which the Proposed Stalking Horse obtains regulatory approval to operate the Gilmore Hospital, whichever is later

    d.     **Break-up Fee:** 4.00% of the Initial Bid

    e.     **Minimum Initial Overbid:** $1,000,000

    f.     **Bid Increments:** $100,000

<u>**PROPOSED BIDDING PROCEDURES**</u>

26.     The Debtors are seeking approval of the Bidding Procedures to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids on a timeline that allows the Debtors to consummate a sale of the Gilmore Hospital and is designed to encourage all prospective bidders to put their best bids forward in order to provide the highest or otherwise best available recoveries to the Debtors' stakeholders.

27.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner under the circumstances, the Debtors developed the Bidding Procedures, attached as **Schedule 1** to the proposed Sale Procedures Order.

28.     The salient terms of the Bidding Procedures are set forth below:

    a.    **Immediate Marketing**. Immediately upon execution of the Gilmore APA and the filing of this Motion, the Debtors may begin marketing the Gilmore Hospital to competing bidders, subject to such bidders executing an appropriate confidentiality agreement.

    b.    **Potential Bidders**. To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a sale (a "***Potential Bidder***") must deliver or have previously delivered, if determined to be necessary by the Debtors in their sole discretion, the following documents:

        i.    an executed confidentiality agreement on terms acceptable to the Debtors (a "***Confidentiality Agreement***"), to the extent not already executed;

        ii.    identification of the Potential Bidder and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction; and

        iii.    unless publicly available in a filing under applicable securities laws or regulations, the most current audited and latest unaudited financial statements (the "***Financials***") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Proposed Purchased Assets (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors and (y) a written

8

commitment acceptable to the Debtors and their advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the Sale).

c. **Due Diligence**. Only Potential Bidders whose Financials, the Financials of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate a transaction for the purchase of the Proposed Purchased Assets shall be eligible to receive due diligence information and access to the Debtors' electronic data room, physical data room, and to additional non-public information regarding the Debtors. **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**. The Debtors will provide to each Potential Bidder that satisfies the foregoing reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any such Potential Bidder to the Debtors' electronic data room. For all Potential Bidders, the due diligence period will end on the Bid Deadline and, subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Proposed Purchased Assets, liabilities of the Debtors, or the potential sale of the Proposed Purchased Assets to any person except to a Potential Bidder or to such Potential Bidder's duly authorized representatives, to the extent provided in the applicable Confidentiality Agreement. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; provided that the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate a transaction to acquire the Proposed Purchased Assets.

The Debtors also reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder that intends in good faith to, or has the capacity to, consummate a transaction to acquire the Proposed Purchased Assets.

i. **Communications with Potential Bidders**. Notwithstanding anything to the contrary in the Bidding Procedures, all substantive direct communications between and amongst Potential Bidders

9

shall involve the Debtors and the Debtors' advisors, to the extent reasonably practicable.

ii.   **Due Diligence from Potential Bidders**. Each bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate a transaction to acquire the Proposed Purchased Assets or discussions with other Potential Bidders regarding any topic and with any party regarding the Debtors and/or any of the Proposed Purchased Assets. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such bidder is not a Qualified Bidder or that a Bid made by such bidder is not a Qualified Bid.

iii.  The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in the Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process, in connection with a potential transaction to acquire the Proposed Purchased Assets, or otherwise in accordance with the terms of any applicable Confidentiality Agreement.

iv.   Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (i) with the prior written consent of such Potential Bidder (or Qualified Bidder) and the Debtors; (ii) to the applicable Potential Bidder or Qualified Bidder; and (iii) as otherwise required or allowed by any applicable Confidentiality Agreement with respect to a particular Potential Bidder or Qualified Bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

d.   **Bid Requirements**. A proposal, solicitation, or offer for a purchase and sale of the Proposed Purchased Assets (each, a "***Bid***") that is submitted in writing and satisfies each of the following requirements (the "***Bid Requirements***") as determined by the Debtors, in their reasonable business judgment, in consultation with the Committee, MidCap Financial Trust, and ServisFirst Bank (collectively, the "***Sale Notice Parties***"), shall constitute a "***Qualified Bid***."

i. **Assets**. Each Bid must clearly state which assets and liabilities of the Debtors that the Qualified Bidders are agreeing to purchase and assume.

ii. **Purchase Price**. Each Bid must clearly set forth the purchase price in U.S. dollars to be paid for each individual Proposed Purchased Asset subject to the applicable asset package, including and identifying separately any cash and non-cash components (the "*Purchase Price*").

iii. **Deposit**. On or before the Bid Deadline, each Bid, other than a credit bid, must be accompanied by a cash deposit in the amount equal to 5% of the aggregate Purchase Price of the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "*Deposit*").

iv. **Assumption of Obligations**. Each Bid must clearly state which liabilities of the Debtors the bidder is agreeing to assume.

v. **Qualified Bid Documents**. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transaction(s) contemplated by the Bid and shall include a schedule of assumed contracts, to the extent applicable to the Bid, and all other material documents integral to such Bid (the "*Qualified Bid Documents*"). Such documents must be based on form documents provided by the Debtors (including a summary of each Bid as may be reasonably requested by the Debtors).

vi. **Committed Financing**. To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the transaction(s) set forth in its Bid with cash on hand, each Bid must include unconditionally committed financing from a reputable financial institution documented to the satisfaction of the Debtors that demonstrates that the Potential Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Proposed Purchased Assets and the proposed transaction(s). Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

vii. **Contingencies; No Financing or Diligence Outs**. A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence,

65035107.4

but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall be acceptable to the Debtors in their business judgment.

viii. **Identity**. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific persons, including financial advisors and counsel, if any, that the Debtors should contact regarding such Bid.

ix. **Demonstrated Financial Capacity**. A Potential Bidder must have, in the Debtors' business judgment, the necessary financial capacity to consummate the proposed transaction(s) required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

x. **Time Frame for Closing**. A Bid by a Potential Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors, in consultation with the Sale Notice Parties.

xi. **Binding and Irrevocable**. A Potential Bidder's Bid shall be irrevocable unless and until the Debtors accept a higher Bid and such Potential Bidder is not selected as the Backup Bidder.

xii. **Expenses; Disclaimer of Fees**. Each Bid, other than the Stalking Horse Purchaser's Bid, must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and, by submitting its Bid, is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under Section 503(b) of the Bankruptcy Code.

12

xiii. **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

xiv. **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the bidder's Bid.

xv. **Adherence to Bid Procedures.** By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

xvi. **Regulatory Approvals and Covenants.** A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the Sale, if any, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible).

xvii. **Consent to Jurisdiction**. The Potential Bidder must submit to the jurisdiction of this court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the documents governing the sale of the Proposed Purchased Assets or any Bid or Qualified Bid, and the Closing, as applicable.

xviii. **Bid Deadline**. Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before 5:00, p.m. (prevailing Central Time) on **November 12, 2018** (the "***Bid Deadline***") by:

65035107.4

1. The Debtors, Curae Health, Inc., Attn: Stephen N. Clapp (steve.clapp@curaehealth.org);

2. Counsel to the Debtors, Polsinelli PC, Attn: David E. Gordon (dgordon@polsinelli.com); and

3. Financial Advisors to the Debtors, GlassRatner, Attn: Marshall Glade (mglade@glassratner.com).

e. **Qualified Bidders**.

i. A "*Qualified Bidder*" is a Potential Bidder whose Financials, the Financials of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate a transaction for the purchase of the Proposed Purchased Assets, whose Bid is a Qualified Bid, and that the Debtors determine should be considered a Qualified Bidder, in consultation with the Sale Notice Parties. Within one business day after the Bid Deadline, the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder.

ii. If any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below), if any, and all accumulated interest on or within three (3) business days after the Bid Deadline.

iii. After the Bid Deadline, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw a Qualified Bid, except for proposed amendments to increase their consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in the Bidding Procedures; provided that any Qualified Bid may be improved at the Auction. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in the Bidding Procedures.

iv. For purposes of the Bidding Procedures, the Stalking Horse Purchaser shall be deemed Qualified Bidder.

e. **Right to Credit Bid**. Any Qualified Bidder who has a valid and perfected lien on any of the Proposed Purchased Assets (a "*Secured Creditor*") and the right and power to credit bid claims secured by such liens, shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims, within the meaning of section 363(k) of the Bankruptcy Code; provided that a Secured Creditor shall have the right to credit bid its

14

secured claim only with respect to the collateral by which such Secured Creditor is secured.

f. **Auction**. If the Debtors receive more than one Qualified Bid for the Proposed Purchased Assets, the Debtors will conduct the Auction, to determine the Successful Bidders with respect to the Proposed Purchased Assets. If the Debtors do not receive a Qualified Bid for the Proposed Purchased Assets, the Debtors will not conduct the Auction.

No later than two (2) business days after the Bid Deadline, at 5:00 p.m. (prevailing Central Time), the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid or combination of Qualified Bids, for which such Qualified Bidder submitted a Qualified Bid or combination of Qualified Bids, as determined in the Debtors' reasonable business judgment, in consultation with the Sale Notice Parties (the "***Baseline Bid***"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid may take into account any factors the Debtors reasonably deem, in consultation with the Sale Notice Parties, relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the amount and nature of the total consideration (including the amount of cash paid to or remaining in the estates pursuant to the Qualified Bid); (b) the likelihood of the Qualified Bidder's ability to close, and the timing of closing, the transaction(s) contemplated by the Qualified Bid; (c) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (d) the tax consequences of such Qualified Bid (collectively, the "***Bid Assessment Criteria***").

The Auction shall take place at 9:00 a.m. (prevailing Central Time) on **November 15, 2018**, at the offices of Polsinelli PC, in Nashville, Tennessee, or such later date and time as selected by the Debtors. The Auction shall be conducted in a timely fashion according to the following procedures:

i. **The Debtors Shall Conduct the Auction**. The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bids. All incremental Bids made thereafter for the Proposed Purchased Assets shall be Overbids and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids on the Proposed Purchased Assets. The Debtors shall maintain a written transcript of all Bids made and

15

announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only Qualified Bidders and their legal and financial advisors, and the members of and advisors to the Sale Notice Parties, and each such parties' respective legal and financial advisors shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to bid at the Auction.

ii.    **Terms of Overbid.** "*Overbid*" means any Bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each applicable Overbid must comply with the following conditions:

A.    **Initial Overbid.** If the Proposed Stalking Horse's Initial Bid is the Baseline Bid, the initial overbid shall exceed the Baseline Bid by $1,000,000. If the Baseline Bid is a Qualified Bid submitted by a Qualified Bidder other than the Proposed Stalking Horse, the initial overbid shall exceed the Baseline Bid by $100,000.

B.    **Minimum Overbid Increments**. Any Overbid following the initial overbid or following any subsequent Prevailing Highest Bid (as defined below) for the Proposed Purchased Assets shall be in increments of value equal to (or exceeding) $100,000. The Debtors may establish different overbid increments at the Auction for any portion or combination of the Proposed Purchased Assets, as determined by the Debtors in an exercise of their business judgment, in consultation with the Sale Notice Parties.

C.    **Conclusion of Each Overbid Round**. Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend time to time, the "*Overbid Round Deadline*") by which time any Overbids must be submitted to the Debtors.

Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified, after consultation with the Sale Notice Parties, an Overbid as being higher or otherwise better than the best Bid the Debtors had prior to receiving such Overbid (in each instance, the "*Prevailing Highest Bid*"). The Debtors shall describe to all Qualified Bidders the material terms of any

16

new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

D.    **Overbid Alterations**. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Sale Notice Parties, but shall otherwise comply with the terms of these Bidding Procedures.

E.    **Overbids by the Stalking Horse Purchaser.** The Stalking Horse Purchaser shall be permitted to include the full amount of the Break-up Fee in each bid by the Stalking Horse Purchaser for the purposes of comparison to any Overbid, in connection with each round of bidding at the Auction.

iii.    **Consideration of Overbids**. The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Sale Notice Parties, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions between the Debtors and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount.

iv.    **Closing the Auction**.

A.    The Auction shall continue until there is only one Bid that the Debtors determine, in their reasonable business judgment, to be the highest or otherwise best Bid for the Proposed Purchased Assets. Such Bid shall be declared the "*Successful Bid*," and such Qualified Bidder, the "*Successful Bidder*" and at which point the Auction will be closed as to the Proposed Purchased Assets subject to such Successful Bid. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is

17

conditioned upon approval by the Court of the Successful Bid.

B. For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under the applicable law.

C. The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

D. As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid(s) and Backup Bid(s) to be filed with this court.

v. **No Collusion; Good-Faith *Bona Fide* Offer**. Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding or otherwise in connection with the sale of the Proposed Purchased Assets; and (ii) its Qualified Bid and subsequent Overbids are a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

g. **Backup Bidder**. The Qualified Bidder with the second-best Qualified Bid (the "***Backup Bid***") at the Auction (if the Auction is conducted) shall be required to serve as a backup bidder (the "***Backup Bidder***"). The Backup Bidder's Deposit, if any, shall be held in escrow until the closing of the transaction with the applicable Successful Bidder. If the Backup Bidder is the Proposed Stalking Horse, the Proposed Stalking Horse shall serve as the Backup Bidder for only thirty (30) days following the Auction. If a Successful Bidder fails to consummate its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Qualified Bid of such Backup Bidder without further order of the Court or notice to any party.

In such case, the defaulting Successful Bidder's Deposit, if any, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

h. **Highest or Otherwise Best Bid**. When determining the highest or otherwise best Qualified Bid or Overbid, as compared to other Qualified

65035107.4

Bids or Overbids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate, in consultation with the Sale Notice Parties: (a) the amount and nature of the total consideration (including the amount of cash paid to or remaining in the estates pursuant to the Bid); (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (d) the tax consequences of such Bid.

i.    **Reservation of Rights**. The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, in consultation with the Sale Notice Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Proposed Purchased Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids, Qualified Bids, or Overbids. Provided, however, that the modifications are not inconsistent in any material respect with the Bidding Procedures or the Gilmore APA.

j.    **Consent to Jurisdiction**. All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of this court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Qualified Bid Documents, as applicable.

k.    **Sale Hearing**. The Debtors respectfully request that a hearing to consider approval of the Sale to the Successful Bidders (the "*Sale Hearing*") take place on or before 11:00 a.m. (prevailing Central Time) on **November 27, 2018**, before the Honorable Charles M. Walker, at the Court, Courtroom 2, 701 Broadway, Nashville, TN. The Sale Hearing may be adjourned from time to time without further notice to parties in interest other than by announcement of the adjournment in open court on the date scheduled for such Sale Hearing or a notice filed with the court, as applicable; provided, however, that if the Proposed Stalking Horse is the Successful Bidder, the Sale Hearing shall not be adjourned without the express written consent of the Proposed Stalking Horse or order of Court. Any objection on any basis to the proposed Sale to the Successful Bidders must be filed with the court no later than **November 20, 2018, at 5:00 p.m. (prevailing Central time)** (the "*Objection Deadline*").

65035107.4

**The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.**

At the Sale Hearing, the Debtors shall present the Successful Bids to this court for approval.

l.   **Return of Deposit**. The Deposit, if any, of the Successful Bidder shall be applied to the respective Purchase Price of such transaction at closing. The Deposits, if any, for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder, and the Backup Bidder) on or within three (3) business days after the Auction. Upon the return of the Deposits, if any, their respective owners shall receive any and all interest that will have accrued thereon.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the Deposit, if any, deposited by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the proposed transaction with the applicable Backup Bidder without the need for an additional hearing or order of this court.

29.   Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize the value of the Debtors' estates, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

30.   On or within three (3) business days after entry of the Sale Procedures Order, the Debtors will cause the Auction Notice, substantially in the form attached as **Exhibit C**, to be served on the following parties or their respective counsel, if known: (a) the Office of the United States Trustee for the Middle District of Tennessee; (b) the Centers for Medicare and Medicaid Services; (c) the State of Tennessee Department of Health Division of Licensure and Regulation Office of Health Care Facilities; (d) the Mississippi State Department of Health; (e) those parties

65035107.4

listed on the consolidated list of creditors holding the thirty (30) largest unsecured claims against the Debtors; (f) counsel to any official committee(s) established in these cases pursuant to Section 1102 of the Bankruptcy Code; (g) ServisFirst Bank and its counsel; (h) Midcap Financial Trust and its counsel; (i) CHS/Community Health Systems, Inc. and its counsel (j) all Tennessee local counsel having entered a notice of appearance in these cases; (k) the Internal Revenue Service; (l) the Tennessee Attorney General's Office; (m) the Mississippi Attorney General's Office; (n) the United States Attorney's Office for the Northern District of Mississippi, (o) the Tennessee Secretary of State; (p) counterparties to the Contracts ("***Contract Counterparties***") and (q) all parties entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013.

31.     In addition, within five (5) business days of entry of the Sale Procedures Order, the Debtors will publish the Auction Notice, with any modifications necessary for ease of publication, once in the (*Monroe Journal and Daily Journal* (both papers for publishing legal notices in Amory, Mississippi) and shall publish the Auction Notice on the website for these Chapter 11 Cases maintained by BMC Group ([www.bmcgroup.com/curaehealth](www.bmcgroup.com/curaehealth)) in order to provide notice to any other potential interested parties.

### ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

32.     The Gilmore APA provides that certain executory contracts and unexpired leases will be assumed and assigned, as part of the transaction contemplated by the Gilmore APA.

33.     Pursuant to Local Rule 9013-1 or 9075-1, if necessary, on or before October 29, 2018, the Debtors will serve a notice, substantially in the form attached to this motion as **Exhibit E** (the "***Assumption Notice***"), on all parties to executory contracts or unexpired leases identified by the Proposed Stalking Horse or other Qualified Bidder as potentially being assumed and assigned.

65035107.4

34. The Assumption Notice will provide notice of, among other things, (a) this motion and the relief sought, (b) the assumption and assignment of the applicable executory contract or unexpired lease, as applicable, and (c) the proposed cure amount(s) for the applicable executory contract or unexpired lease.

35. In addition, each Assumption Notice will set forth the Debtors' proposed procedures for resolving any disputes regarding the assumption and assignment of any executory contract or unexpired lease (the "*Assumption and Assignment Procedures*").

<u>BASIS FOR RELIEF</u>

**I.     The Court Should Approve the Forms and Manner of Notice.**

36. The Debtors have proposed specific provisions in the Bidding Procedures intended to provide notice of the Bidding Procedures, notice of the Debtors' plan to sell the Proposed Purchased Assets pursuant to the terms of the Gilmore APA, notice of the potential for third-parties to submit competing bids, and notice as to the procedures and deadlines for third-parties to submit competing bids or otherwise present objections to the relief contemplated by the Motion.

37. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business. Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein. The Debtors seek approval of the Auction Notice as proper notice of the Auction. The Debtors submit that notice of this motion and the related hearing to consider entry of the Sale Order, coupled with service of the Auction Notice, as provided for herein, constitutes good and adequate notice of the Auction and the proceedings

22

with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtors request that this Court approve the form and manner of the Auction Notice.

**II.    The Bidding Procedures are fair, designed to maximize the value received for the Proposed Purchased Assets, and are consistent with the Debtors' reasonable business judgment.**

38.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Cont'l Air Lines, Inc.,* 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification.'") (internal citations omitted); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (explaining that courts usually defer to the trustee's "legitimate business justification" with respect to the "disposition of assets of the estate").

39.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *In re Nashville Senior Living*, No. 08-07254, 2008 Bankr. LEXIS 3197, at *4–5 (Bankr. M.D. Tenn. Oct. 22, 2008) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *see also In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3rd Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics Corp., v. Chinery*, 330 F.3d 548, 573 (3rd Cir. 2003) (same); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating a primary objective in bankruptcy sales is to enhance the value of the estate at hand).

65035107.4

40. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures, such as break-up fees, "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets are to be enforced strictly in order to provide an adequate basis for comparison of offers, and to provide for an [sic] fair and efficient resolution of bankrupt estates").

41. The Debtors believe that the proposed Bidding Procedures will continue the prepetition sale process and ultimately promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Proposed Purchased Assets.

42. The Bidding Procedures will allow the Debtors to conduct the sale and marketing process in a controlled, fair, and open fashion and are designed to encourage participation by financially capable bidders who can demonstrate the ability to close a transaction.

43. Specifically, the Bidding Procedures contemplate an open market process with minimum barriers to entry and provide potentially interested parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

44. Due to the time constraints imposed by Proposed Stalking Horse's desire to close the sale expeditiously and the financial condition of the Gilmore Hospital, as well as the tight timeframe imposed upon the Debtors by the Sale Milestones, the Debtors believe the Bidding Procedures permit the Debtors to promptly and prudently determine whether third-parties have

24

interest in performing due diligence and evaluating whether to submit a formal and binding bid for the Proposed Purchased Assets.

45.     In addition, the Debtors believe that the proposed Bidding Procedures fairly balance the need to market the Proposed Purchased Assets and market test the Gilmore APA with the desire to minimize the risk of operating losses during any marketing and sale process.

46.     In addition, the Bidding Procedures provide Potential Bidders that may have otherwise applicable rights of first refusal (and similar rights) a fair opportunity to effectively exercise those rights by participating in the marketing and sale process.

47.     Accordingly, the Debtors should be deemed to have complied with or satisfied any such provisions by conducting a sale pursuant to the Bidding Procedures. *See In re Farmland Indus., Inc.*, 284 B.R. 111, 119-20 (Bankr. W.D. Mo. 2002) (relying on the fact that where the first refusal right holder did not receive notice of the auction, the bidding process will be reopened for the highest bidder and the right holder); *but see In re Mr. Grocer*, 77 B. R. 349, 352-53 (Bankr. D.N.H. 1987) (holding that rights of first refusal are *per se* unenforceable under section 365(f) of the Bankruptcy Code).

48.     At the same time, the Bidding Procedures provide the Debtors with an opportunity to consider competing bids and select the highest or otherwise best offers for the completion of the sale.

49.     As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable at or above market.

50.     The Debtors submit that the Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously

approved by this district and other Tennessee bankruptcy courts. *See, e.g., In re Nashville Senior Living*, 2018 Bankr. LEXIS 3197; Expedited Order Pursuant to 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006 (I) Approving Procedures for Sale of Debtors' Assets and Breakage Fees Pursuant to Asset Purchase Agreement With Oreck Acquisition Holdings LLC; (II) Scheduling Bid Deadline and Sale Hearing Date; (III) Establishing Assumption and Assignment Procedures; and (IV) Fixing Notice Procedures and Approving Form of Notice, *In re Oreck Corporation*, No. 13-4006 (Bankr. M.D. Tenn. May 24, 2013).[2]

51. A secured creditor is allowed to "credit bid" the amount of its claim in a sale.

52. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).

53. Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value. *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)* 432 F.3d 448, 459–60 (3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)" including the secured and unsecured portions thereof).

54. Accordingly, secured creditors are entitled to credit bid some or all of the claims secured by their collateral in accordance with the Bidding Procedures, pursuant to section 363(k) of the Bankruptcy Code.

---

[2] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

65035107.4

55.     Accordingly, for all of the foregoing reasons, the Debtors believe the Bidding Procedures: (a) will encourage robust bidding for the Proposed Purchased Assets; (b) are consistent with other previously approved by courts in this district; and (c) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings and should be approved.

## III.     The Bid Protections have a sound business purpose and should be approved.

56.     The Gilmore APA and Bidding Procedures contain certain protections that the Debtors and Proposed Stalking Horse have negotiated at length to incentivize and compensate the Proposed Stalking Horse for serving as a stalking horse purchaser whose bid will be subjected to higher or better offers.

57.     The Proposed Stalking Horse has specifically bargained for the Break-up Fee, which is reasonably calculated to, among other things, reimburse the Proposed Stalking Horse for the Proposed Stalking Horse's reasonable out-of-pocket expenses incurred in conducting the due diligence necessary to serve as the Proposed Stalking Horse.

58.     In addition, the Proposed Stalking Horse has specifically bargained for a minimum initial overbid in the amount of $1,000,000 (the "*Minimum Overbid*"), which is designed to (a) reasonably protect the Proposed Stalking Horse by encouraging only serious additional and higher bids, and (b) protect the Debtors by ensuring that any overbid covers the cost of the Break-up Fee and results in additional proceeds material enough to justify the risk of closing with a new buyer.

59.     Bidding incentives such as the Break-up Fee and Minimum Overbid encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Proposed Purchased Assets, despite the inherent risks and uncertainties associated with an auction process.

65035107.4

60. In conjunction with the Bidding Procedures, the Bid Protections are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values.

61. The use of a stalking horse in a public auction process is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Official Comm. of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-CV-219, n.1 (E.D. Wis. July 7, 2011).

62. As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bid protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id*. (internal citations omitted).

63. Therefore, the use of bid protections has become an established practice in chapter 11 cases.

64. Historically, courts have approved bidding incentives, including incentives such as the Break-up Fee and Minimum Overbid, under the business judgment rule. *E.g.*, *In re 995 Fifth Ave. Assocs. L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y.) (bidding incentives "may be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking"); *see also In re Bear Island Paper Co., L.L.C.*, No. 10-31202, 2010 Bankr. LEXIS 6046, at *7 (Bankr. E.D. Va. Sept. 1, 2010) (approving bid protections).

65. Indeed, break-up fees and other forms of bid protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the

65035107.4

Bankruptcy Code.

66.    "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value." *In re Integrated Res., Inc.*, 147 B.R. at 659-60 (emphasis added).

67.    Specifically, bid protections, such as break-up fees, may "be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks that it is undertaking." *In re Integrated Res., Inc*., 147 B.R. at 660 (break-up fees can prompt bidders to commence negotiations and "also ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's (i.e., 'stalking horses' due diligence").

68.    Courts analyze the appropriateness of bidding incentives under the "business judgment rule" standard, and the law is well established that courts consider whether (a) the incentive hampers, rather than encourages, bidding, and (b) the amount of the incentive is unreasonable relative to the proposed purchase price. *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible); *see also In re ASARCO L.L.C.*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining three-part test used to determine whether expense reimbursement was permissible under business judgment rule); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992) (to evaluate bid protections, courts

65035107.4

should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing and in the exercise of honest judgment).

69.     Here, the Debtors believe the Break-up Fee and Minimum Overbid benefit the estates because they: (a) enable the Debtors to maintain the commitment of the Proposed Stalking Horse to continue expending money, time, and effort in connection with purchasing the Proposed Purchased Assets, notwithstanding that its offer is subjected to higher and better offers; and (b) guarantee a minimum bid for the auction process.

70.     In addition, the Break-up Fee and Minimum Overbid are the product of good faith, arm's length negotiations between the Debtors and Proposed Stalking Horse, each of whom was represented by counsel.

71.     As a result, the Break-up Fee is specifically designed and calculated to reimburse the Proposed Stalking Horse for its reasonable out of pocket expenses incurred in connection with, among other things, reviewing and assessing the potential transaction and the retention of third-party consultants and advisors to perform financial, operational, legal, and regulatory analysis.

72.     The Break-up Fee represents 4.00% of the Initial Bid. The sale of the Gilmore Hospital implicates many issues related to the regulatory environment under which a hospital operates and treats patients. The cost, manpower resources, and time commitment necessary for such review, analysis, and preparation of definitive agreements supports establishing a 4.00% Break-up Fee. Thus, the Debtors believe the amount of the Break-up Fee is reasonable in light of the size and complexity of the transaction. The Break-up Fee is reasonable given the range of break-up fees approved by courts in other stalking horse sales. *See e.g., Calpine Corp. v. O'Brien*

65035107.4

*Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536 (3d Cir. 1999) (break-up fee of approximately 4.00% is reasonable in relation to the purchase price); *In re Oreck Corp., et. al.*, Case No.: 13-4006 (Bankr. M.D. Tenn. May 24, 2013) (Dkt. # 95, 199) (court approved break-up fee of 3.65% plus expense reimbursement of up to $1,200,000 in a transaction with approximately $21,882,000 purchase price); *In re Kaiser Aluminum Corp.*, Case No. 02-10429 (JFK) (Bankr. D. Del. June 21, 2004) (court approved break-up fee of 4.6% or $1.05 million in connection with a $23 million sale transaction); *Gey Assocs. Gen. P'ship v. 310 Assocs., L.P.*, No. 02 Civ. 0710 (SHS), 2002 U.S. Dist. LEXIS 20759 (S.D.N.Y. Oct. 29, 2002) (3.23% break-up fee of $ 100,000 for a $ 3.1 million purchase price is reasonable); *In re Chi-Chi's, Inc.*, Case No. 03-13063 (CGC) (Bankr. D. Del. Nov. 4, 2003) (court approved break-up fee of 5% or $200,000 in connection with a $4 million sale transaction); *In re America Classic Voyages Co.*, Case No. 01-10954 (EIK) (Bankr. D. Del. March 20, 2002) (court approved break-up fee of 6.6% or $250,000 in connection with a $3.75 million sale transaction).

73.     Moreover, the Break-up Fee and Minimum Overbid will not hamper the ability of other parties to participate in the auction process.

74.     Under this standard, the Debtors' request to approve, in their reasonable business judgment, the Bid Protections passes muster.

75.     The Debtors recognize the significant expenditure of time, energy, and resources that has gone into preparing a stalking horse bid, and that bidding incentives have encouraged the Proposed Stalking Horse to invest the requisite time, money, and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Proposed Purchased Assets, despite the inherent risks and uncertainties of the chapter 11 process.

76.     Moreover, the Proposed Stalking Horse's Initial Bid will provide a floor with

respect to the Proposed Purchased Assets.

77.     For the reasons set forth above, the Debtors respectfully request approval of the Bid Protections.

## IV.     The Assumption and Assignment Procedures are fair, reasonable, and should be approved.

78.     The Assumption and Assignment Procedures comply with section 365 of the Bankruptcy Code and Rule 6006 of the Bankruptcy Rules and provide an efficient and economical procedure for providing notice of the potential assumption and assignment of contracts and leases and the resolution of any objections relating to such assumption and assignment.

79.     Moreover, the Assumption Notice provides adequate notice to counterparties to executory contracts and unexpired leases, regarding the potential assumption and assignment of their respective executory contract or unexpired lease.

## V.     The sale of the Proposed Purchased Assets should be free and clear of liens, claims, and encumbrances.

11 U.S.C. § 363(f) provides:

> The Trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate only if:
>
> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2)     such entity consents;
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4)     such interest is a bona fide dispute; or
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

80.     Pursuant to 11 U.S.C. § 363(f), the Debtors seek authority to sell and transfer the Proposed Purchase Assets free and clear of all liens, claims, and encumbrances.

65035107.4

81.     A sale free and clear of liens, claims, encumbrances, and other interests is necessary to maximize the value of the Proposed Purchased Assets.

82.     A sale subject to liens, claims, encumbrances, and other interests would result in a lower purchase price and be of substantially less benefit to the Debtors' estates.

83.     A sale free and clear of liens is particularly appropriate under the circumstances, because any liens, claims, encumbrances, and other interests in, to, or against any of the Proposed Purchased Assets that exists immediately prior to the closing of the sale will attach to the sale proceeds with the same validity, priority, force, and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest.

84.     The Debtors have fully disclosed and requested the court's approval of all of the terms and conditions of the proposed sale.

85.     The Debtors will further provide notice of the Bidding Procedures and opportunity to present higher or better offers for the Proposed Purchased Assets.

86.     The Bidding Procedures are both substantively and procedurally fair and are designed to solicit the highest and best offers for the Proposed Purchased Assets.

87.     To date, there has been no collusion between any parties regarding the Proposed Purchased Assets, and the Debtors are requiring all parties participating in the Bidding Procedures to certify that they have not colluded in any way in connection with the potential purchase of the Proposed Purchased Assets.

88.     The Proposed Stalking Horse is not an insider or related to the Debtors.

89.     The Gilmore APA has been negotiated by the Debtors and the Proposed Stalking Horse at arms' length.

90.     Accordingly, the Debtors submit that the conduct of the negotiations and potential

65035107.4

sale of the Proposed Purchased Assets has been in good faith.

91. Therefore, the Debtors submit that ordering the sale of the Proposed Purchased Assets free and clear is both warranted and appropriate.

## VI. This court should approve the sale of the Proposed Purchased Assets.

92. The proposed sale of the Proposed Purchased Assets pursuant to the Gilmore APA (as may be modified at the Auction in accordance with the Bidding Procedures) is supported by sound business justifications and, at the Sale Hearing, should be approved.

93. Given consideration to the significant and robust prepetition marketing efforts, the Debtors believe that the pool of potential purchasers for the Proposed Purchased Assets has been adequately identified, and the delay of any sale of the Gilmore Hospital would not increase the likelihood of identifying any additional potential purchasers.

## VII. The sale of the Proposed Purchased Assets is in the best interests of creditors.

94. The proposed sale of the Proposed Purchased Assets pursuant to the Gilmore APA in accordance with the proposed Bidding Procedures is in the best interests of the creditors.

95. The Proposed Purchased Assets have been adequately marketed, and the proposed sale process is permissible under 11 U.S.C. § 363.

96. A sale of the Proposed Purchased Assets will reduce the costs and professional fees currently being incurred to maintain and administer the Proposed Purchased Assets.

97. A sale of the Proposed Purchased Assets is the most practical way for creditors to realize a recovery in this case.

## VIII. Sound business justification for the sale exists.

98. There is more than adequate business justification to sell the Proposed Purchased Assets to a Successful Bidder.

99.     Absent a sale of the Proposed Purchased Assets to a third party, the Debtors would likely be forced to liquidate the Gilmore Hospital's assets piecemeal and wind up the Gilmore Hospital's operations.

100.    Further, if the Gilmore Hospital is not sold as a going concern, the value obtained for the assets of Hospital would be significantly less, which would decrease any potential recovery for creditors.

## IX.     The Gilmore APA provides fair and reasonable compensation to the Debtors.

101.    The Debtors, in the Debtors' sound business judgment, have determined that the proposed sale of the Proposed Purchased Assets in accordance with the Bidding Procedures will enable the Debtors to obtain the highest or best offer for the Proposed Purchased Assets and maximize the value of the Proposed Purchased Assets for their creditors.

102.    As set forth above, the Debtors have engaged in a robust marketing process and, to date, the Gilmore APA and the Proposed Stalking Horse's offer represents the highest and best offer for the Proposed Purchased Assets.

103.    Based upon the Debtors' sound business judgment, the Gilmore APA and offer from the Proposed Stalking Horse represent fair and reasonable consideration for the Proposed Purchased Assets, and any higher or better offers obtained through the Bidding Procedures would, therefore, also constitute fair and reasonable consideration for the Proposed Purchased Assets.

## <u>NOTICE</u>

Notice of this Motion is being served via First Class U.S. Mail and/or CM/ECF to: (a) the U.S. Trustee; (b) counsel to the Proposed Stalking Horse; (c) counsel to ServisFirst; (d) counsel to CHS; (e) counsel to MidCap; (f) the Office of the United States Attorney for the Middle District of Tennessee; (g) the United States Department of Health and Human Services, Centers

65035107.4

for Medicare and Medicaid Services; (h) the Tennessee State Department of Health Division of Licensure and Regulation of Health Care Facilities; (i) the Attorney General of the State of Tennessee; (j) the Tennessee Department of Revenue; (k) the Tennessee Secretary of State; (l) the Mississippi State Department of Health; (m) the Attorney General of the State of Mississippi; (n) the United States Attorney's Office for the Northern District of Mississippi; (o) the Mississippi Department of Revenue; (p) the Internal Revenue Service; (q) the parties included on the list of the Debtors list of thirty largest unsecured creditors; (r) any party who has requested notice pursuant to Bankruptcy Rule 2002; (s) all parties entitled to notice under Bankruptcy Rule 2002(a); and (t) all lienholders holding interests of record in the assets of Amery.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this court enter: (a) an order, substantially in the form attached to this motion as **Exhibit A**, (i) approving the Debtors' selection of the Proposed Stalking Horse as the stalking horse purchaser for the Gilmore Hospital, (ii) approving the Gilmore APA, (iii) authorizing and approving the Bidding Procedures, (iv) authorizing and approving the Bid Protections, (v) authorizing and approving the form and manner of notice of the auction and Sale Hearing, (v) authorizing and approving the Assumption Notice and Assumption and Assignment Procedures, (vi) scheduling the Sale Hearing, (vii) setting an objection deadline, and (viii) granting other and further related relief; and (b) after conducting the Sale Hearing, an order, substantially in the form attached to this motion as **Exhibit B**, (i) authorizing, approving, and directing the sale of the Proposed Purchased Assets to the Successful Bidder and Backup Bidder, in accordance with the Bidding Procedures, free and clear of all liens, claims, encumbrances, and other interests, (ii) authorizing and

36

approving the Gilmore APA or substantially similar asset purchase agreement applicable to the Successful Bidder or Backup Bidder, as applicable, and (iii) granting other and further related relief.

Dated this 31st day of August, 2018

Respectfully submitted,

**POLSINELLI PC**

*/s/ Michael Malone*
Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (*Pro Hac Vice*)
Caryn E. Wang (*Pro Hac Vice*)
1201 West Peachtree Street NW, Suite 1100
Atlanta, Georgia
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

65035107.4

**EXHIBIT A**
**PROPOSED SALE PROCEDURES ORDER**

38

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

**ORDER (I) AUTHORIZING AND APPROVING BIDDING PROCEDURES
FOR THE SALE OF GILMORE MEDICAL CENTER, (II) AUTHORIZING
THE SALE OF GILMORE MEDICAL CENTER FREE AND CLEAR OF
ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS,
(III) APPROVING STALKING HORSE PURCHASER, BREAK-UP FEE,
AND OVERBID PROTECTIONS, (IV) ESTABLISHING PROCEDURES FOR THE
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, (V) SCHEDULING AN AUCTION, (VI) SCHEDULING
A HEARING AND OBJECTION DEADLINES WITH RESPECT TO THE SALE
OF GILMORE MEDICAL CENTER, (VII) APPROVING THE FORM AND MANNER
OF NOTICE THEREOF, AND (VIII) GRANTING RELATED RELIEF**

Upon consideration of the *Debtors' Motion for Entry of an Order (I) Authorizing and
Approving Bidding Procedures for the Sale of Gilmore Medical Center, (II) Authorizing the Sale
of Gilmore Medical Center Free and Clear of All Liens, Claims, Encumbrances and Other
Interests, (III) Approving Stalking Horse Purchaser, Break-up Fee, and Overbid Protections,
(IV) Establishing Certain Procedures for the Assumption and Assignment of Executory Contracts
and Unexpired Leases, (V) Scheduling an Auction, (VI) Scheduling a Hearing and Objections
Deadlines With Respect to the Sale of Gilmore Medical Center, (VII) Approving the Form and
Manner of Notice Thereof, and (VIII) Granting Related Relief* (Dkt. No. ___) (the "***Sale***

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

*Procedures Motion*");[2] and upon consideration of any and all responses, objections, and other filings with respect to the Sale Procedures Motion; and after a hearing and opportunity to be heard; and upon due consideration and finding sufficient cause for the relief sought in the Sale Procedures Motion,

### IT IS HEREBY FOUND, DETERMINED, AND CONCLUDED THAT:[3]

A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

B.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      This is a core proceeding, within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (N), and (O).

D.      The statutory bases for the relief requested in the Motion are sections 105, 363, and 365 of the Bankruptcy Code, Rules 2002, 6003, 6004, 6006, and 9014 of the Bankruptcy Rules, and Bankruptcy Local Rule 9013-1.

E.      Proper, timely, adequate, and sufficient notice of the Sale Procedures Motion and relief sought in the Sale Procedures Motion has been provided, and such notice was sufficient and appropriate under the particular circumstances. Other than as set forth in this order, no other or further notice of the Sale Procedures Motion or relief sought in the Sale Procedures Motion is necessary or required.

---

[2]      Capitalized terms used herein and not defined shall have the meaning given to them in the Sale Procedures Motion or the Bidding Procedures, as applicable.

[3] The findings of fact and conclusions of law herein constitute the court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

65035107.4

F.     A reasonable opportunity to object or be heard regarding the requested relief in the Sale Procedures Motion and this order has been afforded to all parties entitled to notice of the Sale Procedures Motion.

G.     The Debtors have the power and authority to sell the Proposed Purchased Assets free and clear of all liens, claims, and encumbrances, pursuant to section 363 of the Bankruptcy Code, and all requirements for such sale pursuant to section 363 of the Bankruptcy Code have been satisfied.

H.     The Debtors have articulated good and sufficient reasons for this Court to: (a) approve the Bidding Procedures; (b) approve the selection of the Stalking Horse Purchaser and related Bid Protections; (c) schedule the Bid Deadline and the Auction; and (d) approve the form and manner of notice of the Auction Notice.

I.     The Bidding Procedures are reasonable, non-collusive, created in good faith, substantively and procedurally fair, and represent the best available method for maximizing value for the benefit of the Debtors' estates.

J.     The Debtors' authorization to pay the Break-up Fee is an essential inducement and condition relating to the Proposed Stalking Horse's entry into, and continuing obligations under, the Gilmore APA.

K.     The Debtors' promise to pay the Break-up Fee, which has induced the Proposed Stalking Horse to submit its bid that will serve as a minimum or floor bid on which the Debtors can rely, provides a material benefit to the Debtors' estates and their creditors, by increasing the likelihood that the best possible purchase price for the Proposed Purchased Assets will be received.

65035107.4

L.     The Bid Protections are reasonable and appropriate under the circumstances, including in light of the commitments that will be made by the Stalking Horse Purchaser.

M.     The Bidding Procedures were negotiated at arm's length, in good faith, and without collusion. The Bidding Procedures balance the Debtors' interests in an expeditious sale of the Proposed Purchased Assets while preserving the opportunity to attract value-maximizing proposals beneficial to the Debtors' estates, their creditors, and other parties in interest.

N.     The Auction Notice, substantially in the form attached to the Sale Procedures Motion as **Exhibit C** is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction.

O.     The Assumption Notice, substantially in the form attached to the Sale Procedures Motion as **Exhibit E**, is appropriate and reasonably calculated to provide all parties to executory contracts and unexpired leases with the notice required by section 365 of the Bankruptcy Code and Rule 6006(c) of the Bankruptcy Rules and all applicable Local Rules.

P.     The Assumption and Assignment Procedures are fair, reasonable, and calculated to provide all parties to executory contracts and unexpired leases to adequate notice of the proposed assumption and assignment of executory contracts and unexpired leases, pursuant to section 365 of the Bankruptcy Code and in accordance with Rules 6003 and 6006(c) of the Bankruptcy Rules and all applicable Local Rules.

**BASED UPON THE FOREGOING FINDINGS AND THE RECORD BEFORE THIS COURT, IT IS HEREBY**

1.     **ORDERED** that the Sale Procedures Motion is granted as set forth in this order; and it is further

65035107.4

2.      **ORDERED** that all objections to the Gilmore APA, Bidding Procedures, Bid Protections, Assumption Notice, Assumption and Assignment Procedures, and Auction Notice that have not been withdrawn, waived, or settled as announced to the court at the hearing on the Sale Procedures Motion or by stipulation filed with the court, are expressly denied and overruled; and it is further

3.      **ORDERED** that the Gilmore APA as set forth in **Exhibit D** to the Sale Procedures Motion is approved; and it is further

4.      **ORDERED** that the Assumption Notice as set forth in **Exhibit E** to the Sale Procedures Motion is approved; and it is further

5.      **ORDERED** that the Assumption and Assignment Procedures are approved in their entirety; and it is further

6.      **ORDERED** that the Bidding Procedures attached to this order as **Schedule 1** are hereby approved in their entirety and shall govern the submission, receipt, and analysis of all Bids relating to the proposed sale of the Proposed Purchased Assets; and it is further

7.      **ORDERED** that any party desiring to bid on the Proposed Purchased Assets shall comply with the Bidding Procedures and this Sale Procedures Order; and it is further

8.      **ORDERED** that each Qualified Bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding on or sale of the Proposed Purchased Assets, as set forth in the Bidding Procedures; and it is further

9.      **ORDERED** that **a**ny Qualified Bidder who has a valid and perfected lien on the Proposed Purchased Assets (a "***Secured Creditor***") and the right and power to credit bid claims secured by such liens, shall have the right to credit bid all or a portion of the value of such Secured Creditor's secured claims within the meaning of section 363(k) of the Bankruptcy Code;

65035107.4

provided that a Secured Creditor shall have the right to credit bid its secured claim only with respect to the collateral by which such Secured Creditor is secured; and it is further

10.     **ORDERED** that the Debtors are deemed to have complied with all contractual rights of first refusal, or similar contractual purchasing rights, regarding the Proposed Purchased Assets; and it is further

11.     **ORDERED** that the Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Sale Procedures Order; and it is further

12.     **ORDERED** that the Debtors may proceed to sell the Proposed Purchased Assets free and clear of liens, claims, encumbrances, and other interests, in accordance with the Bidding Procedures, with such liens, claims, encumbrances, and other interests attaching to the proceeds of such sale in the same order of priority and validity; and it is further

13.     **ORDERED** that the Proposed Stalking Horse's Escrow Amount (as provided in the Gilmore APA) shall be held in escrow and shall not constitute or be deemed to constitute property of the Debtors or the Debtors' estates, and neither the Debtors nor the Debtors' estates shall have an interest of any kind (equitable or otherwise) in such funds, unless and until such funds are unconditionally paid or payable in accordance with the Gilmore APA, and no liens, claims or encumbrances shall attach to such funds until such funds are unconditionally paid or payable in accordance with the Gilmore APA; and it is further

14.     **ORDERED** that Section 6.17 of the Gilmore APA is approved and binding on the Debtors; and the Break-up Fee shall be paid to the Proposed Stalking Horse (i) no later than any closing of a sale of some or all of the Proposed Purchased Assets to a purchaser other than the Proposed Stalking Horse or from the recovery of any other Successful Bidder's forfeited deposit, (ii) if any secured creditor purchases any or all of the Proposed Purchased Assets by credit bid at

the Auction or otherwise, then the secured creditor shall pay the Break-up Fee to the Proposed Stalking Horse Purchaser no later than any closing regardless of the amount of proceeds actually paid to the Debtors, and (iii) if Seller files a plan of reorganization that does not contemplate a sale of the Proposed Purchased Assets to the Proposed Stalking Horse; and it is further

15. **ORDERED** that the Sale Hearing shall be held on **November 27, 2018, at 11:00 a.m. (prevailing Central time)**; and it is further

16. **ORDERED** that any objection on any basis to the proposed sale of the Proposed Purchased Assets must be filed in writing with the court no later than **November 20, 2018, at 5:00 p.m. (prevailing Central time)** (the "*Objection Deadline*") and served on (a) counsel to the Stalking Horse Purchaser, c/o Ryan K. Cochran, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, Tennessee 37219, 615.244.6804 (facsimile), ryan.cochran@wallerlaw.com, (b) counsel to the Debtors, c/o David E. Gordon, Polsinelli PC, 1201 West Peachtree Street, Suite 1100, Atlanta, Georgia 30309, dgordon@polsinelli.com, (c) counsel to MidCap Financial, c/o David E. Lemke, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, Tennessee 37219, david.lemke@wallerlaw.com and (d) counsel ServisFirst Bank, David G. Thompson, Neal & Harwell, PLC, 1201 Demonbreun Street, Suite 1000, Nashville, Tennessee 37203, dthompson@nealharwell.com; and it is further

17. **ORDERED** that the Debtors shall: (A) provide notice to (i) all relevant federal, state and local taxing and regulatory authorities or offices that have a reasonably known interest in the relief requested in the Sale Procedures Motion; (ii) counsel to the Proposed Stalking Horse; (iii) the parties set forth on the certificate of service of the Sale Procedures Motion and any other party that has entered an appearance in this case or otherwise requested notice in this case; and (iv) all of the persons or entities the Debtors have identified as (a) having an interest in

65035107.4

the Proposed Purchased Assets or (b) potentially interested in acquiring the Proposed Purchased Assets; and (B) publish a notice, substantially in the form attached to the Sale Procedures Motion as **Exhibit C**, once in the (*Monroe Journal and Daily Journal* (both papers for publishing legal notices in Amory, Mississippi) and shall publish the Auction Notice on the website for these Chapter 11 Cases maintained by BMC Group ([www.bmcgroup.com/curaehealth](www.bmcgroup.com/curaehealth)) prior to the proposed Auction, which publication shall be deemed due, timely, good, and sufficient notice of the entry of this order and all proceedings to be held in accordance with this order; and it is further

18.     **ORDERED** that the notice already provided for in the Sale Procedures Motion together with the notice directed to be given in accordance with this order shall be deemed good and sufficient notice of the Sale Procedures Motion, this Sale Procedures Order, and the relief sought by the Sale Procedures Motion, and such notice shall be deemed to satisfy the requirements of Rule 6004(a) and Rule 6006(c) of the Bankruptcy Rules and all applicable Local Rules; and it is further

19.     **ORDERED** that the terms and conditions of this order shall be immediately effective and enforceable upon its entry; and it is further

20.     **ORDERED** that this court retains exclusive jurisdiction with respect to all matters arising from or related to this order or its enforcement.

Dated: _____, 2018

_____

Prepared and submitted by:

POLSINELLI PC

/s/ Michael Malone
Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (*Pro Hac Vice*)
Caryn E. Wang (*Pro Hac Vice*)
1201 West Peachtree Street NW, Suite 1100
Atlanta, Georgia
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

**SCHEDULE 1**
**BIDDING PROCEDURES**

65035107.4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

## BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS

On September __, 2018, the United States Bankruptcy Court for the Middle District of Tennessee (the "***Court***") entered an *Order (I) Authorizing and Approving Bidding Procedures for the Sale of Gilmore Medical Center, (II) Authorizing the Sale of Gilmore Medical Center Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (III) Approving Stalking Horse Purchaser, Break-up Fee, and Overbid Protections, (IV) Establishing Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (V) Scheduling an Auction, (VI) Scheduling a Hearing and Objection Deadlines With Respect to the Sale of Gilmore Medical Center, (VII) Approving the Form and Manner of Notice Thereof, and (VIII) Granting Related Relief* (Dkt. No. **[___]**) (the "***Sale Procedures Order***"),[2] by which the Court approved the following procedures (the "***Bidding Procedures***") governing the solicitation of bids and conducting an auction (the "***Auction***") for the sale (the "***Sale***") of substantially all assets of Gilmore Medical Center, a 95 bed acute care hospital and related healthcare operations and facilities located in Amory, Mississippi (the "**Gilmore Hospital**") (as more fully described in the Gilmore APA, the "***Proposed Purchased Assets***").

## I.     Submissions to the Debtors.

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each of the following persons unless otherwise provided (collectively, the "***Notice Parties***"):

A.     **Debtors**: Curae Health, Inc., Stephen N. Clapp, steve.clapp@curaehealth.org

B.     **Debtors' Counsel**: Polsinelli PC, David E. Gordon, dgordon@polsinelli.com

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

[2]     All capitalized terms used but not defined herein shall have the meaning given to them in the Sale Procedures Order.

C.  **Debtors' Financial Advisors**: GlassRatner, Marshall Glade, mglade@glassratner.com

## II.  Potential Bidders.

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a sale (a "***Potential Bidder***") must deliver or have previously delivered, if determined to be necessary by the Debtors in their sole discretion, the following documents:

(i)  an executed confidentiality agreement on terms acceptable to the Debtors (a "***Confidentiality Agreement***"), to the extent not already executed;

(ii)  identification of the Potential Bidder and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction; and

(iii)  unless publicly available in a filing under applicable securities laws or regulations, the most current audited and latest unaudited financial statements (the "***Financials***") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Proposed Purchased Assets (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors and (y) a written commitment acceptable to the Debtors and their advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the Sale).

## III.  Due Diligence.

Only Potential Bidders whose Financials, the Financials of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate a transaction for the purchase of the Proposed Purchased Assets shall be eligible to receive due diligence information and access to the Debtors' electronic data room, physical data room, and to additional non-public information regarding the Debtors. **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**. The Debtors will provide to each Potential Bidder that satisfies the foregoing reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any such Potential Bidder to the Debtors' electronic data room. For all Potential Bidders, the due diligence period will end on the Bid Deadline and, subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Proposed Purchased Assets, liabilities of the Debtors, or the potential sale of the Proposed Purchased Assets to any person except to a Potential Bidder or to such Potential Bidder's duly authorized representatives, to the extent provided in the applicable Confidentiality Agreement. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional

information and due diligence access; provided that the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate a transaction to acquire the Proposed Purchased Assets.

The Debtors also reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder that intends in good faith to, or has the capacity to, consummate a transaction to acquire the Proposed Purchased Assets.

**All due diligence requests must be directed to Debtors' Counsel and Debtors' Financial Advisors.**

(a) **Communications with Potential Bidders.**

Notwithstanding anything to the contrary in the Bidding Procedures, all substantive direct communications between and amongst Potential Bidders shall involve the Debtors and the Debtors' advisors, to the extent reasonably practicable.

(b) **Due Diligence from Potential Bidders.**

Each bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate a transaction to acquire the Proposed Purchased Assets or discussions with other Potential Bidders regarding any topic and with any party regarding the Debtors and/or any of the Proposed Purchased Assets. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such bidder is not a Qualified Bidder or that a Bid made by such bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in the Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process, in connection with a potential transaction to acquire the Proposed Purchased Assets, or otherwise in accordance with the terms of any applicable Confidentiality Agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (i) with the prior written consent of such Potential Bidder (or Qualified Bidder) and the Debtors; (ii) to the applicable Potential Bidder or Qualified Bidder; and (iii) as otherwise

3

required or allowed by any applicable Confidentiality Agreement with respect to a particular Potential Bidder or Qualified Bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

## IV.    Bid Requirements.

A proposal, solicitation, or offer for a purchase and sale of the Proposed Purchased Assets (each, a "*Bid*") that is submitted in writing and satisfies each of the following requirements (the "*Bid Requirements*") as determined by the Debtors, in their reasonable business judgment, Committee, MidCap Financial Trust, and ServisFirst Bank (collectively, the "*Sale Notice Parties*"), shall constitute a "*Qualified Bid*."

(a)    **Assets**. Each Bid must clearly state which assets and liabilities of the Debtors that the Qualified Bidders are agreeing to purchase and assume.

(b)    **Purchase Price** Each Bid must clearly set forth the purchase price in U.S. dollars to be paid for each individual Proposed Purchased Asset subject to the applicable asset package, including and identifying separately any cash and non-cash components (the "*Purchase Price*").

(c)    **Deposit**. On or before the Bid Deadline, each Bid, other than a credit bid, must be accompanied by a cash deposit in the amount equal to 5% of the aggregate Purchase Price of the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "*Deposit*").

(d)    **Assumption of Obligations**. Each Bid must clearly state which liabilities of the Debtors the bidder is agreeing to assume.

(e)    **Qualified Bid Documents**. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transaction(s) contemplated by the Bid and shall include a schedule of assumed contracts, to the extent applicable to the Bid, and all other material documents integral to such Bid (the "*Qualified Bid Documents*"). Such documents must be based on form documents provided by the Debtors (including a summary of each Bid as may be reasonably requested by the Debtors).

(f)    **Committed Financing**. To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the transaction(s) set forth in its Bid with cash on hand, each Bid must include unconditionally committed financing from a reputable financial institution documented to the satisfaction of the Debtors that demonstrates that the Potential Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Proposed Purchased Assets and the proposed transaction(s). Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

4

(g) **Contingencies; No Financing or Diligence Outs**. A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall be acceptable to the Debtors in their business judgment.

(h) **Identity**. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific persons, including financial advisors and counsel, if any, that Debtors' Financial Advisor and Debtors' Counsel should contact regarding such Bid.

(i) **Demonstrated Financial Capacity**. A Potential Bidder must have, in the Debtors' business judgment, the necessary financial capacity to consummate the proposed transaction(s) required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

(j) **Time Frame for Closing**. A Bid by a Potential Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors, in consultation with the Sale Notice Parties.

(k) **Binding and Irrevocable**. A Potential Bidder's Bid shall be irrevocable unless and until the Debtors accept a higher Bid and such Potential Bidder is not selected as the Backup Bidder.

(l) **Expenses; Disclaimer of Fees**. Each Bid, other than the Stalking Horse Purchaser's Bid, must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and, by submitting its Bid, is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under Section 503(b) of the Bankruptcy Code.

(m) **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

5

(n)     **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the bidder's Bid.

(o)     **Adherence to Bid Procedures**. By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

(p)     **Regulatory Approvals and Covenants**. A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the Sale, if any, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible).

(q)     **Consent to Jurisdiction**. The Potential Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the documents governing the sale of the Proposed Purchased Assets or any Bid or Qualified Bid, and the Closing, as applicable.

(r)     **Bid Deadline**. Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before 5:00 p.m. (prevailing Central Time) on **November 12, 2018** (the "*Bid Deadline*") by each of the Notice Parties.

## V.     Qualified Bidders.

(a)     A "*Qualified Bidder*" is a Potential Bidder whose Financials, the Financials of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate a transaction for the purchase of the Proposed Purchased Assets, whose Bid is a Qualified Bid, and that the Debtors determine should be considered a Qualified Bidder, in consultation with the Sale Notice Parties. Within one business day after the Bid Deadline, the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder.

(b)     If any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below), if

6

any, and all accumulated interest on or within three (3) business days after the Bid Deadline.

(c)     After the Bid Deadline, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw a Qualified Bid, except for proposed amendments to increase their consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in the Bidding Procedures; provided that any Qualified Bid may be improved at the Auction. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in the Bidding Procedures.

(d)     For purposes of the Bidding Procedures, the Stalking Horse Purchaser shall be deemed Qualified Bidder.

## VI.     Right to Credit Bid.

Any Qualified Bidder who has a valid and perfected lien on any of the Proposed Purchased Assets (a "*Secured Creditor*") and the right and power to credit bid claims secured by such liens, shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims, within the meaning of section 363(k) of the Bankruptcy Code; provided that a Secured Creditor shall have the right to credit bid its secured claim only with respect to the collateral by which such Secured Creditor is secured.

## VII.    Auction.

If the Debtors receive more than one Qualified Bid for the Proposed Purchased Assets, the Debtors will conduct the Auction, to determine the Successful Bidders with respect to the Proposed Purchased Assets. If the Debtors do not receive a Qualified Bid for the Proposed Purchased Assets, the Debtors will not conduct the Auction.

No later than two (2) business days after the Bid Deadline, at 5:00 p.m. (prevailing Central Time), the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid or combination of Qualified Bids, for which such Qualified Bidder submitted a Qualified Bid or combination of Qualified Bids, as determined in the Debtors' reasonable business judgment, in consultation with the Sale Notice Parties (the "*Baseline Bid*"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid may take into account any factors the Debtors reasonably deem, in consultation with the Sale Notice Parties, relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the amount and nature of the total consideration (including the amount of cash paid to or remaining in the estates pursuant to the Qualified Bid); (b) the likelihood of the Qualified Bidder's ability to close, and the timing of closing, the transaction(s) contemplated by the Qualified Bid; (c) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction

65035107.4

contemplated by the Qualified Bid Documents; and (d) the tax consequences of such Qualified Bid (collectively, the "*Bid Assessment Criteria*").

The Auction shall take place at 9:00 a.m. (prevailing Central Time) on **November 15, 2018**, at the offices of Polsinelli PC, in Nashville, Tennessee, or such later date and time as selected by the Debtors. The Auction shall be conducted in a timely fashion according to the following procedures:

**(a)     The Debtors Shall Conduct the Auction.**

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bids. All incremental Bids made thereafter for the Proposed Purchased Assets shall be Overbids and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids on the Proposed Purchased Assets. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only Qualified Bidders and their legal and financial advisors, and the members of and advisors to the Sale Notice Parties, and each such parties' respective legal and financial advisors shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to bid at the Auction.

**(b)     Terms of Overbid**.

"*Overbid*" means any Bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each applicable Overbid must comply with the following conditions:

(i)     **Initial Overbid**. If the Proposed Stalking Horse's Initial Bid is the Baseline Bid, the initial overbid shall exceed the Baseline Bid by $1,000,000. If the Baseline Bid is a Qualified Bid submitted by a Qualified Bidder other than the Proposed Stalking Horse, the initial overbid shall exceed the Baseline Bid by $100,000.

(ii)     **Minimum Overbid Increment**. Any Overbid following the initial overbid or following any subsequent Prevailing Highest Bid (as defined below) for the Proposed Purchased Assets shall be in increments of value equal to (or exceeding) $100,000. The Debtors may establish different overbid increments at the Auction for any portion or combination of the Proposed Purchased Assets, as determined by the Debtors in an exercise of their business judgment, in consultation with the Sale Notice Parties.

(iii)     **Conclusion of Each Overbid Round**. Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend time to time, the

8

"*Overbid Round Deadline*") by which time any Overbids must be submitted to the Debtors.

Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified, after consultation with the Sale Notice Parties, an Overbid as being higher or otherwise better than the best Bid the Debtors had prior to receiving such Overbid (in each instance, the "*Prevailing Highest Bid*"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

(iv)    **<u>Overbid Alterations</u>**. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Sale Notice Parties, but shall otherwise comply with the terms of these Bidding Procedures.

(v)    **<u>Overbids by the Stalking Horse Purchaser.</u>** The Stalking Horse Purchaser shall be permitted to include the full amount of the Break-up Fee in each bid by the Stalking Horse Purchaser for the purposes of comparison to any Overbid, in connection with each round of bidding at the Auction.

**(c)**    **Consideration of Overbids.**

The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Sale Notice Parties, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions between the Debtors and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount.

**(d)**    **Closing the Auction.**

(i)    The Auction shall continue until there is only one Bid that the Debtors determine, in their reasonable business judgment, to be the highest or otherwise best Bid for the Proposed Purchased Assets. Such Bid shall be declared the "*Successful Bid*," and such Qualified Bidder, the "*Successful Bidder*" and at which point the Auction will be closed as to the Proposed Purchased Assets subject to such Successful Bid. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing

9

Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

(ii)    For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under the applicable law.

(iii)   The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

(iv)    As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid(s) and Backup Bid(s) to be filed with this court.

**(e)     No Collusion; Good-Faith *Bona Fide* Offer.**

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding or otherwise in connection with the sale of the Proposed Purchased Assets; and (ii) its Qualified Bid and subsequent Overbids are a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

## VIII.   Backup Bidder.

The Qualified Bidder with the second-best Qualified Bid (the "***Backup Bid***") at the Auction (if the Auction is conducted) shall be required to serve as a backup bidder (the "***Backup Bidder***"). The Backup Bidder's Deposit, if any, shall be held in escrow until the closing of the transaction with the applicable Successful Bidder.  If the Backup Bidder is the Proposed Stalking Horse, the Proposed Stalking Horse shall serve as the Backup Bidder for only thirty (30) days following the Auction. If a Successful Bidder fails to consummate its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Qualified Bid of such Backup Bidder without further order of the Court or notice to any party.

In such case, the defaulting Successful Bidder's Deposit, if any, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

## IX.     Highest or Otherwise Best Bid.

When determining the highest or otherwise best Qualified Bid or Overbid, as compared to other Qualified Bids or Overbids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate, in consultation with the Sale Notice Parties: (a) the amount and nature of the total consideration (including the amount of cash paid to or remaining in the estates pursuant to the Bid); (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to

the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (d) the tax consequences of such Bid.

## X.    Reservation of Rights.

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, in consultation with the Sale Notice Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Proposed Purchased Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids, Qualified Bids, or Overbids.  Provided, however, that modifications are not inconsistent in any material respect with the Bidding Procedures or the Gilmore APA.

## XI.    Consent to Jurisdiction.

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Qualified Bid Documents, as applicable.

## XII.    Confirmation and Sale Hearing.

A hearing to consider approval of the results of the Auction and sale of the Proposed Purchased Assets (the "*Sale Hearing*") will take place on November 27, 2018 at 11:00 a.m. (prevailing Central Time).  Any objection on any basis to the proposed sale of the Proposed Purchased Assets must be filed with the court no later than **November 20, 2018, at 5:00 p.m. (prevailing Central time)** (the "*Objection Deadline*").

**The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.**

At the Sale Hearing, the Debtors shall present the Successful Bid(s) to the Court for approval.

## XIII.    No Modification of Bidding Procedures.

Except as provided by Section X of these Bidding Procedures, these Bidding Procedures may not be modified except with the Debtors' express written consent.

## XIV.    Return of Deposit.

The Deposit, if any, of the Successful Bidder shall be applied to the respective Purchase Price of such transaction at closing. The Deposits, if any, for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors in their sole

65035107.4

discretion and shall be returned (other than with respect to the Successful Bidder, and the Backup Bidder) on or within three (3) business days after the Auction. Upon the return of the Deposits, if any, their respective owners shall receive any and all interest that will have accrued thereon.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the Deposit, if any, deposited by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the proposed transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court.

## XV.    Fiduciary Out.

Nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of the Debtors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

DATED:        _____, 2018

Respectfully submitted,

POLSINELLI PC

/s/ Michael Malone
Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (*Pro Hac Vice*)
Caryn E. Wang (*Pro Hac Vice*)
1201 West Peachtree Street NW, Suite 1100
Atlanta, Georgia
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**EXHIBIT B**

**PROPOSED SALE ORDER**

65035107.4

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 18-05665 |
| Curae Health, Inc., *et al.*[1] | ) | |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

## ORDER (I) AUTHORIZING, APPROVING, AND DIRECTING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF GILMORE MEDICAL CENTER TO THE SUCCESSFUL BIDDER AND BACKUP BIDDER IN ACCORDANCE WITH THE BIDDING PROCEDURES FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING THE GILMORE APA; (III) APPROVING THE DEBTORS' MARKETING AND SALE PROCESS; AND (IV) GRANTING RELATED RELIEF

Upon consideration of the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Bidding Procedures for the Sale of Gilmore Medical Center, (II) Authorizing the Sale of Gilmore Medical Center Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (III) Approving Stalking Horse Purchaser, Break-up Fee, and Overbid Protections, (IV) Establishing Certain Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (V) Scheduling an Auction, (VI) Scheduling a Hearing and Objections Deadlines With Respect to the Sale of Gilmore Medical Center, (VII) Approving the Form and Manner of Notice Thereof, and (VIII) Granting Related Relief* (Dkt. No. ___) (the "***Sale Procedures Motion***");[2] and upon consideration of the [*Notice of Auction Results*]; and after due consideration and finding sufficient cause for the relief sought in the Sale Procedures Motion,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

[2] Capitalized terms used in this order and not otherwise defined shall have the meanings ascribed to them in the Sale Procedures Motion.

**IT IS HEREBY FOUND, DETERMINED, AND CONCLUDED THAT:[3]**

1.      This Court has jurisdiction over this matter and over the property of the Debtors' estates, pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding, within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (N), and (O).

3.      Venue is proper in this court, pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The relief in this order is granted pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure.

5.      Proper, timely, adequate, and sufficient notice of the Sale Procedures Motion and relief sought in the Sale Procedures Motion has been provided, and such notice was sufficient and appropriate under the particular circumstances and no other or further notice of the Sale Procedures Motion or relief sought in the Sale Procedures Motion is necessary or required.

6.      A reasonable opportunity to object or be heard regarding the requested relief in the Sale Procedures Motion and this order has been afforded to all parties entitled to notice of the Sale Procedures Motion and such relief.

7.      The Debtors have the power and authority to sell the Proposed Purchased Assets free and clear of all liens, claims, and encumbrances pursuant to section 363 of the Bankruptcy Code, and all requirements for such sale pursuant to section 363 of the Bankruptcy Code have been satisfied.

---

[3] The findings of fact and conclusions of law herein constitute the court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

2

8.	The Debtors have the power and authority to assume and assign the contracts identified in the Gilmore APA, and all requirements for such assumption and assignment pursuant to section 365 of the Bankruptcy Code have been satisfied.

9.	It is necessary and appropriate for this court to retain jurisdiction to, among other things, (a) interpret, implement, and enforce the terms and provisions of this order, the Gilmore APA, all amendments to the Gilmore APA, any waivers and consents under the Gilmore APA, and each of the agreements executed in connection with the Gilmore APA and (b) to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale of the Proposed Purchased Assets, and such jurisdiction is retained.

## PROPER NOTICE OF THE MOTION AND AUCTION

10.	The Debtors properly provided notice, pursuant to and in accordance with the Sale Procedures Order, and no other or further notice is necessary or required.

11.	The Debtors have adequately disclosed all material terms and conditions regarding the Bidding Procedures, Gilmore APA, and sale of the Proposed Purchased Assets.

12.	The notice provided by the Debtors was in substantial compliance with all applicable laws and satisfied all due process requirements.

13.	The notice provided was reasonably calculated to apprise all interested parties of the sale of the Proposed Purchased Assets free and clear of all liens, claims, encumbrances, and other interests.

14.	As a result, notice of the Sale Procedures Motion, Bidding Procedures, Sale Hearing, and Auction and a reasonable opportunity to object or be heard with respect to the foregoing has been afforded to all interested persons and entities, and the notice provided is

3

appropriate and sufficient for all purposes, including the sale of the Proposed Purchased Assets free and clear of all liens, claims, encumbrances, and other interests.

## THE AUCTION COMPLIED WITH THE SALE PROCEDURES ORDER AND APPLICABLE LAW

15. On November 15, 2018, the Debtors conducted the Auction in accordance with the Sale Procedures Order.

16. The Debtors complied in all material respects with applicable law.

17. All Qualified Bidders confirmed that they did not engage in any collusion in connection with the Auction or the purchase of the Proposed Purchased Assets.

18. The Auction was substantively and procedurally fair to all potential Bidders and Qualified Bidders, including the Proposed Stalking Horse.

## HIGHEST AND BEST OFFER

19. At the Auction, pursuant to the Gilmore APA and Bidding Procedures, the Successful Bidder was [_____], with a Successful Bid in the amount of $[_____].

20. A true and correct copy of the Gilmore APA applicable to the Successful Bidder is attached to this order as **Exhibit 1** and incorporated in this paragraph by reference.

21. The Successful Bidder submitted the highest or otherwise best offer to purchase the Proposed Purchased Assets.

22. Neither the sale of the Proposed Purchased Assets nor the Gilmore APA violate or are otherwise inconsistent with the Sale Procedures Order, the Bidding Procedures, or applicable law.

23. The Successful Bidder has confirmed that it did not engage in any collusion in connection with the Auction or the purchase of the Proposed Purchased Assets.

24.     The Successful Bid and Gilmore APA constitute the highest and best offer for the Proposed Purchased Assets and will provide a greater recovery for the Debtors' creditors than would be provided by any other practical alternative.

25.     The Debtors' determination that the Successful Bid and Gilmore APA constitute the highest and best offer for the Proposed Purchased Assets constitutes a valid and sound exercise of the Debtors' reasonable business judgment.

26.     The Successful Bid and Gilmore APA represent a fair and reasonable offer to purchase the Proposed Purchased Assets under the circumstances of this bankruptcy case.

27.     No other entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtors' or their estates than the Successful Bidder.

28.     The Debtors' decision to sell the Proposed Purchased Assets to the Successful Bidder pursuant to the Gilmore APA and this order is supported by good business reasons and sound justification based upon the Debtors' experience and the circumstances presented in this case.

## GOOD FAITH OF THE SUCCESSFUL BIDDER

29.     The Successful Bidder is not an affiliate, subsidiary, or other insider of the Debtor.

30.     The terms of the sale of the Proposed Purchased Assets, as set forth more specifically in the Gilmore APA, are fair and reasonable under the circumstances.

31.     The sale of the Proposed Purchased Assets to the Successful Bidder in all respects complies with the Bidding Procedures, Sale Procedures Order, and applicable law.

32.     The Successful Bidder negotiated the terms and conditions of the sale of the Proposed Purchased Assets in good faith and at arm's length.

5

33.     The Successful Bidder is entering into the Gilmore APA and sale of the Proposed Purchased Assets in good faith and is a good faith purchaser for value.

34.     The Successful Bidder will be acting in good faith in closing the sale of the Proposed Purchased Assets pursuant to the Gilmore APA after entry of this order.

35.     The court has found that the Successful Bidder has acted in good faith in all respects in connection with this case, the Bidding Procedures, the Auction, and the sale of the Proposed Purchased Assets.

36.     The Auction was conducted in good faith, and the Successful Bidder is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is entitled to all the protections afforded by 363(m) of the Bankruptcy Code.

37.     [In accordance with the Sale Procedures Order, the Proposed Stalking Horse is entitled to receive the Break-up Fee in the amount of $_____ for the material contributions the Proposed Stalking Horse has made by serving as the stalking horse purchaser and agreeing to submit its offer to higher and better offers.]

## NO FRAUDULENT TRANSFER

38.     The consideration provided for the Proposed Purchased Assets under the Gilmore APA (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Proposed Purchased Assets, and (c) constitutes reasonably equivalent value for the Proposed Purchased Assets.

## VALIDITY OF TRANSFER

39.     The Debtors' transfer of the Proposed Purchased Assets including fee title to the real property along pursuant to the Gilmore APA and this order will be a legal, valid, and effective transfer of the Proposed Purchased Assets including fee title to the real property and

6

will indefeasibly vest the Successful Bidder with good and valid title in and to the Proposed Purchased Assets free and clear of any Liens (as defined below).

40.     The Debtors have full power and authority to execute and consummate the Gilmore APA and all related documents and is directed to do so, and no consents or approvals (other than those expressly provided for in the Gilmore APA) are required to consummate the transactions contemplated by the Gilmore APA and this order.

41.     The Debtors and Successful Bidder proposed, negotiated, and entered into the Gilmore APA without collusion, in good faith, and from arm's length bargaining positions.

42.     Neither the Debtors nor the Successful Bidder has engaged in any conduct that would cause or permit the Gilmore APA or transactions contemplated by the Gilmore APA to be avoided or otherwise set aside.

43.     Holders of liens, claims, encumbrances, or others interests in, on, or to any of the Property who did not object, or who withdrew their objections, to the Sale Procedures Motion are deemed to have consented to entry of this order, pursuant to section 363(f)(2) of the Bankruptcy Code.

44.     The sale of the Proposed Purchased Assets to the Successful Bidder does not amount to a consolidation, merger, or de facto merger of the Successful Bidder and the Debtors or the Successful Bidder and the Debtors' estates, there is not substantial continuity between the Successful Bidder and the Debtors or the Successful Bidder and the Debtors' estates, there is no continuity of enterprise between the Successful Bidder and the Debtors or the Successful Bidder and the Debtors' estates, the Successful Bidder is not a mere continuation of the Debtors or Debtors' estates, and the Successful Bidder does not constitute a successor to the Debtors or the Debtors' estates.

7

65035107.4

Case 3:18-bk-05665    Doc 79    Filed 08/31/18    Entered 08/31/18 18:22:55    Desc Main
                    Document      Page 71 of 177

45. Without limiting the generality of the foregoing, the Successful Bidder shall have no successor or transferee liability of any kind or character with respect to any "claim" (as defined in the Bankruptcy Code) against the Debtors or any other liability or obligation of any kind or nature whatsoever of the Debtors, as a result of its purchase of the Proposed Purchased Assets, its operation of the business formerly operated by the Debtors, or otherwise (except as expressly assumed).

46. Neither the Debtors nor the Successful Bidder has engaged in any conduct that would cause or permit the sale of the Property to the Successful Bidder to be avoided under section 363(n) of the Bankruptcy Code.

**BASED UPON THE FOREGOING FINDINGS AND CONCLUSIONS, IT IS HEREBY:**

1. **ORDERED** that the Motion is GRANTED as set forth in this order; and it is further.

2. **ORDERED** that all objections to the Sale Procedures Motion concerning the Auction, Successful Bid, Successful Bidder, marketing process employed by the Debtor, Gilmore APA or otherwise relating to the sale of the Proposed Purchased Assets and relief granted in this order that have not been withdrawn, waived, resolved, sustained, or settled are expressly denied and overruled in their entirety; and it is further

3. **ORDERED** that the Gilmore APA, as set forth in **Exhibit 1** to this order, is approved in its entirety; and it is further

4. **ORDERED** that the Debtors are directed to sell the Proposed Purchased Assets free and clear of all Liens (as defined below) in accordance with the Bidding Procedures, Gilmore APA and this order; and it is further

8

5.     **ORDERED** that the Debtors are authorized to take all actions to consummate the sale of the Proposed Purchased Assets pursuant to and in accordance with the Bidding Procedures, Gilmore APA, and this order, including transferring and conveying the Proposed Purchased Assets to the Successful Bidder; and it is further

6.     **ORDERED** that the Debtors are authorized, directed, and empowered to consummate and implement fully the Gilmore APA, together with all additional instruments and documents that may be necessary or desirable to implement and consummate the sale of the Proposed Purchased Assets in accordance with the Gilmore APA and this order; and it is further

7.     **ORDERED** that the Debtors are authorized and directed to take all actions necessary or desirable for the purpose of assigning, transferring, granting, conveying, and conferring the Proposed Purchased Assets to the Successful Bidder; and it is further

8.     **ORDERED** that any assignee of the Successful Bidder shall have the same substantive and procedural protections of the Gilmore APA and of this order as the Successful Bidder; and it is further

9.     **ORDERED** that, time being of the essence, the Successful Bidder is directed to use its best efforts to close the sale of the Proposed Purchased Assets in accordance with the terms of the Gilmore APA and this order as soon as reasonably practicable; and it is further

10.     **[ORDERED** that, in accordance with the Sale Procedures Order, the Proposed Stalking Horse is entitled to receive the Break-up Fee in the amount of $_____ no later than any closing with the Successful Bidder for the material contributions the Proposed Stalking Horse has made by serving as the stalking horse purchaser and agreeing to submit its offer to higher and better offers.  Such amounts shall be allowed superpriority administrative

9

expense claims of Seller under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind.]

11.     **ORDERED** that, in the Debtors' sole discretion, any agreements, documents, or other instruments executed in connection with the Gilmore APA may be modified, amended, or supplemented by the Debtors and Successful Bidder, in accordance with the terms of the Gilmore APA, without further notice or order of this court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates or their creditors; and it is further

12.     **ORDERED** that the transfer of the Proposed Purchased Assets to the Successful Bidder shall be free and clear of any and all liens, encumbrances, claims, charges, defenses, offsets, recoupments, and interests on the foregoing and against the foregoing of whatever type or description, including, without limitation, any restrictions on or conditions to transfer or assignment, liens, mortgages, security interests, pledges, hypothecations, control agreements, equities and other claims and interests having arisen, existed, or accrued prior to and through the Closing Date, whether direct or indirect, monetary or non-monetary, arising at law or in equity, contract or tort, absolute or contingent, matured or unmatured, voluntary or involuntary, liquidated or unliquidated, of, by, or against the Proposed Purchased Assets (collectively, the "*Liens*"), with such Liens to attach to the net proceeds of the sale of the Proposed Purchased Assets in accordance with the same validity, priority, and enforceability as existed prior to the sale; and it is further

13.     **ORDERED** that all holders of Liens on any of the Proposed Purchased Assets are directed, upon Closing, to execute such documents and take all other actions as may be necessary or requested by the Debtors or the Successful Bidder, to terminate and release any filed or

65035107.4

recorded documents evidencing their respective Liens on any of the Proposed Purchased Assets; and, if any such holder does not deliver to the Debtors or the Successful Bidder by Closing, in proper form for filing (and, if necessary, executed by the appropriate parties), termination statements, instruments of satisfaction, releases of liens and easements, or any other documents necessary, or requested by the Debtors or the Successful Bidder, for the purpose of terminating or releasing any filed or recorded document evidencing a Lien on any of the Property, the Debtors and the Successful Bidder each are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of any such holder with respect to any of the Proposed Purchased Assets; and it is further

14. **ORDERED** that any person or entity that is presently, or as of Closing, in possession of some or all of the Proposed Purchased Assets is hereby directed to surrender possession of such Proposed Purchased Assets to the Successful Bidder upon Closing; and it is further

15. **ORDERED** that any and all Liens will attach to the net proceeds of the sale of the Proposed Purchased Assets with the same effect, validity, enforceability, and priority of such Liens, if any, as such Liens had against the Proposed Purchased Assets prior to the sale authorized by this order, subject to any rights, claims, defenses, and objections of the Debtors and all interested parties with respect to such Liens; and it is further

16. **ORDERED** that the transfer of the Proposed Purchased Assets to the Successful Bidder may not be avoided under any applicable law, because the Successful Bidder is a good faith purchaser and is providing the Debtors' estates with reasonably equivalent value; and it is further

11

17.    **ORDERED** that the provisions of this order authorizing the sale of the Proposed Purchased Assets free and clear of any Liens shall be and are self-executing, and the Debtors and Successful Bidder shall not be required, but are permitted in their discretion, to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of the Gilmore APA and this order; and it is further

18.    **ORDERED** that neither the purchase of the Proposed Purchased Assets nor the subsequent operation of the Proposed Purchased Assets by the Successful Bidder shall cause the Successful Bidder or its affiliates, successors, or assigns or their respective properties (including the Proposed Purchased Assets) to be deemed a successor in any respect of the Debtors' or Debtors' business operations within the meaning of any laws, rules, or regulations relating to any tax, revenue, pension, benefit, ERISA, environmental, labor, employment, products liability, or other law, rule, or regulation of any federal, state, or local government; and it is further

19.    **ORDERED** that this order and the documents executed in connection with and pursuant to this order constitute a full and complete general assignment, conveyance, and transfer of the Proposed Purchased Assets or a deed or a bill of sale transferring good and marketable title in the Proposed Purchased Assets to the Successful Bidder on the Closing Date, free and clear of all Liens, and each and every federal, state, and local governmental agency or department is directed to accept this order as such an assignment, deed or bill of sale or any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Gilmore APA and this order; and it is further

12

20. **ORDERED t**hat, if necessary, this order shall be accepted for recordation on or after the Closing Date as conclusive evidence of the free and clear, unencumbered transfer of title to the Proposed Purchased Assets to the Successful Bidder; and it is further

21. **ORDERED** that this order is effective as a determination that any and all Liens, if any, will be, and are, without further action by any person or entity, unconditionally released, discharged, and terminated with respect to the Proposed Purchased Assets; and it is further

22. **ORDERED** that this court retains exclusive jurisdiction to (a) enforce and implement the Gilmore APA and any other agreements, documents, and instruments executed in connection with the Gilmore APA, (b) compel delivery of possession of the Proposed Purchased Assets (or any part of the Proposed Purchased Assets) to the Successful Bidder, (c) resolve any disputes, controversies, or claims arising out of or relating to the Gilmore APA, this order, or the sale of the Proposed Purchased Assets, and (d) interpret, implement, and enforce the provisions of this order; and it is further

23. **ORDERED** that the terms and conditions of the Gilmore APA and this order will be binding in all respects upon, and will inure to the benefit of, the Debtors, Successful Bidder, and their respective affiliates, successors and assigns, and any affected third parties; and it is further

24. **ORDERED** that all persons who hold Liens against the Debtors' estates, the Debtors, insiders of the Debtors, or the Proposed Purchased Assets are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Successful Bidder, its affiliates, successors or assigns, or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the sale of the Proposed Purchased Assets; and it is further

13

25.     **ORDERED** that nothing contained in any plan of reorganization or plan of liquidation confirmed in the Debtors' chapter 11 case, in any order confirming such a plan, or in any other order of this court, shall conflict with or deviate from the provisions of the Gilmore APA or the terms of this order, and to the extent such provisions do conflict, then the terms of the Gilmore APA or this order, as the case may be, shall control over such conflicting plan or order; and it is further

26.     **ORDERED** that, to the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Gilmore APA and this order, the provisions contained in the Gilmore APA control; and it is further

27.     **ORDERED** that the reversal or modification of this order on appeal shall not affect the validity of the sale of the Proposed Purchased Assets to the Successful Bidder, because the Successful Bidder acted in good faith in participating in the Bidding Procedures and Auction and in purchasing the Proposed Purchased Assets in accordance with the Gilmore APA; and it is further

28.     **ORDERED** that the authority granted to the Debtors to close the sale of the Proposed Purchased Assets pursuant to and in accordance with the Gilmore APA and this order shall not be stayed if this order is appealed; and it is further

29.     **ORDERED** that there is no just delay for the implementation of this order and, for all purposes, this order shall be a final order with respect to the sale of the Proposed Purchased Assets and other relief granted in this order; and it is further

30.     **ORDERED** that time is of the essence and, accordingly, the fourteen (14) day stays imposed by Rules 6004(h) and 6006(d) of the Bankruptcy Rules are waived with respect to this order, and this order shall take effect immediately upon its entry.

14

Dated: _____, 2018

                                    _____


Prepared and submitted by:

POLSINELLI PC

/s/ Michael Malone
Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (*Pro Hac Vice*)
Caryn E. Wang (*Pro Hac Vice*)
1201 West Peachtree Street NW, Suite 1100
Atlanta, Georgia
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

**EXHIBIT C**
<u>**AUCTION NOTICE**</u>

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

## NOTICE OF AUCTION FOR THE SALE OF DEBTORS' ASSETS

**PLEASE TAKE NOTICE** that on September __, 2018, the United States Bankruptcy Court for the Middle District of Tennessee (the "***Court***") entered an *Order (I) Authorizing and Approving Bidding Procedures for the Sale of Gilmore Medical Center, (II) Authorizing the Sale of Gilmore Medical Center Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (III) Approving Stalking Horse Purchaser, Break-up Fee, and Overbid Protections, (IV) Establishing Certain Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (V) Scheduling an Auction, (VI) Scheduling a Hearing and Objections Deadlines With Respect to the Sale of Gilmore Medical Center, (VII) Approving the Form and Manner of Notice Thereof, and (VIII) Granting Related Relief* [Dkt. # ___] (the "***Sale Procedures Order***") approving Bidding Procedures for the sale of the Gilmore Medical Center, a 95 bed acute care hospital and related healthcare operations and facilities located in Amory, Mississippi as more fully described in the Gilmore APA.[2]

---

Copies of the Sale Procedures Order, the Bidding Procedures, or other documents related thereto are available upon request to Caryn E. Wang by calling (404) 253-6016 or visiting the Debtors' restructuring website at www.bmcgroup.com/curaehealth.

---

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend to conduct the Auction, at which they will consider proposals submitted to the Debtors and their professionals, by and pursuant to the Bidding Procedures as set forth in the Sale Procedures Order, on **November 15, 2018 at 9:00 a.m. (prevailing Central Time)** at the offices of Polsinelli PC, 401 Commerce Street, Suite 900, Nashville, TN 37219.

**PLEASE TAKE FURTHER NOTICE** that the Bid Deadline is **Monday November 12, 2018, at 5:00 p.m.** (prevailing Central Time), and that any person or entity who wishes to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

[2] Capitalized terms used but not defined herein shall have the meanings given to them in the Sale Procedures Order or the Bidding Procedures, as applicable.

participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to modify the Bidding Procedures, in their reasonable business judgment and in consultation with the Committee, MidCap Financial Trust, and ServisFirst Bank in accordance with the Bidding Procedures.

DATED: _____, 2018

Respectfully submitted,

POLSINELLI PC

/s/ Michael Malone
Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (*Pro Hac Vice*)
Caryn E. Wang (*Pro Hac Vice*)
1201 West Peachtree Street NW, Suite 1100
Atlanta, Georgia 30309
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**EXHIBIT D**
**GILMORE APA**

ASSET PURCHASE AGREEMENT

BY AND AMONG

AMORY REGIONAL MEDICAL CENTER, INC.

AMORY REGIONAL PHYSICIANS, LLC

CURAE HEALTH, INC.

AND

NORTH MISSISSIPPI HEALTH SERVICES, INC.

DATED AS OF AUGUST 31, 2018

## LIST OF SCHEDULES

| | |
|---|---|
| Schedule 2.1(l) | Assumed Contracts |
| Schedule 2.1(n) | Trademarks/Domain Names/Restricted Names |
| Schedule 2.2(l) | Other Excluded Assets |
| Schedule 2.3(a)(iii) | Assumed Capital Leases |
| Schedule 2.3(b) | Cure Amounts |
| Schedule 2.3(c)(i) | Additional Assumed Contracts |
| Schedule 2.3(c)(ii) | Additional Excluded Contracts |
| Schedule 4.2 | Non-contravention |
| Schedule 4.3 | Subsidiaries; Minority Interests |
| Schedule 4.4(a) | Encumbrances |
| Schedule 4.5(a) | Historical Financial Information |
| Schedule 4.5(c) | Indebtedness |
| Schedule 4.6 | Permits and Approvals |
| Schedule 4.8 | Accreditation |
| Schedule 4.9(i) | Private Programs |
| Schedule 4.9(ii) | National Provider Identifiers; Provider Numbers |
| Schedule 4.9(iii) | CMS Reporting |
| Schedule 4.10 | Third-Party Payor Cost Reports |
| Schedule 4.12(c) | Information Privacy and Security Compliance |
| Schedule 4.16(a) | Owned Intellectual Property |
| Schedule 4.16(b) | Liens on Owned Intellectual Property |
| Schedule 4.16(c) | Violations of Intellectual Property Contracts |
| Schedule 4.16(d) | Claims Regarding Intellectual Property Infringement |
| Schedule 4.16(e) | Owned Intellectual Property Infringement |
| Schedule 4.16(g) | Open Source Materials |
| Schedule 4.17(a) | Contracts |
| Schedule 4.17(b) | Violations Under Assumed Contracts |
| Schedule 4.18 | Personal Property |
| Schedule 4.20(a) | List of Facilities |
| Schedule 4.20(b) | Owned Real Property |
| Schedule 4.20(c) | Leased Real Property |
| Schedule 4.20(d) | Rent Rolls |
| Schedule 4.20(e) | Third Party Leases |
| Schedule 4.21 | Insurance |
| Schedule 4.22(a) | Employee Benefit Plans |
| Schedule 4.22(e) | Benefit Plan Proceedings |
| Schedule 4.22(g) | Payments under Benefit Plans |
| Schedule 4.23(a) | Employees |
| Schedule 4.23(c) | Labor Matters |
| Schedule 4.24 | Litigation |
| Schedule 4.25 | Tax Matters |
| Schedule 4.26 | Environmental Matters |
| Schedule 4.28 | Affiliate Transactions |
| Schedule 4.29 | Brokers and Finders |
| Schedule 5.2 | Buyer Non-contravention |
| Schedule 6.2 | Conduct of Business |

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | Sale Order |
| Exhibit B | Sale Procedures Motion and Sale Procedures Order |
| Exhibit C | Lease Assignment |
| Exhibit D | Bill of Sale |
| Exhibit E | Assignment and Assumption Agreement |
| Exhibit F | Power of Attorney |
| Exhibit G | Transition Services Agreement |
| Exhibit H | Escrow Agreement |
| Exhibit I | Trademark Assignment Agreement |
| Exhibit J | Domain Name Assignment Agreement |
| Exhibit K | Curae Restrictive Covenants Agreement |

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into effective as of August 31, 2018 by and among Amory Regional Medical Center, Inc., a Tennessee non-profit corporation qualified to do business in Mississippi (with ARP, "**Seller**"), Amory Regional Physicians, LLC, a Tennessee limited liability company qualified to do business in Mississippi ("ARP"), Curae Health, Inc., a Tennessee non-profit corporation qualified to do business in Tennessee ("**Curae**") and North Mississippi Health Services, Inc., a Delaware non-profit corporation qualified to do business in Mississippi or its designated controlled Affiliate ("**Buyer**" and collectively with Seller and Curae, the "**Parties**").

## W I T N E S S E T H

**WHEREAS**, Seller owns and operates Gilmore Medical Center, a 95 bed acute care hospital and related healthcare operations and facilities located in Amory, Mississippi (the "**Hospital**"); and

**WHEREAS**, Seller has delegated responsibility for the management of the Hospital to Curae Health, Inc., a Tennessee nonprofit corporation ("**Curae**"), pursuant to a management services agreement; and

**WHEREAS**, Seller has filed voluntary petitions (collectively, the "**Bankruptcy Case**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Tennessee (the "**Bankruptcy Court**") prior to the date of this Agreement; and

**WHEREAS**, the Parties intend that Buyer be designated as the Stalking Horse Bidder (as defined in the Sale Procedures Order);

**WHEREAS**, Seller desires to sell and assign to Buyer, and Buyer desires to purchase and assume from Seller, all of the Purchased Assets and Assumed Liabilities, in each case on the terms and conditions set forth herein, and, as applicable, free and clear of all Encumbrances (other than Permitted Encumbrances) in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and

**WHEREAS**, following Bankruptcy Court approval of this Agreement and entry of the Sale Order and satisfaction of other conditions set forth herein, the Parties intend to consummate the Contemplated Transactions as further described herein.

**NOW, THEREFORE**, for and in consideration of the premises, the agreements, covenants, representations and warranties set forth in this Agreement, and other good and valuable consideration, the receipt and adequacy of which are acknowledged and agreed, the Parties agree as follows:

1. **DEFINITIONS; INTERPRETATION.**

    1.1 **Definition**. As used herein the terms below shall have the following meanings:

    "**AAA**" is defined in Section 13.4(c).

    "**Accounting Firm**" is defined in Section 2.8(c).

    "**Affiliate**" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question and any successors or assigns of

Case 3:18-bk-05665   Doc 79   Filed 08/31/18   Entered 08/31/18 18:22:55   Desc Main
Document      Page 87 of 177

such Person; provided, however, that (a) stockholders, officers or directors shall not be considered "Affiliates," and (b) except for a Person's direct and indirect subsidiaries, and other Persons controlled (directly or indirectly) by such Person, no association, corporation, limited liability company, partnership, limited liability partnership, trust or other Person shall be considered an "Affiliate" solely as a result of any direct or indirect ownership, control or other relationship between the stockholders, officers or directors of such Person. For purposes of this definition, "control" means possession, directly or indirectly, of the power to direct, or cause the direction of, the management and policies of a Person whether through ownership of voting securities, by Contract or otherwise.

"**Agency Settlements**" is defined in Section 7.4(a).

"**Agreed Upon Assignments**" is defined in Section 6.3(b).

"**Agreement**" is defined in the preamble to this Agreement.

"**Allocation**" is defined in Section 11.1.

"**ALTA**" means the American Land Title Association.

"**Alternative Transaction**" is defined in Section 6.13.

"**Approval**" means any approval, authorization, consent, notice, qualification or registration, or any extension, modification, amendment or waiver of any of the foregoing, of or from, or any notice, statement, filing or other communication to be filed with or delivered to, any Governmental Authority or any other Person.

"**Arbitration Notice**" is defined in Section 13.4(d)(i).

"**Arbitrators**" is defined in Section 13.4(d).

"**ARP**" shall mean Amory Regional Physicians, LLC, a Tennessee limited liability company qualified to do business in Mississippi.

"**Assignment and Assumption Agreement**" is defined in Section 3.2(d).

"**Assumed Capital Leases**" means those capital lease obligations of Seller that are included among the Assumed Contracts and set forth on Schedule 2.3(a)(iii).

"**Assumed Contracts**" is defined in Section 2.1(l).

"**Assumed Indebtedness**" means the aggregate amount (as of immediately prior to the Effective Time) of the current and long-term Liabilities of Seller under the Assumed Capital Leases, if any, all as set forth in the Closing Statement.

"**Assumed Liabilities**" is defined in Section 2.3(a).

"**Assumed Paid Time Off**" is defined in Section 7.1(c).

"**Auction**" has the meaning set forth in the Sale Procedures Order.

"**Backup Bidder**" has the meaning set forth in the Sale Procedures Order.

"**Balance Sheet Date**" means May 31, 2018.

"**Bankruptcy Case**" is defined in the recitals to this Agreement.

"**Bankruptcy Code**" means Title 11 of the United States Code, Sections 101 *et seq.*

"**Bankruptcy Court**" is defined in the recitals to this Agreement.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedures

"**Bid Protections**" is defined in Section 6.17(f).

"**Bill of Sale**" is defined in Section 3.2(c).

"**Books and Records**" means originals, or where not available, copies (including in electronic format), of books and records maintained in connection with the Business or the Purchased Assets, including books and records relating to books of account, ledgers and general financial accounting records, Physician records, medical staff records, personnel records, machinery and equipment maintenance files, patient and customer lists, price lists, distribution lists, supplier lists, quality control records and procedures, customer and patient complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, marketing plans, internal financial statements and marketing and promotional surveys, pricing and cost information, material and research that relate to the Business.

"**Break-Up Fee**" is defined in Section 6.17(f).

"**Business**" means the ownership and operation of the Hospital and all assets and operations ancillary to or associated with any of the foregoing as currently conducted or as contemplated by Seller to be conducted in the future, including any interest or management contracts related to physician practices controlled or managed by the Hospital or its Affiliates.

"**Business Day**" means any day except Saturday, Sunday and any day which is a legal holiday in the State of Mississippi.

"**Business Offerings**" means any products or services designed, developed, offered, provided, licensed or otherwise distributed by or for Seller or any Seller Affiliate related to the Business, or that Seller or any Seller Affiliate intends to offer for license, provide or otherwise distribute in connection with the Business, including any products or service offerings under development that form the basis, in whole or in part, of any revenue or business projection provided to Buyer.

"**Buyer**" is defined in the preamble to this Agreement.

"**Buyer Employer**" means Buyer or one of its Affiliates.

"**Buyer Fundamental Representations**" means, collectively, the representations and warranties set forth in Section 5.1 (Organization; Capacity), Section 5.2 (Authority; Non-contravention; Binding Agreement) and Section 5.4 (Brokers and Finders).

"**Buyer Indemnified Parties**" is defined in Section 10.1(a).

"**Buyer Threshold**" is defined in Section 10.2(b).

4822-2526-1169.2                                    3

"**Cardholder Data**" is defined in <u>Section 4.16(i)</u>.

"**Closing**" is defined in <u>Section 3.1</u>.

"**Closing Date**" is defined in <u>Section 3.1</u>.

"**Closing Statement**" is defined in <u>Section 2.8(a)</u>.

"**Closing Working Capital**" means Net Working Capital as of immediately prior to the Effective Time.

"**CMS**" means the Centers for Medicare & Medicaid Services.

"**CMS Program Payments**" means payments or discounts that are not based directly on the submission of claims for services delivered and are received through participation in a CMS program implemented by CMS through a contract with CMS or as a participant through a contract with a CMS contractor. Such programs include, but are not limited to, Medicare accountable care organizations, episode-based payment initiatives and other Medicare Innovation Models as implemented by CMS as authorized pursuant to the laws and regulations identified in CMS Reporting.

"**CMS Reporting**" means any cost, quality, performance, and electronic reporting requirements implemented by CMS pursuant, but not limited, to the Social Security Act, the Patient Protection and Affordable Care Act of 2010 (or any replacement or successor Law), the Health Care and Education Reconciliation Act of 2010, the Pathway for Sustainable Growth Reform (SGR) Act of 2013, the Protecting Access to Medicare Act of 2014, the Improving Medicare Post-Acute Care Transformation Act of 2014 (IMPACT), American Taxpayer Relief Act of 2012 (ATRA), Balanced Budget Act of 1997 (BBA), the Medicare, Medicaid and SCHIP (State Children's Health Insurance Program) Balanced Budget Refinement Act of 1999 (BBRA), the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA), the 21st Century Cures Act, the HITECH Act, the Medicare Access & CHIP Reauthorization Act of 2015 (MACRA) and/or the Bipartisan Balanced Budget Act of 2018, each of which may be amended from time to time by a Balanced Budget Act of the United States Congress, each applicable at such time as healthcare services are rendered.

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985, the Public Health Service Act, codified as 42 U.S.C. §§ 300bb-1 through 300bb-8, and any similar state or federal continuation of coverage Laws.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**Commitments**" is defined in <u>Section 6.6(a)</u>.

"**Confidential Information**" means all information (whether or not specifically identified as confidential), in any form or medium that relates to the Purchased Assets or the Business, including: (a) internal business information related to the Business (including, information relating to strategic plans and practices, business, accounting, financial or marketing plans, practices or programs, training practices and programs, salaries, bonuses, incentive plans and other compensation and benefits information and accounting and business methods); (b) identities of, individual requirements of, specific contractual arrangements with, and information about, the Business or any Purchased Asset; (c) any confidential or proprietary information of any third party that Seller has a duty to maintain confidentiality of, or use only for certain limited purposes; (d) industry research compiled by, or on behalf of the Business, Seller, or

4822-2526-1169.2                                                    4

any Seller Affiliate, including, identities of potential target companies, management teams, and transaction sources identified by, or on behalf of, Seller or any Seller Affiliate; (e) compilations of data and analyses, processes, methods, track and performance records, data and data bases relating thereto; (f) information related to the Transferred Intellectual Property and updates of any of the foregoing; and (g) information obtained in connection with Section 10.3 during the prosecution or defense of any Third-Party Claim; provided that Confidential Information shall not include any information that has become generally known to and widely available for use within the industry other than as a result of the acts or omissions of Seller or a Person that Seller has any direct control over to the extent such acts or omissions are not authorized by Seller in the performance of such Person's assigned duties for Seller.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement by and between Curae and Buyer, dated as of March 29, 2017.

"**Contemplated Transactions**" means, collectively, the transactions contemplated by, or related to, this Agreement, including (a) the sale and purchase of the Purchased Assets and (b) the execution, delivery and performance of this Agreement and the other Transaction Documents.

"**Contracts**" means any legally binding oral or written commitment, promise, contract, lease, sublease, license, sublicense, guaranty, indenture, occupancy or other agreement or arrangement of any kind (and all amendments, side letters, modifications and supplements thereto).

"**Copyrights**" means all copyrights, whether in published or unpublished works, which include literary works, and any other original works of authorship fixed in any tangible medium of expression (including nutritional and weight loss manuals and written programs); Software, web site and online application content; rights to compilations, collective works and derivative works of any of the foregoing; and registrations and applications for registration for any of the foregoing and any renewals or extensions thereof.

"**Cost Report**" means any cost report required to be filed in respect of the Business pursuant to a Government Program or any third-party payor program.

"**Covered Person**" means any officer, director, manager, employee or independent contractor of (a) Buyer Employer or any of Buyer Employer's Affiliates who, as of any date of determination, works at, or provides services to, the Business, or worked at, or provided services to, the Business at any time during the twelve (12) month period prior to such date of determination, or (b) Seller or any Seller Affiliate, working at, or providing services to, the Business, at any time during the six (6) month period immediately prior to the Effective Time.

"**Curae**" is defined in the recitals above.

"**Curae Restrictive Covenants Agreement**" is defined in Section 3.2(j).

"**Cure Amounts**" means the amounts, if any, determined by the Bankruptcy Court to be necessary to cure all defaults and to pay all actual Losses that have resulted from such defaults under the Assumed Contracts.

"**Damaged Assets**" is defined in Section 6.15.

"**Deductible**" is defined in Section 10.1(b).

"**Deeds**" is defined in Section 3.2(a).

4822-2526-1169.2                     5

"**Domain Name Assignment Agreement**" is defined in Section 3.2(i).

"**Domain Names**" means Internet electronic addresses, uniform resource locators and alphanumeric designations associated therewith registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic address on the Internet, rights in social media accounts and social media pages, and all applications for any of the foregoing.

"**DRG**" is defined in Section 7.8(a).

"**DRG Transition Patients**" is defined in Section 7.8(a).

"**Effective Time**" is defined in Section 3.1.

"**Encumbrance**" means any claim, charge, easement, servitude, assessment, encumbrance, encroachment, defect in title, security interest, bailment (in the nature of a pledge or for purposes of security), mortgage, deed of trust, the grant of a power to confess judgment, conditional sales and title retention, lease, sublease, option, right of first refusal or first offer, lien, hypothecation, pledge, restriction or other similar arrangement or interest in real or personal property, whether imposed by Contract, Law, equity or otherwise.

"**End Date**" is defined in Section 12.1(c).

"**Environmental Condition**" means any event, circumstance or conditions related in any manner whatsoever to: (a) the current or past presence or spill, emission, discharge, disposal, release or threatened release of any hazardous, infectious or toxic substance or waste (each term as defined by any applicable Environmental Laws) or any chemicals, pollutants, petroleum, petroleum products or oil, infectious waste material, medical waste, human tissue, syringes, needles, any material contaminated with bodily fluids of any type, character or nature, friable asbestos, toxic mold and poly-chlorinated biphenyls ("**PCBs**") (collectively, "**Hazardous Materials**"), into the environment; (b) the on-site or off-site treatment, storage, disposal or other handling of any Hazardous Material originating on or from the Business or any portion of the Real Property; (c) the placement of structures or materials into waters of the United States; (d) the presence of any Hazardous Materials in any building, structure or workplace or on any portion of the Real Property; or (e) any violation of Environmental Laws at or on any portion of the Real Property or arising from the activities of Seller, any Seller Affiliate, or any other Person at the Hospital involving Hazardous Materials.

"**Environmental Laws**" means all Laws relating to pollution, the environment or human health and safety (including worker health and safety), including the Comprehensive Environmental Recovery, Compensation, and Liability Act, as amended, 42 U.S.C. § 6901, *et seq.*, the Clean Air Act, 42 U.S.C. § 7401; OSHA; and all other Laws relating to emissions, discharges, releases, or threatened releases of pollutants, contaminants, chemicals, pesticides, or industrial, infectious, toxic or hazardous substances or wastes into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or otherwise relating to the processing, generation, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, chemicals, or industrial, infectious, toxic, or hazardous substances or wastes.

"**ERISA**" is defined in Section 4.22(a).

"**ERISA Controlled Group**" is defined in Section 4.22(d).

"**Escrow Account**" is defined in Section 2.7(d).

"**Escrow Agent**" means _____

"**Escrow Agreement**" is defined in Section 3.2(g).

"**Escrow Amount**" is defined in Section 2.7(d).

"**Escrow Release Date**" is defined in Section 10.11.

"**Estimated Assumed Indebtedness**" is defined in Section 2.6(a).

"**Estimated Business Loss**" is defined in Section 6.15.

"**Estimated Closing Statement**" is defined in Section 2.6(a).

"**Estimated Purchase Price**" is defined in Section 2.6(a).

"**Estimated Working Capital**" is defined in Section 2.6(a).

"**Exception Claim**" is defined in Section 10.3(a).

"**Excluded Assets**" is defined in Section 2.2.

"**Excluded Contracts**" means all Contracts other than the Assumed Contracts.

"**Excluded Liabilities**" is defined in Section 2.4.

"**Expense Reimbursement**" is defined in Section 6.17(f).

"**Exhibits**" means the exhibits to this Agreement.

"**Facility**" means the Hospital as defined in the recitals hereto and all other healthcare facilities, healthcare operations, or Physician practices owned, leased, managed or operated by Seller or any Seller Affiliate related to or associated with the Hospital and all assets and operations ancillary to or associated with any of the foregoing.

"**False Claims Act**" is defined in Section 4.11(d).

"**Federal Anti-Kickback Statute**" is defined in Section 4.11(d).

"**Federal Fiscal Year**" means the fiscal year of the federal government of the United States.

"**Final and Binding**" means, with respect to any calculation or determination, that such calculation or determination shall have the same preclusive effect for all purposes as if such calculation or determination had been embodied in a final judgment, no longer subject to appeal, entered by a court of competent jurisdiction.

"**Final Order**" means an Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial,

4822-2526-1169.2                                         7

stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Action or Order shall have become final in accordance with Bankruptcy Rule 8002; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"**Final Resolution Date**" means the earliest to occur of (a) thirty (30) days after delivery of the Closing Statement if a Post-Closing Notice of Disagreement is not timely received by Buyer in accordance with Section 2.8, (b) the date Buyer and Seller resolve in writing all differences they have with respect to the matters specified in a Post-Closing Notice of Disagreement, if timely received by Buyer in accordance with Section 2.8 or (c) the date all disputed matters set forth in a Post-Closing Notice of Disagreement, if timely received by Buyer in accordance with Section 2.8, are finally resolved in writing by the Accounting Firm in accordance with Section 2.8.

"**First Arbitrator**" is defined in Section 13.4(d)(ii).

"**FTC**" means the Federal Trade Commission.

"**FTC Red Flag Rules**" means the regulations set forth in 16 C.F.R. Part 681.

"**GAAP**" means United States generally accepted accounting principles and practices as in effect from time to time.

"**Government Programs**" means the Medicare (including Medicare Part D and Medicare Advantage), Medicaid, Medicaid-waiver and CHAMPUS/TRICARE programs, any other similar or successor federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) and any similar state or local programs.

"**Governmental Authority**" means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal, special district or other instrumentality of any government, whether federal, state or local, domestic or foreign, and any self-regulatory organization, including Medicare Administrative Contractors (MACs).

"**Ground Lease**" means that certain Ground Lease dated April 27, 2017 by and between Amory Regional medical Center, Inc., as landlord, and CHCT Mississippi, LLC, as tenant for those certain medical office buildings being improved property known as: (i) 1107 Earl Frye Blvd.; (ii) 1111 Earl Frye Blvd.; and (iii) 1127 Earl Frye Blvd.

"**Hazardous Materials**" is defined in the definition of Environmental Condition.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996 and all regulations promulgated thereunder, including the Privacy Standards (45 C.F.R. Parts 160 and 164), the Electronic Transactions Standards (45 C.F.R. Parts 160 and 162), and the Security Standards (45 C.F.R. Parts 160, 162 and 164), as amended by the HITECH Act, the final HIPAA/HITECH Omnibus Rules published by the U.S. Department of Health and Human Services on January 25, 2013, and as otherwise may be amended from time to time.

4822-2526-1169.2                                            8

"**Historical Financial Information**" is defined in <u>Section 4.5(a)</u>.

"**HITECH Act**" means the Health Information Technology for Economic and Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009, Pub. Law No. 111-5 and its implementing regulations, including 42 C.F.R. §§ 412, 413, 422 and 495, as amended by the HIPAA Omnibus Rule, issued on January 25, 2013, effective as of March 26, 2013.

"**Hospital**" is defined in the recitals to this Agreement.

"**Immediate Family Member**" means husband or wife; birth or adoptive parent, child, or sibling; stepparent, stepchild, stepbrother, or stepsister; father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law; grandparent or grandchild; and spouse of a grandparent or grandchild.

"**Immigration Act**" means the Immigration Reform and Control Act of 1986.

"**Indebtedness**" means, at any specified time (without duplication), any of the following Liabilities of any Person (whether or not contingent and including any and all principal, accrued and unpaid interest, prepayment premiums or penalties, related expenses, commitment and other fees, sale or liquidity participation amounts, reimbursements, indemnities and other amounts which would be payable in connection therewith): (a) any Liabilities of such Person for borrowed money or in respect of loans or advances; (b) any Liabilities of such Person evidenced by bonds, debentures, notes, or other similar instruments or debt securities; (c) any Liabilities of such Person as lessee under any lease or similar arrangement required to be recorded as a capital lease in accordance with GAAP; (d) all Liabilities of such Person under or in connection with letters of credit or bankers' acceptances, performance bonds, sureties or similar obligations; (e) any Liabilities of such Person to pay the deferred purchase price of property, goods or services other than those trade payables incurred in the ordinary course of business, which are not more than sixty (60) days past due; (f) all Liabilities of such Person arising from cash/book overdrafts; (g) all Liabilities of such Person under conditional sale or other title retention agreements; (h) all Liabilities of such Person with respect to vendor advances or any other advances made to such Person; (i) all Liabilities of such Person arising out of interest rate and currency swap arrangements and any other arrangements designed to provide protection against fluctuations in interest or currency rates; (j) all Liabilities to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interests or any warrant, right or option to acquire such equity interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference <u>plus</u> accrued and unpaid dividends; (k) any Liabilities of such Person related to unfunded 401(k) plans, pension plans, profits sharing plans or similar retirement plan or obligations; and (l) any Liabilities of others guaranteed by, or secured by any Encumbrance on the assets of, such Person, whether or not such indebtedness, liabilities or obligations shall have been assumed by such Person or is limited in recourse.

"**Indemnified Party**" means a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, seeking indemnification pursuant to <u>Article 10</u>.

"**Indemnifying Party**" means a Party from whom indemnification is sought pursuant to <u>Article 10</u>.

"**Information Privacy or Security Laws**" means HIPAA and all other Laws concerning the privacy or security of Personal Information, including state data breach notification Laws, state health privacy and information security Laws, the FTC Act, the FTC Red Flag Rules and state consumer protection Laws.

"**Information Technology Systems**" means all information technology systems, Software, computers, workstations, databases, routers, hubs, switches, networks and other information technology equipment used or held for use in, or otherwise relating to, the Business.

"**Insurance Policies**" is defined in Section 4.21.

"**Intellectual Property**" means any and all of the following, and rights in, arising out of, or associated therewith, throughout the world: Copyrights, Domain Names, Patents, Trademarks and Trade Secrets, the right to use the names and likenesses of natural persons and publicity and privacy rights generally, any other proprietary rights now known or hereafter recognized in any jurisdiction worldwide, copies and tangible embodiments thereof (in whatever form or medium), and the right to sue and recover damages or other remedies for past, present and future infringement, misappropriation, dilution, or other violation thereof.

"**Intellectual Property Contracts**" means all Contracts (including licenses, indemnification agreements, co-existence agreements, and covenants not to sue) that relate to the Transferred Intellectual Property, including any Contracts: (a) under which Seller has granted or agreed to grant to any other person any license, covenant, release, immunity or other right that applies to any Owned Intellectual Property (including any source code escrow agreements); or (b) under which any other Person has granted or agreed to grant to Seller any license, covenant, release, immunity or other right with respect to Intellectual Property rights or technology.

"**Interim Billings**" is defined in Section 7.8(b).

"**Inventory**" means all usable inventory and supplies used or held for use in, or otherwise relating to, the Business.

"**IRS**" means the Internal Revenue Service.

"**Justice Department**" means the United States Department of Justice.

"**Knowledge of Buyer**" means the actual knowledge after due inquiry of Shane Spees.

"**Knowledge of Seller**" means the actual knowledge after due inquiry of Steve Clapp and J. Allen Tyra.

"**Law**" means any constitutional provision, statute, law, rule, regulation, code, ordinance, accreditation standard, resolution, Order, ruling, promulgation, policy, treaty directive, interpretation, or guideline adopted or issued by any Governmental Authority.

"**Lease Assignment**" is defined in Section 3.2(b).

"**Leased Real Property**" means all real property leased, subleased or licensed to, or for which a right to use, possess or occupy has been granted to, Seller or any Seller Affiliate and used or held for use in, or otherwise relating to, the Business, together with all rights, easements and privileges appertaining or relating to such real property, and all improvements located on such real property.

"**Liability**" means any liability, Indebtedness, obligation, deficiency, interest, Tax, penalty, fine, claim, demand, judgment, cause of action or other Losses (including loss of benefit or relief), cost or expense of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute, fixed, or contingent, accrued or unaccrued, liquidated or unliquidated, recorded or unrecorded, due or to

4822-2526-1169.2                                      10

become due or otherwise, and regardless of when asserted.

"**Losses**" means any and all losses, Liabilities, Proceedings, causes of action, costs, damages, or expenses, whether or not arising from or in connection with any Third-Party Claims (including interest, penalties, reasonable attorneys', consultants' and experts' fees and expenses and all amounts paid in investigation, defense or settlement of any of the foregoing); provided that Losses shall not include punitive or exemplary damages except to the extent awarded in connection with a Third-Party Claim.

"**LVP**" is defined in Section 7.10(b).

"**Malicious Code**" means any virus, trojan horse, worm, ransom ware, back door, time bomb, drop dead device or other software routines or hardware components designed to permit unauthorized access, to disable, erase or otherwise harm Software, hardware or data, or to disable a computer program automatically with the passage of time or under the positive control of a Person other than the user of the program.

"**Material Adverse Effect**" means any change, fact, circumstance, occurrence, event, effect or condition that, individually or in the aggregate with all other changes, facts, circumstances, occurrences, events, effects or conditions, directly or indirectly, results in, or could reasonably be expected to result in, a material adverse effect on (a) the ability of Seller to consummate the Contemplated Transactions or (b) the business, operation, condition (financial or otherwise), results of operations, prospects, assets or Liabilities of the Hospital, the Business, the Real Property or the Purchased Assets, except to the extent resulting from (i) changes in general local, domestic, foreign, or international economic conditions, (ii) changes generally affecting the healthcare industry, (iii) acts of war, sabotage or terrorism, military actions or the escalation thereof, (iv) any changes in applicable Laws or accounting rules or principles, including changes in GAAP, (v) the commencement of the Bankruptcy Case (but only to the extent that such change, fact, circumstance, occurrence, event, effect or condition could have been reasonably anticipated prior to the failing thereof), or (vi) the announcement of the Contemplated Transactions, provided that, in each case of clauses (i), (ii), (iii) and (iv), such change, fact, circumstance, occurrence, event, effect or condition does not affect the Hospital or the other Hospital, in a substantially disproportionate manner relative to other similarly-situated hospitals or facilities.

"**Material Contracts**" is defined in Section 4.17(a).

"**MDSP**" is defined in Section 7.10(a).

"**Medicare Physician Fee Schedule**" means the payment structure established under the Social Security Act, Section 1848 (42 U.S.C. Section 1395w-4), effective January 1, 1992, and implementing regulations, pursuant to which CMS reimburses Physicians, non-physician practitioners and certain other suppliers for delivery of Medicare Part B healthcare services.

"**MU**" is defined in Section 7.10(c).

"**Net Working Capital**" means, as of any date of determination, the aggregate value of the Prepaid Expenses and the Inventory, less the aggregate value of the Assumed Paid Time Off, in the case of the Prepaid Expenses and the Assumed Paid Time Off, calculated in accordance with GAAP.

"**NPIs**" is defined in Section 2.1(p).

"**Objections**" is defined in Section 6.6(c).

"**OFAC**" means the Office of Foreign Asset Contract of the Department of Treasury.

"**OIG**" means the Office of the Inspector General of the U.S. Department of Health and Human Services.

"**Open Source Materials**" means Software (including source code, object code, libraries and middleware) or other materials that are licensed pursuant to the GNU General Public License (GPL), the GNU Lesser Public License (LGPL), the GNU Affero General Public License (AGPL), the Mozilla Public License, the BSD Licenses, the Artistic License, the Common Development and Distribution License, the Eclipse Public License, all Creative Commons "sharealike" licenses, any other license approved as an open source license by the Open Source Initiative or other similar licensing regimes, or any license that requires, as a condition of use, modification or distribution of such Software or other materials, that such Software or other materials, or any other Intellectual Property incorporated into, derived from, used, or distributed with such Software or other materials: (a) in the case of Software, be made available or distributed in a form other than binary (e.g., source code form); (b) be licensed for the purpose of preparing derivative works; (c) be licensed under terms that allow such Software or materials or portions thereof or interfaces therefor to be reverse engineered, reverse assembled or disassembled (other than by operation of Law) or (d) be redistributable at no license fee.

"**Order**" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority or an arbitrator, mediator or other judicially sanctioned Person or body.

"**OSHA**" means the Occupational Safety and Health Act, 29 U.S.C. § 600, *et seq.*

"**Owned Intellectual Property**" means any and all Intellectual Property, to the extent used or held for use in, or otherwise relating to, the Business or the Purchased Assets, that is owned or purported to be owned by Seller or any Seller Affiliate.

"**Owned Real Property**" means all real property that is owned in whole or in part by Seller or any Seller Affiliate that is (a) used or held for use in, or otherwise relating to, the Business, (b) currently under development for use in the Business, or (c) undeveloped or unused real property located within the Restricted Area, in each case, together with all rights and interests under any Third Party Leases, all improvements, buildings or fixtures located thereon or therein, all easements, rights of way, and other appurtenances thereto (including appurtenant rights in and to public street(s)), all architectural plans or design specifications relating to the development thereof, and all claims and recorded or unrecorded interests therein, including any and all options to acquire such real property.

"**Paid Time Off**" means Seller Employees' accrued vacation, sick, holiday or other paid time off and related Taxes and other payroll obligations.

"**Parties**" is defined in the preamble to this Agreement.

"**Pass-Thru Payments**" is defined in Section 7.4(b).

"**Patents**" means all inventions (whether or not patentable and whether or not reduced to practice), patents, industrial and utility models, industrial designs, certificates of invention, and any other indicia of invention ownership issued or granted by any Governmental Authority, including all provisional applications, priority and other applications, divisionals, continuations (in whole or in part), extensions, reissues, reexaminations or equivalents or counterparts of any of the foregoing.

Case 3:18-bk-05665    Doc 79    Filed 08/31/18    Entered 08/31/18 18:22:55    Desc Main
Document      Page 98 of 177

"**Payor Agreement**" means any Contract between Seller and a Government Program or a Private Program under which the Business or Seller directly or indirectly receives payments for medical services provided to such program's beneficiaries at the Hospital.

"**PCBs**" is defined in the definition of Environmental Condition.

"**Permit**" means any consent, ratification, registration, waiver, authorization, license, permit, grant, franchise, concession, exemption, order, notice, certificate or clearance issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law.

"**Permitted Encumbrances**" means (a) zoning and building Laws, ordinances, resolutions and regulations, (b) statutory liens for real property Taxes not due and payable on or before the Effective Time, (c) the Assumed Capital Leases, and (d) the title and survey matters approved by Buyer in accordance with Section 6.6, and (e) any Encumbrances related to Assumed Liabilities or Assumed Contracts. No monetary Encumbrance will be deemed a Permitted Encumbrance except as expressly set forth in this Agreement.

"**Person**" means an individual, association, hospital authority, corporation, limited liability company, partnership, limited liability partnership, trust, Governmental Authority or any other entity or organization.

"**Personal Information**" means any information with respect to which there is a reasonable basis to believe that the information can be used to identify an individual, including "individually identifiable health information" as defined in 45 C.F.R. § 160.103, demographic information, and Social Security numbers.

"**Personal Property**" means all tangible and intangible personal property used or held for use in, or otherwise relating to, the Business, including all equipment, medical devices, medical and office supplies, diagnostic equipment, computer hardware and data processing equipment, furniture, fixtures, machinery, vehicles, office furnishings, instruments, leasehold improvements, telephones, telephone numbers, keys, security access cards and other tangible personal property used or held for use in, or otherwise relating to, the Business and, to the extent assignable or transferable by Seller, all rights in all warranties of any manufacturer, vendor, or other Person with respect thereto.

"**Petitioner**" is defined in Section 13.4(d)(ii).

"**Physician**" means a doctor of medicine or osteopathy, a doctor of dental surgery or dental medicine, a doctor of podiatric medicine, a doctor of optometry, or a chiropractor, as defined in section 1861(r) of the Social Security Act.

"**Plans**" is defined in Section 4.22(a).

"**Post-Closing Notice of Disagreement**" is defined in Section 2.8(b).

"**Power of Attorney**" is defined in Section 3.2(e).

"**Practitioner**" or "**Practitioners**" is defined in Section 4.6.

"**Prepaid Expenses**" means all prepaid expenses made with respect to the Business that are assumable and result in an economic benefit to the Buyer.

4822-2526-1169.2                    13

"**Private Program**" is defined in Section 4.9.

"**Proceeding**" means any action, arbitration, charge, claim, complaint, demand, dispute, audit, grievance, hearing, inquiry, investigation, self-disclosure, litigation, proceeding, qui tam action, suit (whether civil, criminal, administrative, judicial, or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any (a) Governmental Authority, (b) Medicare fiscal intermediary or administrative contractor, recovery audit contractor, zone program integrity contractor, or (c) arbitrator, whether at law or in equity.

"**Property Taxes**" shall mean all ad valorem, real property and personal property Taxes, all general and special private and public assessments relating to real property, and all similar obligations and Taxes.

"**Property Tax Statement**" is defined in Section 2.9(b).

"**Purchase Price**" is defined in Section 2.5.

"**Purchased Assets**" is defined in Section 2.1.

"**Real Property**" means, collectively, the Owned Real Property and the Leased Real Property.

"**Reference Balance Sheet**" is defined in Section 4.5(a)(ii).

"**Referral Source**" shall mean any of the following: (a) a Physician, an Immediate Family Member of a Physician, or an entity owned in whole or in part by a Physician or by an Immediate Family Member of a Physician; (b) any other Person who (i) makes, who is in a position to make, or who could influence the making of referrals of patients to any health care facility; (ii) has a provider number issued by Medicare, Medicaid or any other Government Program; or (iii) provides services to patients who have conditions that might need to be referred for clinical or medical care, and participates in any way in directing, recommending, arranging for or steering patients to any health care provider or facility; or (c) any Person or entity that is an Affiliate of any Person or other entity described in clause (a) or (b) above.

"**Representatives**" means, with respect to any Person, the officers, directors, employees, agents, attorneys, accountants, advisors, bankers, financing sources, and other authorized representatives of such Person.

"**Respondent**" is defined in Section 13.4(d)(ii).

"**Restricted Area**" means the geographic area identified on Attachment A to **Exhibit K**.

"**Restricted Business**" means any healthcare facility, business or service that may now or hereafter compete with the Hospital, whether provided in-person or through tele-medicine or other remote platform, including the following: acute care hospitals; long term acute care hospitals; psychiatric hospitals; specialty hospitals; ambulance or other healthcare related transportation services; medical office buildings; cancer treatment centers (including outpatient radiation oncology centers, gamma-knife centers and cyber-knife centers); children's, cardiac, rehabilitation, orthopedic, cancer, neuro, trauma or other facilities that specialize in one or more disease states; Physician practices; outpatient clinics, including surgery, urgent care, pain, burn, trauma, stroke, cancer and endoscopy centers; ambulatory surgery centers; free-standing emergency facilities or departments; psychiatric services; diagnostic imaging services; neonatal intensive care facilities; physical therapy facilities; catheterization laboratories; nursing facilities; parking facilities; and facilities used in or connection with or in support of

any such healthcare facility, business or service, including non-healthcare and administrative services such as parking, transportation, maintenance, dieting, linen, repair, engineering, and business, administrative, and technical support.

"**Restricted Names**" is defined in Section 2.1(n).

"**Restricted Period**" means the period beginning as of the Effective Time and ending on the fifth (5th) anniversary of the Effective Time.

"**Retirement Plans**" is defined in Section 4.22(f).

"**Sale Hearing**" has the meaning set forth in the Sale Procedures Order.

"**Sale Order**" means a Final Order of the Bankruptcy Court in substantially the form attached as Exhibit A approving, *inter alia*, (a) the sale of the Purchased Assets to Buyer free and clear of any Encumbrances (other than Permitted Encumbrances), Excluded Liabilities or interests, and (b) the assumption and assignment of the Assumed Contracts to Buyer; provided that any modifications thereto must be satisfactory to the Buyer in its sole discretion.

"**Sale Procedures Motion**" means a motion filed with the Bankruptcy Court substantially in the form attached as Exhibit B seeking approval of, among other things, the Sales Procedure Order and Sale Order.

"**Sale Procedures Order**" means a Final Order of the Bankruptcy Court in substantially the form attached as Exhibit B approving the procedures for the sale of Seller's assets; provided that any modifications thereto must be satisfactory to the Buyer in its sole discretion.

"**Schedules**" means the disclosure schedules and any other schedule to this Agreement.

"**Second Arbitrator**" is defined in Section 13.4(d)(ii).

"**Seller Affiliate**" means any Affiliate of Seller.

"**Seller Cost Reports**" is defined in Section 7.4(a).

"**Seller Employees**" means the employees of Seller or any Seller Affiliate who (i) work at the Hospital, or (ii) otherwise provide services primarily to the Business.

"**Seller Fundamental Representations**" means, collectively, the representations and warranties set forth in Section 4.1 (Organization; Capacity), Section 4.2 (Authority; Non-contravention; Binding Agreement), Section 4.3 (Subsidiaries; Minority Interests), Section 4.4 (Title to Assets; Sufficiency and Condition of Assets), Section 4.25 (Tax Matters), and Section 4.29 (Brokers and Finders).

"**Seller Indemnified Parties**" is defined in Section 10.2(a).

"**Seller Significant Representations**" means, collectively, the representations and warranties set forth in Section 4.6 (Permits and Approvals), Section 4.7 (Statutory Funds), Section 4.8 (Accreditation), Section 4.9 (Government Program Participation; Private Programs; Reimbursement), Section 4.10 (Third-Party Payor Costs Reports), Section 4.11 (Compliance with Laws), Section 4.12 (Information Privacy and Security Compliance), Section 4.13 (Compliance Program), Section 4.15 (Experimental Procedures), and Section 4.22 (Employee Benefit Plans).

4822-2526-1169.2                    15

"**Seller**" is defined in the preamble to this Agreement.

"**Social Security Act**" means the Social Security Act of 1935 and all regulations promulgated thereunder.

"**Software**" means any and all (a) computer programs and other software, including software implementations of algorithms, models, and methodologies, whether in source code, object code or other form, including libraries, subroutines and other components thereof; (b) computerized databases and other computerized compilations and collections of data or information, including all data and information included in such databases, compilations or collections (whether machine readable or otherwise) and rights therein; (c) screens, user interfaces, command structures, report formats, templates, menus, buttons and icons; (d) descriptions, flow-charts, architectures, development tools, and other materials used to design, plan, organize and develop any of the foregoing; and (e) all documentation, including development, diagnostic, support, user and training documentation related to any of the foregoing.

"**Standard Software**" means generally commercially available, "off the shelf" or "shrink wrapped" Software that has not been modified, customized for Seller or any Seller Affiliate, or used in the development or provision of any Business Offering and that has an annual license and support cost of $5,000 or less.

"**Stark Law**" is defined in Section 4.11(d).

"**Straddle Period**" is defined in Section 11.2(b).

"**Successful Bidder**" has the meaning set forth in the Sale Procedures Order.

"**Surveyor**" is defined in Section 6.6(b).

"**Surveys**" is defined in Section 6.6(b).

"**Survival Expiration Date**" is defined in Section 10.9.

"**Tail Policies**" is defined in Section 6.16.

"**Tax Proceeding**" is defined in Section 11.4.

"**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Taxes**" means (a) any and all federal, state, local, foreign, Property Taxes and other taxes, including net income, gross income, gross receipts, sales, use, ad valorem, hospital, provider, unclaimed property, transfer, franchise, profits, license, lease, rent, service, service use, withholding, payroll, employment, excise, severance, privilege, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties or other taxes, and other governmental fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts with respect thereto, (b) any Liability for payment of amounts described in clause (a) as a result of successor or transferee Liability or otherwise through operation of Law, and (c) any Liability for the payment of amounts described in clauses (a) or (b) as a result of any tax sharing, tax indemnity or tax allocation agreement or any other express or implied agreement to indemnify any other Person.

"**Tenant Lease**" means any lease, sublease, license, occupancy agreement or other contractual obligation pursuant to which Seller currently leases, subleases, licenses or otherwise uses, possesses or occupies all or some portion of the Leased Real Property (together with any applicable amendments, supplements, exhibits, addenda and modifications thereto).

"**Third Arbitrator**" is defined in Section 13.4(d)(ii).

"**Third Party Lease**" means any lease, sublease, license, occupancy agreement or other contractual obligation pursuant to which Seller currently leases, subleases, licenses or otherwise grants a right to use, possess or occupy to a third party all or some portion of the Real Property, together with any amendments, supplements, exhibits, addenda and modification thereto.

"**Third-Party Claim**" is defined in Section 10.3(a).

"**Title Company**" means [_____].

"**Title Evidence**" means, collectively, the Commitment and the Surveys.

"**Title Policy**" is defined in Section 6.6(a).

"**Trade Secrets**" means anything that would constitute a "trade secret" under applicable Laws, and, whether or not confidential, all business information (including ideas, research and development information, know-how, formulas, compositions, technical data, designs, drawings, specifications, research records, records of inventions, test information, financial, marketing and business data, customer and supplier lists and information, pricing and cost information, business and marketing plans and proposals).

"**Trademark Assignment Agreement**" is defined in Section 3.2(h).

"**Trademarks**" means trademarks, service marks, trade names (including fictitious, assumed and d/b/a names), certification marks, collective marks, and other proprietary rights to any words, names, slogans, symbols, logos or combinations thereof used to identify, distinguish and indicate the source or origin of goods or services; registrations, renewals, applications for registration, equivalents and counterparts of the foregoing; and the goodwill of the business associated with each of the foregoing.

"**Transaction Documents**" means this Agreement, the Transition Services Agreement, the Deeds, the Bill of Sale, the Assignment and Assumption Agreement, the Lease Assignments, the Power of Attorney, the Trademark Assignment Agreement, the Domain Name Assignment Agreement, the Escrow Agreement, the Curae Restrictive Covenants Agreement, and the other certificates, Contracts, instruments, and documents contemplated to be delivered or executed in connection with this Agreement.

"**Transfer Taxes**" means any real property transfer, sales, use, documentary, transfer, value added, stock transfer, and stamp Taxes, any transfer, recording, registration, and other fees, and any similar Taxes imposed on the transactions (or deemed transactions) contemplated by, or related to, this Agreement.

"**Transferred Employee**" is defined in Section 7.1(b).

"**Transferred Information Technology Systems**" means any and all Information Technology Systems, to the extent used or held for use in, or otherwise relating to, the Business that are owned or purported to be owned or licensed, or purported to be licensed, in whole or in part, by or to Seller or any

Case 3:18-bk-05665    Doc 79    Filed 08/31/18    Entered 08/31/18 18:22:55    Desc Main
                              Document        Page 103 of 177

Seller Affiliate, other than any Intellectual Property included in the definition of Excluded Assets.

"**Transferred Intellectual Property**" means any and all Intellectual Property, to the extent used or held for use in, or otherwise relating to, the Business or the Purchased Assets that is owned or purported to be owned or licensed or purported to be licensed, in whole or in part, by or to Seller or any Seller Affiliate, other than any Intellectual Property included in the definition of Excluded Assets.

"**Transition Patients**" is defined in <u>Section 7.8</u>.

"**Transition Patient Services**" is defined in <u>Section 7.8</u>.

"**Transition Services Agreement**" is defined in <u>Section 3.2(f)</u>.

"**VDR**" is defined in Section 1.2(l).

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101, *et seq*.

     **1.2**    **Interpretation**. In this Agreement, unless the context otherwise requires:

     (a)    references to this Agreement are references to this Agreement and to the Exhibits and Schedules attached or delivered with respect hereto or expressly incorporated herein by reference; each Schedule is hereby incorporated by reference into this Agreement and will be considered a part hereof as if set forth herein in full;

     (b)    references to "Articles" and "Sections" are references to articles and sections of this Agreement;

     (c)    references to any Party shall include references to its respective successors and permitted assigns and delegates;

     (d)    the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement;

     (e)    references to any agreement (including this Agreement) are references to that agreement as amended, consolidated, supplemented, novated or replaced in accordance with the terms and conditions therein from time to time;

     (f)    unless the context requires otherwise, references to any Law are references to that Law as of the Closing Date, and shall also refer to all rules and regulations promulgated thereunder;

     (g)    the word "including" (and all derivations thereof) means "including, without limitation," and any lists or examples following the word "including" or the phrase "including, without limitation," are intended to be non-exclusive examples solely for the purpose of illustration and without the intention of limiting the text preceding such lists or examples;

     (h)    references to time are references to Central Standard Time or Central Daylight Time (as in effect on the applicable day) unless otherwise specified herein;

     (i)    the gender of all words herein include the masculine, feminine and neuter, and the number of all words herein include the singular and plural;

4822-2526-1169.2          18

(j)     the provisions of this Agreement shall be interpreted in such a manner so as not to inequitably benefit or burden any Party through "double counting" of assets or Liabilities or failing to recognize benefits that may result from any matters that impose losses or burdens on any Party, including in connection with (i) the determination of the adjustments contemplated by Section 2.8; and (ii) the calculation of Losses;

(k)     the terms "date hereof," "date of this Agreement," and similar terms shall mean the date set forth in the preamble to this Agreement;

(l)     the phrases "Seller has delivered", "Seller has provided" "Seller has made available" and phrases of similar import shall mean that, prior to the date hereof, Seller has made the document or information in question available by posting a copy thereof to the date room made available to the Buyer (the "VDR") prior to the date of this Agreement;

(m)     references to the "ordinary course of business" shall mean the ordinary course of business consistent with past practice;

(n)     if any provision of this Agreement requires a Party to obtain the consent of another Party, such consent may be withheld or conditioned in the requested Party's sole and absolute discretion unless otherwise expressly provided herein;

(o)     nothing in the Schedules shall be deemed adequate to disclose an exception to a representation or warranty herein unless the Schedule identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself); and

(p)     each representation, warranty and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) that such Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty or covenant.

## 2.     SALE OF ASSETS AND CERTAIN RELATED MATTERS.

**2.1     Sale of Purchased Assets**. On the terms and subject to the conditions set forth in this Agreement, Seller shall sell, assign, convey, transfer, and deliver to Buyer, and Buyer shall purchase, acquire, and accept as of the Effective Time, good and marketable title to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances). "**Purchased Assets**" means all assets, properties, rights, and interests of every description, wherever situated and of whatever kind and nature, whether real, personal or mixed, tangible or intangible, used in or held for use in, or otherwise relating to, the Business (other than the Excluded Assets), including the following items:

(a)     Net Working Capital, as defined above;

(b)     fee simple title to the Owned Real Property and the rights of Seller or any Seller Affiliate against third parties under general warranty deeds or limited warranty deeds related to any such Owned Real Property;

(c)     [the leasehold interest of Seller located on 404 Gilmore Drive, Amory, MS pursuant to the Lease Agreement dated April 27, 2017, between Seller and CHCT Mississippi, LLC, a Delaware limited liability company, as lessor; the leasehold interest of the Seller located on 305 Highway 45N, Aberdeen, MS pursuant to the Lease Agreement dated April 27, 2017 between the Seller and CHCT Mississippi, LLC; the leasehold interest of the Seller located on 1107 Earl Frye Blvd., Amory, MS, pursuant to the Lease Agreement dated April 27, 2017; the leasehold interest of the Seller located on 1111 Earl Frye Blvd., Amory, MS, pursuant to the Lease Agreement dated April 27, 2017; and the leasehold interest of the Seller located on 1127 Earl Frye Blvd., Amory, MS, pursuant to the Lease Agreement dated April 27, 2017] (as well as any other leasehold title to the Leased Real Property (other than the Excluded Leased Real Property) and all other interests of Seller in all Tenant Leases, Third Party Leases, and leasehold improvements with respect to the Business);

(d)     Furniture, office equipment, medical equipment, computer hardware;

(e)     Seller's interests in joint ventures related to the Business, if any;

(f)     all Personal Property;

(g)     all registered and unregistered rights granted, applied for or otherwise now or hereafter in existence under, arising out of, or related to any software (whether hosted or installed on any hardware, in source code, object code or other form, computerized databases or other compilations, algorithms, user interfaces, command structures, report formats, templates, menus, architecture, development tools and all related documentation);

(h)     all Inventory, including any rights to rebates, refunds or discounts due with respect to the Inventory;

(i)     all Prepaid Expenses;

(j)     originals, or where not available, copies (including in electronic format), of all medical records, patient files, and other written accounts of the medical history of the Business' patients maintained in connection with the Business, to the extent transferable by Law;

(k)     the Books and Records;

(l)     subject to Section 2.3(c), the Contracts listed on Schedule 2.1(l) (collectively, the "**Assumed Contracts**");

(m)     all Permits and Approvals issued or granted by, or filed with or delivered to, any Governmental Authority to the extent assignable and that are used or held for use in, or otherwise relating to, the Business or the Purchased Assets or that have been filed or delivered by or on behalf of Seller (including any such Permits and Approvals that are pending);

(n)     all Transferred Intellectual Property, including the Trademarks (or variations thereof) that are used or held for use in, or otherwise relating to, the Business and all right, title and interest in and to the Domain Names set forth on Schedule 2.1(m), all Transferred Information Technology Systems, and all right, title and interest of Seller and any Seller Affiliate to use of the names set forth on Schedule 2.1(m) and any derivatives or variations thereof (the "**Restricted Names**");

(o)     any claims, causes of action or rights against third parties related to the Business or the Purchased Assets (including warranties, indemnities, rebates and guarantees), contractual or

otherwise, arising before or after the Effective Time;

(p) to the extent assignable, Seller's Government Program provider agreements and provider numbers and related national provider identifiers ("**NPIs**");

(q) to the extent applicable, Seller's goodwill associated with, or symbolized by, the Business and any other Purchased Assets;

(r) any insurance proceeds arising in connection with damage to the Purchased Assets occurring prior to the Effective Time; and

(s) to the extent not included in any of the foregoing, (i) any assets included in the determination of Closing Working Capital or reflected on the Reference Balance Sheet, other than any assets used, consumed or disposed of in the ordinary course of business since the Balance Sheet Date, (ii) any assets purchased or otherwise acquired since the Balance Sheet Date that are not reflected on the Reference Balance Sheet but that are used or held for use in, or otherwise relating to, the Business, and (iii) all other assets (other than the Excluded Assets) that are owned, leased or used by Seller or any Seller Affiliate and used or held for use in, or otherwise relating to the Business, whether or not scheduled or described herein.

2.2 **Excluded Assets**. Notwithstanding anything herein to the contrary, the following assets of Seller are not intended by the Parties to be a part of the Contemplated Transactions and are excluded from the Purchased Assets (collectively, the "**Excluded Assets**"):

(a) any bank account of Seller or any Seller Affiliate, and all cash and cash equivalents, marketable securities and other investments of Seller or any Seller Affiliate, including all cash and cash equivalents in any bank account of Seller or any Seller Affiliate;

(b) all accounts receivable generated, and other rights to receive payment for goods and services provided by Seller, in connection with the Business prior to the Effective Time;

(c) all Plans and records relating thereto;

(d) all organizational documents, corporate records, stock books, proprietary manuals, other proprietary materials of, or other records relating to the corporate organization of, Seller or any Seller Affiliate;

(e) rights that accrue or will accrue to Seller under this Agreement or the other Transaction Documents;

(f) any records that by Law Seller is required to retain in its possession, provided that Seller, at its expense, and to the extent permitted by Law, will deliver copies of such records to Buyer at the Closing;

(g) subject to Section 2.3(c), the Excluded Contracts;

(h) all rights to refunds of Taxes related to the Business or Purchased Assets to the extent related to periods prior to the Effective Time;

(i) any Permits or Approvals that are not transferable to Buyer pursuant to applicable Laws;

4822-2526-1169.2
21

(j)     any claims of Seller against third parties to the extent that such claims relate to the Excluded Assets or the Excluded Liabilities;

(k)     the Excluded Leased Real Property; and

(l)     those assets of Seller specifically identified on Schedule 2.2(l).

**2.3     Assumed Liabilities; Assignment of Contracts.**

(a)     On the terms and subject to the conditions set forth in this Agreement, Buyer shall assume as of the Effective Time the future payment and performance of the following Liabilities of Seller (collectively, the "**Assumed Liabilities**"):

(i)     Liabilities as of immediately prior to the Effective Time in respect of the Assumed Paid Time Off, but only to the extent that such Liabilities are reflected as a current Liability in the calculation of Closing Working Capital;

(ii)     all Liabilities relating to the period after the Effective Time arising under the Assumed Contracts;

(iii)     any Cure Amounts, which shall be satisfied by Buyer in connection with the assumption of any Assumed Contracts;

(iv)     the Assumed Capital Leases and the Assumed Contracts; and

(v)     all other Liabilities included in the calculation of Closing Working Capital.

(b)     Schedule 2.3(b) hereto sets forth Seller's good faith estimate of the Cure Amount for each Assumed Contract. Prior to the Sale Hearing, Seller shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all necessary actions to determine the actual amount of the Cure Amounts, including resolving any disputes as to Cure Amounts prior to or at the Sale Hearing, such that all Assumed Contracts may be assumed by Seller and assigned to Buyer in accordance with Section 365 of the Bankruptcy Code. The payment of all Cure Amounts shall be the sole responsibility of Buyer; provided, however, Buyer's total liability as determined by Buyer to pay the Cure Amounts shall not exceed $2,000,000 (the "Cure Cap"). In the event the Cure Amounts exceed the Cure Cap, the Buyer may, in its sole discretion: (i) choose not to cure any Assumed Contract, in which event such uncured Assumed Contract shall be excluded from the Purchased Assets and be deemed an Excluded Contract and listed on Schedule 2.3(c)(ii); (ii) pay the Cure Amounts for any Assumed Contract in full; or (iii) terminate this Agreement without further obligation.

(c)     Notwithstanding anything to the contrary herein, at any time (and from time to time) prior to the Closing, Buyer may (i) designate any Contract that binds or affects any of the Purchased Assets or to which Seller is a party or by which Seller is bound in connection with the Business or the Purchased Assets or binds or affects the Hospital and other operations and facilities managed by Curae (a "Multi-Facility Contract"), or as one that Buyer desires to have assigned to Buyer, in which case such Contract shall be deemed an Assumed Contract and listed on Schedule 2.3(c)(i) hereto; and/or (ii) designate any Assumed Contract as one that Buyer no longer desires to have assigned to Buyer, in which case such Contract shall be deemed an Excluded Contract and listed on Schedule 2.3(c)(ii) hereto. To the extent that a Multi-Facility Contract is designated as an Assumed Contract, Buyer shall only assume obligations related to the Hospital, and Seller shall use its commercially reasonable efforts to obtain any

such consents to assign any such Multi-Facility Contract. Any amount paid by Buyer to effectuate the assignment of a Multi-Facility Contract shall be considered in determining whether the Cure Cap is exceeded. To the extent that the assignment to Buyer of any Assumed Contract is not permitted by Law or is not permitted without the consent of another Person, and such restriction cannot be effectively overridden or canceled by the Sale Order or other related Order of the Bankruptcy Court prior to the Closing, then, at Buyer's option, Buyer may designate any such Assumed Contract (or purported Assumed Contract, if determined not to be assignable) as an Excluded Contract and, in such event, Seller shall use its commercially reasonable efforts to obtain any such consents to assign any such Assumed Contract. This Section 2.3(c) does not (A) require Seller to provide any financial accommodation to any applicable counterparty to any Contract in order to obtain its consent, other than Cure Amounts, (B) prohibit Seller from ceasing operations or winding up its affairs following the Closing, nor (C) constitute a waiver, if any, of any closing condition of Buyer, including with respect to the assignment of Assumed Contracts.

**2.4    Excluded Liabilities**. Other than the Assumed Liabilities, Buyer shall not be responsible to pay, perform, discharge or assume, and none of the Purchased Assets shall be or become liable for or subject to, any Liabilities of Seller or any Seller Affiliate, or any Liabilities otherwise related to the ownership or operation of the Business or the Purchased Assets prior to the Effective Time, or any Liabilities related to any acts or omissions by Seller or any Seller Affiliate (the "**Excluded Liabilities**").

**2.5    Purchase Price; Adjustments**. Subject to the terms and conditions hereof, the purchase price will be an amount equal to (i) $15,000,000 (including the $2,000,000 Buyer is placing into the Escrow Account at Closing), plus (ii) the amount of Net Working Capital (as defined above) of the Hospital at Closing, minus (iii) the lease obligations assumed with respect to the leasehold interests of Seller in property owned by CHCT Mississippi, LLC (including current portions and past due portions) that are assumed by Buyer as well as the obligations (including current portions and past due portions) that are assumed by Buyer with respect to any other capital leases assumed by Buyer (the "**Assumed Indebtedness**") (the resulting amount from the foregoing, as finally adjusted pursuant to Section 2.8, the "**Purchase Price**"). The Purchase Price to be paid by Buyer at Closing shall be based on estimates of the Closing Working Capital (as contemplated by Section 2.6(a)), and such amounts shall be subject to adjustment after the Closing pursuant to Section 2.8 and other provisions of this Agreement.

**2.6    Delivery of Estimated Closing Statement**.

(a)    Seller shall prepare and deliver to Buyer, not more than five (5) Business Days (but at least three (3) Business Days) prior to the Closing Date, a statement, in form and substance reasonably satisfactory to Buyer (the "**Estimated Closing Statement**"), setting forth in reasonable detail Seller's (i) good faith written estimate of the Closing Working Capital (the "**Estimated Working Capital**"), (ii) good faith written estimate of the Assumed Indebtedness (the "**Estimated Assumed Indebtedness**"), and (iii) calculation of the Purchase Price payable at Closing in accordance with Section 2.5 as if such Estimated Working Capital and Estimated Assumed Indebtedness were the actual amount of Closing Working Capital and Assumed Indebtedness (the Purchase Price as so estimated, the "**Estimated Purchase Price**"). All amounts set forth in the Estimated Closing Statement shall be subject to the review, comment, and approval of Buyer, which shall not be unreasonably withheld, conditioned, or delayed. To the extent requested by Buyer, Seller shall promptly provide Buyer with reasonable access to such information of Seller, including the information used by Seller in calculating such amounts, as is reasonably necessary for Buyer to review such amounts.

**2.7    Closing Date Payments**. At the Closing, Buyer shall make the following payments:

(a)    to Seller by wire transfer of immediately available funds to the bank account

designated by Seller in the Estimated Closing Statement, an amount equal to the (i) the Estimated Purchase Price, minus (ii) the Escrow Amount, and minus (iii) the unpaid and remaining amounts with respect to the Hospital's capitalized leases.

(b)　　to the applicable payees, by wire transfer of immediately available funds to the bank accounts designated by such payees, all Cure Amounts relating to the assignment and assumption of the Assumed Contracts, only up to the Cure Cap.

(c)　　to the Escrow Agent by wire transfer of immediately available funds to an escrow account (the "**Escrow Account**") established pursuant to the terms of the Escrow Agreement, an amount equal to $2,000,000 (the "**Escrow Amount**") to support Seller's indemnification obligations pursuant to and in accordance with Article 10 and Seller's payment obligations pursuant to and in accordance with Section 2.8.

**2.8    Post-Closing Adjustment to Purchase Price**.

(a)　　Not more than ninety (90) days after the Closing Date, Buyer shall prepare and deliver to Seller a statement (the "**Closing Statement**") setting forth in reasonable detail Buyer's calculation of (i) the actual amount of the Closing Working Capital, (ii) the actual amount of the Assumed Indebtedness; and (iii) the Purchase Price in accordance with Section 2.5 resulting from such actual amount of Closing Working Capital and Assumed Indebtedness. The Closing Statement shall become Final and Binding on the Parties on the Final Resolution Date.

(b)　　During the thirty (30) days after delivery of the Closing Statement, Buyer will provide Seller and its accountants reasonable access, during normal business hours and upon reasonable notice, (i) to review the financial books and records of Buyer to the extent related to the Closing Statement, including any of Buyer's accountants' work papers related to the calculation of amounts in the Closing Statement (subject to the execution of any access letters that such accountants may reasonably require in connection with the review of such work papers), and (ii) to the employees and other Representatives of Buyer who were responsible for the preparation of the Closing Statement to respond to questions relating to the preparation of the Closing Statement and the calculation of the items thereon, in each case solely to allow Seller to determine the accuracy of Buyer's calculation of the items set forth on the Closing Statement. Any information shared with Seller or Seller's accountants will be subject to Section 6.14, and Buyer shall not have any obligation to provide information or access to information, materials or Persons if doing so could reasonably be expected to result in the waiver of any attorney-client privilege or the disclosure of any Trade Secrets or violate any Law or the terms of any applicable Contract to which Buyer or any of its Affiliates is a party. If Seller disagrees with any of Buyer's calculations set forth in the Closing Statement, Seller may, within thirty (30) days after delivery of the Closing Statement, deliver a written notice of its disagreement (a "**Post-Closing Notice of Disagreement**") to Buyer disagreeing with such calculations; provided, however, that such Post-Closing Notice of Disagreement shall include only objections based on whether (A) the amounts set forth on the Closing Statement were prepared in a manner consistent with the provisions of this Agreement or (B) there were mathematical errors in the computation of any amount set forth on the Closing Statement. Such Post-Closing Notice of Disagreement shall specify those items or amounts with which Seller disagrees, together with a reasonably detailed written explanation of the reasons for disagreement with each such item or amount, and shall set forth Seller's calculation, based on such objections, of the Closing Working Capital or the Assumed Indebtedness, as applicable, and the Purchase Price resulting therefrom. To the extent not set forth in such Post-Closing Notice of Disagreement, Seller shall be deemed to have agreed with Buyer's calculation of all items and amounts contained in the Closing Statement. If Buyer does not receive a Post-Closing Notice of Disagreement from Seller within such thirty (30) day period, then the amounts set forth in the Closing Statement shall become Final and Binding on Buyer and Seller.

(c)     If a Post-Closing Notice of Disagreement is received by Buyer on or prior to the fifteenth (15th) day following Buyer's delivery of the Closing Statement, then Buyer and Seller shall, during the fifteen (15) days following Buyer's receipt of such Post-Closing Notice of Disagreement, seek to resolve any differences that they may have with respect to the matters specified in such Post-Closing Notice of Disagreement; provided, however, that any discussions relating thereto shall be governed by Rule 408 of the Federal Rules of Evidence and any applicable similar state rule(s), and evidence of such discussions shall not be admissible in any future Proceedings between Buyer and Seller. If Buyer and Seller are not able to resolve their differences during such fifteen (15) day period, then at the end of such period, Buyer and Seller shall promptly mutually engage and submit for Final and Binding resolution any and all matters related to such Post-Closing Notice of Disagreement that remain in dispute to [_____], or if [_____] is unable or unwilling to be engaged, then to a mutually agreeable independent accounting firm of recognized national standing (the "**Accounting Firm**"). Each of Buyer and Seller shall make readily available to the Accounting Firm all relevant financial books and records, including any accountants' work papers (subject to the execution of any access letters that such accountants may require in connection with the review of such work papers) relating to the Closing Statement or the Post-Closing Notice of Disagreement. Buyer and Seller shall enter into a customary engagement letter with the Accounting Firm, which engagement letter shall explicitly provide that, in resolving the amounts in dispute, the Accounting Firm shall (i) consider only those items or amounts disputed by Seller in the Post-Closing Notice of Disagreement that remain in dispute; (ii) not assign a value to any item or amount in dispute greater than the greatest value for such item or amount assigned by Seller, on the one hand, or Buyer on the other hand, or less than the smallest value for such item or amount assigned by Seller, on the one hand, or Buyer, on the other hand; and (iii) not be bound by any arbitration rules or procedures in connection with the resolution of the dispute under this Section 2.8. The Accounting Firm's determination will be based solely upon information presented by Buyer and Seller and not on the basis of independent review. Buyer and Seller shall cause the Accounting Firm to deliver to Buyer and Seller as promptly as practicable (but in any event within fifteen (15) days of its retention) a written report setting forth its determination of the amounts in dispute. Absent manifest error, the written report prepared by the Accounting Firm shall be Final and Binding on Buyer and Seller and judgment upon the determination set forth in such written report may be entered in any court of competent jurisdiction of the United States.

(d)     Buyer and Seller shall each be responsible for the fees and expenses of the Accounting Firm pro rata, as between Buyer, on the one hand, and Seller, on the other hand, in proportion to the relative difference between the positions taken by Buyer and Seller compared to the determination of the Accounting Firm. All other fees and expenses incurred in connection with the dispute resolution process set forth in this Section 2.8, including fees and expenses of attorneys and accountants, shall be borne and paid by the Party incurring such expense.

(e)     If the Purchase Price as finally determined pursuant to this Section 2.8 is less than the Estimated Purchase Price (the absolute value of such difference, the "**Closing Payment Shortfall Amount**"), then Buyer shall be paid an amount equal to the Closing Payment Shortfall Amount, at the option of Buyer, either (i) from the Escrow Account or (ii) from Seller. Within five (5) Business Days after the Final Resolution Date, Seller shall make, and/or Buyer and Seller shall direct the Escrow Agent to make, as applicable, any payment or release contemplated by this Section 2.8(e), in each case by wire transfer of immediately available funds to one or more accounts designated in writing by the applicable payee.

(f)     If the Purchase Price as finally determined pursuant to this Section 2.8 is greater than the Estimated Purchase Price, then within five (5) Business Days after the Final Resolution Date, Buyer shall pay, or cause to be paid, to Seller an amount equal to the amount of such excess via wire transfer of immediately available funds to an account designated in writing by Seller.

4822-2526-1169.2                                    25

(g)     If the Purchase Price as finally determined pursuant to this <u>Section 2.8</u> is equal to the Estimated Purchase Price, there will be no adjustment to the Purchase Price pursuant to this <u>Section 2.8</u>.

(h)     Any payments made pursuant to this <u>Section 2.8</u> shall be treated as an adjustment to the Purchase Price by the Parties for Tax purposes unless otherwise required by Law.

**2.9     Proration.**

(a)     Seller and Buyer shall estimate as of the Effective Time and prorate at the Closing (i) any amounts as of the Effective Time that were paid by Seller prior to the Effective Time and that relate, in whole or in part, to periods ending after the Effective Time, (ii) any amounts as of the Effective Time that are to be paid by Buyer after the Effective Time and that relate, in whole or in part, to utilities servicing any of the Purchased Assets, including water, sewer, telephone, electricity and gas service, in each case to the extent not reflected in the Closing Working Capital or otherwise covered by <u>Section 2.8</u>. Any such amounts that are not available to be prorated on the Closing Date shall be similarly prorated as of the Effective Time as soon as practicable thereafter.

(b)     Notwithstanding anything herein to the contrary, and without duplication of any amounts included in the determination of Closing Working Capital, all Property Taxes, if any, on the Purchased Assets shall be prorated by Buyer and Seller on the Closing Date as of the Effective Time. All such amounts to be prorated will be reflected on a Property Tax proration statement (the "**Property Tax Statement**") to be agreed upon by the Parties prior to the Closing Date. If necessary for such proration, payments for Property Taxes shall initially be determined based on the previous year's Property Taxes and shall later be adjusted to reflect the current year's Property Taxes when the Property Tax bills are finally rendered. Seller shall be liable for (and shall reimburse Buyer to the extent that Buyer shall have paid) that portion of Property Taxes relating to, or arising in respect of, periods ending prior to the Effective Time, and Buyer shall be liable for (and shall reimburse Seller to the extent Seller shall have paid) that portion of Property Taxes relating to, or arising in respect of, periods (or portions thereof) ending after the Effective Time, including any adjustments made after the Closing Date to the amounts reflected on the Property Tax Statement for the actual amount of Property Taxes as finally determined for the applicable period (taking into account any related fees and costs incurred by Buyer in such determination). The Parties shall cooperate to avoid, to the extent legally possible, the payment of duplicate Property Taxes, and each Party shall furnish, at the request of any other Party, proof of payment of any Property Taxes or other documentation that is a prerequisite to avoid payment of a duplicate Property Tax.

**2.10     Withholding Rights.** Without limiting any other provision of this Agreement, each of Buyer and the Escrow Agent shall be entitled to deduct and withhold from any consideration otherwise payable to any Person pursuant to this Agreement or any other Transaction Document such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code, or any other provision of applicable Tax Law. To the extent that such amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the applicable Person in respect to which such deduction and withholding was made.

**2.11     Remittances.**

(a)     As of the Effective Time, Seller hereby (i) authorizes Buyer to open any and all mail addressed to Seller and delivered to the offices of the Business or otherwise to Buyer if received on or after the Effective Time, and (ii) appoints Buyer as its attorney in fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Effective Time with respect to any

Purchased Asset or any accounts receivable relating to services provided by Buyer after the Effective Time, as the case may be, made payable or endorsed to Seller or Seller's order, for Buyer's own account.

(b)     From and after the Effective Time, if Seller or any Seller Affiliate receives or collects any funds relating to any Purchased Asset or any accounts receivable relating to services provided by Buyer after the Effective Time, whether from patients, third-party payors, group purchasing organizations, suppliers or any other Person, Seller shall, or shall cause the applicable Seller Affiliate to, remit such funds to Buyer within five (5) Business Days after receipt thereof. From and after the Effective Time, if Buyer or any of its Affiliates receives or collects any funds relating to any Excluded Asset, Buyer shall, or shall cause its Affiliate to, remit any such funds to Seller within five (5) Business Days after its receipt thereof.

**2.12    Physical Inventory.**  Within the five (5) day period preceding the Closing Date, Seller will perform a physical inventory in a manner consistent with its past practice to verify the levels and amounts of the Inventory. Seller will give Buyer not less than ten (10) days' prior written notice of such physical inventory. Representatives of Buyer will be permitted to observe such physical inventory and will be permitted to make test counts of Inventory and receive copies of the records related to such physical inventory. In connection with such physical inventory, Seller and Buyer shall jointly determine if any items of Inventory are unusable or obsolete, which unusable or obsolete items of Inventory shall be excluded from the calculation of the value of the Inventory calculated pursuant to this Section 2.12. Prior to the Closing Date, Seller shall remove items of Inventory from the Hospital that, based upon such physical inventory, have been determined by the Parties to be unusable or obsolete. The value of the Inventory shall be determined by applying the lower of market or cost to each item of Inventory as of the date of such physical inventory and Seller shall prepare a schedule thereof; provided, that the value of the Inventory (for purposes of calculating Closing Working Capital) shall be increased or decreased, as appropriate, to reflect the value of any additions to, or the value of deletions from (as determined by the physical inventory), the Inventory between the date(s) of such physical inventory and the Effective Time.

**3.    CLOSING.**

**3.1    Closing.**  The consummation of the Contemplated Transactions (the "**Closing**") shall take place at the Nashville, Tennessee, offices of Waller Lansden Dortch & Davis, LLP at 10:00 a.m. local time on the last calendar day of the month in which the conditions set forth in Article 8 and Article 9 (other than those conditions that by their terms are to be satisfied at the Closing) have been satisfied or waived, or at such other date and/or at such other location as the Parties may mutually designate in writing (the "**Closing Date**"). Unless otherwise agreed in writing by the Parties, the Closing shall be effective as of 12:00:01 a.m. on the first day of the calendar month immediately following the calendar month in which the Closing Date occurs (the "**Effective Time**").

**3.2    Deliveries of Seller at the Closing.**  At the Closing and unless otherwise waived in writing by Buyer, Seller shall deliver to Buyer (or the Escrow Agent, as appropriate), or shall cause the appropriate Person to deliver to Buyer (or the Escrow Agent, as appropriate), the following:

(a)     Special Warranty Deeds (the "**Deeds**"), conveying to Buyer fee simple title to the Owned Real Property, free and clear of all Encumbrances other than the Permitted Encumbrances;

(b)     With respect to each Tenant Lease or Third Party Lease, an assignment of such Tenant Lease or Third Party Lease, substantially in the form attached hereto as Exhibit C (each, a "**Lease Assignment**"), duly executed by Seller, together with such consents to assignment, non-referral certificates, estoppel certificates, subordination, non-disturbance and attornment agreements or similar documents as requested by Buyer and in forms reasonably acceptable to Buyer;

Case 3:18-bk-05665    Doc 79    Filed 08/31/18    Entered 08/31/18 18:22:55    Desc Main
Document      Page 113 of 177

(c)     A bill of sale, substantially in the form attached hereto as <u>Exhibit D</u> (the "**Bill of Sale**"), duly executed by Seller, conveying to Buyer good and marketable title to the Personal Property;

(d)     An assignment and assumption agreement, substantially in the form attached hereto as <u>Exhibit E</u> (the "**Assignment and Assumption Agreement**"), duly executed by Seller, effecting the assignment to and assumption by Buyer of the Assumed Contracts, the Assumed Liabilities and any Purchased Assets not conveyed by any other Transaction Document;

(e)     A power of attorney, substantially in the form attached hereto as <u>Exhibit F</u> (the "**Power of Attorney**"), duly executed by Seller, authorizing Buyer to utilize Seller's federal and state controlled substances permits and pharmacy licenses;

(f)     A transition services agreement, substantially in the form attached hereto as <u>Exhibit G</u> (the "**Transition Services Agreement**"), duly executed by Curae;

(g)     An escrow agreement, substantially in the form attached hereto as <u>Exhibit H</u> (the "**Escrow Agreement**"), duly executed by Seller and the Escrow Agent;

(h)     A confirmatory trademark assignment agreement, substantially in the form attached hereto as <u>Exhibit I</u> (the "**Trademark Assignment Agreement**"), duly executed by Seller;

(i)     A confirmatory domain name assignment agreement, substantially in the form attached hereto as <u>Exhibit J</u> (the "**Domain Name Assignment Agreement**"), duly executed by Seller or appropriate Seller Affiliates, as applicable;

(j)     A restrictive covenants agreement, substantially in the form attached hereto as <u>Exhibit K</u> (the "**Curae Restrictive Covenants Agreement**"), duly executed by Curae;

(k)     Copies of resolutions duly adopted by the boards of directors or boards of managers, as applicable, of Seller authorizing and approving Seller's performance of the Contemplated Transactions and the execution and delivery of this Agreement and the other Transaction Documents, certified as true and in full force and effect as of the Closing Date, by the appropriate officers of Seller;

(l)     A certificate, dated as of the Closing Date, of Seller certifying that the conditions set forth in <u>Section 8.1</u>, <u>Section 8.2</u> and <u>Section 8.3</u> have been satisfied;

(m)     Certificates of incumbency for the respective officers of Seller executing this Agreement and the other Transaction Documents dated as of the Closing Date;

(n)     Certificates of existence and good standing of Seller from its jurisdiction of formation or organization, each dated within ten (10) days prior to the Closing Date;

(o)     A non-foreign affidavit of Seller (or, if Seller is treated as a disregarded entity for federal Tax purposes, by its applicable owner), dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code and reasonably satisfactory to Buyer, stating that Seller (or owner, if applicable) is not a "foreign person" as defined in Section 1445 of the Code;

(p)     With respect to the Real Property and the Personal Property, a recent UCC lien search dated no more than ten (10) days prior to the Closing Date showing no Encumbrances on any fixtures attached to any Real Property or Encumbrances on Personal Property, except for Permitted

4822-2526-1169.2

28

Encumbrances and Encumbrances that shall be released at or prior to the Closing;

(q)     All instruments and documents necessary to release any and all Encumbrances, other than Permitted Encumbrances, on the Business or the Purchased Assets, including (i) appropriate UCC financing statement amendments or termination statements, and (ii) payoff letters or other documents, notices or instruments as Buyer may reasonably deem necessary to evidence the satisfaction and termination of all Indebtedness or other Liabilities by which the Business or the Purchased Assets may be bound or affected and a release of all Encumbrances (other than Permitted Encumbrances) on the Business or the Purchased Assets;

(r)     Assignments and applications for transfer of title to the motor vehicles used in the Business, if applicable;

(s)     Applications or amendments for filing in appropriate form to abandon or change each of the Restricted Names;

(t)     A Certificate of No Tax Due from the Mississippi Sales Tax Commission and the Monroe County Tax Assessor showing that no Tax from Mississippi or Monroe County is due or owing by Seller;

(u)     A completed Statement of Occasional Sale Form evidencing an exemption from Mississippi sales Tax, duly executed by Seller;

(v)     Any and all other certificates, documents, and instruments required to be delivered by Seller pursuant to and in accordance with Article 8;

(w)     A certified copy of the Sale Order; and

(x)     Such other agreements, instruments and documents as Buyer reasonably deems necessary to effect the Contemplated Transactions, including consents to assignment, evidence, reasonably satisfactory to Buyer, of the termination of any existing management agreement, and estoppel certificates from such parties as Buyer may reasonably require.

**3.3     Deliveries of Buyer at the Closing**.  At the Closing and unless otherwise waived in writing by Seller, Buyer shall deliver to Seller (or the Escrow Agent, as appropriate) the following:

(a)     Evidence of the wire transfers and other payments provided for in Section 2.7;

(b)     The Lease Assignments, duly executed by Buyer;

(c)     The Bill of Sale, duly executed by Buyer;

(d)     The Assignment and Assumption Agreement, duly executed by Buyer;

(e)     The Transition Services Agreement, duly executed by Buyer (or an Affiliate of Buyer);

(f)     The Escrow Agreement, duly executed by Buyer and the Escrow Agent;

(g)     The Trademark Assignment Agreement, duly executed by Buyer;

(h)     The Domain Name Assignment Agreement, duly executed by Buyer;

(i)     Copies of resolutions duly adopted by the board of **[managers]** of Buyer, authorizing and approving Buyer's performance of the Contemplated Transactions and the execution and delivery of this Agreement and the other Transaction Documents, certified as true and in full force and effect as of the Closing Date by an appropriate officer of Buyer;

(j)     A certificate, dated as of the Closing Date, of Buyer certifying that the conditions set forth in Section 9.1, Section 9.2, and Section 9.3 have been satisfied;

(k)     Certificates of incumbency for the respective officers of Buyer executing this Agreement and any other Transaction Document dated as of the Closing Date;

(l)     A certificate of existence or good standing of Buyer from the State of [●], dated within ten (10) days prior to the Closing;

(m)     Any and all other certificates, documents, and instruments required to be delivered by Seller pursuant to and in accordance with Article 9; and

(n)     Such other agreements, instruments and documents as Buyer reasonably deems necessary to effect the Contemplated Transactions, including consents to assignment, evidence, reasonably satisfactory to Buyer, of the termination of any existing management agreement, and estoppel certificates from such parties as Buyer may reasonably require.

        **3.4     Additional Acts.** From time to time after the Effective Time, Seller and Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges relating to the Purchased Assets intended to be conveyed to Buyer under this Agreement and the other Transaction Documents and to assure fully to Seller and any Seller Affiliate and their respective successors and permitted assigns, the assumption of the Assumed Liabilities intended to be assumed by Buyer under this Agreement and the other Transaction Documents, and to otherwise make effective the Contemplated Transactions. Seller also shall furnish Buyer with such information and documents in Seller's possession or under Seller's control, or which Seller can execute or cause to be executed, as will enable Buyer to prosecute any and all petitions, applications, claims and demands relating to or constituting a part of the Purchased Assets.

**4.     REPRESENTATIONS AND WARRANTIES OF SELLER AND CURAE.**

        Seller and Curae, jointly and severally, hereby represents and warrants to Buyer that the statements contained in this Article 4 are true and correct as of the date of this Agreement and will be true and correct as of the Closing Date (except in the case of representations and warranties that are made as of a specified date, in which case such representations and warranties will be true and correct as of such specified date).

        **4.1     Organization; Capacity.** Seller is a nonprofit corporation, duly incorporated, validly existing and in good standing under the Laws of the State of Tennessee. Seller is duly authorized, qualified to do business and in good standing under all applicable Laws of any jurisdictions (domestic and foreign) in which the character or the location of the assets owned or leased by it or the nature of the business conducted by it requires such authorization or qualification. The execution and delivery by Seller of this Agreement and the other Transaction Documents to which it is a party or will become a party, the performance by Seller of its obligations under this Agreement and the other Transaction

4822-2526-1169.2                                    30

Documents to which it is a party or will become a party and the consummation by Seller of the Contemplated Transactions and the Transaction Documents to which it is a party or will become a party, as applicable, have been, or will be, duly and validly authorized and approved by all necessary corporate actions, as applicable, on the part of Seller, none of which actions has been modified or rescinded and all of which actions remain in full force and effect.

**4.2    Authority; Non-contravention; Binding Agreement**. The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party or will become a party, and the consummation by Seller of the Contemplated Transactions and its obligations under the Transaction Documents, as applicable (a) are within Seller's corporate powers and are not and will not be in contravention or violation of the terms of the organizational or governing documents of Seller; (b) except (i) as set forth on <u>Schedule 4.2</u> and (ii) for the entry of the Sale Order and, solely with respect to Seller's obligations under <u>Section 6.17</u>, the Sale Procedures Order, do not and will not require any Approval of, filing or registration with, the issuance of any Permit by, or any other action to be taken by, any Governmental Authority to be made or sought by Seller; and (c) assuming the Approvals and Permits set forth on <u>Schedule 5.2</u> are obtained, do not and will not require any Approval or other action under, conflict with, or result in any violation of or default under (with or without notice or lapse of time or both), or give rise to a right of termination, cancellation, acceleration or augmentation of any obligation, or loss of a material benefit under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) upon, any of the Purchased Assets under (i) any Contract or Permit applicable to any of the Purchased Assets (including the assignment of the Assumed Contracts to Buyer) or (ii) any Order or Law applicable to any of the Purchased Assets or to which Seller may be subject. Subject to the entry of the Sale Order, this Agreement and the other Transaction Documents to which Seller or any Seller Affiliate is or will become a party are and will constitute the valid and legally binding obligations of such Person and are and will be enforceable against them in accordance with the respective terms hereof and thereof, except as enforceability may be subject to general principles of equity. In the event the entry of the Sale Procedures Order or Sale Order shall be appealed, Seller shall use its best efforts to defend such appeal.

**4.3    Subsidiaries; Minority Interests**. Except as set forth on <u>Schedule 4.3</u>, Seller does not directly or indirectly own any equity, membership, or similar interest in, or any interest convertible into or exchangeable or exercisable for any equity, membership, or similar interest in, any corporation, partnership, limited liability company, joint venture, trust, or other business association or entity.

**4.4    Title to Assets; Sufficiency and Condition of Assets**.

(a)    Seller owns and holds good and marketable title to, or has valid and subsisting leasehold interests in, all assets, real, personal or mixed, whether tangible or intangible (including all Intellectual Property), used or held for use in, or otherwise relating to, the Business or located at the Hospital, free and clear of all Encumbrances other than as set forth on <u>Schedule 4.4(a)</u> and the Permitted Encumbrances, all of which shall be a part of the Purchased Assets, except for the Excluded Assets. No Person other than Seller owns or holds in its name any assets, real, personal or mixed, whether tangible or intangible (including all Intellectual Property), used or held for use in, or otherwise relating to, the Business or located at the Hospital, except for (i) items leased by Seller or improvements to items leased by Seller pursuant to a lease agreement identified on <u>Schedule 4.17(a)</u>, (ii) furniture and equipment owned or leased by Physicians leasing space in the Real Property pursuant to a lease agreement identified on <u>Schedule 4.17(a)</u>, and (iii) personal property of Seller Employees, patients or visitors. At the Closing, Seller will convey to Buyer, and Buyer will acquire, good and marketable title to, or valid and subsisting leasehold interests in, the Purchased Assets, free and clear of all Encumbrances, other than Permitted Encumbrances. There are no outstanding rights (including any right of first refusal or right of first offer), options, or Contracts giving any Person any current or future right to require Seller to sell or transfer to

such Person or to any third party any interest in any of the Purchased Assets.

(b)     The Purchased Assets (together with the Excluded Assets) constitute all the assets used in or necessary to operate, and are adequate for the purposes of operating, the Business in the manner in which it has been operated prior to the Effective Time.  There are no facts or conditions affecting the Purchased Assets that could, individually or in the aggregate, interfere in any material respect with the use, occupancy or operation of the Purchased Assets as currently used, occupied or operated, or their adequacy for such use. Following the consummation of the Contemplated Transactions, neither Seller nor any Seller Affiliate will retain any asset necessary to operate the Business in the manner in which it has been operated prior to the Effective Time.  The Purchased Assets will enable Buyer to operate the Business after the Effective Time in substantially the same manner as operated by Seller prior to the Effective Time. All tangible Purchased Assets are in good operating condition and repair and are adequate for the uses to which they are being put, and none of the tangible Purchased Assets is in need of maintenance or repairs, except for ordinary, routine maintenance and repairs that are not material in nature or cost.

### 4.5     Financial Information.

(a)     Schedule 4.5(a) contains the following financial statements and financial information of the Business (collectively, the "**Historical Financial Information**"):

(i)     consolidated balance sheets, income statements, statements of cash flows of the Business (including the accompanying consolidating schedules of balance sheet information and income statement information) as of, and for the twelve (12) month periods_____;[1]

(ii)     an unaudited consolidated balance sheet of the Business (including the accompanying consolidating schedules of balance sheet information) as of the Balance Sheet Date (the "**Reference Balance Sheet**"); and

(iii)     an unaudited consolidated income statement of the Business (including the accompanying consolidating schedules of income statement information) for the _____ (___) month period ended on the Balance Sheet Date.

(b)     The Historical Financial Information is true, correct and complete in all material respects and fairly presents the consolidated financial position of the Business as of the respective dates thereof and the consolidated results of the operations of the Business and changes in financial position for the respective periods covered thereby. The consolidated financial statements included in the Historical Financial Information have been prepared in accordance with GAAP, applied on a consistent basis throughout the periods indicated (subject, in the case of the unaudited Historical Financial Information, to the absence of notes and normal year-end audit adjustments, the effect of which is not material, individually or in the aggregate), and are based on the information contained in the Books and Records of Seller.  Seller has not changed any accounting policy or methodology during the periods presented in the Historical Financial Information (including the accounting policies and methodologies for determining the obsolescence of Inventory or in calculating reserves, including reserves for uncollected accounts receivable).

(c)     Schedule 4.5(c) sets forth all Indebtedness of Seller. For each item of

---

[1] Seller to advise dates with respect to available financial statements

Case 3:18-bk-05665    Doc 79    Filed 08/31/18    Entered 08/31/18 18:22:55    Desc Main
Document      Page 118 of 177

Indebtedness of Seller, Schedule 4.5(c) correctly sets forth, as of the date hereof, the debtor or borrower, creditor or lender, outstanding principal amount and accrued but unpaid interest, maturity date, the collateral, if any, securing the Indebtedness (in reasonable detail), and any prepayment, make-whole, breakage or other premiums, payments, fees, costs or penalties required to be paid (in reasonable detail) to fully discharge such Indebtedness in connection with the consummation of the Contemplated Transactions.

(d)     Except for (i) Liabilities reflected in the Reference Balance Sheet, and (ii) Liabilities that were incurred after the Balance Sheet Date in the ordinary course of business, none of which, individually or in the aggregate, is material in amount, Seller has no Liabilities of any nature, and there is no basis for any Proceeding with respect to any Liability relating to the Business, the Purchased Assets, or the Assumed Liabilities.

**4.6     Permits and Approvals**. The Hospital is duly licensed in accordance with the applicable Laws of the State of Mississippi as set forth on Schedule 4.6, which sets forth the type of hospital that the Hospital is licensed as under the Law of the State of Mississippi and the number of licensed beds at the Hospital. The Facilities, including without limitation, the pharmacies, laboratories, and all other ancillary departments or services located at the Hospital or operated for the benefit of the Hospital that are required to be separately licensed are duly licensed by the appropriate Governmental Authority. Schedule 4.6 sets forth an accurate and complete list of all Permits and Approvals owned or held by Seller with respect to the Facilities, including the dates of issuance and expiration dates for each such Permit or Approval, and such Permits and Approvals constitute all Permits and Approvals necessary for Seller to own and operate the Facilities and the Purchased Assets and to carry on the Business as currently conducted or proposed to be conducted. Seller has provided accurate and complete copies to Buyer of each Permit and Approval set forth on Schedule 4.6. Each of the Physicians and other licensed professional providers who provide services to the Business (each, a "**Practitioner**", and collectively, the "**Practitioners**") is in possession of all Permits and Approvals necessary for his or her performance of such services. Seller, the Practitioners, and the Facilities, including without limitation the Hospital, as applicable, are, and at all times have been, in compliance with the terms of such Permits and Approvals, and there are no provisions in, or agreements relating to, any Permits or Approvals that preclude or limit Seller from operating the Hospital or other Facilities and the Purchased Assets and carrying on the Business as currently conducted. No Permits or Approvals relating to the Business will expire or be terminated as a result of the Contemplated Transactions. There is no pending or, to the Knowledge of Seller, threatened, Proceeding by or before any Governmental Authority to revoke, cancel, rescind, suspend, restrict, modify, or refuse to renew any Permit or Approval owned or held by Seller, any Facility, or any Practitioner and all such Permits and Approvals are now, and as of the Closing Date shall be, unrestricted, in good standing, in full force and effect and not subject to meritorious challenge. No event has occurred and no facts exist with respect to any such Permits or Approvals that allow, or after notice or the lapse of time or both, would allow the suspension, revocation, or termination of any Permits or Approvals, or would result in any other impairment in the rights of any holder thereof. Neither Seller, nor any Practitioner or Facility has received any notice or communication from any Governmental Authority regarding any violation of any such Permits or Approvals (other than any surveys or deficiency reports for which Seller has submitted a plan of correction that has been accepted or approved by the applicable Governmental Authority). Seller has delivered to Buyer accurate and complete copies of all survey reports, deficiency notices, plans of correction, and related correspondence received by Seller or any Facility since January 1, 2014, in connection with the Permits and Approvals relating to the Business.

**4.7     Statutory Funds**. Neither Seller nor any respective predecessors have received any loans, grants, loan guarantees, donations, monies, or other financial assistance pursuant to the Hill-Burton Act program, the Health Professions Educational Assistance Act, the Nurse Training Act, the National Health Planning and Resources Development Act, or the Community Mental Health Centers Act, as

amended, or similar Laws relating to healthcare facilities that remain unpaid or which impose any restrictions on the Hospital or the Purchased Assets.

**4.8    Accreditation**. Schedule 4.8 sets forth an accurate and complete list of all accreditations and certifications held by Seller and the Hospital or other Facilities. All such accreditations and certifications are and will be effective, unrestricted and in good standing as of the date hereof and as of the Closing Date. No event has occurred or other fact exists with respect to such accreditations and certifications that allows, or after notice or the lapse of time or both, would allow, revocation or termination of any such accreditations or certifications, or would result in any other impairment in the rights of any holder thereof. There is no pending or, to the Knowledge of Seller, threatened, Proceeding by any accrediting body to revoke, cancel, rescind, suspend, restrict, modify, or not renew any such accreditation or certifications, and no such Proceedings, surveys or actions are pending, threatened or imminent. The Hospital is duly accredited, without conditions, by The Joint Commission through the period set forth on Schedule 4.8. Since the date of the most recent Joint Commission survey, neither Seller nor the Hospital or any other Facility has made any changes in policy or operations that would cause the Hospital or any such other Facility to lose such accreditations. Seller has delivered to Buyer a copy of the Hospital's most recent Joint Commission accreditation report and any reports, documents, or correspondence relating thereto.

**4.9    Government Program Participation; Private Programs; Reimbursement**. The Hospital is certified for participation in the Government Programs and have current and valid Payor Agreements with such Government Programs from which Seller presently receives payments on account of services provided by the Hospital or the Practitioners who have reassigned their right to bill to Seller, and Seller is party to, or is otherwise entitled to bill under, current Payor Agreements with certain private non-governmental payors or programs, including any private insurance payor or program, self-insured employer, or other third-party payor (each, a "**Private Program**"), under which Seller directly or indirectly receives payments, each as set forth on Schedule 4.9(i). Seller has delivered accurate and complete copies of all Payor Agreements to Buyer. The Hospital is in compliance with the conditions of participation in the Government Programs and Private Programs and with the terms, conditions, and provisions of the Payor Agreements. The Payor Agreements are each in full force and effect, and no events or facts exist that would cause any Payor Agreement to be suspended, terminated, restricted or withdrawn. Seller has not received notice from any Government Program or Private Program to the effect that it intends to cease or materially alter its business relationship with Seller (whether as a result of the Contemplated Transactions or otherwise). No Government Program or Private Program (i) has indicated its intent to cancel or otherwise substantially modify its relationship with Seller, or (ii) has advised Seller of any material problem or dispute. Seller has received all Permits and Approvals necessary for reimbursement of the Hospital by the Government Programs and Private Programs. All billing practices of Seller with respect to all Government Programs and Private Programs have been conducted in compliance with all applicable Laws and the billing guidelines of such Government Programs or Private Programs. Neither Seller nor the Hospital have billed or received any payment or reimbursement in excess of amounts allowed by Law or the billing guidelines of any Private Programs or Government Programs. There is no Proceeding, survey, or other action pending, or, to the Knowledge of Seller, threatened, involving the Government Program or any Private Program, including the Hospital' participation in and the reimbursement received by Seller and the Hospital from the Government Programs or any Private Program, and Seller has no reason to believe that any such Proceedings, surveys, or actions are pending, threatened or imminent. Neither Seller nor, to the Knowledge of Seller, any of the Seller Employees or any former employee or current or former officer or director of Seller has committed a violation of any Law relating to payments and reimbursements under any Government Program or any Private Program. Schedule 4.9(ii) contains a list of all NPIs and all provider numbers under the Government Programs issued to and held by Seller and the Hospital, all of which are in full force and effect. Except as set forth on Schedule 4.9(iii), for the six (6) fiscal years or calendars years, as

4822-2526-1169.2

34

applicable, immediately preceding the current calendar year, Seller has timely filed all reports, data, and other information to be filed with CMS regarding Seller's CMS Reporting obligations in support of Seller's right to receive payments from Medicare or Medicaid. No Seller, any managing Seller Employee, or any other managing employee or officer or director of any Seller has knowingly and willfully made or caused to be made a false statement or representation of a material fact in any report, data, and other information supporting Seller's CMS Reporting.

**4.10    Third-Party Payor Cost Reports.** Seller has timely filed all required Cost Reports relating to the Business for all fiscal years through and including the 2017 fiscal year, and copies of all Cost Reports relating to the Business filed by or on behalf of Seller since December 31, 2014, have been provided to Buyer. All Cost Reports relating to the Business filed by or on behalf of Seller accurately reflect the information required to be included therein, and such Cost Reports do not claim, and neither Seller nor the Hospital have received, reimbursement in any amount in excess of the amounts allowed by Law or any applicable agreement. No facts or circumstances exist that would give rise to any disallowance under any such Cost Reports. Schedule 4.10 indicates which of such Cost Reports have not been audited and finally settled and includes a brief description of any and all notices of program reimbursement, proposed or pending audit adjustments, disallowances, appeals of disallowances, and any and all other unresolved claims or disputes in respect of such Cost Reports. Seller has established adequate reserves to cover any potential reimbursement obligations that Seller may have in respect of such Cost Reports, and such reserves are accurately set forth in the Historical Financial Information. Seller shall ensure that Buyer has access to all records for cost report purposes for a period of three years after Closing.

**4.11    Compliance with Laws.**

(a)    (i) Seller has conducted, and is conducting, the Business, the Hospital, and its properties in compliance with all Laws, and (ii) Seller has (A) not received notice, correspondence or other written or oral communication of any violation, alleged violation or potential violation of, or Liability under, any such Laws, or to the effect that Seller or any Affiliate or Representative of, or any Person acting on behalf of, Seller, is or could potentially be under investigation or inquiry with respect to any violation or alleged violation of any Law, applicable to Seller, and (B) no actual, alleged, or potential obligation to undertake, or to bear all or any portion of the cost of, any remedial action.

(b)    No event has occurred, and no condition exists, that would reasonably be expected to (with or without notice or lapse of time) constitute or result directly or indirectly in (i) a violation by Seller of, or a failure on the part of Seller to comply with, any Law relating to the operation and conduct of the Business or any of Seller's respective properties or facilities or (ii) any obligation on the part of Seller to undertake, or to bear all or any portion of the cost of, any remedial action.

(c)    Neither Seller, the Practitioners, the Hospital, Seller Employees nor any other officer, director, employee or independent contractor of Seller or the Hospital, has been convicted of, charged with or, to the Knowledge of Seller, investigated for, or has engaged in conduct that would constitute, an offense related to Medicare or any other Government Program or convicted of, charged with or, to the Knowledge of Seller, investigated for, or engaged in conduct that would constitute a violation of any Law related to fraud, theft, embezzlement, breach of fiduciary duty, kickbacks, bribes, other financial misconduct, obstruction of an investigation or controlled substances. Neither Seller, the Practitioners, the Hospital, nor Seller Employees nor any other officer, director, employee or independent contractor of Seller or the Hospital (whether an individual or entity), has been excluded from participating in any Government Program, subject to sanction pursuant to 42 U.S.C. § 1320a-7a or § 1320a-8, or been convicted of a crime described at 42 U.S.C. § 1320a-7b, nor are any such exclusions, sanctions or charges pending or, to the Knowledge of Seller, threatened.

4822-2526-1169.2                                    35

(d)     Seller, the Hospital, and the Business have been and are presently in compliance with all applicable Laws, including Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll (the Medicare statute), including specifically, the Ethics in Patient Referrals Act, as amended, or "**Stark Law**," 42 U.S.C. § 1395nn; Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-5 (the Medicaid statute); the Federal Health Care Program Anti-Kickback Statute (the "**Federal Anti-Kickback Statute**"), 42 U.S.C. § 1320a-7b(b); the False Claims Act, as amended (the "**False Claims Act**"), 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58; the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a and 1320a-7b; the Exclusion Laws, 42 U.S.C. § 1320a-7; HIPAA; any similar state and local Laws that address the subject matter of the foregoing; any state Law or precedent relating to the corporate practice of the learned or licensed healthcare professions; any state Law concerning the splitting of healthcare professional fees or kickbacks; any state Law concerning healthcare professional self-referrals; any state healthcare professional licensure Laws, qualifications or requirements for the practice of medicine or other learned healthcare profession; any state requirements for business corporations or professional corporations or associations that provide medical services or practice medicine or related learned healthcare profession; workers compensation; any state and federal controlled substance and drug diversion Laws, including, the Federal Controlled Substances Act (21 U.S.C. § 801, *et seq.*) and the regulations promulgated thereunder; and all applicable implementing regulations, rules, ordinances and Orders related to any of the foregoing.

(e)     Neither Seller nor the Hospital have received any notification, correspondence, or any other oral or written communication, including notification of any pending or threatened Proceeding or other action from any Governmental Authority, Private Program or patient, of any potential or actual non-compliance by, or Liability of, Seller, the Hospital, the Practitioners, or the Purchased Assets under any Law. Seller has timely filed all material reports, data, and other information required to be filed with such Governmental Authorities regarding the Hospital and the Purchased Assets.

(f)     All of Seller's and the Hospital' Contracts with a Physician or any Immediate Family Members of any Physicians, or entities in which Physicians or Immediate Family Members of any Physicians are equity owners, involving services, supplies, payments, or any other type of remuneration, and all of Seller's and the Hospital' leases of personal or real property with such Physicians, Immediate Family Members of any Physician or other Persons are in writing, are signed by the appropriate parties, set forth the services to be provided, provide for a fair market value compensation in exchange for such services, space, or goods and comply with all applicable Laws.

(g)     Except in compliance with applicable Laws, neither Seller, nor any Seller Employees or any other employees, officers or directors of Seller are party to any Contract (including any joint venture or consulting agreement) to provide services, lease space, lease equipment or engage in any other venture or activity related to Seller, the Hospital, the Business, or the Purchased Assets with any Physician, Immediate Family Member of a Physician, or other Person that is in a position to make or influence referrals to or otherwise generate business for Seller with respect to the Hospital or the Purchased Assets.

(h)     Neither Seller, the Hospital, the Seller Employees nor any other employees, officers or directors of Seller have engaged in any activities that are prohibited under 42 U.S.C. §§ 1320a-7, *et seq.*, or the regulations promulgated thereunder, or under any other federal or state statutes or regulations, or which are prohibited by applicable rules of professional conduct.

(i)     Seller, each Seller Affiliate, Seller's Representatives and Seller Affiliates' Representatives have complied with the U.S. Foreign Corrupt Practices Act of 1977, as amended, the Corruption of Foreign Public Officials Act, the OECD Anti-Bribery Convention and other applicable

Case 3:18-bk-05665   Doc 79   Filed 08/31/18   Entered 08/31/18 18:22:55   Desc Main
Document      Page 122 of 177

Laws regarding the use of funds for political activity or commercial bribery. Seller, Seller Affiliate, and any of their respective Representatives have not, for or on behalf of Seller, at any time, (i) made or caused to be made or provided, directly or indirectly, any type of payment, gift, contribution or similar item to a governmental official, political party, or candidate for office for the purpose of influencing a decision, inducing an official to violate their lawful duty, securing an improper advantage, or inducing an official to use their influence to affect a governmental decision, or (ii) accepted or received any unlawful payments, gifts, contributions or similar items. Neither Seller, Seller Affiliate, nor any of their respective Representatives has, directly or indirectly, taken any action in violation of any export restrictions, anti-boycott regulations, embargo regulations or other similar applicable U.S. or foreign Laws. Neither Seller, Seller Affiliate, nor any of their respective Representatives is a "specially designated national" or blocked Person under U.S. sanctions administered by OFAC. Seller has not engaged in any business with any Person or in any country that it is prohibited for a U.S. Person to engage in any business with or under applicable Law or under applicable U.S. sanctions administered by U.S. Department of the Treasury. Neither Seller or any Seller Affiliate is, nor will Seller or any Seller Affiliate become, a Person with whom U.S. Persons are restricted from doing business under regulations of OFAC (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive Order (including Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001), or the United and Strengthening America by Providing Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56, or any other governmental action.

(j)     All billing and collection practices of, and claims submitted by, Seller with respect to all Government Programs and Private Programs have been in compliance with all applicable Laws, regulations and policies of, and Payor Agreements with, such Government Programs and Private Programs. Seller has not submitted any claims that are cause for civil penalties or overpayments under, or mandatory or permissive exclusion from, any Government Program, Private Program, or under the terms of a Payor Agreement. Seller has maintained such records as required by applicable Laws or third party payor policy supporting the provision of services billed under all Government Programs and Private Programs.

(k)     For the entire duration of Seller's ownership of the Hospital, Seller has timely filed, and for the six (6) Federal Fiscal Years or calendars years, as applicable, immediately preceding the current Federal Fiscal Year or current calendar year, as applicable the previous owner of the Hospital timely filed, all quality and performance reports, data, and other information to be filed with CMS, with respect to both Physicians and hospitals, inpatients and outpatients, as required by CMS Reporting, and all reports, data and other information submitted by Seller in support of its quality and performance for the avoidance of negative payment adjustments or in support of positive payment adjustments are accurate, correct and in all material respects support its claims of quality and performance and receipt of positive payment adjustment and avoidance of negative payment adjustments, as applicable. Neither Seller nor any of its respective officers, directors or managing employees have knowingly and willfully made or caused to be made a false statement or representation of a material fact in any report, data, and other information supporting Seller's CMS Reporting.

(l)     Seller is in compliance with all applicable Laws regarding the selection, deselection, and credentialing of its Physicians and other Practitioners, including verification of licensing status and eligibility for reimbursement under Government Programs.

(m)     Each individual now or formerly employed by or contracted by Seller or any Seller Affiliate to provide professional services, including the Practitioners, is or was duly licensed to provide such services, is or was in compliance with all Laws relating to such professional licensure and meets or met the qualifications to provide such professional services under applicable Laws and the terms and conditions of the Payor Agreements to which Seller is a party, in each case during the periods during

4822-2526-1169.2                    37

which such employee or independent contractor provided such services on behalf of any of them.

(n)     All off-campus locations of the Hospital that are treated by the Hospital as being a provider-based location or department of the Hospital (i) were in operation and billing the Medicare program under the outpatient prospective payment system for covered outpatient department services prior to November 2, 2015, (ii) are in compliance with the site-neutral programs of Section 603 of the Bipartisan Budget Act of 2015 and CMS Regulations 42 C.F.R. § 413.65, and (iii) have been reported as practice locations on the Hospital's Medicare enrollment record.

**4.12    Information Privacy and Security Compliance.**

(a)     Seller and the Hospital (i) are, and at all times have been, in compliance with HIPAA and (ii) are, and at all times have been, in compliance with all other applicable Information Privacy or Security Laws and all rules and regulations promulgated thereunder.  Seller has undertaken surveys, audits, inventories, reviews, analyses and/or assessments of all areas of the Business required by the HITECH Act and the administrative simplification provisions of HIPAA.

(b)     Seller has provided to Buyer accurate and complete copies of the compliance policies and/or procedures and privacy notices of the Hospital relating to Information Privacy or Security Laws.  All of Seller's and the Hospital' respective workforces (as such term is defined in 45 C.F.R. § 160.103) have received training with respect to compliance with Information Privacy or Security Laws.

(c)     Seller has entered into business associate agreements with all third parties acting as a business associate (as defined in 45 C.F.R. § 160.103) of Seller or the Business.  Seller (i) is not under investigation by any Governmental Authority for a violation of any Information Privacy or Security Law; (ii) has not received any notices from the United States Department of Health and Human Services Office for Civil Rights, the Justice Department, the FTC, or the Attorney General of any state or territory of the United States relating to any such violations; or (iii) except as set forth on Schedule 4.12(c) has not acted in any manner, and, to the Knowledge of Seller, there has not been any incident, that would trigger a notification or reporting requirement under any business associate agreement or any Information Privacy or Security Law, including a breach with respect to any unsecured protected health information maintained by or on behalf of the Business.

(d)     Seller has provided to Buyer accurate and complete copies of any written complaint(s) delivered to Seller or the Hospital during the past three (3) years alleging a violation of any Information Privacy or Security Laws.

(e)     No Breach or potential Breach has occurred with respect to any Unsecured Protected Health Information (as such terms are defined in 45 C.F.R. § 164.402) maintained by or for Seller or the Hospital, and no information security or privacy breach event has occurred that would require notification under any other applicable Information Privacy or Security Laws.

**4.13    Compliance Program.**  Seller has provided to Buyer an accurate and complete copy of each Facility's current compliance program materials, including all program descriptions, compliance officer and committee descriptions, ethics and risk area policy materials, training and education materials, auditing and monitoring protocols, reporting mechanisms and disciplinary policies.  Seller and the Hospital have conducted their operations in accordance with their respective compliance programs.  Seller (a) is not a party to a Corporate Integrity Agreement with the OIG; (b) has no reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; (c) to the Knowledge of Seller, has not been the subject of any Government Program investigation conducted by any federal or state enforcement agency; (d) has not been a defendant in any qui tam/False Claims Act

litigation; (e) has not been served with or received any search warrant, subpoena, civil investigation demand, contact letter, or, to the Knowledge of Seller, telephone or personal contact by or from any federal or state enforcement agency (except in connection with medical services provided to third-parties who may be defendants or the subject of investigation into conduct unrelated to the Business); and (f) has not received any complaints through Seller's compliance "hotline" from Seller Employees, other employees, independent contractors, vendors, Physicians, patients, or any other Persons that could reasonably be considered to indicate that Seller has violated, or is currently in violation of, any Law. For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in compliance guidance published by the OIG.

**4.14    Medical Staff Matters.**  Seller has made available to Buyer true, correct and complete copies of the bylaws and rules and regulations of the medical staffs of the Hospital, as well as a list of all current members of each Facility's medical staff.  Except as has been otherwise disclosed to Buyer in writing, there are no (a) pending or threatened adverse actions with respect to any medical staff member of any of the Hospital or any applicant thereto, including any adverse actions for which a medical staff member or applicant has requested a judicial review hearing that has not been scheduled or that has been scheduled but has not been completed, or (b) pending or threatened disputes with applicants, medical staff members or health professional affiliates, and all appeal periods in respect of any medical staff member or applicant against whom an adverse action has been taken have expired.  No medical staff members of the Hospital have resigned or had their privileges revoked or suspended since the Balance Sheet Date.

**4.15    Experimental Procedures.**  During the past five (5) years, Seller and the Hospital have not performed or permitted the performance of any experimental or research procedure or study involving patients in the Hospital that were not authorized and/or conducted in accordance with the policies and procedures of the Hospital that comply with applicable Laws, including applicable U.S. Food and Drug Administration regulations.

**4.16    Intellectual Property.**

(a)    Schedule 4.16(a)[2] sets forth an accurate and complete list of the following Owned Intellectual Property as of the date of this Agreement: (i) Patents; (ii) registered Trademarks and applications therefor, and unregistered Trademarks that are material to the operation of the Business; (iii) registered Copyrights and applications therefor; (iv) Domain Names (including social media accounts used or held for use in or ancillary to the Business or the Purchased Assets); (v) Restricted Names, and (vi) Software, including for each item listed, as applicable, the owner, the jurisdiction, the application/serial number, the registration number, the filing date, and the issuance/registration date. Schedule 4.16(a) also sets forth all payments and filings that are due, and all other actions with Governmental Authorities that must be taken, within one hundred eighty (180) days after the date hereof with respect to each item of registered Intellectual Property listed in such schedule.  All of the foregoing registered Owned Intellectual Property is valid, subsisting and enforceable in accordance with applicable Laws, has not been canceled, expired or abandoned, and is not involved in any interference, reexamination, cancellation, or opposition Proceeding.

(b)    Except as set forth on Schedule 4.16(b), Seller or Seller Affiliates solely and exclusively own all right, title and interest (including the right to enforce), free and clear of all Encumbrances, other than Permitted Encumbrances, in all Owned Intellectual Property.  During the five (5) year period prior to the date of this Agreement, Seller and Seller Affiliates have used commercially reasonable efforts, consistent with customary industry practices, to maintain, police and protect each item

---

[2] Schedule to be bifurcated for each of Seller and Seller Affiliates

Case 3:18-bk-05665   Doc 79   Filed 08/31/18   Entered 08/31/18 18:22:55   Desc Main
Document       Page 125 of 177

of Owned Intellectual Property. Seller has valid rights to use the Transferred Intellectual Property as necessary for the operation of the Business. Neither Seller, any Seller Affiliate nor any Owned Intellectual Property, is subject to any Contract containing any covenant or other provision that in any way limits or restricts the ability of Seller to use, assert, enforce, or otherwise exploit any Owned Intellectual Property anywhere in the world. No Person who has licensed Intellectual Property to Seller or any Seller Affiliate has any ownership rights or license rights to derivative works or improvements made by or on behalf of Seller or any Seller Affiliate related to such Intellectual Property.

(c)     Except as set forth on Schedule 4.16(c): (i) the consummation of the Contemplated Transactions will neither violate nor result in the breach, modification, cancellation, termination or suspension of, or acceleration of any payments under, any of the Intellectual Property Contracts; and (ii) following the Effective Time, Buyer will have and be permitted to exercise all of Seller's or Seller Affiliates' rights under and to all Transferred Intellectual Property, including under or pursuant to all Intellectual Property Contracts to the same extent Seller or any Seller Affiliate would have been able to had the Contemplated Transactions not occurred and without being required to pay any additional amounts or consideration other than fees, royalties or payments that Seller or any Seller Affiliate would otherwise be required to pay had the Contemplated Transactions not occurred. No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or could reasonably be expected to, result in the delivery, license, or disclosure of any source code included in the Owned Intellectual Property.

(d)     The Business Offerings, the Owned Intellectual Property, the use of the Transferred Intellectual Property by Seller and Seller Affiliates, and the operation of the Business have not infringed, misappropriated, violated, or otherwise conflicted with, and do not infringe, misappropriate, violate or otherwise conflict with, any Intellectual Property rights of any other Person, violate any right to privacy or publicity, nor constitute unfair competition or trade practices under the Laws of any jurisdiction. Except as set forth on Schedule 4.16(d), neither Seller nor any Seller Affiliates have received any claim (or notice of any related action) that Seller, any Seller Affiliate, any Business Offering, or any Transferred Intellectual Property infringes, misappropriates, or otherwise violates any Intellectual Property rights of any Person, or constitutes unfair competition or trade practices under the Laws of any jurisdiction (nor to the Knowledge of Seller are there any facts, circumstances or information that could reasonably be the basis for such a claim). No claim of infringement or misappropriation of Intellectual Property is pending or, to the Knowledge of Seller, threatened, against any Person who may be entitled to be indemnified, defended, held harmless, or reimbursed by Seller with respect to such claim.

(e)     Except as set forth on Schedule 4.16(e), (i) to the Knowledge of Seller, no Person is infringing, misappropriating, diluting or otherwise violating any Owned Intellectual Property, and (ii) Seller has not made any claims with respect to infringement or misappropriation of any Owned Intellectual Property against any Person, nor has Seller or any Seller Affiliate issued any written communication inviting any Person to take a license, ownership interest, release, covenant not to sue or the like with respect to any Owned Intellectual Property.

(f)     All Owned Intellectual Property that derives independent economic value, actual or potential, from not being generally known to the public or to other Persons who can obtain economic value from its disclosure or use has been maintained in confidence in accordance with procedures customarily used in Seller's industry to protect rights of like importance. All Seller Employees, current and former employees, consultants and contractors of Seller or any Seller Affiliate, and other Persons who have participated in the creation or development of any Owned Intellectual Property have executed valid and enforceable agreements in which they have assigned or otherwise vested all of their rights in and to such Owned Intellectual Property to Seller and have agreed to maintain the confidentiality of such Owned Intellectual Property. No such Person has asserted, and to the Knowledge of Seller, no such

Person has, any right, title, interest or other claim in, or the right to receive any royalties or other consideration with respect to, any Owned Intellectual Property. At no time during the conception of or reduction to practice of any Owned Intellectual Property was any developer, inventor or other contributor to such Intellectual Property operating under any grants from any Governmental Authority, educational institution or private source, performing research sponsored by any Governmental Authority, educational institution or private source, utilizing the facilities of any Governmental Authority or educational institution, or subject to any employment agreement or invention assignment or nondisclosure agreement or other obligation with any third Person.

(g)     Except as set forth on Schedule 4.16(g), no Open Source Materials have been used in, incorporated into, embedded, integrated or bundled with, or used in the development or compilation of, any Business Offerings or any other Owned Intellectual Property. No Open Source Materials set forth on Schedule 4.16(g) have been modified or distributed by or on behalf of Seller in such a manner as would require Seller or any Seller Affiliate to (i) publicly make available any source code that is part of the Owned Intellectual Property, (ii) license, distribute, or make available any source code for the purpose of reverse engineering or making derivative works of such source code, or to permit any other Person to perform such actions, or (iii) be restricted or limited from charging for distribution of any Business Offerings or any other Owned Intellectual Property.

(h)     All Information Technology Systems and Business Offerings (and all parts thereof) (i) operate and perform in accordance with their documentation and functional specifications and otherwise as required by Seller and Seller Affiliates, (ii) have not materially malfunctioned or failed within the past five (5) years, and (iii) are free of (A) any critical defects, including any critical error or critical omission in the processing of any transactions and (B) any Malicious Code. Seller and Seller Affiliates take and have taken reasonable steps intended to ensure that the Business Offerings and the Information Technology Systems are free from Malicious Code. Seller and Seller Affiliates have disaster recovery plans, procedures and facilities that are consistent with the best practices of the industry of Seller, and take and have taken all reasonable steps to safeguard and back-up at secure off-site locations the Information Technology Systems. During the five (5) year period prior to the date of this Agreement, there has not been an unauthorized breach, disclosure, or loss of data stored or contained in the Information Technology Systems.

(i)     To the extent that Seller or any Seller Affiliates receive, process, transmit or store any financial account numbers (such as credit cards, bank accounts, PayPal accounts, debit cards), passwords, CCV data, or other related data ("**Cardholder Data**"), Seller has implemented information security procedures, processes and systems that have at all times met or exceeded all applicable Laws and industry standards related to the collection, storage, processing and transmission of Cardholder Data, including those established by applicable Governmental Authorities, and the Payment Card Industry Standards Council (including the Payment Card Industry Data Security Standard).

**4.17    Contracts.**

(a)     Schedule 4.17(a) sets forth an accurate and complete list of each Contract (including a description of any oral Contract) to the extent that, such Contract binds or affects any of the Purchased Assets or Seller is a party to or is bound by such Contract in connection with the Business or the Purchased Assets (collectively, the "**Material Contracts**"), organized into the following subsections:

(i)     all Contracts involving aggregate consideration in excess of $25,000 or requiring performance by any party more than one year from the date hereof;

(ii)     all Contracts that cannot be cancelled without penalty or without more than thirty (30) days' notice;

(iii)    all Contracts that relate to the acquisition of any business, a material amount of stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(iv)    all Contracts that contain non-competition or non-solicitation provisions restricting the conduct of the Business, or restricting the conduct of any Person potentially competing with the Business, in any geographic area or during any period of time;

(v)     all Contracts granting any exclusive rights, rights of first refusal, rights of first negotiation or similar rights to any Person;

(vi)    except for agreements relating to trade receivables, all Contracts relating to Indebtedness (including guarantees), or imposing an Encumbrance on any Purchased Asset;

(vii)   all managed care or third-party payor Contracts;

(viii)  all Contracts with any Physician, any Practitioner or licensed health care facility;

(ix)    all Contracts for medical direction, the provision of professional health care services, or medical supervision of the performance of health care services at the Hospital;

(x)     all Contracts between or among Seller on the one hand and any Seller Affiliate on the other hand;

(xi)    all collective bargaining agreements or Contracts with any labor organization, union or association;

(xii)   all employment agreements and Contracts with independent contractors or consultants (or similar arrangements);

(xiii)  all Contracts pursuant to which material payments are required upon a sale of substantially all the assets that constitute the Business;

(xiv)   all Contracts that provide for severance pay or any other material post-employment payment by, or financial obligation of, Seller;

(xv)    all joint venture, partnership or similar Contracts that provide for the sharing of profits relating to the Business (excluding the organizational documents of Seller);

(xvi)   all Contracts for the sale of any of the Purchased Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Purchased Assets;

(xvii)  all Contracts that provide for the indemnification of any Person or the assumption of any Tax, environmental or other Liability of any Person;

(xviii) all Intellectual Property Contracts;

(xix)   all Third Party Leases and Tenant Leases;

(xx)   all confidentiality agreements, non-disclosure agreements or similar agreements;

(xxi)   all agency agreements and powers of attorney; and

(xxii)   all other Contracts material to the Purchased Assets or the operation of the Business and not previously listed in a category set forth in <u>Sections 4.17(a)(i)-(xxi)</u> above.

(b)   Each Assumed Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. Seller (in each case, to the extent a party thereto) has properly conducted and paid all amounts to be paid by Seller, as applicable, and otherwise performed all material obligations required to be performed by Seller under each Assumed Contract and Seller has not received any notice of termination, cancellation, breach or default under any Assumed Contract. To the Knowledge of Seller, no event has occurred that, with the passage of time or the giving of notice or both, would result in a default, breach or event of noncompliance by Seller under any Assumed Contract, or result in the termination thereof, or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder, except as set forth on <u>Schedule 4.17(b)</u>. To the Knowledge of Seller, no other party to any Assumed Contract or Material Contract is in breach thereof or default thereunder. A true, correct and complete copy of each written Assumed Contract and Material Contract and an accurate written description setting forth the terms and conditions of each oral Assumed Contract and Material Contract has been delivered to Buyer.

4.18   **Personal Property**. <u>Schedule 4.18</u> includes an accurate and complete list of the Personal Property as of the Balance Sheet Date. Except as disclosed on <u>Schedule 4.18</u>, since the Balance Sheet Date, Seller has not sold or otherwise disposed of any item or items of Personal Property having a value (individually or in the aggregate) in excess of $5,000 (other than Inventory items sold, used or disposed of in the ordinary course of business).

4.19   **Inventory**. All of the Inventory existing on the date hereof will exist on the Closing Date, except for Inventory exhausted or added in the ordinary course of business between the date hereof and the Closing Date. Inventory is carried at the lower of cost or market on a first in, first out basis and is properly stated in the Historical Financial Information. Except to the extent of reserves reflected in the Reference Balance Sheet, all of the Inventory on hand on the date of this Agreement and to be on hand on the Closing Date, consists and will consist of items of a quality usable or saleable in the ordinary course of business. The quantities of all Inventory are reasonable and justified under the normal operations of each of the Hospital and do not exceed levels that Seller reasonably believes will be fully utilized within the twelve (12) month period after the date of recordation on the Books and Records.

4.20   **Real Property**.

(a)   <u>Schedule 4.20(a)</u> sets forth an accurate and complete list of each Facility, including the name, physical address and brief description of each Facility, whether the Real Property comprising such Facility is Owned Real Property or Leased Real Property, and the correct legal name of the owner of such Facility.

(b)   <u>Schedule 4.20(b)</u> sets forth the physical address, as well as a metes and bounds description, for each parcel of Owned Real Property. Seller owns, and (in the case of the Owned Real Property) at the Closing Seller will convey to Buyer, good, marketable and insurable fee simple title to the Owned Real Property free and clear of all Encumbrances, other than Permitted Encumbrances. Seller

agrees that title to the Owned Real Property shall not be altered or encumbered between the date of this Agreement and the Closing Date. Except as set forth on Schedule 4.20(b), other than the right of Buyer pursuant to this Agreement, there are no outstanding agreements, options, rights of first offer or rights of first refusal to sell such Owned Real Property or any portion thereof or interest therein. No Seller Affiliate or any other Person has any ownership or leasehold interest in any of the Owned Real Property or the Hospital (except for tenants under the Third Party Leases and rights of third parties under the Assumed Capital Leases).

(c)     Schedule 4.20(c) sets forth an accurate and complete list of the physical addresses of all of the Leased Real Property and identifies each Tenant Lease under which such Leased Real Property is occupied or used by Seller, including the date of and legal name of each of the parties to such Tenant Lease, any security deposit of Seller held under such Tenant Lease and any Approval required to assign such Tenant Lease to Buyer. Except as set forth on Schedule 4.20(c), with respect to such Leased Real Property: (i) the applicable Tenant Lease is legal, valid, binding and in full force and effect; (ii) the assignment of such Tenant Lease will not require the consent of any other party to such Tenant Lease, will not result in a breach of or default under such Tenant Lease, and will not otherwise cause such Tenant Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Effective Time; (iii) there are no ongoing disputes with respect to such Tenant Lease; (iv) neither Seller, Seller Affiliates, nor any other party to such Tenant Lease is in breach or default under such Tenant Lease, and no event has occurred or circumstance exists that, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Tenant Lease; (v) no security deposit or portion thereof deposited with respect to such Tenant Lease has been applied in respect of a breach or default under such Tenant Lease that has not been re-deposited in full; and (vi) there are no Encumbrances on the estate or interest created by such Tenant Lease other than Permitted Encumbrances. Seller holds, and at the Closing Seller will assign to Buyer, good, marketable and insurable leasehold title to all of the Leased Real Property, free and clear of all Encumbrances other than Permitted Encumbrances.

(d)     Schedule 4.20(d) sets forth an accurate and complete list and rent roll of all existing Third Party Leases, including the following information with respect to each: (i) the physical address and premises covered; (ii) the effective date and any amendments thereto; (iii) the legal name of the tenant, licensee or occupant; (iv) its term; (v) the rents and other charges payable thereunder; (vi) the rents or other charges in arrears or prepaid thereunder, if any, and the period for which any such rents and other charges are in arrears or have been prepaid; (vii) the nature and amount of the security deposits thereunder, if any; (viii) any options to renew or extend such Third Party Lease; (ix) any free rent, concessions, abatements, allowances, rebates or refunds to which the tenant, licensee or occupant may be or may have been entitled; (x) the status of any tenant improvements to be performed by Seller or the tenant, subtenant, licensee or occupant; and (xi) the nature and amount of any commissions payable with respect thereto.

(e)     Except as set forth on Schedule 4.20(e), with respect to each Third Party Lease: (i) the Third Party Lease is legal, valid, binding and in full force and effect; (ii) the execution, delivery and performance by Seller of this Agreement, and the consummation of the Contemplated Transactions, do not or shall not (as the case may be) require the consent of any other party to such Third Party Lease, will not result in a breach of or default under such Third Party Lease, and will not otherwise cause such Third Party Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing; (iii) there are no material ongoing disputes with respect to such Third Party Lease; (iv) neither Seller nor any other party to such Third Party Lease is in breach or default under such Third Party Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination,

4822-2526-1169.2                                         44

modification or acceleration of rent under such Third Party Lease; (v) no security deposit or portion thereof deposited with respect to such Third Party Lease has been applied in respect of a breach or default under such Third Party Lease that has not been re-deposited in full; and (vi) there are no Encumbrances on the estate or interest created by such Third Party Lease other than Permitted Encumbrances.

(f)     Seller has made available to Buyer accurate and complete copies of the Tenant Leases and the Third Party Leases, in each case as amended or otherwise modified and in effect, together with all extension notices and other material correspondence, fair market value analyses, estoppel certificates, and subordination, non-disturbance and attornment agreements related thereto.

(g)     Seller has not received written notice from any Governmental Authority of, and there is not: (i) any pending or, to the Knowledge of Seller, threatened, condemnation Proceedings affecting the Real Property or any part thereof; (ii) any violation of any Laws (including zoning and land use ordinances, building codes and similar requirements) with respect to the Real Property or any part thereof, which have not heretofore been cured; or (iii) any pending or, to the Knowledge of Seller, threatened, injunction, decree, Order, writ or judgment outstanding, nor any claims, litigation, administrative actions or similar Proceedings against Seller, any Seller Affiliate, or any Real Property relating to the ownership, lease, use or occupancy of such Real Property or any portion thereof which is reasonably likely to result in a material change in the condition of any Real Property or any part thereof or in any material respect prevent or limit the present operation of the improvements on the Real Property or any part thereof.

(h)     As of the Closing Date, there will be no incomplete construction projects affecting the Real Property and all completed construction projects will be fully paid for and all applicable lien releases obtained.

(i)     No subdivision shall be required for the lawful conveyance or lease of the Real Property to Buyer. Each parcel of the Real Property is separately assessed for purposes of ad valorem real property Taxes. No variance, reliance on adjacent property or special exception is required for the operation and use of the improvements on the Real Property.

(j)     No brokerage or leasing commissions or other compensation are due or payable by Seller or any Seller Affiliate to any Person, firm, corporation or other entity with respect to, or on account of, any Tenant Lease, any Third Party Lease or any extensions or renewals thereof.

(k)     All improvements, including all utilities that are a part of the Real Property, have been completed and installed in accordance with the plans and specifications approved by the Governmental Authority having jurisdiction, to the extent applicable, and are transferable to Buyer without additional cost. Permanent certificates of occupancy, all licenses, permits, authorizations and approvals required by all Governmental Authorities having jurisdiction, and the requisite certificates of the local board of fire underwriters (or other body exercising similar functions), have been issued for the Real Property and are in full force and effect.

(l)     The improvements which are a part of the Real Property, as designed and constructed, comply with all Laws applicable thereto, including the Americans with Disabilities Act, as amended, and Section 504 of the Rehabilitation Act of 1973.

(m)     The existing water, sewer, gas and electricity lines, storm sewer and other utility systems on the Real Property are adequate to serve the utility needs of the Real Property and the Business. All Approvals and Permits required for said utilities have been obtained and are in force and effect. All of said utilities are installed and operating, and all installation and connection charges have been paid in

full.

(n)     Neither the location, construction, occupancy, operation, nor use of the Real Property (including the improvements which are a part of the Real Property) violates any applicable Laws or determination of any Governmental Authority or any board of fire underwriters (or other body exercising similar functions), judicial precedent or any restrictive covenant or deed restriction (recorded or otherwise) affecting the Real Property or the location, construction, occupancy, operation or use thereof, including all applicable Laws. All improvements located on the Real Property are located within boundary lines of the described parcels of land and each parcel of Real Property has access to a public street adjoining the Real Property, and such access is not dependent on any land or other real property interest which is not included in the Real Property.

(o)     There are not any structural or latent defects in any of the buildings or other improvements which are a part of the Real Property. Such buildings and improvements which are a part of the Real Property, and all parts thereof and appurtenances thereto, including the heating, ventilation, air conditioning, electrical, mechanical and plumbing systems, and the drainage at or servicing the Real Property, the Hospital, and any equipment relating thereto, are in good condition and working order and adequate in quantity and quality for the normal operation of the Real Property.

(p)     The Real Property comprises all of the real property owned or leased by Seller or any Seller Affiliate in the Restricted Area.

**4.21     Insurance.** Schedule 4.21 sets forth an accurate and complete list of all insurance policies or self-insurance funds maintained by Seller as of the date of this Agreement covering the Business or the Purchased Assets (collectively, the "**Insurance Policies**"), indicating with respect to each such policy or fund, the type of insurance, policy number, annual premium, remaining term, identity of the insurer, coverage limits, applicable deductibles, and whether such policies are on an occurrence or claims made basis. Seller has made available to Buyer accurate and complete copies of all of such Insurance Policies. Seller has one or more "business interruption" Insurance Policies in customary form and amount covering the Business and the Purchased Assets **[(which coverage includes post-Closing operations by Buyer with respect to pre-Closing incidents), and the proceeds of such Insurance Policies are assignable to Buyer as to the period following the Effective Time].** All of the Insurance Policies are now and will be until the Effective Time in full force and effect with no premium arrearages. All premiums due on the Insurance Policies have either been paid or, if due and payable on or prior to the Closing Date, will be paid prior to the Closing Date in accordance with the payment terms of each Insurance Policy. The Insurance Policies do not provide for any retrospective premium adjustment or other experience-based Liability on the part of Seller (except with respect to workers' compensation policies). All Insurance Policies (a) are valid and binding in accordance with their terms; (b) are provided by carriers who are financially solvent; and (c) have not been subject to any lapse in coverage. There are no claims pending under any of the Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights. Seller is not in default under, nor has Seller otherwise failed to comply with, in any material respect, any provision contained in any Insurance Policy. The Insurance Policies are of the type and in the amounts customarily carried by Persons conducting a business similar to the Business and are sufficient for compliance with all applicable Laws and Contracts to which Seller is a party or by which Seller or any of the Purchased Assets are bound. Seller has timely provided all notices required to be given under the Insurance Policies to the respective insurer with respect to all claims and actions covered by insurance, and no insurer has denied coverage of any such claims or actions or reserved its rights in respect of or rejected any such claims. Seller has not (i) received any notice or other communication from any insurer canceling or materially amending any of the Insurance Policies, and no such cancellation or amendment is threatened, or (ii) failed to present any claim which is still outstanding under any of the Insurance Policies.

**4.22    Employee Benefit Plans**.

(a)    Schedule 4.22(a) contains a true and complete list of all of the following agreements, plans or other Contracts covering any Seller Employee, any current or former employee or director of Seller or any Seller Affiliate, any current or former leased employee, consultant or contractor of Seller or any Seller Affiliate, or any beneficiary or dependent thereof: (i) employee benefit plans within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), whether or not subject to ERISA, and (ii) any employment, consulting, independent contractor, employee leasing, severance, termination or similar Contract and any other employee benefit plan, program, policy, or arrangement providing for compensation, bonuses, commission, profit-sharing, stock option or other stock- or equity-linked benefits or rights, incentive, deferred compensation, fringe benefits, vacation or paid-time-off benefits, insurance (including any self-insured arrangements), death, life, dental, vision, health or medical benefits, employee assistance, disability or sick leave benefits, workers' compensation, supplemental unemployment benefits, retention, transaction, change of control payments, savings, pension, retirement, post-employment or retirement benefits or other employee compensation plan, program, policy, agreement, program, arrangement or commitment, in each case, whether written or unwritten, formal or informal, which Seller or any Seller Affiliate currently sponsors, or to which Seller or any Seller Affiliate has any outstanding present or future obligations to contribute or other Liability, whether voluntary, contingent or otherwise (collectively, the "**Plans**").

(b)    Seller has provided an accurate and complete copy of the following documents to Buyer: (i) each Plan (including all plan documents and amendments thereto and summary of the material terms of any Plan that is not in writing); (ii) the most recent Form 5500 annual report with accompanying schedules and attachments filed with the IRS, (iii) the most recent Form 1094 and Form 1095 filed with the IRS, (iv) the most recent summary plan description (as well as any summary of material modifications thereto) or other summary or description provided to participants and beneficiaries for each Plan, (v) the current employee handbook or similar document of the Hospital and (vi) the most recently received determination or opinion letter, if any, issued by the IRS and each currently pending application to the IRS for a determination letter with respect to any Plan that is intended to qualify under Section 401(a) of the Code.

(c)    All contributions (including all employer contributions and Seller Employee salary reduction contributions), premiums and expenses to or in respect of the Plans have been timely paid in full or, to the extent not yet due, have been adequately accrued for in accordance with GAAP.

(d)    With respect to Seller and any entity that is required to be aggregated with Seller under Section 414 of the Code (Seller and such aggregated entities referred to collectively as the "**ERISA Controlled Group**"), (i) there is no "multiemployer plan" (as defined in Sections 4001(a)(3) or 3(37)(A) of ERISA) under which any member of the ERISA Controlled Group has any present or future obligations, whether contingent or otherwise, or under which Seller Employees or any other employee of Seller has any present or future right to receive benefits; (ii) none of the Plans and no plan that is or has been maintained or contributed to by a member of the ERISA Controlled Group is a pension plan subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code; and (iii) none of the Plans is a "multiple employer plan" (as defined in Section 413(c) of the Code) or a multiple employer welfare plan (as defined in Section 3(40) of ERISA); and (iv) none of the Plans is subject to the terms of a collective bargaining agreement. No Plan provides for post-employment health benefits to Seller Employees or former employee or beneficiaries thereof of Seller or any Seller Affiliate, except as required by COBRA, and then only to the extent that the former employee or beneficiary pays the full applicable premium for such COBRA coverage.

(e)    Except as set forth on Schedule 4.22(e), there are no Proceedings pending or, to

the Knowledge of Seller, threatened, against Seller with respect to any Plans, other than routine claims for benefits in the ordinary course of business.

(f)     Each Plan has been operated and administered in material compliance with its terms and all applicable Laws, including ERISA and the Code. Seller and each member of the ERISA Controlled Group has complied with all of the continuation coverage requirements of COBRA and the requirements of Section 5000 of the Code. Each Plan that is intended to be Tax-qualified under Section 401(a) of the Code ("**Retirement Plans**") from which assets may be transferred or involved in a "direct rollover" (as defined in Section 401(a)(31) of the Code) to a Retirement Plan of Buyer has received a favorable determination letter or is entitled to rely on a favorable opinion letter from the IRS concerning the Tax-qualification of such Plan and no event or circumstance exists that would be reasonably expected to adversely affect such qualification.

(g)     Except as set forth on Schedule 4.22(g), neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions, either alone or in combination with another event (whether contingent or otherwise) will (i) entitle any Seller Employee, any current or former employee or director of Seller or any Seller Affiliate, or any current or former consultant or contractor of Seller or any Seller Affiliate to any payment or benefit; (ii) increase the amount or value of any payment, compensation or benefits due to any Seller Employee, any current or former employee or director of Seller or any Seller Affiliate, or any current or former consultant or contractor of Seller or any Seller Affiliate; or (iii) accelerate the vesting, funding or time of payment or delivery of any compensation, equity award or other payment or benefit; (iv) result in any Liability or commitment by Buyer or any of its Affiliates under, or with respect to, any Plan to any Seller Employee, any current or former employee or director of Seller or any Seller Affiliate, or any current or former consultant or contractor of Seller or any Seller Affiliate; or (v) result in any "parachute payment" within the meaning of Section 280G of the Code or any similar foreign, state or local Laws.

**4.23     Employee Matters**.

(a)     Schedule 4.23(a) sets forth an accurate and complete list of all Seller Employees, their salary or wage rates, bonus and other compensation, Paid Time Off, recognized date of hire, department, job title, scheduled hours per week, status as part-time, full-time, PRN or temporary, name of employer, work location, and whether such Seller Employees are active or on a leave of absence (and, if so, the type of leave). Seller and each Plan have properly classified individuals providing services to Seller as independent contractors or employees and as exempt or non-exempt from the application of state and federal wage and hour Laws for all purposes, as the case may be, and have properly reported all compensation paid to such service providers for all purposes and no Proceeding has been initiated or threatened against Seller with respect to any of the foregoing. All Seller Employees are employees "at-will," unless otherwise set forth on Schedule 4.23(a). Except as set forth on Schedule 4.17(a), Seller is not a party to any oral or written (i) employment agreement (including severance or change of control agreements), (ii) consulting agreement, or (iii) independent contractor agreement with any Person. No Seller Employee or other service provider of Seller or any Seller Affiliate has informed Seller or Seller Affiliates (whether orally in or writing) of any plan to terminate employment with or services for Seller or Seller Affiliates, and to the Knowledge of Seller, no such Person has any plans to terminate employment with or services for Seller or any Seller Affiliate.

(b)     Seller and the Seller Affiliates, as applicable, are not delinquent in payments to any of the Seller Employees for any wages, salaries, commissions, bonuses or other direct compensation for any services performed for any of them or any other amounts required to be reimbursed to such Seller Employees (including Paid Time Off and other benefits) or in the payment to the appropriate Governmental Authority of all required Taxes, insurance, Social Security and withholding thereon. As of

the Effective Time, neither Seller nor any Seller Affiliate, as applicable, will have any Liability to any of the Seller Employees or to any Governmental Authority for any such matters that are not properly reflected on the Reference Balance Sheet.

(c)    Except as set forth on Schedule 4.23(c): (i) there is no pending or, to the Knowledge of Seller, threatened, employee strike, work stoppage or labor dispute at any of the Hospital, and none has ever occurred; (ii) to the Knowledge of Seller, no union representation question exists respecting the Seller Employees or any other employees of Seller or any Seller Affiliate, no demand has been made for recognition by a labor organization by or with respect to the Seller Employees or any other employees of Seller or any Seller Affiliate, no union organizing activities by or with respect to the Seller Employees or any other employees of Seller or Seller Affiliates are taking place, and none of the Seller Employees or any other employees of Seller or any Seller Affiliate is represented by any labor union or organization; (iii) no collective bargaining agreement exists, has existed or is currently being negotiated by Seller; (iv) there is no unfair labor practice claim against Seller before the National Labor Relations Board pending or, to the Knowledge of Seller, threatened, against or involving the Business or the Hospital; (v) Seller and each Seller Affiliate is in compliance with all Laws and Contracts to which Seller or such Seller Affiliate is a party respecting employment and employment practices, labor relations, terms and conditions of employment, and wages and hours with respect to the Seller Employees; (vi) neither Seller nor any Seller Affiliate is engaged in any unfair labor practices with respect to the Seller Employees; and (vii) there are no pending or, to the Knowledge of Seller, threatened, complaints or charges related to any of the Hospital before any Governmental Authority regarding employment discrimination, safety or other employment-related charges or complaints, wage and hour claims, unemployment compensation claims or workers' compensation claims.

(d)    Seller is in compliance with the terms and provisions of the Immigration Act. For the Seller Employees for whom compliance with the Immigration Act is required, Seller has obtained and retained a complete and accurate copy of each such Seller Employee's Form I9 (Employment Eligibility Verification Form) and all other records or documents required to be prepared, procured or retained pursuant to the Immigration Act. Seller has not been cited, fined, served with a Notice of Intent to Fine or with a Cease and Desist Order (as such terms are defined in the Immigration Act) at any of the Hospital, nor has any Proceeding been initiated or threatened against Seller in connection with the Business, by reason of any actual or alleged failure to comply with the Immigration Act.

(e)    Since January 1, 2013, neither Seller nor any Seller Affiliate has effectuated (i) a "plant closing" (as defined in the WARN Act or any similar state, local or foreign Law) affecting any site of employment or one or more Hospital or operating units within any site of employment or facility of Seller or any Seller Affiliate or (ii) a "mass layoff" (as defined in the WARN Act, or any similar state, local or foreign Law) affecting any site of employment or facility of Seller or any Seller Affiliate.

**4.24    Litigation.**

(a)    Schedule 4.24 sets forth an accurate and complete list and summary description of all Proceedings with respect to Seller, the Business, or the Purchased Assets, as well as all Orders, settlements and conciliation Contracts under which Seller or any Seller Affiliate has current or future obligations with respect to the Business or the Purchased Assets. Except as set forth on Schedule 4.24, there are no Proceedings, Orders, compliance reports or information requests, subpoenas or production requests pending or, to the Knowledge of Seller, threatened, against or affecting (i) Seller or any Seller Affiliate with respect to the Business or the Purchased Assets, (ii) any Seller Employees or former employee or current or former agent of Seller or any Seller Affiliate, or (iii) any current or former medical staff member, supplier or contractor at law or in equity, or before or by any Governmental Authority. Neither Seller nor any of the Hospital have been subject to any formal or informal (for which Seller or a

Case 3:18-bk-05665   Doc 79   Filed 08/31/18   Entered 08/31/18 18:22:55   Desc Main
                    Document      Page 135 of 177

Facility has received notice) Proceeding of the OIG, CMS, the Justice Department, the United States General Accounting Office, the Mississippi Department of Health, the Mississippi Medicaid program or any other Governmental Authority. There are no Proceedings pending or threatened by Seller against any Person. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any of the foregoing.

(b)     To the Knowledge of Seller, Seller is not the subject of any governmental investigation or inquiry and, to the Knowledge of Seller, there is no valid basis for any of the foregoing. Neither Seller, nor any assets owned or used by Seller, are subject to any Order or unsatisfied judgment, penalty, award, settlement Contract or conciliation Contract. Seller has at all times been in compliance with each Order to which Seller, or any assets owned or used by Seller, is or has been subject. No event has occurred or circumstance exists that could constitute or result in (with or without notice or lapse of time) a violation of, or failure to comply with, any Order to which Seller, or any assets owned or used by Seller, is subject. Seller has not ever received any notice or other communication (whether oral or written) from any Governmental Authority or any other Person regarding any actual, alleged, or potential violation of, or failure to comply with, any Order to which Seller, or any assets owned or used by Seller, is subject.

(c)     Seller has not engaged in any transaction that would reasonably be expected to subject Seller (or any successor-in-interest) to any avoidance action with respect to the Purchased Assets. Without limiting the generality of the foregoing, Seller has not, with respect to the Purchased Assets, (i) received any material payments from its account debtors outside the ordinary course of business, (ii) acquired or sold any asset other than for reasonably equivalent value or (iii) conducted any business with any debtor-in-possession or bankrupt estate other than in the ordinary course of business.

(d)     There is no Proceeding or Order pending or, to the Knowledge of Seller, threatened, against or affecting Seller before any court or Governmental Authority that has or would reasonably be expected to have an adverse effect on Seller's ability to perform under this Agreement or the other Transaction Documents with respect to any aspect of the Contemplated Transactions. Seller is not subject to any Order or other governmental restriction that would materially adversely affect the consummation of the Contemplated Transactions.

**4.25    Tax Matters**. Except as set forth on <u>Schedule 4.25</u>:

(a)     Seller has timely filed all Tax Returns required to be filed by it, including all Tax Returns relating to the Purchased Assets and the Business (all of which are true, complete and correct in all material respects). All Taxes due and owing by Seller (whether or not shown on any Tax Return), including all Taxes with respect to the Purchased Assets and the Business, have been timely paid. Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency. Seller is not currently the beneficiary of any extension of time within which to file any Tax Return.

(b)     Seller has withheld and timely paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any Seller Employee, independent contractor, creditor, or other third party, and all IRS Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed. All Persons who have provided services to Seller as independent contractors for Tax purposes were properly classified.

(c)     Seller has not taken, and Seller will not take, any action in respect of any Taxes (including any withholdings required to be made in respect of Seller Employees) that may have an adverse impact upon the Purchased Assets as of or subsequent to the Effective Time.

(d)     There are no Tax Encumbrances on any of the Purchased Assets and no basis exists for the imposition of any such Encumbrances.

(e)     No deficiencies for Taxes have been claimed, proposed or assessed by any Governmental Authority for which Seller may have any Liability or which may attach to the Purchased Assets. There are no pending or threatened Proceedings for or relating to any Liability in respect of Taxes for which Seller may have any Liability or which may attach to the Purchased Assets. There are no matters under discussion by Seller with any Governmental Authority with respect to Taxes that may result in an additional amount of Taxes for which Seller may have any Liability or which may attach to the Purchased Assets.

(f)     Seller is not a party to any Tax allocation or sharing agreement or has any Liability with respect to any such agreement.

(g)     There is no Contract or plan to which Seller is a party that requires Seller to pay a Tax gross-up or reimbursement payment to any Person.

(h)     None of the Purchased Assets is an interest in a joint venture, partnership or other arrangement that is or should be treated as a partnership for Tax purposes.

(i)     No Tax Return relating to the Purchased Assets or the Business that was filed by Seller contains, or was required to contain, a disclosure statement under Section 6662 of the Code (or any predecessor provision or comparable provision of state, local or foreign Law). Seller has not entered into any "reportable transaction" as defined in Treasury Regulation Section 1.6011-4(b). Seller has no Liability for unpaid Taxes relating to the Purchased Assets or the Business of any Person as a former member of an affiliated group or as a transferee or successor, by contract, or otherwise. Seller has not agreed and is not required to make any adjustment under Section 481(a) of the Code by reason of a change in accounting method, and the IRS has not proposed any such adjustment or change in accounting method used by Seller.

(j)     Seller has (i) timely paid all sales and use Taxes required to be paid under all applicable Laws, (ii) properly collected and remitted all sales Taxes required under all applicable Laws, and (iii) for all sales that are exempt from sales Taxes and that were made without charging or remitting sales or similar Taxes, received and retained any appropriate Tax exemption certificates and other documentation qualifying such sale as exempt.

(k)     If Seller is a nonprofit corporation, then it (i) is an organization described in Section 501(c)(3) of the Code and exempt from taxation to the extent described in Section 501(a) of the Code, (ii) is not a private foundation within the meaning of Section 509(a) of the Code, (iii) is in possession of a determination letter from the Internal Revenue Service regarding its federal income Tax exemption, which determination letter has not been revoked or otherwise modified, (iv) is in compliance in all material respects with all applicable Laws pertaining to the operation of an organization described in Section 501(c)(3) of the Code, including, requirements as to private benefit, inurement, self-dealing, conflicts of interest, private business use and other applicable requirements, (v) is in compliance in all material respects with all applicable requirements of Section 501(r) of the Code if Seller is classified as a "hospital" pursuant to Section 170(b)(1)(A)(iii) of the Code and (vi) has not entered into any transaction which has constituted or may constitute an "excess benefit transaction" within the meaning of Section 4958 of the Code and the Treasury Regulations thereunder.

(l)     Seller has (i) timely filed or caused to be filed with the appropriate Governmental Authority all reports required to be filed with respect to any unclaimed property and has remitted to the

appropriate Governmental Authority all unclaimed property required to be remitted, or (ii) delivered or paid all unclaimed property to its original or proper recipient. None of the Purchased Assets is escheatable to any Governmental Authority under any applicable Laws.

     **4.26**    **Environmental Matters**. Except as set forth on <u>Schedule 4.26</u>:

     (a)    Seller has at all times complied, and is in compliance with, and the Real Property and all improvements on the Real Property are in compliance with, all Environmental Laws.

     (b)    Seller has no Liability under any Environmental Law with respect to any of the Purchased Assets or the Real Property, and Seller is not responsible for any Liability of any other Person under any Environmental Law with respect to any of the Purchased Assets or the Real Property. There are no pending or, to the Knowledge of Seller, threatened, Proceedings or Orders based on, and neither Seller nor any Seller Affiliate has received any formal or informal notice of any complaint, Order, directive, citation, notice of responsibility, notice of potential responsibility, or information request from any Governmental Authority or any other Person arising out of or attributable to any Environmental Condition or alleged noncompliance with any Environmental Law, nor does any fact exist that would reasonably be expected to form the basis for any such actions or notices arising out of or attributable to any Environmental Condition or alleged noncompliance with any Environmental Law.

     (c)    There are no Environmental Conditions existing at, underneath, or migrating to or from the Real Property, nor are there any Environmental Conditions resulting from, or which could reasonably be expected to result from, the operation of the Business or the Real Property.

     (d)    Seller has been duly issued, and currently have and will maintain through the Effective Time, all Approvals and Permits required under any Environmental Law with respect to any of the Hospital. A true and complete list of such Approvals and Permits, all of which are valid and in full force and effect, is set forth on <u>Schedule 4.26</u>, and any Approvals and Permits presently undergoing modification or renewal are described as such on <u>Schedule 4.26</u>. There are no Proceedings pending or, to the Knowledge of Seller, threatened, that seek the revocation, cancellation, suspension or adverse modification of any such Approval or Permit. All required applications for renewal thereof have been timely filed. No such Approval or Permit will terminate as a result of the consummation of the Contemplated Transactions, and no such Approval or Permit is required to be transferred to Buyer or any of its Affiliates as of the Effective Time in order for Buyer to lawfully operate each Facility as presently operated on and after the Effective Time. Seller is, and at all times have been, in compliance with such Approvals and Permits. Except in accordance with such Approvals and Permits, there has been no release of material regulated by such Approvals and Permits at, on, under, or from the Real Property in violation of Environmental Laws.

     (e)    The Real Property contains no underground improvements, including treatment or storage tanks, or underground piping associated with such tanks, used currently or in the past for the management of Hazardous Materials, and no Person has used any portion of the Real Property as a dump or landfill.

     (f)    Seller has provided to Buyer all environmental audits, reports and assessments concerning the Hospital, the Real Property or the Business that are in the possession, custody or control of Seller or any Seller Affiliate.

     (g)    Seller will promptly furnish to Buyer written notice of any Environmental Condition or of any actions or notices described in this <u>Section 4.26</u> arising or received after the date hereof.

(h)     No PCBs, lead-based paint, or asbestos-containing materials (each as defined in Environmental Laws) are present on or in the Real Property or the improvements thereto.

(i)     No Encumbrance in favor of any Person relating to or in connection with any claim under any Environmental Law has been filed or has attached to the Real Property.

**4.27     Absence of Changes**.  Since the Balance Sheet Date, Seller has conducted the Business in the ordinary course of business and there has not occurred any change in the operation of the Business or any event or development that, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect.  Since the Balance Sheet Date, Seller has not taken any action that, if taken after the date of this Agreement, would constitute a breach of any of the covenants set forth in Section 6.2.

**4.28     Affiliate Transactions**.  Except as set forth on Schedule 4.28, no Seller Affiliate, directly or indirectly: (a) provides any services to the Business or is a lessor, lessee, or supplier to the Business; (b) has any cause of action or other claim whatsoever against or owes any amount to, or is owed any amount by, Seller; (c) has any financial interest in or owns property or rights used in the Business; (d) is a party to any Contract relating to the Purchased Assets or the Business (other than compensation or employee benefits payable in the ordinary course of business); (e) received from or furnished to Seller any goods or services; or (f) has any financial interest in, or serves as an officer, manager, director of any customer, competitor or vendor, or supplier of the Business.

**4.29     Brokers and Finders**.  Except as set forth on Schedule 4.29, there are no claims for brokerage commissions, finders' fees, financial advisors' fees or similar compensation in connection with the Contemplated Transactions based on any Contract to which Seller is a party or that is otherwise binding upon Seller, and no Person is entitled to any fee or commission or like payment in respect thereof.

**4.30     Statements True and Correct**.  The representations and warranties of Seller contained in this Agreement and the other Transaction Documents, the statements contained in the Schedules or certificates or other documents furnished, or to be furnished, to Buyer pursuant to this Agreement and the information furnished, or to be furnished, to Buyer and Buyer's Representatives by Seller pursuant to this Agreement or in connection with the Contemplated Transactions do not and will not contain any untrue statement of a material fact, or omit to state any material fact necessary to make the statements or facts contained therein with respect to Seller, the Business or the Purchased Assets not misleading.]

**5.     REPRESENTATIONS AND WARRANTIES OF BUYER.**

Buyer hereby represents and warrants to Seller that the statements contained in this Article 5 are true and correct as of the date of this Agreement and will be true and correct as of the Closing Date (except in the case of representations and warranties that are made as of a specified date, in which case such representations and warranties will be true and correct as of such specified date).

**5.1     Organization; Capacity**.  Buyer is a [●] duly organized, validly existing and in good standing under the Laws of the State of [**Delaware**].  Buyer has the requisite power and authority to enter into this Agreement and the other Transaction Documents to which Buyer will become a party hereunder and to perform its obligations hereunder and thereunder.

**5.2     Authority; Non-contravention; Binding Agreement**.

(a)     The execution, delivery and performance by Buyer of this Agreement and the

4822-2526-1169.2                                             53

other Transaction Documents to which it is a party or will become a party, and the consummation by Buyer of the Contemplated Transactions and its obligations under the Transaction Documents, as applicable (i) are within Buyer's [●] powers and are not, and will not be, in contravention or violation of the terms of Buyer's organizational or governing documents; (ii) except as set forth on Schedule 5.2, do not require any Approval of, filing or registration with, the issuance of any Permit by, or any other action to be taken by, any Governmental Authority to be made or sought by Buyer; and (iii) assuming the Approvals and Permits set forth on Schedule 5.2 are obtained, do not and will not require any Approval or other action under, conflict with, or result in any violation of or default under (with or without notice or lapse of time or both) any Order or Law to which Buyer may be subject.

(b)     This Agreement and the other Transaction Documents to which Buyer is or will become a party are and will constitute the valid and legally binding obligations of Buyer and are and will be enforceable against Buyer in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**5.3     Litigation.**  There is no Proceeding or Order pending or, to the Knowledge of Buyer, threatened against or affecting Buyer or any of its properties or rights that challenges or may otherwise have the effect of preventing, rendering illegal or otherwise delaying the Contemplated Transactions.

**5.4     Brokers and Finders.**  There are no claims for brokerage commissions, finders' fees, financial advisors' fees or similar compensation in connection with the Contemplated Transactions based on any Contract to which Buyer is a party or that is otherwise binding upon Buyer, and no Person is entitled to any fee or commission or like payment in respect thereof.

**5.5     Statements True and Correct.**  The representations and warranties of Buyer contained in this Agreement and the other Transaction Documents, the statements contained in the Schedules or certificates or other documents furnished, or to be furnished, to Seller pursuant to this Agreement and the information furnished, or to be furnished, to Seller and Seller's respective Representatives by Buyer pursuant to this Agreement or in connection with the Contemplated Transactions do not and will not contain any untrue statement of a material fact, or omit to state any material fact necessary to make the statements or facts contained therein with respect to Buyer not misleading.

## 6.     PRE-CLOSING COVENANTS OF SELLER AND BUYER.

**6.1     Access to Premises; Information.**  From the date of this Agreement until the Effective Time, to the extent permitted by Law, Seller and Curae shall, and shall cause the Seller Affiliates to, allow Buyer, its Affiliates and its and their respective authorized Representatives access to, and the right to inspect, the Hospital, properties, Contracts, papers, and Books and Records of Seller and any Seller Affiliate relating to the Business or the Purchased Assets, and will furnish Buyer with such additional financial and operating data and other information relating to the Business or the Purchased Assets as Buyer may from time to time request without regard to where such information may be located. Seller and Curae will furnish to Buyer's and its Affiliates' Representatives access, upon reasonable prior notice and during normal business hours, to the Seller Employees and the officers and agents of Seller who have responsibility for the operation of the Business and the Hospital. Buyer's and its Affiliates' right of access and inspection shall be made in such a manner as not to unreasonably interfere with the Business.

**6.2     Conduct of Business.**  From the date of this Agreement until the Effective Time, Seller and Curae will, except as ordered by the Bankruptcy Court or limited by restrictions or limitations under the Bankruptcy Code on chapter 11 debtors, (a) conduct the Business in the ordinary course of business; (b) preserve intact its corporate existence and business organization; (c) use its commercially reasonable

Case 3:18-bk-05665   Doc 79   Filed 08/31/18   Entered 08/31/18 18:22:55   Desc Main
                    Document       Page 140 of 177

efforts to preserve the goodwill and present business relationships (contractual or otherwise) with all customers, suppliers, resellers, Seller Employees, licensors, distributors and others having business relationships with it, in each case with respect to the Business; (d) make all normal repairs, maintenance and planned capital expenditures with respect to the Business; (e) use its commercially reasonable efforts to preserve in all material respects its present properties used in or related to the operation of the Business, including the Personal Property; (f) comply in all material respects with all applicable Laws and all Material Contracts; (g) pay all Liabilities of the Business arising after the filing of the Bankruptcy Case as such Liabilities become due and payable; and (h) maintain all existing Approvals and Permits applicable to the Business. Without limiting the foregoing, and as an extension thereof, except as set forth on Schedule 6.2 or as expressly permitted by any other provision of this Agreement, Seller will not, from the date of this Agreement until the Effective Time, directly or indirectly, do, agree or commit to do, or take any action, or fail or omit to take any action that would result in, any of the following without the prior written consent of Buyer:

(i)     sell, lease, license, assign, convey, distribute or otherwise transfer or dispose of any of the Purchased Assets, except dispositions of Inventory in the ordinary course of business, with comparable replacement thereof;

(ii)     fail to maintain the Purchased Assets in at least as good condition as they are being maintained on the date hereof, subject to normal wear and tear;

(iii)     mortgage, pledge or subject to any Encumbrance any portion of the Purchased Assets, other than Permitted Encumbrances;

(iv)     incur any Indebtedness or guarantee any Indebtedness other than Debtor-in-Possession Financing approved by the Bankruptcy Court;

(v)     amend, modify, accelerate or terminate, as applicable, any Assumed Contract or Permit;

(vi)     waive, release, assign, settle or compromise any material rights or claims, or any material litigation or arbitration with respect to the Business or the Purchased Assets;

(vii)     disclose to any Person that is not subject to any confidentiality or non-disclosure agreement, or otherwise fail to maintain or protect the confidentiality of, any Trade Secrets of, or related to, the Business (including source code included in the Owned Intellectual Property) or other Confidential Information;

(viii)     (A) increase the compensation or benefits payable or to become payable to any Physician or other Referral Source of Seller, any Seller Employee, or any director, manager, officer or consultant of the Business; (B) grant or increase any rights to change in control, severance or termination payments or benefits to, or enter into any change in control, employment, consulting or severance agreement with, any Seller Employee or any other Person, including any director, manager, officer or consultant of the Business; (C) establish, adopt, enter into, amend, modify or terminate any Plan, except to the extent required by applicable Laws; or (D) take any affirmative action to amend or waive any performance or vesting criteria or accelerate vesting, exercisability or funding under any Plan;

(ix)     (A) make loans or advances to, guarantees for the benefit of, or any investments in any Person or (B) cancel any Indebtedness owed to Seller or waive any claims or rights of value;

(x)     make any change in the accounting policies, practices, principles, methods or procedures of the Business, other than as required by GAAP or by applicable Laws;

(xi)     (A) accelerate or delay collection of notes receivable or accounts receivable in advance of or beyond its regular due dates or the dates when the same would have been collected in the ordinary course of business; (B) delay or accelerate payment of any account payable related to the Business in advance of or beyond its due date or the date such Liability would have been paid in the ordinary course of business; (C) make any changes to the cash management policies of any of the Hospital; (D) delay or postpone the repair or maintenance of the Hospital; or (E) vary any inventory purchase practices of any of the Hospital in any material respect from past practices;

(xii)     make any capital expenditure commitment in excess of $15,000 for additions to property, plant, equipment, intangible or capital assets of the Business or for any other purpose, other than for routine and customary repairs or replacement, the payment of which is to be made prior to the Closing Date;

(xiii)     fail to keep in force the Insurance Policies or replacement or revised provisions providing insurance coverage with respect to the Purchased Assets or the Business as are currently in effect;

(xiv)     take or omit to take any action that, individually or in the aggregate, could reasonably be expected to result in any representation or warranty of Seller to be untrue, result in a breach of any covenant made by Seller in this Agreement, would require disclosure pursuant to Section 6.4 or could reasonably be expected to result in any condition set forth in Article 8 not being satisfied;

(xv)     enter into any new line of business or make any material change in the Business or the operation of the Purchased Assets;

(xvi)     acquire (including by merger, consolidation, license or sublicense) any interest in any Person or material portion of the assets or business of any Person, or otherwise acquire any material asset other than in the ordinary course of business; or

(xvii)     (A) make or change any election concerning Taxes; (B) file any amended Tax Return; (C) enter into any closing Contract or settle any Tax claim, or assessment; (D) consent to any extension or waiver of the limitation period applicable to any Tax claim Proceeding or assessment; or (E) omit to take any action relating to the filing of any Tax Return or the payment of any Tax in each case, relating to the Purchased Assets or the Business.

**6.3     Consents to Assignment.**

(a)     Buyer, with Seller's assistance as requested by Buyer, shall be responsible for obtaining or delivering, and shall use commercially reasonable efforts to obtain or deliver, as applicable, prior to the Closing, any and all consents or notices to assign any Assumed Contract necessary or desirable in connection with the Contemplated Transactions; provided that Buyer shall be responsible for paying any necessary Cure Amounts as provided in Section 2.3(b) herein. Each Party shall cooperate

4822-2526-1169.2                          56

with the other as reasonably requested to obtain any such consents or deliver any such notices.

(b)     Anything contained herein to the contrary notwithstanding, unless such Assumed Contract is assignable without the consent of any other party pursuant to the Bankruptcy Code or other applicable Law, this Agreement shall not constitute an agreement to assign any Assumed Contract if an attempted assignment thereof without the consent of another party thereto would constitute a breach thereof or in any material way adversely affect the rights of Seller thereunder (or the rights of Buyer thereunder following the Effective Time), unless such consent is obtained.  If such consent is not obtained, or if an attempted assignment would be ineffective or would materially and adversely affect the rights of Seller thereunder (or the rights of Buyer thereunder following the Effective Time), then Seller shall, upon the request of Buyer, cooperate in any reasonable arrangement designed to provide for Buyer the benefits under any such Assumed Contract, including enforcement of any and all rights of Seller against the other party or parties thereto.  To the extent Buyer cannot receive the benefit of an Assumed Contract due to the failure or inability to obtain the necessary consent from the counterparty to such Assumed Contract, then, at Buyer's option, such Contract shall be deemed an Excluded Contract, and all Liabilities with respect to such Contract shall be Excluded Liabilities. Notwithstanding anything contained in this Section 6.3(b) to the contrary, the Parties may mutually agree to assign an Assumed Contract to Buyer pursuant to the Assignment and Assumption Agreement notwithstanding the failure to obtain any consent thereto (the "**Agreed Upon Assignments**").

(c)     If, prior to the Closing, Buyer discovers information regarding an Assumed Contract that causes Buyer to determine in its reasonable discretion that such Assumed Contract may violate applicable Laws or Buyer's written policies, Buyer shall have the right to designate such Assumed Contract as an Excluded Contract by giving Seller written notice of such election prior to the Closing Date, and as a result, such Contract shall be deemed an Excluded Contract.

6.4     **Notification of Certain Matters**.

(a)     From the date of this Agreement until the Closing Date, Seller shall give prompt written notice to Buyer of (i) the occurrence, or failure to occur, of any event, circumstance or fact that is reasonably likely to cause any representation or warranty of Seller contained in this Agreement to be untrue in any material respect; (ii) any failure of Seller to comply with or satisfy, in any material respect, any covenant, condition or agreement to be complied with or satisfied by it under this Agreement; and (iii) any other material development affecting the Purchased Assets or the Assumed Liabilities.  Such notice shall provide a reasonably detailed description of the relevant circumstances and shall include the amount that Seller believes, based on facts known to Seller, would be payable by Seller pursuant to the indemnification provisions set forth in Article 10.  The content of any notice or update delivered by Seller to Buyer prior to the Closing Date pursuant to this Section 6.4 shall not be deemed to amend or supplement the Schedules or to modify the applicable representations, warranties and covenants contained in this Agreement or the other Transaction Documents for purposes of determining whether applicable conditions precedent in Article 8 are satisfied or for purposes of determining or calculating Seller's indemnification obligations set forth in Article 10.

(b)     If (i) Seller discovers at any time following the date of this Agreement that any Material Contract exists that is not disclosed on Schedule 4.17(a) or any Contract exists that is not disclosed on Schedule 2.1(l); or (ii) Seller enters into a Contract between the date of this Agreement and the Closing Date that would be required to be disclosed on Schedule 4.17(a) or Schedule 2.1(l), then Seller shall promptly notify Buyer of such fact and provide Buyer with an accurate and complete copy of such Contract.  Buyer may, in its sole discretion, designate such Contract either as an Assumed Contract or Excluded Contract, and if Buyer elects to treat such Contract as an Assumed Contract, the Parties shall update Schedule 2.1(l) accordingly.

4822-2526-1169.2                                    57

**6.5**     **Approvals**.  Between the date of this Agreement and the Closing Date, (a) Buyer, at its sole cost and expense, shall take all reasonable steps to obtain as promptly as practicable all Approvals and Permits necessary for Buyer's operation of the Business following the Effective Time, and (b) Seller, at its sole cost and expense, shall take all reasonable steps to obtain as promptly as practicable all Approvals and Permits necessary for Seller to transfer the Purchased Assets to Buyer.  Notwithstanding the foregoing, Buyer and Seller agree to cooperate with each other and to provide such information and communications to each other or to any Governmental Authority as may be reasonably requested in order to obtain the Approvals and Permits contemplated above or otherwise necessary to consummate the Contemplated Transactions.  Seller and Buyer will, and will cause their respective counsel to, supply to each other copies of all material correspondence, filings or written communications by such Party or its Affiliates with any Governmental Authority or staff members thereof, with respect to the Contemplated Transactions.

**6.6**     **Title and Survey Matters**.

(a)     Buyer has received or will receive commitments (the "**Commitments**") from the Title Company to issue as of the Effective Time a Mississippi form owner's or lessee's, as appropriate, policy of title insurance with all endorsements, as reasonably required by Buyer (the "**Title Policy**") for the Owned Real Property and the Leased Real Property in which Seller owns a leasehold interest in the land relating to such Leased Real Property, together with appurtenant easements, improvements, buildings and fixtures thereon, in amounts equal to the value assigned to such Real Property by Buyer. The Parties agree that the Title Company shall be responsible for all underwriting decisions with respect to the policy or policies issued pursuant to the Commitments. The Commitments provide for the issuance of the Title Policy to Buyer as of the Effective Time and shall insure fee simple title to the Owned Real Property and a leasehold interest for the Leased Real Property in which Seller owns a leasehold interest in the land relating to such Leased Real Property, subject only to the Permitted Encumbrances and without standard exceptions.  Seller will deliver any information as may be required by the Title Company under the requirements section of the Commitments or otherwise in connection with the issuance of the Title Policy.  Seller will provide an affidavit of title and/or such other information as the Title Company may reasonably require in order for the Title Company to insure over the "gap" (i.e., the period of time between the effective date of the title insurance company's last checkdown of title to the Real Property and the Effective Time) and to cause the Title Company to delete all standard exceptions from the Title Policy and to provide mechanic's and materialmen's lien coverage.

(b)     Buyer has received or will receive, at its expense, ALTA surveys of the land and improvements comprising the Owned Real Property and the Leased Real Property in which Seller owns a leasehold interest in the land relating to such Leased Real Property (collectively, the "**Surveys**") from a Mississippi-licensed surveyor selected by Buyer (the "**Surveyor**").  The legal descriptions of the surveyed Real Property created by the Surveyor shall be used to convey title to Buyer pursuant to the Deeds described in Section 3.2(a). The Surveys will comply in all respects with the minimum detail requirements of the ALTA/American Congress on Survey and Mapping as such requirements are in effect on the date of preparation of the Surveys and are sufficient for the Title Company to remove all standard survey exceptions from the Title Policy and issue a survey endorsement acceptable to Buyer.  The Surveys are or will be certified to Buyer, the Title Company and to any other Person as Buyer directs.

(c)     Buyer shall notify Seller within ten (10) Business Days after the later to occur of (i) the receipt of the last component of the Title Evidence, or (ii) the date of this Agreement, of any liens, claims, encroachments, exceptions or defects disclosed in the Title Evidence (collectively, the "**Objections**").  Seller shall, at its sole cost and expense, (A) cure the Objections on or before the Closing, (B) cause the Title Company to (1) delete the Objections from the Commitment, or (2) agree to add a provision, if available, to the Title Policy obligating the Title Company to protect the Buyer against all

4822-2526-1169.2                                           58

Losses that may be incurred on account of each of the Objections. Notwithstanding the forgoing, Seller shall take all actions necessary to cure, or cause the Title Company to insure over, any monetary Encumbrances encumbering the Real Property. If Seller fails to cure any Objection in one of the manners provided above on or before the sixtieth (60th) day following Seller's receipt of notice of such Objection, the Buyer may (I) waive such Objection and close the Contemplated Transactions, subject to any satisfaction or waiver of the remaining closing conditions in Article 8 and Article 9, or (II) terminate this Agreement. Any matters shown by the Title Evidence to which Buyer does not object or which are waived by Buyer as herein provided shall be deemed to be Permitted Encumbrances. Notwithstanding anything contained in this Section 6.6(c) to the contrary, at the Closing, Seller will cause all mortgages, deeds of trust, mechanic's and materialmen's liens and other similar Encumbrances (other than Permitted Encumbrances) encumbering Seller's fee interest in the Real Property and arising by, through or under Seller or any Seller Affiliate, to be released.

6.7 **Additional Financial Information.** On or before the third business day of every week, Seller shall provide Buyer a weekly cash flow update which compares actual cash flows with projected cash flows filed with the Bankruptcy Court. Within fifteen (15) days following the end of each calendar month between the date of this Agreement and the Closing Date, Seller will deliver to Buyer copies of the unaudited consolidated balance sheets and the related unaudited consolidated statements of operations relating to the Business for each month then ended and any additional financial statements or information to the extent prepared in the ordinary course of business, including key volume and payor mix data, income statements and statements of cash flows. Such financial statements shall be prepared from and in accordance with the Books and Records of Seller, shall fairly present the financial position and results of operations of the Business as of the date and for the period indicated, and shall be prepared in accordance with GAAP, consistently applied, except that such financial statements need not include required footnote disclosures, nor reflect normal year-end adjustments or adjustments that may be required as a result of the Contemplated Transactions.

6.8 **Closing Conditions.** Between the date of this Agreement and the Closing Date, Seller and Buyer will use their commercially reasonable efforts to cause the conditions specified in Article 8 and Article 9 over which Seller, any Seller Affiliate, Buyer or any of its Affiliates, as applicable, have control to be satisfied as soon as reasonably practicable.

6.9 **Interim Operating Reporting.** During the period from the date of this Agreement until the Closing Date, Seller shall cause its Representatives to confer from time to time as requested by Buyer with one or more Representatives of Buyer to report material operational matters in respect of the Hospital and to report the general status of ongoing operations. Seller shall notify Buyer in writing of any adverse change in the financial position or earnings of the Hospital after the date of this Agreement and prior to the Closing Date and any unexpected emergency or other unanticipated change in the Hospital and of any complaints or Proceedings (or communications indicating that the same may be contemplated) by or on behalf of Governmental Authorities or of any other such matter and shall keep Buyer fully informed of such events.

6.10 **Insurance Ratings.** Seller will take all action reasonably requested by Buyer to enable Buyer to succeed to the Workmen's Compensation and Unemployment Insurance ratings of the Hospital and other ratings for insurance or other purposes established by Seller for the Hospital. Buyer shall not be obligated to succeed to any such rating, except as it may elect to do so.

6.11 **Bulk Sales Law.** Buyer and Seller hereby arise compliance with any provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable. Any Liabilities arising out of the failure of Seller to comply with the requirements and provisions of any such laws shall be treated as Excluded Liabilities.

**6.12    Social Media Accounts**.  Immediately prior to the Closing Date, Seller shall grant Buyer exclusive access rights and permissions to the social media accounts owned or operated by Seller set forth on Schedule 4.16(a).

**6.13    Marketing Activities**.   Seller will, and will allow the Seller Affiliates and their respective Representatives, only to market the proposed Purchased Assets: (i) between execution of this Agreement and entry of the Sales Procedures Order in a manner consistent with the proposed Bidding Procedures, and (ii) after the entry of the Sale Procedures Order, consistent with the Bidding Procedures.

**6.14    Confidentiality**.

(a)    It is understood by the Parties that certain of their obligations under the Confidentiality Agreement will survive the execution and delivery of this Agreement until their expiration in accordance with the terms of the Confidentiality Agreement.

(b)    Unless the prior written consent of the other Parties is obtained, except as otherwise required by applicable Laws, or in connection with the seeking of any Approval or Permit contemplated by this Agreement or any consent to the assignment of any of the Assumed Contracts or as reasonably necessary to satisfy any of the Parties' conditions or pre-Closing covenants, each of the Parties shall keep confidential and not disclose, and cause its Affiliates, its Representatives, and its Affiliates' Representatives to keep confidential and not disclose the terms and status of this Agreement and the other Transaction Documents, the Contemplated Transactions and the identity of the other Parties. Notwithstanding the foregoing, each of the Parties shall have the right to communicate and discuss with, and provide to, its respective Representatives, any information regarding the terms and status of this Agreement and the other Transaction Documents and the Contemplated Transactions.

(c)    Prior to the Closing, unless otherwise required by applicable Laws (in which case the disclosing Party will use its commercially reasonable efforts to notify the non-disclosing Party of such disclosure), no Party shall make any public announcements in respect of this Agreement or the Contemplated Transactions or otherwise communicate with any news media in connection therewith without the prior written consent of the other Party. To the extent that any press releases or public announcements are to be issued or made following the Closing to patients, customers, vendors, and employees relating to the Contemplated Transactions the timing and content of such press releases and public announcements shall be determined jointly agreed to by Buyer and Seller.

(d)    Notwithstanding the foregoing, (i) any Party may disclose Confidential Information received from any other Party in an action or Proceeding brought by a Party in pursuit of its rights or in exercise of its remedies hereunder, and (ii) disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto shall not constitute a breach of this Agreement or the Confidentiality Agreement.

**6.15    Casualty**.  If any part of the Purchased Assets (including any Facility) is damaged, lost or destroyed (whether by fire, theft, vandalism or other cause or casualty), in whole or in part, prior to the Effective Time (such damaged, lost or destroyed assets, the "**Damaged Assets**"), Buyer may, at its option, (a) reduce the Purchase Price by the greater of (i) the fair market value of the Damaged Assets (such value to be determined as of the date immediately prior to such damage, loss or destruction) plus an amount equal to the estimated revenues in excess of expenses for the Hospital during any period of repair or reconstruction that extends beyond the Closing (the "**Estimated Business Loss**"), or (ii) the estimated cost to replace or restore the Damaged Assets plus an amount equal to the Estimated Business Loss, (b) require Seller to transfer the proceeds (or the right to the proceeds) of the applicable Insurance Policies covering the Damaged Assets (including the business interruption Insurance Policy covering the

Business) to Buyer at the Closing plus an amount equal to any deductibles paid or incurred by Seller, or (c) if the fair market value of the Damaged Assets is greater than $2,000,000 or if a Facility has suffered material damage, terminate this Agreement. Any reduction in the Purchase Price pursuant to this Section 6.15 shall be determined by **[Value Management Group L.L.C. d/b/a VMG Health]**, and the costs and expenses of such firm shall be paid by Seller. Until the Effective Time, Seller will bear all risk of loss with respect to the Damaged Assets.

**6.16    Insurance Policies**. Seller will obtain supplemental insurance policies (the "**Tail Policies**") providing for extended reporting periods for claims made after the Effective Time in respect of events occurring prior to the Effective Time, in form and substance reasonably acceptable to Buyer, for any claims-made Insurance Policies held for the benefit of the Business, the Purchased Assets, the Hospital, or the Practitioners, including professional liability coverage, relating to all periods prior to the Effective Time, and to have the effect of converting such claims-made Insurance Policies into "occurrence based" coverage. Such Tail Policies shall extend for the greater available option of an indefinite period of time or the maximum time period permissible by each respective Insurance Policy and shall provide minimum coverage in an amount no less than the coverage currently maintained under the applicable Insurance Policy. Seller shall deliver to Buyer evidence of Seller's purchase of the Tail Policies at least five (5) Business Days prior to the Closing Date. The cost of the Tail Policies shall be borne by Seller.]

**6.17    Bankruptcy Court Approval; Executory Contracts; Sale Procedures; and Stalking Horse Provisions**.

(a)    Within two (2) business days following the execution of this Agreement, Seller shall file the Sale Procedures Motion with the Bankruptcy Court, in form and substance approved by Buyer, seeking approval of the transactions contemplated by this Agreement and the procedures for bidding at any Auction.

(b)    Seller shall deliver or cause to be delivered to Buyer for review and comment all documents to be filed by Seller with the Bankruptcy Court that relate to the transactions contemplated by this Agreement, as soon as commercially reasonable and in any event not less than one (1) Business Day prior to filing, including all motions, proposed orders, applications, and supporting papers prepared by Seller, prior to filing such documents. All motions, proposed orders, applications and supporting papers prepared by Seller and relating to the transactions contemplated by this Agreement to be filed by Seller following execution of this Agreement must be in form and substance acceptable to both Buyer and Seller.

(c)    Seller shall use its best efforts to gain approval by the Bankruptcy Court of the purchase and sale of the Purchased Assets and the assumption and assignment of all Assumed Contracts and Assumed Liabilities contemplated hereby to the fullest extent required by Sections 363 and 365 and all other applicable provisions of the Bankruptcy Code within the terms of the Sale Procedures Order and Sale Order. The Sale Procedures Order shall only be amended with the approval of Buyer, which approval may be granted or withheld in Buyer's sole discretion. Seller shall serve on all non-Seller counterparties to all of the Assumed Contracts a notice specifically stating that Seller may be seeking the assumption and assignment of such Assumed Contracts and shall notify such non-Seller counterparties of the deadline for objecting to the Cure Amounts stated in such notices, if any, which deadline shall not be less than ten (10) Business Days prior to the Sale Hearing.

(d)    From and after the date hereof and until the Closing Date or the termination of this Agreement in accordance with Article 12, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure

4822-2526-1169.2                                         61

to act is to, result in the reversal, voiding, modification or staying of the Sale Procedures Order or this Agreement. If Buyer is the Successful Bidder at the Auction, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order or this Agreement.

(e)     This Agreement is subject to approval by the Bankruptcy Court.

(f)     The Sale Procedures Order shall provide, *inter alia*, that in the event (i) the Bankruptcy Court approves a sale of all or some of the Purchased Assets with a buyer other than Buyer, (ii), Seller enters into a definitive agreement for an Alternative Transaction or (iii) Seller files a plan of reorganization that does not contemplate a sale of the Purchased Assets to Buyer, Seller shall be required to pay Buyer a fee in the amount of four percent (4%) of the Purchase Price (the "**Break-Up Fee** or the "**Bid Protections**"). The Bid Protections shall be allowed superpriority administrative expense claims of Seller under Section 364(c)(1) of the Bankruptcy Code wit priority over any and all administrative expenses of any kind, including, without limitation, those specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and , if earned pursuant to subsection (i) above, shall be paid at closing from the sale proceeds prior to the payment of any other amounts. The Sale Procedures Order shall provide, in the event of an Auction, for an initial overbid protection in an amount equal to $1,000,000 and minimum bid increments thereafter of $100,000. The Sale Procedures Order shall provide that any Qualified Bid (as defined in the Sale Procedures Order) shall be a bid for all of the Purchased Assets to Buyer, and shall contemplate the same transaction form and structure as contemplated by this Agreement and the Contemplated Transactions. The Sales Procedure Order shall provide that Buyer shall serve as a Backup Bidder for a period of only thirty (30) days following the Auction if Buyer is not the Successful Bidder at the Auction.

(g)     The Sale Order shall contain the following provisions:

(i)     approval of this Agreement, including the sale of the Purchased Assets by Seller to Buyer, which shall vest in Buyer all right, title, and interest of Seller to the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances), Excluded Liabilities and interests pursuant to Section 363(f) of the Bankruptcy Code;

(ii)     a finding that Buyer has acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code, the Contemplated Transactions have been undertaken by Seller and Buyer at arm's length and without collusion, and Buyer is entitled to the protections of Section 363(m) of the Bankruptcy Code;

(iii)     all Persons shall be enjoined from taking any actions against Buyer, any Affiliate or assignee of Buyer, or the Purchased Assets to recover any claim that such Person has against Seller;

(iv)     Buyer shall have no successor Liability on account of the purchase or sale of the Purchased Assets, except on account of Assumed Liabilities;

(v)     due notice of the Sale Procedures Motion, Sale Procedures Order, the Sale Order, and this Agreement shall have been provided;

(vi)     there shall be sufficient cause to lift the stay contemplated by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure with regards to the Contemplated Transactions; and

(vii)   the Bankruptcy Court retains exclusive jurisdiction to interpret and enforce the provisions of this Agreement and the Sale Order in all respects.

## 7.   ADDITIONAL AGREEMENTS.

### 7.1   Seller Employees.

(a)   As of the Effective Time, Seller shall terminate or cause the Seller Affiliates to terminate all of the active Seller Employees. Subject to Buyer's standard employment screening and other criteria for eligibility to hire, Buyer (or a designated Affiliate thereof) will offer employment to substantially all active non-physician employees of the Business who are in good standing, in such positions and subject to such terms and conditions of employment as Buyer may determine, Buyer shall not assume any pension liability accruing prior to the Effective Time.

(b)   The term "**Transferred Employee**" as used in this Agreement means a Seller Employee who accepts employment with Buyer Employer as of the Effective Time. The terms of all such Transferred Employees' employment with Buyer Employer shall be in accordance with the usual and customary practices of Buyer Employer and its Affiliates with respect to similarly-situated employees of Buyer Employer and its Affiliates working at comparable facilities operated by Buyer Employer and its Affiliates in the general area of the Hospital. Buyer Employer shall provide each Transferred Employee with employee benefits, including retirement, welfare and paid time off, substantially similar to similarly-situated employees of Buyer Employer and its Affiliates working at comparable facilities operated by Buyer Employer and its Affiliates in the general area of the Hospital. Buyer Employer agrees to recognize each Transferred Employee's date of hire by Seller or Seller Affiliate, as applicable, as the anniversary date of record with Buyer Employer and to honor that seniority for purposes of prospective benefit accrual under Buyer Employer's fringe benefit policies such as paid time off and short-term disability. Buyer Employer will waive the customary waiting periods under its welfare and 401(k) plans for the Transferred Employees and, subject to each Transferred Employee's election of coverage, participation in Buyer Employer's benefit plans shall begin as of the Effective Time (subject to any plan requirement that coverage begins only upon active employment) for each Transferred Employee who is in an eligible class as defined under the respective Buyer Employer benefit plans. To the extent lawful and subject to the approval of any applicable insurer, Buyer Employer shall honor the Transferred Employees' prior service credit under Seller's current welfare plans for purposes of satisfying pre-existing condition limitations in Buyer Employer's welfare benefit plans.

(c)   Subject to the terms and conditions of Buyer Employer's applicable benefit plans, for each Seller Employee (other than any Seller Employee who is a Practitioner) who becomes a Transferred Employee, Buyer Employer shall carry over, and give credit for, the unused Paid Time Off of such Transferred Employee as of immediately prior to the Effective Time in an amount not to exceed 40 hours of Paid Time Off, but only to the extent that the Liability for such Paid Time Off is reflected as a current Liability in the calculation of Closing Working Capital (the aggregate number of hours of Paid Time Off assumed by Buyer Employer for all Transferred Employees pursuant to this Section 7.1(c), the "**Assumed Paid Time Off**"). At or before the Closing, Seller shall have paid out the Liability as of immediately prior to the Closing for all unused Paid Time Off in excess of the Assumed Paid Time Off assumed by Buyer Employer with respect to the Transferred Employees to such Transferred Employees.

(d)   Prior to the Effective Time, Seller shall be solely responsible for complying with the WARN Act and any and all obligations under other applicable Laws requiring notice of plant closings, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to Seller Employees as a result of any action by Seller or any Seller Affiliate on or prior to the Effective Time, or following the Effective Time with respect to any Seller

Employee who does not become a Transferred Employee for any reason.

(e)     With respect to each M&A qualified beneficiary (as defined in the regulations under COBRA), Seller or a Seller Affiliate shall retain the obligation for providing notices and continuation coverage under COBRA. Seller or a Seller Affiliate shall offer continuation coverage under the applicable Plan of Seller to the fullest extent required by COBRA. Seller shall timely provide Buyer with all necessary information, including the identity, applicable coverage and duration of coverage, as may be reasonably requested by Buyer in order to provide such continuation coverage.

(f)     Prior to the Effective Time, Seller shall adopt any amendments and take all other action with respect to each defined contribution Plan qualified under Section 401 or 403 of the Code in which any Transferred Employee participates, (i) cause the account balance or accrued benefit of each Transferred Employee to become fully vested as of the Effective Time, and (ii) waive any employment or service conditions (including without limitation any requirement that a Transferred Employee be employed on a specific date or complete a minimum number of hours during any period) applicable to employer contributions under such Plan for the plan year in which the Effective Time occurs.

(g)     As of the Effective Time, Seller will, at its expense or at the expense of the applicable Plan, (i) discontinue participation of the Transferred Employees in all applicable Plans, (ii) take such actions as are necessary to make, or cause such Plans to make, timely appropriate distributions to such Transferred Employees to the extent required or permitted by, and in accordance with, such Plans and applicable Laws, as determined by Seller and/or its counsel, and (iii) comply with all applicable Laws in connection with the foregoing. As of the Closing Date, Seller will have fully funded all benefits provided under any retirement, annuity, or custodial account Plan intended to be qualified under Sections 401 or 403 of the Code maintained or contributed to by Seller or any Seller Affiliate.

(h)     Notwithstanding any provision herein to the contrary, no term of this Agreement shall be deemed to (i) create any Contract with any Transferred Employee, (ii) give any Transferred Employee the right to be retained in the employment of Buyer Employer or any of its Affiliates, (iii) interfere with Buyer Employer's right to terminate the employment of any Transferred Employee at any time, or (iv) obligate Buyer Employer or any of its Affiliates to adopt, enter into or maintain any employee benefit plan or other compensatory plan, program or arrangement at any time. Nothing in this Agreement shall diminish Buyer Employer's right to change or terminate its policies regarding salaries, benefits and other employment matters at any time or from time to time. The representations, warranties, covenants and agreements contained herein are for the sole benefit of the Parties, and the Transferred Employees are not intended to be and shall not be construed as beneficiaries hereof.

**7.2     Post-Closing Access to Information**. Buyer and Seller acknowledge that, subsequent to the Effective Time, Buyer and Seller may need access to information, documents or computer data in the control or possession of the other, and Seller may need access to records that are a part of the Purchased Assets for purposes of concluding the Contemplated Transactions and for audits, investigations, compliance with governmental requirements, regulations and requests, and the prosecution or defense of Third-Party Claims. Accordingly, Buyer agrees that, at the sole cost and expense of Seller, it will make available to Seller and its respective Representatives such documents and information as may be available relating to the Purchased Assets and the Business in respect of periods prior to the Effective Time and will permit Seller (or its respective Representatives) to make copies of such documents and information. Seller agrees that, at the sole cost and expense of Buyer, Seller will make available to Buyer and its Representatives such documents and information as may be in the possession of Seller or any Seller Affiliate relating to the Excluded Assets and will permit Buyer (or its Representatives) to make copies of such documents and information. In addition, Seller shall provide access to the books and records with respect to Pre-Closing Periods for the Hospital and Business for a minimum of three years subsequent to

the Closing.

**7.3     Confidentiality; Non-Competition; Non-Solicitation; Non-Disparagement**. In further consideration for the payment of the Purchase Price and in order to protect the value of the Purchased Assets purchased by Buyer (including the goodwill inherent in the Business as of the Effective Time), effective as of the Effective Time, Seller agrees as follows:

(a)     Seller shall not use for itself or any other Person, or disclose to any other Person, any Confidential Information except to the extent such use or disclosure is (i) approved in writing in advance by Buyer, (ii) expressly permitted or required pursuant to the terms of this Agreement, or (iii) required by Law or any Order (in which event Seller shall inform Buyer in advance of any such required disclosure, shall cooperate with Buyer in all reasonable respects in obtaining a protective order or other protection in respect of such required disclosure and shall limit such disclosure to the extent reasonably possible while still complying with such requirements).  Seller shall use commercially reasonable efforts to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft.

(b)     Seller acknowledges that Seller has become, and following the date of this Agreement shall continue to be, familiar with Confidential Information. Therefore, during the Restricted Period, Seller shall not (and shall not take any steps to, or prepare to), and shall cause the Seller Affiliates not to, directly or indirectly, in any capacity, (i) develop, own, manage, control or exert any influence upon, acquire, lease, consult with, render or provide advice to, operate, affiliate with, participate in, permit its name to be used in connection with, receive any economic benefit from or in any other manner engage in any other similar activity or have any financial interest in, or otherwise provide any services to or for the benefit of, a Restricted Business within the Restricted Area, (ii) manage or provide management or consulting services to, or participate in the management or control of, or exert any influence upon, any Person involved in the development, construction, ownership or operation of any Restricted Business within the Restricted Area or (iii) own a direct or indirect interest (financial or otherwise) in, or lend or contribute money to, or otherwise provide financial support for, any Person that engages in any of the activities described in clauses (i) and (ii), above.

(c)     During the Restricted Period, Seller shall not, and shall cause the Seller Affiliates not to, directly or indirectly, in any capacity, (i) encourage, induce, solicit or attempt to encourage, induce or solicit, any officer, director, manager, employee or independent contractor of Buyer Employer or any of Buyer Employer's Affiliates who works at, or provides services to, the Business, to leave the employ of Buyer Employer or any of Buyer Employer's Affiliates or terminate or diminish any relationship with Buyer Employer or any of Buyer Employer's Affiliates; provided, that the foregoing shall not apply to any general solicitation by Seller or any Seller Affiliate that is not directed specifically to any such Person; or (ii) hire, employ or contract with any Covered Person.

(d)     From and after the date of this Agreement (both before and after the Effective Time or termination of this Agreement), Seller shall, and shall cause the Seller Affiliates to, instruct their officers, directors and employees not to, directly or indirectly, alone or in connection with any other Person, engage in any conduct or make any statement, whether in commercial or noncommercial speech, that disparages, criticizes or is injurious to the reputation of Buyer, any of its Affiliates, or any of its or their respective Representatives, managers, shareholders, members and principals.

(e)     Seller recognizes that the covenants in this Section 7.3, and the territorial, time and other limitations with respect thereto, are reasonable and properly required for the adequate protection of the acquisition of the Purchased Assets by Buyer, including the Confidential Information, and agree and acknowledge that such limitations are reasonable with respect to Buyer's activities,

4822-2526-1169.2                                    65

business and public purpose. Seller acknowledges and represents that: (i) sufficient consideration has been given by each Party to the other as it relates to the covenants set forth in this Section 7.3; (ii) the restrictions and agreements in this Section 7.3 are reasonable in all respects and necessary for the protection of Buyer and its Affiliates, the Confidential Information and the goodwill associated with the Business and that, without such protection, Buyer's customer and client relationships and competitive advantage would be materially adversely affected; and (iii) the agreements in this Section 7.3 are an essential inducement to Buyer to enter into this Agreement and they are in addition to, rather than in lieu of, any similar or related covenants to which Seller is party or by which it is bound. Seller agrees and acknowledges that the violation of the covenants or agreements in this Section 7.3 would cause irreparable injury to Buyer and its Affiliates and that monetary damages and any other remedies at law for any violation or threatened violation thereof would be inadequate, and that, in addition to whatever other remedies may be available at law or in equity, Buyer and its Affiliates shall be entitled to temporary and permanent injunctive or other equitable relief without the necessity of proving actual damages or posting a bond or other security. In addition, in the event of a breach or violation by Seller or any Seller Affiliate of this Section 7.3, the Restricted Period shall be tolled until such breach or violation has been duly cured.

(f)     It is the intention of each Party that the provisions of this Section 7.3 shall be enforced to the fullest extent permissible under the Law and the public policies of the State of Mississippi and of any other jurisdiction in which enforcement may be sought, but that the unenforceability (or the modification to conform with such Laws or public policies) of any provisions hereof shall not render unenforceable or impair the remainder of this Agreement. Accordingly, if any term or provision of this Section 7.3 shall be determined to be illegal, invalid or unenforceable, either in whole or in part, this Agreement shall be deemed amended to delete or modify, as necessary, the offending provisions and to alter the balance of this Agreement in order to render the same valid and enforceable to the fullest extent permissible as aforesaid, with the maximum period, scope or geographical area permitted under applicable Laws being substituted for the period, scope or geographical area hereunder.

7.4     **Cost Reports**.

(a)     Seller, at its own cost and expense, will timely prepare and file (and will pay any amounts due pursuant to, and will receive and retain any amounts resulting from) all Cost Reports relating to Seller and the Hospital for periods ending at or prior to the Effective Time or required as a result of the consummation of the Contemplated Transactions, including terminating Cost Reports for the Government Programs and for any other cost based payors (collectively, the "**Seller Cost Reports**"). Buyer shall forward to Seller any and all correspondence relating to Seller Cost Reports within ten (10) Business Days after receipt by Buyer. Buyer shall remit any receipts of funds relating to the Seller Cost Reports promptly after receipt by Buyer and shall forward to Seller any demand for payments relating to the Seller Cost Reports within ten (10) Business Days after receipt by Buyer. Seller shall retain all rights, Liabilities and obligations associated with Agency Settlements and the Seller Cost Reports, including any amounts receivable or payable in respect of such reports or reserves relating to such reports. Such rights shall include the right to appeal any Medicare determinations relating to Agency Settlements and the Seller Cost Reports. Seller shall retain the originals of the Seller Cost Reports, correspondence, work papers and other documents relating to the Seller Cost Reports and the Agency Settlements. "Agency Settlements" as used herein shall mean all rights to settlements and retroactive adjustments, if any, for open cost reporting periods ending prior to the Effective Time (whether open or closed) arising from or against the federal government or any state under the terms of the Government Programs and against any commercial third-party payor programs that settle on a cost report basis ("**Agency Settlements**"). Seller will furnish copies of such documents to Buyer prior to the Closing. Except as required by Law, Seller shall not open, re-file, or amend any Seller Cost Report without the prior written consent of Buyer. In the event that any Government Program offsets, withholds or recoups any amounts payable or paid to Buyer as a result of any Liabilities or obligations of Seller or its predecessors in respect of periods ending at or

prior to the Effective Time arising under the terms of the Government Programs (including as a consequence of Seller's failure to timely file any terminating Cost Report), Seller shall tender to Buyer an amount equal to the amount offset, withheld or recouped within five (5) Business Days after Seller's receipt of written notice from Buyer of such offset, withholding or recoupment. Seller, at its own cost and expense, will timely prepare and file any other required reports for the Hospital with respect to any reportable period ending at or before the Effective Time.

(b)     The Hospital is reimbursed on an interim basis under the Medicare program on a bi-weekly pass-thru payment ("**Pass-Thru Payments**") basis. If Buyer receives any Pass-Thru Payments from the Medicare program associated with the operations of the Hospital relating solely to periods prior to the Effective Time, Buyer shall pay Seller an amount equal to such Pass-Thru Payment(s) received by Buyer within ten (10) days of receipt. If Buyer receives any Pass-Thru Payments from the Medicare program associated with the operations of the Hospital relating to the period commencing prior to and ending after the Effective Time, Buyer shall pay Seller within ten (10) days of receipt an amount equal to the Pass-Thru Payment(s) actually received by Buyer for such period multiplied by a fraction, the numerator of which shall be the total number of days prior to the Effective Time and the denominator of which shall be the total number of days attributable to such Pass-Thru Payment(s). If Seller receives any Pass-Thru Payments from the Medicare program associated with the operations of the Hospital relating solely to periods after the Effective Time, Seller shall pay Buyer within ten (10) days of receipt an amount equal to such Pass-Thru Payment(s) received by Seller. If Seller receives any Pass-Thru Payments from the Medicare program associated with the operations of the Hospital relating to the periods commencing prior to and ending after the Effective Time, Seller shall pay Buyer within ten (10) days of receipt an amount equal to the Pass-Thru Payment(s) actually received by Seller for such period multiplied by a fraction, the numerator of which shall be the total number of days after the Effective Time and the denominator of which shall be the total number of days attributable to such Pass-Thru Payment(s). It is the intent of the Parties that Buyer and Seller shall receive all third-party payments applicable to the period of time that the Hospital are owned by the Parties.

(c)     If any Party receives any amount from patients, third-party payors, group purchasing organizations or suppliers which, under the terms of this Agreement, belongs to the other Party, the Party receiving such amount shall remit within ten (10) Business Days the full amount so received to the other Party.

(d)     Seller will cooperate with Buyer in all reasonable respects in providing pre-Closing patient data and any documents Buyer reasonably believes are necessary or appropriate to file with respect to the Mississippi Medicaid disproportionate share hospital surveys and Mississippi Uncompensated Care Programs for the fiscal periods prior to and after the Effective Time.

(e)     Notwithstanding the foregoing, nothing in this Agreement shall require Buyer to prepare, file or otherwise participate in any Government Program or Private Program appeal relating to the operations of Seller and the Business prior to the Effective Time.

7.5     **CMS Reporting and Payment Adjustments**.

(a)     Following the Effective Time, Buyer will cooperate with Seller in all reasonable respects in providing documents or data that Seller reasonably believes are necessary or appropriate to file with respect to CMS Reporting for all Federal Fiscal Years ending at or prior to the Effective Time. Buyer shall forward to Seller any and all correspondence from CMS relating to applicable CMS Reporting for such Federal Fiscal Years within ten (10) Business Days after receipt by Buyer.

(b)     Following the Effective Time, Seller will cooperate with Buyer in all reasonable

Case 3:18-bk-05665   Doc 79   Filed 08/31/18   Entered 08/31/18 18:22:55   Desc Main
Document      Page 153 of 177

respects in providing pre-Closing documents or data that Buyer reasonably believes are necessary or appropriate to file with respect to CMS Reporting for the Federal Fiscal Year in which the Effective Time occurs and any subsequent Federal Fiscal Year, and in providing pre-Closing documents or data that Buyer reasonably believes are necessary or appropriate to respond to any request by CMS or other Governmental Authority, formal or informal, for documentation supporting CMS Reporting for all Federal Fiscal Years ending at or prior to the Effective Time. Seller shall forward to Buyer any and all correspondence from CMS relating to CMS Reporting for such Federal Fiscal Years within ten (10) Business Days after receipt by Seller.

(c)     To the extent Buyer incurs a penalty or reduction, or incurs a recoupment, in fees paid by CMS for hospital or physician services based on CMS Reporting (or failure to report) for services rendered by Seller prior to the Effective Time, then Seller will pay to Buyer the recoupment amount or payment differential, as applicable, attributable to such reduction in fees paid under CMS Reporting within ten (10) Business Days after notice to Seller of such amount due.

(d)     To the extent Buyer is required to refund, reimburse or repay any portion of an increased Medicare payment or Medicaid payment based on CMS Reporting or any portion of a CMS Reporting bonus, shared savings or other non-claims based payment paid to any Seller, or discount to Seller, prior to the Effective Time, then Seller will pay to Buyer the amount of the required refund, reimbursement or repayment within ten (10) Business Days after Buyer refunds, reimburses or remits such amount to Medicare or Medicaid, as applicable.

(e)     With respect to non-claims-based payments arising under CMS Program Payments for the Federal Fiscal Year in which the Effective Time occurs, the Parties agree that such CMS Program Payments (including all rights to pursue such payments and/or appeal any decisions regarding such payments) are included in the Purchased Assets and shall become the property of Buyer as of the Effective Time. To the extent Buyer is required to refund or repay any portion of any CMS Program Payments, Seller will pay to Buyer Seller's portion of the amount of the required refund or repayment within ten (10) Business Days after Buyer refunds or remits such amount to Medicare or Medicaid, as applicable.

(f)     Notwithstanding anything in Section 7.5 of this Agreement, Buyer shall have the unilateral right to make a claim under the Escrow Account with respect to any of Seller's obligations for refunds or repayments.

**7.6     Waiver Program Payments**. Buyer and Seller shall prorate any payments received by the Hospital or the Business after the Effective Time under the Mississippi Medicaid Section 115 Waiver or Medicaid supplemental payment programs as follows:

(a)     Any such amounts that correspond to Federal Fiscal Years prior to the Federal Fiscal Year during which the Effective Time occurs will be paid to Seller;

(b)     Any such amounts that correspond to Federal Fiscal Years after the Federal Fiscal Year during which the Effective Time occurs will be paid to Buyer; and

(c)     Any such amounts that correspond to the Federal Fiscal Year during which the Effective Time occurs will be allocated between Buyer and Seller on a pro rata basis (based upon the number of days during such year that Seller operates the Hospital and the number of days during such year that Buyer operates the Hospital).

**7.7     License to Use Billing Information**. Effective as of the Effective Time and to the extent

Case 3:18-bk-05665   Doc 79   Filed 08/31/18   Entered 08/31/18 18:22:55   Desc Main
Document      Page 154 of 177

allowed by applicable Laws, Seller grants Buyer and its Affiliates a license to use Seller's billing identification information (which information shall include Seller's name, Medicare and related Medicaid and TriCare provider numbers, federal employer identification numbers, and such other information as may be reasonably necessary) for purposes of submitting claims to Medicare, Medicaid and TriCare for services provided at the Hospital by Buyer or its Affiliates after the Effective Time. Each such license shall be effective (a) for purposes of Medicare, until CMS and the applicable CMS Medicare Administrative Contractor approve Buyer's or its Affiliate's Medicare change of ownership application and issue a tie-in notice and approval letter acknowledging that Buyer (or its Affiliate) may be reimbursed for claims submitted using Buyer's (or such Affiliate's) billing identification information; and (b) for purposes of Medicaid and any other Government Programs, until the applicable Medicaid program(s) or program agent(s) approves Buyer's (or its Affiliate's) provider enrollment application and/or approves assignment of the applicable provider contract and issues the appropriate notice acknowledging that Buyer (or its Affiliate) may be reimbursed by the applicable Medicaid or other Government Program for claims submitted using Buyer's (or its Affiliate's) identification information. So long as such license remains in effect, Buyer (or its Affiliate) shall not act to: (i) terminate any of Seller's billing identification information except as required by applicable Laws; (ii) close any accounts used by Seller prior to the Effective Time for purposes of receiving reimbursement; or (iii) cancel any electronic funds transfer agreements with respect to Medicare, TriCare, Medicaid, any other Government Program. All accounts receivable and monies collected in the name of Buyer and/or its Affiliates or the Hospital for services provided by Buyer (and/or its Affiliates) after the Effective Time shall belong to Buyer (and/or its Affiliates).

      **7.8    Transition Patients**. To compensate Seller for services rendered and medicine, drugs and supplies provided up to the Effective Time with respect to patients who are admitted to the Hospital prior to the Effective Time but who are not discharged until after the Effective Time (such patients being referred to herein as the "**Transition Patients**" and services rendered to them being referred to herein as the "**Transition Patient Services**"), the Parties shall take the following actions:

      (a)    As soon as practicable after the Closing Date, Seller shall deliver to Buyer a statement itemizing the Transition Patient Services provided by Seller to the Transition Patients whose medical care is paid for, in whole or in part, by Medicare, Medicaid, TRICARE, Blue Cross or any other third party payor who pays on a diagnostic related group ("**DRG**"), case rate or other similar basis (the "**DRG Transition Patients**"). Buyer shall pay to Seller an amount equal to (i) the total DRG (including disproportionate share, uncompensated care, low volume adjustment, indirect medical education and graduate medical education) and outlier payments (including capital and any deposits, deductibles or co-payments received by Buyer Entity or Seller) per the remittance advice received by Buyer on behalf of a DRG Transition Patient, multiplied by a fraction, the numerator of which shall be the number of days such DRG Transition Patient was confined in a Facility through and including the day immediately preceding the date on which the Effective Time occurs, and the denominator of which shall be the total number of days such DRG Transition Patient was confined in a Facility, minus (ii) any deposits, deductibles or co-payments made or payable by such DRG Transition Patients to Seller; and

      (b)    As of the Effective Time, cut-off billings ("**Interim Billings**") for all Transition Patients not covered by Section 7.8(a) shall be prepared by Seller and sent by Seller following the discharge of the patient from the Hospital. Any payments received by either Buyer or Seller for such Interim Billings are the property of Seller and shall be paid to Seller, when and as received by Buyer, within ten (10) Business Days of receipt.

      **7.9    Change of Restricted Names**. No later than three (3) Business Days after the Closing Date, Seller shall file with the applicable Governmental Authority all applications or amendments to abandon or change each of the Restricted Names that were delivered at Closing pursuant to Section 3.2(i).

Additionally, Seller shall take such actions and execute such documents as may be necessary for Buyer to make appropriate assumed name filings in order to evidence and protect Buyer's right to use the Restricted Names in connection with the operation of the Business after the Effective Time, and Seller shall take all necessary action to eliminate the Restricted Names from, or paint over or otherwise permanently obscure the Restricted Names on, any signage or other materials (including any publicly distributable documents and other materials bearing such Restricted Names) owned or controlled by Seller following the Effective Time.

### 7.10 Rights to Certain Funds Payable after the Effective Time.

(a) Buyer shall be entitled to any Mississippi Disproportionate Share Payments ("**MDSP**") paid with respect to the Hospital to the extent related to operations prior to the Effective Time. Buyer shall be entitled to any MDSP paid with respect to the Hospital to the extent related to operations after the Effective Time. Seller shall have sole responsibility for any MDSP repayments to the extent relating to periods prior to the Effective Time. Buyer shall have sole responsibility for any MDSP repayments to the extent relating to periods after the Effective Time. The Parties shall have the right to pursue MDSP and appeal any decisions regarding such MDSP relative to the Hospital with respect to any periods to which such Party is entitled to the MDSP payments and responsible for any MDSP repayments.

(b) Buyer shall be entitled to any Low Volume Payments ("**LVP**") paid with respect to the Hospital to the extent related to operations prior to the Effective Time. Buyer shall be entitled to any LVP paid with respect to the Hospital to the extent related to operations after the Effective Time. Seller shall have sole responsibility for any LVP repayments to the extent relating to periods prior to the Effective Time. Buyer shall have sole responsibility for any LVP repayments to the extent relating to periods after the Effective Time. The Parties shall have the right to pursue LVP and appeal any decisions regarding such LVP relative to the Hospital with respect to any periods to which such Party is entitled to the LVP payments and responsible for any LVP repayments.

(c) Buyer shall be entitled to any Meaningful Use funds ("**MU**") paid with respect to the Hospital to the extent related to operations prior to the Effective Time. Buyer shall be entitled to any MU paid with respect to the Hospital to the extent related to operations after the Effective Time. Seller shall have sole responsibility for any MU repayments to the extent relating to periods prior to the Effective Time. Buyer shall have sole responsibility for any MU repayments to the extent relating to periods after the Effective Time. The Parties shall have the right to pursue MU and appeal any decisions regarding such MU relative to the Hospital with respect to any periods to which such Party is entitled to the MU payments and responsible for any MU repayments.

(d) Any amounts which may become payable from Seller to Buyer pursuant to this Agreement shall constitute a super priority administrative expense of Seller under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

### 7.12 Curae Action.
Curae shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns the full and complete performance and observance by Seller of its obligations under this Agreement and the other Transaction Documents, and to otherwise make effective the Contemplated Transactions.

## 8. CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER.

Case 3:18-bk-05665   Doc 79   Filed 08/31/18   Entered 08/31/18 18:22:55   Desc Main
Document      Page 156 of 177

The obligations of Buyer to consummate the Contemplated Transactions and to perform its obligations in connection with the Closing are subject to the satisfaction, at or prior to the Closing, of each of the following conditions unless waived in writing by Buyer:

**8.1    Representations and Warranties.**  Each of the representations and warranties of Seller contained in this Agreement and the other Transaction Documents (a) that is not qualified by materiality or similar phrases and is not a Seller Fundamental Representation shall be true and correct in all material respects on and as of the date of this Agreement and on and as of the Closing Date (except to the extent that such representations and warranties address matters as of particular dates, in which case, such representations and warranties shall be true and correct in all material respects on and as of such dates) and (b) that is qualified by materiality or similar phrases or that is a Seller Fundamental Representation, shall be true and correct in all respects on and as of the date of this Agreement and on and as of the Closing Date (except to the extent that such representations and warranties address matters as of particular dates, in which case, such representations and warranties shall be true and correct in all respects on and as of such dates).

**8.2    Hospital Still Open and Operating Consistently with Past Practice.**  Buyer shall be satisfied in its sole discretion that the Hospital has been operating continuously since this execution of this Agreement in accordance with past practice and has not ceased provided any service that was provided at the Hospital at the time of execution of this Agreement and has the legal right to continue operating as an acute care hospital consistently with past practice.

**8.3    Buyer's Due Diligence.**  Buyer shall be satisfied in its sole discretion with all aspects of its due diligence with respect to the Hospital.

**8.4    Performance; Property Tax Payment.**  Seller shall have performed and complied with all agreements, obligations and covenants contained in this Agreement and the other Transaction Documents that are required to be performed or complied with by Seller at or prior to the Closing. All delinquent property tax amounts plus penalties and interest shall been have been paid (or will be paid at Closing) to the sole satisfaction of the Buyer.

**8.5    No Material Adverse Effect**.  There shall have been no Material Adverse Effect.

**8.6    Pre-Closing Confirmations**.  Buyer shall have obtained documentation or other evidence reasonably satisfactory to Buyer that:

(a)    That certain management services agreement, as amended, between Curae and the Seller, with respect to the Hospital and the Business has been terminated with no remaining obligations by the Hospital and/or Business to Curae or Curae's Affiliates and a cancellation of any amount due Curae and/or Curae's Affiliates under such management services agreements;

(b)    No Corporate Integrity Agreement from CMS or the OIG shall be imposed on the Hospital or the Business which will survive the Closing, as determined by the Buyer in its sole discretion;

(c)    all Governmental Authorities whose Approval is required for Buyer or Seller to consummate the Contemplated Transactions have given (or will give) such Approval effective as of the Effective Time, and all Approvals and Permits required by Law to operate the Hospital will be transferred to, or reissued in the name of, Buyer effective as of or prior to the Effective Time; and

(d)    the Government Programs shall have certified and enrolled Buyer, the Hospital and the Practitioners under the auspices of Buyer in the applicable Government Programs effective as of

4822-2526-1169.2                                  71

the Effective Time, and the Business, the Hospital, and the Practitioners will be entitled to participate in and receive reimbursement from the Government Programs effective as of the Effective Time.

**8.7** **Action/Proceeding**. No Governmental Authority shall have issued an Order restraining or prohibiting the consummation of the Contemplated Transactions. No Person shall have commenced or threatened in writing to commence any Proceeding before any Governmental Authority that seeks to restrain or prohibit the consummation of the Contemplated Transactions or otherwise seeks a remedy which would materially and adversely affect the ability of Buyer to enjoy the full use and enjoyment of the Purchased Assets. Neither the Justice Department, the FTC, nor any state Attorney General shall have requested, orally or in writing, that the Parties delay or postpone the Closing.

**8.8** **Title to Real Property**. The Real Property shall not have become subject to an Encumbrance other than Permitted Encumbrances and the Title Company shall have irrevocably committed to issue the Title Policy to Buyer.

**8.9** **Closing Documents**. Seller shall have executed and delivered to Buyer all of the items required to be delivered by Seller as contemplated by Section 3.2 or otherwise pursuant to any term or provision contained in this Agreement or the other Transaction Documents.

**8.10** **Third-Party Consents and Amendments to Contracts**. Buyer shall have received consents to the assignment of, and/or amendments to, the Assumed Contracts set forth on Schedule 2.1(h), each of which shall be in form and substance reasonably acceptable to Buyer.

**8.11** **Estoppel Certificates**. Seller shall have delivered to Buyer at least seven (7) Business Days prior to the Closing Date executed estoppel certificates in a form reasonably acceptable to Buyer for all Third Party Leases.

**8.12** **Landlord Estoppels; Subordination and Non-Disturbance Agreements**. Seller shall have delivered to Buyer at least seven (7) Business Days prior to the Closing Date executed landlord estoppel certificates in a form reasonably acceptable to Buyer and executed subordination and non-disturbance agreements from any mortgagees in a form reasonably acceptable to Buyer for all Tenant Leases.

**8.13** **Environmental Site Assessments**. To the extent requested by Buyer, Buyer shall have received Phase I environmental site assessments with respect to the Real Property, and if recommended by the environmental engineering firm, and at Buyer's expense, a Phase II and additional reports, prepared by an environmental engineering firm selected by Buyer, and the findings and conclusions of any such reports shall be acceptable to Buyer.

**8.14** **Confirmation of No Encumbrances.** Seller shall have delivered in form and substance satisfactory to Buyer, including the payoff letters, UCC termination statements, invoices and other documents reasonably requested by Buyer, that the Purchased Assets delivered to Buyer at the Closing are free and clear of Encumbrances other than Permitted Encumbrances.

**8.16** **Tail Insurance**. Seller shall have purchased the Tail Policies described in Section 6.16 and shall have delivered certificates of insurance evidencing the same at least five (5) Business Days prior to the Closing Date.

**8.17** **Transition Services Agreement**. Buyer and Seller shall have agreed to the schedules attached to the Transition Services Agreement; and Buyer and Seller shall have executed a mutually agreed upon Transition Services Agreement prior to the hearing date on the Sale Procedures Motion.

**8.18    Seller Bank Accounts.**  Seller shall have made arrangements such that, after Closing, all funds received from third-party payors resulting from the operation of the Hospital are not commingled with any other funds, including funds received from the operation of other facilities owned by Seller.

**8.20    Sale Order.**  The Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to Seller and Buyer, and the Sale Order shall have become a Final Order.

**8.21    Proof of Payment and Insurance Proceeds.**  Buyer shall be satisfied in its sole discretion that Seller has satisfactorily made payments with respect to the Hospital's swing beds and has satisfactorily applied the insurance proceeds from the Women's Building.

**9.    CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER.**

The obligations of Seller to consummate the Contemplated Transactions and to perform its obligations in connection with the Closing are subject to the satisfaction, at or prior to the Closing, of each of the following conditions unless waived in writing by Seller:

**9.1    Representations and Warranties.**  Each of the representations and warranties of Buyer contained in this Agreement and the other Transaction Documents (a) that is not qualified by materiality or similar phrases and is not a Buyer Fundamental Representation shall be true and correct in all material respects on and as of the date of this Agreement and on and as of the Closing Date (except to the extent that such representations and warranties address matters as of particular dates, in which case, such representations and warranties shall be true and correct in all material respects on and as of such dates) and (b) that is qualified by materiality or similar phrases or that is a Buyer Fundamental Representation shall be true and correct in all respects on and as of the date of this Agreement and on and as of the Closing Date (except to the extent that such representations and warranties address matters as of particular dates, in which case, such representations and warranties shall be true and correct in all respects on and as of such dates).

**9.2    Performance.**  Buyer shall have performed and complied with all agreements, obligations and covenants contained in this Agreement and the other Transaction Documents that are required to be performed or complied with by Buyer at or prior to the Closing.

**9.3    Action/Proceeding.**  No Governmental Authority shall have issued an Order restraining or prohibiting the consummation of the Contemplated Transactions. No Person shall have commenced or threatened in writing to commence any Proceeding before any Governmental Authority that seeks to restrain or prohibit the consummation of the Contemplated Transactions. Neither the Justice Department, the FTC, nor any state Attorney General shall have requested, orally or in writing, that the Parties delay or postpone the Closing.

**9.4    Closing Documents.**  Buyer shall have executed and delivered to Seller all of the items required to be delivered by Buyer as contemplated by <u>Section 3.3</u> or otherwise pursuant to any term or provision contained in this Agreement or the other Transaction Documents.

**9.5    Cure Amounts.**  Any and all Cure Amounts, as provided in <u>Section 2.3(b)</u>, herein shall have been paid by Buyer.

**10.    INDEMNIFICATION.**

**10.1    Indemnification by Seller.**

4822-2526-1169.2                     73

(a)     Seller shall indemnify, defend and hold harmless Buyer, its Affiliates, and its and their respective Representatives, managers, shareholders, members, principals, successors, heirs and assigns (collectively, the "**Buyer Indemnified Parties**") from and against, and pay on behalf of or reimburse each of them for, any and all Losses that any such Buyer Indemnified Party incurs or becomes subject to as a result of, arising out of, relating to or in connection with: (i) any breach of, or inaccuracy in, any of the representations or warranties made by Seller in this Agreement or in any other Transaction Document; (ii) any breach, noncompliance or nonfulfillment of any covenants or other agreements made by Seller in this Agreement or in any other Transaction Document; (iii) any of the Excluded Liabilities; and (iv) any fraud, intentional misrepresentation or willful or criminal misconduct of Seller, any Seller Affiliate or any Representatives, members, managers, principals, or shareholders of Seller or any Seller Affiliate.

(b)     Seller shall have no obligation to indemnify the Buyer Indemnified Parties pursuant to Section 10.1(a)(i) for any Losses unless and until the aggregate amount of all such Losses incurred or suffered by the Buyer Indemnified Parties exceeds $200,000.00 (the "**Deductible**"), upon which event the Buyer Indemnified Parties shall be entitled to indemnification under Section 10.1(a)(i) only for the amount of Losses in excess of the Deductible. For the avoidance of doubt, claims for indemnification pursuant to Sections 10.1(a)(ii)-(iv) shall not be subject to the Deductible. Once Buyer has incurred the aggregate deductible of $200,000, any additional indemnification claims for Losses resulting from Excluded Liabilities shall be subject to Seller indemnification on a dollar-for-dollar basis.

(c)     Seller's aggregate Liability in respect of claims for indemnification pursuant to Section 10.1(a) shall not exceed the Escrow Amount.

**10.2     Indemnification by Buyer**. Buyer shall indemnify, defend and hold harmless Seller, the Seller Affiliates, and its and their respective Representatives, managers, shareholders, members, principals, successors, heirs, and assigns (collectively, the "**Seller Indemnified Parties**") from and against, and pay on behalf of or reimburse each of them for, any and all Losses that any such Seller Indemnified Party incurs or becomes subject to as a result of, arising out of, relating to or in connection with: (i) any breach of, or inaccuracy in, any of the representations or warranties made by Buyer in this Agreement or in any other Transaction Document; (ii) any breach, noncompliance, or non-fulfillment of any covenants or other agreements made by Buyer in this Agreement or in any other Transaction Document; (iii) any of the Assumed Liabilities; and (iv) any fraud, intentional misrepresentation or willful or criminal misconduct of Buyer or any Representatives of Buyer.

(a)     Buyer shall have no obligation to indemnify the Seller Indemnified Parties pursuant to Section 10.2 for any Losses unless and until the aggregate amount of all such Losses incurred or suffered by the Seller Indemnified Parties exceeds $100,000.00 (the "Deductible"), upon which event the Buyer Indemnified Parties shall be entitled to indemnification under Section 10.1(a)(i) only for the amount of Losses in excess of the Deductible. For the avoidance of doubt, claims for indemnification pursuant to Sections 10.1(a)(ii)-(iv) shall not be subject to the Deductible. Once Buyer has incurred the aggregate deductible of $100,000, any additional indemnification claims for Losses resulting from Excluded Liabilities shall be subject to Seller indemnification on a dollar-for-dollar basis.

(b)     Buyer's 's aggregate Liability in respect of claims for indemnification pursuant to Section 10.1(a) shall not exceed the Escrow Amount.

**10.3     Notice and Defense of Third-Party Claims**.

(a)     If an Indemnified Party seeks indemnification under this Article 10 with respect to any Proceeding or other claim brought against it by a third party (a "**Third-Party Claim**"), such

4822-2526-1169.2                                    74

Indemnified Party shall promptly give written notice to the Indemnifying Party after receiving written notice of such Third-Party Claim; provided, however, that any failure to so notify or any delay in notifying the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder, except to the extent that the Indemnifying Party is materially prejudiced by such failure or delay. With respect to any Third-Party Claim that, if adversely determined, would entitle the Indemnified Party to indemnification pursuant to this Article 10, the Indemnifying Party shall be entitled, at its sole cost and expense, (i) to participate in the defense of such Third-Party Claim giving rise to the Indemnified Party's claim for indemnification or (ii) at its option (subject to the limitations set forth below), to assume control of such defense and appoint lead counsel reasonably acceptable to the Indemnified Party; provided, however, that as a condition precedent to the Indemnifying Party's right to assume control of such defense, it must first: (A) notify the Indemnified Party in writing within fifteen (15) days after the Indemnified Party has given notice of the Third-Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any Losses the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third-Party Claim in accordance with the terms of this Agreement (including the limitations set forth in Sections 10.1 and 10.2) and (B) furnish the Indemnified Party with evidence reasonably satisfactory to the Indemnified Party that the Indemnifying Party has sufficient resources to defend such Third-Party Claim and to satisfy its obligations to the Indemnified Party under this Article 10 in respect of such Third-Party Claim. Notwithstanding the foregoing, the Indemnifying Party shall not have the right to assume or continue control of the defense of any Third-Party Claim if such Third-Party Claim (I) seeks non-monetary relief, (II) involves criminal or quasi-criminal allegations or regulatory matters, (III) involves a claim that, if adversely determined, would be reasonably expected, in the good faith judgment of the Indemnified Party, to establish a precedent, custom or practice materially adverse to the continuing business interests or prospects of the Indemnified Party or the Business, (IV) involves a claim that, in the good faith judgment of the Indemnified Party, the Indemnifying Party has failed or is failing to vigorously prosecute or defend, or (V) results in, or could reasonably be expected to result in, under applicable standards of professional conduct, a conflict of interest between the Indemnifying Party and the Indemnified Party in respect of such Third-Party Claim (each of the foregoing, an "**Exception Claim**").

(b)     In the event that (i) the Indemnifying Party does not or fails to elect to assume control of the defense of any Third-Party Claim in the manner set forth in Section 10.3(a) or (ii) such Third-Party Claim is, or at any time becomes, an Exception Claim, the Indemnified Party may defend against, and may consent to the entry of any judgment or enter into any settlement with respect to, such Third-Party Claim in any manner it may deem appropriate, and the fees and disbursements of the Indemnified Party's counsel shall be at the expense of the Indemnifying Party.

(c)     If the Indemnifying Party is controlling the defense of any Third-Party Claim in accordance with Section 10.3(a), the Indemnified Party shall have the right to participate in the defense of such Third-Party Claim with counsel selected by it, subject to the Indemnifying Party's right to control the defense thereof, and the fees and disbursements of such counsel shall be at the expense of the Indemnified Party.

(d)     Irrespective of which Party controls the defense of any Third-Party Claim, the other Parties will, and will cause their respective Affiliates to, reasonably cooperate with the controlling Party in such defense and make available to the controlling Party all witnesses, pertinent records, materials and information in such non-controlling Parties' possession or under its control relating thereto as is reasonably required by the controlling Party. The Parties agree that all communications between any Party and counsel responsible for or participating in the defense of any Third-Party Claim shall, to the extent possible, be made so as to preserve any applicable attorney-client or work-product privilege.

    **10.4    Notice of Non-Third-Party Claims**. If an Indemnified Party seeks indemnification

under this Article 10 with respect to any matter which does not involve a Third-Party Claim, the Indemnified Party shall, promptly after becoming aware of the circumstance giving rise to the claim, give written notice to the Indemnifying Party of such claim for indemnification; provided, however, that any failure to so notify or any delay in notifying the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder. If the Indemnifying Party does not notify the Indemnified Party in writing within thirty (30) days from its receipt of the indemnity notice that the Indemnifying Party disputes such claim, the Indemnifying Party shall be deemed to have agreed to indemnify the Indemnified Party from and against the entirety of any Losses described in the indemnity notice. If the Indemnifying Party has delivered a written notice to the Indemnified Party within such thirty (30) day period disputing such claim, the Indemnifying Party and the Indemnified Party shall proceed in good faith to negotiate a resolution to such dispute. If the Indemnifying Party and the Indemnified Party cannot resolve such dispute within thirty (30) days after delivery of such written notice, such dispute shall be resolved in accordance with Section 13.4.

**10.5    Manner of Payment.** Any indemnification payment pursuant to this Article 10 shall be effected by wire transfer of immediately available funds to an account designated by Seller or Buyer, as the case may be, within five (5) Business Days after the determination of the amount thereof, whether pursuant to a final judgment, settlement or agreement between the Parties; provided, that, to the extent that all or any portion of any indemnification payment to be made to any Buyer Indemnified Party is to be satisfied through funds that remain available in the Escrow Account, Seller and Buyer shall, within five (5) Business Days after the determination of the amount thereof, deliver a joint written instruction to the Escrow Agent instructing the Escrow Agent to release the appropriate portion of the funds in the Escrow Account to an account designated by Buyer.

**10.6    Determination of Loss Amount.**

(a)    The amount of any Losses subject to indemnification pursuant to this Article 10 shall be reduced or reimbursed, as the case may be, by any amount actually received by any Buyer Indemnified Party or any Seller Indemnified Party, as applicable, with respect thereto under any insurance coverage provided by any non-Affiliate third party or from any other party alleged to be responsible therefor (net of any deductible or co-payment, the Buyer Indemnified Parties' or Seller Indemnified Parties', as applicable, good faith estimate of any increase in insurance premiums attributable to such recovery and all out of pocket costs related to such recovery). The Buyer Indemnified Parties and the Seller Indemnified Parties, as applicable, shall use commercially reasonable efforts to collect any amounts available under such insurance coverage or from such other party alleged to have responsibility therefor; provided, that in no event shall the Buyer Indemnified Parties or the Seller Indemnified Parties have any obligation to file or commence any Proceeding to collect any such amounts. If a Buyer Indemnified Party or Seller Indemnified Party, as applicable, receives and is entitled to retain an amount under insurance coverage or from such other party with respect to Losses at any time subsequent to any indemnification provided by Seller pursuant to Section 10.1 or by Buyer pursuant to Section 10.2, then such Buyer Indemnified Party or Seller Indemnified Party, as applicable, shall promptly reimburse Seller or Buyer, as applicable, for any payment made by such Person in connection with providing such indemnification up to the amount received (net of any deductible or co-payment, and all out of pocket costs related to such recovery) by the Buyer Indemnified Party or Seller Indemnified Party, as applicable; provided, that in no event shall any Buyer Indemnified Party or Seller Indemnified Party, as applicable, have any obligation hereunder to remit to Buyer or Seller, as applicable, any portion of such insurance or other recoveries in excess of the indemnification payment or payments actually received from Buyer or Seller, as applicable, with respect to such Losses.

(b)    To the extent that Seller has an indemnification obligation pursuant to this Article 10, any of the Buyer Indemnified Parties may set off the amount of such indemnification against any

amounts then due and unpaid to Seller by any of the Buyer Indemnified Parties pursuant to this Agreement or any other Transaction Document.

(c)     For purposes of calculating the amount of Losses resulting therefrom to which a Buyer Indemnified Party or Seller Indemnified Party is entitled under this Article 10, the terms "material," "materiality," and similar qualifiers, modifiers, or limitations shall be disregarded.

(d)     The right to indemnification of any Party pursuant to this Article 10, or the availability of any other remedies contemplated hereby or otherwise available to the such Party at law or in equity, based upon any representation, warranty, covenant, agreement or obligation contained in or made pursuant to this Agreement or any other Transaction Document will not be affected by any investigation made by or on behalf of any such Party or its Affiliates, or the knowledge of any such Party's (or its Affiliates') Representatives with respect to the accuracy or inaccuracy of, or compliance or non-compliance with, any such representation, warranty, covenant, agreement or obligation at any time prior to or following the date hereof.

**10.7    Exclusive Remedy**.  The Parties agree that, from and after the Closing Date, the indemnification provisions set forth in this Article 10 are the exclusive provisions in this Agreement with respect to the Liability of Seller or Buyer for the breach, inaccuracy or nonfulfillment of any representation or warranty or any pre-Closing covenants, agreements or other pre-Closing obligations contained in this Agreement, and the sole remedy of the Buyer Indemnified Parties and the Seller Indemnified Parties for any claims for breach of any representation or warranty or pre-Closing covenants, agreements or other pre-Closing obligations arising out of this Agreement or any Law or legal theory applicable thereto; provided, that nothing herein shall preclude any Party from (a) seeking any remedy based upon fraud, intentional misrepresentation or willful or criminal misconduct by any other Party (including any fraud, intentional misrepresentation or willful or criminal misconduct committed by any officer, director, manager, employee or Representative in connection with the consummation of the Contemplated Transactions), (b) enforcing its right to specific performance of post-Closing covenants, agreements or other post-Closing obligations, including pursuant to Section 6.14, Section 7.3, Section 10.10, or equitable remedies or (c) seeking any remedy available to such Party under or in respect of the Transition Services Agreement or the Curae Restrictive Covenants Agreement, whether by their respective terms, at law or in equity.

**10.8    Adjustment to Purchase Price**.  The Parties agree to treat any indemnification payment received pursuant to this Agreement for all Tax purposes as an adjustment to the Purchase Price to the extent permitted by applicable Laws.

**10.9    Survival**.  All representations and warranties contained in or made pursuant to this Agreement or any other Transaction Document shall survive the execution and delivery of this Agreement or such other Transaction Document and the consummation of the Contemplated Transactions until the Survival Expiration Date. Notwithstanding anything herein to the contrary, Seller will not be liable with respect to any claim for indemnification pursuant to Section 10.1(a)(i), and Buyer will not be liable with respect to any claim for indemnification pursuant to Section 10.2(a)(i) unless written notice of such claim is delivered to Seller or Buyer, as the case may be, prior to the applicable Survival Expiration Date (if any). For purposes of this Agreement, the term "**Survival Expiration Date**" shall mean the date that is thirty-six (36) months after the Closing Date; provided, that:

(a)     with respect to the Seller Fundamental Representations, the Buyer Fundamental Representations, and the Seller Significant Representations and those representations set forth in Section 4.20 (Real Property) and Section 4.26 (Environmental Matters), the Survival Expiration Date shall be the day after the expiration of the applicable statute of limitations, including any extensions thereto to the

Case 3:18-bk-05665   Doc 79   Filed 08/31/18   Entered 08/31/18 18:22:55   Desc Main
                        Document      Page 163 of 177

extent that such statute of limitations is tolled, or five (5) years if there is no applicable statute of limitations.

For the avoidance of doubt, this Section 10.9 shall not affect any rights to bring claims after the Survival Expiration Date based on (A) any covenant or agreement of the Parties which contemplates performance after the Closing, (B) the obligations of Seller under Sections 10.1(a)(ii)-(iv), or (C) the obligations of Buyer under Sections 10.2(a)(ii)-(iv).

**10.10  Escrow Release**. Subject to the terms and conditions of this Agreement and the Escrow Agreement, within ten (10) Business Days following the date which is three (3) years after the Closing Date (the "**Escrow Release Date**"), Seller and Buyer shall deliver a joint written instruction to the Escrow Agent instructing the Escrow Agent to release to Seller (a) any funds remaining in the Escrow Account as of the Escrow Release Date (if any), minus (b) the aggregate amount of all unresolved (or resolved but unpaid) indemnification claims under this Article 10 asserted by the Buyer Indemnified Parties in accordance with this Article 10 as of the Escrow Release Date.

## 11.    TAX MATTERS.

**11.1    Allocation of Purchase Price**.    The Parties shall jointly prepare an allocation ("**Allocation**") of an amount totaling the sum of the (a) Purchase Price, (b) Assumed Liabilities and (c) all other capitalized costs under this Agreement among the Purchased Assets, in accordance with Section 1060 of the Code (and any similar provisions of state or local Law, as appropriate) and any appraisals and valuations obtained in connection with the Contemplated Transactions. The parties shall agree upon such Allocation no later than two (2) days prior to Closing Date. Buyer and Seller shall report and file all Tax Returns (including IRS Form 8594) in all respects and for all purposes consistent with such Allocation. Seller shall timely and properly prepare, execute, file and deliver all such documents, forms and other information as Buyer may reasonably request to assist in the preparation of such Allocation. Neither Buyer nor Seller shall take any position (whether in audits, Tax Returns or otherwise in connection with Tax matters) that is inconsistent with such Allocation, unless required to do so by applicable Laws.

**11.2    Tax Returns**.

(a)    Seller shall prepare and file or cause to be prepared and filed on a timely basis all Tax Returns relating to the Purchased Assets and the Business with respect to all taxable periods ending prior to the Effective Time. Seller shall be responsible for and shall pay any Taxes arising or resulting from or in connection with the ownership of the Purchased Assets and operation of the Business for all taxable periods (or portion thereof) ending prior to the Effective Time. Seller shall not consent, without the prior written consent of Buyer, to any change in the treatment of any item with respect to the Purchased Assets or the Business that would affect the Tax Liability of Buyer after the Effective Time. Buyer shall prepare and file or cause to be prepared and filed on a timely basis all Tax Returns relating to the Purchased Assets and the Business with respect to all taxable periods ending after the Effective Time. Buyer shall be responsible for and shall pay any Taxes arising or resulting from or in connection with the ownership of the Purchased Assets and operation of the Business for all taxable periods (or portion thereof) ending after the Effective Time.

(b)    Buyer shall prepare and file or cause to be prepared and filed all Tax Returns required to be filed with respect to the Purchased Assets and the Business for all taxable periods beginning prior to the Effective Time and ending after the Effective Time (a "**Straddle Period**"). Buyer shall notify Seller of Buyer's calculation of Seller's share of the Taxes for any such Straddle Periods and Seller shall pay to Buyer (in cash or other immediately available funds) the amount of Seller's share of the Tax Liability for the portion of the Straddle Period ending as of the Effective Time, as determined

pursuant to Section 11.2(c).

(c)     In order to apportion appropriately any Taxes relating to a Straddle Period, the Parties shall, to the extent required or permitted under applicable Laws, treat the calendar day immediately preceding the day in which the Effective Time occurs as the last day of the taxable year or period for all Tax purposes. With respect to such prorated Taxes, the portion of any Taxes that are allocable to the portion of the Straddle Period ending on the calendar day immediately preceding the day in which the Effective Time occurs shall be: (i) in the case of Taxes that are imposed on a periodic basis, deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of calendar days in the Straddle Period ending on (and including) the calendar day immediately preceding the day in which the Effective Time occurs and the denominator of which is the number of calendar days in the entire relevant Straddle Period; and (ii) in the case of Taxes not described in (i) (such as (A) Taxes that are based upon or measured by income or receipts or imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible) and (B) payroll and similar Taxes), deemed equal to the amount that would be payable if the taxable year or period ended on the calendar day immediately preceding the day in which the Effective Time occurs.

**11.3     Cooperation**. Following the Closing, the Parties shall cooperate with each other and shall make available to each other, as reasonably requested, all information, records or documents relating to Tax Liabilities or potential Tax Liabilities with respect to the Purchased Assets or the Business for all periods, and shall preserve all such information, records and documents (to the extent not a part of the Purchased Assets or the Business delivered by Seller at the Closing) at least until the expiration of any applicable statute of limitations or extensions thereof. Seller further agrees, upon request of Buyer, to use its reasonable best efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Taxes that could be imposed on Buyer or the Purchased Assets and the Business (including with respect to the Contemplated Transactions).

**11.4     Tax Proceedings**. After the Effective Time, with respect to any Proceeding relating to Taxes with respect to the Purchased Assets (collectively, a "**Tax Proceeding**") for any taxable period ending after the Effective Time, such Tax Proceeding shall be controlled by Buyer. For any Tax Proceeding for any Straddle Period, Buyer shall notify Seller of such Tax Proceeding, and Seller may (at its sole cost and expense) participate in the defense of such Tax Proceeding that is controlled by Buyer.

**11.5     Transfer Taxes**. All Transfer Taxes incurred in connection with the Contemplated Transactions shall be paid by Buyer, and all necessary Tax Returns and other documentation with respect to such Transfer Taxes shall be prepared and filed by the Party required to file such Tax Returns under applicable Laws.

## 12.     TERMINATION.

**12.1     Termination**. Without prejudice to other remedies which may be available to the Parties, this Agreement may be terminated and the Contemplated Transactions may be abandoned at any time prior to the Closing as follows:

(a)     By mutual written consent of Buyer and Seller;

(b)     By Buyer, if Buyer is not satisfied with its due diligence concerning the Hospital or the Business in its sole discretion at any time up to the Due Diligence Deadline for potential bidders provided for in the Sale Procedures Order;

4822-2526-1169.2                                      79

(c)     By Buyer, if Buyer is not satisfied in its sole discretion that the Assumed Contracts can be assumed and assigned for less than the Cure Cap;

(d)     By either Buyer or Seller upon delivery of written notice to the other if the Closing has not occurred on or before 5:00 p.m., Central Time, on December 31, 2018 (the "**End Date**"); provided, that neither Buyer nor Seller will be entitled to terminate this Agreement pursuant to this Section 12.1(d) if such Person's material breach of, or material failure to fulfill any obligation under, this Agreement or any other Transaction Document has been the principal cause of the failure of the Closing to occur on or prior to such time on the End Date;

(e)     By Buyer upon delivery of written notice to Seller, if there has been a breach of any representation, warranty, covenant or agreement made by Seller in this Agreement or in any other Transaction Document, which breach (i) would give rise to the failure of a condition set forth in Article 8 to be satisfied and (ii) (A) cannot be cured by the End Date or (B) if capable of being cured, shall not have been cured by the earlier of (1) fifteen (15) calendar days following receipt of written notice from Buyer of such breach or (2) the date that is three (3) calendar days prior to the End Date;

(f)     By Seller upon delivery of written notice to Buyer, if there has been a breach of any representation, warranty, covenant or agreement made by Buyer in this Agreement or in any other Transaction Document, which breach (i) would give rise to the failure of a condition set forth in Article 9 to be satisfied and (ii) (A) cannot be cured prior to the End Date or (B) if capable of being cured, shall not have been cured by the earlier of (1) fifteen (15) calendar days following receipt of written notice from Seller of such breach or (2) the date that is three (3) calendar days prior to the End Date;

(g)     By either Buyer or Seller upon delivery of written notice to the other if any Governmental Authority shall have issued or entered any Order, enacted any Law or taken any other action which, in any such case, (i) permanently restrains, enjoins or otherwise prohibits the consummation of all or any of the Contemplated Transactions, (ii) would prevent the Closing from occurring as contemplated by this Agreement on or prior to the applicable time on the End Date or (iii) has had or would reasonably be expected to have a Material Adverse Effect; provided, that neither Buyer nor Seller will be entitled to terminate this Agreement pursuant to this Section 12.1(f) if the issuance or entry of such Order is principally caused by such Person's material breach of, or material failure to fulfill any obligation under, this Agreement or any other Transaction Document;

(h)     By Buyer upon delivery of written notice to Seller if a Material Adverse Effect shall have occurred;

(i)     By Buyer in accordance with Section 6.6(c) or 6.15;

(j)     By Seller upon delivery of written notice to Buyer if Seller accepts and the Bankruptcy Court approves an Alternative Transaction; or

(k)     By Buyer upon delivery of written notice to Seller if:

(i)     any secured creditor of Seller obtains relief from the automatic stay or is otherwise permitted to foreclose on any of the Purchased Assets;

(ii)     the Sale Procedures Order is not entered by September 30, 2018;

(iii)     the Sale Order is not entered by November 30, 2018;

4822-2526-1169.2

(iv)     Seller shall not have obtained the assignment of the employment agreements of all Physicians pursuant to Section 6.3;

(v)     the assignment or reconciliation of any past due amounts owed to any vendor or providers of medical services shall not have been obtained to Buyer's sole satisfaction;

(vi)     Seller seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Seller under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers (other than a fee examiner) relating to the operation of Seller's businesses pursuant to Section 1104 of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered for any reason; or

(vii)     (A) Seller enters into a definitive agreement with respect to an Alternative Transaction, (B) the Bankruptcy Court approves an Alternative Transaction or (C) Seller accepts an Alternative Transaction as the winning bid at Auction.

**12.2     Effect of Termination**.  Subject to the provisions of this <u>Section 12.2</u>, the rights of termination set forth above are in addition to any other rights a terminating Party may have under this Agreement and the other Transaction Documents, and the exercise of a right of termination will not be an election of remedies.  Notwithstanding the foregoing sentence, in the event of any termination of this Agreement by either Buyer or Seller as provided in <u>Section 12.1</u>, this Agreement shall forthwith become void, and there shall be no Liability on the part of any Party or any of its or their Affiliates to any other Person resulting from, arising out of, relating to, or in connection with this Agreement or any other Transaction Document, except that (a) nothing in this Agreement or any other Transaction Document will relieve any Party from any material breach of this Agreement or any other Transaction Document prior to such termination or for fraud, intentional misrepresentation or willful or criminal misconduct, (b) <u>Section 6.14</u> (Confidentiality), and <u>Article 13</u> (General) and any pre-termination breaches of such provisions shall survive any termination of this Agreement and each Party shall be entitled to all remedies available at law or in equity in connection with any past or future breach of any such provision and (c) Seller's obligations to pay Buyer the Break-Up Fee and the Expense Reimbursement if approved in the Sale Procedures Order shall survive any termination of this Agreement.

## 13.     GENERAL.

**13.1     Notice**.  Any notice, demand or communication required, permitted, or desired to be given hereunder must be in writing and shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile transmission or electronic mail), or five (5) days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

<div style="margin-left:2em">

If to Seller:                    Amory Regional Medical Center, Inc.
                                 1721 Midpark Road, Suite B200
                                 Knoxville, TN 37921
                                 Attention: Steve Clapp

</div>

| With simultaneous copy (which shall not constitute notice) to: | Polsinelli PC<br>1201 West Peachtree Street, NE<br>Suite 1100<br>Atlanta, GA 30309<br>Attention: David E. Gordon, Esq.<br>dgordon@polsinelli.com |
| --- | --- |
| If to Buyer: | North Mississippi Health Services, Inc.<br>830 South Gloster Street<br>Tupelo, MS 38801<br>Attention: Shane Spees' |
| With simultaneous copy (which shall not constitute notice) to: | North Mississippi Health Services, Inc.<br>830 South Gloster Street<br>Tupelo, MS 38801<br>Attention: Bruce Toppin, Esq.<br><br>Waller Lansden Dortch & Davis, LLP<br>1901 Sixth Avenue North, Suite 1400<br>Birmingham, AL 35203<br>Attention: Colin H. Luke, Esq.<br>Facsimile: (615) 244-6804<br>Email: colin.luke@wallerlaw.com |

or to such other address, and to the attention of such other Person or officer as any Party may designate.

**13.2    Legal Fees and Costs of Disputes**. In the event a Party incurs legal expenses to enforce or interpret any provision of this Agreement by mediation, arbitration or judicial means, the prevailing Party will be entitled to recover such legal expenses, including attorney's fees, costs and necessary disbursements, in addition to any other relief to which such Party shall be entitled.

**13.3    Choice of Law**. Except to the extent the mandatory provisions of the Bankruptcy Code apply, the Parties agree that this Agreement shall be governed by and construed in accordance with the applicable Laws of the State of Mississippi without giving effect to any choice or conflicts of law provision or rule thereof that would result in the application of the applicable Laws of any other jurisdiction other than the applicable Laws of the United States of America, where applicable.

**13.4    Arbitration**. The Parties agree that the Bankruptcy Court shall have exclusive jurisdiction over all disagreements, disputes or claims arising out of or relating to this Agreement or the Contemplated Transactions that cannot be settled by the relevant Parties, including any claims for injunctive relief. If the Bankruptcy Case has closed or if the Bankruptcy Court otherwise declines to exercise jurisdiction, the Parties agree that all disagreements, disputes or claims arising out of or relating to this Agreement or the Contemplated Transactions that cannot be settled by the relevant Parties, including any claims for injunctive relief, shall be settled by arbitration in accordance with the provisions set forth below.

(a)    Forum. The forum for arbitration shall be Nashville, Tennessee.

(b)    Law. The governing Law shall be the Law of the State of Mississippi.

4822-2526-1169.2                82

(c)     Administration.    The arbitration shall be administered by the American Arbitration Association ("**AAA**").

(d)     Selection; Notice.    In the case of one or more claims or disputes under this Agreement for which the amount in controversy, whether for an individual claim or dispute or in the aggregate as to multiple claims or disputes, is less than $500,000.00, the Parties agree to submit such claims or disputes to a single arbitrator, to be chosen in the manner prescribed below.  In the event the amount in controversy, whether for an individual claim or dispute or in the aggregate as to multiple claims or disputes between the Parties, is $500,000.00 or more, or, in the event the Parties do not agree as to whether such amount in controversy is $500,000.00 or more, the Parties agree to submit such claims or disputes to a board of arbitrators consisting of three arbitrators, as set forth below (the term "**Arbitrators**" shall refer to the board of arbitrators or the single arbitrator, as applicable).  For the avoidance of doubt, in determining the aggregate amount in controversy for purposes of the two preceding sentences, in the event that there are multiple claims or disputes such claims or disputes need not be related, including as to the same subject matter, the same provisions of this Agreement or the same set of facts.

(i)     If any Person determines to submit a dispute for arbitration pursuant to this Section 13.4, such Person shall furnish the other Parties to the dispute with a dated, written statement (the "**Arbitration Notice**") indicating (A) such Person's intent to commence arbitration Proceedings, (B) the nature, with reasonable detail, of the dispute and (C) the remedy or remedies such Person will seek.

(ii)    Where the Parties use a single arbitrator, within twenty (20) days of the Arbitration Notice, the Parties shall select a single arbitrator from a list of members of the AAA's National Panel of Commercial Arbitrators.  Such arbitrator must be "neutral" and must have at least ten (10) years' experience in merger and acquisition transactions.  If the Parties do not reach agreement on the selection of a single arbitrator within the twenty (20) day period, the AAA shall have the right to make such selection upon the request of any Party to the arbitration Proceedings.  Where the Parties use a board of arbitrators, within twenty (20) days of the date of the Arbitration Notice, the Person commencing the arbitration (collectively, the "**Petitioner**") and the Party with whom the Petitioner has its dispute (collectively, the "**Respondent**") shall each select one neutral arbitrator (and provide written notice of such selection to the Respondent and Petitioner).  If either the Petitioner or Respondent fails to select a neutral arbitrator or provide such notice within the twenty (20) day period, the AAA shall have the right to make such selection upon the request of any Party to the arbitration Proceedings.  (Such qualifying arbitrators hereafter may be referred to, respectively, as the "**First Arbitrator**" and the "**Second Arbitrator**").  Within ten (10) days following their selection, the First and Second Arbitrator shall select (and provide written notice to the Respondent and the Petitioner of such selection) a third arbitrator (the "**Third Arbitrator**") from a list of members of the AAA's National Panel of Commercial Arbitrators.  The Third Arbitrator must be "neutral" and must have at least ten (10) years' experience in merger and acquisition transactions.  For purposes of this Section 13.4, a "neutral" arbitrator shall be a Person who would not be subject to disqualification under rule No. 18 of the AAA Rules.

(e)     Rules.    The rules of arbitration shall be the Commercial Arbitration Rules of the AAA, as modified by any other instructions that the Parties may agree upon at the time, except that each Party shall have the right to conduct discovery in any manner and to the extent authorized by the Federal Rules of Civil Procedure as interpreted by the United States District Court for the Middle District of Tennessee.  The Arbitrators shall not modify the terms of this Agreement.

(f)     Award.    The award rendered by arbitration shall be Final and Binding upon the Parties, and judgment upon the award may be entered in any court of competent jurisdiction of the United States.  The Arbitrators shall have authority to award legal fees and associated costs to the Party that substantially prevails in any arbitration Proceeding.

4822-2526-1169.2                                          83

**13.5    Benefit; Assignment; Delegation**.  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and permitted assigns and delegates.  No Party may assign any of its rights hereunder or delegate any of its duties hereunder without the prior written consent of the other Parties; <u>provided, however</u>, that Buyer, without the prior consent of Seller, may assign any of its rights hereunder or delegate any of its duties hereunder to Buyer's Affiliates, or, for collateral security purposes, to Persons providing financing to Buyer or its Affiliates, but in such event, Buyer shall be required to remain obligated hereunder in the same manner as if such assignment or delegation had not been effected.

**13.6    Waiver of Jury Trial**.  EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

**13.7    Legal Advice and Reliance**.  Except as expressly provided in this Agreement, none of the Parties (nor any of the Parties' respective Representatives) has made or is making any representations to any other Party (or to any other Party's Representatives) concerning the consequences of the Contemplated Transactions under applicable Laws, including Tax-related Laws or under the Laws governing the Government Programs.  Except for the representations and warranties made in this Agreement, each Party has relied solely upon the Tax, Government Program and other advice of its own Representatives engaged by such Party and not on any such advice provided by any other Party.

**13.8    Reproduction of Documents**.  This Agreement and the other Transaction Documents, including (a) consents, waivers and modifications which may hereafter be executed, (b) the documents delivered at the Closing, and (c) financial statements, certificates and other information previously or hereafter furnished to Seller or to Buyer, may, subject to the provisions of <u>Section 6.14</u> and <u>Section 7.3(a)</u>, be reproduced by Seller and by Buyer by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process, and Seller and Buyer may destroy any original documents so reproduced.  Seller and Buyer agree and stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial, arbitral or administrative Proceeding (whether or not the original is in existence and whether or not such reproduction was made by Seller or Buyer in the regular course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

**13.9    Cost of Transaction**.  Except as otherwise provided herein, the Parties agree as follows:

(a)    whether or not the Contemplated Transactions shall be consummated, Seller will pay (i) the fees, expenses and disbursements of Seller and its respective Representatives incurred in connection with the subject matter hereof and any amendments hereto; and (ii) recording fees and similar Closing costs relating to the transfer of the Real Property; and

(b)    whether or not the Contemplated Transactions shall be consummated, Buyer will pay (i) the fees, expenses and disbursements of Buyer and its Representatives incurred in connection with the subject matter hereof and any amendments hereto; (ii) any and all costs related to any due diligence investigations conducted by Buyer; ;and (iii) the fees and expenses associated with any documentary stamps, Transfer Taxes, and similar Closing costs relating to the transfer of the Real Property, the Commitments and the Title Policy;.

**13.10    Waiver of Breach**.  The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or other provision hereof.

4822-2526-1169.2                    84

**13.11  Severability.**  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of Buyer, Curae, or Seller under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom, and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

**13.12  No Inferences; Sophisticated Parties.**  Each Party acknowledges and agrees to the following: (a) all of the Parties are sophisticated and represented by experienced healthcare and transactional counsel in the negotiation and preparation of this Agreement; (b) this Agreement is the result of lengthy and extensive negotiations between the Parties and an equal amount of drafting by all Parties; (c) this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; and (d) no inference in favor of, or against, any Party shall be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such Party.

**13.13  Divisions and Headings of this Agreement.**  The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

**13.14  No Third-Party Beneficiaries.**  The terms and provisions of this Agreement are intended solely for the benefit of Buyer, Curae, Seller, the Seller Indemnified Parties with respect to Article 10, the Buyer Indemnified Parties with respect to Article 10, and such parties' respective permitted successors, assigns, or delegates, and it is not the intention of the Parties to confer, and, this Agreement shall not confer, third-party beneficiary rights upon any other Person.

**13.15  Entire Agreement; Amendment.**  This Agreement, together with the other Transaction Documents and the Confidentiality Agreement, represent the entire agreement between the Parties with respect to the subject matter of this Agreement and supersede all prior or contemporaneous oral or written understandings, negotiations, letters of intent or agreements between the Parties. This Section 13.15 shall be deemed a "merger" clause under Mississippi Law, and this Agreement (together with the other Transaction Documents and the Confidentiality Agreement) is intended as a complete integration of the agreement of the Parties. No modifications of, amendments to, or waivers of any rights or duties under this Agreement shall be valid or enforceable unless and until made in writing and signed by all Parties.

**13.16  Multiple Counterparts.**  This Agreement may be executed in any number of counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. The facsimile signature of any Party or other Person to this Agreement or any other Transaction Document or a PDF copy of the signature of any Party or other Person to this Agreement or any other Transaction Document delivered by electronic mail for purposes of execution or otherwise, is to be considered to have the same binding effect as the delivery of an original signature on an original contract.

**13.17  Other Owners of Purchased Assets.**  The Parties acknowledge that certain Purchased Assets may be owned by one or more Seller Affiliates rather than Seller. Notwithstanding the foregoing, and for purposes of all representations, warranties, covenants and agreements contained herein, Seller and Curae each agree that (a) its obligations with respect to any Purchased Assets shall be joint and several with any Seller Affiliate which owns or controls such Purchased Assets, (b) the representations and

warranties herein, to the extent applicable, shall be deemed to have been made by, on behalf of and with respect to, such Seller Affiliates in their ownership capacity, and (c) it has the legal capacity to cause, and it shall cause, any Seller Affiliate that owns or controls any Purchased Assets to meet all of Seller's and Curae's obligations under this Agreement with respect to such Purchased Assets. Seller and Curae each hereby waive any defense to a claim made by Buyer under this Agreement based on the failure of any Person who owns or controls the Purchased Assets to be a Party.

14.  **GOVERNING LAW.**  The parties agree that this Agreement shall be governed by and construed in accordance with the laws of the State of Mississippi, without regard to conflict of laws principles.

15.  **TIME PERIOD FOR COMPLETING SCHEDULES AND EXHIBITS.**  Notwithstanding anything herein to the contrary, the Parties shall complete the attached complete schedules and exhibits, as well as any blanks to be filled in, in a mutually satisfactory manner on or before September 24, 2018.

<div align="center">[SIGNATURE PAGE FOLLOWS]</div>

4822-2526-1169.2

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

SELLER:

AMORY REGIONAL MEDICAL CENTER, INC.

By: _____
Name: Stephen N. Clapp
Title: President

AMORY REGIONAL PHYSICIANS, LLC

By: _____
Name: Steph N. Clapp
Title: President

BUYER:

NORTH MISSISSIPPI HEALTH SERVICES, INC.

By: _____
Name: _____
Title: PRES. CEO

CURAE:

CURAE HEALTH, INC.

By: _____
Name: Stephen N. Clapp
Title: President

**EXHIBIT E**

**ASSUMPTION NOTICE**

65035107.4

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

In re:                                         )
                                               )      Chapter 11
Curae Health, Inc., *et al.*[1]                )      Case No. 18-05665
                                               )
1721 Midpark Road, Suite B200                  )      Judge Walker
Knoxville, TN 37921                            )
                              Debtors.         )      Jointly Administered

## NOTICE OF: (I) DEBTORS' INTENT TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS, UNEXPIRED LEASES OF PERSONAL PROPERTY, AND UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY; AND (II) CURE AMOUNTS RELATED TO THE FOREGOING

PLEASE TAKE NOTICE THAT, on August 31, 2018, the above-captioned debtors (the "***Debtors***") filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Bidding Procedures for the Sale of Gilmore Medical Center, (II) Authorizing the Sale of Gilmore Medical Center Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (III) Approving Stalking Horse Purchaser, Break-up Fee, and Overbid Protections, (IV) Establishing Certain Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (V) Scheduling an Auction, (VI) Scheduling a Hearing and Objections Deadlines With Respect to the Sale of Gilmore Medical Center, (VII) Approving the Form and Manner of Notice Thereof, and (VIII) Granting Related Relief* (Dkt. No. ___) (the "***Sale Procedures Motion***").[2]

PLEASE TAKE FURTHER NOTICE that, pursuant to the Sale Procedures Motion, the Debtors sought, among other things, authorization and approval of (a) the sale of the Gilmore Hospital, pursuant to the Gilmore APA, free and clear of all liens, claims, encumbrances and other interests (the "***Sale***"), (b) the assumption and assignment of certain executory contracts (the "***Contracts***") and unexpired leases (the "***Leases***"), in connection with the Sale, and (c) scheduling a final hearing to approve the Sale, including the assumption and assignment of the Contracts and Leases.

PLEASE TAKE FURTHER NOTICE that the Gilmore APA contemplates, and the proposed order approving the Sale, if entered, shall authorize and approve, the assumption and assignment of certain Contracts and Leases, pursuant to section 365 of the Bankruptcy Code.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).
[2] Capitalized terms used in this notice and not otherwise defined shall have the meanings ascribed to them in the Sale Procedures Motion.

PLEASE TAKE FURTHER NOTICE that the Debtors maintain a schedule of Contracts and Leases the Debtors **may** assume and assign in connection with the Sale and you are receiving this notice because you are a party to one or more of the Contracts and Leases the Debtor **may** assume and assign in connection with the Sale.

PLEASE TAKE FURTHER NOTICE that receipt of this notice does not guarantee that the Contract or Lease to which you are party will ultimately be assumed and assigned, because the party ultimately purchasing the Gilmore Hospital pursuant to the Gilmore APA reserves the right to exclude any assumable executory contract or unexpired lease; however,

1.      Please review the cure amounts set forth on **Exhibit 1** to this notice for your Contract or Lease.

2.      If you agree with the respective cure amount on **Exhibit 1** and otherwise do not object to the Debtors' assumption and assignment of your Contract or Lease, you are not required to take any further action.

3.      Objections, if any, to the proposed assumption and assignment of a Contract or Lease (each, an "***Assumption Objection***"), including objections to cure amounts, must be made in writing and filed with the United States Bankruptcy Court so as to be received no later than ten (10) days after the date of this notice (the "***Objection Deadline***") by (a) the Debtors, (b) Ryan K. Cochran, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, Tennessee 37219, ryan.cochran@wallerlaw.com, (c) counsel to MidCap Financial, c/o David E. Lemke, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, Tennessee 37219, david.lemke@wallerlaw.com, and (d) counsel ServisFirst Bank, David G. Thompson, Neal & Harwell, PLC, 1201 Demonbreun Street, Suite 1000, Nashville, Tennessee 37203, dthompson@nealharwell.com.

4.      If a timely Assumption Objection is filed solely as to the cure amount (a "***Cure Objection***"), then the Contract or Lease shall nevertheless be assumed and assigned to the purchaser of the Gilmore Hospital upon the closing of the Sale, the purchaser shall pay the undisputed portion of the cure amount on or as soon as reasonably practicable after the closing of the Sale, and the disputed portion of the cure amount shall be paid as soon as practicable after the resolution of the dispute, either through good faith discussion or with the aid of the court.

5.      If a timely Assumption Objection is filed that objects to the assumption and assignment on a basis other than the cure amount, the Debtors, the purchaser, and the objecting non-debtor party to the Contract or Lease shall meet and confer in good faith to attempt to resolve any such objection without intervention by the court; however, if the Debtors determine that the objection cannot be resolved without judicial intervention, then at the discretion of the Debtors and the purchaser, the objection shall be determined by the court at the Sale Hearing or such other date as determined by the court. If the court determines at such hearing that the Contract or Lease subject to the Assumption Objection should not be assumed and assigned, then such Contract or Lease shall not be assumed or assigned to the purchaser.

6.      If the Debtors, the purchaser, and the non-debtor counterparty to a Contract or Lease resolves any Assumption Objection, they shall enter into a written stipulation, which

2

stipulation is not required to be filed with or approved by the court and shall not be assigned to the purchaser.

PLEASE TAKE FURTHER NOTICE that, unless an Assumption Objection is filed on or before the Objection Deadline, you shall be deemed to have consented to the assumption and assignment of your Contract or Lease and the associated cure amount, and you shall be forever barred from objecting to the cure amount and from asserting any additional cure or other amounts against the Debtors, their estates, or the purchaser.

PLEASE TAKE FURTHER NOTICE that, up to the date that is thirty (30) days following the closing of the Sale, or such other date as mutually agreed upon by the purchaser and Debtors (the "***Designation Deadline***"), the purchaser may, in its sole discretion, subject to certain limitations specified in the Gilmore APA, exclude any Contract or Lease by providing notice to the Debtors and you. Upon such designation, the Contract or Lease excluded by the purchaser shall not be deemed to be, or to have been, assumed or assigned, and shall remain subject to assumption, rejection, or assignment by the Debtors.

PLEASE TAKE FURTHER NOTICE that the Debtors' decision to assume and assign a Contract or Lease is subject to approval by the court and consummation of the Sale and, absent such approval and consummation, no Contract or Lease will be assumed or assigned to the purchaser and shall in all respects remain subject to further administration by the court in accordance and subject to the Bankruptcy Code.

PLEASE TAKE FURTHER NOTICE that, upon approval by the court and consummation of the Sale, all Contracts and Leases to be assumed and assigned by the Debtors to the purchaser shall be assumed and assigned to the purchaser on the date (the "***Assumption Effective Date***") that is the later of (a) the date following expiration of the Objection Deadline, if no Assumption Objection is filed, and (b) the entry of an order by the court authorizing the assumption and assignment of such Contract or Lease.

PLEASE TAKE FURTHER NOTICE that, until the Assumption Effective Date, assumption and assignment of any Contract or Lease is subject to the purchaser's rights to add or exclude any Contract or Lease.

PLEASE TAKE FURTHER NOTICE that this notice and the terms set forth in this notice are subject in all respects to the terms and conditions of the Sale Procedures Motion and the court's orders approving the Sale Procedures Motion and Sale.

3