# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

## DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO: (I)(A) SHUT DOWN THE CLARKSDALE HOSPITAL; (B) REJECT UNEXPIRED LEASES AND CONTRACTS OF CLARKSDALE; AND (C) RECEIVE RELATED RELIEF; OR, IN THE ALTERNATIVE, (II)(A) TRANSFER OPERATIONS OF THE CLARKSDALE HOSPITAL TO A NEW OPERATOR FREE AND CLEAR OF ANY LIENS, CLAIMS, OR ENCUMBRANCES PURSUANT TO AN OPERATIONS TRANSFER AGREEMENT TO BE FILED WITH THE COURT; (B) ASSUME AND ASSIGN THE COAHOMA COUNTY LEASE AND CERTAIN OTHER UNEXPIRED LEASES AND CONTRACTS REQUESTED BY THE NEW OPERATOR; AND (C) RECEIVE RELATED RELIEF

By this motion (the "**Emergency Motion**"), the above-captioned debtors and debtors in possession (the "**Debtors**") seek entry of an order[2] pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 2002 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rule 9075-1 of the Local Rules of the Bankruptcy Court for the Middle District of Tennessee (the "**Local Rules**") authorizing, but not directing, the Debtors to: (I)(A) shut down the Clarksdale Hospital (as defined below); (B) reject unexpired leases and contracts of Clarksdale; and (C) receive necessary related relief; or, in the alternative, (II)(A) transfer the operations of the Clarksdale Hospital to a new operator

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

[2] Because Debtors seek relief in the alternative, Debtors have not filed a proposed order contemporaneously with the filing of this Emergency Motion but will file a proposed order with the Court prior to any hearing on Debtors' Emergency Motion or on such date as required by the Court.

free and clear of all liens, claims, and encumbrances; (B) assume and assign the Coahoma County Lease and certain other unexpired leases and contracts of Clarksdale requested by the new operator; and (C) receive necessary related relief. The Debtors further request that the Court set a hearing on this Emergency Motion as provided in Debtors' Motion for a Hearing filed contemporaneously herewith. In support of this Emergency Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

The Debtors filed these Chapter 11 Cases[3] for the purpose of keeping the Debtors' hospital Facilities open for the benefit of the Mississippi communities in which they are located until such time as the Facilities can be sold to new operators. Unfortunately, Debtors cannot continue to operate the Clarksdale Hospital without creating significant risk to all of the Debtors' Mississippi Facilities. Since the Petition Date, the Clarksdale Hospital has significantly underperformed under the Debtors' Budget for various reasons. Over the next three months, the Clarksdale Hospital is projected to operate at a cumulative negative cash flow of approximately $2.5 million. The Debtors' estates cannot sustain this level of negative cash flow, and Debtors must take immediate action to prevent the shutdown of all of the Debtors' Facilities.

Debtors are working diligently to locate a new operator willing to take over operation of the Clarksdale Hospital. If a new operator, or Coahoma County, were to step forward and agree to take over the Clarksdale Hospital, needed medical care could continue to be provided to the communities where the Clarksdale Hospital is located, the employees of the Clarksdale Hospital could remain employed, and the Debtors' estates would avoid the imposition of WARN Act liability and other shut down costs. However, in the event a new operator cannot be located in

---

[3] Capitalized terms used in this Preliminary Statement have the meaning ascribed to them in this Emergency Motion.

65544948.4

the very near term, Debtors must shut down the Clarksdale Hospital in order to preserve the operations of the Amory Facilities and Batesville Facilities and carry them through the sale process. Stated otherwise, if no new operator steps forward to take over Clarksdale, continuing to carry Clarksdale would bring down both Amory and Batesville. The Debtors' financial projections forecast that, even if the Debtors shut down the Clarksdale Hospital and are required to incur WARN Act liability and other shut down costs, Debtors will have sufficient liquidity to comply with their obligations under the DIP Financing, avoid administrative insolvency, and carry Amory and Batesville through the sale process.

Debtors understand and appreciate the gravity of the relief requested in this Emergency Motion and do not seek such relief lightly. This is an unfortunate situation. But Debtors must either shut down the Clarksdale Hospital or transfer operations of the Clarksdale Hospital to a new operator in early November. If the Debtors continue to operate the Clarksdale Hospital all of the Debtors' Facilities will be forced to shut down.

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Middle District of Tennessee (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6006.

## GENERAL BACKGROUND

4.      On August 24, 2018 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court commencing the above-

3

captioned chapter 11 cases (the "**Chapter 11 Cases**").  The general factual background regarding the Debtors, including their business operations, debt structure, and the events leading to the filing of the Chapter 11 Cases is set forth in detail in the *Declaration of Stephen N. Clapp, Chief Executive Officer of Curae Health, Inc., in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**") [Docket No. 49] and fully incorporated herein by reference.

5.       The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

6.       On August 29, 2018, the Court entered an order authorizing the joint administration of the Chapter 11 Cases [Docket No. 59].

7.       Support for this Emergency Motion is set forth in detail in the *Declaration of Stephen N. Clapp, Chief Executive Officer of Curae Health, Inc., in Support of Debtors' Emergency Motion* the ("**Clapp Declaration**"), attached hereto as <u>Exhibit A</u>, and the *Declaration of Marshall Glade, Financial Advisor to the Debtors, in support of Debtors' Emergency Motion* (the "**Glade Declaration**"), attached hereto as <u>Exhibit B</u>.

## THE CLARKSDALE HOSPITAL

8.       In 2017, Debtor Curae Health, Inc. ("**Curae**") acquired three hospitals in Mississippi from Community Health Systems, Inc. ("**CHS**"), including a 181-bed regional medical center located in Clarksdale, Mississippi (the "**Clarksdale Hospital**", together with the Debtors' hospital facilities in Batesville, Mississippi (the "**Batesville Facilities**") and Amory, Mississippi, (the "**Amory Facilities**"), the "**Facilities**"). Clapp Declaration, at ¶ 6. The Clarksdale Hospital is operated by Debtor Clarksdale Regional Medical Center, Inc., a

4

Tennessee nonprofit corporation (together with Clarksdale Regional Physicians, LLC, "**Clarksdale**"). *Id.*

9.       Clarksdale leases the Clarksdale Hospital from Coahoma County, Mississippi ("**Coahoma County**") pursuant to that certain Lease Agreement dated as of December 28, 1995 among Coahoma County acting through the Coahoma County Board of Supervisors, Clarksdale HMA, Inc., and Health Management Associates, Inc. as guarantor (the "**Original Lease**"). The Original Lease was subsequently amended and assigned to Clarksdale pursuant to that certain Assignment and Assumption of Lease dated as of November 1, 2017 between Clarksdale HMA, LLC (f/k/a Clarksdale HMA, Inc.) and Clarksdale (the "**Coahoma County Lease**"), attached hereto as <u>Exhibit C</u>. *Id.* at ¶ 7. Pursuant to its terms, the Coahoma County Lease continues to be guaranteed by Health Management Associates, Inc.

10.       Prior to the Petition Date, all of the Debtors' Facilities experienced a dramatic decline in net revenue. *Id.* at ¶ 8. This dramatic decline more than offset the expense savings that were realized as a result of the Debtors' operating model. *Id.*

11.       Given the Debtors' pre-petition financial condition, financing arrangements, and capital structure, the Debtors filed a motion on August 24, 2018 (the "**DIP Financing Motion**") [Docket No. 7] seeking post-petition financing (the "**DIP Financing**") in accordance with a budget (the "**Budget**") to, *inter alia*, fund payroll and continue to provide quality patient care to the patients of the Facilities operated by the Debtors until the Facilities can be sold to new operators. The Court entered an interim order granting Debtors' DIP Financing Motion on August 30, 2018 (the "**Interim DIP Order**") [Docket No. 60]. The DIP Financing has been essential to the Debtors' ability to preserve the value of the estates during the initial stages of these Chapter 11 Cases.

65544948.4

12.    After the Petition Date, Clarksdale's financial performance has been significantly worse than forecasted in the Budget as a result of, *inter alia*, lower than expected patient volumes and delayed collection of receipts. Clapp Declaration, at ¶ 9. The delayed collection of receipts was a result of transitioning to a new billing system. Curae transitioned Clarksdale to a new billing system provided by MedHost of Tennessee in September, 2018. *Id.* As is typical in the transition of an accounting and billing system, Clarksdale experienced a delay in its ability to submit invoices. *Id.* The inability to collect receipts combined with lower than normal patient volumes has created a significant cash flow deficit and extreme variance from the Debtors' Budget. Glade Declaration, at ¶ 4. This cash flow deficit will continue to increase if immediate action is not taken. *Id.*

13.    Debtors filed these Chapter 11 Cases to keep the Facilities open for the benefit of their communities and transition the Facilities to new operators. Clapp Declaration, at ¶ 10. Unfortunately, the poor financial performance of the Clarksdale Hospital since the Petition Date has created a cash drain on the Debtors' estates. *Id.* If the Debtors continue to operate the Clarksdale Hospital all of the Debtors' Facilities will be forced to shut down. *Id.*

14.    Based on the pre- and post-petition performance of Clarksdale, Debtors, with the assistance of their financial advisors, have created and analyzed three potential scenarios going forward. Glade Declaration, at ¶ 5. The first scenario provides for the Debtors operating the Clarksdale Hospital as a going concern through a normal bankruptcy sale process. *Id.* The second scenario provides for shutting down the Clarksdale Hospital and rejecting the Coahoma County Lease in early November. *Id.* The third scenario provides for transitioning the Clarksdale Hospital to a new operator and assuming and assigning the Coahoma County Lease to the new operator in early November. *Id.* The following table summarizes the financial position of

65544948.4

Clarksdale under each scenario through February 22, 2018. *Id.* Detailed financial projections supporting the cash flow summaries (the "**Cash Flow Projections**") under each scenario are attached hereto as <u>Exhibit D</u>.

| Clarksdale Cash Flow Summary [1] | | |
|---|---|---|
| Scenario | | |
| Going Concern | Shutdown | New Operator |
| (2,538,542) | (679,083) | 2,025,793 |

Notes:
*[1] Cumulative cash flows for Week Ending 10/12/18 to 2/22/19*

15.    If the Debtors operate under scenario one and continue to carry Clarksdale through a bankruptcy sale process, Debtors project that the Debtors' estates will have a cumulative negative cash flow of over $2.5 million attributable to Clarksdale. *Id.* at ¶ 6. The Debtors cannot continue to operate the Clarksdale Hospital without extreme detriment to the Amory Facilities, Batesville Facilities, and Debtors' creditors. *Id.* The only way Debtors can continue to operate the Clarksdale Hospital is with an infusion of cash of at least $2.5 million. *Id.* Debtors have communicated the urgency of the situation to Coahoma County in the hopes of reaching an agreement whereby Coahoma County would either contribute such funding or take over operations of the Clarksdale Hospital. *Id.* Unfortunately, no such agreement has been reached, and the Debtors cannot continue to operate the Clarksdale Hospital. *Id.* If the Debtors continue to operate the Clarksdale Hospital all of the Debtors' Facilities will be at risk of shutting down. *Id.* Accordingly, Debtors believe that continuing to operate the Clarksdale Hospital is not a viable option without additional funding. *Id.*

65544948.4

16.     Because continuing to operate the Clarksdale Hospital is not a viable option and Debtors do not currently have an operator interested in immediately taking over operation of the Clarksdale Hospital, Debtors believe that shutting down the Clarksdale Hospital under scenario two is their only option at this time. *Id.* at ¶ 12. If the Debtors shut down the Clarksdale Hospital under scenario two, Debtors will have enough time and cash to sell the Amory Facilities and Batesville Facilities to new operators under normal bankruptcy sale processes. Glade Declaration, at ¶ 7. Importantly, scenario two only works if Debtors begin shutting down the Clarksdale Hospital in early November. *Id.*

17.     Scenario three provides the best probable outcome in these Chapter 11 Cases. Glade Declaration, at ¶ 8. Under scenario three, the Clarksdale Hospital will stay open and continue to serve the community, and Debtors will have a positive cumulative cash flow. *Id.* However, scenario three depends entirely on finding a new qualified operator willing to take over the operations of the Clarksdale Hospital in a very short time period. *Id.* Debtors have engaged in extensive marketing of all of the Facilities. Clapp Declaration, at ¶ 13. Debtors, with the help of their investment banker, have reached out to approximately thirty-six companies with respect to the sale of the Clarksdale Hospital. *Id.* Despite Debtors' marketing efforts, there has been limited interest from potential buyers with respect to acquiring just the Clarksdale Hospital. *Id.* Based on this limited interest, Debtors do not believe that a sale of the Clarksdale Hospital through a normal bankruptcy sale process will generate enough proceeds to cover Clarksdale's negative cash flow. *Id.* The only way scenario three works is if Debtors can identify a new operator and transfer operations of the Clarksdale Hospital on an expedited timeline. Glade Declaration, at ¶ 8.

18.     Debtors have been working diligently to find a solution and avoid a shutdown of

65544948.4

the Clarksdale Hospital. Clapp Declaration, at ¶ 14. Unfortunately, based on the Cash Flow

Projections and the lack of additional funding or a new operator to take over operations, shutting

down the Clarksdale Hospital is the Debtors' only viable option at this time. *Id.*

**RELIEF REQUESTED**

19.     By this Motion, the Debtors seek to either: (I) shut down the operations of the

Clarksdale Hospital and reject all unexpired leases and contracts of Clarksdale; or (II) transfer

operations of the Clarksdale Hospital to a yet to be determined new operator free and clear of all

liens, claims, and encumbrances (if such an operator can be found prior to the hearing on this

Emergency Motion) and assume and assign the Coahoma County Lease and certain other

unexpired leases and contracts of Clarksdale.

**BASIS FOR RELIEF**

I.     **Debtors Seek Authority to Shut Down the Clarksdale Hospital and Reject All the Unexpired Leases and Contracts of Clarksdale, including the Coahoma County Lease**

    A.     **Shutting Down the Operations of the Clarksdale Hospital Is a Sound Exercise of the Debtors' Business Judgment, in the Best Interests of the Debtors' Estates, and Necessary to Prevent the Shutdown of All of the Debtors' Facilities**

20.     The decision to wind down a debtor's business is arguably a transaction outside

the ordinary course of business for which court approval in accordance with section 363(b) of the

Bankruptcy Code is required. Section 363(b) of the Bankruptcy Code provides, in relevant part,

that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course

of business, property of the estate . . . ." 11 U.S.C. § 363(b).

21.     In reviewing a debtor's decision to use estate property pursuant to section 363 of

the Bankruptcy Code, courts have routinely held that if such use represents reasonable business

judgment on the part of the debtor, such use should be approved. *See In re Lionel Corp.,* 722

9

F.2d 1063, 1070–71 (2d Cir. 1983) (requiring a "good business reason" to approve a transaction under section 363). "Ordinarily, the position of the trustee is afforded deference, particularly where business judgment is entailed in the analysis or where there is no objection." *In re Lahijani,* 325 B.R. 282, 289 (9th Cir. B.A.P. 2005).

22.     Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed transaction appears to enhance the debtor's estate." *In re Food Barn Stores, Inc.,* 107 F.3d 558, 566 n.16 (8th Cir. 1997); *accord In re AbitibiBowater,* 418 B.R. 815, 831 (Banks. D. Del. 2009) (the business judgment standard is "not a difficult standard to satisfy"). Under the business judgment rule, "management of a corporation's affairs is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, *inter alia,* clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code." *In re Farmland Indus., Inc.,* 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (citing *In re United Artists Theatre Co.,* 315 F.3d 217, 233 (3d Cir. 2003); *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1309 (5th Cir. 1985); *In re Defender Drug Stores, Inc.,* 145 B.R. 312, 317 (9th Cir. B.A.P. 1992)).

23.     Here, the Debtors have determined in their business judgment that it is prudent to shut down operations at the Clarksdale Hospital. Operating the Clarksdale Hospital will result in significant negative cash flow and put all of the Debtors' Facilities at risk of shutting down. In the event the Debtors receive a *bona fide* offer to acquire the Clarksdale assets as a going concern prior to the hearing on this Emergency Motion, the Debtors will instead seek to transfer operations of the Clarksdale Hospital free and clear of all liens, claims, and encumbrances.

65544948.4

Absent such an offer, however, the Debtors have determined that it is in the best interests of their estates and creditors to cease operations and focus on a safe and orderly wind-down in accordance with all applicable state and federal laws.[4]

**B.** **Rejection of Clarksdale's Unexpired Leases and Contracts Is a Sound Exercise of the Debtors' Business Judgment and in the Best Interests of the Debtors' Estates**

24.      Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a) (2017).  Courts routinely approve motions to reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that the traditional standard applied by courts to authorize the rejection of an executory contract is that of "business judgment"); *In re Evans Coal Corp.*, 485 B.R. 162, 167 (Bankr. E.D. Tenn. 2013); *In re Taylor*, 913 F.2d 102 (3d. Cir. 1990); *In re Buckhead America Corp.*, 180 B.R. 83 (Bankr. D. Del. 1995).

25.      Courts generally will not second-guess a debtor's business judgment concerning the rejection of an executory contract or unexpired lease. *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of bad faith, or whim or caprice.").  The "business judgment" test is not a strict standard; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate. *See N.L.R.B. v. Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982) (noting that the "usual test for rejection of an executory contract is simply whether rejection would benefit the

---

[4] In connection with the filing of this Emergency Motion, Debtors have issued notices to the employees of Clarksdale as required under the Worker Adjustment and Retraining Notification Act.

Absent such an offer, however, the Debtors have determined that it is in the best interests of their estates and creditors to cease operations and focus on a safe and orderly wind-down in accordance with all applicable state and federal laws.[4]

**B.**    **Rejection of Clarksdale's Unexpired Leases and Contracts Is a Sound Exercise of the Debtors' Business Judgment and in the Best Interests of the Debtors' Estates**

24.      Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a) (2017).  Courts routinely approve motions to reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that the traditional standard applied by courts to authorize the rejection of an executory contract is that of "business judgment"); *In re Evans Coal Corp.*, 485 B.R. 162, 167 (Bankr. E.D. Tenn. 2013); *In re Taylor*, 913 F.2d 102 (3d. Cir. 1990); *In re Buckhead America Corp.*, 180 B.R. 83 (Bankr. D. Del. 1995).

25.      Courts generally will not second-guess a debtor's business judgment concerning the rejection of an executory contract or unexpired lease. *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of bad faith, or whim or caprice.").  The "business judgment" test is not a strict standard; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate. *See N.L.R.B. v. Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982) (noting that the "usual test for rejection of an executory contract is simply whether rejection would benefit the

---

[4] In connection with the filing of this Emergency Motion, Debtors have issued notices to the employees of Clarksdale as required under the Worker Adjustment and Retraining Notification Act.

estate"), *aff'd*, 465 U.S. 513. Further, "[s]ection 365 enables the trustee to maximize the value of the debtor's estate by assuming executory contracts and unexpired leases that benefit the estate and rejecting those that do not." *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000); *see also In re Register*, 95 B.R. 73, 74 (Bankr. M.D. Tenn. 1989); *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (section 365 of the Bankruptcy Code "allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed").

26. Here, the Debtors' rejection of Clarksdale's unexpired leases and contracts (the "**Clarksdale Contracts**"), including the Coahoma County Lease, is an appropriate exercise of their business judgment and will reduce the administrative burden on their estates. A list of the Clarksdale Contracts that may be rejected with their respective contract counterparties and proposed Cure Amounts thereunder (the "**Contract Counterparties**") is attached hereto as Exhibit E-1. To engage in an orderly wind down of the operations at the Clarksdale Hospital and minimize the cost to the estates, Debtors must be able to reject all the Clarksdale Contracts effective as soon as the Court grants the Debtors authority to shut down the Clarksdale Hospital. Debtors are not seeking authority to reject any payor contracts or contracts or leases that affect the operations of Curae, the Amory Facilities, or the Batesville Facilities. Accordingly, Debtors seek authority, but not direction, to reject the Clarksdale Contracts.

**II. Alternatively, Debtors Seek Authority to Transfer Operations of the Clarksdale Hospital to a New Operator Free and Clear of All Liens, Claims, and Encumbrances**

27. In the event Debtors can identify a qualified new operator for the Clarksdale Hospital prior to the hearing on this Emergency Motion, Debtors request authority to transfer on an expedited and emergency basis the operations of the Clarksdale Hospital to the new operator

65544948.4

free and clear of all liens, claims, and encumbrances and assume and assign the unexpired leases and contracts of Clarksdale requested by the new operator.

**A.** **Transfer of the Clarksdale Hospital to a New Operator Is in the Best Interests of Debtors' Estates and Such Transfer Should Be Free and Clear of Liens, Claims, and Encumbrances**

28.     Pursuant to 11 U.S.C. § 363(f), the Debtors seek authority to sell and transfer the Clarksdale Hospital free and clear of all liens, claims, and encumbrances. A sale free and clear of liens, claims, encumbrances, and other interests is necessary to maximize the possibility of finding a new operator for the Clarksdale Hospital.

29.     A transfer subject to liens, claims, encumbrances, and other interests would result in substantially less likelihood of finding a new operator, which would require the Debtors to shut down the Clarksdale Hospital.

30.     A transfer free and clear of liens is particularly appropriate under the circumstances because not permitting the Debtors to transfer operations of the Clarksdale Hospital would significantly decrease the overall value of the Debtors' estates. Moreover, any liens, claims, encumbrances, and other interests in, to, or against any of the Clarksdale assets that exist immediately prior to the closing of the transfer will attach to any proceeds with the same validity, priority, force, and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest.

**B.** **Assumption and Assignment of the Coahoma County Lease and Certain of Clarkdale's Unexpired Leases and Contracts Is a Sound Exercise of the Debtors' Business Judgment and in the Best Interests of the Debtors' Estates**

31.      Section 365 of the Bankruptcy Code permits a debtor-in-possession, with court approval, to assume, assume and assign, or reject any executory contracts. *See, e.g.*, *In re VisionAmerica, Inc.*, 2001 WL 1097741, at *3 (Bankr. W.D. Tenn. Sept. 12, 2001); *In re Beare*

65544948.4

*Co.*, 177 B.R. 879, 882 (Bankr. W.D. Tenn. 1994); *In re Rovine Corp.*, 5 B.R. 402, 403 (Bankr. W.D. Tenn. 1980); 11 U.S.C. § 365(a).

32.     "In order for it to be assumed, an executory contract must benefit a debtor's bankruptcy estate , . . . and the assumption of the contract must be an exercise of 'reasonable business judgment.'" *In re Beare Co.*, 177 B.R. 879, 882 (Bankr. W.D. Tenn. 1994) (internal citations omitted); *Matter of Taylor*, 913 F.2d 102 (3rd Cir. 1990); *In re Global International Airways*, 35 B.R. 881 (Bankr. W.D. Mo. 1983). The business judgment test is not a strict standard, but merely requires a showing that either the assumption or rejection of a contract will benefit a debtor's estate.  *In re Bildisco*, 682 F.2d 72, 79 (3rd Cir. 1982), *aff'd sub nom. N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 104 S. Ct. 1118, 79 L. Ed. 2d 482 (1984); *In re Beare Co.*, 177 B.R. 879, 882 (Bankr. W.D. Tenn. 1994). If a debtor-in-possession assumes an executory contract, the debtor-in-possession "must perform the contract according to its terms, cure any defaults, and provide adequate assurance of future performance." *In re Terrell*, 892 F.2d 469, 471 (6th Cir. 1989).

33.     Once an executory contract has been assumed, a debtor may assign that contract so long as adequate assurances regarding future performance are provided. *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 (3d Cir. 2001) ("Before an executory contract may be assigned, the trustee first must assume the contract and 'adequate assurance of future performance' of the contract must be provided. 11 U.S.C. §§ 365(f)(2)(A), (B). This requirement provides needed protection to the non-debtor party because the assignment relieves the trustee and the bankruptcy estate from liability for breaches arising after the assignment."). The Bankruptcy Code "provides debtors with broad authority to assume and assign executory contracts" and "although assignment requires the satisfaction of certain conditions, the

65544948.4

Bankruptcy Code favors free assignability." *Id.* at 123 (citing *In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 238 (3d Cir.1995); 11 U.S.C. § 365(f)(1); 2 NORTON BANKRUPTCY LAW AND PRACTICE § 39:1 (William L. Norton Jr. ed., 2d ed. 1997); *Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir.2000)).

34.     Here, assumption and assignment of certain of the Clarksdale Contracts, including the Coahoma County Lease, to a new operator is in the best interests of the Debtors and will benefit the Debtors' estates. Debtors have been and will continue to work diligently to find a new operator of the Clarksdale Hospital. If the Debtors receive a bona fide offer to purchase the Clarksdale assets and such offer includes adequate assurance of future performance of the Clarksdale Contracts, Debtors believe that assumption and assignment of the Clarksdale Contracts will be in the best interests of all interested parties.

35.     Assumption and assignment of certain of the Clarksdale Contracts will be necessary to any orderly transition of the operations of the Clarksdale Hospital to a new operator. Providing for an orderly transition of operations is the best way to ensure the Clarksdale Hospital will stay open and continue to serve the community.

36.     A list of the Clarksdale Contracts that may be assumed and assigned, including proposed Cure Amounts for the same, is attached hereto as Exhibit E-2, and notice of this Motion and opportunity to object is being served on the Contract Counterparties. The new operator shall be responsible for any and all cure amounts to be paid to the Contract Counterparties, and the Debtors will not incur any expenses in connection with any assumption and assignment of the Clarksdale Contracts.

37.     In the event Debtors identify a qualified new operator to take over operations of the Clarksdale Hospital, Debtors will file a supplement to this Emergency Motion providing a

final list of unexpired leases and contracts to be assumed and assigned or rejected and proposed procedures for assumption and assignment.

38.     Accordingly, Debtors seek authority, but not direction, to assume and assign certain of the Clarksdale Contracts.

## NOTICE

39.     Concurrently with the filing of this Motion, the Debtors shall provide notice of this Motion to: (a) the Office of the United States Trustee for the Middle District of Tennessee; (b) Centers for Medicare and Medicaid Services; (c) State of Tennessee Department of Health Division of Licensure and Regulation Office of Health Care Facilities; (d) Mississippi State Department of Health; (e) counsel to the official committee of unsecured creditors established in these cases pursuant to Section 1102 of the Bankruptcy Code; (f) ServisFirst Bank and its counsel; (g) Midcap Financial Trust and its counsel; (h) CHS/Community Health Systems, Inc. and its counsel (i) all Tennessee local counsel having entered a notice of appearance in these cases; (j) the Internal Revenue Service; (k) the Tennessee Attorney General's Office; (l) the Mississippi Attorney General's Office; (m) the Tennessee Secretary of State; (n) the Contract Counterparties; (o) the Mississippi Health Facilities Licensure Unit; (p) the patient care ombudsman and her proposed counsel; and (q) any party that has requested notice pursuant to Bankruptcy Rule 2002. Service is being executed via the Court's CM/ECF system, email, hand delivery, and/or overnight mail.

WHEREFORE, the Debtors respectfully request that the Court grant the relief sought herein and such other and further relief as the Court may deem proper.

65544948.4

Dated: October 12, 2018
      Nashville, Tennessee

**POLSINELLI PC**

*/s/ Michael Malone*

Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (*Admitted Pro Hac Vice*)
Caryn E. Wang (*Admitted Pro Hac Vice*)
1201 West Peachtree Street NW
Atlanta, Georgia
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

*Counsel to the Debtors and*
*Debtors in Possession*

# **EXHIBIT A**

Clapp Declaration

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

## DECLARATION OF STEPHEN N. CLAPP IN SUPPORT OF DEBTORS' EMERGENCY MOTION

Pursuant to 28 U.S.C. § 1764, Stephen N. Clapp, declares as follows under the penalty of perjury:

1.       I am the President and Chief Executive Officer ("**CEO**") of Curae Health, Inc. ("**Curae**" or "**the Company**"), a Tennessee nonprofit corporation. Curae is the sole member and sponsoring organization of Amory Regional Medical Center, Inc. ("**Amory**"); Batesville Regional Medical Center, Inc. ("**Batesville**"); and Clarksdale Regional Medical Center, Inc. ("**Clarksdale**"). Amory, Batesville, and Clarksdale are each the sole member of a physician entity as follows: Amory is the sole member of Amory Regional Physicians, LLC ("**Amory Physicians**"); Batesville is the sole member of Batesville Regional Physicians, LLC ("**Batesville Physicians**"); Clarksdale is the sole member of Clarksdale Regional Physicians, LLC ("**Clarksdale Physicians**"). Curae, Amory, Batesville, Clarksdale, Amory Physicians, Batesville Physicians, and Clarksdale Physicians are the debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") and shall be collectively referred to herein

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

as the "**Debtors**" or the "**Company**". I am authorized to submit this declaration (the "**Declaration**") on behalf of the Debtors.

2.  I have served as President and CEO of Curae since it was formed in 2014. Prior to serving as President and CEO of Curae, I served as President and CEO of Restoration Healthcare, LLC ("**Restoration**"), a for-profit rural hospital company that was focused on helping to save struggling rural hospitals. I served as President and CEO of Restoration from the time it was formed in 2006 until 2013 when Restoration divested its last hospital. Prior to forming Restoration, I worked for Baptist Health System of East Tennessee ("**Baptist**") from 1995 to 2006. For several years, I served as Senior Vice President of Baptist, and during that time I was responsible for overseeing: (a) the hospital and other operating entities; (b) strategic planning; (c) business development; (d) physician recruitment; and (e) real estate.

3.  I am familiar with the Debtors' business operations, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from other employees, agents, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration.

4.  References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5.  I submit this Declaration on behalf of the Debtors in support of the *DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO: (I)(A) SHUT DOWN THE CLARKSDALE HOSPITAL; (B) REJECT ALL UNEXPIRED LEASES AND*

CONTRACTS OF CLARKSDALE; AND (C) RECEIVE RELATED RELIEF; OR, IN THE ALTERNATIVE, (II)(A) TRANSFER OPERATIONS OF THE CLARKSDALE HOSPITAL TO A NEW OPERATOR FREE AND CLEAR OF ANY LIENS, CLAIMS, OR ENCUMBRANCES PURSUANT TO AN OPERATIONS TRANSFER AGREEMENT TO BE FILED WITH THE COURT; (B) ASSUME AND ASSIGN THE COAHOMA COUNTY LEASE AND CERTAIN OTHER UNEXPIRED LEASES AND CONTRACTS REQUESTED BY THE NEW OPERATOR; AND (C) RECEIVE RELATED RELIEF (the "**Emergency Motion**").[2]

6.  In 2017, Curae acquired three hospitals in Mississippi from CHS: the Clarksdale Hospital, the Batesville Facilities, and the Amory Facilities. The Clarksdale Hospital is operated by Debtor Clarksdale, a Tennessee nonprofit corporation.

7.  Clarksdale leases the Clarksdale Hospital from Coahoma County pursuant to the Coahoma County Lease, attached to the Emergency Motion as Exhibit C.

8.  Prior to the Petition Date, all of the Debtors' Facilities experienced a dramatic decline in net revenue. This dramatic decline more than offset the expense savings that were realized as a result of the Debtors' operating model.

9.  After the Petition Date, Clarksdale's financial performance has been significantly worse than forecasted in the Budget as a result of, *inter alia*, lower than expected patient volumes and delayed collection of receipts. The delayed collection of receipts was a result of transitioning to a new billing system. Curae transitioned Clarksdale to a new billing system provided by MedHost of Tennessee in September, 2018. As is typical in the transition of an accounting and billing system, Clarksdale experienced a delay in its ability to submit invoices.

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Emergency Motion.

10. Debtors filed these Chapter 11 Cases to keep the Facilities open for the benefit of their communities and transition the Facilities to new operators. Unfortunately, the poor financial performance of the Clarksdale Hospital since the Petition Date has created a cash drain on the Debtors' estates. If the Debtors continue to operate the Clarksdale Hospital all of the Debtors' Facilities will be forced to shut down.

11. Debtors' management and professionals have communicated the urgency of the situation to Coahoma County in the hopes of reaching an agreement whereby Coahoma County would either contribute such funding or take over operations of the Clarksdale Hospital. Unfortunately, no such agreement has been reached, and the Debtors cannot continue to operate the Clarksdale Hospital. If the Debtors continue to operate the Clarksdale Hospital all of the Debtors' Facilities will be at risk of shutting down. I believe that continuing to operate the Clarksdale Hospital is not a viable option without additional funding.

12. Because continuing to operate the Clarksdale Hospital is not a viable option and Debtors do not currently have an operator interested in immediately taking over operation of the Clarksdale Hospital, I believe that shutting down the Clarksdale Hospital is their only option at this time.

13. Debtors, with the help of their investment banker, have reached out to approximately thirty-six companies with respect to the sale of the Clarksdale Hospital. Despite Debtors' marketing efforts, there has been limited interest from potential buyers with respect to acquiring just the Clarksdale Hospital. Based on this limited interest, Debtors do not believe that a sale of the Clarksdale Hospital through a normal bankruptcy sale process will generate enough proceeds to cover Clarksdale's negative cash flow.

4

14.     Debtors' management and professionals have been working diligently to find a solution and avoid a shutdown of the Clarksdale Hospital. Unfortunately, based on the Cash Flow Projections and the lack of additional funding or a new operator to take over operations, shutting down the Clarksdale Hospital is the Debtors' only viable option at this time.

15.     I believe that the relief sought in the Emergency Motion is a sound exercise of the Debtors' business judgment because such relief in the best interests of the Debtors' estates, the Debtors' creditors, and other parties in interest.

16.     I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the Motion be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

*[Signature on Following Page]*

5

Executed this 12th day of October, 2018.

**Curae Health, Inc.**
**Amory Regional Medical Center, Inc.,**
**Batesville Regional Medical Center, Inc.,**
**Clarksdale Regional Medical Center, Inc.**
**Amory Regional Physicians, LLC**
**Batesville Regional Physicians, LLC**
**Clarksdale Regional Physicians, LLC**

Debtors and Debtors in Possession

_____
Stephen N. Clapp
President and Chief Executive Officer of Curae
Health, Inc.

6

# **EXHIBIT B**

Glade Declaration

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

### DECLARATION OF MARSHALL GLADE IN SUPPORT OF DEBTORS'
### EMERGENCY MOTION

I, MARSHALL GLADE of GlassRatner Advisory & Capital Group, LLC, make this Declaration pursuant to 28 U.S.C. § 1746, and state:

1. I am a Managing Director with GlassRatner Advisory & Capital Group, LLC ("**GlassRatner**"). GlassRatner is a professional services firm engaged in the business of providing financial advisory and distressed asset management services, with offices located at 3445 Peachtree Road, Atlanta, GA 30326, and additional offices located in Florida, California, Texas, New York and Arizona. GlassRatner is employed as financial advisor to the Debtors. Except as otherwise noted, I have personal knowledge of the matters set forth herein.[2]

2. References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

[2] Certain of the disclosures herein relate to matters within the personal knowledge of other professionals at GlassRatner and are based on information provided by such professionals.

65655978.1

competently to the facts set forth in this Declaration.

3. I submit this Declaration in support of the *DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO: (I)(A) SHUT DOWN THE CLARKSDALE HOSPITAL; (B) REJECT ALL UNEXPIRED LEASES AND CONTRACTS OF CLARKSDALE; AND (C) RECEIVE RELATED RELIEF; OR, IN THE ALTERNATIVE, (II)(A) TRANSFER OPERATIONS OF THE CLARKSDALE HOSPITAL TO A NEW OPERATOR FREE AND CLEAR OF ANY LIENS, CLAIMS, OR ENCUMBRANCES PURSUANT TO AN OPERATIONS TRANSFER AGREEMENT TO BE FILED WITH THE COURT; (B) ASSUME AND ASSIGN THE COAHOMA COUNTY LEASE AND CERTAIN OTHER UNEXPIRED LEASES AND CONTRACTS REQUESTED BY THE NEW OPERATOR; AND (C) RECEIVE RELATED RELIEF* (the "**Emergency Motion**").[3]

4. After the Petition Date, Clarksdale's financial performance has been significantly worse than forecasted in the Budget, which has created a significant cash flow deficit and extreme variance from the Debtors' Budget. This cash flow deficit will continue to increase if immediate action is not taken.

5. Based on the pre- and post-petition performance of Clarksdale, GlassRatner assisted the Debtors in creating and analyzing three potential scenarios going forward. The first scenario provides for the Debtors operating the Clarksdale Hospital as a going concern through a normal bankruptcy sale process. The second scenario provides for shutting down the Clarksdale Hospital and rejecting the Coahoma County Lease in early November. The third scenario provides for transitioning the Clarksdale Hospital to a new operator and assuming and assigning the Coahoma County Lease to the new operator in early November. The table in paragraph 14 of

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Emergency Motion.

65655978.1

the Emergency Motion summarizes the financial position of Clarksdale under each scenario through February 22, 2018. Detailed financial projections supporting the cash flow summaries (the "**Cash Flow Projections**") under each scenario are attached to the Emergency Motion as Exhibit D.

6.      If the Debtors operate under scenario one and continue to carry Clarksdale through a bankruptcy sale process, Debtors project that the Debtors' estates will have a cumulative negative cash flow of over $2.5 million attributable to Clarksdale. The Debtors cannot continue to operate the Clarksdale Hospital without extreme detriment to the Amory Facilities, Batesville Facilities, and Debtors' creditors. The only way Debtors can continue to operate the Clarksdale Hospital is with an infusion of cash of at least $2.5 million.

7.      If the Debtors shut down the Clarksdale Hospital under scenario two, Debtors will have enough time and cash to sell the Amory Facilities and Batesville Facilities to new operators under normal bankruptcy sale processes. Importantly, scenario two only works if Debtors begin shutting down the Clarksdale Hospital in early November.

8.      Scenario three provides the best probable outcome in these Chapter 11 Cases. Under scenario three, the Clarksdale Hospital will stay open and continue to serve the community, and Debtors will have a positive cumulative cash flow. However, scenario three depends entirely on finding a new qualified operator willing to take over the operations of the Clarksdale Hospital in a very short time period. The only way scenario three works is if Debtors can identify a new operator and transfer operations of the Clarksdale Hospital on an expedited timeline.

65655978.1

9.　　　I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the Motion be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

[*Signature on Following Page*]

4

65655978.1

Dated: October 12th, 2018

/s/ *[signature]*

Marshall Glade
Managing Director
GlassRatner

# **EXHIBIT C**

Coahoma County Lease

65544948.4

confidential
Heather Ferguson
Aug 29, 2016 16:26

# LEASE AGREEMENT

### dated as of December 28, 1995

### among

## COAHOMA COUNTY, MISSISSIPPI,
### acting through the
## COAHOMA COUNTY BOARD OF SUPERVISORS

### and

## CLARKSDALE HMA, INC.

### and

## HEALTH MANAGEMENT ASSOCIATES, INC.

# TABLE OF CONTENTS

ARTICLE 1.  DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.1    *"Assumed Liabilities"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.2    *"Closing Balance Sheet"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.3    *"Closing Date"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.4    *"Contracts"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.5    *"Excluded Assets"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.6    *"Improvements"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.7    *"Lease Commencement Date"* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.8    *"Lease Term"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.9    *"Lease Year"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.10   *"Leased Assets"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.11   *"Permitted Encumbrances"* . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.12   *"Premises"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.13   *"Purchased Assets"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE 2.  LEASE OF LEASED ASSETS . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARTICLE 3.  USE AND CONTROL OF PREMISES . . . . . . . . . . . . . . . . . . . . . 4
    3.1    Hospital Services and Related Activities . . . . . . . . . . . . . . . . . . . . 4
    3.2    Charity Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    3.3    Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    3.4    Advisory Board . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.5    Continued Operation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.6    Operational Compliance by Lessee . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE 4.  LEASE TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE 5.  RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    5.1    Initial Rent and Purchase Price . . . . . . . . . . . . . . . . . . . . . . . . 7
    5.2    Annual Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    5.3    Additional Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    5.4    Current Construction and Renovation Project . . . . . . . . . . . . . . . . 7
    5.5    Elimination of Capital Debt . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    5.6    Other Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARTICLE 6.  PURCHASE AND SALE OF PURCHASED ASSETS . . . . . . . . . . . 8
    6.1    Purchase and Sale of Purchased Assets . . . . . . . . . . . . . . . . . . . . 8
    6.2    Assignment of Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARTICLE 7.  ASSUMPTION OF ASSUMED LIABILITIES . . . . . . . . . . . . . . . . 9
    7.1    Limited Assumption of Liabilities . . . . . . . . . . . . . . . . . . . . . . . 9
    7.2    Assumption of Certain Liabilities . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE 8.  INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    8.1    Indemnification by Lessee . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

confidential
Heather Ferguson
Aug 29, 2016 16:26

8.2     Indemnification by Lessor . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10
8.3     Indemnification Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

ARTICLE 9.   REPRESENTATIONS AND WARRANTIES OF LESSOR . . . . . .     11
9.1     Capacity, Etc. of Lessor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11
9.2     Assets; Title . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     12
9.3     Consents; Absence of Conflicts With Other Agreements, Etc. . . . . . .     12
9.4     Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13
9.5     Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13
9.6     No Additional Material Liabilities . . . . . . . . . . . . . . . . . . . . . . . .     13
9.7     Licenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13
9.8     Medicare Participation; Accreditation . . . . . . . . . . . . . . . . . . . . .     14
9.9     Regulatory Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14
9.10    Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14
9.11    Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14
9.12    Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14
9.13    Employee Benefit Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14
9.14    Employee Relations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15
9.15    Litigation or Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15
9.16    Special Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15
9.17    Medical Staff Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15
9.18    Subsequent Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15
9.19    Environmental Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     16
9.20    Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     16
9.21    Disproportionate Share Hospital . . . . . . . . . . . . . . . . . . . . . . . .     17
9.22    No Broker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     17

ARTICLE 10.   REPRESENTATIONS AND WARRANTIES OF
              LESSEE AND GUARANTOR . . . . . . . . . . . . . . . . . . . . . . .     17
10.1    Capacity, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     17
10.2    Consents; Absence of Conflicts With Other Leases, Etc. . . . . . . . . .     17
10.3    Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     17
10.4    Information in Response to RFP . . . . . . . . . . . . . . . . . . . . . . . . .     17
10.5    No Broker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     18

ARTICLE 11.   CONDITIONS PRECEDENT TO LESSEE'S AND
              GUARANTOR'S OBLIGATIONS . . . . . . . . . . . . . . . . . . . .     18
11.1    Lessor's Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     18
11.2    Accuracy of Representations and Warranties . . . . . . . . . . . . . . . . .     18
11.3    Conditions Performed Prior to Lease Commencement Date . . . . . . . .     18
11.4    Regulatory Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     18
11.5    No Adverse Change . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     19
11.6    Actions or Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     19
11.7    Delivery of Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     19
11.8    Title Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     19

ARTICLE 12.   CONDITIONS PRECEDENT TO LESSOR'S OBLIGATION . . . .     20
12.1    Lessee's and Guarantor's Authority . . . . . . . . . . . . . . . . . . . . . . .     20

confidential
Heather Ferguson
Aug 29, 2016 16:26

| 12.2 | Accuracy of Representations and Warranties | 20 |
| 12.3 | Conditions Performed Prior to Lease Commencement Date | 20 |
| 12.4 | Payment of Rent and Purchase Price | 20 |
| 12.5 | Actions or Proceedings | 20 |
| 12.6 | Delivery of Documents | 21 |
| 12.7 | Licensure, Certification and Approvals | 21 |

ARTICLE 13. EQUIPMENT ... 21
| 13.1 | Lessor's Equipment | 21 |
| 13.2 | Lessee's Equipment | 21 |
| 13.3 | Disposition of Obsolete Equipment | 22 |

ARTICLE 14. INSURANCE ... 22
| 14.1 | In General | 22 |
| 14.2 | Property Insurance | 22 |
| 14.3 | Liability Insurance | 22 |
| 14.4 | Mutual Releases and Waiver of Subrogation | 23 |
| 14.5 | Business Interruption Insurance | 23 |
| 14.6 | Compliance by Lessee | 23 |
| 14.7 | Remedy for Noncompliance | 23 |

ARTICLE 15. FIRE AND CASUALTY DAMAGE ... 24
| 15.1 | Notice of Damage | 24 |
| 15.2 | Substantial Destruction | 24 |
| 15.3 | Partial Destruction | 24 |
| 15.4 | Obligations of Lessor | 24 |
| 15.5 | Extension of Lease Term | 24 |

ARTICLE 16. UTILITIES ... 24

ARTICLE 17. CARE OF PREMISES; ALTERATIONS, ADDITIONS, ETC. ... 25
| 17.1 | Care of Premises | 25 |
| 17.2 | Alterations, Additions and Capital Improvements | 25 |

ARTICLE 18. LICENSURE AND GOVERNMENTAL APPROVAL ... 26

ARTICLE 19. ACCESS ... 26

ARTICLE 20. GOVERNMENTAL FEES ... 26

ARTICLE 21. QUIET ENJOYMENT ... 26

ARTICLE 22. SUBLEASE AND ASSIGNMENT ... 26

ARTICLE 23. LIENS, MORTGAGE, TAXES, ETC. ... 27
| 23.1 | Use as Security | 27 |
| 23.2 | Taxes and Special Assessments | 27 |
| 23.3 | Payments in Lieu of Taxes | 27 |

Confidential Heather Ferguson Aug 29, 2016 16:26

confidential
Heather Ferguson
Aug 29, 2016 16:26

23.4   Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
23.5   Lessee's Permitted Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

ARTICLE 24.   LESSEE'S DEFAULT AND REMEDIES THEREFOR . . . . . . . .   28
24.1   Major Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
24.2   Other Breaches of Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
24.3   Indemnity for Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
24.4   Causes Beyond a Party's Control . . . . . . . . . . . . . . . . . . . . . . .   30
24.5   Lessor's Remedies Upon Default . . . . . . . . . . . . . . . . . . . . . . .   30
24.6   In the Event of Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . .   31
24.7   Repossession of the Premises on Termination . . . . . . . . . . . . . . . .   31

ARTICLE 25.   SURRENDER OF POSSESSION . . . . . . . . . . . . . . . . . . .   32
25.1   Surrender of Leased Assets . . . . . . . . . . . . . . . . . . . . . . . . . .   32
25.2   Assignment and Assumption of Contracts . . . . . . . . . . . . . . . . . .   32
25.3   Holding Over . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32
25.4   Survival of Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . .   33

ARTICLE 26.   EMINENT DOMAIN . . . . . . . . . . . . . . . . . . . . . . . . .   33

ARTICLE 27.   TIME FOR PERFORMANCE . . . . . . . . . . . . . . . . . . . . .   33
27.1   Time is of the Essence . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
27.2   Delay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
27.3   No Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

ARTICLE 28.   NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

ARTICLE 29.   GUARANTOR'S GUARANTY . . . . . . . . . . . . . . . . . . . .   34
29.1   Guaranty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34
29.2   Right of First Refusal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

ARTICLE 30.   ADDITIONAL COVENANTS OF LESSEE . . . . . . . . . . . . . .   36
30.1   Reports and Other Information . . . . . . . . . . . . . . . . . . . . . . . .   36
30.2   Name of Hospital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
30.3   Hill-Burton Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
30.4   Utilization of Local Services . . . . . . . . . . . . . . . . . . . . . . . . . .   36
30.5   Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
30.6   Medical Staff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
30.7   Post-Lease Commencement Date Access to Information . . . . . . . . . .   37
30.8   Inspection of Books and Records . . . . . . . . . . . . . . . . . . . . . . .   37
30.9   Educational Affiliations . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
30.10  Prisoners and Wards of County . . . . . . . . . . . . . . . . . . . . . . . .   38

ARTICLE 31.   MEDICARE PROVISIONS . . . . . . . . . . . . . . . . . . . . . .   38

ARTICLE 32.   MANAGEMENT OF LEASED PREMISES . . . . . . . . . . . . . .   38

ARTICLE 33.   CERTAIN AFTER-ACQUIRED REAL PROPERTY AS

confidential
Heather Ferguson
Aug 29, 2016 16:26

PART OF THE LEASED ASSETS . . . . . . . . . . . . . . . . . . . . . . 38

ARTICLE 34.  IN GENERAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    34.1   Relationships of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    34.2   Rights and Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    34.3   Successors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    34.4   Cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    34.5   Entire Agreement; Amendment . . . . . . . . . . . . . . . . . . . . . . . 39
    34.6   Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    34.7   Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    34.8   Multiple Originals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    34.9   Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    34.10  Memorandum of Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

TABLE OF SCHEDULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

confidential
Heather Ferguson
Aug 29, 2016 16:26

confidential
Heather Ferguson
Aug 29, 2016 16:26

# LEASE AGREEMENT

This **Lease Agreement** (this "*Lease*") has been made and entered into this 28th day of December, 1995 by and among:

**Coahoma County, Mississippi, acting through the Coahoma County Board of Supervisors,** a political subdivision of the State of Mississippi ("*Lessor*"),

and

**Clarksdale HMA, Inc.,** a Mississippi corporation ("*Lessee*"),

and

**Health Management Associates, Inc.,** a Delaware corporation ("*Guarantor*").

## W I T N E S S E T H:

WHEREAS, Lessor is the owner of Northwest Mississippi Regional Medical Center, a 175-bed licensed general acute care non-profit community hospital, 20-bed licensed skilled nursing facility and home health agency licensed for six counties, all located in Clarksdale, Mississippi (the "*Hospital*"), and is authorized pursuant to Section 41-13-1, *et seq.*, Mississippi Code of 1972, as amended, to lease the Hospital to a Mississippi corporation; and

WHEREAS, the Hospital has been operated heretofore on behalf of Lessor by the Board of Trustees of Northwest Mississippi Regional Medical Center (the "*Board of Trustees*"); and

WHEREAS, Lessor has determined that it is in the best interests of the citizens of the area served by the Hospital to lease the Hospital to Lessee and that this Lease will safeguard community health interests and enhance the public health and general welfare of such citizens; and

WHEREAS, Lessor desires to lease the Hospital to Lessee and Lessee desires to lease the Hospital from Lessor, subject to the following terms and conditions; and

WHEREAS, Lessee is the wholly-owned subsidiary of Guarantor, and Guarantor has agreed to guarantee the performance of Lessee's obligations under this Lease, as hereinafter set forth.

NOW, THEREFORE, for and in consideration of the premises and other good and valuable consideration, the receipt and adequacy of which are forever acknowledged and confessed, the parties hereto agree as follows:

confidential
Heather Ferguson
Aug 29, 2016 16:26

# ARTICLE 1. DEFINITIONS

In addition to the other definitions contained in this Lease, as used herein the following terms will have the following meanings:

**1.1** *"Assumed Liabilities"* means: (a) the Contracts; (b) the current liabilities of the Hospital, comprised of accounts payable, accrued payroll and employee benefits expense and accrued expenses, all as set forth on Schedule 1.1(b); (c) principal and interest accruing after the Lease Commencement Date on the notes payable set forth on Schedule 1.1(c), including amounts due as a result of repricing the tax-exempt notes so set forth as taxable notes; (d) remaining payments of rent due after the Lease Commencement Date of the capitalized leases set forth on Schedule 1.1(d); (e) the Hill-Burton obligations described in Section 30.3; and (f) the cost report liability described in Article 31; provided, however, that Assumed Liabilities do not include any other capital debt or long-term liabilities of Lessor or the Hospital.

**1.2** *"Closing Balance Sheet"* means the trial balance of the Hospital as of September 30, 1995, together with an explanatory letter of Watkins, Ward and Stafford, independent auditors for the Hospital, annexed hereto as Schedule 1.2.

**1.3** *"Closing Date"* means December 29, 1995.

**1.4** *"Contracts"* means all commitments, contracts, agreements and leases (whether written or oral) of the Hospital or of the County in respect of the Hospital, including all contracts with Hospital employees and physicians on the Hospital's medical staff, outstanding at the Lease Commencement Date, all of which are set forth on Schedule 1.4, together with all other commitments, contracts, agreements and leases added to Schedule 1.4 subsequent to the Lease Commencement Date by mutual agreement of Lessor and Lessee.

**1.5** *"Excluded Assets"* means the following assets of Lessor or of the Hospital, none of which are subject to this Lease: (a) assets whose use is limited, as described on Schedule 1.5; (b) all commitments, contracts, agreements and leases in respect of the Hospital not comprising the Contracts; (c) proprietary information that is not specific to the Hospital; (d) all credits relating to purchasing cooperatives and other similar credits and assets; (e) all premium rebates for insurance maintained by the Board of Trustees or Lessor in connection with operations of the Hospital; (f) all employee benefit agreements, arrangements, plans and programs; (g) cash designated as E-911 funds and E-911 equipment; and (h) all other assets set forth on Schedule 1.5.

**1.6** *"Improvements"* means all buildings, structures, fixtures, landscaping, utility lines, roads, driveways, fences, parking areas, contiguous and adjacent and entry rights, and all other improvements to the Premises owned by Lessor and located in and upon the Premises.

**1.7** *"Lease Commencement Date"* means January 1, 1996.

2

confidential
Heather Ferguson
Aug 29, 2016 16:26

**1.8** *"Lease Term"* means a period consisting of 30 Lease Years, commencing on the Lease Commencement Date and expiring on December 31, 2025.

**1.9** *"Lease Year"* means a twelve-month period commencing on the Lease Commencement Date and on each of the next succeeding 29 anniversaries thereof.

**1.10** *"Leased Assets"* means: (a) the Premises; (b) all furniture, furnishings, equipment and vehicles contained on the Premises or used in connection therewith or with the operation of the Hospital, all as reflected on the Closing Balance Sheet; (c) all licenses, permits, certificates and authorizations required to operate the Hospital, and all other rights, privileges and franchises relating to the operations or development of, and all patents and patent applications, trade names, trademarks and service marks (or variations thereof) associated with, the Hospital; (d) all businesses owned or leased by the Hospital or by Lessor with respect to the Hospital, including home health services and offices, but excluding Lessor's interests in the Coahoma County Health Department and Region One Mental Health Center and related facilities; and (e) all rights, privileges and interests appurtenant to the foregoing; provided, however, that the Leased Assets do not include the Purchased Assets or the Excluded Assets.

**1.11** *"Permitted Encumbrances"* means: (a) standard printed title exceptions; (b) such encumbrances which, individually or in the aggregate, do not materially detract from the value or impair the use or marketability of any of the Leased Assets or the Purchased Assets; (c) the liens and encumbrances set forth on Schedule 1.11; and (d) such other liens or encumbrances as Lessee may expressly permit in writing subsequent to the Lease Commencement Date; provided, however, that liens or encumbrances arising out of any capital debt or other long-term liabilities of Lessor or the Hospital (other than liens and encumbrances arising out of Assumed Liabilities and set forth on Schedule 1.11) are not Permitted Encumbrances.

**1.12** *"Premises"* means the real property more particularly described on Schedule 1.12, together with all Improvements thereon and interests therein, and all rights, privileges and easements appurtenant thereto.

**1.13** *"Purchased Assets"* means: (a) the Contracts; (b) all operating cash, non-operating cash, cash equivalents, accounts and funds, accounts receivable, including those related to Medicare, Medicaid and all other health care or third-party payors (less any estimated allowance for uncollectible accounts), inventories, prepaid expenses usable by Lessee, Medicare and Medicaid reimbursement and other current and other assets of the Hospital or of Lessor used in connection with the Hospital, the Leased Assets or the Purchased Assets, all as shown on the Closing Balance Sheet; and (c) all rights, privileges and interests appurtenant thereto, including good will (if any) in connection with the ongoing operations of the Hospital; provided, however, that the Purchased Assets do not include the Leased Assets or the Excluded Assets.

3

confidential
Heather Ferguson
Aug 29, 2016 16:26

## ARTICLE 2. LEASE OF LEASED ASSETS

As of the Lease Commencement Date, Lessor hereby demises, rents and lets to Lessee and Lessee hereby leases, rents and hires from Lessor all of Lessor's right, title and interest in and to the Leased Assets, as is, where is, with all faults, except for the representations and warranties contained in this Lease or in the Schedules. Therefore, except for the representations and warranties contained in this Lease or in the Schedules, Lessor makes no representations or warranties of any nature whatsoever with respect to the Leased Assets, including any representation or warranty with respect to the merchantability, fitness, nature, condition or value of the Hospital or the Leased Assets, and Lessor makes no warranty or representation with respect to the future operations or prospects of the Leased Assets. Without limiting the effectiveness of the representations and warranties contained in this Lease or in the Schedules, Lessee has had the opportunity to inspect the Leased Assets, has inspected the Leased Assets and has determined that the Leased Assets are suitable for Lessee's intended use thereof. On the Lease Commencement Date Lessor will deliver possession of the Leased Assets to Lessee.

## ARTICLE 3. USE AND CONTROL OF PREMISES

**3.1    Hospital Services and Related Activities.**  Lessee will use the Premises only for the operation of the business of an acute care hospital and other licensed health related activities ("*Permitted Premises Use*").  During the Lease Term, Lessee will operate an acute care hospital and related activities on the Premises and in connection therewith will have the exclusive right to use and control the entire Hospital operations, including administration, services, finances, medical and non-medical staffing, equipment, inventory, furnishings, supplies, renovation and addition to or expansion of the Premises, except as otherwise provided herein.  Lessee will comply with all laws and governmental regulations applicable to the operation and maintenance of the Premises.  The Premises will not be used for illegal or unlawful purposes or for any purpose that is not a Permitted Premises Use.  Lessee will provide at its own cost and expense current and modern equipment as generally used in accredited, comparable community hospitals, and will provide all equipment, machinery, furnishings, supplies and other personal property required or necessary for the proper operation, repair and maintenance of the Hospital and the Leased Assets, consistent with standards of hospital organization and administration generally acceptable for fully accredited hospitals comparable to the Hospital.

**3.2    Charity Care.**  During the Lease Term, Lessee will comply with all state and federal requirements to provide emergency services without regard to an individual's ability to pay, and accept any patient admitted by an active member of the Hospital's medical staff without regard to the ability of such patient to pay for the services provided.  Throughout the Lease Term, Lessee agrees not to refuse treatment to any person by reason of such person's race, creed, color or religious or sexual preference and to provide uncompensated care to indigent citizens in Coahoma County, Mississippi in a manner consistent with the current charity care policy of the Board of Trustees.  Lessee will be solely responsible for providing indigent care at the Hospital, and Lessor and the Board of Trustees will have no liability or obligation in respect thereof.  Lessee will

4

confidential
Heather Ferguson
Aug 29, 2016 16:26

provide such care without compensation and will not seek payment from Lessor, which will have no financial responsibility for such care.

### 3.3 Employees.

(a)     On the Lease Commencement Date, Lessee will hire and employ each person who was an employee of the Hospital on the day immediately preceding the Lease Commencement Date (collectively, the "*Employees*") and offer to each Employee (i) compensation at a level no less favorable than that currently paid such Employee by the Board of Trustees, and (ii) Lessee's standard employee benefit package, as set forth in the employee handbook annexed hereto as Schedule 3.3. All Employees will be covered by Lessee's standard personnel policies and procedures. Lessee retains the right to change or terminate any such benefits and any such policies and procedures at any time and from time to time as Lessee deems appropriate in its sole discretion.

(b)     Lessee will give each Employee full credit for all service with the Hospital, as if such service had been with Guarantor and its affiliates, for purposes of eligibility to participate in, vesting and payment of benefits under (but not for purposes of determining the amount of any benefit under) Guarantor's 401(k) plan and any other employee benefit plan maintained by Lessee, as permitted by law and the terms of each such plan.

(c)     All accrued paid annual leave of Employees not cashed out by the Board of Trustees and existing on the Lease Commencement Date will be carried forward and honored by Lessee, which will give each Employee full credit in equivalent hours or days for the time in such Employee's account on the Lease Commencement Date. Lessee may, at its option, cash out each Employee's accrued paid annual leave in excess of 80 hours after the Lease Commencement Date.

(d)     Lessee's standard employee benefit package will on the Lease Commencement Date offer Employees a group health plan that provides coverage for any preexisting condition (within the meaning of the Internal Revenue Code) of an Employee (or eligible dependent) under terms no less nor no more favorable to the Employee than that provided him immediately prior to the Lease Commencement Date.

(e)     Lessee will give credit (or cause its insurance carriers to give credit) to each Employee, on a dollar-for-dollar basis, toward the deductible and co-payment requirements of Lessee's group health plans for any such amounts paid by any Employee (or eligible dependent) for the plan year under the Hospital's applicable group health plan during which the Lease Commencement Date occurs; provided, however, that such Employee will provide Lessee reasonable evidence of the amount credited toward his deductible and co-payment requirements.

(f)     During the first Lease Year, Lessee will not effect any reductions in force at the Hospital other than reductions as a result of attrition, completion of the Hospital's current construction and renovation project, flexible staffing for seasonal adjustments, or downsizing in connection with decreases in patient census.

5

confidential
Heather Ferguson
Aug 29, 2016 16:26

(g) Nothing contained in this Section 3.3 will limit Lessee's manage-ment prerogatives with respect to Employees, or create a right of continued employment for any specific Employee or create any right of action by any Employee, any group of Employees or any other third party, either jointly or severally.

3.4 **Advisory Board.** Lessee will establish a Board of Advisors for the Hospital to provide counsel to Lessee concerning the delivery of health care and hospital services to residents of the Hospital's service area. The Board of Advisors will consist of at least 11 members, all of whom will be residents of the service area of the Hospital, with a majority of the members being residents of Coahoma County, Mississippi. The Board of Advisors' membership will consist of physicians and representatives from industry, government, community and religious organizations.

3.5 **Continued Operation.** With regard to the continued operation of the Hospital, the parties agree that there are certain basic services that are normally offered by hospitals of like size and community setting as the Hospital. Lessee will continue the provision of the inpatient and outpatient services currently provided at the Hospital, including general medical, surgical, obstetrical, gynecologic, pediatric and emergency. Lessee further agrees as follows:

(a) Lessee will at all times use its best efforts to maintain and operate the Hospital and the Leased Assets to meet the standards and requirements and provide health care of such quality and in such manner as will enable the Hospital to participate in, and provide services in connection with, recognized medical insurance programs, and so long as the Hospital remains a participating facility under such recognized programs, Lessee will use its best efforts to comply with the standards and requirements for remaining a participating medical facility thereunder, unless Lessee determines, by resolution adopted by its Board of Directors, that it is not in the best interest of the citizens of the service area of the Hospital to comply therewith and that the financial condition of Lessee will not be adversely and materially affected by noncompliance.

(b) Lessee will comply with applicable federal and state laws prohibiting discrimination based on race, religion, creed, color, sex or national origin.

(c) Lessee will not take any action to discontinue a designated health care service provided by the Hospital, including any discontinuation for the purpose of relocation.

(d) Lessee will use its best efforts, consistent with trends in the hospital industry, to develop the Hospital as a primary resource of the Hospital's service area, and to recruit physicians, for the following services: urology, otolaryngology, cardiology, pulmonology, oncology and radiology.

3.6 **Operational Compliance by Lessee.** Lessor will be entitled, without limitation as to its remedies, to the remedy of specific performance for Lessee's breach of or failure to comply with any provision of this Article 3, except that any such breach or failure will not constitute a Major Event of Default.

6

confidential
Heather Ferguson
Aug 29, 2016 16:26

## ARTICLE 4. LEASE TERM

The Lease Term will commence on the Lease Commencement Date and will continue for 30 consecutive Lease Years, expiring on December 31, 2025.

## ARTICLE 5. RENT

Lessee will pay Lessor, and Lessor will accept, as the total rent for the Leased Assets, the amounts provided by this Article 5.

5.1     **Initial Rent and Purchase Price.** On the Closing Date, Lessee will pay to Lessor, by wire transfer of federal funds to a bank account of Lessor's designation, as initial rent for the Leased Assets, which shall be deemed earned upon receipt, and as the purchase price of the Purchased Assets, the amount of Thirty Million Dollars ($30,000,0-00). Subject to applicable Mississippi law or pursuant to local and private legislation which may be obtained by Lessor, Lessor will create a special fund of the Thirty Million Dollars received from Lessee under this Section 5.1. Monies from such special fund may be used by Lessor to purchase Lessee's Equipment pursuant to Section 13.2 in the event of termination of the Lease, to exercise Lessor's right of first refusal pursuant to Section 29.2, to pay any liabilities of Lessor with respect to the Hospital which are not Assumed Liabilities, to resume operations of the Hospital in the event of termination of this Lease, to expend funds for health services and health related activities, and to expend funds for any other lawful purpose for which general revenue funds of Lessor may be used.

5.2     **Annual Rent.** Lessee will also pay to Lessor, in advance on the first day of each Lease Year during the Lease Term, annual rent in the amount of Five Hundred Thousand Dollars ($500,000) per Lease Year. Lessee will pay the annual rent for the first Lease Year on the Closing Date, by wire transfer of federal funds to a bank account of Lessor's designation. Such annual rent will be deposited in such funds as Lessor deems appropriate under applicable Mississippi law.

5.3     **Additional Rent.** During the first ten Lease Years, Lessee will expend at least Fifteen Million Dollars ($15,000,000) for additional capital equipment and improvements to the Premises, making such capital expenditures as may be necessary to renovate the Hospital, upgrade equipment and take steps intended to reduce out-migration of potential patients to other hospitals. It is reasonably expected that the initial such renovations and equipment upgrades will occur within the first three Lease Years. Notwithstanding the foregoing, if the cost to Lessee of completing the project described in Section 5.4 exceeds Two Million Two Hundred Thousand Dollars ($2,200,000), then the amount required by this Section 5.3 to be expended by Lessee will be reduced dollar-for-dollar by the amount of such excess, up to a maximum reduction of Two Million Eight Hundred Thousand Dollars ($2,800,000).

5.4     **Current Construction and Renovation Project.** From and after the Lease Commencement Date, Lessee will supervise and complete at its own expense the Hospital's current construction and renovation project pursuant to the current approved

7

confidential
Heather Ferguson
Aug 29, 2016 16:26

plans and specifications therefor, with such reasonable changes as Lessee deems necessary for the proper and efficient operation of the Hospital.

**5.5    Elimination of Capital Debt.** On the Closing Date, Lessee will pay to Lessor an amount equal to the principal balance of Lessor's general obligation bonds with respect to the Hospital in the amount of approximately One Million Four Hundred Ninety Thousand Dollars ($1,490,000) (the *"Bonds"*), together with the additional amount of One Hundred Fifty Thousand Dollars ($150,000) to defease the Bonds. Lessor will thereupon deposit such amounts in escrow pursuant to an escrow agreement acceptable to Lessee. As soon as practicable after the Closing Date, Lessor will defease the Bonds. Lessee will be responsible for the reasonable attorneys' fees incurred by Lessor in connection with defeasance of the Bonds.

**5.6    Other Obligations.** Any other obligation of Lessee which under the terms of this Lease requires the payment of money to Lessor will be construed as an additional rental obligation.

**5.7    Absolute Obligation to Pay Rental Payments.** The obligation of Lessee to make rental payments in accordance with this Article 5 will be a general obligation of Lessee, will be absolute and unconditional and will not be abated, rebated, set off, reduced, abrogated, waived, diminished or otherwise modified in any manner or to any extent whatsoever, regardless of any rights of set off, recoupment or counterclaim that Lessee might otherwise have against Lessor. Failure to receive any prior notice of the due date of any rental payment will not relieve Lessee of its obligation to pay such installment thereof, without notice or demand therefor, in such coin or currency of the United States of America as, at the time of payment, will be legal tender for the payment of public and private debts.

## ARTICLE 6.    PURCHASE AND SALE OF PURCHASED ASSETS

**6.1    Purchase and Sale of Purchased Assets.** On the Closing Date but effective as of the Lease Commencement Date, Lessor will sell, assign and transfer to Lessee all of its and the Hospital's right, title and interest in and to all of the Purchased Assets, and will deliver to Lessee duly executed documents of transfer and assignment (including contract assignments), in form satisfactory to Lessee, conveying to Lessee good and marketable title to all of the Purchased Assets, subject only to Permitted Encumbrances and the Assumed Liabilities.

**6.2    Assignment of Contracts.** Lessor will use its best efforts to obtain any consents necessary to cause the Contracts to be assigned to Lessee, and will execute all such documents and take such other steps as may be required to assure that on the Lease Commencement Date Lessee will have all of Lessor's rights and remedies under the Contracts.

confidential
Heather Ferguson
Aug 29, 2016 16:26

## ARTICLE 7. ASSUMPTION OF ASSUMED LIABILITIES

**7.1** **Limited Assumption of Liabilities.** It is expressly understood and agreed that Lessee will not assume nor will it be liable for any liability, obligation, claim against or contract of Lessor or the Hospital of any kind or nature, at any time existing or asserted, whether or not accrued, whether fixed, contingent or otherwise, whether known or unknown, and whether or not recorded on the books and records of Lessor or the Hospital, arising out of or by reason of this or any other transaction or event occurring prior or subsequent to the Lease Commencement Date, unless such liability, obligation, claim or contract is expressly assumed by Lessee pursuant to Section 7.2.

**7.2** **Assumption of Certain Liabilities.** On the Closing Date, but effective as of the Lease Commencement Date, Lessee will assume the payment and performance of the Assumed Liabilities coming due after the Lease Commencement Date, and agrees to satisfy and hold Lessor harmless against the same.

## ARTICLE 8. INDEMNIFICATION

**8.1** **Indemnification by Lessee.** To the extent provided in this Article 8, and except for matters as to which Lessor is obligated to indemnify Lessee as provided in Section 8.2, from and after the Lease Commencement Date Lessee will indemnify and hold harmless Lessor, the respective members of the Coahoma County Board of Supervisors and the Board of Trustees (as now or hereafter constituted, including past members), and all of their respective officers, employees and agents against:

(a) any losses, liabilities, claims, obligations, damages and deficiencies and all costs and expenses incident thereto (including reasonable attorneys' fees and all other reasonable expenses incurred in investigating and preparing or defending any litigation or proceeding, commenced or threatened) (collectively, "*Losses*") suffered by Lessor arising out of the failure of Lessee to satisfy fully and in a timely fashion all of the Assumed Liabilities;

(b) any Losses suffered by Lessor arising out of (i) any act of commission or omission of Lessee or its employees, officers, agents or independent contractors after the Lease Commencement Date, or (ii) the use, operation or maintenance of the Leased Assets, the Purchased Assets or the Hospital after the Lease Commencement Date (unless such Losses relate solely to Lessor's ownership and operation of the Leased Assets, the Purchased Assets or the Hospital prior to the Lease Commencement Date), of any kind or nature whatsoever, including any Medicare, Medicaid or any other third party payor claim relating to any period after the Lease Commencement Date, but excluding any Losses relating to any employee benefit plan, agreement or arrangement entered into by Lessor or the Board of Trustees;

(c) any Losses suffered by Lessor arising out of or resulting from any misrepresentation, breach of warranty or nonfulfillment of any agreement on the part of Lessee contained in this Lease; and

9

confidential
Heather Ferguson
Aug 29, 2016 16:26

(d)     any Losses suffered by Lessor in respect of any gain on the disposal of Excluded Assets to be paid to Medicare or Medicaid, or for any foregone Medicare and Medicaid reimbursement related to any loss on the disposal of Excluded Assets to be reimbursed by Medicare or Medicaid;

provided, however, that Lessee's breach or alleged breach of any Assumed Liability will not constitute a breach of this Lease so long as Lessee complies with its indemnity obligation under this Article 8.

**8.2     Indemnification by Lessor.**  To the extent provided in this Article 8, and except for matters as to which Lessee is obligated to indemnify Lessor as provided in Section 8.1, from and after the Lease Commencement Date Lessor will indemnify and hold harmless Lessee, to the extent permitted by Mississippi law, against:

(a)     any Losses suffered by Lessee arising out of (i) any liability, obligation, claim against or contract of Lessor or the Hospital incurred prior to the Lease Commencement Date, (ii) any act of commission or omission of Lessor or its employees, officers, agents or independent contractors prior to the Lease Commencement Date, or (iii) the use, operation or maintenance of the Leased Assets, the Purchased Assets or the Hospital prior to the Lease Commencement Date, of any kind or nature whatsoever, which is not an Assumed Liability; and

(b)     any Losses suffered by Lessee arising out of or resulting from any misrepresentation, breach of warranty or nonfulfillment of any agreement on the part of Lessor contained in this Lease.

The parties acknowledge and agree that the indemnification provided by this Section 8.2 is not intended, nor will it be construed, as a waiver of the immunity of Lessor, the Hospital or the Board of Trustees from suit for negligent, tortious or unauthorized acts of the Board of Trustees, the members thereof, or the agents, servants, volunteers or employees thereof or of the Hospital, and such immunity as presently exists is hereby specifically retained and recognized pursuant to Section 41-13-11(2), Mississippi Code Annotated of 1972, as amended, or otherwise.  Further, indemnification by Lessor will be limited (i) in the case of Losses in the nature of matters of general or professional liability, solely to Losses suffered by Lessee during the period of the applicable statute of limitations, and (ii) in the case of all other Losses, solely to Losses suffered by Lessee during the period from the Lease Commencement Date to six months following the date of completion of Guarantor's audit for the fiscal year ending September 30, 1996.

**8.3     Indemnification Procedure.**

(a)     As used in this Article 8, the term "Losses" includes only losses actually paid or incurred, and does not include: (i) any Losses to the extent of amounts recoverable from any surety, insurance carrier or third party obligor, or the cost of maintaining any surety or insurance policies, and no right of subrogation against the indemnifying party will accrue hereunder to or for the benefit of any surety, insurance company or any third party; (ii) any incidental or consequential damages that the

10

confidential
Heather Ferguson
Aug 29, 2016 16:26

indemnified party may suffer; or (iii) any cost or expense previously counted in determining Losses. The indemnified party agrees to submit in a timely manner to any applicable surety, insurance carrier or third party obligor all claims for indemnifiable Losses for which such entity may have liability.

(b)     As a condition precedent to a claim under this Article 8, an indemnified party will promptly give to an indemnifying party notice of any matter which the indemnified party has determined has given or could give rise to a right of indemnification under this Lease, which notice will specify in detail the nature of the claim and the basis for indemnification. If a claim by a third party is made against an indemnified party, and if such indemnified party intends to seek indemnity hereunder with respect thereto, the indemnified party will promptly (and in any case within 30 days of such claim being formally made) give the indemnifying party notice of such claim. The indemnifying party will have 30 days after receipt of such notice to assume and control the defense of such claim at its expense and through counsel of its choice reasonably satisfactory to the indemnified party. If the indemnifying party elects not to defend against such claim, then it will promptly so notify the indemnified party and, in such event, the indemnified party will then be entitled, at its option, to assume and control the defense of such claim at its expense and through counsel of its choice. If the indemnifying party exercises its right to undertake the defense against any such claim as herein provided, the indemnified party will cooperate with the indemnifying party in such defense and make available to the indemnifying party all pertinent records, materials and information in its possession or under its control relating thereto as is reasonably requested by the indemnifying party. No claim that is being assumed and defended in good faith by the indemnifying party will be settled by the indemnified party without the consent of the indemnifying party.

(c)     The indemnifying party will be subrogated to any and all defenses, claims and setoffs which the indemnified party asserted or could have asserted against the third party making a claim. The indemnified party will execute and deliver to the indemnifying party such documents as may be reasonably necessary to establish by way of subrogation the ability and right of the indemnifying party to assert such defenses, claims and setoffs.

## ARTICLE 9. REPRESENTATIONS AND WARRANTIES OF LESSOR

As of the date hereof, and as of the Lease Commencement Date, Lessor represents and warrants to Lessee the following:

**9.1     Capacity, Etc. of Lessor.** Lessor is a political subdivision of the State of Mississippi and is validly existing under the laws of the State of Mississippi. Lessor has the requisite power and authority to enter into this Lease, perform its obligations hereunder and conduct its business as now being conducted.

11.

confidential
Heather Ferguson
Aug 29, 2016 16:26

**9.2    Assets; Title.**

(a)    The Leased Assets and the Purchased Assets together constitute all assets, properties and leasehold estates, real, personal and mixed, tangible and intangible, of every kind and nature, comprising, employed in the operation of or associated with the Hospital, except for the Excluded Assets.

(b)    Lessor has good and marketable fee or leasehold title to all of the assets comprising the Leased Assets and the Purchased Assets, subject only to Permitted Encumbrances.  On the Closing Date, but effective as of the Lease Commencement Date, Lessor will effectively:  (i) transfer to Lessee good and marketable leasehold title to the Leased Assets, subject only to Permitted Encumbrances, and grant to Lessee a valid and fully enforceable leasehold estate in the real property comprising the Leased Assets, subject only to Permitted Encumbrances; and (ii) transfer to Lessee good and marketable title to the Purchased Assets, subject only to Permitted Encumbrances. Without limiting the generality of the foregoing, on or before the Lease Commencement Date Lessor will cause to be removed all security interests in or other liens or encumbrances (other than Permitted Encumbrances) on any of the Leased Assets or any of the Purchased Assets.  After the Lease Commencement Date, if any lien, including any deed of trust lien, mechanic's or materialmen's lien or judgment lien, is asserted against any of the real property comprising the Leased Assets by, through or under Lessor which is not a Permitted Encumbrance, Lessor will obtain the release of such lien or obtain title insurance covering such lien.

(c)    The zoning classification of the Premises permits the Permitted Premises Use.  There are no violations of zoning laws or municipal ordinances regarding zoning matters affecting the Premises.  There is no existing, pending or, to the best of Lessor's knowledge, contemplated, threatened or anticipated change in the zoning classification of the Premises or any part thereof.

**9.3    Consents; Absence of Conflicts With Other Agreements, Etc.**  Lessor's execution, delivery and performance of this Lease, and the consummation by Lessor of the transactions contemplated herein: (a) are within Lessor's powers, are not in contravention of law, and have been duly authorized by all appropriate action; (b) except as otherwise expressly provided herein, do not require any approval or consent of, or declaration or filing with, any governmental agency or authority bearing on the validity of this Lease which is required by law or the regulations of any such agency or authority; (c) will neither conflict with nor result in any material breach or contravention of, nor permit the acceleration of the maturity of a material portion of, any liabilities, nor the creation of any lien, charge or encumbrance affecting any of the Leased Assets or the Purchased Assets; (d) will not violate, conflict with or constitute on the part of Lessor a breach of or a default under any existing statute, law, rule or regulation of any governmental authority, or any agreement, indenture, mortgage or lease to which Lessor, the Hospital or any of the Leased Assets or the Purchased Assets may be subject; and (e) will not violate any judgment of any court or governmental authority to which Lessor, the Hospital or any of the Leased Assets or the Purchased Assets may be subject.

12

confidential
Heather Ferguson
Aug 29, 2016 16:26

**9.4    Binding Effect.** This Lease is and will constitute the valid and legally binding obligation of Lessor, and is and will be enforceable against it in accordance with the terms hereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity and limitations applicable to Lessor as a body politic.

**9.5    Financial Statements.** Lessor has heretofore delivered to Lessee copies of the following financial statements of Hospital (the *"Financial Statements"*):  (a) audited balance sheets as of September 30, 1992, 1993 and 1994, and the related audited statements of revenues and expenses, fund balances and cash flows for the years then ended (the *"Audited Financial Statements"*); and (b) unaudited balance sheet as of June 30, 1995, and the related unaudited statements of revenues and expenses, fund balances and cash flows for the six-months then ended.  The Audited Financial Statements and the Closing Balance Sheet have been prepared in accordance with generally accepted accounting principles, applied on a consistent basis throughout the periods indicated, and conform to generally accepted accounting principles and practices consistently applied, except as set forth in Schedule 9.5.  Except as described in Schedule 9.5, the Closing Balance Sheet and the balance sheets comprising the Financial Statements present fairly in all material respects the financial condition of the Hospital at the dates indicated thereon, and the statements of revenue and expenses comprising the Financial Statements present fairly in all material respects the results of operations of the Hospital for the periods indicated thereon.

**9.6    No Additional Material Liabilities.**  Lessor has heretofore delivered to Lessee, and there is annexed hereto as Schedule 9.6, an accurate list to the best of Lessor's knowledge of all material liabilities of the Hospital or of Lessor with respect to the Hospital as of the date hereof, not included in the Financial Statements or the Closing Balance Sheet, which are of the kind and character required in financial statements prepared in accordance with generally accepted accounting principles and which were incurred other than in the ordinary course of business, whether accrued, absolute, contingent or otherwise.  Except as disclosed in Schedules 9.5 or 9.6, to the best of Lessor's knowledge Lessor has no material liabilities of any nature, whether accrued, absolute, contingent or otherwise.

**9.7    Licenses.**  The Hospital is duly licensed by the State of Mississippi as a general acute care hospital having 175 licensed acute care beds, as a skilled nursing facility having 20 licensed long-term care beds and as a home health agency.  The ancillary departments and other operations thereof (included in the Hospital) which are required to be specifically licensed are duly licensed by the appropriate state agencies. To the extent permitted by law, Lessor has and will effectively lease to Lessee all such licenses and permits necessary to operate the Hospital and all other rights, privileges, franchises, certificates of need and certificate of need applications relating to the operations or development of the Hospital or the Leased Assets, all of which are in good standing and not subject to meritorious challenge.

13

confidential
Heather Ferguson
Aug 29, 2016 16:26

**9.8    Medicare Participation; Accreditation.**  Except as set forth on Schedule 9.8, the Hospital is qualified for participation in the Medicare and Medicaid programs, has a current and valid provider agreement with the Medicare and Medicaid programs, is currently accredited by the Joint Commission on Accreditation of Health Care Organizations (*"JCAHCO"*) and, to the best of Lessor's knowledge, information and belief, is in compliance in all material respects with the conditions of participation in such programs and has received all health planning approvals necessary for capital reimbursement on the Leased Assets.

**9.9    Regulatory Compliance.**  To the best of Lessor's knowledge after due inquiry, except as set forth on Schedule 9.9, the Hospital is in compliance in all material respects with all applicable statutes, rules, regulations and requirements of all federal, state and local commissions, boards, bureaus and agencies having jurisdiction over the Hospital and its operations, and the Hospital has timely filed all reports, data and other information required to be filed with such commissions, boards, bureaus and agencies where a failure to file timely would have a material adverse effect on the Hospital.

**9.10    Contracts.**  Lessor has made available to Lessee true and complete copies of each of the Contracts.  To the best of Lessor's knowledge, each of the Contracts constitutes the valid and legally binding obligation of Lessor and is enforceable against Lessor in accordance with its terms.  To the best of Lessor's knowledge, each of the Contracts constitutes the valid and legally binding obligation of the other party to such contract and is enforceable against such party in accordance with its terms.  To the best of Lessor's knowledge after due inquiry, each of the Contracts constitutes the entire agreement between the respective parties thereto relating to the subject matter thereof. To the best of Lessor's knowledge after due inquiry, all material obligations required to be performed under the terms of the Contracts have been performed, no act or omission has occurred or failed to occur which, with the giving of notice, the lapse of time or both would constitute a default under any of the Contracts, and each of the Contracts is in full force and effect without default on the part of the parties thereto.

**9.11    Equipment.**  Annexed hereto as Schedule 13.1 is an accurate list, as of December 19, 1995, of the equipment included in Leased Assets.

**9.12    Insurance.**  Annexed hereto as Schedule 9.12 is a list of the insurance policies covering the ownership and operations of the Hospital, the Leased Assets and the Purchased Assets, reflecting the policies' terms, identity of insurers, amounts and coverage.  All of such policies are now and will be until the Lease Commencement Date in full force and effect.  From and after the Lease Commencement Date, Lessor may, at its option and sole expense, purchase "tail coverage" for acts, errors and omissions of professional liability incurred at the Hospital prior to the Lease Commencement Date.

**9.13    Employee Benefit Plans.**  The Hospital currently makes available to its employees participation in the Mississippi Public Employees Retirement System (*"PERS"*), and such employees' rights to retirement benefits under PERS are governed by Mississippi law.  To the best of Lessor's knowledge after due inquiry, except for PERS, Lessor neither has nor ever has had any pension, profit sharing, compensation, deferred

14

confidential
Heather Ferguson
Aug 29, 2016 16:26

compensation or other employee pension, health or welfare benefit plan or arrangement relating to any one or more employees at, or the operations of, the Hospital. Except for Lessee's assumption of the Assumed Liability identified on Schedule 1.1(b) as "employee benefits expense," any reporting, disclosure, funding or other obligation, whether arising by law or contract, with respect to any such plan or arrangement will be the sole responsibility of Lessor, and Lessee will not have any obligation with respect thereto, either before or after the Lease Commencement Date.

**9.14 Employee Relations.** Except as set forth in Schedules 9.14 or 9.15, to the best of Lessor's knowledge after due inquiry: (a) there is no pending or threatened employee strike, work stoppage or labor dispute; (b) no union representation effort is underway respecting any employees at the Hospital, no collective bargaining agreement exists or is currently being negotiated by Lessor or the Hospital, no demand has been made for recognition by a labor organization by or with respect to any employees at the Hospital no union organizing activities by or with respect to any employees at the Hospital is taking place, and none of the employees at the Hospital is represented by any labor union or organization; (c) there is no unfair practice claim against Lessor or the Hospital before the National Labor Relations Board, nor any strike, dispute, slow-down or stoppage pending or threatened against or involving the Hospital; and (d) there are no pending or threatened unfair labor practices claims, equal employment opportunity claims, wage and hour claims, unemployment compensation claims, workers' compensation claims or the like with respect to the Hospital.

**9.15 Litigation or Proceedings.** Except as set forth in Schedule 9.15, there are no material claims, actions, suits, proceedings or investigations pending or, to the best of Lessor's knowledge, threatened against or affecting the Hospital, Lessor with respect to the Hospital, the Leased Assets or the Purchased Assets, at law or in equity, before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, wherever located.

**9.16 Special Funds.** None of the Leased Assets or the Purchased Assets are subject to any liability in respect of amounts received by Lessor or others for the purchase or improvement of the Leased Assets, the Purchased Assets or any part thereof under restricted or conditioned grants or donations, including monies received under the Public Health Service Act, 42 U.S.C. §291 *et seq.*, other than as identified as an Assumed Liability.

**9.17 Medical Staff Matters.** Lessor has heretofore provided to Lessee true, correct and complete copies of the bylaws and rules and regulations of the medical staff of the Hospital (if any). Except as set forth in Schedule 9.17, there are no pending or, to the best of Lessor's knowledge, threatened disputes with applicants, staff members or health professional affiliates, and all appeal periods in respect of any medical staff member or applicant against whom an adverse action has been taken have expired.

**9.18 Subsequent Results.** Since June 30, 1995, and except as disclosed in Schedule 9.18 or attributable to normal seasonal fluctuation, there has not been: (a) any material adverse change in the operations, financial condition, assets, liabilities (contin-

15

confidential
Heather Ferguson
Aug 29, 2016 16:26

gent or otherwise), income or business of or related to the Hospital; (b) any material damage, destruction or loss (whether or not covered by insurance) adversely affecting the Hospital, the Leased Assets or the Purchased Assets; (c) any material labor dispute, law or regulation or any event or condition of any character adversely affecting the operations of the Hospital; (d) any sale, assignment, transfer or disposition of any item of plant, property or equipment of the Hospital (other than supplies) having a net book value in excess of $10,000, except in the ordinary course of business; or (e) any transaction by Lessor with respect to the Hospital or any of the Leased Assets or the Purchased Assets outside the ordinary course of business.

9.19   **Environmental Matters.**  Lessor and Lessee are jointly conducting a Phase I environmental assessment of the Leased Assets (the *"Environmental Assessment"*). The Environmental Assessment will be provided to Lessee and its counsel immediately upon receipt by Lessor.  Except as disclosed in Schedule 9.19 or the Environmental Assessment, to the best of Lessor's knowledge neither Lessor nor the Hospital is in material violation of any federal, state or local statute, regulation, directive or order pertaining to environmental matters (which includes air, water vapor, surface water, groundwater, soil or natural resources), including the Comprehensive Environmental Response, Compensation and Liability Act, the Medical Waste Tracking Act and the Resource Conservation and Recovery Act (collectively, *"Environmental Laws"*).  Except as disclosed in Schedule 9.19 or the Environmental Assessment, to the best of Lessor's knowledge, neither Lessor nor the Hospital has disposed of *"Hazardous Substances"* (which for purposes of this Lease mean and include polychlorinated biphenyls, asbestos, petroleum products and any substances, materials, constituents or wastes (infectious or otherwise) regulated by Environmental Laws) in a manner that has materially violated any Environmental Laws.  To the best of Lessor's knowledge, there has been no such disposal by any previous owner or operator of the Leased Assets.  To the best of Lessor's knowledge, and except as disclosed in Schedule 9.19, neither Lessor nor the Hospital has received any request for information, notice or order alleging that it may be a potentially responsible party under any Environmental Laws for the investigation or remediation of a release or threatened release of Hazardous Substances.  Lessor will immediately notify Lessee should Lessor or the Hospital become aware of any lien, notice, litigation or threat of litigation relating to an alleged unauthorized release of any Hazardous Substance in a reportable quantity on the Leased Assets or any other environmental contamination or liability with respect to the Leased Assets.

9.20   **Taxes.**  To the best of Lessor's knowledge:  (a) all returns required to be filed by or in respect of the Hospital with respect to all federal, state and local income, payroll, withholding, excise, sales, use, real and personal property, use and occupancy, business and occupation, mercantile, real estate, capital stock and franchise or other taxes (all the foregoing, including penalties and interest thereon and estimated taxes, being collectively called *"Taxes"*) have been timely filed or extended; (b) all Taxes shown to have become due pursuant to such returns have been paid; and (c) all other Taxes for which a notice of assessment or demand for payment has been received have been paid. Neither Lessor nor, to the best of Lessor's knowledge, the Hospital has received any notice of any proposed assessments of Taxes against or in respect of the Hospital, or of any proposed adjustments to any tax returns filed by or in respect of the Hospital.

16

confidential
Heather Ferguson
Aug 29, 2016 16:26

**9.21 Disproportionate Share Hospital.** The Hospital is currently classified as a Medicaid "disproportionate share hospital" under applicable Medicaid statutes and regulations. Lessee acknowledges that it may not be able to participate in the current Hospital programs for funding Medicaid disproportionate share.

**9.22 No Broker.** Lessor has not employed any investment banker, finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Lease or of any of the transactions contemplated hereby as to which Lessee or Guarantor may have any liability for a broker's, finder's, financial advisory or similar fee.

## ARTICLE 10. REPRESENTATIONS AND WARRANTIES OF LESSEE AND GUARANTOR

As of the date hereof and as of the Lease Commencement Date, Lessee and Guarantor jointly and severally represent and warrant to Lessor the following:

**10.1 Capacity, Etc.** Lessee is a business corporation duly organized and validly existing in good standing under the laws of the State of Mississippi. Guarantor is a business corporation duly organized and validly existing in good standing under the laws of the State of Delaware. Lessee and Guarantor each has the requisite corporate power and authority to enter into this Lease, perform its obligations hereunder, and conduct the business now conducted at the Hospital.

**10.2 Consents; Absence of Conflicts With Other Leases, Etc.** Lessee's and Guarantor's respective execution, delivery and performance of this Lease, and the consummation by Lessee and by Guarantor of the transactions contemplated herein: (a) are within their respective corporate powers, are not in contravention of law or of the terms of their respective certificates of incorporation or bylaws or any amendments thereto, and have been duly authorized by all appropriate corporate action; (b) except as otherwise expressly provided herein, do not require any approval or consent of, or any declaration or filing with, any governmental agency or authority bearing on the validity of this Lease which is required by law or the regulations of any such agency or authority; (c) will not violate, conflict with or constitute on the part of Lessee or Guarantor a breach of or a default under any existing statute, law, rule or regulation of any governmental authority or any agreement, indenture, mortgage or lease to which Lessee or Guarantor may be subject; and (d) will not violate any judgment of any court or governmental authority to which Lessee or Guarantor may be subject.

**10.3 Binding Effect.** This Lease is and will constitute the valid and legally binding obligation of Lessee and of Guarantor, and is and will be enforceable against Lessee and Guarantor in accordance with the terms hereof, except as validity or enforceability against Lessee or Guarantor may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

17

confidential
Heather Ferguson
Aug 29, 2016 16:26

**10.4  Information in Response to RFP.** The information contained in the Proposal of Lessee in response to the RFP was true, correct and complete as of the date of response.

**10.5  No Broker.** Neither Lessee nor Guarantor has employed any investment banker, finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Lease or of any of the transactions contemplated hereby as to which Lessor may have any liability for a broker's, finder's, financial advisory or similar fee.

## ARTICLE 11.  CONDITIONS PRECEDENT TO LESSEE'S AND GUARANTOR'S OBLIGATIONS

This Lease is executed by Lessee and Guarantor subject to satisfaction, on or before the Closing Date, of all of the express conditions precedent set forth in this Article 11, any of which may be waived in writing by Lessee. In the event of the failure of any of such express conditions precedent and the absence of a written waiver thereof by Lessee, this Lease will, upon notice from Lessee to Lessor, terminate and be of no further force or effect.

**11.1  Lessor's Authority.** Lessor will deliver to Lessee an opinion of counsel satisfactory to Lessee to the effect that Lessor possesses the lawful power and authority to enter into this Lease, that by so doing it does not violate any state, local or federal, rule, regulation or statute, that it has performed any and all necessary enabling acts authorizing the execution of this Lease and consummation of the transactions contemplated hereby, and that this Lease has been duly executed by and on behalf of Lessor.

**11.2  Accuracy of Representations and Warranties.** The representations and warranties of Lessor herein contained will have been true when made and, in addition, will be true on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date, and Lessee will have received a certificate of a duly authorized executive representative of Lessor to such effect (which certificate will constitute a representation by Lessor as though set forth in this Lease).

**11.3  Conditions Performed Prior to Lease Commencement Date.** Lessor will have performed and complied with all agreements and conditions required by this Lease to be performed or complied with by it prior to or on the Lease Commencement Date, and Lessee will have received a certificate of a duly authorized executive representative of Lessor to such effect (which certificate will constitute a representation by Lessor as though set forth in this Lease).

**11.4  Regulatory Matters.** Lessee will have obtained documentation or other evidence reasonably satisfactory to it that Lessee has:

(a)  received approval from all governmental agencies whose approval is required to complete the transactions contemplated hereby;

18

(b)     received confirmation from the appropriate authorities of the State of Mississippi as to hospital licensure, certificate of need matters and section 1122 approvals (if any), and reasonable confirmation from all other applicable licensure agencies that upon consummation of the transactions contemplated hereby all licenses required by law to operate the Hospital, for Lessee's own account, as it is currently operated will be transferred to or reissued in the name of Lessee; and

(c)     obtained reasonable assurances that Medicare and Medicaid certification of the Hospital for its operation by Lessee will be effective upon the Lease Commencement Date and that Lessee may participate in and receive reimbursement from such programs effective upon the Lease Commencement Date.

**11.5    No Adverse Change.**  Between the date of execution of this Lease and the Closing Date, there will not have been the occurrence or discovery of any event, condition or change in the operations, financial condition, assets, liabilities (contingent or otherwise), income or business of or related to the Hospital that materially adversely impairs the use or value of any of the Leased Assets, the Purchased Assets or the Hospital, and no litigation, administrative proceeding, audit or investigation will have been initiated which, if concluded adversely, might reasonably be expected to cause such an event, condition or change.

**11.6    Actions or Proceedings.**  No action or proceeding before a court or any other governmental agency or body will have been instituted and remain in effect seeking to restrain or prohibit the transactions herein contemplated; and no governmental agency or body will have taken any other action or made any request of Lessor or Lessee as a result of which Lessee reasonably and in good faith deems it inadvisable to proceed with the transactions contemplated hereby.

**11.7    Delivery of Documents.**  All the documents required by this Lease to be delivered to Lessee on or before the Lease Commencement Date will have been delivered on or before the Closing Date in accordance with provisions hereof.

**11.8    Title Matters.**

(a)     Lessor will deliver to Lessee, at Lessor's expense, (i) a plat of the Premises, and (ii) a title commitment by Lawyer's Title and by First American Title Insurance Company, satisfactory to Lessee, that Lessor, as of the Lease Commencement Date, has good and marketable title to the Premises, and that the Premises are free and clear of all liens, encumbrances, charges, assessment, taxes, easements, restrictions and stipulations, except for Permitted Encumbrances.

(b)     Lessee will have obtained a leasehold title policy for the Premises, in the form and containing such endorsements as Lessee requires, and satisfactory to Lessee in its sole discretion.  Any survey defect or encroachment or violation of easements or building lines from or onto the Premises, other than Permitted Encumbrances, will have been cured or insured over pursuant to an endorsement satisfactory to or waived by Lessee.  Any liens that are not Permitted Encumbrances will have been

19

confidential
Heather Ferguson
Aug 29, 2016 16:26

deleted from the leasehold title policy. Such leasehold title policy will be in an amount equal to the leasehold value of the Premises as reasonably specified by Lessee, insuring that Lessee is vested with a valid leasehold interest subject only to Permitted Encumbrances.

(c)     Lessor will deliver to Lessee a legal opinion, satisfactory to Lessee, that the Premises are in compliance with all zoning and land use laws (except Environmental Laws), ordinances and regulations.

## ARTICLE 12.  CONDITIONS PRECEDENT TO LESSOR'S OBLIGATION

This Lease is executed by Lessor subject to satisfaction, on or before the Closing Date, of all of the express conditions precedent set forth in this Article 12, any of which may be waived in writing by Lessor.  In the event of the failure of any of such express conditions precedent and the absence of a written waiver thereof by Lessor, this Lease will, upon notice from Lessor to Lessee, terminate and be of no further force or effect.

**12.1    Lessee's and Guarantor's Authority.**  Lessee will deliver to Lessor an opinion of the Senior Vice President and General Counsel of Guarantor to the effect that Lessee and Guarantor each possess the lawful power and authority to enter into this Lease, that by so doing neither Lessee nor Guarantor violates any state, local or federal, rule, regulation or statute, that Lessee's and Guarantor's execution of this Lease and consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action, and that this Lease has been duly executed by and on behalf of Lessee and Guarantor.

**12.2    Accuracy of Representations and Warranties.**  The representations and warranties of Lessee and Guarantor herein contained will have been true when made and, in addition, will be true on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date, and Lessor will have received a certificate of the President or a Vice President of Lessee, and of a Vice President of Guarantor, to such effect (which certificate will constitute a representation by Lessee and by Guarantor as though set forth in this Lease).

**12.3    Conditions Performed Prior to Lease Commencement Date.**  Lessee will have performed and complied with all agreements and conditions required by this Lease to be performed or complied with by it prior to or on the Lease Commencement Date, and Lessor will have received a certificate of the President or a Vice President of Lessee to such effect (which certificate will constitute a representation by Lessee as though set forth in this Lease).

**12.4    Payment of Rent and Purchase Price.**  Lessee will have paid, as provided by Article 5, the purchase price for the Purchased Assets and all rent payment required to be paid on the Closing Date.

**12.5    Actions or Proceedings.**  No action or proceeding before a court or any other governmental agency or body will have been instituted and remain in effect

20

confidential
Heather Ferguson
Aug 29, 2016 16:26

seeking to restrain or prohibit the transactions herein contemplated; and no governmental agency or body will have taken any other action or made any request of Lessor or Lessee as a result of which Lessor reasonably and in good faith deems it inadvisable to proceed with the transactions contemplated hereby.

**12.6 Delivery of Documents.** All the documents required by this Lease to be delivered to Lessor on or before the Lease Commencement Date will have been delivered on or before the Closing Date in accordance with provisions hereof.

**12.7 Licensure, Certification and Approvals.** Any provision hereof to the contrary notwithstanding, this Lease is expressly conditioned upon the receipt of approvals of the lease of the Hospital herein contemplated, or exemption from such approvals, from any applicable governmental agency or instrumentality whose approval is required lawfully to effect the lease of the Hospital herein contemplated.

## ARTICLE 13. EQUIPMENT

**13.1 Lessor's Equipment.** All equipment, furniture and furnishings of Lessor on hand as of the Lease Commencement Date, a schedule of which equipment, furniture and furnishings is annexed hereto as Schedule 13.1, together with all replacements, substitutions or enhancements thereof (collectively, *"Lessor's Equipment"*), will constitute a part of the Leased Assets and will be and remain the personal property of Lessor; provided, however, that replacements or substitutions (but not enhancements) that represent new and different technology or expanded capability will not constitute Lessor's Equipment.

**13.2 Lessee's Equipment.** All equipment, furniture and furnishings acquired by Lessee and not constituting Lessor's Equipment (collectively *"Lessee's Equipment"*) will be and remain the personal property of Lessee and will be tagged or marked by Lessee as such. Lessee hereby grants Lessor the right and option to purchase Lessee's Equipment from Lessee upon the expiration or termination of this Lease, howsoever effected, for a purchase price equal to the greater of the net book value of Lessee's Equipment or the amount of all outstanding indebtedness incurred by Lessee in connection with the purchase or lease of Lessee's Equipment, which indebtedness Lessor may assume in lieu of any payments to Lessee. Lessor may exercise such option as to all or any portion of Lessee's Equipment by tendering written notice to Lessee of such intent, and identifying the specific items of Lessee's Equipment to be purchased (if less than all is to be purchased), on or prior to the last day of the Lease Term. Lessee will convey and transfer Lessee's Equipment, or such portion thereof as designated by Lessor, to Lessor free and clear of all claims, liens, security interests, agreements, charges or other encumbrances (other than debt, if any, to be assumed by Lessor in connection with such purchase and subject to the receipt of appropriate consents of third parties), and will execute and deliver to Lessor such bills of sale and assignments as may be necessary to effect such conveyance and transfer. Notwithstanding the foregoing, in the event of a First Refusal Transaction as contemplated by Section 29.2, Lessor's option to purchase Lessee's Equipment as herein provided will instead be exercisable at a purchase price equal to the appraised value of the Lessee's Equipment so purchased.

21

confidential
Heather Ferguson
Aug 29, 2016 16:26

**13.3   Disposition of Obsolete Equipment.**  Lessor and Lessee recognize that portions of Lessor's Equipment may become inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary in the operation of the Leased Assets.  In any instance in which Lessee, in its sound discretion, determines that any item of Lessor's Equipment has become inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary in the operation of the Leased Assets, Lessee may remove, subject to applicable Mississippi law, such items of Lessor's Equipment from the Leased Assets, and (on behalf of Lessor) sell, trade-in, exchange or otherwise dispose of same without any responsibility or accountability to Lessor therefor; provided, however, that Lessee will substitute and install in the Leased Assets other equipment having equal or greater utility (but not necessarily the same function) in the operation of the Leased Assets, and provided further that such removal and substitution will not impair the operating utility of the Leased Assets.  All such substitute equipment will constitute Lessor's Equipment and will be held by Lessee on the same terms and conditions as items originally comprising Lessor's Equipment.  Lessee will execute and deliver to Lessor such documents as may from time to time be requested to confirm the title of Lessor to any items of Lessor's Equipment.  Lessee will not remove or permit the removal of any of Lessor's Equipment from the Premises except in accordance with the provisions of this Section 13.3 and in compliance with applicable Mississippi law.

## ARTICLE 14.  INSURANCE

**14.1   In General.**  Lessor will be named as an additional insured and loss payee in every policy of insurance required by this Lease to be obtained and maintained by Lessee.  Proceeds of insurance policies will be payable to Lessee or Lessor as their respective interests may appear or as specifically set forth in this Article 14.  No such policy will be canceled or reduced in scope of coverage or amount of coverage without 45 days' written notice to Lessor.  Certificates of insurance evidencing the policies required hereby will be delivered by Lessee to Lessor on or before the Closing Date.  The failure of Lessor to require any additional insurance coverage will not be deemed to relieve Lessee from any obligations under this Lease.

**14.2   Property Insurance.**  Lessee will, at its own expense, obtain and keep in force during the Lease Term a policy or policies of insurance covering loss or damage to the Leased Assets in the amount of the replacement cost basis thereof, as the same may exist from time to time, against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, special extended perils (all risk), earthquake and sprinkler leakage.  If Lessee fails to procure and maintain such insur-ance, Lessor may, but will not be required to, procure and maintain the same, but at the expense of Lessee.

**14.3   Liability Insurance.**  Lessee will, at its own expense, obtain and keep in force during the Lease Term policies of comprehensive liability insurance, professional (malpractice) liability insurance, excess coverage (umbrella) insurance and employer's liability insurance insuring Lessee against any liability arising out of the use, occupancy or maintenance of the Leased Assets with coverage amounts as are customary for hospitals of the same size and services as the Hospital.  The comprehensive liability

22

confidential
Heather Ferguson
Aug 29, 2016 16:26

insurance will have a policy limit of not less than $1,000,000. The professional liability policy will have policy limits of not less than $1,000,000 per person and $3,000,000 per occurrence. The excess coverage (umbrella) policy will have a policy limit of not less than $10,000,000. The limits of such insurance will not, however, limit the liability of Lessee hereunder. If Lessee fails to procure and maintain such insurance, Lessor may, but will not be required to, procure and maintain the same, but at the expense of Lessee.

14.4 **Mutual Releases and Waiver of Subrogation.** Lessor and Lessee hereby waive all rights of recovery and causes of action which either has or may have or which may arise hereafter against the other, whether caused by negligence, intentional misconduct or otherwise, for any damage to the Leased Assets or to any property stored thereon or to the operations of the Hospital caused by any perils covered by fire and extended coverage, building, contents and business interruption insurance, or for which either party may be reimbursed as a result of insurance coverage affecting any loss suffered by it; provided, however, that the foregoing waivers are in addition to all other waivers or releases contained in this Lease and will apply only to the extent of any recovery made by the parties under any policy of insurance now or hereafter issued; and further provided that the foregoing waivers do not invalidate any policy of insurance of the parties, now or hereafter issued. Lessee agrees that it will cause all policies of insurance maintained in connection with the Leased Assets or the operations of the Hospital to contain a clause or endorsement by which the insurer waives rights of recovery by subrogation or otherwise for damage to property caused by fire or any casualty or peril covered by such insurance, whether or not the same has been caused by the fault or negligence of the other party or anyone to whom such party may be responsible.

14.5 **Business Interruption Insurance.** It is understood that Lessee may maintain business interruption insurance for its own protection and that any proceeds payable under any such policy will be the sole property of Lessee.

14.6 **Compliance by Lessee.** It is agreed that Lessee will be in compliance with the terms of this Article 14 so long as the total limits of insurance herein required are provided, regardless of the allocation of such limits among underlying or excess policies. In addition, Lessee will be in compliance with the terms of this Article 14 should it, in its discretion, choose to self-insure all or any portion of the risks described herein so long as it complies with all aspects of Mississippi law regarding such self-insurance.

14.7 **Remedy for Noncompliance.** Unless Lessee self-insures as contemplated herein, should Lessee fail to obtain and pay the premiums for any insurance policies providing the coverages specified in this Article 14, then Lessor may obtain the same and pay the premiums therefor, and the amount paid by Lessor will be deemed additional rent, and shall become immediately due and payable.

confidential
Heather Ferguson
Aug 29, 2016 16:26

## ARTICLE 15. FIRE AND CASUALTY DAMAGE

   **15.1   Notice of Damage.**  If any part or all of the Premises should be damaged or destroyed by fire, storm or other casualty and the amount of damage exceeds the dollar amount stated to be applicable in the standard "deductible clause" of the property insurance policy, Lessee will give written notice thereof to Lessor within ten days after the date the damage occurred.

   **15.2   Substantial Destruction.**  If the hospital building or other Improvements comprising the Premises is substantially destroyed at any time during the Lease Term by fire, storm or other casualty, to the extent the Premises cannot reasonably be used for an acute care hospital, then Lessee will, subject to compliance with applicable zoning regulations or such variances or non-conforming uses as may be allowed, rebuild the Hospital building and any other damaged portions of the Premises so that the Premises can be used to furnish substantially the same type and quality of services as were furnished on the Premises prior to the substantial destruction.  In such event, Lessor will make available or will pay and deliver to Lessee any insurance proceeds received by Lessor because of damage to the Premises.

   **15.3   Partial Destruction.**  If the hospital building or other Improvements comprising the Premises are damaged by fire, storm or other casualty to the extent that a portion, but not substantially all, of the Premises cannot be used for the purpose for which such portion was used prior to the casualty, Lessee will restore the Premises to the condition they were in prior to the casualty.  In such event, Lessor will make available or will pay and deliver to Lessee any insurance proceeds paid to Lessor because of the casualty loss resulting in the partial destruction.

   **15.4   Obligations of Lessor.**  Nothing contained herein will be construed to obligate Lessor to expend funds beyond those received as insurance proceeds.

   **15.5   Extension of Lease Term.**  The Lease Term will be automatically extended for a period equal to the number of days during which the ordinary and usual operation of the Hospital is prevented by reason of any partial destruction of the Premises.  In the event of substantial destruction of the Hospital Improvements and the subsequent reconstruction thereof as provided by Section 15.2: (a) if such destruction occurs during the first 20 Lease Years, the Lease Term will be automatically extended for five additional Lease Years; and (b) if such destruction occurs after the first 20 Lease Years, the Lease Term will be automatically extended for the period of time which, when added to the remaining time left in the initial Lease Term after the date of destruction, equals 20 years.  Any extension of the Lease Term arising under this Article 15 will be upon the same terms and conditions otherwise set forth in this Lease.

## ARTICLE 16. UTILITIES

   Lessee will pay all charges for water, electricity, gas, sewer, telephone and all other utilities, which are used in or on, or are properly charged against, the Premises during the Lease Term.  Lessee will not be in breach of this Lease for failure to pay any

confidential
Heather Ferguson
Aug 29, 2016 16:26

charge reasonably contested so long as Lessee indemnifies Lessor against such charge. In the event that easements for the installation and operation of utilities are required to be granted to any utility company or municipality to service the Premises, Lessor will cooperate with Lessee in the grant of such easements as may be reasonably required effectively to create the required easement, and all such easements will be subject to the approval of Lessee.

## ARTICLE 17. CARE OF PREMISES; ALTERATIONS, ADDITIONS, ETC.

### 17.1 Care of Premises.

(a) During the Lease Term Lessee, at Lessee's expense, will keep and maintain the Premises in good order and repair, ordinary wear and tear, casualty loss or other insured loss excepted. Lessee will do all things which from the character and use of the Premises would be reasonably necessary for proper maintenance, repair and replacement thereof, and in this respect, without limiting the generality of the foregoing, Lessee will perform and furnish, at Lessee's expense, all painting, carpentry, redecorating, landscaping, refurbishing, maintenance, servicing, repairing and replacement of all portions of the Premises. Lessee will be responsible for the care, maintenance and repairs, renovation, restoration or replacement, if required, of the air conditioning, heating, mechanical, plumbing, electrical/fire alarm, security and sprinkler systems.

(b) Lessee acknowledges that its obligations to repair, renovate, restore or replace extends to the roof of the hospital structure. Both Lessor and Lessee acknowledge that certain improvements, when necessary from time to time, may require a certificate of need from the Mississippi Department of Health and Rehabilitative Services, Health Planning and Development. Lessee will apply for, and use its best efforts to obtain, approvals necessary to effect such improvements.

(c) Failure of Lessee to maintain, repair, replace or restore, as provided by this Section 17.1, will entitle Lessor, after notice in the manner provided by this Lease, to seek specific performance or to enter onto the Premises and repair and maintain the Premises and to charge Lessee therefor, and such charges properly made will be construed as additional rent, and shall become immediately due and payable.

### 17.2 Alterations, Additions and Capital Improvements.
Lessee has the right to make alterations, additions and capital Improvements to the Premises, with or without the prior approval of Lessor, provided they are architecturally consistent with the Improvements, and such will be made in a good and workmanlike manner, and will comply with all applicable governmental laws, regulations and requirements. All alterations, additions and capital Improvements will be made at the cost and expense of Lessee and will become the property of Lessor upon expiration or termination of the Lease Term. Lessee will not, in its reasonable judgment, make or effect any renovations, alterations, structural additions or capital improvements to the Premises which would impede the use or reduce the value of the Leased Assets. The consent and authorization granted to Lessee under this Section 17.2 or otherwise to make alterations, addi-

25

confidential
Heather Ferguson
Aug 29, 2016 16:26

tions or improvements will not constitute "the written consent of the owner" as contemplated in Miss. Code Ann. §85-7-137.

## ARTICLE 18.  LICENSURE AND GOVERNMENTAL APPROVAL

Lessee will, at all times during the Lease Term, conduct its business pursuant to a valid license issued by the State of Mississippi authorizing Lessee to operate an acute care hospital on the Premises and to furnish such other services as are offered by Lessee and which can lawfully be performed pursuant to a valid license or governmental approval. Lessee will obtain and maintain continuously throughout the Lease Term the license by which the Hospital is allowed to operate, and will do all things reasonably required by the appropriate licensing authority to maintain such license. Lessee will use its best efforts to obtain and maintain throughout the Lease Term accreditation of the Hospital by JCAHCO or a similar nationally recognized accrediting body.

## ARTICLE 19.  ACCESS

Lessor and its agent will have access at reasonable times and upon reasonable notice for the purpose of inspection of the Premises or of making repairs, additions or alterations, but such right will not be construed as an agreement on the part of Lessor to make repairs.

## ARTICLE 20.  GOVERNMENTAL FEES

During the Lease Term all fees due any governmental unit, including units of any city, county, state or federal government, on account of any inspection made on the Premises, will be paid by Lessee. Lessee will not be in breach of this Lease for failure to pay any such charge so long as Lessee indemnifies Lessor against such charge.

## ARTICLE 21.  QUIET ENJOYMENT

Subject to the terms and provisions of this Lease, on payment of the rent and other charges hereunder payable by Lessee, and Lessee's maintaining the required State of Mississippi licenses, Lessee will lawfully, peaceably and quietly have, hold, occupy and enjoy the Leased Assets and any appurtenant rights granted to Lessee under this Lease during the Lease Term without hindrance or ejection by Lessor or any person lawfully claiming under Lessor, and without interference by Lessor in the operation of the Hospital.

## ARTICLE 22.  SUBLEASE AND ASSIGNMENT

Lessee will not assign this Lease or any interest herein, whether by operation of law or otherwise, or sublet the Leased Assets or any part thereof, without the prior written consent of Lessor. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. §101 *et seq.* (the *"Bankruptcy Code"*), will be deemed without further act or deed to have assumed all of the obligations arising under this Lease on or after the date of such assignment. Any such assignee will upon

26

confidential
Heather Ferguson
Aug 29, 2016 16:26

demand execute and deliver to Lessor an instrument confirming said assignment; provided, however, that if this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies and other considerations payable or otherwise to be delivered in connection with such assignment will be paid or delivered to Lessor, will be and remain the exclusive property of Lessor and will not constitute property of Lessee or of the estate of Lessee within the meaning of the Bankruptcy Code. Any and all monies or other considerations constituting Lessor's property under the preceding sentence not paid or delivered to Lessor will be held in trust for the benefit of Lessor and be promptly paid or delivered to Lessor. For the purposes of this Article 22, (a) a transfer or sale of 50 percent or more of the voting interest or stock of Lessee to a third party which was not an affiliate of Lessee immediately prior to such transfer or sale, or (b) the merger or consolidation of Lessee with or into a third party which was not an affiliate of Lessee immediately prior to such merger or consolidation (other than a merger or consolidation in which Lessee is the surviving entity thereof), will each be deemed an assignment requiring the consent of Lessor and will not operate to release Lessee from any liability hereunder.

## ARTICLE 23. LIENS, MORTGAGE, TAXES, ETC.

**23.1    Use as Security.**  Lessor will not sell, convey, mortgage, pledge or otherwise encumber or use as security any portion or all of the Leased Assets subsequent to the execution of this Lease, and Lessor hereby subordinates its fee interest in the Leased Assets to this Lease.  Lessor will take such reasonable action as is necessary to remove any other liens or security interests affecting the Leased Assets or any portion thereof which liens arose because of acts or omissions of Lessor subsequent to execution of this Lease (and not because of acts or omissions of Lessee).

**23.2    Taxes and Special Assessments.**  Lessee will timely pay when due any and all federal, state or local taxes (if any) incurred or assessed in connection with Lessee's operation of the Leased Assets, including federal and state income taxes, franchise taxes, FICA, FUTA and other unemployment taxes; provided, however, that Lessee expressly reserves all of its rights to contest such taxes, assessments or charges to the full extent of its applicable administrative or judicial remedies.  Lessor will, at the request of Lessee, join in and cooperate fully with Lessee in any such proceedings or applications (except those relating to taxes levied, assessed or collected by Lessor), provided that Lessee indemnifies Lessor as provided herein.  Lessor will be responsible and will pay, prior to delinquency, any and all federal, state or local taxes (if any) incurred or assessed in connection with Lessor's or the Board of Trustees' operation of the Hospital, including federal and state income taxes, franchise taxes, FICA, FUTA and other unemployment taxes.  Lessor will promptly pay over to Lessee any refund of any taxes, charges and assessments, and penalties and interest thereon, received by Lessor which had been paid by Lessee.

**23.3    Payments in Lieu of Taxes.**  The parties intend for the Leased Assets to be included in the 1996 Tax Rolls of Coahoma County, Mississippi.  In the event that at any time during the Lease Term Lessee becomes exempt from payment of taxes on the Leased Assets, or taxes are not levied or imposed on the Leased Assets for any reason,

confidential
Heather Ferguson
Aug 29, 2016 16:26

Lessee will pay to Lessor an amount equal to the amount of taxes (including city, county, school and other taxes assessed on owners of commercial real property in general) which would have been levied or imposed on the Leased Assets but for the exemption.

**23.4** **Liens.** Lessee will indemnify Lessor against all liens, encumbrances and charges upon Lessee's leasehold estate in the Leased Assets, the rent payable hereunder or any part of either thereof, which are not Lessee's Permitted Liens (as such term is hereinafter defined). Lessee will take such action as may be required, including the payment of a sum into a court or the posting of a bond to secure payment of any such lien, encumbrance or charge to cause any claim therefor to be cleared prior to execution on judgment. The mere filing or foreclosure of a lien, encumbrance or charge against the Leased Assets or the entry of a judgment thereon will not constitute a breach of this Section 23.4 so long as Lessee complies with the foregoing indemnity obligation.

**23.5** **Lessee's Permitted Liens.** Notwithstanding any provision of this Lease to the contrary, but without limiting Lessee's obligation timely to pay rent and other amounts due and payable by Lessee hereunder, Lessee may create or permit to be created the following liens or encumbrances only with respect to Lessee's leasehold interest in the Leased Assets (collectively, *"Lessee's Permitted Liens"*):

(a) liens, charges or encumbrances created in connection with the improvements to the Leased Assets contemplated by Sections 5.3 or 5.4, or in connection with any other improvements, expansion, extension, additions or modifications of the Hospital or any of the Premises;

(b) liens, charges, encumbrances or restrictions in favor of Lessor which may be created or exist by reason of this Lease;

(c) liens, charges or encumbrances for taxes, assessments or other governmental charges or levies which are not then delinquent, or which are delinquent but are being contested by Lessee in good faith and by appropriate proceedings;

(d) mechanic's, laborer's, materialmen's, supplier's or vendor's liens for work or services performed or materials furnished in connection with the Hospital which are not yet due and payable, or which are due and payable but are being contested by Lessee in good faith and by appropriate proceedings; and

(e) liens, charges or encumbrances, including any pledge of Lessee's revenues, created in connection with Lessee's financing of capital improvements to the Leased Assets.

## ARTICLE 24. LESSEE'S DEFAULT AND REMEDIES THEREFOR

**24.1** **Major Events of Default.** The following events will constitute *"Major Events of Default"* under this Lease, upon the occurrence of which Lessor may elect to pursue its remedies as hereinafter provided:

Case 3:18-bk-05665    Doc 314    Filed 10/12/18    Entered 10/12/18 17:23:06    Desc Main
Document    Page 65 of 116

confidential
Heather Ferguson
Aug 29, 2016 16:26

(a)  Lessee fails to pay rent when due as provided in Article 5, and such failure continues for a period of ten days after written notice thereof has been given to Lessee by Lessor; or

(b)  Lessee fails to complete within a reasonable time, but in no event later than January 1, 1999, the current construction and renovation project contemplated by Section 5.4; or

(c)  Lessee loses or forfeits its license to operate the Hospital as an acute care hospital, or loses its Medicare certification or (if eligible therefor) its Medicaid certification; provided, however, that if Lessee is notified by the appropriate authority or is otherwise informed that its operating license, its Medicare certification or (if eligible therefor) its Medicaid certification has been lost, forfeited or revoked, then Lessee may take such action as it may deem necessary to seek reinstatement or recertification, including commencement or defense of such administrative and/or judicial proceedings as may be indicated, and Lessee will have a period to cure such default that will continue until all of the administrative and/or judicial remedies of Lessee have been exhausted and such proceedings have resulted in the final judicial determination that Lessee is not entitled to reinstatement, renewal or recertification, or that Lessee must surrender the same, as the case may be; and provided further that such period of cure will extend only so long as Lessee is legally or judicially allowed to continue the operation of the Hospital without thereby being in violation of any order of a court of competent jurisdiction; or

(d)  Lessee fails to operate the Hospital as an acute care hospital for any period of 10 consecutive days (taking into account the provisions of Section 24.4), and the Premises have not been partially or substantially destroyed as contemplated by Article 15, or substantially taken by eminent domain proceedings as contemplated by Article 26; or

(e)  either Lessee or Guarantor:  ceases doing business as a going concern; makes an assignment for the benefit of creditors; transfers assets for the purpose of hindering, delaying or defrauding creditors; generally does not pay its debts as they become due or admits in writing its inability to pay its debts as they become due; files a petition commencing a voluntary case under any chapter of the Bankruptcy Code; has filed against it a petition commencing an involuntary case under any chapter of the Bankruptcy Code, and such petition is not stayed or dismissed within 90 days after its filing; is adjudicated an insolvent; files a petition seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar arrangement under any present or future statute, law, rule or regulation, or files an answer admitting the material allegations of a petition filed against it in any such proceeding; or consents to the filing of such a petition or acquiesces in the appointment of a trustee, receiver, custodian or other similar official for it or for all or any substantial part of its assets or properties; provided, however, that the merger, consolidation or sale of substan-

29

confidential
Heather Ferguson
Aug 29, 2016 16:26

tially all of the stock or assets of Lessee or of Guarantor as a going concern will not be deemed to be an event within the contemplation of this Section 24.1(e).

**24.2    Other Breaches of Lease.** If during the Lease Term Lessee fails to perform, observe or comply with any other term, covenant, condition or provision of this Lease binding upon it, and such failure continues for a period of ten days after written notice thereof has been given to Lessee by Lessor, then Lessor may have and exercise all such rights and remedies as are provided under the applicable provisions of this Lease; provided, however, that where a specific remedy has been provided for in this Lease, such specific remedy will be Lessor's sole remedy for such breach; and provided further that if Lessee proceeds to cure any such breach and such cure, if begun and prosecuted with due diligence, cannot be completed within a period of ten days, then such cure period will be increased to such extent as is necessary to enable Lessee to begin and complete such cure through the exercise of due diligence.

**24.3    Indemnity for Breach.** Notwithstanding any other provision of this Article 24, if any breach of this Lease occurs, and Lessee fails to cure such breach in the manner specified herein, and such breach results only in monetary loss to Lessor, then Lessee may elect to cure such breach by indemnifying Lessor against such loss, as provided by Article 8, immediately upon the final determination of such breach, and such indemnification will have the same effect as if no breach had occurred, and this Lease will continue for the balance of the Lease Term.

**24.4    Causes Beyond a Party's Control.** If during the Lease Term either party is delayed or prevented from the performance of any act required by this Lease by reason of acts of God, strikes, lockouts, or other cause, without fault and beyond the reasonable control of such party, then performance of such act by such party will be excused for the period of the delay; and the period for the performance of any such act will be extended for a period equivalent to the period of such delay; provided, however, that nothing in this Section 24.4 will excuse Lessee from the prompt payment of any rent or other charge required of Lessee except as may be expressly provided elsewhere in this Lease.

**24.5    Lessor's Remedies Upon Default.** In the event of a default by Lessee or Guarantor under this Lease, then Lessor at any time thereafter will have the full right, at its election, to exercise without notice or demand any of the following rights and remedies, which will not be exclusive, but cumulative, and will in no way limit any other rights or remedies available to Lessor at law or in equity:

    (a)    the right to cure, at the defaulting party's cost and expense, any default;

    (b)    the right to collect any sums due and owing under this Lease when they become due;

    (c)    the right to collect damages suffered by Lessor by reason of the occurrence of a default;

30

confidential
Heather Ferguson
Aug 29, 2016 16:26

(d)     the right to seek specific performance of the defaulted obligations;

(e)     if such default is a Major Event of Default, the right to accelerate the rent due for the remainder of the Lease Term, which Lessee agrees will constitute liquidated damages to which Lessor is entitled as a result of a default; and

(f)     if such default is a Major Event of Default, the right to terminate this Lease.

**24.6   In the Event of Bankruptcy.**  In the event that an order for relief under the Bankruptcy Code is entered with respect to Lessee, Lessee agrees that the following will apply:

(a)     this Lease will be construed as a lease of non-residential real property;

(b)     Lessee's obligations under this Lease will be continuing in nature and will be construed as arising from day to day from and after the date upon which performance of each obligation first becomes due until paid or performed;

(c)     the rent and other monetary obligations of Lessee due under this Lease constitute the fair market rental value of the Leased Assets for which Lessee will remain liable until Lessee vacates and surrenders the Leased Assets;

(d)     All amounts which Lessee is obligated to pay under this Lease constitute actual, necessary and reasonable expenses of preserving Lessee's bankruptcy estate for which Lessor will be entitled to an administrative expense priority claim pursuant to 11 U.S.C. §503(b)(1)(A) should Lessor exercise its option to pay such expenses upon Lessee's default; and

(e)     In the event Lessee seeks to assume and assign this Lease, "adequate assurance of future performance" by the proposed assignee will include, at a minimum, the continuing guaranty of this Lease by Guarantor and proof that the financial condition and operating performance of the proposed assignee and its guarantors, if any, will be similar to the financial condition and operating performance of Lessee and Guarantor as of the time that Lessee entered into this Lease; provided, however, that this provision will not constitute consent by Lessor to any such assignment, or be deemed a waiver of Lessor's right to contest any such assignment.

**24.7   Repossession of the Premises on Termination.**  Upon termination of this Lease as provided by this Article 24, Lessor may proceed to enter into and repossess the Premises with process of law and remove Lessee's employees or property therefrom in such manner and in accordance with such procedures as a court of competent jurisdiction may allow, without incurring any liability to Lessee or to any persons occupying or using the Premises for any damage caused or sustained by reason of such lawful entry or

confidential
Heather Ferguson
Aug 29, 2016 16:26

removal; provided, however, that upon posting a bond in the amount and manner determined by a court of competent jurisdiction, Lessee may continue to operate the Hospital and have possession of the Premises until it becomes legally obligated to surrender the same by reason of a final judicial determination in the courts of the State of Mississippi, or at the level of the U.S. Circuit Court of Appeals if the applicable proceeding was commenced in a U.S. District Court by an unrelated party.

## ARTICLE 25. SURRENDER OF POSSESSION

25.1 **Surrender of Leased Assets.** Upon the expiration or termination of the Lease Term, howsoever effected, Lessee will forthwith surrender the Leased Assets to Lessor, free and clear of all claims, liens, security interests and other encumbrances (except those existing on the Lease Commencement Date) and in good working order and condition as on the Lease Commencement Date, ordinary wear and tear excepted. Lessor's Equipment and all inventory acquired by Lessee during the Lease Term and on hand as of the date of expiration or termination will also be surrendered to Lessor and will become the property of Lessor. All equipment and inventory surrendered will have an aggregate functional capability at least equal to the aggregate functional capability of the equipment and inventory existing at the Hospital as of the Lease Commencement Date. The inventory surrendered to Lessor will be sufficient to operate the Hospital in the normal course of its operations as then constituted and will be at a level consistent with Lessee's operation of the Hospital throughout the Lease Term. Lessee will execute and deliver to Lessor such bills of sale and assignments as Lessor may reasonably require. To the extent Lessor does not exercise Lessor's purchase option in respect of Lessee's Equipment as described in Section 13.2, Lessee may remove Lessee's Equipment from the Premises upon the expiration or termination of the Lease Term; provided, however, that Lessee will be responsible for and will immediately repair any damage to the Leased Assets caused by the removal of Lessee's Equipment. Lessee will cooperate in all reasonable requests of Lessor to assist in the transfer of all applicable Hospital licenses, permits and certificates of need required by Lessor to operate Hospital for its own account.

25.2 **Assignment and Assumption of Contracts.** Upon expiration or termination of the Lease Term, howsoever effected, and after due diligence and approval by Lessor, those contracts and leases (including those entered into for the purpose of enhancing Hospital census, services and operations) negotiated at arms length by Lessee during the Lease Term and approved by Lessor, will be assigned to and assumed by Lessor, and Lessor will indemnify Lessee, as provided by Article 8, from all obligations and liabilities arising out of such contracts and leases after expiration of the Lease Term.

25.3 **Holding Over.** In the event Lessee remains in possession of the Leased Assets after the expiration or termination of the Lease Term, howsoever effected, such holding over on the part of Lessee will not, of itself, renew or extend the Lease Term, and Lessee will be deemed to be a tenant at sufferance, subject to all of the provisions of this Lease (to the extent applicable to such form of tenancy).

32

confidential
Heather Ferguson
Aug 29, 2016 16:26

**25.4 Survival of Indemnification.** Lessee's obligations to indemnify Lessor pursuant to Article 8 will survive the termination of this Lease and/or the expiration of the Lease Term and other due diligence and approval by Lessor. Such indemnification by Lessee will be limited (a) in the case of Losses in the nature of matters of general or professional liability, solely to Losses suffered by Lessor during the period of the applicable statute of limitations, and (b) in the case of all other Losses, solely to Losses suffered by Lessor during the period from the date of termination or expiration of the Lease Term to six months following the date of completion of Lessor's audit for the fiscal year next ending after the date of termination or expiration of the Lease Term.

## ARTICLE 26. EMINENT DOMAIN

If the entire Premises, or such part thereof as renders the remaining portion unsuitable for use as a 175-bed general hospital with adequate parking area, and vehicular and pedestrian access to the Premises, is acquired by governmental or quasi-governmental authorities by the exercise of the power of eminent domain, then upon written notice of Lessee's election so to do, given by Lessee to Lessor within 30 days after receipt by Lessee of notice from Lessor that proceedings or negotiations with respect to such acquisition have begun, this Lease will terminate for all purposes (except enforcement of rights then accrued), at the time possession must be surrendered to such authority, and the amount of the award will be divided between Lessor and Lessee as their respective interests may appear. Any rentals paid by Lessee for any period beyond the date of termination by Lessee will be promptly repaid to Lessee.

## ARTICLE 27. TIME FOR PERFORMANCE

**27.1 Time is of the Essence.** Time is of the essence, and both parties agree to perform their obligations hereunder in a timely manner.

**27.2 Delay.** No delay or failure on the part of either party in exercising or enforcing any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege preclude any other or further exercise of any other right, power or privilege.

**27.3 No Waiver.** The waiver of any breach of a term, condition, or covenant of this Lease by Lessor or Lessee must be in writing to be effective, and any such waiver will be limited to the particular instance and will not be deemed to waive future breaches of same or other terms, conditions or covenants.

## ARTICLE 28. NOTICES

Whenever in connection with this Lease it is required or permitted that notice, demand, consent, approval or communication be given or served by either party to the other, it will be given or served (with a copy to the attorney whom Lessor or Lessee may from time to time designate in writing to review such notice) and will be deemed not to have been duly given or served and will be ineffectual unless in writing and forwarded by

Case 3:18-bk-05665   Doc 314   Filed 10/12/18   Entered 10/12/18 17:23:06   Desc Main
Document   Page 70 of 116

confidential
Heather Ferguson
Aug 29, 2016 16:26

certified or registered mail, postage prepaid, addressed to Lessor or Lessee (and their duly designated attorneys) as follows:

|  |  |
|---|---|
| If to Lessor: | Coahoma County Board of Supervisors<br>P.O. Box 579<br>Clarksdale, Mississippi 38614<br>Attention: President |
| If to Lessee: | Clarksdale HMA, Inc.<br>5811 Pelican Bay Boulevard, Suite 500<br>Naples, Florida 33963-2710<br>Attention: President |
| If to Guarantor: | Health Management Associates, Inc.<br>5811 Pelican Bay Boulevard, Suite 500<br>Naples, Florida 33963-2710<br>Attention: President |

or to such other single address as either party may direct from time to time, and will be deemed given when deposited in the United States mail, postage prepaid.

## ARTICLE 29. GUARANTOR'S GUARANTY

29.1  **Guaranty.**  Guarantor hereby guarantees to Lessor the full and prompt payment and performance by Lessee of Lessee's obligations and duties under this Lease and any and all of Lessee's successors' or assigns' obligations and duties under this Lease.  Guarantor will pay all costs, expenses and fees, including all reasonable attorneys' fees, which may be incurred by Lessor in any successful proceeding instituted to enforce the duties and obligations of Guarantor under this Section 29.1 following any default on the part of Guarantor hereunder.  Guarantor will execute and deliver such other agreements, documents and instruments as may be reasonably required to further evidence Guarantor's obligations set forth in this Section 29.1.  Any discharge or limitation of Lessee's obligations under this Lease by operation of law or otherwise will not discharge or limit Guarantor's obligations to Lessor.

29.2  **Right of First Refusal.**

(a)  In the event that, at any time during the first five Lease Years, Guarantor proposes (i) a transfer or sale of 50 percent or more of the voting interest or stock, or substantially all of the assets, of Guarantor to a third party which was not an affiliate of Guarantor immediately prior to such transfer or sale, or (ii) the merger or consolidation of Guarantor with or into a third party which was not an affiliate of Guarantor immediately prior to such merger or consolidation (other than a merger or consolidation in which Guarantor is the surviving entity thereof) (each, a "*Disposition*"), then Guarantor will first give a right of refusal (the "*First Refusal*") to Lessor to terminate this Lease and reacquire possession of all (but not less than all) of the Leased Assets (the "*First Refusal Transaction*") upon payment to Lessee, in cash, of an amount

34

confidential
Heather Ferguson
Aug 29, 2016 16:26

equal to the then-current appraised value of the Leased Assets, determined by a nationally recognized appraiser mutually agreeable to Lessor and Guarantor (such appraiser to have no existing financial or service relationship with Guarantor, Lessor or their respective affiliates). The First Refusal will be given by notice to Lessor, given by registered or certified mail (return receipt requested), containing a complete description of the essential terms of the proposed Disposition and the name, address, qualifications and background of the proposed purchaser or transferee (the "*Purchaser*").

(b)     The First Refusal may be exercised by Lessor by giving to Guarantor notice by registered or certified mail (return receipt requested) of exercise within 45 days following the date on which Guarantor's notice was given (the "*Offer Date*"). Lessor's notice will contain an unequivocal statement of its intention to exercise the First Refusal in accordance with the provisions of this Section 29.2 and will be accompanied by a certificate to the effect that Lessor will use its best efforts, in good faith, to the end that sufficient funds will, by the time of closing, be available to Lessor to enable it to make payment of the amount provided by Section 29.2(a).

(c)     Within 180 days following the Offer Date, Guarantor and Lessor will have entered into an agreement setting forth the terms and conditions of the First Refusal Transaction (the "*First Refusal Agreement*") and consummated the First Refusal Transaction. The parties agree that their efforts in that regard will be pursued diligently and in good faith, and further agree that the First Refusal Agreement will contain only those terms and conditions as would be customary to consummate the First Refusal Transaction, including those in respect of any required governmental approvals and transfers of licenses.

(d)     In the event that Lessor fails to exercise the First Refusal as herein provided, or fails to execute the First Refusal Agreement, or fails to close the First Refusal Transaction as herein and therein provided, then Guarantor's consummation of the Disposition will not give rise to any rights or obligations, provided that: (i) the Disposition is to the Purchaser described in the notice given by Guarantor to Lessor; and (ii) such Purchaser executes and delivers to Lessor and to Guarantor, as a condition precedent to such Disposition, an instrument by which such Purchaser irrevocably and unconditionally assumes the performance and observation of the agreements and obligations of Guarantor under this Lease.

(e)     Guarantor and Lessee will afford to Lessor, its counsel, accountants and other representatives reasonable access during the period commencing on the Offer Date to and including (i) in the case of an unexercised First Refusal, the date on which the 45-day exercise period referred to in Section 29.2(b) has expired, or (ii) in the case of an exercised First Refusal, the date of closing of the First Refusal Transaction, to the Leased Assets and the books and records of Lessee relevant to its operation of Hospital, and will promptly furnish Lessor with all information as Lessor reasonably requests in connection therewith.

confidential
Heather Ferguson
Aug 29, 2016 16:26

## ARTICLE 30. ADDITIONAL COVENANTS OF LESSEE

### 30.1 Reports and Other Information.

(a)     For so long as the capital stock of Guarantor is publicly traded, Guarantor will provide to Lessor, contemporaneously with the distribution thereof to its stockholders, copies of its annual report and quarterly reports to stockholders. In the event that the capital stock of Guarantor ceases to be publicly traded, Guarantor will provide to Lessor, promptly upon the completion thereof, copies of its annual audited financial statements and quarterly unaudited financial statements.

(b)     On or before January 1, 1997, Lessee will provide to Lessor a written plan reviewing areas within the Hospital and outlining the capital improvements and expenditures to be made to or at the Hospital by Lessee and the timetable to effect such capital improvements and expenditures in compliance with Section 5.3.

(c)     On or about December 1 of each Lease Year, Lessee will provide to Lessor a report, substantially in the form annexed hereto as Schedule 30.1, with respect to the most recently completed fiscal year of Lessee, setting forth a summary description of: (i) the capital expenditures made by Lessee pursuant to Section 5.3 (until such time as such capital expenditures have been completed); (ii) the alterations, additions and capital improvements, as contemplated by Section 17.2, made by Lessee; (iii) all removals and substitutions of each item of Lessor's Equipment having a book value in excess of $10,000 made pursuant to Section 13.3; and (iv) all liens and other encumbrances being contested by Lessee pursuant to Section 23.2. In the event of a change in Lessee's fiscal year, Lessee will provide such report to Lessor within 60 days following the end of each such fiscal year during the Lease Term.

### 30.2 Name of Hospital. Lessee will maintain the name of the Hospital as "Northwest Mississippi Regional Medical Center" and will operate the Hospital using such name, unless otherwise agreed upon by the parties.

### 30.3 Hill-Burton Obligations. Subsequent to the Lease Commencement Date, Lessee will fully and timely satisfy, discharge and assume all obligations of Lessor from and after the Lease Commencement Date in respect of grants received by Lessor under the Hill-Burton Act, 42 U.S.C. § 291, *et seq.*, and the regulations promulgated thereunder, including the timely satisfaction of Lessor's uncompensated care obligation as of the Lease Commencement Date.

### 30.4 Utilization of Local Services. Throughout the Lease Term, and subject to sound fiscal management of the affairs of the Hospital, Lessee will endeavor to utilize and purchase goods and services from local vendors and providers of services and to utilize the services of local financial institutions in connection with Lessee's operation of the Hospital, when such local purchasing or the use of such local services is in the best interests of the Hospital, its operations, and quality, cost-efficient patient care.

36

confidential
Heather Ferguson
Aug 29, 2016 16:26

**30.5   Rates.** Lessee agrees that any increase in rates at the Hospital will be reasonable and commensurate with both the services offered and the costs to provide such services and competitive with similarly situated hospitals in Mississippi.

**30.6   Medical Staff.** Lessor has previously delivered to Lessee true and correct copies of medical staff privilege and membership application forms, delineation of privilege forms and all current Medical Staff Bylaws, rules, regulations and amendments thereto.  Lessee accepts the existing Medical Staff Bylaws and, except as may be necessary to conform to JCAHCO standards, has no present intent substantially to revise the Medical Staff Bylaws; provided, however, that the Medical Staff Bylaws may be amended from time to time in the future.  Lessee will maintain an active medical staff development program designed to meet the needs of the community for physician services.  Recruiting efforts will seek physicians without regard to race, sex or creed.

**30.7   Post-Lease Commencement Date Access to Information.** Lessee acknowledges that subsequent to the Lease Commencement Date Lessor may need access to information or documents in the control or possession of Lessee for the purposes of audits, compliance with government requirements and regulations, the prosecution or defense of third party claims, compliance with the terms of this Lease, or for other legitimate purposes.  Accordingly, Lessee agrees that subsequent to the Lease Commencement Date Lessee will make available to Lessor, Lessor's agents, independent auditors and/or governmental agencies, upon reasonable notice, under reasonable conditions and for a reasonable cost, such documents and information in respect of the Leased Assets to the extent necessary to facilitate audits, compliance with governmental requirements and regulations, compliance with the terms of this Lease and the prosecution or defense of claims or for other legitimate purposes.  In addition, former Trustees, former Hospital officers or former Hospital Administrators will, upon reasonable notice, have reasonable access, at their expense, to such information for the purpose of prosecution or defense of claims in which they are named.

**30.8   Inspection of Books and Records.**

(a)   Until the expiration of four years after the furnishing of any services hereunder and in the event the services provided by the parties hereunder are valued at $10,000 or more during any 12-month period, the parties will make available, upon written request of the Secretary of the U.S. Department of Health and Human Services, or upon the written request of the U.S. Comptroller General, or any of their duly authorized representatives, all contracts, books, documents or records that are necessary to verify the nature and extent of any and all charges, costs and payments made or received hereunder.  The parties agree that any applicable attorney-client, accountant-client or other legal privilege will not be deemed waived by virtue of this Lease.

(b)   Each party or its designated representatives is granted access at any reasonable time, upon reasonable conditions and notice, to the books and records of the other party insofar as necessary to verify or review accounting records for the purpose of determining compliance with the terms and provisions of this Lease only.

37

confidential
Heather Ferguson
Aug 29, 2016 16:26

**30.9    Educational Affiliations.**  The Hospital currently maintains significant educational affiliations, as identified on Schedule 30.9.  Lessee intends to continue educational affiliations and to continue to provide and support programs in medical education, allied health and management/administrative development.  It is Lessee's intent to continue to develop and strengthen the teaching programs at the Hospital as an essential part of the Hospital's role and mission.

**30.10    Prisoners and Wards of County.**  Lessee will provide free care to prisoners and wards of Coahoma County, Mississippi throughout the Lease Term.

## ARTICLE 31.  MEDICARE PROVISIONS

Lessor will cause to be properly prepared, signed and timely filed all claims, costs reports or other documentation required by the Medicare, Medicaid and any other third-party payor programs for the operations of the Leased Assets prior to the Lease Commencement Date.  To the extent any such programs determine, on the basis of such closing cost reports or otherwise, that amounts are due to Lessor in respect of periods prior to the Lease Commencement Date, Lessee will be entitled to such amounts.  To the extent any such closing costs reports indicate that amounts are due to the Medicare, Medicaid and other third-party payor programs, Lessee will assume liability for same and will timely pay such amounts.

## ARTICLE 32.  MANAGEMENT OF LEASED PREMISES

Lessee may not enter into any management or similar agreement in respect of the Leased Assets (other than agreements for the management of discrete departments or services of the Hospital) with any party other than an affiliate, parent or wholly-owned subsidiary of Lessee or Guarantor without the prior written approval of Lessor.  Any permitted management agreement pertaining to the Leased Assets or a discrete department or service of the Hospital will be subject and subordinate to this Lease and the rights of Lessor hereunder and will not relieve Lessee of any liability or obligations hereunder.

## ARTICLE 33.  CERTAIN AFTER-ACQUIRED REAL PROPERTY AS PART OF THE LEASED ASSETS

Any health care facility within Coahoma County, Mississippi acquired by Lessee during the Lease Term utilizing a transfer of any licensed beds of the Hospital will become part of the Premises, and all buildings, structures, improvements, machinery, equipment and other property which is constructed, placed or installed in or upon such health care facility as an addition to, or as a substitute for or in renewal or replacement of, any buildings, structures, improvements, furnishings, equipment or other property constituting part of the Leased Assets will (unless Lessor and Lessee otherwise provide by signed written agreement directed to a specific item) become part of the Leased Assets without any further act or deed.

38

confidential
Heather Ferguson
Aug 29, 2016 16:26

## ARTICLE 34.  IN GENERAL

**34.1  Relationships of Parties.**  Nothing contained in this Lease will be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent or partnership or joint venture or of any association between Lessor and Lessee (or Guarantor), and no provision contained in this Lease nor any acts of the parties hereto will be deemed to create any relationship between Lessor and Lessee (or Guarantor) other than the relationship of lessor and lessee.

**34.2  Rights and Remedies.**  It is the intention of the parties specifically to set forth their respective rights and remedies in the specific provisions of this Lease.  However, where no specific remedy has been provided by the terms of this Lease, both Lessor and Lessee will retain their right to damages, specific performance or other appropriate relief.  The party who successfully litigates any dispute arising under, or to enforce any provision of, this Lease will be entitled to reasonable attorneys' fees and expenses incurred at the trial, arbitration or appellate level.

**34.3  Successors.**  This Lease will be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns, and the respective successor governing boards of Lessor, Lessee and Guarantor.

**34.4  Cooperation.**  The parties agree to pursue and perform with all due diligence all acts, applications, authorizations and consents necessary or convenient to the fulfillment of the terms, covenants, conditions and provisions of this Lease, and to execute any and all documents incident thereto.

**34.5  Entire Agreement; Amendment.**  This Lease contains the entire agreement of Lessor, Lessee and Guarantor with respect to the subject matter hereof, and no other agreement, proposal, bid. response, statement or promise made by any party, or to any employee, officer or agent of any party, whether oral or written, which is not contained herein will be binding or valid.  No amendment or modification of this Lease will be binding on the parties unless it is in writing and executed by each of Lessor, Lessee and Guarantor.

**34.6  Severability.**  Each and every provision of this Lease is severable from each other provision.  If any provision is determined to be invalid or in violation of any applicable law or regulation, the same may be amended to the extent needed to comply therewith and the existence of such invalid provision or violation will not in any manner affect or invalidate any other provision of this Lease.

**34.7  Interpretation.**  In this Lease, unless the context otherwise requires:
(a) references to "Articles" and "Sections" are to the Articles or Sections of this Lease, and references to "Schedules" are to the Schedules annexed hereto and made a part hereof; (b) references to any party to this Lease includes references to its respective successors and permitted assigns; (c) references to a judgment includes references to any order, writ, injunction, decree, determination or award of any court or tribunal; (d) references to a person or entity includes references to any individual, company, body

confidential
Heather Ferguson
Aug 29, 2016 16:26

corporate, association, partnership, firm, joint venture, trust or governmental agency; (e) any of the terms defined herein may, unless the context requires otherwise, be used in the singular or the plural depending on the reference; (f) the masculine pronoun includes the feminine and the neuter, as appropriate in the context; (g) with respect to any matter or thing, the terms "including" or "includes" mean including but not limited to such matter or thing; and (h) references to Lessor's "knowledge after due inquiry" means Lessor's knowledge after due inquiry of the Chief Executive Director of the Hospital. The divisions of this Lease into articles, sections and subsections and the use of captions and headings in connection therewith are solely for convenience and will have no legal effect in construing the provisions of this Lease.

**34.8    Multiple Originals.**  This Lease may be executed in several counterparts, each of which will be deemed to be an original.

**34.9    Applicable Law.**  This Lease will be governed by and construed in accordance with the laws of the State of Mississippi without reference to its principles of conflict of laws.

**34.10    Memorandum of Lease.**  The parties agree to execute a short form Memorandum of Lease in recordable form which either party may record in the office of the Coahoma County Clerk.

**In Witness Whereof**, the undersigned have executed this Lease on the date first above written.

Attest:                                                    Lessor:

                                                          Coahoma County, Mississippi, acting through
                                                          the Coahoma County Board of Supervisors

_Wayne S. Ow_____            By: _____
                                                          Its:


Attest:                                                    Lessee:

                                                          Clarksdale HMA, Inc.

_Robb C. Smith_____
Secretary                                            By: _____
                                                          Its:   EVP

40

confidential
Heather Ferguson
Aug 29, 2016 16:26

*Attest:*

*Guarantor:*

**Health Management Associates, Inc.**

_Robb C. Smith_
Secretary

By: _Earl P. Gilliland_
Its: E.V.P.

confidential
Heather Ferguson
Aug 29, 2016 16:26

41

confidential
Heather Ferguson
Aug 29, 2016 16:26

STATE OF MISSISSIPPI
COUNTY OF COAHOMA

Personally appeared before me, the undersigned authority in and for the said County and State, on this _28_ day of December, 1995, within my jurisdiction, the within named _Jim Hunter_ and _Wayne Orr_, who acknowledged that they are the _President_ and _Clerk_, respectively, of the **Coahoma County Board of Supervisors**, a corporate body politic, and that for and on behalf of the said corporate body politic, and as its act and deed they executed the above said foregoing instrument, after first having been duly authorized by said corporate body politic to do so.

_Linda K. Smith_ (NOTARY PUBLIC)

My commission expires:

Notary Public State of Mississippi At Large
My Commission ~~... January 10, 1999~~
~~BONDED THRU HEIDEN-MARCHETTI, INC.~~

(Affix official seal, if applicable)

STATE OF MISSISSIPPI
COUNTY OF COAHOMA

Personally appeared before me, the undersigned authority in and for the said County and State, on this _28th_ day of December, 1995, within my jurisdiction, the within named _Earl P. Holland_ and _Bobb L. Smith_, who acknowledged that they are the _Exec. V.P._ and _Secretary_, respectively, of **Clarksdale HMA, Inc.**, a Mississippi corporation, and that for and on behalf of the said corporation, and as its act and deed they executed the above said foregoing instrument, after first having been duly authorized by said corporation to do so.

_Jane D. Baker_ (NOTARY PUBLIC)

My commission expires:

Notary Public State of Mississippi At Large
My Commission Expires: January 12, 2000
~~BONDED THRU HEIDEN-MARCHETTI, INC.~~

(Affix official seal, if applicable)

42

confidential
Heather Ferguson
Aug 29, 2016 16:26

STATE OF MISSISSIPPI
COUNTY OF COAHOMA

Personally appeared before me, the undersigned authority in and for the said County and State, on this _28_ day of December, 1995, within my jurisdiction, the within named _Earl P. Tyler_ and _Robb L. Smith_, who acknowledged that they are the _Exec. V.P._ and _Secretary_, respectively, of **Health Management Associates, Inc.**, a Delaware corporation, and that for and on behalf of the said corporation, and as its act and deed they executed the above said foregoing instrument, after first having been duly authorized by said corporation to do so.


_Jane D. Baker_ (NOTARY PUBLIC)

My commission expires:

Notary Public State of Mississippi At Large
My Commission Expires: January 12, 2000
BONDED THRU HEIDEN-MARCHETTI, INC.


(Affix official seal, if applicable)

confidential
Heather Ferguson
Aug 29, 2016 16:26

confidential
Heather Ferguson
Aug 29, 2016 16:26

# TABLE OF SCHEDULES

| | |
|---|---|
| Schedule 1.1(b) | Assumed Liabilities: Current Liabilities |
| Schedule 1.1(c) | Assumed Liabilities: Notes Payable |
| Schedule 1.1(d) | Assumed Liabilities: Capitalized Leases |
| Schedule 1.2 | Closing Balance Sheet |
| Schedule 1.4 | Contracts |
| Schedule 1.5 | Excluded Assets |
| Schedule 1.11 | Permitted Encumbrances |
| Schedule 1.12 | Real Property |
| Schedule 3.3 | Lessee's Employee Handbook |
| Schedule 9.5 | Financial Statement Matters |
| Schedule 9.6 | Additional Material Liabilities |
| Schedule 9.8 | Medicare Participation; Accreditation |
| Schedule 9.9 | Regulatory Compliance |
| Schedule 9.12 | Insurance |
| Schedule 9.14 | Employee Relations |
| Schedule 9.15 | Litigation or Proceedings |
| Schedule 9.17 | Medical Staff Matters |
| Schedule 9.18 | Subsequent Results |
| Schedule 9.19 | Environmental Matters |
| Schedule 13.1 | Lessor's Equipment |
| Schedule 30.1 | Form of Annual Report |
| Schedule 30.9 | Educational Affiliations |

Case 3:18-bk-05665   Doc 314   Filed 10/12/18   Entered 10/12/18 17:23:06   Desc Main
Document   Page 81 of 116

| PREPARED BY AND WHEN RECORDED RETURN TO: | REVIEW FOR COMPLIANCE WITH MISSISSIPPI RECORDING STATUTE ONLY BY: |
|---|---|
| Bradley Arant Boult Cummings LLP<br>Attn: Stephen T. Braun and Rob Clement (MS Bar # 6294)<br>1600 Division Street, Suite 700<br>Nashville, TN 37203<br>615.252.2300 | Baker, Donelson, Bearman, Caldwell and Berkowitz, P.C.<br>Attn: William S. Mendenhall (MS Bar#2869)<br>One Eastover Center<br>100 Vision Drive, Suite 400<br>Jackson, Mississippi 39211<br>601.351.2400 |
| **Assignor's Address:**<br>Clarksdale HMA, LLC<br>4000 Meridian Boulevard<br>Franklin, Tennessee 37067<br>Attention: General Counsel<br>615.465.7000 | **Assignee's Address:**<br>Clarksdale Regional Medical Center, Inc.<br>1721 Midpark Road, Suite B200<br>Knoxville, Tennessee 37921<br>Attention: Chief Executive Officer<br>865.269.4074 |

## ASSIGNMENT AND ASSUMPTION OF LEASE

**THIS ASSIGNMENT AND ASSUMPTION OF LEASE** (this "Agreement") is made and entered into effective as of November 1, 2017 (the "Effective Date"), by and between **CLARKSDALE HMA, LLC** (f/k/a Clarksdale HMA, Inc.), a Mississippi limited liability company ("Assignor"), and **CLARKSDALE REGIONAL MEDICAL CENTER, INC.**, a Tennessee nonprofit corporation ("Assignee").

**RECITALS:**

**A.** As of the date hereof, Assignor has conveyed to Assignee certain assets owned by Assignor, as more particularly described in and as contemplated by that certain Amended and Restated Asset Purchase Agreement dated as of April 27, 2017, by and between CHS/Community Health Systems, Inc., a Delaware corporation, and Curae Health, Inc., a Tennessee nonprofit corporation (as may be amended, amended and restated, or supplemented, the "Purchase Agreement"). Any capitalized terms

used but not otherwise defined in this Agreement shall have the same meanings herein as ascribed to such terms in the Purchase Agreement.

B.    Pursuant to the Purchase Agreement, Assignor has agreed to assign to Assignee all of Assignor's rights under that certain Lease Agreement dated December 28, 1995 (the "Original Lease"), by and among Coahoma County, Mississippi, acting through the Coahoma County Board of Supervisors, Assignor, and Health Management Associates, Inc., as amended by that certain Amendment to Lease Agreement dated December 15, 1998 (the "Amendment") (the Original Lease and the Amendment are referred to herein, collectively, as the "Hospital Lease"), which Original Lease was filed of record on December 29, 1995, in Book 719, page 127 of the land records of Coahoma County, Mississippi, and which Amendment was filed of record on December 22, 1998, in Book 771, page 185 of the land records of Coahoma County, Mississippi.

C.    Pursuant to the Purchase Agreement, Assignee has agreed to assume and perform all obligations of Assignor which accrue or arise after the Effective Time under the Hospital Lease.

**AGREEMENT:**

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    **ASSIGNMENT**.  Assignor hereby irrevocably grants, sells, assigns, transfers, conveys and sets over unto Assignee, its successors and assigns, all of Assignor's right, title and interest under, in and to the Hospital Lease.

2.    **ASSUMPTION**.  Assignee hereby accepts, as of the Effective Time, the forgoing assignment and expressly assumes and agrees to pay, perform and/or discharge all obligations of Assignor which accrue or arise after the Effective Time under the Hospital Lease, subject to the limitations contained herein and in the Purchase Agreement.

3.    **EXCLUDED LIABILITIES**.  The Excluded Liabilities are expressly excluded from the obligations being assumed by Assignee under this Agreement.

4.    **THIRD PARTY RIGHTS**.  Assignee's assumption of the Hospital Lease from Assignor, to the extent provided herein, shall not enlarge the rights of any third party under the Hospital Lease; nor shall it prevent Assignee, with respect to any party other than Assignor, from contesting or disputing any liability, or the terms and provisions of the Hospital Lease.

5.    **FURTHER ASSURANCES**.  Each of Assignor and Assignee agree to execute such other documents and take such other actions as may be reasonably necessary or desirable to confirm or effectuate the assignment and assumption contemplated hereby.

6.    **BINDING EFFECT**.  This Agreement and the covenants and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

7.    **NO MODIFICATION OF PURCHASE AGREEMENT**.  This Agreement is delivered pursuant to the Purchase Agreement and is subject in all respects to the provisions thereof and is not meant to alter, enlarge or otherwise modify the provisions of the Purchase Agreement.  The parties hereto hereby recognize and confirm that their execution of this Agreement shall not discharge or otherwise modify the representations, warranties, rights, and obligations of the Assignor and Assignee under the

Purchase Agreement. This Agreement is subject and subordinate to all of the terms and provisions of the Purchase Agreement, and to the extent of any conflict between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.

**8.** **MODIFICATION**. This Agreement may be modified or supplemented only by written agreement of the parties hereto.

**9.** **EXECUTION / COUNTERPARTS**. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by a combination of such means, shall constitute effective execution and delivery of this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Agreement as of the date set forth above.

**ASSIGNOR**:

**CLARKSDALE HMA, LLC**

By:_____
Name:_____
Title:_____

Terry H. Hendon
Vice President

**ASSIGNEE:**

**CLARKSDALE REGIONAL MEDICAL CENTER, INC.**

By:_____
Name:_____
Title:_____

-4-

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Agreement as of the date set forth above.

ASSIGNOR:

**CLARKSDALE HMA, LLC**

By:_____
Name:_____
Title:_____

ASSIGNEE:

**CLARKSDALE REGIONAL MEDICAL CENTER, INC.**

By:_____
Name:_____
Title:_____

-4-

STATE OF _Tennessee_

COUNTY OF _Williamson_

Personally appeared before me, the undersigned authority in and for the said county and state, on this _30th_ day of October, 2017, within my jurisdiction, the within named _Terry H. Hendon_, who acknowledged to me that he/she is _Vice President_ of **CLARKSDALE HMA, LLC**, a Mississippi limited liability company, and that for and on behalf of said limited liability company, and as its act and deed, he/she executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

My commission expires
Monday, June 22, 2020

_____
Notary Public

STATE OF _____

COUNTY OF _____

Personally appeared before me, the undersigned authority in and for the said county and state, on this ___ day of October, 2017, within my jurisdiction, the within named _____, who acknowledged to me that he/she is _____ of **CLARKSDALE REGIONAL MEDICAL CENTER, INC.**, a Tennessee nonprofit corporation, and that for and on behalf of said corporation, and as its act and deed, he/she executed the above and foregoing instrument, after first having been duly authorized by said corporation so to do.

_____
Notary Public

-5-

7/3963630.3

STATE OF _____

COUNTY OF _____


Personally appeared before me, the undersigned authority in and for the said county and state, on this ___ day of October, 2017, within my jurisdiction, the within named _____, who acknowledged to me that he/she is _____ of **CLARKSDALE HMA, LLC**, a Mississippi limited liability company, and that for and on behalf of said limited liability company, and as its act and deed, he/she executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.


_____
Notary Public



STATE OF _Tennessee_____

COUNTY OF _Knox_____


Personally appeared before me, the undersigned authority in and for the said county and state, on this _30th_ day of October, 2017, within my jurisdiction, the within named _Stephen N. Clapp_____, who acknowledged to me that he/she is _President_____ of **CLARKSDALE REGIONAL MEDICAL CENTER, INC.**, a Tennessee nonprofit corporation, and that for and on behalf of said corporation, and as its act and deed, he/she executed the above and foregoing instrument, after first having been duly authorized by said corporation so to do.


_____
Notary Public

-5-

7/3963630.3

# EXHIBIT D

Cash Flow Projections

# Going Concern Scenario

**Curae Health**
Clarksdale
Cash Flow Forecast - Through February 2019

| Week Ending | Footnotes | 10/12/18 | 10/19/18 | 10/26/18 | 11/02/18 | 11/09/18 | 11/16/18 | 11/23/18 | 11/30/18 | 12/07/18 | 12/14/18 | 12/21/18 | 12/29/18 | 01/04/19 | 01/11/19 | 01/18/19 | 01/25/19 | 02/01/19 | 02/08/19 | 02/15/19 | 02/22/19 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | | | | | | | | | | |
| Northwest Mississippi Regional Medical Center | | | | | | | | | | | | | | | | | | | | | | | |
| Hospital operations | [1] | $ 336,155 | $ 403,386 | $ 470,616 | $ 537,847 | $ 605,078 | $ 638,694 | $ 672,309 | $ 773,156 | $ 874,002 | $ 874,002 | $ 1,008,464 | $ 1,008,464 | $ 1,008,464 | $ 874,002 | $ 840,387 | $ 672,309 | $ 672,309 | $ 672,309 | $ 672,309 | $ 672,309 | 14,286,571 |
| Supplemental | [2] | - | 815,965 | - | - | - | 812,954 | - | - | - | 807,419 | - | - | - | 797,036 | - | - | 789,127 | - | - | - | 4,022,501 |
| Practice Groups | | | | | | | | | | | | | | | | | | | | | | | |
| Clarksdale Regional Physicians | [3] | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 1,100,528 |
| **Total receipts** | | 391,181 | 1,274,377 | 525,643 | 592,874 | 660,105 | 1,506,674 | 727,336 | 828,182 | 929,028 | 1,736,447 | 1,063,490 | 1,063,490 | 1,063,490 | 1,726,064 | 895,413 | 727,336 | 727,336 | 1,516,463 | 727,336 | 727,336 | 19,409,599 |
| **Disbursements** | | | | | | | | | | | | | | | | | | | | | | | |
| Salaries, Contract Labor & Benefits | [4] | 999,710 | 177,727 | 999,710 | 195,315 | 999,710 | 177,727 | 999,710 | 195,315 | 999,710 | 177,727 | 999,710 | 195,315 | 999,710 | 177,727 | 999,710 | 195,315 | 999,710 | 177,727 | 999,710 | 195,315 | 11,862,315 |
| Physician Services | [5] | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 55,595 | 1,111,893 |
| Contract Services | [5] | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 130,916 | 2,618,318 |
| Supplies and Other | [6] | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 121,952 | 2,439,033 |
| Repairs and Maintenance | [6] | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 39,182 | 783,647 |
| Rents & Leases | [7] | - | - | - | 45,064 | - | - | - | 45,064 | - | - | - | 45,064 | - | - | - | - | - | 45,064 | - | - | 180,256 |
| Telephone & Utilities | [8] | - | - | - | 86,433 | - | - | - | 86,433 | - | - | - | 86,433 | - | - | - | - | - | 86,433 | - | - | 345,733 |
| Insurance | [9] | - | - | - | 63,627 | - | - | - | 63,627 | - | - | - | 63,627 | - | - | - | - | - | 63,627 | - | - | 254,507 |
| Taxes & Assessments | [10] | - | - | 192,470 | - | - | 192,470 | - | - | - | 246,055 | - | - | - | - | 192,589 | - | - | - | 192,589 | - | 1,016,173 |
| Other operating | [11] | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 13,811 | 276,213 |
| IT | [12] | - | - | - | 256,023 | - | - | - | 66,344 | - | - | - | - | 66,344 | - | - | - | 66,344 | - | - | - | 455,055 |
| Bankruptcy Fees | [13] | - | 75,000 | - | - | - | - | 102,500 | - | - | - | 102,500 | - | - | - | 102,500 | - | - | - | 102,500 | - | 485,000 |
| **Subtotal other disbursements** | | 1,361,165 | 614,183 | 1,553,635 | 1,007,917 | 1,361,165 | 731,653 | 1,463,665 | 818,238 | 1,361,165 | 785,237 | 1,463,665 | 751,894 | 1,427,510 | 539,183 | 1,656,254 | 556,770 | 1,622,634 | 539,183 | 1,656,254 | 556,770 | 21,828,142 |
| MidCap Facility Interest | | - | - | - | 30,000 | - | - | - | - | 30,000 | - | - | - | - | 30,000 | - | - | - | 30,000 | - | - | 120,000 |
| **Total Disbursements** | | $ 1,361,165 | 614,183 | 1,553,635 | 1,037,917 | 1,361,165 | 731,653 | 1,463,665 | 818,238 | 1,391,165 | 785,237 | 1,463,665 | 751,894 | 1,427,510 | 569,183 | 1,656,254 | 556,770 | 1,622,634 | 569,183 | 1,656,254 | 556,770 | 21,948,142 |
| **Net Cash Flow** | | (969,984) | 660,194 | (1,027,993) | (445,043) | (701,061) | 775,022 | (736,330) | 9,944 | (462,137) | 951,210 | (400,175) | 311,596 | (364,019) | 1,156,882 | (760,842) | 170,565 | (895,298) | 947,280 | (928,919) | 170,565 | (2,538,542) |

[1] Average weekly cash collections from June 17, 2018 - September 9, 2018, adjusted for system conversion collection projections per discussions with management
[2] See MHAP detail schedule
[3] Average weekly Physician group cash collections from December 2018 - July 2018 straightlined over 4 weeks.
[4] Salaries, Contract Labor & Benefits disbursements based on June 2018 expense from the income statement.
[5] Based upon the average monthly expenses April 2018 - June 2018 straightlined over 4 weeks, but reduced by 10% due to recent expense control.
[6] Average monthly expenses April 2018 - June 2018 straightlined over 4 weeks.
[7] Per Lease Schedule
[8] Based upon the average monthly expenses April 2018 - June 2018 straightlined over 4 weeks. Due to seasonality of historical expenses, the weekly average has been utilized.
[9] Per Insurance Schedule
[10] Represents MHAP payment (payments were due quarterly in FY2018 (changed to monthly in FY2019), but have been adjusted for just a monthly payment during the last two quarters of FY2018) required to be paid to State of Mississippi. No invoice has been issued by the State for 3Q2018.
[11] Based upon the average monthly expenses April 2018 - June 2018 straightlined over 4 weeks.
[12] Based upon MedHost CapEx schedule.
[13] Case Costs are detailed below and split between the three primary entities:

First Month
BANKRUPTCY PROFESSIONAL FEES
| | |
|---|---|
| Debtor Counsel - Polsinelli | 41,667 |
| Special Counsel - McSween | 8,333 |
| FA Debtor - GlassRatner | 25,000 |
| **Total Bankruptcy Professional Fees** | **75,000** |

Subsequent Months
BANKRUPTCY PROFESSIONAL FEES
| | |
|---|---|
| Debtor Counsel - Polsinelli | 50,000 |
| Special Counsel - McSween | 6,333 |
| FA Debtor - GlassRatner | 16,667 |
| Patient Care Ombudsman | 2,500 |
| UCC | 25,000 |
| **Total Bankruptcy Professional Fees** | **102,500** |

GlassRatner — Privileged and Confidential

# Shutdown Scenario

**Curae Health**
Clarksdale
Cash Flow Forecast - Through February 2019

| Week Ending | Footnotes | 10/12/18 | 10/19/18 | 10/26/18 | 11/02/18 | 11/09/18 | 11/16/18 | 11/23/18 | 11/30/18 | 12/07/18 | 12/14/18 | 12/21/18 | 12/28/18 | 01/04/19 | 01/11/19 | 01/18/19 | 01/25/19 | 02/01/19 | 02/08/19 | 02/15/19 | 02/22/19 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | | | | | | | | | |
| Northwest Mississippi Regional Medical Center | | | | | | | | | | | | | | | | | | | | | | |
| Hospital operations | 1 | $ 336,155 $ | 403,386 $ | 470,616 $ | 537,847 $ | 605,078 $ | 638,694 $ | 672,309 $ | 773,156 $ | 537,847 $ | 537,847 $ | 672,309 $ | 437,001 $ | 437,001 $ | 235,308 $ | 201,693 $ | 33,615 $ | 33,615 $ | 33,615 $ | 33,615 $ | 33,615 $ | 7,664,325 |
| Supplemental | 2 | | 815,965 | | | | | | | | | | | | | | | | | | | 815,965 |
| Practice Groups | | | | | | | | | | | | | | | | | | | | | | |
| Clarksdale Regional Physicians | 3 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 27,513 | 27,513 | 27,513 | 27,513 | 13,757 | 13,757 | 13,757 | 13,757 | 6,878 | 6,878 | 6,878 | 6,878 | 632,803 |
| **Total receipts** | | **391,181** | **1,274,377** | **525,643** | **592,874** | **660,105** | **693,720** | **727,336** | **828,182** | **565,361** | **565,361** | **699,822** | **464,514** | **450,758** | **249,065** | **215,449** | **47,372** | **40,494** | **40,494** | **40,494** | **40,494** | **9,113,092** |
| **Disbursements** | | | | | | | | | | | | | | | | | | | | | | |
| Other disbursements | | | | | | | | | | | | | | | | | | | | | | |
| Salaries, Contract Labor & Benefits | 4 | 999,710 | 177,727 | 999,710 | 195,315 | 999,710 | 75,000 | 75,000 | | | | | | | | | | | | | | 3,791,882 |
| Physician Services | 5 | 55,595 | 55,595 | 55,595 | | | | | | | | | | | | | | | | | | 222,379 |
| Contract Services | 6 | 130,916 | 130,916 | 130,916 | | | | | | | | | | | | | | | | | | 392,748 |
| Supplies and Other | 6 | 121,952 | 121,952 | 121,952 | | | | | | | | | | | | | | | | | | 365,857 |
| Repairs and Maintenance | 6 | 39,182 | 39,182 | 39,182 | | | | | | | | | | | | | | | | | | 117,547 |
| Rents & Leases | 7 | | | | | | | | | | | | | | | | | | | | | |
| Telephone & Utilities | 8 | | | | | | | | | | | | | | | | | | | | | |
| Insurance | 9 | | | | | | | | | | | | | | | | | | | | | |
| Taxes & Assessments | 10 | | | 192,470 | | | | | | 192,470 | | | | | | | | | | | | 384,940 |
| Other operating | 11 | 13,811 | 13,811 | 13,811 | 13,811 | | | | | | | | | | | | | | | | | 55,243 |
| IT | 12 | | | | | | | | | | | | | | | | | | | | | |
| Shut Down Costs | 13 | | | | 75,000 | | 75,000 | | 25,000 | 25,000 | | | 50,000 | | 50,000 | | 50,000 | | | | | 350,000 |
| Bankruptcy Fees | 14 | | 75,000 | | | | | 102,500 | | | | 102,500 | | | | 102,500 | | | | | 102,500 | 485,000 |
| **Subtotal other disbursements** | | **1,361,165** | **614,183** | **1,553,635** | **284,126** | **999,710** | **150,000** | **177,500** | **25,000** | **25,000** | **192,470** | **102,500** | **50,000** | **-** | **50,000** | **102,500** | **50,000** | **-** | **-** | **-** | **102,500** | **9,672,176** |
| MidCap Facility Interest | | | | 30,000 | | | | | | | 30,000 | | | | 30,000 | | | | | 30,000 | | 120,000 |
| **Total Disbursements** | | **$ 1,361,165 $** | **614,183 $** | **1,553,635 $** | **314,126 $** | **999,710 $** | **150,000 $** | **177,500 $** | **25,000 $** | **55,000 $** | **192,470 $** | **102,500 $** | **50,000 $** | **- $** | **80,000 $** | **102,500 $** | **50,000 $** | **- $** | **30,000 $** | **102,500 $** | **3,831,867 $** | **9,792,176** |
| **Net Cash Flow** | | **(969,984)** | **660,194** | **(1,027,993)** | **278,748** | **(339,606)** | **543,720** | **549,836** | **803,182** | **510,361** | **372,891** | **597,322** | **414,514** | **450,758** | **169,065** | **112,949** | **(2,628)** | **40,494** | **10,494** | **(62,006)** | **(3,791,393)** | **(679,083)** |

[1] Average weekly cash collections from June 17, 2018 - September 9, 2018, adjusted for system conversion collection projections per discussions with management
[2] See MHAP detail schedule
[3] Average monthly Physician group cash collections from December 2018 - July 2018 straightlined over 4 weeks.
[4] Salaries, Contract Labor & Benefits disbursements based on June 2018 expense from the income statement.
[5] Based upon the average monthly expenses April 2018 - June 2018 straightlined over 4 weeks, but reduced by 10% due to recent expense control.
[6] Average monthly expenses April 2018 - June 2018 straightlined over 4 weeks.
[7] Per Lease Schedule
[8] Based upon the average monthly expenses April 2018 - June 2018 straightlined over 4 weeks. Due to seasonality of historical expenses, the weekly average has been utilized.
[9] Per Insurance Schedule
[10] Represents MHAP payment (payments were due quarterly in FY2018 (changed to monthly in FY2019), but have been adjusted for just a monthly payment during the last two quarters of FY2018) required to be paid to State of Mississippi. No invoice has been issued by the State for 3Q2018.
[11] Based upon the average monthly expenses April 2018 - June 2018 straightlined over 4 weeks.
[12] Based upon MedHost CapEx schedule.
[13] Costs include securing facilities, disposal of waste products, shutdown of pharmacy, etc.
[14] Case Costs as defined below and split between the three primary entities:
   First Month
   BANKRUPTCY PROFESSIONAL FEES
   Debtor Counsel - Polsinelli          41,667
   Special Counsel - McSween             8,333
   FA Debtor - GlassRatner              25,000
   Total Bankruptcy Professional Fees   75,000

   Subsequent Months
   BANKRUPTCY PROFESSIONAL FEES
   Debtor Counsel - Polsinelli          50,000
   Special Counsel - McSween             6,333
   FA Debtor - GlassRatner              16,667
   Patient Care Ombudsman                2,500
   UCC                                  25,000
   Total Bankruptcy Professional Fees  102,500

GlassRatner

Privileged and Confidential

# New Operator Scenario

**Curae Health**
Clarksdale
Cash Flow Forecast - Through February 2019

| Week Ending | Footnotes | 10/12/18 | 10/19/18 | 10/26/18 | 11/02/18 | 11/09/18 | 11/16/18 | 11/23/18 | 11/30/18 | 12/07/18 | 12/14/18 | 12/21/18 | 12/28/18 | 01/04/19 | 01/11/19 | 01/18/19 | 01/25/19 | 02/01/19 | 02/08/19 | 02/15/19 | 02/22/19 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | | | | | | | | | |
| Northwest Mississippi Regional Medical Center | | | | | | | | | | | | | | | | | | | | | | |
| Hospital operations | 1 | $ 336,155 | $ 403,386 | $ 470,616 | $ 537,847 | $ 605,078 | $ 638,694 | $ 672,309 | $ 773,156 | $ 537,847 | $ 537,847 | $ 672,309 | $ 437,001 | $ 437,001 | $ 235,308 | $ 201,693 | $ 33,615 | $ 33,615 | $ 33,615 | $ 33,615 | $ 33,615 | $ 7,664,325 |
| Supplemental | 2 | | 815,965 | | | | | | | | | | | | | | | | | | | 815,965 |
| Practice Groups | | | | | | | | | | | | | | | | | | | | | | |
| Clarksdale Regional Physicians | 3 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 55,026 | 27,513 | 27,513 | 27,513 | 27,513 | 13,757 | 13,757 | 13,757 | 13,757 | 6,878 | 6,878 | 6,878 | 6,878 | 632,803 |
| **Total receipts** | | 391,181 | 1,274,377 | 525,643 | 592,874 | 660,105 | 693,720 | 727,336 | 828,182 | 565,361 | 565,361 | 699,822 | 464,514 | 450,758 | 249,065 | 215,449 | 47,372 | 40,494 | 40,494 | 40,494 | 40,494 | 9,113,093 |
| **Disbursements** | | | | | | | | | | | | | | | | | | | | | | |
| Other disbursements | | | | | | | | | | | | | | | | | | | | | | |
| Salaries, Contract Labor & Benefits | 4 | 999,710 | 177,727 | 999,710 | 195,315 | 999,710 | 75,000 | 75,000 | | | | | | | | | | | | | | 3,522,173 |
| Physician Services | 5 | 55,595 | 55,595 | 55,595 | | | | | | | | | | | | | | | | | 222,379 | 389,163 |
| Contract Services | 5 | 130,916 | 130,916 | 130,916 | | | | | | | | | | | | | | | | | 523,664 | 916,411 |
| Supplies and Other | 6 | 121,952 | 121,952 | 121,952 | | | | | | | | | | | | | | | | | 487,807 | 953,662 |
| Repairs and Maintenance | 6 | 39,182 | 39,182 | 39,182 | | | | | | | | | | | | | | | | | 156,729 | 274,276 |
| Rents & Leases | 7 | | | | | | | | | | | | | | | | | | | | | |
| Telephone & Utilities | 8 | | | | | | | | | | | | | | | | | | | | 86,433 | 86,433 |
| Insurance | 9 | | | | | | | | | | | | | | | | | | | | | |
| Taxes & Assessments | 10 | | | 192,470 | | | | | | | 192,470 | | | | | | | | | | | 384,940 |
| Other operating | 11 | 13,811 | 13,811 | 13,811 | 13,811 | | | | | | | | | | | | | | | | | 55,243 |
| IT | 12 | | | | | | | | | | | | | | | | | | | | | |
| Bankruptcy Fees | 13 | | 75,000 | | | | 102,500 | | | | 102,500 | | | | 102,500 | | | | | 102,500 | | 485,000 |
| **Subtotal other disbursements** | | 1,361,165 | 614,183 | 1,553,635 | 209,126 | 999,710 | 75,000 | 177,500 | - | - | 192,470 | 102,500 | - | - | - | 102,500 | - | - | - | 102,500 | 1,477,011 | 6,967,301 |
| MidCap Facility Interest | | | | | 30,000 | | | | | 30,000 | | | | | | 30,000 | | | | 30,000 | | 120,000 |
| **Total Disbursements** | | $ 1,361,165 | $ 614,183 | $ 1,553,635 | $ 239,126 | $ 999,710 | $ 75,000 | $ 177,500 | $ - | $ 30,000 | $ 192,470 | $ 102,500 | $ - | $ - | $ - | $ 132,500 | $ - | $ - | $ - | $ 132,500 | $ 1,477,011 | $ 7,087,301 |
| **Net Cash Flow** | | (969,984) | 660,194 | (1,027,993) | 353,748 | (339,606) | 618,720 | 549,836 | 828,182 | 535,361 | 372,891 | 597,322 | 464,514 | 450,758 | 219,065 | 112,949 | 47,372 | 40,494 | 10,494 | (62,006) | (1,436,518) | 2,025,793 |

[1] Average weekly cash collections from June 17, 2018 - September 9, 2018, adjusted for system conversion collection projections per discussions with management
[2] See MHAP detail schedule
[3] Average monthly Physician group cash collections from December 2016 - July 2018 straightlined over 4 weeks.
[4] Salaries, Contract Labor & Benefits disbursements based on June 2018 expense from the income statement.
[5] Based upon the average monthly expenses April 2018 - June 2018 straightlined over 4 weeks, but reduced by 10% due to recent expense control.
[6] Average monthly expenses April 2018 - June 2018 straightlined over 4 weeks.
[7] Per Lease Schedule
[8] Based upon the average monthly expenses April 2018 - June 2018 straightlined over 4 weeks. Due to seasonality of historical expenses, the weekly average has been utilized.
[9] Per Insurance Schedule
[10] Represents MHAP payment (payments were due quarterly in FY2018 (changed to monthly in FY2019), but have been adjusted for just a monthly payment during the last two quarters of FY2018) required to be paid to State of Mississippi. No invoice has been issued by the State for 3Q2018.
[11] Based upon the average monthly expenses April 2018 - June 2018 straightlined over 4 weeks.
[12] Based upon MedHost CapEx schedule.
[13] Costs include securing facilities, disposal of waste products, shutdown of pharmacy, etc.
[14] Case Costs as defined below and split between the three primary entities:

First Month
BANKRUPTCY PROFESSIONAL FEES
Debtor Counsel - Polsinelli ... 41,667
Special Counsel - McSween ... 8,333
FA Debtor - GlassRatner ... 25,000
Total Bankruptcy Professional Fees ... 75,000

Subsequent Months
BANKRUPTCY PROFESSIONAL FEES
Debtor Counsel - Polsinelli ... 50,000
Special Counsel - McSween ... 8,333
FA Debtor - GlassRatner ... 16,667
Patient Care Ombudsman ... 2,500
UCC ... 25,000
Total Bankruptcy Professional Fees ... 102,500

GlassRatner

Privileged and Confidential

Page 1 of 2

## **EXHIBIT E-1**

Clarksdale Contracts That May Be Rejected

65544948.4

# CLARKSDALE REGIONAL MEDICAL CENTER, INC.
## TABLE OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| Abbott Point of Care | Laboratory service Agreement | $1,236.00 |
| Aderonke Adefisayo MD | Physician Employment Agreement (Pediatric Hospitalist) | 0.00 |
| Advanced Sterilization Products Services, Inc. Johnson & Johnson Advanced Sterilization | Service Agreement (Maintenance Sterrad NX #Hydrogen Peroxide Plasm Sterilization) | 0.00 |
| Air Gas Midsouth, Inc. | Service Agreement (Cylinder Rental) | $11,900.00 |
| Airgas USA, LLC | Purchase of Cylinder and Bulk Gas | 0.00 |
| All Source Recruiting Group, Inc. dba Ardor Health Solutions | Staffing Agreement (Therapist) | 0.00 |
| Alliance Oncology | Sales Imaging, Computer Tomography Guidance | 0.00 |
| Aman Munir, MD | Physician Employment Agreement | 0.00 |
| American National Red Cross | Service Agreement (Purchase of Blood Products) | $84,851.14 |
| Andrea Smith, MD | Professional Services Agreement (Interpretive Services) | 0.00 |
| Martin A. Andrew | Professional Services (Medical Director Pathology Laboratory) | 0.00 |
| Martin A. Andrew, MD | Independent Contractors (PSA) | 0.00 |
| Associated Pathologists Laboratory, P.A. | External Peer Review Services (Pathology) | 0.00 |
| Atmos Energy Corporation | Service Agreement (Spot Gas Sales Service) | $6,413.55 |
| Ayers Martin Enterprises dba MidSouth Pathology | Professional Services Agreement | 0.00 |

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| | (Exclusive Pathology Services) | |
| Baxter Healthcare Corporation | Service Agreement (Maintenance Spectrum IV Pumps) | $46,577.04 |
| Bayer Healthcare, LLC | Service Agreement (Maintenance CT Injection System) | $3,629.10 |
| Bayer U.S., LLC | Service Agreement (Maintenance MR Injection System) | 0.00 |
| Beckman Coulter | Laboratory Service Agreement | $4,202.00 |
| Biomerieux, Inc. | Contract | $8,723.54 |
| Biomerieux, Inc. Healthtrust Purchasing Group | Placed Equipment (Vidas 3 Analyzer for Procalcitonin Test) | 0.00 |
| Bio-Reference Laboratories, Inc. | Reference Lab (Pathology) | $18,866.00 |
| Cable One, Inc. | Service Agreement (Digital Cable Services & Internet) | 0.00 |
| Carrier Commercial Service | Service Agreement (Maintenance Cooling Systems) | $12,817.40 |
| Central Defense Services, LLC | Security Services Agreement | 0.00 |
| Charles Meyers | Lawn Service | 0.00 |
| CHCT Mississippi, LLC | Real Property Lease | 0.00 |
| ChemTreat | Service Agreement (Maintenance Facility Water System) | $6,159.52 |
| CHG-Meridian USA Corp | Service Agreement (Accudose Main Cabinet Wireless Scanners) | $12,255.56 |
| CHG-Meridian | Service Agreement (Accudose/Ref Lock HC Locking Drawer) | 0.00 |

65659937.1

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| CHSPC Leasing | Equipment Lease | $686,035.00 |
| Cintas Corp. | EVS Rental Services for Floor Mats | $5,240.40 |
| Clarksdale Country Club Apartments | Real Property Lease (Apartment Rental) | $2,168.00 |
| Clarksdale Municipal School District | Sales Hospital Services (Speech/Occupational/Physical Therapy) | 0.00 |
| CMS Imaging, Inc. | Service-Maintenance Imaging Konica Panels | $32,121.76 |
| Coahoma County Board of Supervisors | Real Property Lease (Hospital Building Lease) | 0.00 |
| Cornerstone DME, LLC | Product Placement of Durable Medical Equipment and Supplies | 0.00 |
| Crown Health Care Laundry Services, LLC | Service Agreement (Laundry and Linen Services) | $75,027.93 |
| Deep South Physics PLLC | Service Agreement (Physics Services) | $4,730.13 |
| De Lage Landen | Equipment Lease | 0.00 |
| Dothan Security, Inc. d/b/a Security Services | Service Agreement (Security Management Services (CHS) | $179,141.21 |
| Energy Systems Southeast, LLC | Service Agreement (Maintenance Generators) | $570.00 |
| Faseeh Hadidi, MD | Professional Services Agreement (Stroke Program Medical Director) | 0.00 |
| Faseeh Hadidi, MD | Call Coverage Agreement (Neurology) | 0.00 |
| First American Commercial Bancorp | Equipment Lease | 0.00 |
| Firstline Executives | Employment Placement Services | 0.00 |
| Fresenius / Bio-Medical Applications of Mississippi, Inc. | Service Agreement | $56,384.56 |
| G. Davis Berryhill, MD | Professional Services Agreement | 0.00 |

65659937.1

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| | (Interpretive Services) | |
| GE Healthcare Finance (FL) | Equipment Lease (Exera Scopes) | $9,140.43 |
| GE Healthcare Finance (FL) | Equipment Lease (Mammo Equipment) | 0.00 |
| GE Healthcare Finance (FL) | Equipment Lease (CT) | 0.00 |
| GE Healthcare Finance (FL) | Equipment Lease (Anesthesia Equipment) | 0.00 |
| GE Healthcare Finance (FL) | Equipment Lease (Hill-Rom Beds) | 0.00 |
| GE Healthcare (MA) | Centricity Image Archive Services | 0.00 |
| GE Healthcare (WI) | Service Agreement (Maintenance Imaging Equipment) | $39,606.72 |
| GE Healthcare (WI) | Service Agreement (Maintenance Anesthesia Equipment) | 0.00 |
| GE Healthcare (IL) | Service Agreement (Maintenance Imaging Equipment) | $53,101.74 |
| General Biomedical | Service Agreement (Maintenance Ventilators) | $4,548.81 |
| Germfree Laboratories, Inc. | Service Agreement (Maintenance Cleanroom Equipment-Germfree Compounding Isolators) | 0.00 |
| GNXcor, Inc. | Software (Maintenance Care Enterprise) (Asset Management System for Plant OPS) | $1,925.02 |
| Greenbough Health and Rehabilitation Center | Sales Hospital Services Inpatient Respite and Acute Care Services | 0.00 |
| Hargrove, Inc | Vending Services Agreement | 0.00 |
| Healogics Inc. | Service Agreement (Wound | $138,256.44 |

65659937.1

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| | Care Management Services) | |
| HHS Environmental Services LLC | Services Agreement (Housekeeping Services) | 0.00 |
| Hunter B. Nelson, MD | Personal Services Agreement (Exclusive Radiology Services) | 0.00 |
| Hunter B. Nelson, MD | Medical Director and Midlevel Supervisor (Wound Care Center) | 0.00 |
| Hunter Ben Nelson, MD | Professional Services (Interpretive Services) | 0.00 |
| Huong Pham, MD | Physician Recruitment Agreement | 0.00 |
| Instrumentation Laboratory | Laboratory Service Agreement | 0.00 |
| Jacqueline Hampton, MD | Physician Employment Agreement | 0.00 |
| Jaiyeola Adeleye | Physician Employment Agreement | 0.00 |
| John Speca, MD | Physician Employment Agreement (Orthopedics) | 0.00 |
| Johnson Controls | Service Agreement (Maintenance Metasys and Related Devices) | $25,930.72 |
| Kendrix Evans, MD | Physician Employment Agreement (General Surgery) | 0.00 |
| Konica Minolta | Maintenance Agreement (Ortho Clinic) | 0.00 |
| Laboratory Corporation of America | Lab | $38,435.36 |
| Lakeview Properties, LLC | Real Property Lease (Rent-Campbell's Clinic) | $6,365.28 |
| Leasing Associates of Barrington | Equipment Lease (Lab Equipment) (Exl Chem Immuno System) | $27,648.88 |
| Life Link, LLC | Clinical Education (Certification Classes in ACLS, PALS, EKG and CPR) | $10,120.00 |

65659937.1

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| Maha Wasef, MD | Physician Employment Agreement | 0.00 |
| MalFinance (A Neopost USA Company) | Equipment Lease/Maintenance Agreement (Neopost IN600 Postage Meter) | 0.00 |
| Medivators | Service Agreement (Maintenance Medivator Cleaning Equipment) | $12,757.61 |
| Medworks | Nuclear Equipment Lease and Staffing | $13,395.00 |
| Mid South Waste Disposals, Inc. | Service Agreement (Waste Disposal) | 0.00 |
| Mid-South Medical Imaging, LLC | Service Agreement (Maintenance AGFA CR Reader) | $6,525.01 |
| MidSouth Nuclear Services | Service Agreement (Nuclear Medicine Physicist Services) | $2,160.00 |
| MidSouth Pathology | Service Agreement (Pathology Department Physician Staffing) | 0.00 |
| Mississippi Department of Health | Sales: Hospital Services for Breast and Cervical Cancer Program | 0.00 |
| Mississippi Department of Rehabilitation | Service Agreement (Hospital Rehabilitation Services) | 0.00 |
| Mississippi Emergency Physicians Services LLC | Management Services (Emergency Medicine) | $263,260.83 |
| Mississippi Lions Eye Bank | Recovery Access Agreement (Eye) | 0.00 |
| Morrison Management Specialists, Inc. | Management Services (Food Services) | $186,770.78 |
| MS Valley Gas Co. | | 0.00 |
| Neopost Southeast | Product Lease Agreement | $1,065.73 |
| Net Health | Software Purchase & Implementation | $2,806.37 |

6

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| | (Medhost Project) | |
| Nighthawk Radiology | Service Agreement | 0.00 |
| Nihon Kohden America Inc. | Service Agreement (Maintenance Sleep Lab Equipment) | $26,325.27 |
| Nikki Cager, MD | Physician Employment Agreement | 0.00 |
| Nuance Communications, Inc. | Interface Change for Imaging RIS (Medhost Project) | $51,309.49 |
| Nuance Communications, Inc | Transcript Services (Continue under CHS Escription) | 0.00 |
| Olympus America Inc. | Service Agreement (Maintenance GI Endoscopy Equipment) | $8,369.20 |
| Otis Elevator | Service Agreement (Maintenance Elevators) | $13,710.39 |
| Pharmacy Onesource, Inc. | Professional Services (Sentr17 Migration/Implementation (Medhost Project) | 0.00 |
| Philips Healthcare (WA) | Service Agreement (Maintenance Cath Lab) | $144,277.03 |
| Philips Healthcare (MA) | Service Agreement (Maintenance-Diagnostic Imaging Equipment) | 0.00 |
| Philips Medical Capital | Equipment Lease (EPIQ Ultrasound Equipment (2)) | $44,848.51 |
| Philips Medical Capital | Equipment Lease (Affinity Ultrasound) | 0.00 |
| Philips Medical Capital | Equipment Lease (Surgery PT Monitoring Equipment) | 0.00 |
| Pitney Bowes | Service Agreement | 0.00 |

7

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| Priority Anesthesia | Service Agreement | 0.00 |
| Quitman County Tax Collector | Real Property Lease (Rent-Deporres Clinic) | $1,321.68 |
| Rajesh Subramanya, MD | Physician Employment Agreement (Pediatric Hospitalist) | 0.00 |
| Region One Mental Health Center | Professional Services (Mental Health Consulting) | $13,845.33 |
| Richard Earl Brownstein, MD | Professional Services Agreement (Gastroenterology) | 0.00 |
| Richard Earl Brownstein, MD | Contracted Provider Reassignment of EHR (Incentive Payments) | 0.00 |
| Sarah Perkins, FNP | NP Employment Agreement | 0.00 |
| Sayle Oil Co. | Outside Services Agreement | $200.00 |
| SCC Soft Computer Consultants | Service Agreement (Maintenance SoftLab Laboratory System) | $27,020.00 |
| SCC-Soft Computer | Interface Change for SoftBank and His (Medhost Project) Maintenance) | 0.00 |
| Seng Pang | NP Employment Agreement | 0.00 |
| Shawanda Agnew, MD | Recruitment Agreement (Aaron E. Henry Community Health Services Center, Inc.) | 0.00 |
| Sherrica Smith, NP | NP Employment Agreement | 0.00 |
| Siemens Medical Solutions USA Inc. | Service Agreement (Maintenance MRI Siemens AERA) | $35,851.00 |
| Simplex Grinnell, LP | Service Agreement (Maintenance Life Safety System) (Fire) | 0.00 |
| Smiths Medical, ASD | Service Agreement (Software Maintenance CADD Ambulatory Pumps and | $5,644.42 |

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| | Syringe Pumps) | |
| Softscript, Inc. | Transcript Services | 0.00 |
| Southern Duplicating | Office Equipment Lease (Copiers) | $18,972.00 |
| Southern Duplicating | Service Agreement (Copier/Printer Lease & Maintenance Services) | 0.00 |
| Specialists on Call, Inc. | Professional Services Agreement (Specialty Consultative Service) | 0.00 |
| Spetra Lab | Service Agreement (End Stage Renal Dialysis Lab Services) | 0.00 |
| Stanley Security Solutions | Service Agreement (Maintenance Access Control System) | $5,544.50 |
| Stericycle | Service Agreement (Pharmaceutical Waste) | $37,634.49 |
| Steris Corporation | Service Agreement (Maintenance Sterilization Equipment) | $11,082.69 |
| Steritech Group, Inc. | Service Agreement (Pest Prevention Services) | 0.00 |
| Stryker Flex Financial | Office Equipment Lease | $3,804.95 |
| Stryker Sales Corporation (Stryker Endoscopy) | Service Agreement (Maintenance, Laproscopy Equipment (2 Laporscope, 1288 Camera Head and Coupler, Cystoscope) | $19,943.07 |
| Susan Prather, FNP | NP Employment Agreement | 0.00 |
| Talentwise | Consumer Reporting Service (Background Screening Reports for Physician Credentialing) | 0.00 |
| Tunica County Board of Supervisors | Sales: Hospital Services for Inmates of Tunica County Jail | 0.00 |

9

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| Tutwiler Clinic | Sales: Hospital Services for Patients of Tutwiler Clinic | 0.00 |
| USF Group | Service Agreement (Procure Discount on Telecom, Data, and Internet Services) | 0.00 |
| Vernon T. Hughes, DO | Professional Services (NP Preceptor) | 0.00 |
| Vikram Reddy Beemidi, MD | Physician Employment Agreement | 0.00 |
| Virtual Radiologic Corporation | Service Agreement (Teleradiologic) | 0.00 |
| Willow Anesthesia Services, LLC | Locums Staffing (Anesthesia) | 0.00 |
| Yashwant Chowdhary, MD | Professional Services (Nephrology) | 0.00 |

65659937.1

## Exhibit E-2

Clarksdale Contracts That May Be Assumed and Assigned

# CLARKSDALE REGIONAL MEDICAL CENTER, INC.
## TABLE OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| Abbott Point of Care | Laboratory service Agreement | $1,236.00 |
| Aderonke Adefisayo MD | Physician Employment Agreement (Pediatric Hospitalist) | 0.00 |
| Advanced Sterilization Products Services, Inc. Johnson & Johnson Advanced Sterilization | Service Agreement (Maintenance Sterrad NX #Hydrogen Peroxide Plasm Sterilization) | 0.00 |
| Air Gas Midsouth, Inc. | Service Agreement (Cylinder Rental) | $11,900.00 |
| Airgas USA, LLC | Purchase of Cylinder and Bulk Gas | 0.00 |
| All Source Recruiting Group, Inc. dba Ardor Health Solutions | Staffing Agreement (Therapist) | 0.00 |
| Alliance Oncology | Sales Imaging, Computer Tomography Guidance | 0.00 |
| Aman Munir, MD | Physician Employment Agreement | 0.00 |
| American National Red Cross | Service Agreement (Purchase of Blood Products) | $84,851.14 |
| Andrea Smith, MD | Professional Services Agreement (Interpretive Services) | 0.00 |
| Martin A. Andrew | Professional Services (Medical Director Pathology Laboratory) | 0.00 |
| Martin A. Andrew, MD | Independent Contractors (PSA) | 0.00 |
| Associated Pathologists Laboratory, P.A. | External Peer Review Services (Pathology) | 0.00 |
| Atmos Energy Corporation | Service Agreement (Spot Gas Sales Service) | $6,413.55 |
| Ayers Martin Enterprises dba MidSouth Pathology | Professional Services Agreement | 0.00 |

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| | (Exclusive Pathology Services) | |
| Baptist Health Services Group of the MidSouth, Inc. | Hospital Payor Agreement | 0.00 |
| Baxter Healthcare Corporation | Service Agreement (Maintenance Spectrum IV Pumps) | $46,577.04 |
| Bayer Healthcare, LLC | Service Agreement (Maintenance CT Injection System) | $3,629.10 |
| Bayer U.S., LLC | Service Agreement (Maintenance MR Injection System) | 0.00 |
| Beckman Coulter | Laboratory Service Agreement | $4,202.00 |
| Biomerieux, Inc. | Contract | $8,723.54 |
| Biomerieux, Inc. Healthtrust Purchasing Group | Placed Equipment (Vidas 3 Analyzer for Procalcitonin Test) | 0.00 |
| Bio-Reference Laboratories, Inc. | Reference Lab (Pathology) | $18,866.00 |
| Blue Cross and Blue Shield of Mississippi | Hospital Payor Agreement | 0.00 |
| Cable One, Inc. | Service Agreement (Digital Cable Services & Internet) | 0.00 |
| Carrier Commercial Service | Service Agreement (Maintenance Cooling Systems) | $12,817.40 |
| Central Defense Services, LLC | Security Services Agreement | 0.00 |
| Charles Meyers | Lawn Service | 0.00 |
| CHCT Mississippi, LLC | Real Property Lease | 0.00 |
| ChemTreat | Service Agreement (Maintenance Facility Water System) | $6,159.52 |
| CHG-Meridian USA Corp | Service Agreement (Accudose Main Cabinet Wireless Scanners) | $12,255.56 |

65660797.1

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| | | |
| CHG-Meridian | Service Agreement (Accudose/Ref Lock HC Locking Drawer) | 0.00 |
| CHSPC Leasing | Equipment Lease | $686,035.00 |
| Cigna Health and Life Insurance Company | Hospital Payor Agreement | 0.00 |
| Cintas Corp. | EVS Rental Services for Floor Mats | $5,240.40 |
| Clarksdale Country Club Apartments | Real Property Lease (Apartment Rental) | $2,168.00 |
| Clarksdale Municipal School District | Sales Hospital Services (Speech/Occupational/Physical Therapy) | 0.00 |
| CMS Imaging, Inc. | Service-Maintenance Imaging Konica Panels | $32,121.76 |
| Coahoma County Board of Supervisors | Real Property Lease (Hospital Building Lease) | 0.00 |
| Cornerstone DME, LLC | Product Placement of Durable Medical Equipment and Supplies | 0.00 |
| Crown Health Care Laundry Services, LLC | Service Agreement (Laundry and Linen Services) | $75,027.93 |
| Deep South Physics PLLC | Service Agreement (Physics Services) | $4,730.13 |
| De Lage Landen | Equipment Lease | 0.00 |
| Dothan Security, Inc. d/b/a Security Services | Service Agreement (Security Management Services (CHS) | $179,141.21 |
| Energy Systems Southeast, LLC | Service Agreement (Maintenance Generators) | $570.00 |
| Faseeh Hadidi, MD | Professional Services Agreement (Stroke Program Medical Director) | 0.00 |
| Faseeh Hadidi, MD | Call Coverage Agreement (Neurology) | 0.00 |
| First American Commercial Bancorp | Equipment Lease | 0.00 |
| First Choice Health Plan | Hospital Payor Agreement | 0.00 |

3

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| of Mississippi, LLC | | |
| Firstline Executives | Employment Placement Services | 0.00 |
| Fresenius / Bio-Medical Applications of Mississippi, Inc. | Service Agreement | $56,384.56 |
| G. Davis Berryhill, MD | Professional Services Agreement (Interpretive Services) | 0.00 |
| GE Healthcare Finance (FL) | Equipment Lease (Exera Scopes) | $9,140.43 |
| GE Healthcare Finance (FL) | Equipment Lease (Mammo Equipment) | 0.00 |
| GE Healthcare Finance (FL) | Equipment Lease (CT) | 0.00 |
| GE Healthcare Finance (FL) | Equipment Lease (Anesthesia Equipment) | 0.00 |
| GE Healthcare Finance (FL) | Equipment Lease (Hill-Rom Beds) | 0.00 |
| GE Healthcare (MA) | Centricity Image Archive Services | 0.00 |
| GE Healthcare (WI) | Service Agreement (Maintenance Imaging Equipment) | $39,606.72 |
| GE Healthcare (WI) | Service Agreement (Maintenance Anesthesia Equipment) | 0.00 |
| GE Healthcare (IL) | Service Agreement (Maintenance Imaging Equipment) | $53,101.74 |
| General Biomedical | Service Agreement (Maintenance Ventilators) | $4,548.81 |
| Germfree Laboratories, Inc. | Service Agreement (Maintenance Cleanroom Equipment-Germfree Compounding Isolators) | 0.00 |
| GNXcor, Inc. | Software (Maintenance Care Enterprise) (Asset Management System for | $1,925.02 |

4

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| | Plant OPS) | |
| Greenbough Health and Rehabilitation Center | Sales Hospital Services Inpatient Respite and Acute Care Services | 0.00 |
| Hargrove, Inc | Vending Services Agreement | 0.00 |
| Healogics Inc. | Service Agreement (Wound Care Management Services) | $138,256.44 |
| HHS Environmental Services LLC | Services Agreement (Housekeeping Services) | 0.00 |
| Hunter B. Nelson, MD | Personal Services Agreement (Exclusive Radiology Services) | 0.00 |
| Hunter B. Nelson, MD | Medical Director and Midlevel Supervisor (Wound Care Center) | 0.00 |
| Hunter Ben Nelson, MD | Professional Services (Interpretive Services) | 0.00 |
| Huong Pham, MD | Physician Recruitment Agreement | 0.00 |
| Instrumentation Laboratory | Laboratory Service Agreement | 0.00 |
| Jacqueline Hampton, MD | Physician Employment Agreement | 0.00 |
| Jaiyeola Adeleye | Physician Employment Agreement | 0.00 |
| John Speca, MD | Physician Employment Agreement (Orthopedics) | 0.00 |
| Johnson Controls | Service Agreement (Maintenance Metasys and Related Devices) | $25,930.72 |
| Kendrix Evans, MD | Physician Employment Agreement (General Surgery) | 0.00 |
| Konica Minolta | Maintenance Agreement (Ortho Clinic) | 0.00 |
| Laboratory Corporation of America | Lab | $38,435.36 |
| Lakeview Properties, LLC | Real Property Lease (Rent-Campbell's Clinic) | $6,365.28 |

65660797.1

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| | | |
| Leasing Associates of Barrington | Equipment Lease (Lab Equipment) (Exl Chem Immuno System) | $27,648.88 |
| Life Link, LLC | Clinical Education (Certification Classes in ACLS, PALS, EKG and CPR) | $10,120.00 |
| Maha Wasef, MD | Physician Employment Agreement | 0.00 |
| MalFinance (A Neopost USA Company) | Equipment Lease/Maintenance Agreement (Neopost IN600 Postage Meter) | 0.00 |
| Medivators | Service Agreement (Maintenance Medivator Cleaning Equipment) | $12,757.61 |
| Medworks | Nuclear Equipment Lease and Staffing | $13,395.00 |
| Mid South Waste Disposals, Inc. | Service Agreement (Waste Disposal) | 0.00 |
| Mid-South Medical Imaging, LLC | Service Agreement (Maintenance AGFA CR Reader) | $6,525.01 |
| MidSouth Nuclear Services | Service Agreement (Nuclear Medicine Physicist Services) | $2,160.00 |
| MidSouth Pathology | Service Agreement (Pathology Department Physician Staffing) | 0.00 |
| Mississippi Department of Health | Sales: Hospital Services for Breast and Cervical Cancer Program | 0.00 |
| Mississippi Department of Rehabilitation | Service Agreement (Hospital Rehabilitation Services) | 0.00 |
| Mississippi Emergency Physicians Services LLC | Management Services (Emergency Medicine) | $263,260.83 |
| Mississippi Lions Eye Bank | Recovery Access Agreement (Eye) | 0.00 |

65660797.1

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| Mississippi State Department of Health | Hospital Payor Agreement | $25,080.00 |
| Morrison Management Specialists, Inc. | Management Services (Food Services) | $186,770.78 |
| MS Valley Gas Co. | | 0.00 |
| Neopost Southeast | Product Lease Agreement | $1,065.73 |
| Net Health | Software Purchase & Implementation (Medhost Project) | $2,806.37 |
| Nighthawk Radiology | Service Agreement | 0.00 |
| Nihon Kohden America Inc. | Service Agreement (Maintenance Sleep Lab Equipment) | $26,325.27 |
| Nikki Cager, MD | Physician Employment Agreement | 0.00 |
| Nuance Communications, Inc. | Interface Change for Imaging RIS (Medhost Project) | $51,309.49 |
| Nuance Communications, Inc | Transcript Services (Continue under CHS Escription) | 0.00 |
| Olympus America Inc. | Service Agreement (Maintenance GI Endoscopy Equipment) | $8,369.20 |
| Otis Elevator | Service Agreement (Maintenance Elevators) | $13,710.39 |
| Pharmacy Onesource, Inc. | Professional Services (Sentr17 Migration/Implementation (Medhost Project) | 0.00 |
| Philips Healthcare (WA) | Service Agreement (Maintenance Cath Lab) | $144,277.03 |
| Philips Healthcare (MA) | Service Agreement (Maintenance-Diagnostic Imaging Equipment) | 0.00 |
| Philips Medical Capital | Equipment Lease (EPIQ Ultrasound Equipment | $44,848.51 |

65660797.1

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| | (2)) | |
| Philips Medical Capital | Equipment Lease (Affinity Ultrasound) | 0.00 |
| Philips Medical Capital | Equipment Lease (Surgery PT Monitoring Equipment) | 0.00 |
| Pitney Bowes | Service Agreement | 0.00 |
| Priority Anesthesia | Service Agreement | 0.00 |
| Quitman County Tax Collector | Real Property Lease (Rent-Deporres Clinic) | $1,321.68 |
| Rajesh Subramanya, MD | Physician Employment Agreement (Pediatric Hospitalist) | 0.00 |
| Region One Mental Health Center | Professional Services (Mental Health Consulting) | $13,845.33 |
| Richard Earl Brownstein, MD | Professional Services Agreement (Gastroenterology) | 0.00 |
| Richard Earl Brownstein, MD | Contracted Provider Reassignment of EHR (Incentive Payments) | 0.00 |
| Sarah Perkins, FNP | NP Employment Agreement | 0.00 |
| Sayle Oil Co. | Outside Services Agreement | $200.00 |
| SCC Soft Computer Consultants | Service Agreement (Maintenance SoftLab Laboratory System) | $27,020.00 |
| SCC-Soft Computer | Interface Change for SoftBank and His (Medhost Project) Maintenance) | 0.00 |
| Seng Pang | NP Employment Agreement | 0.00 |
| Shawanda Agnew, MD | Recruitment Agreement (Aaron E. Henry Community Health Services Center, Inc.) | 0.00 |
| Sherrica Smith, NP | NP Employment Agreement | 0.00 |
| Siemens Medical | Service Agreement | $35,851.00 |

65660797.1

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| Solutions USA Inc. | (Maintenance MRI Siemens AERA) | |
| Simplex Grinnell, LP | Service Agreement (Maintenance Life Safety System) (Fire) | 0.00 |
| Smiths Medical, ASD | Service Agreement (Software Maintenance CADD Ambulatory Pumps and Syringe Pumps) | $5,644.42 |
| Softscript, Inc. | Transcript Services | 0.00 |
| Southern Duplicating | Office Equipment Lease (Copiers) | $18,972.00 |
| Southern Duplicating | Service Agreement (Copier/Printer Lease & Maintenance Services) | 0.00 |
| Specialists on Call, Inc. | Professional Services Agreement (Specialty Consultative Service) | 0.00 |
| Spetra Lab | Service Agreement (End Stage Renal Dialysis Lab Services) | 0.00 |
| Stanley Security Solutions | Service Agreement (Maintenance Access Control System) | $5,544.50 |
| Stericycle | Service Agreement (Pharmaceutical Waste) | $37,634.49 |
| Steris Corporation | Service Agreement (Maintenance Sterilization Equipment) | $11,082.69 |
| Steritech Group, Inc. | Service Agreement (Pest Prevention Services) | 0.00 |
| Stryker Flex Financial | Office Equipment Lease | $3,804.95 |
| Stryker Sales Corporation (Stryker Endoscopy) | Service Agreement (Maintenance, Laproscopy Equipment (2 Laporscope, 1288 Camera Head and Coupler, Cystoscope) | $19,943.07 |

65660797.1

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| Susan Prather, FNP | NP Employment Agreement | 0.00 |
| Talentwise | Consumer Reporting Service (Background Screening Reports for Physician Credentialing) | 0.00 |
| TriWest Healthcare Alliance Corporation | Hospital Payor Agreement | 0.00 |
| Tunica County Board of Supervisors | Sales: Hospital Services for Inmates of Tunica County Jail | 0.00 |
| Tutwiler Clinic | Sales: Hospital Services for Patients of Tutwiler Clinic | 0.00 |
| UnitedHealthcare Insurance Company | Hospital Payor Agreement | 0.00 |
| USF Group | Service Agreement (Procure Discount on Telecom, Data, and Internet Services) | 0.00 |
| Vernon T. Hughes, DO | Professional Services (NP Preceptor) | 0.00 |
| Vikram Reddy Beemidi, MD | Physician Employment Agreement | 0.00 |
| Virtual Radiologic Corporation | Service Agreement (Teleradiologic) | 0.00 |
| Willow Anesthesia Services, LLC | Locums Staffing (Anesthesia) | 0.00 |
| Yashwant Chowdhary, MD | Professional Services (Nephrology) | 0.00 |
| 3M* | Service Agreement | $180,061.10 |
| Abbott Laboratories* | Service Agreement | 0.00 |
| Accounts Resolution Team* | Service Agreement | 0.00 |
| Aquapure Water Systems, LLC* | Equipment Lease (Filtered Water System) | 0.00 |
| Athena* | Service Agreement | 0.00 |
| BlueCross BlueShield* | Benefit Contract | 0.00 |
| BMC Copiers* | Service Agreement | 0.00 |

10

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| CBC, LLC* | | 0.00 |
| Delta Dental* | Benefit Contract | 0.00 |
| Experian Passport* | Service Agreement | $42,500.00 |
| EyeMed* | Benefit Contract | 0.00 |
| GIS* | Benefit Contract | 0.00 |
| Health Receivables Group* | Service Agreement | 0.00 |
| Healthstream* | Patient Satisfaction Surveys | $5,465.00 |
| Healthstream* | Benefit Contract | 0.00 |
| HealthTrust* | Service Agreement | 0.00 |
| HS2* | Service Agreement | $3982.50 |
| IN10SITY* | Service Agreement | $570.00 |
| International Finance Services* | Office Equipment Lease (Kronos Badge Reader- Facilities) | 0.00 |
| Interqual* | Service Agreement (Evergreen) | 0.00 |
| Kronos* | Service Agreement | $7,410.00 |
| LBMC* | Benefit Contract | 0.00 |
| McKesson* | Service Agreement (Evergreen) | 0.00 |
| MedHost* | Service Agreement | $92,139.99 |
| Medical Interactive* | Service Agreement | 0.00 |
| MediTract* | Service Agreement | $6270.93 |
| MicroSoft* | Service Agreement | 0.00 |
| MidPark Knoxville, LLC* | Real Property Lease (Corporate Office Rent) | 0.00 |

11

| Counterparty | Contract Description | Proposed Cure Amount |
|---|---|---|
| Milliman* | Benefit Contract | $2001.88 |
| MRS Systems* | Services Agreement | $16,320.00 |
| Mutual of Omaha* | Benefit Contract | $64,651.89 |
| Omega* | Services Agreement | 0.00 |
| Optum360* | Benefit Contract | 0.00 |
| Pascal Metrics* | Benefit Contract | 0.00 |
| PGN Technologies* | Services Agreement | 0.00 |
| Pharmacy Onesource/Wikters Kluwer* | Service Agreement | 0.00 |
| Pitney Bowes* | Office Equipment Lease (Postage Machine) | 0.00 |
| Polestar* | Benefit Contract | $612.15 |
| Revenue Recovery Corporation* | Services Agreement | 0.00 |
| Sentri7* | Service Agreement | 0.00 |
| Sirius Computer Solutions/Nutranix* | Service Agreement | 0.00 |
| STAT Imaging* | Services Agreement | $129,562.00 |
| Sun Life* | Benefit Contract | 0.00 |
| Thomas and Company* | Benefit Contract | 0.00 |
| TIS* | Benefit Contract | 0.00 |
| Trinisys* | Service Agreement | 0.00 |
| Var Technology Finance* | Office Equipment Lease (Nutanix Server-Corporate) | $3,512.63 |
| Your Care Universe* | Service Agreement | $5,445.74 |

*These contracts are at the corporate level and are for the benefit of all Debtors, not just Clarksdale. With respect to these contracts, Debtors seek authority, but not direction, to assume and assign these corporate contracts only as they relate to Clarksdale. Any such assumption and assignment and cure amounts must be agreed to by the Debtors, the Contract Counterparty, and the new operator.

12