# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

---

**THE DEADLINE FOR FILING A TIMELY RESPONSE IS: November 20, 2018**
**THE HEARING WILL BE: November 27, 2018 at 11:00 AM Central Standard Time in Courtroom 2, 2nd Floor Customs House, 701 Broadway, Nashville, TN 37203.**

---

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that on November 6, 2018, the above-captioned debtors and debtors in possession (the "**Debtors**") filed their **MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING BIDDING PROCEDURES FOR THE SALE OF PANOLA MEDICAL CENTER, (II) AUTHORIZING THE SALE OF PANOLA MEDICAL CENTER FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (III) APPROVING STALKING HORSE PURCHASER, BREAK-UP FEE, AND OVERBID PROTECTIONS, (IV) ESTABLISHING CERTAIN PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (V) SCHEDULING AN AUCTION, (VI) SCHEDULING A HEARING AND OBJECTION DEADLINES WITH RESPECT TO THE SALE OF PANOLA MEDICAL CENTER, (VII)**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

**APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (VIII) GRANTING RELATED RELIEF** (the "**Motion**"), attached hereto.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held on **November 27, 2018 at 11:00 AM Central Standard Time** in Courtroom 2, 2nd Floor Customs House, 701 Broadway, Nashville, TN 37203.

**YOUR RIGHTS MAY BE AFFECTED.** If you do not want the court to grant the Motion by entering the proposed final order, attached hereto, or if you want the court to consider your views on the Motion, then on or before **November 20, 2018**, you or your attorney must:

1.  File with the court your response or objection explaining your position. Please note: the Bankruptcy Court for the Middle District of Tennessee requires electronic filing. Any response or objection you wish to file must be submitted electronically. To file electronically, you or your attorney must go to the court website and follow the instructions at: <https://ecf.tnmb.uscourts.gov>.

If you need assistance with Electronic Filing you may call the Bankruptcy Court at (615) 736-5584. You may also visit the Bankruptcy Court in person at: 701 Broadway, 1st Floor, Nashville, TN (Monday - Friday, 8:00 A.M. - 4:00 P.M.).

2.  Your response must state the deadline for filing responses, the date of the scheduled hearing and the motion to which you are responding.

**THERE WILL BE NO FURTHER NOTICE OF THE HEARING DATE.** You may check whether a timely response has been filed by viewing the case on the court's website at <https://ecf.tnmb.uscourts.gov>. If you or your attorney does not take these steps, the court may decide that you do not oppose the relief sought in the Motion and may enter the attached final order granting that relief.

66015390.1

Dated: November 6, 2018
        Nashville, Tennessee

**POLSINELLI PC**
*/s/ Michael Malone*          
Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (*Admitted Pro Hac Vice*)
Caryn E. Wang (*Admitted Pro Hac Vice*)
1201 West Peachtree Street NW
Atlanta, Georgia
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

*Counsel to the Debtors and
Debtors in Possession*

66015390.1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING BIDDING PROCEDURES FOR THE SALE OF PANOLA MEDICAL CENTER, (II) AUTHORIZING THE SALE OF PANOLA MEDICAL CENTER FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (III) APPROVING STALKING HORSE PURCHASER, BREAK-UP FEE, AND OVERBID PROTECTIONS, (IV) ESTABLISHING CERTAIN PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (V) SCHEDULING AN AUCTION, (VI) SCHEDULING A HEARING AND OBJECTION DEADLINES WITH RESPECT TO THE SALE OF PANOLA MEDICAL CENTER, (VII) APPROVING THE FORM AND MANNER OF <u>NOTICE THEREOF, AND (VIII) GRANTING RELATED RELIEF</u>

The above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***") file this motion pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 6003, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 9013-1 of the Local Court Rules of the United States Bankruptcy Court for the Middle District of Tennessee (the "***Local Rules***"), for entry of an order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "***Sale Procedures Order***"), (i) approving bidding procedures for the sale of the Panola Medical Center, a 112-bed acute care hospital and related healthcare operations and facilities located in Batesville, Mississippi, owned and operated by Debtor Batesville Regional Medical Center, Inc. (the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

1

"*Panola Hospital*"), (ii) authorizing the sale of the Panola Hospital free and clear of all liens, claims, encumbrances and other interests, (iii) approving stalking horse purchaser, break-up fee, and overbid protections, (iv) establishing certain procedures for the assumption and assignment of executory contracts and unexpired leases, (v) scheduling an auction, (vi) scheduling a hearing and objection deadlines with respect to the sale of the Hospital and assumption and assignment of executory contracts and unexpired leases, (vii) approving the form and manner of notice, and (vii) granting related relief. In support of the motion, the Debtors rely on and incorporate by reference the *Declaration of Stephen N. Clapp, Chief Executive Officer of Curae Health Inc., in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 49] (the "*First Day Declaration*") and, respectfully, state as follows:

## JURISDICTION AND VENUE

1. This court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. Venue is proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for the relief sought are 11 U.S.C. §§ 105(a), 363(b) and (f) and 365.

## SUMMARY OF REQUESTED RELIEF

5. On August 24, 2018 (the "*Petition Date*"), Batesville Regional Medical Center, Inc. ("*Batesville*"), Batesville Regional Physicians, LLC ("*Batesville Physicians*"), Curae Health, Inc. ("*Curae*"), and certain affiliates commenced cases under chapter 11 of the Bankruptcy Code (the "*Chapter 11 Cases*").

6. The Debtors are operating their businesses and managing their property as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

65929528.2

7.    No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

8.    On August 29, 2018, the Court entered an order authorizing the joint administration of the Chapter 11 Cases [Docket No. 59].

9.    After exploring their alternatives, the Debtors have determined in their business judgment that the sale of the Panola Hospital is in the best interests of the Debtors' chapter 11 estates and their creditors.

10.    Since the Petition Date, Debtors and their professionals have engaged in extensive marketing of the Panola Hospital. As a result of this marketing process, the Debtors have identified Progressive Medical Management of Batesville, LLC or its designee (the "***Proposed Stalking Horse***") as the prospective purchaser with the current best and highest offer for the Panola Hospital, which includes a $2,500,000.00 cash component plus assumption of certain liabilities and a working capital adjustment as set forth more specifically in the Panola APA (as defined below) (the "***Initial Bid***").

11.    The Debtors intend to continue market-testing the Initial Bid to determine whether higher or better offers for the Panola Hospital can be obtained.

12.    The Debtors and the Proposed Stalking Horse have negotiated the terms of the asset purchase agreement for the Panola Hospital (the "***Panola APA***"), which sets forth the Proposed Purchased Assets (defined below) to be sold.

13.    The Panola APA contains certain protections negotiated between the Proposed Stalking Horse and the Debtors to incentivize and compensate the Proposed Stalking Horse for continuing to expend money, time, and effort in connection with purchasing the Panola Hospital

65929528.2

(the "***Bid Protections***"), notwithstanding that the Initial Bid will be subjected to higher or better offers.

14.     In addition, the Debtors and the Proposed Stalking Horse have negotiated certain bidding and auction procedures (the "***Bidding Procedures***") to enable the Debtors to continue to market the Panola Hospital for sale, qualify additional bidders, govern submission of competing bids, and establish a date and location to conduct an auction for the Panola Hospital.

15.     Once a party is determined to be the successful bidder at the auction, the Debtors will then request final approval from the court for the sale (free and clear of all liens, claims, and encumbrances, which all such liens, claims, and encumbrances attaching to the proceeds of such sale in the same order of validity, priority, and enforceability) to the successful bidder on such terms as may be agreed upon by the Debtors and the successful bidder.

16.     To that end, the Debtors seek entry of the proposed "***Sale Procedures Order***" attached to this motion as **Exhibit A** and the proposed "***Sale Order***" attached to this motion as **Exhibit B** providing for, among other things:

a.     approving the Debtors' selection of the Proposed Stalking Horse as the stalking horse purchaser for the Panola Hospital;

b.     approving the Panola APA;

c.     approving the proposed bidding procedures attached as **Schedule 1** to the proposed Sale Procedures Order (the "***Bidding Procedures***") in connection with a sale of the Panola Hospital;

d.     establishing procedures for the assumption and assignment of executory contracts, pursuant to section 365 of the Bankruptcy Code, in connection with the sale of the Panola Hospital;

e.     approving the Bid Protections;

f.     scheduling an auction (the "***Auction***");

g.     approving the form and manner of notice of the Auction attached to this Motion as **Exhibit C** (the "***Auction Notice***");

4

h.    scheduling an objection deadline and setting a hearing date to consider final approval of the sale of the Panola Hospital; and

i.    granting any related relief.

## INTRODUCTION

17.    On the Petition Date, each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The factual background regarding the Debtors, including their business operations and the events leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration and fully incorporated herein by reference.

18.    Batesville is a Tennessee nonprofit corporation that owns and operates a 112-bed hospital and certain other healthcare related facilities located in Batesville, Mississippi, offering services in emergency care, surgery, radiology, labor and delivery, cardiopulmonary services, physical therapy, cardiac rehab, pharmacy, primary care, pediatrics, sleep, adult medicine and women's health clinics. Batesville is the sole member of Batesville Physicians. Batesville Physicians employs some of the physicians that work in the Batesville Facilities.

19.    Debtor Curae acquired the Panola Hospital from Community Health Systems, Inc. ("**CHS**") in 2017. Following the acquisition, the Panola Hospital suffered a dramatic decline in reported net revenue and incurred higher than anticipated operating costs.

20.    Given the Panola Hospital's poor performance, accounts payable continued to grow. Several of the Panola Hospital's large vendors began to request payment plans for the older invoices. Some vendors moved to requiring payment before they would deliver supplies or services. Given an impending complete lack of liquidity, the Panola Hospital filed for Chapter 11 on the Petition Date along with its debtor affiliates to accomplish an orderly sale of their assets in order to maximize their value and ensure the continued operation of the Panola Hospital and the

5

other hospitals for the benefit of the communities they serve. As of the Petition Date, the Debtors had approximately $3.4 million of cash and cash equivalents. The Debtors' aggregate liabilities as of the Petition Date are approximately $96 million.

21. Prior to and after the Petition Date, the Debtors and their professionals have engaged in diligent efforts to locate a buyer willing to acquire the Panola Hospital and the other hospitals operated by the Debtors. The Debtors have provided marketing materials to numerous parties, including the Proposed Stalking Horse, and engaged in discussions with those parties regarding a sale of the Panola Hospital. Unfortunately, given the Panola Hospital's financial distress and stretched payables, few potential buyers were identified. Given the Panola Hospital's pre and post-petition financial condition and the Sale Milestone (as defined below), Debtors believe it is in the best interests of the estate to proceed with the sale process of the Panola Hospital with the Proposed Stalking Horse.

22. On September 29, 2018, the Court entered its *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing* [Docket No. 60] (the "*Interim DIP Order*"). The Interim DIP Order established certain milestones and deadlines that the Debtors must meet. With respect to the sale of the Panola Hospital, the closing of a sale of the Panola Hospital within 180 days of the Petition Date (February 20, 2018) (the "*Sale Milestone*"). In accordance with the Interim DIP Order and the Sale Milestone imposed upon the Debtors, the Debtors file this Motion.

### PROPOSED STALKING HORSE AND PANOLA APA

23. As a result of the Debtors' marketing efforts, the Debtors recently executed the Panola APA with the Proposed Stalking Horse for the purchase of the Panola Hospital and

6

certain assets necessary for or related to the operation of the Panola Hospital (as more fully set forth in the Panola APA, the "***Proposed Purchased Assets***").

24.     A true and correct copy of the Panola APA is attached to this motion as **Exhibit D** and is incorporated in this paragraph by reference.

25.     The Debtors propose to sell the Proposed Purchased Assets to the Proposed Stalking Horse (or such other purchaser as determined in accordance with the Bidding Procedures) free and clear of all liens, claims, encumbrances, and other interests.

26.     The key terms of the Panola APA are as follows:

a.      **Purchase Price:** $2,500,000 cash component, plus certain adjustments as set forth more specifically in the Panola APA

b.      **Proposed Purchased Assets:** Substantially all assets and operations of the Panola Hospital

c.      **Closing Date:** On or before January 31, 2019 or the date on which the Proposed Stalking Horse obtains regulatory approval to operate the Panola Hospital, whichever is later

d.      **Break-up Fee:** $100,000

e.      **Minimum Initial Overbid:** $2,650,000

f.      **Bid Increments:** $100,000

PROPOSED BIDDING PROCEDURES

27.     The Debtors are seeking approval of the Bidding Procedures to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids on a timeline that allows the Debtors to consummate a sale of the Panola Hospital and is designed to encourage all prospective bidders to put their best bids forward in order to provide the highest or otherwise best available recoveries to the Debtors' stakeholders.

7

28.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner under the circumstances, the Debtors developed the Bidding Procedures, attached as **Schedule 1** to the proposed Sale Procedures Order.

29.     The salient terms of the Bidding Procedures are set forth below:

a.     **Continued Marketing**. The Debtors shall continue marketing the Panola Hospital to competing bidders, subject to such bidders executing an appropriate confidentiality agreement.

b.     **Potential Bidders**. To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a sale (a "*Potential Bidder*") must deliver or have previously delivered, if determined to be necessary by the Debtors in their sole discretion, the following documents:

 i.     an executed confidentiality agreement on terms acceptable to the Debtors (a "*Confidentiality Agreement*"), to the extent not already executed;

 ii.    identification of the Potential Bidder and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction; and

 iii.   unless publicly available in a filing under applicable securities laws or regulations, the most current audited and latest unaudited financial statements (the "*Financials*") of the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of acquiring the Proposed Purchased Assets (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors and (y) a written commitment acceptable to the Debtors and their advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the Sale).

c.     **Due Diligence**. Only Potential Bidders whose Financials, the Financials of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate a transaction for the purchase of the Proposed Purchased Assets shall be eligible to receive due diligence information and access to the Debtors' electronic data room, physical data room, and to additional non-public information regarding the Debtors. **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**. The Debtors will provide to each Potential Bidder that satisfies the foregoing reasonable due

8

diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any such Potential Bidder to the Debtors' electronic data room. For all Potential Bidders, the due diligence period will end on the Bid Deadline and, subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Proposed Purchased Assets, liabilities of the Debtors, or the potential sale of the Proposed Purchased Assets to any person except to a Potential Bidder or to such Potential Bidder's duly authorized representatives, to the extent provided in the applicable Confidentiality Agreement. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; provided that the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate a transaction to acquire the Proposed Purchased Assets.

The Debtors also reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder that intends in good faith to, or has the capacity to, consummate a transaction to acquire the Proposed Purchased Assets.

i.    **Communications with Potential Bidders**. Notwithstanding anything to the contrary in the Bidding Procedures, all substantive direct communications between and amongst Potential Bidders shall involve the Debtors and the Debtors' advisors, to the extent reasonably practicable.

ii.   **Due Diligence from Potential Bidders**. Each bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate a transaction to acquire the Proposed Purchased Assets or discussions with other Potential Bidders regarding any topic and with any party regarding the Debtors and/or any of the Proposed Purchased Assets. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that

9

such bidder is not a Qualified Bidder or that a Bid made by such bidder is not a Qualified Bid.

iii. The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in the Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process, in connection with a potential transaction to acquire the Proposed Purchased Assets, or otherwise in accordance with the terms of any applicable Confidentiality Agreement.

iv. Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (i) with the prior written consent of such Potential Bidder (or Qualified Bidder) and the Debtors; (ii) to the applicable Potential Bidder or Qualified Bidder; and (iii) as otherwise required or allowed by any applicable Confidentiality Agreement with respect to a particular Potential Bidder or Qualified Bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

d. **Bid Requirements**. A proposal, solicitation, or offer for a purchase and sale of the Proposed Purchased Assets (each, a "***Bid***") that is submitted in writing and satisfies each of the following requirements (the "***Bid Requirements***") as determined by the Debtors, in their reasonable business judgment, in consultation with the Committee, MidCap Financial Trust, and ServisFirst Bank (collectively, the "***Sale Notice Parties***"), shall constitute a "***Qualified Bid***."

i. **Assets**. Each Bid must clearly state which assets and liabilities of the Debtors that the Qualified Bidders are agreeing to purchase and assume.

ii. **Purchase Price**. Each Bid must clearly set forth the purchase price in U.S. dollars to be paid for each individual Proposed Purchased Asset subject to the applicable asset package, including and identifying separately any cash and non-cash components (the "***Purchase Price***"), and the cash component of such purchase price shall be at least $2.6 million.

iii. **Deposit**. On or before the Bid Deadline, each Bid, other than a credit bid, must be accompanied by a cash deposit in the amount

65929528.2

equal to 10% of the aggregate Purchase Price of the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "***Deposit***").

iv. **Assumption of Obligations, Executory Contracts, and Leases**. Each Bid must clearly state which liabilities of the Debtors the bidder is agreeing to assume, including but not limited to any executor contracts or unexpired lease the bidder proposes to assume.

v. **Provider Agreements**. Each Bid must provide that the bidder, if successful, will assume the Debtor's Medicare and Medicaid provider agreements or will obtain its own within a timeframe acceptable to the Debtors in consultation with the Sale Notice parties.

vi. **Qualified Bid Documents**. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transaction(s) contemplated by the Bid and shall include a schedule of assumed contracts, to the extent applicable to the Bid, and all other material documents integral to such Bid (the "***Qualified Bid Documents***"). Such documents must be based on form documents provided by the Debtors (including a summary of each Bid as may be reasonably requested by the Debtors).

vii. **Committed Financing**. To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the transaction(s) set forth in its Bid with cash on hand, each Bid must include unconditionally committed financing from a reputable financial institution documented to the satisfaction of the Debtors that demonstrates that the Potential Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Proposed Purchased Assets and the proposed transaction(s). Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

viii. **Adequate Assurance of Future Performance**. Each Bid shall contain sufficient financial and other information regarding the bidder such as to constitute adequate assurance of future performance, as set forth in section 365(b)(1)(C) of the Bankruptcy Code, with respect to each executor contract and unexpired lease that the bidder proposes to have assumed and assigned to it.

11

ix. **Contingencies; No Financing or Diligence Outs**. A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall be acceptable to the Debtors in their business judgment.

x. **Identity**. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific persons, including financial advisors and counsel, if any, that the Debtors should contact regarding such Bid.

xi. **Demonstrated Financial Capacity**. A Potential Bidder must have, in the Debtors' business judgment, the necessary financial capacity to consummate the proposed transaction(s) required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

xii. **Time Frame for Closing**. A Bid by a Potential Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors, in consultation with the Sale Notice Parties.

xiii. **Binding and Irrevocable**. A Potential Bidder's Bid shall be irrevocable unless and until the Debtors accept a higher Bid and such Potential Bidder is not selected as the Backup Bidder.

xiv. **Expenses; Disclaimer of Fees**. Each Bid, other than the Stalking Horse Purchaser's Bid, must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and, by submitting its Bid, is agreeing to refrain from and waive any assertion or

request for reimbursement on any basis, including under Section 503(b) of the Bankruptcy Code.

xv. **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

xvi. **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the bidder's Bid.

xvii. **Adherence to Bid Procedures.** By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

xviii. **Regulatory Approvals and Covenants.** A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the Sale, if any, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible).

xix. **Consent to Jurisdiction**. The Potential Bidder must submit to the jurisdiction of this court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the documents governing the sale of the Proposed Purchased Assets or any Bid or Qualified Bid, and the Closing, as applicable.

xx. **Bid Deadline**. Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before 5:00, p.m.

65929528.2
Case 3:18-bk-05665   Doc 401   Filed 11/06/18   Entered 11/06/18 17:44:13   Desc Main
Document     Page 16 of 144

(prevailing Central Time) on **December 11, 2018** (the "*Bid Deadline*") by:

1. The Debtors, Curae Health, Inc., Attn: Stephen N. Clapp (steve.clapp@curaehealth.org);

2. Counsel to the Debtors, Polsinelli PC, Attn: David E. Gordon (dgordon@polsinelli.com);

3. Financial Advisors to the Debtors, GlassRatner, Attn: Marshall Glade (mglade@glassratner.com);

4. Counsel to the Committee: Sills Cummis & Gross, P.C., Andrew Sherman, asherman@sillscummis.com; and

5. Committee's Financial Advisor: EisnerAmper, Allen Wilen, allen.wilen@eisneramper.com

e. **Qualified Bidders**.

i. A "*Qualified Bidder*" is a Potential Bidder whose Financials, the Financials of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate a transaction for the purchase of the Proposed Purchased Assets, whose Bid is a Qualified Bid, and that the Debtors determine should be considered a Qualified Bidder, in consultation with the Sale Notice Parties. Within one business day after the Bid Deadline, the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder.

ii. If any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below), if any, and all accumulated interest on or within three (3) business days after the Bid Deadline.

iii. After the Bid Deadline, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw a Qualified Bid, except for proposed amendments to increase their consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in the Bidding Procedures; provided that any Qualified Bid may be improved at the Auction. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in the Bidding Procedures.

14

iv.     For purposes of the Bidding Procedures, the Stalking Horse Purchaser shall be deemed Qualified Bidder, provided, however, that on or before the Bid Deadline, the Stalking Horse Purchaser shall provide a list of all executory contracts and unexpired leases the Stalking Horse Purchaser proposed to assume.

e.     **Right to Credit Bid**. Any Qualified Bidder who has a valid, perfected, and undisputed lien on any of the Proposed Purchased Assets (a "***Secured Creditor***") and the right and power to credit bid claims secured by such liens, shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims, within the meaning of and subject to section 363(k) of the Bankruptcy Code; provided that a Secured Creditor shall have the right to credit bid its secured claim only with respect to the collateral by which such Secured Creditor is secured.

f.     **Auction**. If the Debtors receive more than one Qualified Bid for the Proposed Purchased Assets, the Debtors will conduct the Auction, to determine the Successful Bidders with respect to the Proposed Purchased Assets. If the Debtors do not receive a Qualified Bid for the Proposed Purchased Assets, the Debtors will not conduct the Auction.

No later than two (2) business days after the Bid Deadline, at 5:00 p.m. (prevailing Central Time), the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid or combination of Qualified Bids, for which such Qualified Bidder submitted a Qualified Bid or combination of Qualified Bids, as determined in the Debtors' reasonable business judgment, in consultation with the Sale Notice Parties (the "***Baseline Bid***"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid may take into account any factors the Debtors reasonably deem, in consultation with the Sale Notice Parties, relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the amount and nature of the total consideration (including the amount of cash paid to or remaining in the estates pursuant to the Qualified Bid); (b) the likelihood of the Qualified Bidder's ability to close, and the timing of closing, the transaction(s) contemplated by the Qualified Bid; (c) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (d) the tax consequences of such Qualified Bid (collectively, the "***Bid Assessment Criteria***").

The Auction shall take place at 9:00 a.m. (prevailing Central Time) on **December 14, 2018**, at the offices of Polsinelli PC, in Nashville, Tennessee, or such later date and time as selected by the Debtors. The

15

Auction shall be conducted in a timely fashion according to the following procedures:

i.     **The Debtors Shall Conduct the Auction**. The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bids. All incremental Bids made thereafter for the Proposed Purchased Assets shall be Overbids and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids on the Proposed Purchased Assets. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only Qualified Bidders and their legal and financial advisors, and the members of and advisors to the Sale Notice Parties, and each such parties' respective legal and financial advisors shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to bid at the Auction.

ii.     **Terms of Overbid**. "*Overbid*" means any Bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each applicable Overbid must comply with the following conditions:

A.     **Initial Overbid.** If the Proposed Stalking Horse's Initial Bid is the Baseline Bid, the initial overbid shall exceed the Baseline Bid by $150,000. If the Baseline Bid is a Qualified Bid submitted by a Qualified Bidder other than the Proposed Stalking Horse, the initial overbid shall exceed the Baseline Bid by $100,000.

B.     **Minimum Overbid Increments**. Any Overbid following the initial overbid or following any subsequent Prevailing Highest Bid (as defined below) for the Proposed Purchased Assets shall be in increments of value equal to (or exceeding) $100,000. The Debtors may establish different overbid increments at the Auction for any portion or combination of the Proposed Purchased Assets, as determined by the Debtors in an exercise of their business judgment, in consultation with the Sale Notice Parties.

C.     **Conclusion of Each Overbid Round**. Upon the solicitation of each round of applicable Overbids, the

65929528.2

Debtors may announce a deadline (as the Debtors may, in their business judgment, extend time to time, the "***Overbid Round Deadline***") by which time any Overbids must be submitted to the Debtors.

Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified, after consultation with the Sale Notice Parties, an Overbid as being higher or otherwise better than the best Bid the Debtors had prior to receiving such Overbid (in each instance, the "***Prevailing Highest Bid***"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

D.   **Overbid Alterations**. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Sale Notice Parties, but shall otherwise comply with the terms of these Bidding Procedures.

E.   **Overbids by the Stalking Horse Purchaser.** The Stalking Horse Purchaser shall be permitted to include the full amount of the Break-up Fee in each bid by the Stalking Horse Purchaser for the purposes of comparison to any Overbid, in connection with each round of bidding at the Auction.

iii.   **Consideration of Overbids**. The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Sale Notice Parties, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions between the Debtors and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount.

17

iv.     **Closing the Auction**.

A.      The Auction shall continue until there is only one Bid that the Debtors determine, in their reasonable business judgment, in consultation with the Sale Notice Parties, to be the highest or otherwise best Bid for the Proposed Purchased Assets. Such Bid shall be declared the "***Successful Bid***," and such Qualified Bidder, the "***Successful Bidder***" and at which point the Auction will be closed as to the Proposed Purchased Assets subject to such Successful Bid. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

B.      For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under the applicable law.

C.      The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

D.      As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid(s) and Backup Bid(s) to be filed with this court.

E.      Consistent with sections (A)–(D) above, the Debtors' presentation to the Bankruptcy Court for approval of a selected bid as a Successful Bid will not constitute the Debtors' acceptance of such bid. The Debtors will have accepted the Successful Bid only if and when such Successful Bid has been approved by the Bankruptcy Court at the Sale Hearing.

v.      **No Collusion; Good-Faith *Bona Fide* Offer**. Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding or otherwise in connection with the sale of the Proposed Purchased Assets; and (ii) its Qualified Bid and subsequent Overbids are a good-faith *bona fide*

65929528.2

offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

g.   **Backup Bidder**. The Qualified Bidder with the second-best Qualified Bid (the "***Backup Bid***") at the Auction (if the Auction is conducted) shall be required to serve as a backup bidder (the "***Backup Bidder***"). The Backup Bidder's Deposit, if any, shall be held in escrow until the closing of the transaction with the applicable Successful Bidder.  If a Successful Bidder fails to consummate its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Qualified Bid of such Backup Bidder without further order of the Court or notice to any party.

In such case, the defaulting Successful Bidder's Deposit, if any, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

h.   **Highest or Otherwise Best Bid**. When determining the highest or otherwise best Qualified Bid or Overbid, as compared to other Qualified Bids or Overbids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate, in consultation with the Sale Notice Parties: (a) the amount and nature of the total consideration (including the amount of cash paid to or remaining in the estates pursuant to the Bid); (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; (d) the tax consequences of such Bid; and (e) community benefit.

i.   **Reservation of Rights**. The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, in consultation with the Sale Notice Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Proposed Purchased Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids, Qualified Bids, or Overbids.

65929528.2

j.      **Consent to Jurisdiction**. All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of this court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Qualified Bid Documents, as applicable.

k.      **Sale Hearing**. The Debtors respectfully request that a hearing to consider approval of the Sale to the Successful Bidders (the "***Sale Hearing***") take place on or before 11:00 a.m. (prevailing Central Time) on **January 8 2019**, before the Honorable Charles M. Walker, at the Court, Courtroom 2, 701 Broadway, Nashville, TN. The Sale Hearing may be adjourned from time to time without further notice to parties in interest other than by announcement of the adjournment in open court on the date scheduled for such Sale Hearing or a notice filed with the court, as applicable; provided, however, that if the Proposed Stalking Horse is the Successful Bidder, the Sale Hearing shall not be adjourned without the express written consent of the Proposed Stalking Horse or order of Court.  Any objection on any basis to the proposed Sale to the Successful Bidders must be filed with the court no later than **January 2, 2019, at 5:00 p.m. (prevailing Central time)** (the "***Objection Deadline***").

**The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.**

At the Sale Hearing, the Debtors shall present the Successful Bids to this court for approval.

l.      **Return of Deposit**. The Deposit, if any, of the Successful Bidder shall be applied to the respective Purchase Price of such transaction at closing. The Deposits, if any, for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder, and the Backup Bidder) on or within three (3) business days after the Auction. Upon the return of the Deposits, if any, their respective owners shall receive any and all interest that will have accrued thereon.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the Deposit, if any, deposited by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the proposed transaction with the applicable Backup Bidder without the need for an additional hearing or order of this court.

65929528.2

30.     Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize the value of the Debtors' estates, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

31.     On or within three (3) business days after entry of the Sale Procedures Order, the Debtors will cause the Auction Notice, substantially in the form attached as **Exhibit C**, to be served on the following parties or their respective counsel, if known: (a) the Office of the United States Trustee for the Middle District of Tennessee; (b) the Centers for Medicare and Medicaid Services; (c) the State of Tennessee Department of Health Division of Licensure and Regulation Office of Health Care Facilities; (d) the Mississippi State Department of Health; (e) those parties listed on the consolidated list of creditors holding the thirty (30) largest unsecured claims against the Debtors; (f) counsel to the official committee of unsecured creditors established in these cases pursuant to Section 1102 of the Bankruptcy Code; (g) ServisFirst Bank and its counsel; (h) Midcap Financial Trust and its counsel; (i) CHS/Community Health Systems, Inc. and its counsel (j) all Tennessee local counsel having entered a notice of appearance in these cases; (k) the Internal Revenue Service; (l) the Tennessee Attorney General's Office; (m) the Mississippi Attorney General's Office; (n) the United States Attorney's Office for the Northern District of Mississippi, (o) the Tennessee Secretary of State; (p) counterparties to the Contracts ("***Contract Counterparties***"); (q) the patient care ombudsman and her counsel; and (r) all parties entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013.

32.     In addition, within five (5) business days of entry of the Sale Procedures Order, the Debtors will publish the Auction Notice, with any modifications necessary for ease of publication, once in the (*The Panolian* (a newspaper for publishing legal notices in Batesville,

65929528.2
Case 3:18-bk-05665    Doc 401    Filed 11/06/18    Entered 11/06/18 17:44:13    Desc Main
                        Document        Page 24 of 144

Mississippi) and shall publish the Auction Notice on the website for these Chapter 11 Cases maintained by BMC Group (www.bmcgroup.com/curaehealth) in order to provide notice to any other potential interested parties.

### ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

33. The Panola APA provides that certain executory contracts and unexpired leases will be assumed and assigned, as part of the transaction contemplated by the Panola APA.

34. Pursuant to Local Rule 9013-1 or 9075-1, if necessary, on or before November 30, 2018, the Debtors will serve a notice, substantially in the form attached to this motion as **Exhibit E** (the "*Assumption Notice*"), on all parties to executory contracts or unexpired leases identified by the Proposed Stalking Horse or other Qualified Bidder as potentially being assumed and assigned.

35. The Assumption Notice will provide notice of, among other things, (a) this motion and the relief sought, (b) the assumption and assignment of the applicable executory contract or unexpired lease, as applicable, and (c) the proposed cure amount(s) for the applicable executory contract or unexpired lease.

36. In addition, each Assumption Notice will set forth the Debtors' proposed procedures for resolving any disputes regarding the assumption and assignment of any executory contract or unexpired lease (the "*Assumption and Assignment Procedures*").

### BASIS FOR RELIEF

I. **The Court Should Approve the Forms and Manner of Notice.**

37. The Debtors have proposed specific provisions in the Bidding Procedures intended to provide notice of the Bidding Procedures, notice of the Debtors' plan to sell the Proposed Purchased Assets pursuant to the terms of the Panola APA, notice of the potential for third-parties to submit competing bids, and notice as to the procedures and deadlines for third-

parties to submit competing bids or otherwise present objections to the relief contemplated by the Motion.

38.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business. Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein. The Debtors seek approval of the Auction Notice as proper notice of the Auction. The Debtors submit that notice of this motion and the related hearing to consider entry of the Sale Order, coupled with service of the Auction Notice, as provided for herein, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtors request that this Court approve the form and manner of the Auction Notice.

## II.     The Bidding Procedures are fair, designed to maximize the value received for the Proposed Purchased Assets, and are consistent with the Debtors' reasonable business judgment.

39.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Cont'l Air Lines, Inc.,* 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification.'") (internal citations omitted); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (explaining that courts usually defer to the trustee's "legitimate business justification" with respect to the "disposition of assets of the estate").

23

40.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *In re Nashville Senior Living*, No. 08-07254, 2008 Bankr. LEXIS 3197, at \*4–5 (Bankr. M.D. Tenn. Oct. 22, 2008) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *see also In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3rd Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics Corp., v. Chinery*, 330 F.3d 548, 573 (3rd Cir. 2003) (same); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating a primary objective in bankruptcy sales is to enhance the value of the estate at hand).

41.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures, such as break-up fees, "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets are to be enforced strictly in order to provide an adequate basis for comparison of offers, and to provide for an [sic] fair and efficient resolution of bankrupt estates").

42.     The Debtors believe that the proposed Bidding Procedures will continue the prepetition and post-petition sale process and ultimately promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Proposed Purchased Assets.

24

43. The Bidding Procedures will allow the Debtors to conduct the sale and marketing process in a controlled, fair, and open fashion and are designed to encourage participation by financially capable bidders who can demonstrate the ability to close a transaction.

44. Specifically, the Bidding Procedures contemplate an open market process with minimum barriers to entry and provide potentially interested parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

45. Due to the time constraints imposed by Proposed Stalking Horse's desire to close the sale expeditiously and the financial condition of the Panola Hospital, as well as the tight timeframe imposed upon the Debtors by the Sale Milestones, the Debtors believe the Bidding Procedures permit the Debtors to promptly and prudently determine whether third-parties have interest in performing due diligence and evaluating whether to submit a formal and binding bid for the Proposed Purchased Assets.

46. In addition, the Debtors believe that the proposed Bidding Procedures fairly balance the need to market the Proposed Purchased Assets and market test the Panola APA with the desire to minimize the risk of operating losses during any marketing and sale process.

47. In addition, the Bidding Procedures provide Potential Bidders that may have otherwise applicable rights of first refusal (and similar rights) a fair opportunity to effectively exercise those rights by participating in the marketing and sale process.

48. Accordingly, the Debtors should be deemed to have complied with or satisfied any such provisions by conducting a sale pursuant to the Bidding Procedures. *See In re Farmland Indus., Inc.*, 284 B.R. 111, 119-20 (Bankr. W.D. Mo. 2002) (relying on the fact that where the first refusal right holder did not receive notice of the auction, the bidding process will

25

be reopened for the highest bidder and the right holder); *but see In re Mr. Grocer*, 77 B. R. 349, 352-53 (Bankr. D.N.H. 1987) (holding that rights of first refusal are *per se* unenforceable under section 365(f) of the Bankruptcy Code).

49.     At the same time, the Bidding Procedures provide the Debtors with an opportunity to consider competing bids and select the highest or otherwise best offers for the completion of the sale.

50.     As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable at or above market.

51.     The Debtors submit that the Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this district and other Tennessee bankruptcy courts. *See, e.g., In re Nashville Senior Living*, 2018 Bankr. LEXIS 3197; Expedited Order Pursuant to 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006 (I) Approving Procedures for Sale of Debtors' Assets and Breakage Fees Pursuant to Asset Purchase Agreement With Oreck Acquisition Holdings LLC; (II) Scheduling Bid Deadline and Sale Hearing Date; (III) Establishing Assumption and Assignment Procedures; and (IV) Fixing Notice Procedures and Approving Form of Notice, *In re Oreck Corporation*, No. 13-4006 (Bankr. M.D. Tenn. May 24, 2013).[2]

52.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale.

53.     Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of

---

[2]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

65929528.2

the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).

54. Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value. *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)* 432 F.3d 448, 459–60 (3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)" including the secured and unsecured portions thereof).

55. Accordingly, secured creditors are entitled to credit bid some or all of the claims secured by their collateral in accordance with the Bidding Procedures, pursuant to section 363(k) of the Bankruptcy Code.

56. Accordingly, for all of the foregoing reasons, the Debtors believe the Bidding Procedures: (a) will encourage robust bidding for the Proposed Purchased Assets; (b) are consistent with other previously approved by courts in this district; and (c) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings and should be approved.

**III.    The Bid Protections have a sound business purpose and should be approved.**

57. The Panola APA and Bidding Procedures contain certain protections that the Debtors and Proposed Stalking Horse have negotiated at length to incentivize and compensate the Proposed Stalking Horse for serving as a stalking horse purchaser whose bid will be subjected to higher or better offers.

58. The Proposed Stalking Horse has specifically bargained for the Break-up Fee in the amount of $100,000.00, which is reasonably calculated to, among other things, reimburse the

65929528.2

Proposed Stalking Horse for the Proposed Stalking Horse's reasonable out-of-pocket expenses incurred in conducting the due diligence necessary to serve as the Proposed Stalking Horse.

59.     In addition, the Proposed Stalking Horse has specifically bargained for a minimum initial overbid in the amount of $150,000 (the "***Minimum Overbid***"), which is designed to (a) reasonably protect the Proposed Stalking Horse by encouraging only serious additional and higher bids, and (b) protect the Debtors by ensuring that any overbid covers the cost of the Break-up Fee and results in additional proceeds material enough to justify the risk of closing with a new buyer.

60.     Bidding incentives such as the Break-up Fee and Minimum Overbid encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Proposed Purchased Assets, despite the inherent risks and uncertainties associated with an auction process.

61.     In conjunction with the Bidding Procedures, the Bid Protections are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values.

62.     The use of a stalking horse in a public auction process is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Official Comm. of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-CV-219, n.1 (E.D. Wis. July 7, 2011).

63.     As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bid protections as an inducement for "setting the floor at auction,

exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id*. (internal citations omitted).

64. Therefore, the use of bid protections has become an established practice in chapter 11 cases.

65. Historically, courts have approved bidding incentives, including incentives such as the Break-up Fee and Minimum Overbid, under the business judgment rule. *E.g.*, *In re 995 Fifth Ave. Assocs. L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y.) (bidding incentives "may be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking"); *see also In re Bear Island Paper Co., L.L.C.*, No. 10-31202, 2010 Bankr. LEXIS 6046, at *7 (Bankr. E.D. Va. Sept. 1, 2010) (approving bid protections).

66. Indeed, break-up fees and other forms of bid protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code.

67. "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value." *In re Integrated Res., Inc.*, 147 B.R. at 659–60 (emphasis added).

68. Specifically, bid protections, such as break-up fees, may "be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks that it is undertaking." *In re Integrated Res., Inc*., 147 B.R. at 660 (break-up fees can prompt bidders to commence negotiations and "also ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992)

65929528.2

("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's (i.e., 'stalking horses' due diligence").

69. Courts analyze the appropriateness of bidding incentives under the "business judgment rule" standard, and the law is well established that courts consider whether (a) the incentive hampers, rather than encourages, bidding, and (b) the amount of the incentive is unreasonable relative to the proposed purchase price. *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible); *see also In re ASARCO L.L.C.*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining three-part test used to determine whether expense reimbursement was permissible under business judgment rule); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992) (to evaluate bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing and in the exercise of honest judgment).

70. Here, the Debtors believe the Break-up Fee and Minimum Overbid benefit the estates because they: (a) enable the Debtors to maintain the commitment of the Proposed Stalking Horse to continue expending money, time, and effort in connection with purchasing the Proposed Purchased Assets, notwithstanding that its offer is subjected to higher and better offers; and (b) guarantee a minimum bid for the auction process.

65929528.2

71.     In addition, the Break-up Fee and Minimum Overbid are the product of good faith, arm's length negotiations between the Debtors and Proposed Stalking Horse, each of whom was represented by counsel.

72.     As a result, the Break-up Fee is specifically designed and calculated to reimburse the Proposed Stalking Horse for its reasonable out of pocket expenses incurred in connection with, among other things, reviewing and assessing the potential transaction and the retention of third-party consultants and advisors to perform financial, operational, legal, and regulatory analysis.

73.     The Break-up Fee represents 4.00% of the cash component of the Initial Bid. The sale of the Panola Hospital implicates many issues related to the regulatory environment under which a hospital operates and treats patients. The cost, manpower resources, and time commitment necessary for such review, analysis, and preparation of definitive agreements supports establishing a 4.00% Break-up Fee. Thus, the Debtors believe the amount of the Break-up Fee is reasonable in light of the size and complexity of the transaction. The Break-up Fee is reasonable given the range of break-up fees approved by courts in other stalking horse sales. *See e.g., Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536 (3d Cir. 1999) (break-up fee of approximately 4.00% is reasonable in relation to the purchase price); *In re Oreck Corp., et. al.*, Case No.: 13-4006 (Bankr. M.D. Tenn. May 24, 2013) (Dkt. # 95, 199) (court approved break-up fee of 3.65% plus expense reimbursement of up to $1,200,000 in a transaction with approximately $21,882,000 purchase price); *In re Kaiser Aluminum Corp.*, Case No. 02-10429 (JFK) (Bankr. D. Del. June 21, 2004) (court approved break-up fee of 4.6% or $1.05 million in connection with a $23 million sale transaction); *Gey Assocs. Gen. P'ship v. 310 Assocs., L.P.*, No. 02 Civ. 0710 (SHS), 2002 U.S. Dist. LEXIS 20759

65929528.2

(S.D.N.Y. Oct. 29, 2002) (3.23% break-up fee of $ 100,000 for a $ 3.1 million purchase price is reasonable); *In re Chi-Chi's, Inc.*, Case No. 03-13063 (CGC) (Bankr. D. Del. Nov. 4, 2003) (court approved break-up fee of 5% or $200,000 in connection with a $4 million sale transaction); *In re America Classic Voyages Co.*, Case No. 01-10954 (EIK) (Bankr. D. Del. March 20, 2002) (court approved break-up fee of 6.6% or $250,000 in connection with a $3.75 million sale transaction).

74.     Moreover, the Break-up Fee and Minimum Overbid will not hamper the ability of other parties to participate in the auction process.

75.     Under this standard, the Debtors' request to approve, in their reasonable business judgment, the Bid Protections passes muster.

76.     The Debtors recognize the significant expenditure of time, energy, and resources that has gone into preparing a stalking horse bid, and that bidding incentives have encouraged the Proposed Stalking Horse to invest the requisite time, money, and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Proposed Purchased Assets, despite the inherent risks and uncertainties of the chapter 11 process.

77.     Moreover, the Proposed Stalking Horse's Initial Bid will provide a floor with respect to the Proposed Purchased Assets.

78.     For the reasons set forth above, the Debtors respectfully request approval of the Bid Protections.

**IV.     The Assumption and Assignment Procedures are fair, reasonable, and should be approved.**

79.     The Assumption and Assignment Procedures comply with section 365 of the Bankruptcy Code and Rule 6006 of the Bankruptcy Rules and provide an efficient and economical procedure for providing notice of the potential assumption and assignment of

32
65929528.2
Case 3:18-bk-05665    Doc 401    Filed 11/06/18    Entered 11/06/18 17:44:13    Desc Main
Document    Page 35 of 144

contracts and leases and the resolution of any objections relating to such assumption and assignment.

80.     Moreover, the Assumption Notice provides adequate notice to counterparties to executory contracts and unexpired leases, regarding the potential assumption and assignment of their respective executory contract or unexpired lease.

**V.    The sale of the Proposed Purchased Assets should be free and clear of liens, claims, and encumbrances.**

11 U.S.C. § 363(f) provides:

> The Trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate only if:
>
> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2)    such entity consents;
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4)    such interest is a bona fide dispute; or
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

81.     Pursuant to 11 U.S.C. § 363(f), the Debtors seek authority to sell and transfer the Proposed Purchase Assets free and clear of all liens, claims, and encumbrances.

82.     A sale free and clear of liens, claims, encumbrances, and other interests is necessary to maximize the value of the Proposed Purchased Assets.

83.     A sale subject to liens, claims, encumbrances, and other interests would result in a lower purchase price and be of substantially less benefit to the Debtors' estates.

84.     A sale free and clear of liens is particularly appropriate under the circumstances, because any liens, claims, encumbrances, and other interests in, to, or against any of the Proposed Purchased Assets that exists immediately prior to the closing of the sale will attach to

65929528.2

the sale proceeds with the same validity, priority, force, and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest.

85.     The Debtors have fully disclosed and requested the court's approval of all of the terms and conditions of the proposed sale.

86.     The Debtors will further provide notice of the Bidding Procedures and opportunity to present higher or better offers for the Proposed Purchased Assets.

87.     The Bidding Procedures are both substantively and procedurally fair and are designed to solicit the highest and best offers for the Proposed Purchased Assets.

88.     To date, there has been no collusion between any parties regarding the Proposed Purchased Assets, and the Debtors are requiring all parties participating in the Bidding Procedures to certify that they have not colluded in any way in connection with the potential purchase of the Proposed Purchased Assets.

89.     The Proposed Stalking Horse is not an insider or related to the Debtors.

90.     The Panola APA has been negotiated by the Debtors and the Proposed Stalking Horse at arms' length.

91.     Accordingly, the Debtors submit that the conduct of the negotiations and potential sale of the Proposed Purchased Assets has been in good faith.

92.     Therefore, the Debtors submit that ordering the sale of the Proposed Purchased Assets free and clear is both warranted and appropriate.

**VI.     This court should approve the sale of the Proposed Purchased Assets.**

93.     The proposed sale of the Proposed Purchased Assets pursuant to the Panola APA (as may be modified at the Auction in accordance with the Bidding Procedures) is supported by sound business justifications and, at the Sale Hearing, should be approved.

65929528.2

94.     Given consideration to the significant and robust prepetition marketing efforts, the Debtors believe that the pool of potential purchasers for the Proposed Purchased Assets has been adequately identified, and the delay of any sale of the Panola Hospital would not increase the likelihood of identifying any additional potential purchasers.

**VII.    The sale of the Proposed Purchased Assets is in the best interests of creditors.**

95.     The proposed sale of the Proposed Purchased Assets pursuant to the Panola APA in accordance with the proposed Bidding Procedures is in the best interests of the creditors.

96.     The Proposed Purchased Assets have been adequately marketed, and the proposed sale process is permissible under 11 U.S.C. § 363.

97.     A sale of the Proposed Purchased Assets will reduce the costs and professional fees currently being incurred to maintain and administer the Proposed Purchased Assets.

98.     A sale of the Proposed Purchased Assets is the most practical way for creditors to realize a recovery in this case.

**VIII.    Sound business justification for the sale exists.**

99.     There is more than adequate business justification to sell the Proposed Purchased Assets to a Successful Bidder.

100.     Absent a sale of the Proposed Purchased Assets to a third party, the Debtors would likely be forced to liquidate the Panola Hospital's assets piecemeal and wind up the Panola Hospital's operations.

101.     Further, if the Panola Hospital is not sold as a going concern, the value obtained for the assets of Hospital would be significantly less, which would decrease any potential recovery for creditors.

65929528.2

**IX.     The Panola APA provides fair and reasonable compensation to the Debtors.**

102.     The Debtors, in the Debtors' sound business judgment, have determined that the proposed sale of the Proposed Purchased Assets in accordance with the Bidding Procedures will enable the Debtors to obtain the highest or best offer for the Proposed Purchased Assets and maximize the value of the Proposed Purchased Assets for their creditors.

103.     As set forth above, the Debtors have engaged in a robust marketing process and, to date, the Panola APA and the Proposed Stalking Horse's offer represents the highest and best offer for the Proposed Purchased Assets.

104.     Based upon the Debtors' sound business judgment, the Panola APA and offer from the Proposed Stalking Horse represent fair and reasonable consideration for the Proposed Purchased Assets, and any higher or better offers obtained through the Bidding Procedures would, therefore, also constitute fair and reasonable consideration for the Proposed Purchased Assets.

<u>**NOTICE**</u>

Notice of this Motion is being served via First Class U.S. Mail and/or CM/ECF to: (a) the U.S. Trustee; (b) counsel to the Proposed Stalking Horse; (c) counsel to ServisFirst; (d) counsel to CHS; (e) counsel to MidCap; (f) the Office of the United States Attorney for the Middle District of Tennessee; (g) the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services; (h) the Tennessee State Department of Health Division of Licensure and Regulation of Health Care Facilities; (i) the Attorney General of the State of Tennessee; (j) the Tennessee Department of Revenue; (k) the Tennessee Secretary of State; (l) the Mississippi State Department of Health; (m) the Attorney General of the State of Mississippi; (n) the United States Attorney's Office for the Northern District of Mississippi; (o) the Mississippi Department of Revenue; (p) the Internal Revenue Service; (q) counsel to the

36

official committee of unsecured creditors; (r) the ombudsman and her counsel; (s) any party who has requested notice pursuant to Bankruptcy Rule 2002; (t) all parties entitled to notice under Bankruptcy Rule 2002(a); and (u) all lienholders holding interests of record in the assets of Batesville.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this court enter: (a) an order, substantially in the form attached to this motion as **Exhibit A**, (i) approving the Debtors' selection of the Proposed Stalking Horse as the stalking horse purchaser for the Panola Hospital, (ii) approving the Panola APA, (iii) authorizing and approving the Bidding Procedures, (iv) authorizing and approving the Bid Protections, (v) authorizing and approving the form and manner of notice of the auction and Sale Hearing, (v) authorizing and approving the Assumption Notice and Assumption and Assignment Procedures, (vi) scheduling the Sale Hearing, (vii) setting an objection deadline, and (viii) granting other and further related relief; and (b) after conducting the Sale Hearing, an order, substantially in the form attached to this motion as **Exhibit B**, (i) authorizing, approving, and directing the sale of the Proposed Purchased Assets to the Successful Bidder and Backup Bidder, in accordance with the Bidding Procedures, free and clear of all liens, claims, encumbrances, and other interests, (ii) authorizing and approving the Panola APA or substantially similar asset purchase agreement applicable to the Successful Bidder or Backup Bidder, as applicable, and (iii) granting other and further related relief.

65929528.2

Dated this 6th day of November, 2018

Respectfully submitted,

**POLSINELLI PC**

*/s/ Michael Malone*

Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (*Pro Hac Vice*)
Caryn E. Wang (*Pro Hac Vice*)
1201 West Peachtree Street NW, Suite 1100
Atlanta, Georgia
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

*Counsel to the Debtors and
Debtors in Possession*

**EXHIBIT A**
**PROPOSED SALE PROCEDURES ORDER**

65929528.2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

**ORDER (I) AUTHORIZING AND APPROVING BIDDING PROCEDURES FOR THE SALE OF PANOLA MEDICAL CENTER, (II) AUTHORIZING THE SALE OF PANOLA MEDICAL CENTER FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (III) APPROVING STALKING HORSE PURCHASER, BREAK-UP FEE, AND OVERBID PROTECTIONS, (IV) ESTABLISHING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (V) SCHEDULING AN AUCTION, (VI) SCHEDULING A HEARING AND OBJECTION DEADLINES WITH RESPECT TO THE SALE OF PANOLA MEDICAL CENTER, (VII) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (VIII) GRANTING RELATED RELIEF**

Upon consideration of the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Bidding Procedures for the Sale of Panola Medical Center, (II) Authorizing the Sale of Panola Medical Center Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (III) Approving Stalking Horse Purchaser, Break-up Fee, and Overbid Protections, (IV) Establishing Certain Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (V) Scheduling an Auction, (VI) Scheduling a Hearing and Objections Deadlines With Respect to the Sale of Panola Medical Center, (VII) Approving the Form and Manner of Notice Thereof, and (VIII) Granting Related Relief* (Dkt. No. ___) (the "**Sale**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

***Procedures Motion***");[2] and upon consideration of any and all responses, objections, and other filings with respect to the Sale Procedures Motion; and after a hearing and opportunity to be heard; and upon due consideration and finding sufficient cause for the relief sought in the Sale Procedures Motion,

### IT IS HEREBY FOUND, DETERMINED, AND CONCLUDED THAT:[3]

A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

B.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      This is a core proceeding, within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (N), and (O).

D.      The statutory bases for the relief requested in the Motion are sections 105, 363, and 365 of the Bankruptcy Code, Rules 2002, 6003, 6004, 6006, and 9014 of the Bankruptcy Rules, and Bankruptcy Local Rule 9013-1.

E.      Proper, timely, adequate, and sufficient notice of the Sale Procedures Motion and relief sought in the Sale Procedures Motion has been provided, and such notice was sufficient and appropriate under the particular circumstances. Other than as set forth in this order, no other or further notice of the Sale Procedures Motion or relief sought in the Sale Procedures Motion is necessary or required.

---

[2]     Capitalized terms used herein and not defined shall have the meaning given to them in the Sale Procedures Motion or the Bidding Procedures, as applicable.

[3] The findings of fact and conclusions of law herein constitute the court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

2

F.     A reasonable opportunity to object or be heard regarding the requested relief in the Sale Procedures Motion and this order has been afforded to all parties entitled to notice of the Sale Procedures Motion.

G.     The Debtors have the power and authority to sell the Proposed Purchased Assets free and clear of all liens, claims, and encumbrances, pursuant to section 363 of the Bankruptcy Code, and all requirements for such sale pursuant to section 363 of the Bankruptcy Code have been satisfied.

H.     The Debtors have articulated good and sufficient reasons for this Court to: (a) approve the Bidding Procedures; (b) approve the selection of the Stalking Horse Purchaser and related Bid Protections; (c) schedule the Bid Deadline and the Auction; and (d) approve the form and manner of notice of the Auction Notice.

I.     The Bidding Procedures are reasonable, non-collusive, created in good faith, substantively and procedurally fair, and represent the best available method for maximizing value for the benefit of the Debtors' estates.

J.     The Debtors' authorization to pay the Break-up Fee is an essential inducement and condition relating to the Proposed Stalking Horse's entry into, and continuing obligations under, the Panola APA.

K.     The Debtors' promise to pay the Break-up Fee, which has induced the Proposed Stalking Horse to submit its bid that will serve as a minimum or floor bid on which the Debtors can rely, provides a material benefit to the Debtors' estates and their creditors, by increasing the likelihood that the best possible purchase price for the Proposed Purchased Assets will be received.

3

L.     The Bid Protections are reasonable and appropriate under the circumstances, including in light of the commitments that will be made by the Stalking Horse Purchaser.

M.     The Bidding Procedures were negotiated at arm's length, in good faith, and without collusion. The Bidding Procedures balance the Debtors' interests in an expeditious sale of the Proposed Purchased Assets while preserving the opportunity to attract value-maximizing proposals beneficial to the Debtors' estates, their creditors, and other parties in interest.

N.     The Auction Notice, substantially in the form attached to the Sale Procedures Motion as **Exhibit C** is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction.

O.     The Assumption Notice, substantially in the form attached to the Sale Procedures Motion as **Exhibit E**, is appropriate and reasonably calculated to provide all parties to executory contracts and unexpired leases with the notice required by section 365 of the Bankruptcy Code and Rule 6006(c) of the Bankruptcy Rules and all applicable Local Rules.

P.     The Assumption and Assignment Procedures are fair, reasonable, and calculated to provide all parties to executory contracts and unexpired leases to adequate notice of the proposed assumption and assignment of executory contracts and unexpired leases, pursuant to section 365 of the Bankruptcy Code and in accordance with Rules 6003 and 6006(c) of the Bankruptcy Rules and all applicable Local Rules.

**BASED UPON THE FOREGOING FINDINGS AND THE RECORD BEFORE THIS COURT, IT IS HEREBY**

1.     **ORDERED** that the Sale Procedures Motion is granted as set forth in this order; and it is further

4

2.      **ORDERED** that all objections to the Panola APA, Bidding Procedures, Bid Protections, Assumption Notice, Assumption and Assignment Procedures, and Auction Notice that have not been withdrawn, waived, or settled as announced to the court at the hearing on the Sale Procedures Motion or by stipulation filed with the court, are expressly denied and overruled; and it is further

3.      **ORDERED** that the Panola APA as set forth in **<u>Exhibit D</u>** to the Sale Procedures Motion is approved; and it is further

4.      **ORDERED** that the Assumption Notice as set forth in **<u>Exhibit E</u>** to the Sale Procedures Motion is approved; and it is further

5.      **ORDERED** that the Assumption and Assignment Procedures are approved in their entirety; and it is further

6.      **ORDERED** that the Bidding Procedures attached to this order as **<u>Schedule 1</u>** are hereby approved in their entirety and shall govern the submission, receipt, and analysis of all Bids relating to the proposed sale of the Proposed Purchased Assets; and it is further

7.      **ORDERED** that any party desiring to bid on the Proposed Purchased Assets shall comply with the Bidding Procedures and this Sale Procedures Order; and it is further

8.      **ORDERED** that each Qualified Bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding on or sale of the Proposed Purchased Assets, as set forth in the Bidding Procedures; and it is further

9.      **ORDERED** that any Qualified Bidder who has a valid, perfected, and undisputed lien on the Proposed Purchased Assets (a "***Secured Creditor***") and the right and power to credit bid claims secured by such liens, shall have the right to credit bid all or a portion of the value of such Secured Creditor's secured claims within the meaning of and subject to section 363(k) of

5

the Bankruptcy Code; provided that a Secured Creditor shall have the right to credit bid its secured claim only with respect to the collateral by which such Secured Creditor is secured; and it is further

10.     **ORDERED** that the Debtors are deemed to have complied with all contractual rights of first refusal, or similar contractual purchasing rights, regarding the Proposed Purchased Assets; and it is further

11.     **ORDERED** that the Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Sale Procedures Order; and it is further

12.     **ORDERED** that the Debtors may proceed to sell the Proposed Purchased Assets free and clear of liens, claims, encumbrances, and other interests, in accordance with the Bidding Procedures, with such liens, claims, encumbrances, and other interests attaching to the proceeds of such sale in the same order of priority and validity; and it is further

**13.     ORDERED** that Section 6.1 of the Panola APA is approved and binding on the Debtors; and the Break-up Fee shall be paid to the Proposed Stalking Horse (i) no later than any closing of a sale of some or all of the Proposed Purchased Assets to a purchaser other than the Proposed Stalking Horse or from the recovery of any other Successful Bidder's forfeited deposit, (ii) if any secured creditor purchases any or all of the Proposed Purchased Assets by credit bid at the Auction or otherwise, then the secured creditor shall pay the Break-up Fee to the Proposed Stalking Horse Purchaser no later than any closing regardless of the amount of proceeds actually paid to the Debtors, and (iii) if Seller files a plan of reorganization that does not contemplate a sale of the Proposed Purchased Assets to the Proposed Stalking Horse; and it is further

14.     **ORDERED** that the Sale Hearing shall be held on **<u>January 8, 2019, at 11:00 a.m. (prevailing Central time)</u>**; and it is further

65929528.2

Case 3:18-bk-05665   Doc 401   Filed 11/06/18   Entered 11/06/18 17:44:13   Desc Main
Document     Page 48 of 144

15.     **ORDERED** that any objection on any basis to the proposed sale of the Proposed Purchased Assets must be filed in writing with the court no later than **January 2, 2019, at 5:00 p.m. (prevailing Central time)** (the "*Objection Deadline*") and served on (a) counsel to the Stalking Horse Purchaser, c/o Quentin Whitsell, Harper Whitsell PLLC, 800 College Hill Road #5201, Oxford, MS 38655, quentin@harperwhitsell.com, (b) counsel to the Debtors, c/o David E. Gordon, Polsinelli PC, 1201 West Peachtree Street, Suite 1100, Atlanta, Georgia 30309, dgordon@polsinelli.com, (c) counsel to MidCap Financial, c/o David E. Lemke, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, Tennessee 37219, david.lemke@wallerlaw.com, (d) counsel ServisFirst Bank, c/o David G. Thompson, Neal & Harwell, PLC, 1201 Demonbreun Street, Suite 1000, Nashville, Tennessee 37203, dthompson@nealharwell.com, and (e) counsel to the Official Committee of Unsecured Creditors, c/o Andrew Sherman, Sills Cummis & Gross, P.C., One Riverfront Plaza, Newark, NJ 07102, asherman@sillscummis.com, and it is further

16.     **ORDERED** that the Debtors shall: (A) provide notice to (i) all relevant federal, state and local taxing and regulatory authorities or offices that have a reasonably known interest in the relief requested in the Sale Procedures Motion; (ii) counsel to the Proposed Stalking Horse; (iii) counsel to the Committee; (iv) the parties set forth on the certificate of service of the Sale Procedures Motion and any other party that has entered an appearance in this case or otherwise requested notice in this case; and (v) all of the persons or entities the Debtors have identified as (a) having an interest in the Proposed Purchased Assets or (b) potentially interested in acquiring the Proposed Purchased Assets; and (B) publish a notice, substantially in the form attached to the Sale Procedures Motion as **Exhibit C**, once in the (*The Panolian* (a newspaper for publishing legal notices in Batesville, Mississippi)) and shall publish the Auction Notice on

65929528.2

the website for these Chapter 11 Cases maintained by BMC Group (www.bmcgroup.com/curaehealth) prior to the proposed Auction, which publication shall be deemed due, timely, good, and sufficient notice of the entry of this order and all proceedings to be held in accordance with this order; and it is further

17. **ORDERED** that the notice already provided for in the Sale Procedures Motion together with the notice directed to be given in accordance with this order shall be deemed good and sufficient notice of the Sale Procedures Motion, this Sale Procedures Order, and the relief sought by the Sale Procedures Motion, and such notice shall be deemed to satisfy the requirements of Rule 6004(a) and Rule 6006(c) of the Bankruptcy Rules and all applicable Local Rules; and it is further

18. **ORDERED** that the terms and conditions of this order shall be immediately effective and enforceable upon its entry; and it is further

19. **ORDERED** that this court retains exclusive jurisdiction with respect to all matters arising from or related to this order or its enforcement.

**This Order Was Signed And Entered Electronically As Indicated At The Top Of The First Page**

Prepared and submitted by:

POLSINELLI PC

/s/ Michael Malone
Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (*Pro Hac Vice*)
Caryn E. Wang (*Pro Hac Vice*)
1201 West Peachtree Street NW, Suite 1100
Atlanta, Georgia
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

*Counsel to the Debtors and*
*Debtors in Possession*

## SCHEDULE 1
## BIDDING PROCEDURES

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

**BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS**

On November __, 2018, the United States Bankruptcy Court for the Middle District of Tennessee (the "**Court**") entered an *Order (I) Authorizing and Approving Bidding Procedures for the Sale of Panola Medical Center, (II) Authorizing the Sale of Panola Medical Center Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (III) Approving Stalking Horse Purchaser, Expense Reimbursement, and Overbid Protections, (IV) Establishing Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (V) Scheduling an Auction, (VI) Scheduling a Hearing and Objection Deadlines With Respect to the Sale of Panola Medical Center, (VII) Approving the Form and Manner of Notice Thereof, and (VIII) Granting Related Relief* (Dkt. No. ___) (the "**Sale Procedures Order**"),[2] by which the Court approved the following procedures (the "**Bidding Procedures**") governing the solicitation of bids and conducting an auction (the "**Auction**") for the sale (the "**Sale**") of substantially all assets of Panola Medical Center, a 112 bed acute care hospital and related healthcare operations and facilities located in Batesville, Mississippi (the "**Panola Hospital**") (as more fully described in the Panola APA, the "**Proposed Purchased Assets**").

**I.      Submissions to the Debtors.**

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each of the following persons unless otherwise provided:

A.      **Debtors**: Curae Health, Inc., Stephen N. Clapp, steve.clapp@curaehealth.org

B.      **Debtors' Counsel**: Polsinelli PC, David E. Gordon, dgordon@polsinelli.com

C.      **Debtors' Financial Advisors**: GlassRatner, Marshall Glade, mglade@glassratner.com

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

[2] All capitalized terms used but not defined herein shall have the meaning given to them in the Sale Procedures Order.

D.  **Counsel to the Committee**: Sills Cummis & Gross, P.C., Andrew Sherman, asherman@sillscummis.com

E.  **Committee's Financial Advisor**: EisnerAmper, Allen Wilen, allen.wilen@eisneramper.com

## II.  Potential Bidders.

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a sale (a "***Potential Bidder***") must deliver or have previously delivered, if determined to be necessary by the Debtors in their sole discretion, the following documents:

(i)  an executed confidentiality agreement on terms acceptable to the Debtors (a "***Confidentiality Agreement***"), to the extent not already executed;

(ii)  identification of the Potential Bidder and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction; and

(iii)  unless publicly available in a filing under applicable securities laws or regulations, the most current audited and latest unaudited financial statements (the "***Financials***") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Proposed Purchased Assets (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors and (y) a written commitment acceptable to the Debtors and their advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the Sale).

## III.  Due Diligence.

Only Potential Bidders whose Financials, the Financials of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate a transaction for the purchase of the Proposed Purchased Assets shall be eligible to receive due diligence information and access to the Debtors' electronic data room, physical data room, and to additional non-public information regarding the Debtors. **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**. The Debtors will provide to each Potential Bidder that satisfies the foregoing reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any such Potential Bidder to the Debtors' electronic data room. For all Potential Bidders, the due diligence period will end on the Bid Deadline and, subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Proposed Purchased Assets, liabilities of the Debtors, or the potential sale of the Proposed Purchased Assets to any person except to a Potential Bidder or to such Potential Bidder's duly authorized

2

representatives, to the extent provided in the applicable Confidentiality Agreement. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; provided that the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate a transaction to acquire the Proposed Purchased Assets.

The Debtors also reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder that intends in good faith to, or has the capacity to, consummate a transaction to acquire the Proposed Purchased Assets.

**All due diligence requests must be directed to Debtors' Counsel and Debtors' Financial Advisors.**

    (a)    **Communications with Potential Bidders.**

Notwithstanding anything to the contrary in the Bidding Procedures, all substantive direct communications between and amongst Potential Bidders shall involve the Debtors and the Debtors' advisors, to the extent reasonably practicable.

    (b)    **Due Diligence from Potential Bidders.**

Each bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate a transaction to acquire the Proposed Purchased Assets or discussions with other Potential Bidders regarding any topic and with any party regarding the Debtors and/or any of the Proposed Purchased Assets. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such bidder is not a Qualified Bidder or that a Bid made by such bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in the Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process, in connection with a potential transaction to acquire the Proposed Purchased Assets, or otherwise in accordance with the terms of any applicable Confidentiality Agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential

information: (i) with the prior written consent of such Potential Bidder (or Qualified Bidder) and the Debtors; (ii) to the applicable Potential Bidder or Qualified Bidder; and (iii) as otherwise required or allowed by any applicable Confidentiality Agreement with respect to a particular Potential Bidder or Qualified Bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

## IV.    Bid Requirements.

A proposal, solicitation, or offer for a purchase and sale of the Proposed Purchased Assets (each, a "***Bid***") that is submitted in writing and satisfies each of the following requirements (the "***Bid Requirements***") as determined by the Debtors, in their reasonable business judgment, Committee, MidCap Financial Trust, and ServisFirst Bank (collectively, the "***Sale Notice Parties***"), shall constitute a "***Qualified Bid***."

(a)    **Assets**. Each Bid must clearly state which assets and liabilities of the Debtors that the Qualified Bidders are agreeing to purchase and assume.

(b)    **Purchase Price** Each Bid must clearly set forth the purchase price in U.S. dollars to be paid for each individual Proposed Purchased Asset subject to the applicable asset package, including and identifying separately any cash and non-cash components (the "***Purchase Price***"), and the cash component of such purchase price shall be at least $2.6 million.

(c)    **Deposit**. On or before the Bid Deadline, each Bid, other than a credit bid, must be accompanied by a cash deposit in the amount equal to 10% of the aggregate Purchase Price of the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "***Deposit***").

(d)    **Assumption of Obligations, Executory Contracts, and Leases**. Each Bid must clearly state which liabilities of the Debtors the bidder is agreeing to assume, including but not limited to any executory contracts or unexpired leases the bidder proposes to assume.

(e)    **Provider Agreements**. Each Bid must provide that the bidder, if successful, will assume the Debtor's Medicare and Medicaid provider agreements or will obtain its own within a timeframe acceptable to the Debtors in consultation with the Sale Notice Parties.

(f)    **Qualified Bid Documents**. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transaction(s) contemplated by the Bid and shall include a schedule of assumed contracts, to the extent applicable to the Bid, and all other material documents integral to such Bid (the "***Qualified Bid Documents***"). Such documents must be based on form documents provided by the Debtors (including a summary of each Bid as may be reasonably requested by the Debtors).

(g)    **Committed Financing**. To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the transaction(s) set forth in its

Bid with cash on hand, each Bid must include unconditionally committed financing from a reputable financial institution documented to the satisfaction of the Debtors that demonstrates that the Potential Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Proposed Purchased Assets and the proposed transaction(s). Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

(h)     **Adequate Assurance of Future Performance**. Each Bid shall contain sufficient financial and other information regarding the bidder such as to constitute adequate assurance of future performance, as set forth in section 365(b)(1)(C) of the Bankruptcy Code, with respect to each executory contract and unexpired lease that the bidder proposes to have assumed and assigned to it.

(i)     **Contingencies; No Financing or Diligence Outs**. A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall be acceptable to the Debtors in their business judgment.

(j)     **Identity**. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific persons, including financial advisors and counsel, if any, that Debtors' Financial Advisor and Debtors' Counsel should contact regarding such Bid.

(k)     **Demonstrated Financial Capacity**. A Potential Bidder must have, in the Debtors' business judgment, the necessary financial capacity to consummate the proposed transaction(s) required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

(l)     **Time Frame for Closing**. A Bid by a Potential Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors, in consultation with the Sale Notice Parties.

(m)    **Binding and Irrevocable**. A Potential Bidder's Bid shall be irrevocable unless and until the Debtors accept a higher Bid and such Potential Bidder is not selected as the Backup Bidder.

(n)    **Expenses; Disclaimer of Fees**. Each Bid, other than the Stalking Horse Purchaser's Bid, must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and, by submitting its Bid, is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under Section 503(b) of the Bankruptcy Code.

(o)    **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(p)    **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the bidder's Bid.

(q)    **Adherence to Bid Procedures**. By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

(r)    **Regulatory Approvals and Covenants**. A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the Sale, if any, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible).

(s)    **Consent to Jurisdiction**. The Potential Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the documents governing the sale of the

6

Proposed Purchased Assets or any Bid or Qualified Bid, and the Closing, as applicable.

**(t)** **Bid Deadline**. Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before 5:00 p.m. (prevailing Central Time) on **December 11, 2018** (the "*Bid Deadline*") by each of the Sale Notice Parties.

## V. Qualified Bidders.

(a) A "*Qualified Bidder*" is a Potential Bidder whose Financials, the Financials of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate a transaction for the purchase or the Proposed Purchased Assets, whose Bid is a Qualified Bid, and that the Debtors determine should be considered a Qualified Bidder, in consultation with the Sale Notice Parties. Within one business day after the Bid Deadline, the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder.

(b) If any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below), if any, and all accumulated interest on or within three (3) business days after the Bid Deadline.

(c) After the Bid Deadline, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw a Qualified Bid, except for proposed amendments to increase their consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in the Bidding Procedures; provided that any Qualified Bid may be improved at the Auction. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in the Bidding Procedures.

(d) For purposes of the Bidding Procedures, the Stalking Horse Purchaser shall be deemed Qualified Bidder, provided, however, that on or before the Bid Deadline, the Stalking Horse Purchaser shall provide a list of all executory contracts and unexpired leases the Stalking Horse Purchaser proposed to assume. The Stalking Horse Purchaser may terminate the Panola APA prior to the Bid Deadline pursuant to the provisions of the Panola APA, provided, however, that the Stalking Horse Purchaser shall lose all Stalking Horse Purchaser protections provided herein in the event of such termination. In addition, after the Bid Deadline, the Stalking Horse Purchaser may not terminate the Panola APA pursuant to any walk rights provided in the Panola APA.

## VI. Right to Credit Bid.

Any Qualified Bidder who has a valid, perfected, and undisputed lien on any of the Proposed Purchased Assets (a "*Secured Creditor*") and the right and power to credit bid claims

65929528.2

secured by such liens, shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims, within the meaning of and subject to section 363(k) of the Bankruptcy Code; provided that a Secured Creditor shall have the right to credit bid its secured claim only with respect to the collateral by which such Secured Creditor is secured.

**VII.   Auction.**

If the Debtors receive more than one Qualified Bid for the Proposed Purchased Assets, the Debtors will conduct the Auction, to determine the Successful Bidders with respect to the Proposed Purchased Assets. If the Debtors do not receive a Qualified Bid for the Proposed Purchased Assets, the Debtors will not conduct the Auction.

No later than two (2) business days after the Bid Deadline, at 5:00 p.m. (prevailing Central Time), the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid or combination of Qualified Bids, for which such Qualified Bidder submitted a Qualified Bid or combination of Qualified Bids, as determined in the Debtors' reasonable business judgment, in consultation with the Sale Notice Parties (the "***Baseline Bid***"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid may take into account any factors the Debtors reasonably deem, in consultation with the Sale Notice Parties, relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the amount and nature of the total consideration (including the amount of cash paid to or remaining in the estates pursuant to the Qualified Bid); (b) the likelihood of the Qualified Bidder's ability to close, and the timing of closing, the transaction(s) contemplated by the Qualified Bid; (c) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (d) the tax consequences of such Qualified Bid (collectively, the "***Bid Assessment Criteria***").

The Auction shall take place at 9:00 a.m. (prevailing Central Time) on **December 14, 2018**, at the offices of Polsinelli PC, in Nashville, Tennessee, or such later date and time as selected by the Debtors. The Auction shall be conducted in a timely fashion according to the following procedures:

**(a)   The Debtors Shall Conduct the Auction.**

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bids. All incremental Bids made thereafter for the Proposed Purchased Assets shall be Overbids and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids on the Proposed Purchased Assets. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only Qualified Bidders and their legal and financial advisors, and the members of and advisors to the Sale Notice Parties, and each such parties' respective legal and financial advisors shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in

65929528.2

person and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to bid at the Auction.

**(b)** **Terms of Overbid**.

"*Overbid*" means any Bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each applicable Overbid must comply with the following conditions:

(i)     **Initial Overbid**. The initial overbid shall exceed the Baseline Bid by $150,000.

(ii)    **Minimum Overbid Increment**. Any Overbid following the initial overbid or following any subsequent Prevailing Highest Bid (as defined below) for the Proposed Purchased Assets shall be in increments of value equal to (or exceeding) $100,000. The Debtors may establish different overbid increments at the Auction for any portion or combination of the Proposed Purchased Assets, as determined by the Debtors in an exercise of their business judgment, in consultation with the Sale Notice Parties.

(iii)   **Conclusion of Each Overbid Round**. Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend time to time, the "*Overbid Round Deadline*") by which time any Overbids must be submitted to the Debtors.

Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified, after consultation with the Sale Notice Parties, an Overbid as being higher or otherwise better than the best Bid the Debtors had prior to receiving such Overbid (in each instance, the "*Prevailing Highest Bid*"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

(iv)    **Overbid Alterations**. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Sale Notice Parties, but shall otherwise comply with the terms of these Bidding Procedures.

(v)     **Overbids by the Stalking Horse Purchaser.** The Stalking Horse Purchaser shall be permitted to include the full amount of the Expense Reimbursement in each bid by the Stalking Horse Purchaser for the

9

purposes of comparison to any Overbid, in connection with each round of bidding at the Auction.

**(c)** **Consideration of Overbids.**

The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Sale Notice Parties, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions between the Debtors and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount.

**(d)** **Closing the Auction.**

(i) The Auction shall continue until there is only one Bid that the Debtors determine, in their reasonable business judgment, in consultation with the Sale Notice Parties to be the highest or otherwise best Bid for the Proposed Purchased Assets. Such Bid shall be declared the "***Successful Bid***," and such Qualified Bidder, the "***Successful Bidder***" and at which point the Auction will be closed as to the Proposed Purchased Assets subject to such Successful Bid. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

(ii) For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under the applicable law.

(iii) The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

(iv) As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid(s) and Backup Bid(s) to be filed with this court.

(v) Consistent with sections (i)–(iv) above and Section 15 below, the Debtors' presentation to the Bankruptcy Court for approval of a selected bid as a Successful Bid will not constitute the Debtors' acceptance of such bid. The Debtors will have accepted the Successful Bid only if and when such Successful Bid has been approved by the Bankruptcy Court at the Sale Hearing.

(e)     **No Collusion; Good-Faith *Bona Fide* Offer.**

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding or otherwise in connection with the sale of the Proposed Purchased Assets; and (ii) its Qualified Bid and subsequent Overbids are a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

## VIII.    Backup Bidder.

The Qualified Bidder with the second-best Qualified Bid (the "***Backup Bid***") at the Auction (if the Auction is conducted) shall be required to serve as a backup bidder (the "***Backup Bidder***"). The Backup Bidder's Deposit, if any, shall be held in escrow until the closing of the transaction with the applicable Successful Bidder.  If the Backup Bidder is the Proposed Stalking Horse, the Proposed Stalking Horse shall serve as the Backup Bidder for only thirty (30) days following the Auction. If a Successful Bidder fails to consummate its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Qualified Bid of such Backup Bidder without further order of the Court or notice to any party.

In such case, the defaulting Successful Bidder's Deposit, if any, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

## IX.     Highest or Otherwise Best Bid.

When determining the highest or otherwise best Qualified Bid or Overbid, as compared to other Qualified Bids or Overbids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate, in consultation with the Sale Notice Parties: (a) the amount and nature of the total consideration (including the amount of cash paid to or remaining in the estates pursuant to the Bid); (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; (d) the tax consequences of such Bid; and (e) community benefit.

## X.      Reservation of Rights.

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, in consultation with the Sale Notice Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Proposed Purchased Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids, Qualified Bids, or Overbids.

65929528.2

## XI.     Consent to Jurisdiction.

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Qualified Bid Documents, as applicable.

## XII.    Confirmation and Sale Hearing.

A hearing to consider approval of the results of the Auction and sale of the Proposed Purchased Assets (the "***Sale Hearing***") will take place on January 8, 2019 at 11:00 a.m. (prevailing Central Time). Any objection on any basis to the proposed sale of the Proposed Purchased Assets must be filed with the court no later than **January 2, 2019, at 5:00 p.m. (prevailing Central time)** (the "*Objection Deadline*").

**The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.**

At the Sale Hearing, the Debtors shall present the Successful Bid(s) to the Court for approval.

## XIII.   No Modification of Bidding Procedures.

Except as provided by Section X of these Bidding Procedures, these Bidding Procedures may not be modified except with the Debtors' express written consent.

## XIV.    Return of Deposit.

The Deposit, if any, of the Successful Bidder shall be applied to the respective Purchase Price of such transaction at closing. The Deposits, if any, for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder, and the Backup Bidder) on or within three (3) business days after the Auction. Upon the return of the Deposits, if any, their respective owners shall receive any and all interest that will have accrued thereon.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the Deposit, if any, deposited by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the proposed transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court.

## XV.     Fiduciary Out.

Nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of the Debtors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such board of directors,

12

board of managers, or such similar governing body determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

13

**Exhibit B**
**Proposed Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

**ORDER (I) AUTHORIZING, APPROVING, AND DIRECTING THE
SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF PANOLA MEDICAL CENTER
TO THE SUCCESSFUL BIDDER AND BACKUP BIDDER IN ACCORDANCE WITH
THE BIDDING PROCEDURES FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING AND
APPROVING THE PANOLA APA; (III) APPROVING THE DEBTORS' MARKETING
AND SALE PROCESS; AND (IV) GRANTING RELATED RELIEF**

Upon consideration of the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Bidding Procedures for the Sale of Panola Medical Center, (II) Authorizing the Sale of Panola Medical Center Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (III) Approving Stalking Horse Purchaser, Break-up Fee, and Overbid Protections, (IV) Establishing Certain Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (V) Scheduling an Auction, (VI) Scheduling a Hearing and Objections Deadlines With Respect to the Sale of Panola Medical Center, (VII) Approving the Form and Manner of Notice Thereof, and (VIII) Granting Related Relief* (Dkt. No. ___) (the "**Sale Procedures Motion**");[2] and upon consideration of the [*Notice of Auction Results*]; and after due consideration and finding sufficient cause for the relief sought in the Sale Procedures Motion,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

[2] Capitalized terms used in this order and not otherwise defined shall have the meanings ascribed to them in the Sale Procedures Motion.

**IT IS HEREBY FOUND, DETERMINED, AND CONCLUDED THAT:[3]**

1.       This Court has jurisdiction over this matter and over the property of the Debtors' estates, pursuant to 28 U.S.C. §§ 157 and 1334.

2.       This is a core proceeding, within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (N), and (O).

3.       Venue is proper in this court, pursuant to 28 U.S.C. §§ 1408 and 1409.

4.       The relief in this order is granted pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure.

5.       Proper, timely, adequate, and sufficient notice of the Sale Procedures Motion and relief sought in the Sale Procedures Motion has been provided, and such notice was sufficient and appropriate under the particular circumstances and no other or further notice of the Sale Procedures Motion or relief sought in the Sale Procedures Motion is necessary or required.

6.       A reasonable opportunity to object or be heard regarding the requested relief in the Sale Procedures Motion and this order has been afforded to all parties entitled to notice of the Sale Procedures Motion and such relief.

7.       The Debtors have the power and authority to sell the Proposed Purchased Assets free and clear of all liens, claims, and encumbrances pursuant to section 363 of the Bankruptcy Code, and all requirements for such sale pursuant to section 363 of the Bankruptcy Code have been satisfied.

---

[3] The findings of fact and conclusions of law herein constitute the court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

2

8.     The Debtors have the power and authority to assume and assign the contracts identified in the Panola APA, and all requirements for such assumption and assignment pursuant to section 365 of the Bankruptcy Code have been satisfied.

9.     It is necessary and appropriate for this court to retain jurisdiction to, among other things, (a) interpret, implement, and enforce the terms and provisions of this order, the Panola APA, all amendments to the Panola APA, any waivers and consents under the Panola APA, and each of the agreements executed in connection with the Panola APA and (b) to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale of the Proposed Purchased Assets, and such jurisdiction is retained.

## PROPER NOTICE OF THE MOTION AND AUCTION

10.    The Debtors properly provided notice, pursuant to and in accordance with the Sale Procedures Order, and no other or further notice is necessary or required.

11.    The Debtors have adequately disclosed all material terms and conditions regarding the Bidding Procedures, Panola APA, and sale of the Proposed Purchased Assets.

12.    The notice provided by the Debtors was in substantial compliance with all applicable laws and satisfied all due process requirements.

13.    The notice provided was reasonably calculated to apprise all interested parties of the sale of the Proposed Purchased Assets free and clear of all liens, claims, encumbrances, and other interests.

14.    As a result, notice of the Sale Procedures Motion, Bidding Procedures, Sale Hearing, and Auction and a reasonable opportunity to object or be heard with respect to the foregoing has been afforded to all interested persons and entities, and the notice provided is

3

appropriate and sufficient for all purposes, including the sale of the Proposed Purchased Assets free and clear of all liens, claims, encumbrances, and other interests.

### THE AUCTION COMPLIED WITH THE SALE PROCEDURES ORDER AND APPLICABLE LAW

15.     On December 14, 2018, the Debtors conducted the Auction in accordance with the Sale Procedures Order.

16.     The Debtors complied in all material respects with applicable law.

17.     All Qualified Bidders confirmed that they did not engage in any collusion in connection with the Auction or the purchase of the Proposed Purchased Assets.

18.     The Auction was substantively and procedurally fair to all potential Bidders and Qualified Bidders, including the Proposed Stalking Horse.

### HIGHEST AND BEST OFFER

19.     At the Auction, pursuant to the Panola APA and Bidding Procedures, the Successful Bidder was [_____], with a Successful Bid in the amount of $[_____].

20.     A true and correct copy of the Panola APA applicable to the Successful Bidder is attached to this order as **Exhibit 1** and incorporated in this paragraph by reference.

21.     The Successful Bidder submitted the highest or otherwise best offer to purchase the Proposed Purchased Assets.

22.     Neither the sale of the Proposed Purchased Assets nor the Panola APA violate or are otherwise inconsistent with the Sale Procedures Order, the Bidding Procedures, or applicable law.

23.     The Successful Bidder has confirmed that it did not engage in any collusion in connection with the Auction or the purchase of the Proposed Purchased Assets.

4

24.     The Successful Bid and Panola APA constitute the highest and best offer for the Proposed Purchased Assets and will provide a greater recovery for the Debtors' creditors than would be provided by any other practical alternative.

25.     The Debtors' determination that the Successful Bid and Panola APA constitute the highest and best offer for the Proposed Purchased Assets constitutes a valid and sound exercise of the Debtors' reasonable business judgment.

26.     The Successful Bid and Panola APA represent a fair and reasonable offer to purchase the Proposed Purchased Assets under the circumstances of this bankruptcy case.

27.     No other entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtors' or their estates than the Successful Bidder.

28.     The Debtors' decision to sell the Proposed Purchased Assets to the Successful Bidder pursuant to the Panola APA and this order is supported by good business reasons and sound justification based upon the Debtors' experience and the circumstances presented in this case.

### GOOD FAITH OF THE SUCCESSFUL BIDDER

29.     The Successful Bidder is not an affiliate, subsidiary, or other insider of the Debtor.

30.     The terms of the sale of the Proposed Purchased Assets, as set forth more specifically in the Panola APA, are fair and reasonable under the circumstances.

31.     The sale of the Proposed Purchased Assets to the Successful Bidder in all respects complies with the Bidding Procedures, Sale Procedures Order, and applicable law.

32.     The Successful Bidder negotiated the terms and conditions of the sale of the Proposed Purchased Assets in good faith and at arm's length.

5

33. The Successful Bidder is entering into the Panola APA and sale of the Proposed Purchased Assets in good faith and is a good faith purchaser for value.

34. The Successful Bidder will be acting in good faith in closing the sale of the Proposed Purchased Assets pursuant to the Panola APA after entry of this order.

35. The court has found that the Successful Bidder has acted in good faith in all respects in connection with this case, the Bidding Procedures, the Auction, and the sale of the Proposed Purchased Assets.

36. The Auction was conducted in good faith, and the Successful Bidder is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is entitled to all the protections afforded by 363(m) of the Bankruptcy Code.

37. [In accordance with the Sale Procedures Order, the Proposed Stalking Horse is entitled to receive the Break-up Fee in the amount of $_____ for the material contributions the Proposed Stalking Horse has made by serving as the stalking horse purchaser and agreeing to submit its offer to higher and better offers.]

### NO FRAUDULENT TRANSFER

38. The consideration provided for the Proposed Purchased Assets under the Panola APA (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Proposed Purchased Assets, and (c) constitutes reasonably equivalent value for the Proposed Purchased Assets.

### VALIDITY OF TRANSFER

39. The Debtors' transfer of the Proposed Purchased Assets including fee title to the real property along pursuant to the Panola APA and this order will be a legal, valid, and effective transfer of the Proposed Purchased Assets including fee title to the real property and will

6

indefeasibly vest the Successful Bidder with good and valid title in and to the Proposed Purchased Assets free and clear of any Liens (as defined below).

40.     The Debtors have full power and authority to execute and consummate the Panola APA and all related documents and is directed to do so, and no consents or approvals (other than those expressly provided for in the Panola APA) are required to consummate the transactions contemplated by the Panola APA and this order.

41.     The Debtors and Successful Bidder proposed, negotiated, and entered into the Panola APA without collusion, in good faith, and from arm's length bargaining positions.

42.     Neither the Debtors nor the Successful Bidder has engaged in any conduct that would cause or permit the Panola APA or transactions contemplated by the Panola APA to be avoided or otherwise set aside.

43.     Holders of liens, claims, encumbrances, or others interests in, on, or to any of the Property who did not object, or who withdrew their objections, to the Sale Procedures Motion are deemed to have consented to entry of this order, pursuant to section 363(f)(2) of the Bankruptcy Code.

44.     The sale of the Proposed Purchased Assets to the Successful Bidder does not amount to a consolidation, merger, or de facto merger of the Successful Bidder and the Debtors or the Successful Bidder and the Debtors' estates, there is not substantial continuity between the Successful Bidder and the Debtors or the Successful Bidder and the Debtors' estates, there is no continuity of enterprise between the Successful Bidder and the Debtors or the Successful Bidder and the Debtors' estates, the Successful Bidder is not a mere continuation of the Debtors or Debtors' estates, and the Successful Bidder does not constitute a successor to the Debtors or the Debtors' estates.

7

45.     Without limiting the generality of the foregoing, the Successful Bidder shall have no successor or transferee liability of any kind or character with respect to any "claim" (as defined in the Bankruptcy Code) against the Debtors or any other liability or obligation of any kind or nature whatsoever of the Debtors, as a result of its purchase of the Proposed Purchased Assets, its operation of the business formerly operated by the Debtors, or otherwise (except as expressly assumed).

46.     Neither the Debtors nor the Successful Bidder has engaged in any conduct that would cause or permit the sale of the Property to the Successful Bidder to be avoided under section 363(n) of the Bankruptcy Code.

**BASED UPON THE FOREGOING FINDINGS AND CONCLUSIONS, IT IS HEREBY:**

1.     **ORDERED** that the Motion is GRANTED as set forth in this order; and it is further.

2.     **ORDERED** that all objections to the Sale Procedures Motion concerning the Auction, Successful Bid, Successful Bidder, marketing process employed by the Debtor, Panola APA or otherwise relating to the sale of the Proposed Purchased Assets and relief granted in this order that have not been withdrawn, waived, resolved, sustained, or settled are expressly denied and overruled in their entirety; and it is further

3.     **ORDERED** that the Panola APA, as set forth in **Exhibit 1** to this order, is approved in its entirety; and it is further

4.     **ORDERED** that the Debtors are directed to sell the Proposed Purchased Assets free and clear of all Liens (as defined below) in accordance with the Bidding Procedures, Panola APA and this order; and it is further

8

5.      **ORDERED** that the Debtors are authorized to take all actions to consummate the sale of the Proposed Purchased Assets pursuant to and in accordance with the Bidding Procedures, Panola APA, and this order, including transferring and conveying the Proposed Purchased Assets to the Successful Bidder; and it is further

6.      **ORDERED** that the Debtors are authorized, directed, and empowered to consummate and implement fully the Panola APA, together with all additional instruments and documents that may be necessary or desirable to implement and consummate the sale of the Proposed Purchased Assets in accordance with the Panola APA and this order; and it is further

7.      **ORDERED** that the Debtors are authorized and directed to take all actions necessary or desirable for the purpose of assigning, transferring, granting, conveying, and conferring the Proposed Purchased Assets to the Successful Bidder; and it is further

8.      **ORDERED** that any assignee of the Successful Bidder shall have the same substantive and procedural protections of the Panola APA and of this order as the Successful Bidder; and it is further

9.      **ORDERED** that, time being of the essence, the Successful Bidder is directed to use its best efforts to close the sale of the Proposed Purchased Assets in accordance with the terms of the Panola APA and this order as soon as reasonably practicable; and it is further

10.     **[ORDERED** that, in accordance with the Sale Procedures Order, the Proposed Stalking Horse is entitled to receive the Break-up Fee in the amount of $_____ no later than any closing with the Successful Bidder for the material contributions the Proposed Stalking Horse has made by serving as the stalking horse purchaser and agreeing to submit its offer to higher and better offers.  Such amounts shall be allowed superpriority administrative

9

expense claims of Seller under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind.]

11.      **ORDERED** that, in the Debtors' sole discretion, any agreements, documents, or other instruments executed in connection with the Panola APA may be modified, amended, or supplemented by the Debtors and Successful Bidder, in accordance with the terms of the Panola APA, without further notice or order of this court, <u>provided</u> <u>that</u> any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates or their creditors; and it is further

12.      **ORDERED** that the transfer of the Proposed Purchased Assets to the Successful Bidder shall be free and clear of any and all liens, encumbrances, claims, charges, defenses, offsets, recoupments, and interests on the foregoing and against the foregoing of whatever type or description, including, without limitation, any restrictions on or conditions to transfer or assignment, liens, mortgages, security interests, pledges, hypothecations, control agreements, equities and other claims and interests having arisen, existed, or accrued prior to and through the Closing Date, whether direct or indirect, monetary or non-monetary, arising at law or in equity, contract or tort, absolute or contingent, matured or unmatured, voluntary or involuntary, liquidated or unliquidated, of, by, or against the Proposed Purchased Assets (collectively, the "*Liens*"), with such Liens to attach to the net proceeds of the sale of the Proposed Purchased Assets in accordance with the same validity, priority, and enforceability as existed prior to the sale; and it is further

13.      **ORDERED** that all holders of Liens on any of the Proposed Purchased Assets are directed, upon Closing, to execute such documents and take all other actions as may be necessary or requested by the Debtors or the Successful Bidder, to terminate and release any filed or

recorded documents evidencing their respective Liens on any of the Proposed Purchased Assets; and, if any such holder does not deliver to the Debtors or the Successful Bidder by Closing, in proper form for filing (and, if necessary, executed by the appropriate parties), termination statements, instruments of satisfaction, releases of liens and easements, or any other documents necessary, or requested by the Debtors or the Successful Bidder, for the purpose of terminating or releasing any filed or recorded document evidencing a Lien on any of the Property, the Debtors and the Successful Bidder each are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of any such holder with respect to any of the Proposed Purchased Assets; and it is further

14.     **ORDERED** that any person or entity that is presently, or as of Closing, in possession of some or all of the Proposed Purchased Assets is hereby directed to surrender possession of such Proposed Purchased Assets to the Successful Bidder upon Closing; and it is further

15.     **ORDERED** that any and all Liens will attach to the net proceeds of the sale of the Proposed Purchased Assets with the same effect, validity, enforceability, and priority of such Liens, if any, as such Liens had against the Proposed Purchased Assets prior to the sale authorized by this order, subject to any rights, claims, defenses, and objections of the Debtors and all interested parties with respect to such Liens; and it is further

16.     **ORDERED** that the transfer of the Proposed Purchased Assets to the Successful Bidder may not be avoided under any applicable law, because the Successful Bidder is a good faith purchaser and is providing the Debtors' estates with reasonably equivalent value; and it is further

65929528.2

17. **ORDERED** that the provisions of this order authorizing the sale of the Proposed Purchased Assets free and clear of any Liens shall be and are self-executing, and the Debtors and Successful Bidder shall not be required, but are permitted in their discretion, to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of the Panola APA and this order; and it is further

18. **ORDERED** that neither the purchase of the Proposed Purchased Assets nor the subsequent operation of the Proposed Purchased Assets by the Successful Bidder shall cause the Successful Bidder or its affiliates, successors, or assigns or their respective properties (including the Proposed Purchased Assets) to be deemed a successor in any respect of the Debtors' or Debtors' business operations within the meaning of any laws, rules, or regulations relating to any tax, revenue, pension, benefit, ERISA, environmental, labor, employment, products liability, or other law, rule, or regulation of any federal, state, or local government; and it is further

19. **ORDERED** that this order and the documents executed in connection with and pursuant to this order constitute a full and complete general assignment, conveyance, and transfer of the Proposed Purchased Assets or a deed or a bill of sale transferring good and marketable title in the Proposed Purchased Assets to the Successful Bidder on the Closing Date, free and clear of all Liens, and each and every federal, state, and local governmental agency or department is directed to accept this order as such an assignment, deed or bill of sale or any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Panola APA and this order; and it is further

12

20.    **ORDERED** that, if necessary, this order shall be accepted for recordation on or after the Closing Date as conclusive evidence of the free and clear, unencumbered transfer of title to the Proposed Purchased Assets to the Successful Bidder; and it is further

21.    **ORDERED** that this order is effective as a determination that any and all Liens, if any, will be, and are, without further action by any person or entity, unconditionally released, discharged, and terminated with respect to the Proposed Purchased Assets; and it is further

22.    **ORDERED** that this court retains exclusive jurisdiction to (a) enforce and implement the Panola APA and any other agreements, documents, and instruments executed in connection with the Panola APA, (b) compel delivery of possession of the Proposed Purchased Assets (or any part of the Proposed Purchased Assets) to the Successful Bidder, (c) resolve any disputes, controversies, or claims arising out of or relating to the Panola APA, this order, or the sale of the Proposed Purchased Assets, and (d) interpret, implement, and enforce the provisions of this order; and it is further

23.    **ORDERED** that the terms and conditions of the Panola APA and this order will be binding in all respects upon, and will inure to the benefit of, the Debtors, Successful Bidder, and their respective affiliates, successors and assigns, and any affected third parties; and it is further

24.    **ORDERED** that all persons who hold Liens against the Debtors' estates, the Debtors, insiders of the Debtors, or the Proposed Purchased Assets are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Successful Bidder, its affiliates, successors or assigns, or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the sale of the Proposed Purchased Assets; and it is further

13

65929528.2

25.      **ORDERED** that nothing contained in any plan of reorganization or plan of liquidation confirmed in the Debtors' chapter 11 case, in any order confirming such a plan, or in any other order of this court, shall conflict with or deviate from the provisions of the Panola APA or the terms of this order, and to the extent such provisions do conflict, then the terms of the Panola APA or this order, as the case may be, shall control over such conflicting plan or order; and it is further

26.      **ORDERED** that, to the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Panola APA and this order, the provisions contained in the Panola APA control; and it is further

27.      **ORDERED** that the reversal or modification of this order on appeal shall not affect the validity of the sale of the Proposed Purchased Assets to the Successful Bidder, because the Successful Bidder acted in good faith in participating in the Bidding Procedures and Auction and in purchasing the Proposed Purchased Assets in accordance with the Panola APA; and it is further

28.      **ORDERED** that the authority granted to the Debtors to close the sale of the Proposed Purchased Assets pursuant to and in accordance with the Panola APA and this order shall not be stayed if this order is appealed; and it is further

29.      **ORDERED** that there is no just delay for the implementation of this order and, for all purposes, this order shall be a final order with respect to the sale of the Proposed Purchased Assets and other relief granted in this order; and it is further

30.      **ORDERED** that time is of the essence and, accordingly, the fourteen (14) day stays imposed by Rules 6004(h) and 6006(d) of the Bankruptcy Rules are waived with respect to this order, and this order shall take effect immediately upon its entry.

14

**This Order Was Signed And Entered Electronically As Indicated At The Top Of The First Page**


Prepared and submitted by:

POLSINELLI PC

/s/ Michael Malone
Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (*Pro Hac Vice*)
Caryn E. Wang (*Pro Hac Vice*)
1201 West Peachtree Street NW, Suite 1100
Atlanta, Georgia
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

*Counsel to the Debtors and*
*Debtors in Possession*

65929528.2

**EXHIBIT C**
**AUCTION NOTICE**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

## NOTICE OF AUCTION FOR THE SALE OF DEBTORS' ASSETS

**PLEASE TAKE NOTICE** that on November __, 2018, the United States Bankruptcy Court for the Middle District of Tennessee (the "***Court***") entered an *Order (I) Authorizing and Approving Bidding Procedures for the Sale of Panola Medical Center, (II) Authorizing the Sale of Panola Medical Center Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (III) Approving Stalking Horse Purchaser, Break-up Fee, and Overbid Protections, (IV) Establishing Certain Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (V) Scheduling an Auction, (VI) Scheduling a Hearing and Objections Deadlines With Respect to the Sale of Panola Medical Center, (VII) Approving the Form and Manner of Notice Thereof, and (VIII) Granting Related Relief* [Dkt. # ___] (the "***Sale Procedures Order***") approving Bidding Procedures for the sale of the Panola Medical Center, a 112 bed acute care hospital and related healthcare operations and facilities located in Batesville, Mississippi as more fully described in the Panola APA.[2]

---

Copies of the Sale Procedures Order, the Bidding Procedures, or other documents related thereto are available upon request to Caryn E. Wang by calling (404) 253-6016 or visiting the Debtors' restructuring website at www.bmcgroup.com/curaehealth.

---

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend to conduct the Auction, at which they will consider proposals submitted to the Debtors and their professionals, by and pursuant to the Bidding Procedures as set forth in the Sale Procedures Order, on **December 14, 2018 at 9:00 a.m. (prevailing Central Time)** at the offices of Polsinelli PC, 401 Commerce Street, Suite 900, Nashville, TN 37219.

**PLEASE TAKE FURTHER NOTICE** that the Bid Deadline is **Tuesday December 11, 2018, at 5:00 p.m.** (prevailing Central Time), and that any person or entity who wishes to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

[2] Capitalized terms used but not defined herein shall have the meanings given to them in the Sale Procedures Order or the Bidding Procedures, as applicable.

participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to modify the Bidding Procedures, in their reasonable business judgment and in consultation with the Committee, MidCap Financial Trust, and ServisFirst Bank in accordance with the Bidding Procedures.

DATED: _____, 2018

Respectfully submitted,

POLSINELLI PC

/s/ Michael Malone
Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (*Pro Hac Vice*)
Caryn E. Wang (*Pro Hac Vice*)
1201 West Peachtree Street NW, Suite 1100
Atlanta, Georgia 30309
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

*Counsel to the Debtors and*
*Debtors in Possession*

65929528.2

**EXHIBIT D**

**PANOLA APA**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**Batesville Regional Medical Center, Inc.**

**Batesville Regional Physicians, LLC**

**Curae Health, Inc.**

**AND**

**Progressive Medical Management of Batesville LLC**

**Dated as of November 6, 2018**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ............................................................................................... 1

    1.1    Certain Definitions ............................................................................. 1

    1.2    Other Definitional and Interpretive Matters ..................................... 9

ARTICLE II PURCHASE AND SALE OF ASSETS .................................................... 10

    2.1    Sale of Assets .................................................................................. 10

    2.2    Purchase of Assets .......................................................................... 11

    2.3    Excluded Liabilities ........................................................................ 11

    2.4    Excluded Assets .............................................................................. 11

    2.5    Nonassignable Assets ...................................................................... 11

    2.6    Method of Conveyance .................................................................... 11

    2.7    Assumed Contracts ......................................................................... 12

    2.8    Assumption of Liabilities................................................................ 12

    2.9    Taxes and Assessments ................................................................... 12

    2.10    Purchaser's Deposit ........................................................................ 13

    2.11    Purchase Price ................................................................................. 13

    2.12    Order of the Bankruptcy Court ....................................................... 13

    2.13    Closing ............................................................................................ 14

    2.14    Medicare, Medicaid and Commercial Carrier Provider Agreements ................. 14

    2.15    Closing Payments............................................................................ 14

    2.16    Closing Deliveries of Seller ........................................................... 15

    2.17    Closing Deliveries of Purchaser...................................................... 16

    2.18    Further Conveyances and Assumptions........................................... 16

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER .............................. 17

    3.1    Corporate Existence and Power of Seller ....................................... 17

    3.2    Validity and Enforceability of Agreement....................................... 17

    3.3    Consents; Waivers and Approvals .................................................. 17

    3.4    No Conflict...................................................................................... 17

    3.5    Rights to Acquire Assets................................................................. 18

    3.6    Title to and Adequacy of the Assets ............................................... 18

    3.7    Government Reimbursement Participation; Health Care Law Compliance ........ 18

# TABLE OF CONTENTS
## (continued)

3.8  Existing Medicare and Medicaid Provider Agreements ...................................... 20

3.9  Intangible Property. ..................................................................................... 20

3.10  Hill Burton .................................................................................................. 20

3.11  Medical Staff............................................................................................... 20

3.12  Compliance with Laws; Permits .................................................................. 20

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ..................... 21

4.1  Corporate Existence of Purchaser ................................................................ 21

4.2  Validity and Enforceability of Agreement ..................................................... 22

4.3  Authorization and Authority ......................................................................... 22

4.4  No Conflict................................................................................................... 22

4.5  Ability to Consummate Transaction .............................................................. 22

4.6  Solvency...................................................................................................... 22

4.7  Litigation and Arbitration ............................................................................. 22

4.8  Brokers and Intermediaries .......................................................................... 23

ARTICLE V CERTAIN COVENANTS AND AGREEMENTS OF SELLER AND
PURCHASER ..................................................................................... 23

5.1  Access and Information ................................................................................ 23

5.2  Authorizations .............................................................................................. 25

5.3  Conduct of Business .................................................................................... 25

5.4  Commercially Reasonable Efforts ................................................................ 27

5.5  Adequacy of Purchaser's Review ................................................................ 27

5.6  Tax Matters ................................................................................................. 27

5.7  Announcement ............................................................................................. 28

5.8  Post-Closing Business Operations Commitment ........................................... 28

5.9  Risk of Loss; Casualty Loss ......................................................................... 28

5.10  Bankruptcy Actions ..................................................................................... 29

5.11  DISCLAIMERS ........................................................................................... 29

5.12  Further Assurances ...................................................................................... 29

5.13  Confidentiality ............................................................................................. 30

5.14  Acceptance and Discharge .......................................................................... 31

# TABLE OF CONTENTS
(continued)

**Page**

5.15    Cooperation ......................................................................................... 31

5.16    Surrender of License ........................................................................... 32

5.17    Removal of Certain Liens .................................................................... 32

5.18    Insurance ............................................................................................ 32

5.19    Final Cost Report ............................................................................... 32

ARTICLE VI CONDITIONS TO PURCHASER'S AND SELLER'S OBLIGATIONS ........... 32

6.1    Entry of the Bid Procedures Order ...................................................... 32

6.2    Entry of the Sale Order ....................................................................... 32

6.3    No Injunctions .................................................................................... 33

6.4    Compliance with Applicable Law ........................................................ 33

6.5    Consents ............................................................................................. 33

ARTICLE VII CONDITIONS TO PURCHASER'S OBLIGATIONS .................................... 33

7.1    Representations and Warranties of Seller ........................................... 33

7.2    Schedules ........................................................................................... 34

7.3    Documents .......................................................................................... 34

7.4    Performance of Obligations ................................................................ 34

7.5    No Changes to Business ...................................................................... 34

7.6    Release of Liens ................................................................................. 34

7.7    Consents ............................................................................................. 34

7.8    FIRPTA Affidavit ............................................................................... 34

ARTICLE VIII CONDITIONS TO SELLER'S OBLIGATIONS ......................................... 34

8.1    Representations and Warranties of Purchaser ..................................... 34

8.2    Performance of this Agreement .......................................................... 35

8.3    Payment of Purchase Price and Assumption of Liabilities and Assumed Contracts .......................................................................................... 35

8.4    Documents .......................................................................................... 35

ARTICLE IX SURVIVAL .................................................................................................. 35

9.1    Survival .............................................................................................. 35

ARTICLE X LIMITED AGREEMENT TERMINATION RIGHTS ....................................... 35

10.1    Termination of Agreement .................................................................. 35

10.2    Procedure for Termination ...................................................................... 36

10.3    Effects of Termination ........................................................................... 36

ARTICLE XI MISCELLANEOUS ................................................................... 36

11.1    Assignment; Binding Agreement............................................................ 36

11.2    Post-Closing Cooperation ...................................................................... 37

11.3    Expenses ................................................................................................ 37

11.4    Entire Agreement and Modification ...................................................... 37

11.5    Severability ........................................................................................... 37

11.6    Waiver ................................................................................................... 37

11.7    Counterparts .......................................................................................... 38

11.8    Headings; Interpretation......................................................................... 38

11.9    Governing Law ...................................................................................... 38

11.10   Bankruptcy Court Jurisdiction ............................................................... 38

11.11   Notices .................................................................................................. 38

11.12   Effectiveness ......................................................................................... 39

11.13   No Third Party Beneficiaries ................................................................. 39

Case 3:18-bk-05665    Doc 401    Filed 11/06/18    Entered 11/06/18 17:44:13    Desc Main
Document      Page 90 of 144

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made as of the 6th day of November, 2018, by and among Batesville Regional Medical Center, Inc., a Tennessee non-profit corporation (with BRP, "Seller"), Batesville Regional Physicians, LLC, a Tennessee limited liability company ("BRP"), Curae Health, Inc., a Tennessee non-profit corporation ("Curae"), and Progressive Medical Management of Batesville LLC, a LLC organized in the state of Mississippi ("Purchaser", and collectively with Seller and Curae, the "Parties").

## WITNESSETH:

WHEREAS, on August 24, 2018, Seller filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court and currently Seller is a debtor-in-possession in its Bankruptcy Case entitled to exercise all the rights and powers provided for in Section 1107 of the Bankruptcy Code;

WHEREAS, Seller presently owns and operates the Hospital, provides hospital services and other health care programs and services at the Hospital; operates the Other Businesses, and owns the Other Assets;

WHEREAS, Seller desires to sell to Purchaser all right, title, and interest of Seller and its bankruptcy estate in, to, and under the Assets and to assign to Purchaser the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code;

WHEREAS, Purchaser desires to purchase from Seller all right, title, and interest of Seller and its bankruptcy estate in, to, and under the Assets and to assume the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to entry of the Sale Order.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1 **Certain Definitions**. For purposes of this Agreement, defined terms used herein have the meanings specified in this Section 1.1.

"Action" means any suit, action, Claim, hearing, administrative action, demand, demand letter, Governmental investigation, notice of violation, or proceeding arising out of any violation or alleged violation of any Law or any breach or alleged breach of any Contract or Order.

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Person referred to. In this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of securities, by contract, or otherwise.

"Agreement" means this Agreement, as hereafter amended, supplemented, or otherwise modified.

"Assessed Cost Report Liability" means the aggregate liability as finally determined and assessed by any Healthcare Program arising from any Cost Reports ending prior to the Effective Time.

"Assets" has the meaning ascribed to it in Section 2.1 herein, provided that (whether or not expressly stated) for all purposes of this Agreement, Assets always exclude Excluded Assets.

"Assignment of Lease" has the meaning ascribed to it in Section 2.6.

"Assumed Contracts" has the meaning ascribed to in Section 2.7.

"Assumed Liabilities" has the meaning ascribed to it in Section 2.8(a).

"Authorizations" means all Healthcare Regulatory Consents, Permits, licenses, certificates, grants, or other authorizations of Governmental Authorities.

"Bankruptcy Case" means the case commenced by Seller and its Affiliates under chapter 11 of the Bankruptcy Code, styled *In re Curae Health, Inc et al case #18-05665*, pending before the Bankruptcy Court.

"Bankruptcy Code" means title 11 of the United States Code Section 101, et seq. (11 U.S.C. § 101, *et seq.*).

"Bankruptcy Court" means the United States Bankruptcy Court for the Middle District of Tennessee and, to the extent of the withdrawal of any reference made pursuant to 28 U.S.C. § 157, the United States District Court for the Middle District of Tennessee with jurisdiction over Seller's Bankruptcy Case.

"Bid Procedures Order" means a Final Order of the Bankruptcy Court in substantially the form attached as Exhibit B approving the procedures for the sale of Seller's assets; provided that any modifications thereto must be satisfactory to the Buyer in its sole discretion.

"Bill of Sale" has the meaning ascribed to it in Section 2.6.

"Billing Services" has the meaning ascribed to it in Section 2.15.

Case 3:18-bk-05665   Doc 401   Filed 11/06/18   Entered 11/06/18 17:44:13   Desc Main
Document     Page 92 of 144

"Books and Records" includes, without limitation, books, ledgers, files, reports, records, inventory data, accounts receivable records, accounts payable records, vendor lists, financing records, personnel and payroll records and other business books and records (including without limitation documents), regardless of the form of and the medium on which such books and records are maintained.

"Break-Up Fee" has the meaning ascribed to it in Section 6.1.

"Business" means the Hospital, the services and programs provided thereat, and the Other Businesses.

"Business Day" means any day of the year, other than Saturday or Sunday, on which national banking institutions in Mississippi are open to the public for conducting business and are not permitted, required, or authorized to close.

"Business Confidential Information" has the meaning ascribed to it in Section 5.15(b).

"Business Records" has the meaning ascribed to it in Section 5.1(e).

"Casualty" has the meaning ascribed to it in Section 5.10.

"Claims" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia*, any and all deeds of trust, Liens, mortgages, assessments, security interests, encumbrances, claims, defenses, demands, damages, causes of action, offset rights, setoff rights, recoupment rights, interests, debts, obligations, guaranties, options, commitments, product liability claims (relating to all products sold or produced prior to the Closing), warranty claims, claims of employees or former employees or their beneficiaries or dependents, including but not limited to, severance or termination payments, pension or employee benefit claims, Taxes, all tort or contractual claims and any claims or obligations arising from Environmental Law, whether absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, known or unknown, in law or in equity, including, without limitation, any claims predicated upon any theory of successor liability or any similar theory, and all Liabilities or guaranties of any kind or nature, arising from or in any way connected with any action or inaction of Seller, arising prior to the Closing Date but excluding the Permitted Encumbrances.

"CLIA" means Clinical Laboratory Improvement Amendments (CLIA) of 1988, which are United States federal regulatory standards that apply to all clinical laboratory testing performed on humans in the United States.

"Closing" means the consummation of the transactions contemplated by this Agreement.

"Closing Date" means such date following the satisfaction of each Party's conditions to Closing or, where permitted, waiver by each Party of the other Party's conditions to Closing as set forth in Articles VI, VII and VIII to this Agreement, as shall be selected by the Parties, but in no event later than _____, or such later date as the Parties may in writing agree; provided that if the Closing shall not have occurred by such outside date and this Agreement

shall not have been terminated in accordance with its terms by Purchaser based on an uncured material breach hereunder by Seller, then Seller shall have the right to extend the outside closing date for an additional sixty (60) days.

"CMS" means the Centers for Medicare & Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means the Official Committee of Unsecured Creditors established in the Bankruptcy Case.

"Committee Parties" means the Committee, the Committee's successors, any estate representative, any liquidating trust relating to the Seller and each of their respective professionals.

"Contract" means any contract, agreement, arrangement, understanding, lease, indenture, note, bond, evidence of indebtedness, license, sublicense, undertaking, binding commitment or instrument, or purchase order entered into or made by or on behalf of Seller in connection with the Business.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Court" means any court, administrative or regulatory body, Government agency, arbitration or mediation panel or similar body.

"Cure Payments" means the amounts, if any, determined by the Bankruptcy Court to be necessary to cure defaults, if any, under each Assumed Contract.

"Data Room" has the meaning ascribed to it in Section 1.2(a)(viii) herein.

"Deed" has the meaning ascribed to it in Section 2.6.

"Deposit" has the meaning ascribed to it in Section 2.10(a).

"DMA" has the meaning ascribed to it in Section 2.15.

"Dispute" has the meaning ascribed to it in Section 11.10(a)

"Effective Time" means the effective time of the Closing, which shall be as of 12:00:01 a.m. prevailing Eastern Time, on the day of the Closing Date.

"Environmental Law" means any federal, state or local statute, law, regulation, code, ordinance, or rule of common law currently in effect relating to the protection or pollution of the environment or natural resources, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 *et seq.*), the Resource

Conservation and Recovery Act (42 U.S.C. § 6901 *et seq.*), the Clean Water Act (33 U.S.C. § 1251 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*) the Toxic Substances Control Act (15 U.S.C. § 2601 *et seq.*), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 *et seq.*), The Medical Waste Tracking Act (42 U.S.C. § 6992 *et seq.*), the Oil Pollution Act (33 U.S.C. § 2701 *et seq.*), the Emergency Planning and Community Right to Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), and the Occupational Safety Health Act (29 U.S.C. § 651 *et seq.*).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Excluded Assets" means those assets of the Seller that are set forth on Schedule 1 attached hereto.

"Excluded Liabilities" means each and every Liability, obligation, debt, or commitment of the Business or Seller, as principal, or a successor of any kind or nature (provided Seller shall take no action causing or resulting in Purchaser being deemed to be a successor owner or operator of the Business for purposes of any Environmental Law), whether absolute or contingent, accrued or unaccrued, asserted or unasserted, known or unknown, liquidated or unliquidated, due or to become due, or otherwise, other than the Assumed Liabilities.

"Excluded Records" means (a) any materials about employees, disclosure of which would violate Law, (b) any materials that are subject to a Privilege or requirement to maintain confidentiality or (c) any Patient Records but only to the extent access to Patient Records is prohibited by Law.

"Exhibits" means the exhibits provided for and referred to in this Agreement.

"Final Cost Report Liability" means the amounts necessary, if any, to satisfy liability incurred as a result of the filing of any Cost Report including, without limitation, the Assessed Cost Report Liability.

"FIRPTA" means the Foreign Investment in Real Property Tax Act.

"Government" or "Governmental" means or refers to the United States of America, any other nation or sovereign state, any federal, bilateral or multilateral governmental authority, state, possession, territory, county, district, city or other governmental unit or subdivision, and any branch, agency, or judicial body of any of the foregoing.

"Governmental Authority" means (i) any federal, state, county, municipal or other local Government or governmental authority, including, without limitation, any regulatory or administrative agency, commission, department, board, bureau, agency, instrumentality or Court and (ii) any arbitrator or arbitral body of any Government.

"Health Care Laws" means, all applicable laws of any Governmental Authority regulating health services or payment, including, but not limited to, the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Stark Law (42 U.S.C. § 1395nn), the Anti-Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), the

administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the exclusion laws (42 U.S.C. § 1320a-7), the civil monetary penalty laws (42 U.S.C. § 1320a-7a), the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. §§ 1320d-1320d-8), the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the Social Security Act), the Food, Drug and Cosmetic Act (21 U.S.C.§§ 301 et seq.), the Prescription Drug Marketing Act of 1987, the Deficit Reduction Act of 2005, the Controlled Substances Act (21 U.S.C. §§ 801 et seq.), the regulations promulgated pursuant to such laws, and any other law, regulation, guidance document, manual provision, program memorandum, opinion letter, or other issuance of any Governmental Authority with legally binding effect which regulates kickbacks, patient or program charges, recordkeeping, claims process, documentation requirements, medical necessity, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded from government health care programs, quality, safety, privacy, security, pharmacy practice, licensure, accreditation or any other aspect of providing health care.

"Healthcare Programs" shall have the meaning set forth in Section 3.8 of this Agreement.

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Authority as shall be required to be obtained by such party in order for such party to consummate the transactions contemplated of it by this Agreement in compliance with all applicable Law relating to health care or healthcare services of any kind, to the extent necessary, under or through CLIA, CMS, DEA, and any other approvals, authorizations, waivers, Orders, licenses, or Permits of any Governmental Authority required to consummate the transactions contemplated hereby and for Purchaser to operate the Business.

"Hospital" means the hospitals operated by Batesville Regional Medical Center, Inc. located in Panola County, Mississippi, known as Panola Medical Center and Panola Medical Center West and operated in connection with the Business.

"Knowledge" means (a) as to Seller, the actual knowledge, after due inquiry, of those senior leadership team members of the Business listed on part 1 of Schedule 2 and (b) as to Purchaser, the actual knowledge, after due inquiry, of the senior leadership team members of Purchaser's ultimate parent company listed on Part 2 of Schedule 2.

"Law" means any statute, law, code, treaty, ordinance, rule, regulation, instrument, directive, decree, agreement, policy, Order, consent decrees and consent orders, or injunction of or with any Government, Governmental Authority, quasi-Governmental Authority, or Court, and includes, without limitation, all judicial and administrative interpretations thereof, and all rules or regulations of any regulatory or self-regulatory authority compliance with which is required by Law.

"Liabilities" means debts and liabilities, whether known or unknown, contingent or absolute, liquidated or unliquidated, and whether or not required to be reflected on the financial statements of a business, whether arising under any Contract, Law, Lien, Order or otherwise.

"Lien" means any lien, security interest, mortgage, deed of trust, option, lease, tenancy, occupancy, covenant, condition, easement, agreement, royalty, pledge, hypothecation, charge, claim or other encumbrance.

"Nonassignable Asset" shall have the meaning set forth in Section 2.5 of this Agreement.

"Mississippi Regulations" means the Mississippi General Statutes as well as the rules and regulations imposed by the Mississippi Division of Health Service Regulation.

"Order" means any order, judgment, writ, injunction, award or decree of any Court or Governmental Authority.

"Ordinary Course of Business" means with respect to the Business, the ordinary course of commercial operations customarily engaged in by the Business reasonably consistent with past practices.

"Other Assets" means and refers to [TBD].

"Other Businesses" means the outpatient, ancillary, and other healthcare businesses incident to the operation of the Hospital set forth in Schedule 3 attached hereto, including, without limitation, [REFERENCE TO PSYCHIATRIC UNIT].

"Patient Records" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996 and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, including, without limitation, Medicare and Medicaid provider numbers and agreements, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Authority.

"Permitted Encumbrances" means (i) the Assumed Liabilities and other obligations assumed by Purchaser under this Agreement, (ii) those Liens or exceptions listed on or described in Schedule 5 attached hereto, and (iii) Liens imposed pursuant to any Assumed Contract.

"Permitted Parties" has the meaning ascribed to it in Section 5.1(e).

"Person" means any natural person, any corporation, partnership, limited liability company, limited liability partnership, joint venture, trust, association, company, or other legal entity, and any Government or Governmental Authority.

"Privilege" means the attorney-client privilege (including the common interest privilege) or the attorney work product doctrine.

"Privileged Materials" means any materials that are protected by or the subject of a Privilege.

"Provider Agreements" means Seller's existing provider agreements with the Medicare and Medicaid programs.

"Purchased Intellectual Property Licenses" means those licenses of the Seller included within the Assets.

"Purchase Price" has the meaning ascribed to it in Section 2.12(a).

"Purchaser" has the meaning set forth in the Preamble to this Agreement.

"Real Property" means each parcel of real property included in the Assets, including, without limitation, all rights of way, easements, facilities and other improvements and fixtures thereon and appurtenances thereto and all rights associated therewith, to the extent owned or leased by Seller, as set forth in Schedule 6 attached hereto.

"Relating to" means arising from, in connection with or otherwise relating to. "Relates to" and "relate to" have corresponding meanings.

"Sale Hearing" means the hearing(s) on the Sale Motion held before the Bankruptcy Court.

"Sale Motion" means the Debtor's Motion for (I) an Order (A) Establishing Bid Procedures Related to the Sale of the Debtor's Assets, (B) Scheduling a Hearing to Consider the Proposed Sale and Approving the Form and Manner of Notice Thereof, (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, and (D) Granting Related Relief, and (II) an Order (A) Approving the Proposed Sale, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief filed on November __, 2018 [Docket No. ___].

"Sale Order" has the meaning ascribed to it in Section 6.1.

"Schedules" means the schedules provided for and referred to in this Agreement.

"Seller" has the meaning set forth in the Preamble to this Agreement.

"Seller's Affidavit" has the meaning ascribed to it in Section 2.6.

"Seller's Confidential Information" has the meaning ascribed to it in Section 5.15(a).

"Survey" has the meaning ascribed to it in Section 2.19.

"Tax" or "Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value

added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes under Section 4979 of the Code, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Taxing Authority" means any Government or Governmental Authority responsible for the imposition or collection of any Tax.

"Title Company" has the meaning ascribed to it in Section 2.19.

"Title Report" has the meaning ascribed to it in Section 2.19.

"Transferred Business Records" has the meaning ascribed to it in Section 5.1(f).

"Transfer Taxes" means all excise, sales, use, transfer (including Real Property transfer or gains), value added, stamp, documentary, filing, recording and similar Taxes and fees which may be imposed or assessed as a result of the transactions effected pursuant to this Agreement together with any interest, additions, penalties with respect thereto and any interest in respect of such additions or penalties. Income taxes do not constitute Transfer Taxes.

### 1.2 Other Definitional and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Periods. When calculating the period before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars. Any reference in this Agreement to "$" means United States dollars.

(iii)     Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are

for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi) Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii) Including. The word "including" means "including, without limitation," and "includes" and "include" have corresponding meanings, and such words shall not be construed to limit any general statement to the specific or similar items or matters immediately following it.

(viii) Made Available to Purchaser. The phrase "made available to Purchaser" means, for all purposes of this Agreement, made available to Purchaser through posting in Seller's electronic data room (the "Data Room"), via email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

(b) No Construction Against Drafter. No presumption, burden of proof, burden of persuasion or similar method of interpretation or standard shall arise or otherwise apply favoring or disfavoring any Party (including, without limitation, the draftsperson) by virtue of the authorship of any one or more provisions of this Agreement, including in any arbitration or litigation proceeding.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1 **Sale of Assets**. At the Closing and as of the Effective Time but in all events subject to the approval of the Bankruptcy Court by and through the Sale Order, Seller agrees, upon and subject to the terms and conditions hereinafter set forth, to sell, transfer, convey, assign and deliver or cause to be sold, transferred, conveyed, assigned and delivered to Purchaser, all right, title and interest of Seller and Seller's bankruptcy estate in, to and under all of the assets and properties and associated rights and interests, real, personal and mixed, tangible and intangible, of whatever kind, owned by Seller (no matter where located, including without limitation, on leased property) including, without limitation, all of the assets and properties used in or related to the Hospital, the Business and the Other Assets, but excluding the Excluded Assets (collectively, after excluding the Excluded Assets, the "Assets"). The Assets shall include, to the extent transferrable, all Patient Records (Seller and its representatives shall continue to have access to all Patient Records as necessary to respond to governmental or other inquiries or issues, to defend malpractice claims, and for other reasonable legitimate reason upon request) but excluding any Excluded Documents. The Assets shall also include all of Seller's membership interests in Mississippi LTAC Holdings, LLC, a Delaware limited liability company, ("LTAC Holdings"), and Mississippi Alzheimer Holdings, LLC, a Delaware limited liability company ("Alzheimer Holdings"). None of the Excluded Assets will be conveyed to Purchaser.

2.2    **Purchase of Assets**.  Purchaser agrees to purchase the Assets upon and subject to the terms, conditions and provisions set forth herein and pursuant to the terms in the Sale Order.

2.3    **Excluded Liabilities**.  Except for the Permitted Encumbrances, the Assets shall be transferred pursuant to the Sale Order and Section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances.

(a)    Purchaser shall not assume, satisfy, discharge, or otherwise be responsible for any Excluded Liabilities.  Purchaser shall at the Closing, assume the Assumed Liabilities pursuant to the terms of Section 2.8 of this Agreement.

(b)    Purchaser shall not assume, satisfy, discharge, or otherwise be responsible for any Liabilities of Seller related to any pension or retirement plans or programs.

(c)    Subject to, and consistent with the Sale Order, Purchaser shall not be responsible for any Liabilities of Seller related to Seller's participation in the Healthcare Programs, including any liability or obligation for overpayments, recapture, recoupment, or set off for previously paid or reimbursed amounts.

(d)    The Parties hereto further agree that, as between Purchaser and Seller, all the Excluded Liabilities shall remain the sole, exclusive obligation and responsibility of Seller.

(e)    Notwithstanding the foregoing, Purchaser shall be responsible for all Liabilities applicable to and incurred with respect to the period after the Effective Time that relate to the Business, the Hospital or Purchaser's post-Closing ownership or operation of the Assets; provided, however, that no statement made in this Agreement shall be deemed to allocate or attribute any Liability or obligation to Purchaser which has been released pursuant to the Sale Order.  To the extent this Section 2.3(e) conflicts with any other provision of this Agreement, this Section 2.3(e) controls.

2.4    **Excluded Assets**.  Nothing herein contained shall be deemed to obligate Seller to sell, transfer, assign, or convey any Excluded Asset, as described on Schedule 1, to Purchaser. The Seller shall retain all right, title, and interest to, in and under the Excluded Assets. To the extent this Section 2.4 conflicts with any other provision of this Agreement, this Section 2.4 controls.

2.5    **Nonassignable Assets.**  To the extent that the assignment of any Asset shall require the consent of any other party and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset") nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained.

2.6    **Method of Conveyance**.  The sale, transfer, conveyance, assignment, and delivery by Seller of the Assets to Purchaser hereunder shall be effected on the Closing Date by delivery by Seller of: (a) an assignment of deed, substantially in the form of Exhibit A, conveying to Purchaser all right, title, and interest of Seller in and to the Real Property, such title

to be free and clear of all Liens pursuant to Section 363 of the Bankruptcy Code, except for Permitted Encumbrances (the "<u>Deed</u>"); (b) an affidavit of Seller, which shall be to Seller's Knowledge, issued to Purchaser and to the Title Company (if Purchaser elects, at Purchaser's sole cost and expense, to obtain title insurance), substantially in the form of Exhibit B ("<u>Seller's Affidavit</u>"), if necessary; and (c) assignments(s) and bill(s) of sale and such other instruments of conveyance in the form of Exhibit C (collectively, "<u>Bill of Sale</u>") conveying all right, title, and interest of Seller in all Assets that comprise tangible or intangible personal property, including separate assignment(s) of any U.S. trademark registrations and applications, if any, included within the purchased intellectual property in a form suitable for recording with the U.S. Patent and Trademark Office, all to the fullest extent permitted by Law, free and clear of any and all Liens, except for Permitted Encumbrances.

2.7 **Assumed Contracts**. On and after the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their terms, all obligations (i) arising after the Effective Time with respect to executory contracts and unexpired leases identified on Schedule 2.7 (the "<u>Assumed Contracts</u>"). Purchaser shall be responsible for all Cure Payments with respect to the Assumed Contracts, which Cure Payments shall be paid by Purchaser at the Closing. Except for the Assumed Contracts, Purchaser shall not assume and shall not be responsible for any of Seller's contracts or leases.

2.8 **Assumption of Liabilities**.

(a) As of the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their respective terms: (i) all Cure Payments; and (ii) all Liabilities of the Hospital or the Business (the "<u>Assumed Liabilities</u>") accruing from and after the Effective Time incurred in connection with or otherwise relating to the Assets or the Business.

(b) Notwithstanding anything to the contrary in this Agreement, (i) Purchaser shall consult with Seller and the Committee with respect to the terms of the assumption of the Assumed Contracts provided that Purchaser shall not modify any terms thereof without the prior written consent of Seller and the Committee if such modification would be or could reasonably be expected to be adverse to Seller in any respect, and (ii) the rights of each of Seller and the Committee to object to such terms are expressly preserved and reserved. In addition, the rights of the Committee to object to any assumption of Assumed Contracts is expressly preserved and reserved as to any assumption that the Committee reasonably concludes is not in the best interests of the Debtor or the Debtor's estate, including any assumption that may or will discharge the obligations of a counterparty with respect to preferences.

(c) Debtor shall not assume any contracts and/or assign any contracts to Purchaser unless Purchaser agrees.

2.9 **Taxes and Assessments**. The Liability for payment of accrued but unbilled or unpaid Taxes (including, but not limited to, real estate taxes, personal property tax, ad valorem tax and similar non-income Taxes) and other assessments relating to, or arising out of the ownership or transfer of, the Assets or the Assumed Contracts (including, but not limited to any water, sewer and other municipal charges owed to any Governmental Authority), imposed on a

periodic basis beginning before and ending after the Effective Time or as a result of the consummation of the transactions evidenced by this Agreement or otherwise, shall be paid by Seller at the Closing, provided that Seller has received at Closing the purchase price required to be paid by Purchaser pursuant to this Section. All Taxes and other assessments shall be listed on Schedule 7, which shall be prepared and delivered at Closing. If any Taxes or other assessments paid by Seller at any time on or prior to the Closing Date are attributable in whole or in part to any period following the Closing, then the Purchase Price payable at Closing shall be increased to adjust for the prior payment of such Taxes and assessments by Seller attributable to the post-closing period.

       2.10   **Purchaser's Deposit**.

       (a)     Upon entry of the Bid Procedures Order, Purchaser shall pay to Seller a deposit in the amount of $150,000 (the "Deposit") to be held in escrow by Seller or Seller's agent in accordance with the terms of this Agreement.

       (b)     Upon entry of the Sale Order, Seller and Purchaser shall have the obligation to consummate the Closing pursuant to and subject to the terms of this Agreement and the Sale Order. If Purchaser fails to consummate the purchase of the Assets on or before March 1, 2019 (unless such failure arises from Seller's uncured material breach and unless Seller, in consultation with the Committee, and Purchaser agree to extend such deadline in writing), Seller, in consultation with the Committee, is authorized but not required to effect the sale of the Assets to one or more third parties as soon as is commercially reasonable subject to further Orders of the Bankruptcy Court. If Purchaser fails to consummate the purchase of Assets hereunder through no fault of its own or as a result of final due diligence efforts being different than as relayed to Purchaser at the time of this Agreement, Seller shall not consummate any transaction unless the Deposit is repaid to Purchaser. If Purchaser fails to consummate the transaction as a result of Purchaser's uncured material default, the entire Deposit and all accrued interest thereon will be retained by Seller.

       2.11   **Purchase Price**.

       (a)     In consideration of the sale, transfer, conveyance, and assignment of the Assets to Purchaser, Purchaser shall at Closing: (i) assume the Assumed Liabilities, (ii) pay or deliver to Seller cash by wire transfer of immediately available funds in the amount of $2,500,000 (the "Cash Purchase Price"); (iii) assume the liabilities described in Sections 2.7 and 2.8 on the terms contained therein; (iv) make the Cure Payments; (v) pay the amount required under Section 2.9; (vi) pay the amount required under Section 2.19; and (vii) pay all Transfer Taxes due in connection with the closing of the transactions contemplated herein (collectively, the "Purchase Price").

       (b)     The Parties agree to report this transaction for federal, state, and local Tax purposes consistently and in accordance with this Section 2.11.

       2.12   **Order of the Bankruptcy Court**. Seller and Purchaser shall take all reasonable steps and use all reasonable efforts necessary or appropriate in order (a) to obtain the Sale Order

from the Bankruptcy Court authorizing the Seller to sell the Assets to the Purchaser; and (b) to consummate the transactions contemplated by the Sale Order.

2.13 **Closing**. The Closing shall take place at 10:00 a.m., prevailing Central Time, on the Closing Date at the offices of Seller's bankruptcy counsel, or at such other time and place as the Parties may agree in writing. The Closing shall be deemed to have occurred and to be effective as between the parties as of the Effective Time. Seller will own, control the management of, and operate the Business until immediately prior to the Effective Time.

2.14 **Medicare, Medicaid and Commercial Carrier Provider Agreements**. Purchaser shall seek to have assigned to Purchaser all current and valid provider contracts of Seller with the Medicare, Medicaid, TRICARE and Commercial programs, including, without limitation, the Provider Agreements, subject to the Government's and Commercial Carriers approval of Seller's assignment and Purchaser's assumption thereof. Seller shall provide Purchaser with information and other assistance as may be reasonably requested by Purchaser with respect to its request to assume the Provider Agreements. Purchaser shall be solely liable for any and all amounts that are or may become due in connection with the assignment of such Provider Agreements.

(a) Upon the Effective Date, to the extent permitted by applicable laws, Purchaser may use Seller's National Provider Identifier and Medicare/Medicaid provider/supplier numbers and provider/supplier agreements to submit claims to the Part A Medicare Administrative Contractor and the Mississippi Department of Medicaid, (the "Payors") for health care services provided after the Effective Date (the "Billing Services").

(b) Seller agrees not to take any action to change its EFT/bank account information used by Payors to deposit monies to be paid as a result of the Billing Services (any such monies deposited to be referred to herein as a "Payment"). Seller acknowledges and agrees that any Payments deposited into the Seller's bank account for Billing Services for services provider after the Effective Date shall be the property of Purchaser.

(c) In the event Seller receives notice of any adjustment to any Payments related to Billing Services, Seller agrees to inform Purchaser and send a copy of such notice to Purchaser by overnight mail or electronic transmission no later than three (3) business days after receipt of such notice.

(d) Whenever a Payor sends other notice to or requests information from Seller regarding a claim for services rendered after the Closing Date, Seller shall send a copy of such notice or inform Purchaser of such request by overnight mail or electronic transmission no later than three (3) business days after receipt of such notice or request.

2.15 **Closing Payments**. No later than five (5) Business Days prior to the Closing Date, Seller shall provide to Purchaser, in writing, Seller's calculation of the Closing payments due as of the Effective Time based on the payment of the Purchase Price, as set forth in Section 2.12, and the estimated apportionment of Taxes and assessments. If within three (3) Business Days following receipt of such calculation, Purchaser has not given Seller written notice of its good faith objection to Seller's calculations, then the transaction shall close based on Seller's

calculations. If Purchaser gives such notice of objection, then the Parties will work together in good faith to resolve the estimated apportionment of Taxes and assessments provided that if they are unable to agree, the Parties shall close and the disputed amount shall be appropriately escrowed.

2.16 **Closing Deliveries of Seller**. At the Closing, in addition to any other documents, assignments, certificates, letters, orders, or agreements described in Section 2.6 or otherwise required to be delivered pursuant to the terms of this Agreement, and the satisfaction of all the conditions set forth in Articles VI and VIII, Seller shall deliver to Purchaser the following:

(a) copies of the resolutions of all corporate bodies of Seller necessary to authorize the transactions contemplated hereby, authorizing the sale of the Assets and the execution and delivery of this Agreement by Seller and the consummation by Seller of the transactions contemplated hereby, certified by the Secretary or an Assistant Secretary of Seller;

(b) a true and complete copy of the certificate of incorporation of Seller, certified by the State of Mississippi, a true and complete copy of the bylaws of Seller, certified by an authorized officer, and a certificate of good standing of Seller from the State of Mississippi, together with a certificate by the Secretary or Assistant Secretary of Seller that the certificate of incorporation of Seller has not been amended since the date of the certification by the State of Mississippi described above and that nothing has occurred since the date of issuance of the certificate of good standing that would adversely affect Seller's corporate existence or good standing;

(c) certificates from the Secretary or Assistant Secretary of Seller as to the incumbency and signatures of each officer of Seller executing this Agreement and any other documents required under this Agreement;

(d) a certified copy of the final, non-appealable Sale Order authorizing and ratifying the execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated hereby;

(e) a certificate of an officer of Seller certifying to Purchaser (a) compliance in all material respects with Seller's covenants set forth in this Agreement, (b) that all of the conditions contained in Articles VI and VII have been satisfied except those, if any, waived in writing by Seller, and (c) that all of the representations and warranties set forth in Article III and the matters set forth in the Schedules are true and correct in all material respects as of the Closing Date;

(f) a duly executed Seller's Affidavit in a form acceptable to the Title Company;

(g) a duly executed FIRPTA Affidavit; and

(h) copies of Seller's most recent Cost Reports as filed with the Medicare and Medicaid programs.

2.17     **Closing Deliveries of Purchaser**.    At the Closing, in addition to any other documents otherwise required to be delivered by Purchaser pursuant to the terms of this Agreement and the satisfaction of all other conditions set forth in Articles VI and VII, Purchaser shall deliver to Seller the following:

(a)     the payment of the Cash Purchase Price, by wire transfer of immediately available funds, pursuant to Section 2.12 herein;

(b)     a true and complete copy of Purchaser's organizational documents and, if applicable, a certificate of good standing of Purchaser from the State of Mississippi, together with a certificate by an authorized officer of Purchaser that the certificate of formation of Purchaser has not been amended since the date of the certification described above and that nothing has occurred since the date of issuance of the certificate of good standing that would adversely affect Purchaser's existence or good standing;

(c)     certificates from an authorized officer of Purchaser as to the incumbency and signatures of each officer of Purchaser executing this Agreement and any other documents required under this Agreement;

(d)     a certificate of an officer of Purchaser certifying to Seller (a) compliance in all material respects with Purchaser's covenants set forth in this Agreement, (b) that all of the conditions contained in Articles VI and VII have been satisfied except those, if any, waived in writing by Purchaser, and (c) that all of the representations and warranties set forth in Article IV are true and correct in all material respects as of the Closing Date; and

(e)     copies of the resolutions of all corporate bodies of Purchaser necessary to authorize the transactions contemplated hereby, authorizing the purchase of the Assets and the execution and delivery by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby, certified by an authorized signatory of Purchaser.

2.18     **Further Conveyances and Assumptions**.    From time to time following Closing, each Party shall, and shall cause their respective Affiliates to execute, acknowledge, and deliver all such further conveyances, notices, assumptions, releases, and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate (i) to assure fully to Purchaser and its successors and permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers, and privileges intended to be conveyed to Purchaser under this Agreement and (ii) to assure fully to Seller and its successors and permitted assigns, the assumption of the Assumed Liabilities and other obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated herein.    Without limiting the generality of the foregoing, if Seller receives any Assets or payments related to the Assets after the Closing Date, it will promptly turn over same to Purchaser.

2.19     **Inventory and Prepaid Expenses**.    Seller has prepared and delivered to Purchaser a balance sheet of the Hospital as of September 30, 2018, which includes an amount for inventory and prepaid expenses (the "<u>Inventory and Prepaid Expenses</u>").    In addition to the

Purchase Price, Purchaser shall pay or deliver to Seller cash by wire transfer of immediately available funds in the amount of the Inventory and Prepaid Expenses.

2.20 **Employee Matters**. As of the Effective Time, Purchaser shall hire substantially all of the employees of Seller, and shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their respective terms all obligations of employees of Curae and/or Seller in connection with their employment at the Hospital prior to the Closing Date for: accrued bonus or other incentive compensation, deferred compensation, severance pay, change in control, retention, salary continuation, sick leave, vacation pay, leave of absence, paid time off, loan, educational assistance, legal assistance, and other material fringe benefit plan, program, agreement or arrangement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby makes the following representations and warranties, subject to any exceptions included in Seller's Disclosure Schedule:

3.1 **Corporate Existence and Power of Seller**. Seller is a non-profit corporation duly organized, validly existing, and in good standing under the laws of the State of Mississippi. Subject to the provisions of the Bankruptcy Code, the Seller has the corporate power to enter into this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby. Seller has all necessary power and authority to enter into this Agreement and all other documents that the Seller is required to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

3.2 **Validity and Enforceability of Agreement**. Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes a legal, valid, and binding obligation of Purchaser, this Agreement constitutes, and all documents required to be executed and delivered at Closing by Seller hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Seller, enforceable against it in accordance with their respective terms, subject to general principles of equity.

3.3 **Consents; Waivers and Approvals**. Except for the approval of the Bankruptcy Court as required by Section 363 of the Bankruptcy Code and approvals relating to the Healthcare Regulatory Consents, no consent, waiver, approval, authorization, license or order of, registration or filing with, or notice to, any Governmental Authority or any other Person is necessary to be obtained, made or given by Seller in connection with the execution and delivery of this Agreement, the performance by Seller of its obligations hereunder or the consummation by Seller of the transactions contemplated hereby.

3.4 **No Conflict**. Subject to the issuance of the Sale Order and approvals relating to the Healthcare Regulatory Consents and the transfer of the Provider Agreements, the execution and delivery by Seller of this Agreement and the other agreements, documents and instruments required to be executed and delivered by Seller pursuant to this Agreement and the

1516150v5
65928702.2

consummation by Seller of the transactions contemplated hereby or thereby, and compliance by Seller with any of the provisions hereof or thereof, will not:

(a) conflict with or result in a breach of any provision of any organizational document of Seller; or

(b) violate (with or without the giving of notice or the lapse of time or both) any Law or any Order to which Seller, the Assets, or the Business is subject to.

3.5 **Rights to Acquire Assets**. Except for Ordinary Course of Business transactions involving the disposition of personal property that are not, individually or in the aggregate, material to the Seller, there are no agreements, options, or other rights to which Seller is a party pursuant to which a Claim exists that Seller is, or may become, obligated to sell or grant any Lien in any of the Assets. Notwithstanding the foregoing, Seller acknowledges and agrees that the Assets shall be transferred pursuant to the Sale Order and Section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances other than the Permitted Encumbrances.

3.6 **Title to and Adequacy of the Assets**. Seller owns each of the Assets and, subject to the approval of this Agreement by the Bankruptcy Court, title to the Assets will be transferred free and clear of any Liens by Order of the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code, except for Permitted Encumbrances. The Assets and the Real Property comprise all items used in the operation of the Hospital and the Business except for (i) Contracts that require consents to the transfer of Contracts made available to Purchaser prior to the date hereof that have not been obtained, (ii) Authorizations that are not transferrable or not transferrable without a consent that has not been obtained, and (iii) the Provider Agreements.

3.7 **Government Reimbursement Participation; Health Care Law Compliance**.

(a) To the Knowledge of Seller, Seller's operation of the Business is and, during the three (3) year period prior to the Closing Date, has been in substantial compliance with all Health Care Laws. Seller has not received notice of, and there are no pending or, to the Knowledge of Seller, threatened legal proceedings relating to violations by Seller of any Health Care Law.

(b) Schedule 3.7(b) sets forth a complete list of Seller's Health Care Permits. Seller has not: (i) received notice and has no Knowledge that any such Governmental Authority is considering limiting, suspending, terminating, adversely amending or revoking any such Health Care Permit; and (ii) received notice of any deficiencies requiring corrective action plans that have not been completed and accepted by the Governmental Authority. All such Health Care Permits are valid and in full force and effect and Seller is in substantial compliance with the terms and conditions of all such Health Care Permits and with the applicable Health Care Laws and rules and regulations of the Governmental Authorities having jurisdiction with respect to such Health Care Permits, except to the extent that any violation with respect to any of the foregoing has not resulted and is not reasonably likely to result in a material adverse effect.

(c) Seller meets all of the material requirements of participation and payment of, and where applicable is a party to valid provider, supplier or other participation agreements

for payment by, Medicare, Medicaid, any other state or federal government health care programs, any private insurance company, health maintenance organization, preferred provider organization, managed care organization, government contracting agency, or any other public or private third party payor program ("Programs") to the extent Seller bills or receives reimbursement from a particular Program. There are no legal proceedings pending or, to the Knowledge of Seller, threatened which would be reasonably likely to result in a revocation, suspension, termination, probation, restriction, limitation, or non-renewal of any Program supplier or other participation agreement or result in the exclusion of Seller or any of its directors, officers, employees or agents from any Program. To the Knowledge of Seller, neither Seller, nor, its officers, directors or managing employees (as defined in 42 U.S.C. §1320a-5(b)) have engaged in any activities which are cause for civil penalties or mandatory or permissive exclusion from any Program.

(d)     To the Knowledge of Seller, all material reports, documents, claims, applications, and notices required to be filed, maintained or furnished to any Governmental Authority, under any Program have been so filed, maintained or furnished and all such reports, documents, claims, applications and notices were complete and correct in all material respects on the date filed (or were corrected or supplemented by a subsequent filing).

(e)     Neither Seller's rights, nor, to the Knowledge of Seller, the right of any licensed professional or other individual employed by Seller to receive reimbursements pursuant to any Government Program or Private Program has been terminated, suspended or materially limited as a result of any investigation or action whether by any federal or state Governmental Authority or other third party. Schedule 3.7(e) sets forth a true, complete and accurate description of inspections, investigations, surveys, audits, monitoring or other form of review conducted by any Governmental Authority, professional review organization, accrediting organization or certifying agency based upon any alleged improper activity related to any Health Care Law or Program during the three (3) year period prior to the Closing Date.

(f)     Except as disclosed to Purchaser, Seller does not have any reimbursement or payment rate appeals, disputes or contested positions currently pending before any Governmental Authority or any administrator of any Private Programs outside the ordinary course of Seller's Business.

(g)     Seller is certified for participation and reimbursement under Titles XVIII and XIX of the Social Security Act and has current provider agreements for such Government Programs and with such Private Programs, including any private insurance program under which it directly or indirectly is presently receiving payments. Set forth in Schedule 3.7(g) is a correct and complete list, with respect to Seller, of all provider numbers under all Government Programs.

(h)     During the one (1) year period prior to the Closing Date, Seller has timely filed all reports required to be filed and timely filed all claims or billings prior to the date hereof in accordance with the Government and Private Programs, all fiscal intermediaries and other insurance carriers; and all such reports and billings are complete and accurate in all material respects and have been prepared in substantial compliance with all applicable Health Care Laws relating to reimbursement and payment. During the one (1) year period prior to the Closing Date,

and except as set forth on Schedule 3.7(h), Seller has paid or caused to be paid all known and undisputed refunds, overpayments, discounts or adjustments which have become due pursuant to such reports and billings and, except as disclosed to Purchaser, to the Knowledge of Seller, has no liability under any Government or Private Program for any refund, overpayment, discount or adjustment pursuant to such reports. To the Knowledge of Seller, there are no other reports or claims or billings required to be filed by Seller in order to be paid under any Government Program or Private Program for services rendered in connection with the Business, except for reports not yet due.

3.8     **Existing Medicare and Medicaid Provider Agreements**.  Seller is eligible to receive payment under Titles XVIII and XIX of the Social Security Act, is a "provider" under the Provider Agreements with the Medicare and Medicaid programs (collectively, the "Healthcare Programs") through the applicable intermediaries, and is in material compliance of applicable conditions of participation and payment required by such Healthcare Programs.

3.9     **Intangible Property.**  Schedule 3.9 contains a list of all Intangible Property owned or used by, or developed for, Seller, in each case, which is primarily used in the Business. In the immediately preceding year, Seller has not received any written claims or assertions made by others that Seller has infringed any intellectual property rights of any third party in the preceding two-year period, and there has been no such infringement by Seller during such period.  To Seller's Knowledge, no third party is infringing on rights of Seller with respect to the Intangible Property listed on Schedule 3.9.  All issued patents and registered trademarks, copyrights and service marks owned by Seller are recorded on the public record in the name of Seller.  Except as set forth in Schedule 3.10 and except for Permitted Liens, Seller has clear and unencumbered title to, or otherwise have the right to use, the Intangible Property listed on Schedule 3.9, and, to Seller's Knowledge, such title or right has not been challenged by others in writing in the last year.  True and complete copies of all documentation relating to the Intangible Property listed in Schedule 3.9 have been delivered or made available to Purchaser.

3.10    **Hill Burton**.  Seller has not received any loans, grants, or loan guarantees pursuant to, or currently has any outstanding unfulfilled obligations arising from, the Hill-Burton Act, 42 U.S.C. § 291a, et seq.

3.11    **Medical Staff**.  To Seller's Knowledge, (i) no member of the medical staff of the Hospital has been excluded from participating in Medicare or any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) and (ii) none of the Seller's or Hospital's current officers, directors or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)), has been excluded from Medicare or any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) or been subject to sanction pursuant to 42 U.S.C. §1320a-7a or 1320a-8 or been convicted of a crime described at 42 U.S.C. §1320a-7b.

3.12    **Compliance with Laws; Permits**.

(a)     The Hospital is duly licensed and authorized by all applicable Governmental Authorities including, but not limited to, the State of Mississippi, to operate all of its health care and medical services.

(b)     Seller is duly licensed and authorized by all applicable Governmental Authorities to own and operate the Hospital and its related health care and medical services.

(c)     Seller has all permits that are necessary to enable it to own, lease or otherwise hold the Assets and to enable it to operate the Business as currently conducted. All such permits are in full force and effect. To the Knowledge of Seller, no proceedings are pending or threatened where the remedy sought is to revoke or materially modify any such permit, materially restrict any renewal of any such permit or deny the right to transfer any such permit that is permitted to be transferred with consent.

(d)     To Seller's Knowledge, Seller is in compliance in all material respects with all applicable Laws respecting the Business. There are no charges of a material violation of a Law pending or to the Knowledge of Seller threatened against Seller.

(e)     To Seller's Knowledge, Seller's ownership and operation of the Business and the Assets are and have been in substantial compliance with all Environmental Laws, except where failure to be in such compliance would not have a material adverse effect on the Debtor's Business or Assets. There is not now pending or, to Seller's Knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Business or the Assets. To Seller's Knowledge, there is not any radon, asbestos or PCBs or any condition with respect to surface soil, subsurface soil, ambient air, surface waters, groundwaters, leachate, run-on or run-off, stream or other sediments, wetlands or similar environmental media on, in, under, above, from or off any of the Real Property, which radon, asbestos, PCBs or condition does or may: (i) require investigation and/or remedial or corrective action pursuant to applicable Environmental Laws on or off such Real Property by Seller or any other owner or occupant thereof; (ii) require compliance by Seller with Environmental Laws; or (iii) result in any claim for personal injury, property damage or natural resources damage or any other proceeding against Purchaser or any of its Affiliates by any Governmental Authority or other Person pursuant to Environmental Laws. To Seller's Knowledge, no portion of the Real Property has been used as a dump or landfill or a storage, recycling or disposal facility for any hazardous substance, other than for the storage and disposal of medical waste in connection with the ordinary course operation of the Business.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the following representations and warranties:

4.1     **Corporate Existence of Purchaser**. Purchaser is a statutory entity created by the State of Mississippi pursuant to NCGS § 116-37, validly existing, and in good standing in the State of Mississippi, and Purchaser is duly authorized to conduct business in Mississippi. Purchaser has all necessary power and authority to enter into this Agreement and all other documents that the Purchaser is required to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

4.2    **Validity and Enforceability of Agreement**.  Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes, and all documents executed and delivered by Purchaser at Closing hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Purchaser, enforceable against it in accordance with their respective terms, except as enforcement hereof may be limited by general principles of equity.

4.3    **Authorization and Authority**.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized, approved and ratified by all necessary action on the part of Purchaser.  Purchaser has full authority to enter into and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.

4.4    **No Conflict**.  Neither the execution and delivery by Purchaser of this Agreement nor the performance by Purchaser of its obligations hereunder, (a) (i) violates or breaches the terms of or causes a default under any legal requirement applicable to Purchaser, (ii) contravenes the certificate of incorporation or bylaws or the certificate of formation and operating agreement or other organizational documents of Purchaser, or (iii) violates or breaches the terms or causes a default under any contract, indenture, evidence of indebtedness or other commitment to which Purchaser is a party or by which it or its properties is bound, or (b) will, with or without the passage of time, the giving of notice or the taking of any action by a third person, have any of the effects set forth in this subsection, except to the extent that any such matter would reasonably be expected to have a material adverse change with regard to Purchaser.

4.5    **Ability to Consummate Transaction**.  Purchaser has or will have sufficient immediately available funds and/or access to credit facilities necessary to consummate the purchase of the Assets and perform of its obligations under this Agreement.

4.6    **Solvency.**  Purchaser is solvent.  The consummation of the transactions provided for in this Agreement will not render Purchaser insolvent.  There are no conditions, obligations or commitments of Purchaser, or Claims against Purchaser, which will or could be reasonably expected to render Purchaser insolvent.

4.7    **Litigation and Arbitration**.

(a)    There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser, including any before any Governmental Authority or any arbitration panel, that seeks to prevent the consummation of the transactions contemplated by this Agreement.

(b)    There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, directors, or other senior executives, and there are no existing facts relating to any Person referred to in this Section 4.7(b), that may cause any required Health Care Regulatory Consent or other consent to the transactions contemplated hereby to not be given.

(c)    There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, directors, or other senior executives or to which Purchaser is otherwise a party before

any Governmental Authority, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby. Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, or senior executives are not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.

4.8     **Brokers and Intermediaries**.  Neither Purchaser nor any of its Affiliates has employed any broker, finder, advisor or intermediary that is entitled, in connection with the consummation of the transactions contemplated hereby, to a broker's, finder's, or similar fee or commission.  Provided, however, the Parties acknowledge and agree that, to the extend allowed by Order of the Bankruptcy Court, the Operational and Strategic Advisor fees and any success fees payable by the Debtor to Morgan Stanley & Co. LLC shall be paid from the cash proceeds of the Sale.

**ARTICLE V**
**CERTAIN COVENANTS AND AGREEMENTS OF SELLER AND PURCHASER**

5.1     **Access and Information**.

(a)     Purchaser agrees to retain and maintain all employee and medical records as required under all applicable laws and regulations.

(b)     Before the Closing and to the extent permitted by Law, and except as required to preserve any Privilege, Seller will provide Purchaser and its representatives with reasonable access during normal business hours, to all of the assets, properties, facilities, employees, medical staff members, agents, accountants, and books and records of Seller and will furnish or make available to Purchaser and its representatives during such period all such information and data concerning Seller in its possession or control as Purchaser reasonably may request; *provided, however*, (i) such access shall be coordinated through such persons as may be designated in writing by Seller for such purpose, and (ii) Seller shall be entitled to participate in and be present during any meeting with any of the physicians on the Hospital medical staff, or with employees, agents, accountants and other representatives.  Purchaser's access shall include IT access to allow Purchaser to prepare to transition/preserve any electronic data as may be customary or required.

(c)     Before the Closing, Seller shall permit Purchaser to engage in discussions and negotiations with Seller's vendors for the purpose of negotiating the terms of contracts between Purchaser and such vendors in connection with Purchaser's purchase of the Assets.

(d)     Before the Closing, Seller shall grant Purchaser and its representatives reasonable access to Seller's employees within the Hospital for the purpose of administering the hiring process as to such employees.  Thus, by way of example and without limitation, except to the extent prohibited by applicable Law, Seller will grant reasonable access to enable Purchaser and its representatives to disseminate documents and information to such employees; collect

documents and information from such employees; interview such employees and their supervisors and managers; investigate the backgrounds, experience, education, qualifications and work records of such employees; offer employment to such employees; and hire such employees. Purchaser agrees to conduct all such activities in compliance with applicable Law.

(e)     After the Closing, Purchaser shall permit, for a period of not less than six (6) years, each of the Seller, any direct or indirect successor to the Seller and their respective professionals, and the Committee Parties (collectively, the "Permitted Parties") access to all Books and Records that are in connection with or that otherwise relate to the Hospital (including the Business) prior to the Closing and/or to Seller and that are in the control or the possession of Purchaser or any of its Affiliates or their respective agents or representatives except for Excluded Records (collectively, "Business Records") for the purposes of (i) pursuing, assessing, settling, or otherwise dealing with any Excluded Assets, (ii) pursuing, assessing, defending, settling, or otherwise dealing with (including, without limitation, exercising rights and remedies with respect to) any Claim, Action, or cause of action, including, without limitation, any objection or motion, that any Permitted Party has the right to pursue, (iii) performing and/or otherwise dealing with any obligations of the Seller pursuant to this Agreement, including the Excluded Liabilities, (iv) assisting any one or more of the Permitted Parties in connection with or otherwise relating to the Claims reconciliation process relating to Seller, including, without limitation, with respect to Claims against any Person, including, without limitation, assessing, resolving, settling, and/or otherwise dealing with priority and administrative Claims and any other general unsecured Claims that accrue prior to the Closing Date and (v) without limiting the generality of the immediately preceding clauses (i) through (iv), otherwise administering Seller's estate including, without limitation, the preparation and confirmation of a plan relating to Seller and the preparation of a disclosure statement relating to Seller, and compliance with any subpoena, document request, or order of any court compelling any Permitted Party to produce documents to third parties, winding down Seller's estate, preparing or filing tax returns and causing audits to be performed and/or for any other reasonable purpose.

(f)     The right of access for the Permitted Parties shall include, without limitation, (a) (i) the right of such Permitted Party to copy at the Permitted Party's premises or the Hospital at each requesting Permitted Party's expense, such documents and records as they may request in furtherance of any of the purposes referred to in Section 5.1(e) and (ii) Purchaser's copying and delivering, at the Permitted Party's cost, to such Permitted Party such documents and records as may be requested, but only to the extent as to this clause (ii) such Permitted Party furnishes Purchaser with reasonable written descriptions of the materials to be so copied.  Purchaser shall not dispose of or destroy any of the Business Records transferred to Purchaser ("Transferred Business Records") before the seventh anniversary of the Closing Date and will provide the Permitted Parties and the Bankruptcy Court pursuant to a filing with the Bankruptcy Court with at least ninety (90) days written notice before doing so and will provide each Party that requests copies of any Transferred Business Records within such ninety (90) day period copies of all requested Transferred Business Records at the cost of the requesting Permitted Party.

(g)     Subsequent to the Closing Date, Purchaser will cooperate with each of the Permitted Parties relating to all matters in connection with the administration of the Seller's estate, including without limitation, in connection with all Claims, Actions, and causes of action

relating to the Excluded Assets or Excluded Liabilities that any Permitted Party elects to pursue, dispute, or defend. Without limiting the generality of the preceding sentence, Purchaser shall use commercially reasonable efforts to make reasonably available to Seller employees of the Business who became employees of Purchaser to assist Seller in connection with the administration of Seller's estate, including, without limitation, in connection with Excluded Assets and/or Excluded Liabilities.

(h) Seller shall provide to Purchaser at the Closing or as soon thereafter as is reasonably possible all appropriate books and records and other documents in the possession or control of Seller, its representatives or its agents relating to the Assets being sold pursuant to this Agreement and the transactions contemplated hereby. Such books, records, and documents shall include, but are not limited to, patient records, all paper and electronic financial, operational, administrative, research, regulatory reporting, maintenance, and HR records.

5.2 **Authorizations**. Purchaser shall use its commercially reasonable efforts to promptly obtain all Authorizations required to enable Purchaser to purchase the Assets and/or operate the Hospital. Purchaser shall provide to Seller and the Committee a weekly report as to the status of obtaining such Authorizations. Seller agrees to execute and deliver such instruments and documents reasonably satisfactory to Seller, and to take all such other and further actions reasonably satisfactory to Seller, that Purchaser cannot take or cause to be taken by any Person other than Seller, that are required to enable Purchaser to obtain such Authorizations or transfer such Authorizations from Seller to Purchaser, provided that Seller shall not be obligated to undertake any material Liabilities or other obligations, individually or in the aggregate, relating to such obligations. Notwithstanding the foregoing, Purchaser shall not be obligated to consent to the imposition of materially burdensome conditions on Purchaser or its lenders in order to obtain the Authorizations it being specifically understood and agreed that conditions required under the Mississippi Regulations (or any Federal corollary) shall not constitute a materially burdensome condition.

5.3 **Conduct of Business**.

(a) Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall:

(i) operate the Business in the Ordinary Course of Business in all material respects;

(ii) use commercially reasonable efforts to (A) maintain the Assets in good working order and condition consistent (including inventory) with past practices, including but not limited to paying when due all reasonable maintenance expenses necessary to maintain the current state of the Assets until Closing, normal wear and tear excepted and (B) maintain the insurance coverage currently in place with respect to the Assets or obtain comparable replacement coverage;

(iii)    perform when due all undisputed post-petition obligations under its contracts, including Purchased Intellectual Property Licenses, and leases of Real Property or personalty to the extent of available funds;

(iv)    comply in all material respects with all Laws and Orders pertaining to the Business and the Assets;

(v)    accurately maintain the books and records of the Business consistent with past practice;

(vi)    without being obligated to make any payment to any Person to preserve any goodwill or relationship, and subject to changes incident to Seller's bankruptcy filing and related intention to sell its assets, use commercially reasonable efforts reasonably consistent with past practices to preserve the goodwill thereof and Seller's relationships with the patients, employees, physicians, suppliers, and others with whom it deals; and

(vii)    perform all undisputed post-petition obligations under Excluded Contracts and timely pay, perform, and discharge in accordance with their respective terms the undisputed post-petition Excluded Liabilities to the extent of available funds.

(b)    Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall not:

(i)    make or enter into any Contract that would be required to be assumed by Purchaser;

(ii)    permit any Person other than Seller (to include Dana Weston although she is not an employee of the Debtor) to manage its Assets or Business;

(iii)    other than in the Ordinary Course of Business, (A) increase the annual level of compensation of any employee or other Person who works in the Business, (B) grant any bonus, similar benefit, or increase in other direct or indirect compensation to any employee or other Person who works in the Business, (C) with respect to any employee or other Person who works in the Business, increase the coverage or benefits available under any (or create any new) employee benefits plan, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition, or similar agreement (or amend any such agreement) with any employee or other Person who works in the Business, except, as to each of clauses (A) through (D), as required by applicable Law from time to time in effect, by any employee benefits plan maintained or sponsored by Seller or by any existing Contract or CBA made available to Purchaser that the Seller is a party to or bound by;

(iv)    subject any of the Assets to any Lien, other than (A) any Permitted Encumbrances or (B) as approved by Order of the Bankruptcy Court;

(v)    other than pursuant to an existing Contract made available to Purchaser, acquire or lease any material assets that would be Assets or sell, assign, license, transfer, convey, lease, or otherwise dispose of any of the Assets, provided that any other

removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets;

(vi)     cancel or compromise any material debt or claim or waive or release any material right of Seller that constitutes an Asset except in the Ordinary Course of Business;

(vii)     permit or allow relocation of (other than within the Hospital or the Hospital's owned Real Property), any services or programs of the Business; or

(viii)     other than in the Ordinary Course of Business or pursuant to an existing Contract made available to Purchaser, remove from the Real Property any furniture, equipment, or other tangible personal property used in the Ordinary Course of Business provided further that any other removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets.

5.4     **Commercially Reasonable Efforts**.     Each Party shall use its commercially reasonable efforts to fulfill or cause the fulfillment of the conditions of the Closing, including, without limitation, the execution and delivery of all agreements contemplated hereunder to be so executed and delivered provided that it shall be the responsibility of Purchaser to obtain the Authorizations and any required consents with respect to the assumption of the Assumed Contracts and satisfy conditions required under the Mississippi Regulations.

5.5     **Adequacy of Purchaser's Review**.     Purchaser agrees that it (a) had a full and complete opportunity to conduct due diligence regarding the Assets prior to making its offer and does not require further due diligence, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its bid and executing and delivering this Agreement, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties of any kind or nature, including, without limitation, any that are express, are implied, arise by operation of law, or that may otherwise be deemed to apply, regarding the Assets, or the completeness of any information provided in connection therewith except, as to clauses (b) and (c), solely for Seller's representations and warranties that are contained in Article 3 of this Agreement.

5.6     **Tax Matters**.

(a)     Purchaser shall be responsible for the payment of all Transfer Taxes (whether or not payable by Seller as a matter of law), including that Purchaser shall promptly reimburse Seller for its share of all Transfer Taxes paid by Seller upon receipt of reasonable documentation evidencing such amount.  Purchaser and Seller will cooperate in the timely preparation and filing of any Tax return that must be filed in connection with any Transfer Taxes.  Any such Taxes or fees resulting from any subsequent transfer of the acquired Assets or Assumed Contracts shall be borne by Purchaser.

(b)     After the Closing Date, Seller and Purchaser shall, and shall cause their respective Affiliates to:

Case 3:18-bk-05665     Doc 401     Filed 11/06/18     Entered 11/06/18 17:44:13     Desc Main
Document     Page 117 of 144

(i)     assist the other Party and its Affiliates in preparing any tax returns that such Party is responsible for preparing and filing relating to the Assets, the Excluded Assets or the Business;

(ii)     cooperate fully in preparing for any tax audit relating to or arising out of the ownership or use of the Assets or the Business;

(iii)     make available to the other Party and its Affiliates and to any Taxing Authority as reasonably requested all information, Books and Records, and documents relating to Taxes arising out of the conduct of the Business or the ownership or use of the Assets; and

(iv)     furnish the other Party with copies of all correspondence received from any Taxing Authority in connection with any tax audit relating to the conduct of the Business or the ownership or use of the Assets with respect to any such taxable period.

5.7     **Announcement**.  Other than confirming information that is already a part of the public record or that is contained in filings a Party hereafter makes with the Bankruptcy Court, Seller will not issue any press release or otherwise make any public statement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of Purchaser(which consent shall not be unreasonably withheld or delayed), except as may be required by applicable Law or the applicable regulations of any exchange.  Subject to the last sentence of this Section 5.7, if Seller is required by Law or pursuant to applicable regulations of any exchange to issue a press release or otherwise make any public statement or disclosure with respect to this Agreement and the transactions contemplated hereby, Seller will use commercially reasonable efforts to promptly notify Purchaser so that Purchaser may seek a protective order or other appropriate remedy, and in the event that no such protective order or other remedy is obtained, Seller may make such disclosure as Purchaser is advised in writing by counsel as may be required by Law or pursuant to applicable regulations of any exchange.  The preceding sentence shall not apply to any filing that Seller reasonably concludes may be required to be made with, or is appropriate to be made with, the Bankruptcy Court.

5.8     **Post-Closing Business Operations Commitment.**  Purchaser shall operate the Hospital as an acute care hospital with an open and accessible emergency department and medical/surgical services for a period of not less than five (5) years after the Closing Date.

5.9     **Risk of Loss; Casualty Loss**.  All risk of loss or damage to or destruction of the Assets, in whole or in part, shall be and remain with Seller until the Effective Time and from and after the Effective Time, the risk of loss or damages to or destruction of the Assets in whole or in part shall be and remain with Purchaser.  If, between the date of this Agreement and the Closing, any of the Assets having a value in excess of $500,000, individually or in the aggregate, shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause (the "Casualty"), individually or in the aggregate, then, with respect to a loss in value in excess of $500,000 (a) Purchaser shall have the option to acquire such Assets on an "as is" basis and take an assignment, without representation, warranty or recourse, from Seller of any insurance proceeds payable to Seller in respect of the Casualty (excluding proceeds under any directors or officers insurance policies) or (b) Seller shall have the option exercisable on or

before the Closing Date by the delivery of written notice thereof to Purchaser (i) to fix such Casualty within sixty (60) days after the Closing Date, or (ii) pay Purchaser the loss in value arising from such Casualty, and if Seller does not elect within twenty (20) days of the occurrence of the Casualty an option set forth in (b)(i) or (b)(ii) above, then Seller shall be deemed to have elected the option in clause (b)(ii).

5.10    **Bankruptcy Actions**.

(a)    Seller and Purchaser acknowledge that this Agreement and the sale of the Assets are subject to Bankruptcy Court approval and entry of the Bid Procedures Order and Sale Order.

(b)    If an appeal is taken or a stay pending appeal is requested, with respect to the Bid Procedures Order or Sale Order, Seller shall promptly notify Purchaser of such appeal or stay request.  Seller shall promptly provide to Purchaser a copy of the related notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from such order.  In the event of an appeal of the Bid Procedures Order or Sale Order, Seller shall, at its own expense, be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.

(c)    From and after the date hereof, Seller shall not take any action that is intended to reverse, void, materially modify, or stay the Bid Procedures Order or Sale Order.

(d)    Seller will provide Purchaser with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) related to the Assets, the Business, or any appeal as described in paragraph 5.11(b), prior to the filing thereof in the Bankruptcy Case, except any involving adversarial matters between Seller and Purchaser.

5.11    **DISCLAIMERS**.    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE TO PURCHASER, EXPRESS OR IMPLIED, WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED HEREBY.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, OR EXCEPT AS EXPRESSLY SET FORTH IN THE SALE ORDER, THE ASSETS TO BE SOLD AND TRANSFERRED HEREUNDER SHALL BE SOLD (A) IN THEIR THEN EXISTING PHYSICAL CONDITION, WITH ALL DEFECTS, IF ANY, AND SUBJECT TO WEAR AND TEAR FROM THE DATE HEREOF TO THE CLOSING DATE AND (B) ON AN "AS IS, WHERE IS" BASIS

5.12    **Further Assurances**.  Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated herein and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate same.  Without limiting the generality of the foregoing, promptly after the discovery by Seller of any item included within the definition of Assets but not transferred, conveyed, or assigned to Purchaser, (x) Seller will deliver written notice to Purchaser of the existence and non-transfer, non-conveyance, or non-assumption of such item

and provide Purchaser with all the information in Seller's possession about, and with access to such item in Seller's possession as Purchaser may reasonably request, and (y) if requested by Purchaser, Seller shall use commercially reasonable efforts to transfer, convey, or assign to Purchaser such item in the manner and on the terms and conditions as applicable to an Asset.

5.13 **Confidentiality**.

(a) From and after the date hereof, Purchaser shall maintain in confidence, including that it shall not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Seller's Confidential Information relating to or obtained from Seller; provided, however, the foregoing restriction shall not apply to any disclosure by Purchaser of Seller's Confidential Information to any Affiliate of Purchaser or to its lenders and legal and financial advisors. For purposes of this Section 5.15, "Seller's Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Assets, the Assumed Liabilities, the Business, the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that Seller's Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Purchaser or its agents or other representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller, provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate Seller's Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written documents or evidence maintained by Purchaser to have been independently developed by Purchaser; and provided further, that upon the Closing, the restrictions contained in this Section 5.15 shall not apply to confidential or proprietary information related primarily to the Assets, the Assumed Liabilities or the Business. Purchaser may disclose Seller's Confidential Information to those who need to know it for the purpose of effectuating the transactions contemplated herein and who agree to keep it confidential. Purchaser shall instruct such Persons having access to Seller's Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom they has transmitted Seller's Confidential Information subject to the confidentiality obligations herein becomes legally compelled, including, but not limited to, through an action brought pursuant to N.C.G.S. 132-9 (Mississippi Public Records Act), to disclose any of such Confidential Information, Purchaser shall provide Seller with notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Seller waives compliance with the provisions of this Section 5.15(a), Purchaser shall furnish only that portion of Seller's Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed. Purchaser shall have no liability to Seller with respect to the disclosure of Seller's Confidential Information ordered by a court of competent jurisdiction pursuant to N.C.G.S. 132-9 or other applicable law, or required by law or regulatory or accrediting agencies.

(b) From and after the date on which the Sale Order is entered, unless this Agreement is terminated, Seller shall maintain in confidence, not disclose to any third party

without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating the Business in the Ordinary Course of Business prior to the Closing Date, (ii) any investigations by any Governmental Authority or any filings with the Bankruptcy Court, (iii) compliance activities prior to or after the Closing related to periods occurring prior to the Closing Date; (iv) any legal proceedings; (v) enforcing any rights or other claims of Seller under this Agreement or otherwise; and (vi) performing any obligations of Seller under this Agreement.  For purposes of this Section 5.15(b), "Business Confidential Information" means any information that is confidential or proprietary in nature that is related to Purchaser or to the Assets, the Assumed Liabilities or the Business, other than information primarily pertaining to the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Seller (other than in connection with filings with the Bankruptcy Court), (ii) becomes available to Seller on a non-confidential basis from a source other than Purchaser, provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully received by Seller from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure.  Seller may disclose Business Confidential Information to those who need to know it for the purpose of effectuating the transactions contemplated herein and who agree to keep it confidential subject to the same confidentiality obligations herein.  Seller shall instruct such Persons having access to Business Confidential Information of such obligation of confidentiality.  If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information (other than in connection with filings with the Bankruptcy Court), Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, or Purchaser waives compliance with the provisions of this Section 5.15(b), Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.

> (c)     The obligations contained in this Section 5.15 shall survive the Closing and are in addition to any separate confidentiality agreements between Seller and Purchaser.

5.14    **Acceptance and Discharge**.  Except to the extent, if at all, Liabilities of Seller to Purchaser are specifically stated herein to survive the Closing, (i) Seller shall cease to have any Liability of any kind or nature relating to its representations and warranties hereunder and/or covenants and agreements to be performed prior to the Effective Time, and (ii) Seller will, without any further writing or other act by Purchaser, at such time be fully and forever, irrevocably and unconditionally, released and discharged from all such Liabilities.

5.15    **Cooperation**.  Seller and Purchaser agree to reasonably cooperate with each other in good faith from the date hereof up through and following the Closing Date, in any effort to

Case 3:18-bk-05665    Doc 401    Filed 11/06/18    Entered 11/06/18 17:44:13    Desc Main
Document      Page 121 of 144

satisfy all further conditions, undertakings and agreements contemplated by this Agreement to be effected after the Closing.

5.16 **Surrender of License**. Following the Closing and in accordance with the timing and other requirements of applicable Law, Seller shall surrender all licenses and operating certificates issued to it relating to the Business, except for the licenses and operating certificates transferred to Purchaser pursuant to this Agreement.

5.17 **Removal of Certain Liens**. If any Liens other than Permitted Encumbrances encumber any Assets, Seller shall have the right, within thirty (30) days of Seller's receiving Purchaser's written notice of any such Lien, to cause such Lien to be removed.

5.18 **Insurance**. Neither Purchaser nor Seller shall have an obligation to purchase tail director and officer insurance coverage or tail professional liability insurance coverage.

5.19 **Final Cost Report.** Purchaser shall file or cause to be filed on Seller's behalf, at Purchaser's sole cost, the final Cost Reports for the period prior to the Closing for the portion of 2019 required to be filed with the Medicare or Medicaid programs or any other Third-Party Payor or Governmental Body as a result of the consummation of the contemplated transactions. Any payments owed and paid to Seller for final settled Cost Reports for any periods prior to Closing are acknowledged as part of the Excluded Assets and are not conveyed to Purchaser by this Agreement. Purchaser shall assume and be responsible for Final Cost Report Liability incurred as a result of the filing of any of said reports or as a result of filing any previous Cost Report for periods prior to the Closing. All Cost Reports shall be prepared in accordance with applicable Law and consistent with past practices.

## ARTICLE VI
## CONDITIONS TO PURCHASER'S AND SELLER'S OBLIGATIONS

The obligations of the Parties to consummate the transaction provided for in this Agreement shall be subject to the satisfaction of the following conditions on or before the Closing Date:

6.1 **Entry of the Bid Procedures Order**. The Bankruptcy Court shall have entered the Bid Procedures Order substantially in the form attached hereto as Exhibit B and in all respects in form and substance reasonably satisfactory to the Parties and the Committee, and which provides, among other things, that in the event Purchaser is not in breach of this Agreement the Bankruptcy Court approves a sale of all or some of the Assets to a buyer other than Purchaser, Seller shall be required to pay to Purchaser out of the proceeds of the sale of the Assets to a buyer other than Purchaser a break-up fee in the amount of $100,000 (the "Break-Up Fee").

6.2 **Entry of the Sale Order**. The Bankruptcy Court shall have entered a sale order in form and substance reasonably satisfactory to the Parties and the Committee (the "Sale Order"), which approves this Agreement and the consummation of the transactions contemplated hereby in their entirety; and which provides for the following rulings and/or findings: (a) Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; (b) timely, adequate, and sufficient notice of the sale was provided; (c) the Assets to be transferred to the

Purchaser are property of the bankruptcy estate and Seller has all requisite authority and approval to transfer the Assets; (d) the total consideration to be realized by the Seller represents fair consideration and reasonably equivalent value in the context of any state or federal law governing the rights of creditors; (e) the conveyance and assignment of the Assets pursuant to this Agreement is a legal, valid, and effective transfer of the Assets to the Purchaser, and will vest the Purchaser with all right, title, and interest of the Seller in and to the Assets free and clear of all Liens, Claims, interests and encumbrances except for those (i) liabilities to be assumed by Purchaser pursuant to this Agreement and (ii) Permitted Encumbrances, and (f) neither the Seller nor the Purchaser has engaged in any conduct that would cause or permit the Agreement, or the transfers contemplated thereby, to be avoided under Bankruptcy Code section 363(n). In addition, unless waived by Purchaser in writing in its sole discretion, the Sale Order shall have become a final, non-appealable order.

6.3 **No Injunctions**. No injunction or restraining Order (whether temporary, preliminary or permanent) of any Governmental Authority shall exist against Purchaser or Seller that prevents the transactions contemplated hereby and approved in the Bid Procedures Order or Sale Order. No other Governmental Authority shall have enacted, issued, promulgated, enforced, or entered any statute, rule, regulation, or non-appealable judgment which prohibits or renders illegal the consummation of the Closing or the transactions provided for herein and approved in the Sale Order.

6.4 **Compliance with Applicable Law**. To the extent required by Law, the filing and waiting period requirements relating to any and all approvals necessary under the Healthcare Regulatory Consents and any other applicable Law, if necessary, relating to consummation of the Closing or the transactions provided for herein shall have been duly complied with and/or such approvals shall have been obtained.

6.5 **Consents**. Purchaser shall have obtained (or shall have had transferred to it) those Healthcare Regulatory Consents and other Authorizations that Purchaser is required to apply for and/or obtain in order to operate the Business, it being specifically understood and agreed that Purchaser shall be required to satisfy conditions required under the Mississippi Regulations.

## ARTICLE VII
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligations of Purchaser to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Purchaser, in its sole discretion, to waive any one or more of the conditions set forth below:

7.1 **Representations and Warranties of Seller**. The representations and warranties of Seller contained in this Agreement, taken as a whole, shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made only as of a specified date, in which case the accuracy of such representation or warranty shall be measured as of such date, and except to the extent of changes permitted by the terms of this Agreement.

7.2 **Schedules**. The matters set forth on the Schedules shall be true and correct in all material respects on the Closing Date, except to the extent of changes permitted by the terms of this Agreement.

7.3 **Documents**. Purchaser shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing, together with copies of all other documents and certificates to be executed and delivered by Seller at Closing.

7.4 **Performance of Obligations**. Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date.

7.5 **No Changes to Business**. Since the date of this Agreement, there shall have been no material changes to the Business or Assets that, in the aggregate, have had a material adverse effect on the Business, excluding adverse changes that (i) were projected to occur in any forecast or budget provided by Seller and/or (ii) relate to a proposed sale of all or substantially all of Seller's assets, thereby leaving Seller without an operating business.

7.6 **Release of Liens**. All Liens on the Assets shall have been released, satisfied or otherwise removed or discharged pursuant to Bankruptcy Court order or otherwise, except for the Permitted Encumbrances.

7.7 **Consents**. Purchaser shall have obtained (or shall have had transferred to it) those Healthcare Regulatory Consents and other Authorizations, including any judicial proceedings and appeals related thereto, which Purchaser is required to apply for and obtain in order to operate the Business, it being specifically understood and agreed that Purchaser shall be required to satisfy conditions required under the Mississippi Regulations.

7.8 **FIRPTA Affidavit**. Seller shall deliver to Purchaser a non-foreign affidavit dated as of the Closing Date and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code so that Purchaser is exempt from withholding any portion of the Purchase Price thereunder (the "FIRPTA Affidavit").

## ARTICLE VIII
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Seller, in its sole discretion to waive any one or more of the conditions set forth below:

8.1 **Representations and Warranties of Purchaser**. The representations and warranties of Purchaser contained in this Agreement, taken as a whole, shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date, and except to the extent of changes permitted by the terms of this Agreement.

8.2 **Performance of this Agreement**. Purchaser shall have materially performed or complied with all of the obligations to be performed or complied with by it under the terms of this Agreement on or prior to the Closing Date. The Purchaser shall have delivered to the Seller a certificate signed by a duly authorized officer of the Purchaser, dated as of the Closing Date, to the foregoing effect.

8.3 **Payment of Purchase Price and Assumption of Liabilities and Assumed Contracts**. Seller shall receive from Purchaser on the Closing Date the Purchase Price pursuant to Section 2.12 of this Agreement and Purchaser shall have assumed the Assumed Liabilities pursuant to a document that is reasonably satisfactory to Seller.

8.4 **Documents**. Seller shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing and copies of all such other documents and certificates executed and delivered hereunder.

**ARTICLE IX**
**SURVIVAL**

9.1 **Survival**. Sections [TBD], and all defined terms used therein, shall survive the Closing, except to the extent (if at all) that such survival is expressly limited herein. The representations and warranties of the Parties shall expire upon the consummation of the Closing.

**ARTICLE X**
**LIMITED AGREEMENT TERMINATION RIGHTS**

10.1 **Termination of Agreement**. This Agreement and the transactions contemplated hereby may be terminated prior to the Closing Date only as follows:

(a) by mutual written consent of Purchaser and Seller;

(b) except as otherwise provided in this Agreement, by either Party if the Closing shall not have occurred on or before the Closing Date;

(c) by Purchaser if any of the conditions to the obligations of Purchaser to close set forth in Article VII shall have become incapable of fulfillment other than because of a breach by Purchaser of any covenant or agreement contained in this Agreement and such condition is not waived by Purchaser;

(d) by Purchaser if there shall be a material breach by Seller, as determined by the Bankruptcy Court, of the representations and warranties, taken as a whole, or of any material covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Purchaser to Seller of such breach;

(e) by Seller if any of the conditions to the obligations of Seller to close set forth in Article VIII shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement and such condition is not waived by Seller;

(f)     by Seller if there is a material breach by Purchaser, as determined by the Bankruptcy Court, of the representations and warranties, taken as a whole, or of any material covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Seller to Purchaser of such breach; or

(g)     by Seller or Purchaser if the Bankruptcy Court fails to approve this Agreement and enter the Sale Order by November 30, 2018, subject to Seller's right to extend the date of Closing as provided in the definition of Closing Date.

10.2    **Procedure for Termination**.  If this Agreement is terminated by Purchaser or Seller, or both, pursuant to Section 10.1, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 10.1) the transactions contemplated hereunder shall be abandoned and this Agreement shall terminate to the extent and with the effect provided in Section 10.3, without further action by the parties.

10.3    **Effects of Termination**.  If this Agreement is validly terminated as provided herein, then each party shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party; provided, however, that (i) the obligations of the parties set forth in Article XI of this Agreement, and to the extent necessary to effectuate the foregoing enumerated provisions, Article I of this Agreement, shall survive any such termination and shall be enforceable in accordance with their terms, and (ii) if this Agreement is terminated as provided herein, each party shall upon request redeliver or destroy as soon as practicable any or all documents, work papers and other material of the other party relating to its business or affairs or the transactions contemplated hereunder, whether obtained before or after the execution hereof, to the party furnishing the same, other than any material which is of public record.  Nothing in this Section 10.3 shall relieve the parties of any Liability for a breach of this Agreement prior to the date of termination or alter the right of Seller to retain the Deposit if permitted to do so pursuant to this Agreement.  Notwithstanding the foregoing, no attorneys' fees reasonably incurred by a party in connection with the transactions contemplated herein, or out-of-pocket expense reimbursement or other fees, shall be payable to any party upon termination of this Agreement pursuant to Section 10.1.

## ARTICLE XI
## MISCELLANEOUS

11.1    **Assignment; Binding Agreement**.

(a)     Except as set forth in Section 11.1(c), neither this Agreement nor any rights or obligations of a Party hereunder may be assigned or delegated without the other Party's prior written consent.  Any purported assignment or delegation without such consent shall be void. Provided, however, Purchaser may assign any or all of its rights under this Agreement, provided that it remains responsible for performance hereunder.

(b)      This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the Parties hereto and to their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights, remedies, obligations, or Liabilities.

(c)      Purchaser shall have the right to assign its rights and obligations under this Agreement including, without limitation, its right to acquire all or any portion of the Assets to its Affiliates, any successor to Purchaser, and/or to its lender if a sale/leaseback transaction is used to finance the transactions contemplated by this Agreement.   Notwithstanding any transfer permitted by this Section 11.1(c), Purchaser shall remain liable to Seller with respect to its obligations under this Agreement.

11.2    **Post-Closing Cooperation**.   From time to time after the Closing, Seller will execute and deliver, or cause to be executed and delivered, such documents to Purchaser as Purchaser shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, the transfer of the Assets to Purchaser.   From time to time after the Closing, Purchaser will execute and deliver, or cause to be executed and delivered, such documents to Seller as Seller shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, Purchaser's assumption of the Assumed Liabilities.   From and after the Closing, Seller shall use its commercially reasonable efforts to deliver to Purchaser all such books, reports and other documents that constitute or relate to Assets (which may be redacted to the extent not relevant to the Assets) as may be requested by Purchaser which were not delivered on or before the Closing Date, and to assist the Purchaser in obtaining any Authorizations not obtained by Purchaser prior to the Closing.

11.3    **Expenses**.   Except as set forth in this Agreement, each Party shall pay the fees and expenses of its respective counsel, accountants, and other experts and shall pay all other expenses incurred by it in connection with the negotiation, preparation, and execution of this Agreement and the consummation of the transactions contemplated hereby.

11.4    **Entire Agreement and Modification**.   This Agreement, including any Exhibits and Schedules attached hereto and thereto and any other documents hereby required to be delivered at the Closing, and any confidentiality agreement previously executed by Seller and Purchaser or Purchaser's Affiliate, constitute the entire agreement between the Parties and supersede all prior discussions, negotiations, or agreements relating to the subject matter of this Agreement.   No changes of, additions to, or other modifications of this Agreement shall be valid unless the same is in writing and signed by the Parties.

11.5    **Severability**.   If any provision of this Agreement shall be determined to be contrary to Law and unenforceable by any Court, the remaining provisions shall be severable and enforceable in accordance with their terms.   To the extent any provision of this Agreement is enforceable in part but not in whole, such provision shall be enforced to the maximum extent permitted by applicable Law.

11.6    **Waiver**.   Any of the conditions to Closing set forth in this Agreement, except for those set forth in Article VI, may be waived at any time prior to or at the Closing hereunder by

Case 3:18-bk-05665    Doc 401    Filed 11/06/18    Entered 11/06/18 17:44:13    Desc Main
Document      Page 127 of 144

the Party entitled to the benefit thereof. Any such waiver shall only be effective if it is in writing and signed by the Party to be charged with such waiver. The failure of any Party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any other breach of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such Party thereafter to enforce each and every such provision. No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach or non-compliance.

11.7 **Counterparts**. This Agreement may be executed in multiple counterparts, by the Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. All signatures of the Parties to this Agreement may be transmitted by email or facsimile, and such email or facsimile of signature will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces and will be binding upon such Party.

11.8 **Headings; Interpretation**. The table of contents and article and section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

11.9 **Governing Law**. This Agreement shall be construed and interpreted according to the Laws of the State of Mississippi, without regard to the application of the choice of law principles thereof. All of the conveyance documents executed and delivered pursuant to the terms hereof shall be governed by and continued and interpreted according to the Laws of the State of Mississippi, without regard to the application of the choice of law principles thereof.

11.10 **Bankruptcy Court Jurisdiction**.

(a) Purchaser and Seller agree that the Bankruptcy Court shall have exclusive jurisdiction over all disputes, Claims, and other controversies (collectively, "Disputes") and other matters relating to (a) the interpretation and enforcement of this Agreement or any document executed pursuant hereto; (b) the Assets; (c) the Assumed Liabilities and other obligations assumed by the Purchaser under this Agreement; and (d) any obligations surviving Closing, as long as the Bankruptcy Court reserves such jurisdiction, and Purchaser expressly consents to and agrees not to contest such exclusive jurisdiction.

(b) The parties shall jointly request that the Bankruptcy Court reserve jurisdiction to consider Disputes arising under this Agreement even after the closing of the Bankruptcy Case. To the extent allowed under existing and controlling law in the Fourth Circuit as of the Closing Date, the parties consent to the jurisdiction of the Bankruptcy Court to hear all such Disputes and to enter final orders with respect to all matters and issues raised therein.

11.11 **Notices**. All notices, requests, demands and other communications hereunder shall be deemed to have been duly given if the same shall be in writing and shall be delivered or sent (a) by personal delivery against a receipted copy, (b) by certified mail, return receipt requested, or (c) by e-mail if the addressee confirms receipt of the e-mail, and addressed as set forth below:

If to Purchaser to:                                                  If to Seller, to:

Progressive Medical Management of Batesville LLC
800 College Hill Road suite 5201
P.O. Box 2547
Oxford, MS  38655
Attn:  Quentin Whitwell

Curae Health, Inc
1721 Midpark Road suite B200
Knoxville, TN  37921
Attention: Steve Clapp, CEO

With copies to:

Egerton, McAfee Armistead &
Davis, P.C.
P.O. Box 2047
Knoxville, TN 37901
Attention: Stephen McSween, Esq.

A Party may change the address to which notices hereunder are to be sent to it by giving notice of such change of address in the manner provided above.  Any notice delivered personally shall be deemed to have been given on the date it is so delivered, or upon attempted delivery if acceptance of delivery is refused.

11.12 **Effectiveness**.  This Agreement shall be effective only when duly signed by Seller in accordance with the order of the Bankruptcy Court approving the sale to Purchaser.

11.13 **No Third Party Beneficiaries.** Except as otherwise provided herein with respect to the Committee, nothing expressed or referred to in this Agreement will be construed to give any person other than the  Parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except as such rights as shall inure to a successor or permitted assignee pursuant to this Agreement; provided the Morehead Memorial Hospital Foundation, Inc. shall be an express third-party beneficiary hereof solely for the purpose of enforcing Purchaser's obligations under Section 2.12(b) of this Agreement on behalf of Seller or any successor thereto.

*[Signature Page Follows]*

1516150v5

39

65928702.2

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

SELLER:

Batesville Regional Medical Center, Inc.

By: _____
Print Name: Stephen N. Clapp
Title: President

Batesville Regional Physicians, LLC

By: _____
Print Name: Stephen N. Clapp
Title: President

CURAE:

Curae Health, Inc.

By: _____
Print Name: Stephen N. Clapp
Title: President

PURCHASER:

Progressive Medical Management of Batesville LLC

By: _____
Print Name: Dr. Kenneth Williams
Title: Authorized Signatory

**Schedules and Exhibits**

Schedule 1           Excluded Assets
Schedule 2           Senior Leadership Team and Managers of the Business and Purchaser's
                            Ultimate Parent Company
Schedule 3           List of Other Businesses
Schedule 4           Other Assets
Schedule 5           List of Permitted Encumbrances
Schedule 6           List of Real Property
Schedule 7           Taxes and Assessments
Schedule 2.7        Assumed Contracts
Schedule 3.8        Subsidiaries

Exhibit A             Form of Deed
Exhibit B             Form of Seller's Affidavit
Exhibit C             Form of Bill of Sale and Assignments

# SCHEDULE 1

## Excluded Assets

"Excluded Assets" means the following assets, properties, interests, and rights of Seller:

**SCHEDULE 2**

**Part 1**

**Senior Leadership and Managers of the Business**

## SCHEDULE 3

### Other Businesses

| *Property Name* | *Location* |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

1516150v5

65928702.2

# SCHEDULE 4

## Other Assets

| Address | Parcel No. |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

1516150v5

65928702.2

# SCHEDULE 5

## Permitted Encumbrances

1516150v5

65928702.2

## SCHEDULE 6

## Real Property

| Address | Parcel No. |
|---------|-----------|
|         |           |
|         |           |
|         |           |
|         |           |
|         |           |
|         |           |
|         |           |
|         |           |

1516150v5

65928702.2

# SCHEDULE 7

## Taxes and Assessments

# SCHEDULE 2.7

## Assumed Contracts

1516150v5

65928702.2

## SCHEDULE 3.9

### Subsidiaries

1516150v5

65928702.2

**EXHIBIT E**
**ASSUMPTION NOTICE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

### NOTICE OF: (I) DEBTORS' INTENT TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS, UNEXPIRED LEASES OF PERSONAL PROPERTY, AND UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY; AND (II) CURE AMOUNTS RELATED TO THE FOREGOING

PLEASE TAKE NOTICE THAT, on November 6, 2018, the above-captioned debtors (the "***Debtors***") filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Bidding Procedures for the Sale of Panola Medical Center, (II) Authorizing the Sale of Panola Medical Center Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (III) Approving Stalking Horse Purchaser, Break-up Fee, and Overbid Protections, (IV) Establishing Certain Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (V) Scheduling an Auction, (VI) Scheduling a Hearing and Objections Deadlines With Respect to the Sale of Panola Medical Center, (VII) Approving the Form and Manner of Notice Thereof, and (VIII) Granting Related Relief* (Dkt. No. ___) (the "***Sale Procedures Motion***").[2]

PLEASE TAKE FURTHER NOTICE that, pursuant to the Sale Procedures Motion, the Debtors sought, among other things, authorization and approval of (a) the sale of the Panola Hospital, pursuant to the Panola APA, free and clear of all liens, claims, encumbrances and other interests (the "***Sale***"), (b) the assumption and assignment of certain executory contracts (the "***Contracts***") and unexpired leases (the "***Leases***"), in connection with the Sale, and (c) scheduling a final hearing to approve the Sale, including the assumption and assignment of the Contracts and Leases.

PLEASE TAKE FURTHER NOTICE that the Panola APA contemplates, and the proposed order approving the Sale, if entered, shall authorize and approve, the assumption and assignment of certain Contracts and Leases, pursuant to section 365 of the Bankruptcy Code.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

[2] Capitalized terms used in this notice and not otherwise defined shall have the meanings ascribed to them in the Sale Procedures Motion.

PLEASE TAKE FURTHER NOTICE that the Debtors maintain a schedule of Contracts and Leases the Debtors **may** assume and assign in connection with the Sale and you are receiving this notice because you are a party to one or more of the Contracts and Leases the Debtor **may** assume and assign in connection with the Sale.

PLEASE TAKE FURTHER NOTICE that receipt of this notice does not guarantee that the Contract or Lease to which you are party will ultimately be assumed and assigned, because the party ultimately purchasing the Panola Hospital pursuant to the Panola APA reserves the right to exclude any assumable executory contract or unexpired lease; however,

1.      Please review the cure amounts set forth on **Exhibit 1** to this notice for your Contract or Lease.

2.      If you agree with the respective cure amount on **Exhibit 1** and otherwise do not object to the Debtors' assumption and assignment of your Contract or Lease, you are not required to take any further action.

3.      Objections, if any, to the proposed assumption and assignment of a Contract or Lease (each, an "***Assumption Objection***"), including objections to cure amounts, must be made in writing and filed with the United States Bankruptcy Court so as to be received no later than ten (10) days **after** the date of this notice (the "***Objection Deadline***") by (a) the Debtors, (b) Quentin Whitwell, Harper Whitwell PLLC, 800 College Hill Road #5201, Oxford, MS 38655, quentin@harperwhitwell.com, (c) counsel to MidCap Financial, c/o David E. Lemke, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, Tennessee 37219, david.lemke@wallerlaw.com, (d) counsel ServisFirst Bank, David G. Thompson, Neal & Harwell, PLC, 1201 Demonbreun Street, Suite 1000, Nashville, Tennessee 37203, dthompson@nealharwell.com, and (e) counsel to the Official Committee of Unsecured Creditors, c/o Andrew Sherman, Sills Cummis & Gross, P.C., One Riverfront Plaza, Newark, NJ 07102, asherman@sillscummis.com.

4.      If a timely Assumption Objection is filed solely as to the cure amount (a "***Cure Objection***"), then the Contract or Lease shall nevertheless be assumed and assigned to the purchaser of the Panola Hospital upon the closing of the Sale, the purchaser shall pay the undisputed portion of the cure amount on or as soon as reasonably practicable after the closing of the Sale, and the disputed portion of the cure amount shall be paid as soon as practicable after the resolution of the dispute, either through good faith discussion or with the aid of the court.

5.      If a timely Assumption Objection is filed that objects to the assumption and assignment on a basis other than the cure amount, the Debtors, the purchaser, and the objecting non-debtor party to the Contract or Lease shall meet and confer in good faith to attempt to resolve any such objection without intervention by the court; however, if the Debtors determine that the objection cannot be resolved without judicial intervention, then at the discretion of the Debtors and the purchaser, the objection shall be determined by the court at the Sale Hearing or such other date as determined by the court. If the court determines at such hearing that the Contract or Lease subject to the Assumption Objection should not be assumed and assigned, then such Contract or Lease shall not be assumed or assigned to the purchaser.

6.    If the Debtors, the purchaser, and the non-debtor counterparty to a Contract or Lease resolves any Assumption Objection, they shall enter into a written stipulation, which stipulation is not required to be filed with or approved by the court and shall not be assigned to the purchaser.

PLEASE TAKE FURTHER NOTICE that, unless an Assumption Objection is filed on or before the Objection Deadline, you shall be deemed to have consented to the assumption and assignment of your Contract or Lease and the associated cure amount, and you shall be forever barred from objecting to the cure amount and from asserting any additional cure or other amounts against the Debtors, their estates, or the purchaser.

PLEASE TAKE FURTHER NOTICE that, up to the Closing Date, the purchaser may, in its sole discretion, subject to certain limitations specified in the Panola APA, exclude any Contract or Lease by providing notice to the Debtors and you. Upon such designation, the Contract or Lease excluded by the purchaser shall not be deemed to be, or to have been, assumed or assigned, and shall remain subject to assumption, rejection, or assignment by the Debtors.

PLEASE TAKE FURTHER NOTICE that the Debtors' decision to assume and assign a Contract or Lease is subject to approval by the court and consummation of the Sale and, absent such approval and consummation, no Contract or Lease will be assumed or assigned to the purchaser and shall in all respects remain subject to further administration by the court in accordance and subject to the Bankruptcy Code.

PLEASE TAKE FURTHER NOTICE that, upon approval by the court and consummation of the Sale, all Contracts and Leases to be assumed and assigned by the Debtors to the purchaser shall be assumed and assigned to the purchaser effective on the Closing Date.

PLEASE TAKE FURTHER NOTICE that, until the effective date of assumption and assignment, assumption and assignment of any Contract or Lease is subject to the purchaser's rights to add or exclude any Contract or Lease.

PLEASE TAKE FURTHER NOTICE that Debtors shall, on or as soon as practicable after December 15, 2018, provide adequate assurance of future performance, as set forth in section 365(b)(1)(C) of the Bankruptcy Code, with respect to any executory contract or unexpired lease listed in this notice, to any party who submits a written request to Caryn E. Wang at cewang@polsinelli.com or (404) 253-6016.

PLEASE TAKE FURTHER NOTICE that this notice and the terms set forth in this notice are subject in all respects to the terms and conditions of the Sale Procedures Motion and the court's orders approving the Sale Procedures Motion and Sale.

3