**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

**DEBTORS' EXPEDITED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING
DEBTORS TO ENTER INTO A MEMBER SUBSTITUTION AGREEMENT WITH
RESPECT TO THE RUSSELLVILLE HOSPITAL, AND
(II) GRANTING RELATED RELIEF**

By this motion (the "**Motion**"), the above-captioned debtors and debtors in possession

(the "**Debtors**") seek entry of an order (the "**Proposed Order**") filed contemporaneously

herewith, pursuant to sections 105(a) and 363 of title 11 of the United States Code (the

"**Bankruptcy Code**"), rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), and rule 9075-1 of the Local Rules of the Bankruptcy Court for the

Middle District of Tennessee (the "**Local Rules**") authorizing the Debtors to into a member

substitution agreement with Dava Foundation, Inc. ("**Dava**"), whereby Dava will acquire the

Russellville Hospital (as defined below). Debtors further request that the Court set a hearing on

this Motion as provided in Debtors' Motion for a Hearing filed contemporaneously herewith. In

support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical
Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044);
Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Middle District of Tennessee (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

## GENERAL BACKGROUND

4.      On August 24, 2018 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court commencing the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").  The general factual background regarding the Debtors, including their business operations, debt structure, and the events leading to the filing of the Chapter 11 Cases is set forth in detail in the *Declaration of Stephen N. Clapp, Chief Executive Officer of Curae Health, Inc., in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**") [Docket No. 49] and fully incorporated herein by reference.

5.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

6.      On August 29, 2018, the Court entered an order authorizing the joint administration of the Chapter 11 Cases [Docket No. 59].

7.      Support for this Motion is set forth in detail in the *Declaration of Stephen N. Clapp, Chief Executive Officer of Curae Health, Inc., in Support of Debtors' Motion* the ("**Clapp Declaration**"), attached hereto as Exhibit A.

2

# THE RUSSELLVILLE HOSPITAL

## Background

7.      Debtor Curae Health, Inc. ("**Curae**") is the sole member and organizational sponsor of Russellville Hospital, Inc. ("**Russellville**"), a Tennessee nonprofit corporation that owns and operates a 100-bed acute care facility in Russellville, Alabama, offering the following services: a 24-hour emergency room; intensive care unit; cardiac care unit; respiratory therapy; inpatient and outpatient diagnostic and treatment services; rehabilitation services; cardiac catheterization; ambulatory surgery; laboratory; and home health (the "**Russellville Hospital**"). Clapp Declaration, at ¶ 6. Russellville is the sole member of Russellville Physicians, LLC ("**Russellville Physicians**"). *Id.* Russellville Physicians employs some of the physicians that work in the Russellville Facilities. *Id.* Russellville and Russellville Physicians are not debtors in these Chapter 11 Cases, and Russellville has continued to own and operate the Russellville Hospital uninterrupted by these Chapter 11 Cases for the benefit of the community in which it is located. *Id.*

8.      Except as otherwise provided herein, the debts and obligations of Russellville are separate and distinct from those of Debtors, and none of the Debtors' obligations are cross-collateralized or cross-defaulted with those of Russellville. Funds generated by Russellville are kept separate and segregated from funds generated by Debtors' hospitals or are otherwise separately tracked and accounted for. *Id.* at ¶ 7.

9.      Since the Petition Date, Debtors have worked to further separate and segregate Russellville's funds and operations. *Id.* at ¶ 8. For example, Debtors have set up a general ledger account to track all activity paid by Curae through system agreements to make sure Debtors get reimbursed weekly and at month end. *Id.* Debtors have their payroll processor provide a report

for just Russellville gross pay and employer taxes to have those amounts transferred on the day

payroll is funded. *Id.* Debtors have set up new agreements, where possible, to put Russellville on

its own separate contract so that Russellville can be billed directly. *Id.* Russellville's accounts

payable account information was changed from a Curae account to a separate account at

ServisFirst Bank that now funds accounts payable for the Russellville Hospital. *Id.*

**Russellville Secured Debt**

10.     In January of 2015, Curae acquired three hospitals in northern Alabama, including

the Russellville Hospital (collectively, the "**Alabama Hospitals**") from Lifepoint Health. *Id.* at

¶ 9. In conjunction with the acquisition, the Alabama Hospitals entered into that certain Loan

Agreement with ServisFirst Bank (the "**ServisFirst Loan Agreement**"), whereby ServisFirst

agreed to advance the Alabama Hospitals $3,000,000.00 (the "**Term Loan**") and make

additional advances on a revolving credit basis up to $3,000,000.00 (the "**Line of Credit**",

together with the Term Loan, the "**ServisFirst Debt**"). *Id.* Russellville granted ServisFirst a lien

on and security interest in the real and personal property of Russellville. Curae is a guarantor on

the ServisFirst Debt, and ServisFirst has a lien on any property of Curae that is specifically

related to the Alabama Hospitals, to the extent such property exists. The Term Loan has been

paid in full, and as of November 6, 2018, the outstanding balance on the Line of Credit was

$832,934.00. *Id.*

11.     In December of 2015, Curae and the Alabama Hospitals entered into loan and

security agreements with USDA Rural Development ("**USDA**"), whereby USDA loaned Curae

and the Alabama Hospitals $19,835,000, *Id.* at ¶ 10, and the Alabama Hospitals granted USDA

liens on substantially all of their assets, excluding accounts receivable. USDA also has a lien on

and security interest in income and revenue of Curae that relates to the operation of the

Russellville Hospital. As of the Petition Date, the outstanding loan amount owed to USDA was $17,525,221 (the "**USDA Debt**"). *Id.*

**The Debt Service Reserve Fund**

12.     To further secure repayment of the ServisFirst Debt, Section 5.10 of the ServisFirst Loan Agreement provides for the creation of a debt service reserve fund (the "**Debt Service Reserve Fund**") and grants ServisFirst a lien on the Debt Service Reserve Fund. In accordance with Section 5.10, Curae created the Debt Service Reserve Fund by opening an account at ServisFirst and depositing the required funds. *Id.* at ¶ 11. As Curae transitioned operations of the Alabama Hospitals to new operators, the Debt Service Reserve Fund was decreased accordingly. *Id.* As of October 31, 2018, there is approximately $950,020.00 in the Debt Service Reserve Fund. *Id.*

13.     The Debt Service Reserve fund is held in an account at ServisFirst in the name of Curae, a debtor in these Chapter 11 cases. *Id.* at ¶ 12. Pursuant to Section 5.10 of the Loan Agreement, Curae and Russellville will no longer be obligated to maintain the Debt Service Reserve Fund once certain conditions are met with respect to the fixed charge coverage ratio. Consummation of the Membership Substitution Agreement (defined below) will satisfy such conditions, and the funds in the Debt Service Reserve Fund will no longer be encumbered by any liens or security interests of ServisFirst. As a result, consummation of the Membership Substitution Agreement (defined below) will materially benefit the Debtors by allowing $950,020.00 to be released from the Debt Service Reserve Fund and returned to the bankruptcy estates.

65978881.4

**The Membership Substitution Agreement**

14.    In late 2017, Curae began looking for new operators to take over operations of the Alabama Hospitals. *Id.* at ¶ 13. By the end of May 2018, the Russellville Hospital was the only remaining Alabama Hospital operated by Curae. *Id.* Curae's management contacted the various health systems in the region as well as growing healthcare companies regarding a sale of the Russellville Hospital. *Id.* As a result of marketing efforts, one potential buyer was identified: Java Medical Group, LLC (an affiliate of Dava). *Id.* No other parties have submitted a sufficient offer to meet the USDA's requirements. *Id.*

15.    On February 21, 2018, Curae and Java Medical Group, LLC entered into a letter of intent for the acquisition of the Russellville Hospital. *Id.* at ¶ 14. Since February, Java Medical Group, LLC has been working to locate the necessary funding to acquire the Russellville Hospital. *Id.* Java Medical Group, LLC, through its affiliate Dava, a Tennessee non-profit corporation, now has the requisite funding and USDA approvals to consummate the transaction. *Id.*

16.    On November 12, 2018, Dava and Curae entered into that certain Member Substitution Agreement (the "**Member Substitution Agreement**"), attached hereto as Exhibit B, subject to approval by this Court. *Id.* at ¶ 15. Pursuant to the terms of the Member Substitution Agreement, Dava will: (a) pay Four Million Dollars ($4,000,000.00), plus any amount required to be paid pursuant to Section 1.5(b) of the Member Substitution Agreement (the "**Consideration**"). The Consideration shall be due and payable at the closing (except as otherwise provided therein) as follows: (i) assumption by Dava of $4,000,000.00 of debt owed by Curae and its affiliates to the USDA in exchange for a complete discharge of all obligations owed by Curae or its affiliates to the USDA, including the USDA Debt; (ii) the payoff of the

6

ServisFirst Debt; and (iii) any amount required to be paid pursuant to Section 1.5(b) of the Member Substitution Agreement by bank certified check payable to Curae. The Member Substitution Agreement further provides that: (a) Dava shall handle cost report submission following the closing of the transaction(s) and (b) Russellville shall release the Debtors for any claims it had, has, or may have.

17.     Debtors believe that approval of the Member Substitution Agreement is in the best interests of the Debtors, the Debtors' estates, the Russellville Hospital, and all other parties in interest. *Id.* at ¶ 16. Approval of the Member Substitution Agreement will allow the Russellville Hospital to continue operating and serving its community. *Id.* In addition, Curae will no longer be liable on the USDA Debt or the ServisFirst Debt, and the Debtors' estates will benefit from the release of the funds in the Debt Service Reserve Fund to Curae.

## RELIEF REQUESTED

18.     By this Motion, the Debtors seek (I) to enter into the Member Substitution Agreement with Dava, whereby Dava will acquire the Russellville Hospital, and (II) necessary related relief.

## BASIS FOR RELIEF

**I.      Entering into the Member Substitution Agreement Is a Sound Exercise of the Debtors' Business Judgment and Is in the Best Interests of the Debtors' Estates**

19.     The decision to enter into the Member Substitution Agreement is arguably a transaction outside the ordinary course of business for which court approval in accordance with section 363(b) of the Bankruptcy Code is required. Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b).

7

20.     In reviewing a debtor's decision to use estate property pursuant to section 363 of the Bankruptcy Code, courts have routinely held that if such use represents reasonable business judgment on the part of the debtor, such use should be approved. *See In re Lionel Corp.*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) (requiring a "good business reason" to approve a transaction under section 363). "Ordinarily, the position of the trustee is afforded deference, particularly where business judgment is entailed in the analysis or where there is no objection." *In re Lahijani*, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005).

21.     Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed transaction appears to enhance the debtor's estate." *In re Food Barn Stores, Inc.*, 107 F.3d 558, 566 n.16 (8th Cir. 1997); *accord In re AbitibiBowater*, 418 B.R. 815, 831 (Banks. D. Del. 2009) (the business judgment standard is "not a difficult standard to satisfy"). Under the business judgment rule, "management of a corporation's affairs is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, *inter alia,* clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code." *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (citing *In re United Artists Theatre Co.*, 315 F.3d 217, 233 (3d Cir. 2003); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. B.A.P. 1992)).

22.     Here, the Debtors have determined in their business judgment that it is prudent to enter into the Member Substitution Agreement. Russellville is not a Debtor in these Chapter 11 Cases, and its assets are not property of the Chapter 11 estates. Russellville's assets, which have

8

a net book value of approximately $3,206,306, are encumbered by over $18 million in secured debt. Upon consummation of the Member Substitution Agreement, USDA will release its liens and security interests and the ServisFirst Debt will be paid off, which will allow the Russellville Hospital to continue operating and serving its community.

## II.    Entering into the Member Substitution Agreement Will Benefit the Debtors' Estates by Allowing $950,020.00 Held in the Debt Service Reserve Fund to be Returned to the Bankruptcy Estates

23.    Entering into the Member Substitution Agreement will materially benefit the bankruptcy estates. Section 5.10 of the ServisFirst Loan Agreement requires that Curae and Russelville maintain the Debt Service Reserve Fund. The balance held in the Debt Service Reserve Fund is $950,020.00, and such funds are held in an account at ServisFirst in the name of Curea, a debtor in these Chapter 11 Cases. Pursuant to Section 5.10 of the Loan Agreement, Curae and Russellville will no longer be obligated to maintain the Debt Service Reserve Fund once certain conditions are met with respect to the fixed charge coverage ratio. Consummation of the Membership Substitution Agreement (defined below) will satisfy such conditions, and the funds in the Debt Service Reserve Fund will no longer be encumbered by any liens or security interests of ServisFirst. As a result, consummation of the Membership Substitution Agreement (defined below) will materially benefit the Debtors by allowing $950,020.00 to be released from the Debt Service Reserve Fund and returned to the bankruptcy estates.

24.    Accordingly, Debtors believe that the terms in the Member Substitution Agreement are reasonable and transferring operations of the Russellville Hospital to Java is in the best interests of the Debtors, the Debtors' estates, creditors, and all other parties in interest.

## NOTICE

25.    Concurrently with the filing of this Motion, the Debtors shall provide notice of

65978881.4

this Motion to: (a) the Office of the United States Trustee for the Middle District of Tennessee; (b) Centers for Medicare and Medicaid Services; (c) State of Tennessee Department of Health Division of Licensure and Regulation Office of Health Care Facilities; (d) Mississippi State Department of Health; (e) counsel to the official committee of unsecured creditors established in these cases pursuant to Section 1102 of the Bankruptcy Code; (f) ServisFirst Bank and its counsel; (g) Midcap Financial Trust and its counsel; (h) CHS/Community Health Systems, Inc. and its counsel (i) all Tennessee local counsel having entered a notice of appearance in these cases; (j) the Internal Revenue Service; (k) the Tennessee Attorney General's Office; (l) the Mississippi Attorney General's Office; (m) the Tennessee Secretary of State; (n) Dava and its counsel; (o) the patient care ombudsman and her proposed counsel; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002. Service is being executed via the Court's CM/ECF system, email, hand delivery, and/or overnight mail.

WHEREFORE, the Debtors respectfully request that the Court grant the relief sought herein and such other and further relief as the Court may deem proper.

Dated: November 15, 2018
      Nashville, Tennessee

**POLSINELLI PC**
*/s/ Michael Malone*
Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

10

-and-

David E. Gordon (*Admitted Pro Hac Vice*)
Caryn E. Wang (*Admitted Pro Hac Vice*)
1201 West Peachtree Street NW
Atlanta, Georgia
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com
*Counsel to the Debtors and*
*Debtors in Possession*

# EXHIBIT A

Clapp Declaration

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[2] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

**DECLARATION OF STEPHEN N. CLAPP IN SUPPORT OF DEBTORS' MOTION**

Pursuant to 28 U.S.C. § 1764, Stephen N. Clapp, declares as follows under the penalty of perjury:

1.      I am the President and Chief Executive Officer ("**CEO**") of Curae Health, Inc. ("**Curae**" or "**the Company**"), a Tennessee nonprofit corporation. Curae is the sole member and sponsoring organization of Amory Regional Medical Center, Inc. ("**Amory**"); Batesville Regional Medical Center, Inc. ("**Batesville**"); and Clarksdale Regional Medical Center, Inc. ("**Clarksdale**"). Amory, Batesville, and Clarksdale are each the sole member of a physician entity as follows: Amory is the sole member of Amory Regional Physicians, LLC ("**Amory Physicians**"); Batesville is the sole member of Batesville Regional Physicians, LLC ("**Batesville Physicians**"); Clarksdale is the sole member of Clarksdale Regional Physicians, LLC ("**Clarksdale Physicians**"). Curae, Amory, Batesville, Clarksdale, Amory Physicians, Batesville Physicians, and Clarksdale Physicians are the debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") and shall be collectively referred to herein

---

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

as the "**Debtors**" or the "**Company**". I am authorized to submit this declaration (the "**Declaration**") on behalf of the Debtors.

2.      I have served as President and CEO of Curae since it was formed in 2014. Prior to serving as President and CEO of Curae, I served as President and CEO of Restoration Healthcare, LLC ("**Restoration**"), a for-profit rural hospital company that was focused on helping to save struggling rural hospitals. I served as President and CEO of Restoration from the time it was formed in 2006 until 2013 when Restoration divested its last hospital. Prior to forming Restoration, I worked for Baptist Health System of East Tennessee ("**Baptist**") from 1995 to 2006. For several years, I served as Senior Vice President of Baptist, and during that time I was responsible for overseeing: (a) the hospital and other operating entities; (b) strategic planning; (c) business development; (d) physician recruitment; and (e) real estate.

3.      I am familiar with the Debtors' business operations, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from other employees, agents, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration.

4.      References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**5.**      I submit this Declaration on behalf of the Debtors in support of the (the "**Motion**").

6.      Curae is the sole member and organizational sponsor of Russellville Hospital, Inc.

("**Russellville**"), a Tennessee nonprofit corporation that owns and operates a 100-bed acute care facility in Russellville, Alabama, offering the following services: a 24-hour emergency room; intensive care unit; cardiac care unit; respiratory therapy; inpatient and outpatient diagnostic and treatment services; rehabilitation services; cardiac catheterization; ambulatory surgery; laboratory; and home health (the "**Russellville Hospital**"). Russellville is the sole member of Russellville Physicians, LLC ("**Russellville Physicians**"). Russellville Physicians employs some of the physicians that work in the Russellville Facilities. Russellville and Russellville Physicians are not debtors in these Chapter 11 Cases, and Russellville has continued to own and operate the Russellville Hospital uninterrupted by these Chapter 11 Cases for the benefit of the community in which it is located.

7.     Funds generated by Russellville are kept separate and segregated from funds generated by Debtors' hospitals or are otherwise separately tracked and accounted for.

8.     Since the Petition Date, the Debtors and their professionals have worked to further separate and segregate Russellville's funds and operations. For example, Debtors have set up a general ledger account to track all activity paid by Curae through system agreements to make sure Debtors get reimbursed weekly and at month end. Debtors have their payroll processor provide a report for just Russellville gross pay and employer taxes to have those amounts transferred on the day payroll is funded. Debtors have set up new agreements, where possible, to put Russellville on its own separate contract so that Russellville can be billed directly. Russellville's accounts payable account information was changed from a Curae account to a separate account at ServisFirst Bank that now funds accounts payable for the Russellville Hospital.

9.     In January of 2015, Curae acquired three hospitals in northern Alabama, including

3

the Russellville Hospital (collectively, the "**Alabama Hospitals**") from Lifepoint Health. In conjunction with the acquisition, the Alabama Hospitals entered into that certain Loan Agreement with ServisFirst Bank (the "**ServisFirst Loan Agreement**"), whereby ServisFirst agreed to advance the Alabama Hospitals $3,000,000.00 (the "**Term Loan**") and make additional advances on a revolving credit basis up to $3,000,000.00 (the "**Line of Credit**", together with the Term Loan, the "**ServisFirst Debt**"). The Term Loan has been paid in full, and as of November 6, 2018, the outstanding balance on the Line of Credit was $832,934.00.

10.     In December of 2015, Curae and the Alabama Hospitals entered into loan and security agreements with USDA Rural Development ("**USDA**"), whereby USDA loaned Curae and the Alabama Hospitals $19,835,000. As of the Petition Date, the outstanding loan amount owed to USDA was $17,525,221 (the "**USDA Debt**").

11.     Curae created the Debt Service Reserve Fund by opening an account at ServisFirst and depositing the required funds. As Curae transitioned operations of the Alabama Hospitals to new operators, the Debt Service Reserve Fund was decreased accordingly. As of October 31, 2018, there is approximately $950,020.00 in the Debt Service Reserve Fund.

12.     The Debt Service Reserve fund is held in an account at ServisFirst in the name of Curae.

13.     In late 2017, Curae began looking for new operators to take over operations of the Alabama Hospitals. By the end of May 2018, the Russellville Hospital was the only remaining Alabama Hospital operated by Curae. Curae's management contacted the various health systems in the region as well as growing healthcare companies regarding a sale of the Russellville Hospital. As a result of marketing efforts, one potential buyer was identified: Java Medical Group, LLC (an affiliate of Dava). No other parties have submitted a sufficient offer to meet the

4

USDA's requirements.

14.     On February 21, 2018, Curae and Java Medical Group, LLC entered into a letter of intent for the acquisition of the Russellville Hospital. Since February, Java Medical Group, LLC has been working to locate the necessary funding to acquire the Russellville Hospital. Java Medical Group, LLC, through its affiliate Dava, a Tennessee non-profit corporation, now has the requisite funding and USDA approvals to consummate the transaction.

15.     On November 12, 2018, Dava and Curae entered into that certain Member Substitution Agreement (the "**Member Substitution Agreement**"), attached to the Motion as Exhibit B, subject to approval by this Court.

16.     Debtors believe that approval of the Member Substitution Agreement is in the best interests of the Debtors, the Debtors' estates, the Russellville Hospital, and all other parties in interest. Moreover, approval of the Member Substitution Agreement will allow the Russellville Hospital to continue operating and serving its community.

I declare under penalty of perjury that the foregoing is true and correct.

*[Signature on Following Page]*

5

Executed this 15th day of November, 2018.

                       **Curae Health, Inc.**
                       **Amory Regional Medical Center, Inc.,**
                       **Batesville Regional Medical Center, Inc.,**
                       **Clarksdale Regional Medical Center, Inc.**
                       **Amory Regional Physicians, LLC**
                       **Batesville Regional Physicians, LLC**
                       **Clarksdale Regional Physicians, LLC**

Debtors and Debtors in Possession

                       _____
Stephen N. Clapp
President and Chief Executive Officer of Curae
Health, Inc.

65978881.4

# EXHIBIT B

Member Substitution Agreement

65978881.4

**MEMBER SUBSTITUTION AGREEMENT**

**BY AND BETWEEN**

**CURAE HEALTH, INC.**

**AND**

**THE DAVA FOUNDATION INC.**


November 12, 2018


1513047v6

i

# MEMBER SUBSTITUTION AGREEMENT

This **MEMBER SUBSTITUTION AGREEMENT** (the "Agreement") is made and entered into as of November 12, 2018 (the "Effective Date"), by and between **CURAE HEALTH, INC.**, a Tennessee non-profit corporation ("Curae"), and **THE DAVA FOUNDATION INC.**, a Tennessee non-profit corporation (the "Buyer").

## RECITALS:

**A**.     Curae is the sole member of **Russellville Hospital, Inc.**, a Tennessee non-profit hospital corporation (the "Hospital Entity"), and the Hospital Entity is the sole member of **Russellville Physicians, LLC**, a Tennessee limited liability company (the "Subsidiary").

**B**.     The Hospital Entity directly or indirectly owns and operates Russellville Hospital, together with certain related businesses including medical office buildings, outpatient care facilities, physician practices and ancillary services (collectively, the "Hospital").

**C**.     Curae and the Buyer desire for Curae to execute an amendment to the Charter of the Hospital Entity so as to replace Curae with the Buyer as the sole member of the Hospital Entity and thereby transfer to the Buyer effective as of the Closing all of Curae's membership interest in the Hospital Entity and any and all governance rights associated therewith (collectively, the "Membership Interest"), on the terms and conditions set forth in this Agreement.

## AGREEMENT:

**NOW, THEREFORE**, for and in consideration of the premises and the mutual agreements, covenants, representations, and warranties hereinafter set forth and other good and valuable consideration, the receipt and adequacy of which are forever acknowledged and confessed, the parties hereto agree as follows:

1.     **MEMBERSHIP INTEREST SUBSTITUTION.**

1.1     *Membership Interest Substitution*.     Subject to the terms and conditions of this Agreement, as of the Closing (as defined in Section 2.1 hereof), Curae agrees to approve any and all amendments to the Charter of the Hospital Entity and any other actions which are necessary and appropriate to remove Curae as the sole member of the Hospital Entity and in Curae's place and stead appoint the Buyer as the sole member of the Hospital Entity, effective immediately upon Closing.

1.2     *Consideration*.   The consideration for the Membership Interest substitution shall be Four Million Dollars ($4,000,000.00), plus any amount required to be paid pursuant to Section 1.5(b) (the "Consideration").   The Consideration shall be due and payable at the Closing (except as otherwise provided herein) as follows: (i) assumption by Buyer of $4,000,000.00 of debt owed by Curae and its Affiliates to the United States Department of Agriculture ("USDA") in exchange for a complete discharge of all obligations owed by Curae or its Affiliates to the USDA; (ii) the payoff of all monetary obligations and loans owed by the Hospital Entity to ServisFirst Bank; and (iii) any amount required to be paid pursuant to Section 1.5(b) by bank certified check payable to Curae.

1.3     *Assets*.   Immediately upon the transfer of the Membership Interest, the Buyer will have control of the Hospital Entity, and the Hospital Entity will retain ownership of all of the assets of every description, and whether real, personal or mixed, tangible or intangible, associated with, used in, held for

1513047v6

use in or used in connection with the operation of the Hospital, except for the Excluded Assets, as defined below (collectively, the "Assets").

    **1.4**    *Excluded Assets*.  Notwithstanding <u>Section 1.3</u>, Curae shall be entitled to exclude, and neither the Hospital Entity nor the Subsidiary shall retain, the following assets of the Hospital Entity or its Affiliates (collectively, the "Excluded Assets"):

    *(a)*    all Hospital Entity records relating to (i) litigation files and records, cost report records relating to periods of time prior to the Closing Date, tax returns and minute books, and (ii) the Excluded Assets and Excluded Liabilities to the extent that the Hospital Entity or the Buyer does not need the same in connection with the operation of the Hospital, as well as all records which by law Curae is required to maintain in its possession;

    *(b)*    any and all names, symbols, trademarks, logos or other symbols used in connection with the Hospital and the Assets which include the name "Curae Health" or any variants thereof or any other names which are proprietary to Curae or its Affiliate (the "Excluded Marks");

    *(c)*    any computer software and programs which are proprietary to Curae or its Affiliates;

    *(d)*    receivables from or obligations with Curae or its Affiliates;

    *(e)*    the Hospital Entity's insurance proceeds arising from pre-Effective Time incidents, provided said proceeds are for losses not related to or in payment for damage to the assets transferred to the Buyer pursuant to this agreement;

    *(f)*    any claims of the Hospital Entity against third parties to the extent that such claims relate to the Excluded Assets or Excluded Liabilities;

    *(g)*    all of Curae's or any Affiliate's proprietary manuals, marketing materials, policy and procedure manuals, standard operating procedures and marketing brochures, data and studies or analyses;

    *(h)*    all rights in connection with and the assets of the Hospital Entity's employee benefit plans (the "Benefit Plans"); and

    *(i)*    all national or regional contracts of Curae or any Affiliate which are made available to the Hospital by virtue of the Hospital being an Affiliate of Curae unless transferred to the Buyer or Java Medical Group, LLC ("Java").

    **1.5**    *Assumed Liabilities*.

    *(a)*    In connection with the conveyance of the Membership Interest hereunder, the Buyer and the Hospital Entity shall collectively assume and retain responsibility, as of the Effective Time, for the future payment and performance of all liabilities indebtedness, commitments, or obligations of the Hospital Entity and Curae (solely to the extent related to the Hospital), whether known or unknown, fixed or contingent, recorded or unrecorded, currently existing or hereafter arising or otherwise, except for Excluded Liabilities.

    *(b)*    In addition, the Buyer and Java will be responsible for covering any Financial Shortfall (as defined below) arising from the operation of the Hospital from the Effective Date through

the date of the Closing (the "Responsibility Period"), and the Buyer and Java shall defend, indemnify, and hold Curae harmless from any and all loss, liability, claims, and demands, including reasonable attorney's fees arising out of the Buyer's or Java's failure to provide such funds, in accordance with Section 10.1. For purposes of this Section 1.5, the term "Financial Shortfall" shall mean the excess, if any, of all direct expenses of the Hospital Entity, actually paid by Curae, over the net revenue of the Hospital Entity during the Responsibility Period. The Financial Shortfall shall be paid to Curae by the Buyer or Java at the Closing.

      1.6    ***Excluded Liabilities***. The Buyer and the Hospital Entity shall not assume or retain the following liabilities (the "Excluded Liabilities"):

      ***(a)***    any liabilities or obligations associated with or arising out of any of the Excluded Assets;

      ***(b)***    liabilities and obligations of the Hospital Entity in respect of periods prior to the Effective Date arising under the terms of the Medicare, Medicaid, CHAMPUS/TRICARE, Blue Cross, or other third party payor programs irrespective of the date of demand or affixing of liability;

      ***(c)***    any liabilities owing to the USDA;

      ***(d)***    any liabilities or payables to or obligations with Curae or its Affiliates reflected on the Financial Statements as "Intercompany Due To/From", except to the extent as required under Section 1.5(b); and

      ***(e)***    any liabilities which Curae has Knowledge of and which have not been specifically disclosed under Schedule 1.6(e). For purposes of this Agreement, "Knowledge" shall mean (i) with respect to Curae, the actual knowledge of any and all of the directors and officers of Curae, with no duty of independent investigation, and (ii) with respect to the Hospital Entity, the actual knowledge of any and all of the directors and officers of the Hospital Entity, with no duty of independent investigation.

## 2.    CLOSING.

      2.1    ***Closing***. Subject to the satisfaction or waiver by the appropriate party of all of the conditions precedent to Closing specified in Sections 7 and 8 hereof, the consummation of the transactions contemplated by and described in this Agreement (the "Closing") shall occur remotely via e-mail, teleconference, and FedEx, at 1:00 p.m. local time, on or before November 30, 2018, or at such other date or at such other location as the parties may mutually designate in writing (the date of consummation is referred to herein as the "Closing Date". The Closing shall be effective as of 12:00:01 a.m., local time in Russellville, Alabama, on November 30, 2018, or at such other time as the parties may mutually designate in writing (such time, the "Effective Time").

      2.2    ***Actions of Curae at Closing***. At the Closing and unless otherwise waived in writing by the Buyer, Curae shall deliver to the Buyer the following:

      ***(a)***    Amendments to the Charter of the Hospital Entity, or such other documents as are appropriate, fully approved and executed by Curae, appointing the Buyer as the sole Member of the Hospital Entity and transferring to the Buyer all rights and responsibilities as the sole Member of the Hospital, including, without limitation, the right to receive and accept the resignations of the current Directors of the Hospital Entity and concurrently therewith appointing new Directors of the Hospital Entity effective as of the Closing;

**(b)** Any and all documents necessary and sufficient to evidence the resignation of the Directors of the Hospital Entity concurrent with the appointment by the Buyer of new Directors;

**(c)** Copies of corporate resolutions duly adopted by the Board of Directors of Curae, authorizing and approving the performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and of full force as of the Closing, by the appropriate officers of Curae;

**(d)** Certificate of the President of Curae, certifying that each covenant and agreement of Curae to be performed prior to or as of the Closing pursuant to this Agreement has been performed in all material respects and each representation and warranty of Curae is true and correct in all material respects on the Closing Date, as if made on and as of the Closing;

**(e)** Certificates of incumbency for the respective officers of Curae executing this Agreement and any other agreements or instruments contemplated herein or making certifications for the Closing dated as of the Closing Date;

**(f)** Certificates of existence and good standing of Curae, the Hospital Entity and the Subsidiary from the state in which it is incorporated or formed, dated the most recent practical date prior to the Closing;

**(g)** A Transition Services Agreement in substantially the form attached hereto as Exhibit A (the "Transition Services Agreement"), fully executed by Curae;

**(h)** Copies of all payoff letters, releases, UCC-3 termination statements and Encumbrance discharges and any other documents reasonably requested by the Buyer reflecting the release of any Encumbrances in favor of the USDA or ServisFirst Bank; and

**(i)** Such other instruments and documents as the parties reasonably agree are appropriate and necessary to effect the transactions contemplated by this Agreement and any agreements ancillary hereto.

**2.3** ***Actions of the Buyer at Closing***.  At the Closing and unless otherwise waived in writing by Curae, the Buyer shall deliver to Curae the following:

**(a)** An amount equal to the Consideration in immediately available funds;

**(b)** Copies of resolutions duly adopted by the governing body of the Buyer authorizing and approving its performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and in full force as of the Closing, by the appropriate officers of the Buyer;

**(c)** Certificate of the Chairman of the Board of the Buyer, certifying that each covenant and agreement of the Buyer to be performed prior to or as of the Closing pursuant to this Agreement has been performed in all material respects and each representation and warranty of the Buyer is true and correct in all material respects on the Closing Date, as if made on and as of the Closing;

**(d)** Certificates of incumbency for the officer of the Buyer executing this Agreement and any other agreements or instruments contemplated herein or making certifications for the Closing dated as of the Closing Date;

*(e)* Certificates of existence and good standing of the Buyer from its state of formation, dated the most recent practical date prior to Closing;

*(f)* The Transition Services Agreement, fully executed by the Buyer or its Affiliates(s), as applicable;

*(g)* A side letter signed by Java covering employee leasing, Java's responsibilities with respect to the Hospital going forward, and certain other matters, in a form reasonably acceptable to Curae;

*(h)* Copies of all releases and any other documents reasonably requested by Curae reflecting the release of Curae from any obligations to, or guaranties in favor of, ServisFirst Bank in connection with loans issued for the benefit of the Hospital Entity or the Hospital;

*(i)* A release agreement, fully executed by the Buyer or its Affiliates(s), as applicable, in a form reasonably acceptable to Curae, whereby the Buyer and its Affiliates release Curae and its Affiliates from all potential claims and causes of action it could have against Curae or its Affiliates; and

*(j)* Such other instruments and documents as the parties reasonably agree are appropriate and necessary to effect the transactions contemplated hereby.

**3.     REPRESENTATIONS AND WARRANTIES OF THE HOSPITAL ENTITY**.  As of the date hereof, and, when read in light of any Schedules attached hereto, as of the Closing Date, the Hospital Entity represents and warrants to the Buyer the following:

**3.1     *Existence and Capacity***.  The Hospital Entity is a non-profit corporation, duly organized and validly existing in good standing under the laws of the State of Tennessee.  The Hospital Entity and the Subsidiary are each duly organized, validly existing and in good standing (including tax standing) under the laws of the State of Tennessee and each has the requisite power to own or hold under lease its properties and assets and to conduct business as now conducted.

**3.2     *Powers; Consents; Absence of Conflicts With Other Agreements, Etc.***  The delivery and performance by the Hospital Entity of this Agreement, and the consummation by the Hospital Entity of the transactions contemplated by this Agreement:

*(a)* are within its corporate powers, are not in contravention of any law applicable to the Hospital Entity or of the terms of its organizational documents, have been duly authorized by all appropriate corporate action;

*(b)* except as provided in <u>Section 5.3</u>, do not require any approval or consent required to be obtained by the Hospital Entity of, or filing required to be made by the Hospital Entity with, any Governmental Authority bearing on the validity of this Agreement or in connection with the consummation of the transactions contemplated hereby which is required by law or the regulations of any such agency or Buyer;

*(c)* assuming the receipt of any consents, approvals or other notices required pursuant to the contracts of the Hospital Entity, or the Subsidiary, will neither conflict with, nor result in any breach or contravention of, or the creation of any lien, claim, encumbrance, charge, adverse claim, liability, preference, priority, transfer restriction, encroachment, order, lis pendens, equitable interest, warrant, right of first refusal, easement, profit, license, servitude, right of way, covenant, zoning

restriction, option, pledge and/or security interest (together "Encumbrances") under, any indenture, agreement, lease, instrument or understanding to which it is a party or by which it or any of the Assets is subject to or bound;

(d) will not violate any statute, law, rule, or regulation of any Governmental Authority to which it or the Assets may be subject; and

(e) will not violate any judgment, decree, writ or injunction of any court or Governmental Authority to which it or the Assets may be subject.

**3.3** *Financial Statements.* The Hospital Entity has delivered to the Buyer copies of certain financial statements of the Hospital Entity ("Financial Statements"), which Financial Statements are maintained on an accrual basis. Except as set forth in Schedule 3.3, such Financial Statements have been prepared in accordance with GAAP, applied on a consistent basis throughout the periods indicated. Such Financial Statements present fairly in all material respects the financial condition of the Hospital as of the dates and for the periods indicated thereon. The Hospital Entity specifically warrants that, to its Knowledge, except with respect to trade payables and other monthly costs arising in the ordinary course of business, there are no undisclosed liabilities indebtedness, commitments, or obligations of the Hospital Entity.

**3.4** *Licenses.* The Hospital is duly licensed pursuant to the applicable laws of the state in which it is located and is in compliance in all material respects with all federal, state and local licensure rules and regulations. The pharmacies, laboratories, and all other ancillary departments owned or operated by the Hospital Entity and located at the Hospital or operated for the benefit of the Hospital which are required to be specially licensed are duly licensed by the appropriate licensing agency (the "State Health Agency"). The Hospital Entity has all material licenses, registrations, permits, authorizations, accreditations and approvals ("Licenses") which are needed to operate the businesses owned or operated by it at the Hospital. The Hospital Entity has delivered to the Buyer an accurate list (Schedule 3.4) of all such Licenses owned or held by the Hospital Entity relating to the ownership, development, or operation of the Hospital or the Assets, all of which are now and as of the Closing shall be in full force and effect and in good standing.*Medicare Participation/Accreditation.* The Hospital is qualified for participation in the Medicare, Medicaid and CHAMPUS/TRICARE programs, has current and valid provider contracts with such programs, is in compliance in all material respects with the conditions of participation in such programs, and has received all approvals or qualifications necessary for capital reimbursement for the Hospital. The Hospital is duly accredited, with no contingencies (except as set forth on Schedule 3.5), by The Joint Commission. Except as set forth on Schedule 3.5, each of the Hospital Entity and the Subsidiary (i) is not a party to a Corporate Integrity Agreement with the Office of Inspector General of the United Sates Department of Health and Human Services, (ii) has no reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority, (iii) has not been, to the Hospital Entity's Knowledge, within the past five (5) years the subject of any governmental payer program investigation conducted by any federal or state enforcement agency, and (iv) has not been, to the Hospital Entity's Knowledge, within the past five (5) years a defendant in any qui tam/False Claims Act litigation.

**3.6** *Regulatory Compliance*. Except as set forth on Schedule 3.6 hereto, the Hospital Entity has been and is in compliance in all material respects with all applicable statutes, rules, regulations, and requirements of the Governmental Authorities having jurisdiction over the Hospital Entity, the Subsidiary, the Hospital and its operations, and the Assets. As used herein, "Governmental Authority" means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local. The Hospital Entity has not received any written notice with respect to the operation of the Hospital and

1513047v6

the Assets from any Governmental Authority indicating or alleging any violation of or liability arising under any law.

**3.7** *Litigation or Proceedings*. Except as set forth on <u>Schedule 3.7</u>, there are no claims, actions, suits, proceedings, or investigations pending, or to the Knowledge of the Hospital Entity, threatened, against the Hospital Entity, the Hospital, the Subsidiary or the Assets at law or in equity, or before or by any federal, state, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality wherever located. Except as set forth on <u>Schedule 3.7</u>, there are no judgments, orders, injunctions, decrees, subpoenas, settlement agreements, legal processes, citations, fines and/or penalties heretofore assessed, filed or rendered against, served upon, entered against or binding on the Hospital Entity or the Subsidiary affecting the Assets under any federal, state or local law.

**3.8** *Taxes*. Except as set forth on <u>Schedule 3.8</u>, each of the Hospital Entity and the Subsidiary has timely filed all federal, state and local Tax Returns required to be filed by it (all of which are true, correct and complete in all material respects) and has duly paid or made provision for the payment of all Taxes which are owed by it to the appropriate tax authorities. Except as set forth on <u>Schedule 3.8</u>, no deficiencies for any of such Taxes have been asserted or to the Knowledge of the Hospital Entity, threatened, and no audit or other administrative proceedings or court proceedings with respect to Taxes is currently pending or under way or to the Knowledge of the Hospital Entity, threatened. There are no tax liens on any of the Assets and no basis exists for the imposition of any such liens. There is no dispute or claim concerning any Tax liability of the Hospital Entity or the Subsidiary either (a) claimed or raised by a tax Buyer in writing or (b) as to which any of the directors and officers of the Hospital Entity has Knowledge. As used herein, "Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, payroll, employment, excise, stamp, withholding, real property, personal property, sales, use, or other tax of any kind whatsoever, relating to the Assets, the Hospital or the operation of the Hospital, including any interest, penalty or addition thereto, whether disputed or not. "Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

**3.9** *Employee Relations*. To the Hospital Entity's Knowledge, there is no threatened employee strike, work stoppage, or labor dispute pertaining to the Hospital. No union representation question exists respecting any employees of the Hospital Entity. No collective bargaining agreement exists or is currently being negotiated by the Hospital Entity, no written demand has been received for recognition by a labor organization by or with respect to any employees of the Hospital Entity, no union organizing activities by or with respect to any employees of the Hospital Entity are, to the Knowledge of the Hospital Entity, taking place, and none of the employees of the Hospital Entity is represented by any labor union or organization. There is no written unfair practice claim against the Hospital Entity before the National Labor Relations Board, nor any strike, dispute, slowdown, or stoppage pending or threatened against or involving the Hospital, and none has occurred within the last three (3) years.

**3.10** *Accounts Receivable*. <u>Schedule 3.10</u> hereto sets forth a complete and accurate list of all Accounts Receivable as of November 1, 2018 that sets forth the aging of such Accounts Receivable as of such date. The Accounts Receivable represent and constitute (a) bona fide indebtedness owing to the Hospital Entity or the Subsidiary for services actually performed or for goods or supplies actually provided, (b) valid and enforceable claims, (c) claims not subject to any dispute, set-off, deductions, compromises or reductions (other than reasonable allowances for bad debts and contractual allowances in an amount consistent with historical policies and procedures of the Hospital Entity and accrued for in the Financial Statements), and (d) genuine and subsisting claims. This representation does not constitute a guaranty that the Accounts Receivable existing as of the Closing will be collected by the Buyer. For purposes hereof, "Accounts Receivable" means all accounts and notes receivable of the Hospital Entity, the Subsidiary and the Hospital (including any accounts receivable of any physician or health care

provider to the extent related to services performed on behalf of the Hospital Entity, the Subsidiary or otherwise in connection with the operation of the Hospital and the Assets) and all rights to payment, whether billed or unbilled, recorded or unrecorded, accrued and existing, whether or not written off, as of the Effective Time.

3.11    *Supplies*.    All the inventory and supplies constituting any part of the Assets are substantially of a quality and quantity usable and salable in the ordinary course of business of the Hospital.  Obsolete items have been written off the Financial Statements.  Inventory and supplies are carried at the lower of cost or market, on a first-in, first-out basis and are properly stated in the Financial Statements.  The inventory levels are based on past practices of Hospital Entity at the Hospital.

3.12    *Insurance*.  Schedule 3.12 sets forth a complete and accurate list and brief description (in each case specifying the insurer, the amount of coverage and the type of insurance, including whether each policy is on an "occurrence" or "claims made" basis and the expiration date thereof) of all insurance policies issued and currently in effect in favor of, or covering the ownership and operations of, the Hospital Entity and the Subsidiary and the Assets, or pursuant to which the Hospital Entity or the Subsidiary is a named insured or otherwise a beneficiary in respect of the business (the "Business Insurance Policies").  All of the Business Insurance Policies listed or required to be listed in Schedule 3.12 are in full force and effect with no premium arrearage and the provisions of such policies have been complied with in all material respects.  The Hospital Entity has given in a timely manner to their insurers all notices required to be given under their insurance policies with respect to all of the claims and actions covered by insurance, and no insurer has denied coverage of any such claims or actions.  The Hospital Entity has not (a) received any written notice or other communication from any such insurance company canceling, non-renewing or materially amending (including premium increase) any of such Business Insurance Policies, and, to the Hospital Entity's Knowledge, no such cancellation, non-renewal or amendment is threatened or (b) failed to give any written notice or present any claim which is still outstanding under any of such policies with respect to the Hospital or any of the Assets.  There are no outstanding surety or performance bonds with respect to the Hospital or any of the Assets.

3.13    *Condition of Assets*.  Except as set forth on Schedule 3.13, the Assets include all machinery, equipment and other tangible personal property necessary for the conduct of the business and operations of the Hospital as now conducted.  Other than with respect to the express representations and warranties of the Hospital Entity provided for in this Agreement, the Assets are otherwise delivered by Curae and accepted by the Buyer AS IS WITH NO OTHER WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, WITH RESPECT TO THE LAND, BUILDINGS AND IMPROVEMENTS, AND WITH NO OTHER WARRANTIES, INCLUDING WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE EQUIPMENT, INVENTORY, AND SUPPLIES, AND ANY AND ALL OF SUCH OTHER WARRANTIES CURAE HEREBY DISCLAIMS.  The Hospital Entity further explicitly does not represent that the Hospital is in compliance with the Americans with Disabilities Act.  All of the Assets shall be further subject to normal wear and tear on the land, buildings, improvements and equipment and normal and customary use and disposal of inventory and supplies in the ordinary course of business up to the Closing Date.

3.14    *Title to Assets; Subsidiaries; Sufficiency.*  Except as set forth on Schedule 3.14, the Hospital Entity or the Subsidiary, as applicable, has good and valid fee simple or leasehold title, as the case may be, to the Real Property.  Other than the Subsidiary and except as identified on Schedule 3.14, the Hospital Entity has no subsidiaries or other entities in which the Hospital Entity, directly or indirectly, owns or holds equity or an ownership interest of any kind.  Except as set forth in Schedule 3.14, the Real Property is not subject to any Encumbrances, other than title exceptions shown on existing title policies with respect to the Real Property, monetary Encumbrances that will be paid in full at or prior to Closing,

and any Encumbrances related to Assumed Liabilities. The Hospital Entity owns and holds good and valid title or leasehold interests, as the case may be, to all of the tangible Assets, other than the Real Property, free and clear of all Encumbrances (other than Encumbrances related to any Assumed Liability). Except for the Real Property and except for the Excluded Assets, no other real property or interest (fee simple or leasehold) in real property is used or held for use with respect to the Hospital and its operation. Except for the Excluded Assets, the Assets constitute all of the assets, properties and rights necessary to operate the Hospital and conduct its operations as now operated and conducted.

3.15    *Real Properties and Related Matters*.

(a)    Except as set forth on Schedule 3.15(a), neither the Hospital Entity nor the Subsidiary owns any real property. Schedule 3.15(a) sets forth a correct and complete list of all of the real property owned by the Hospital Entity, the Subsidiary or any of its Affiliates and used or held for use in connection with the Hospital and its operations as of the date hereof (the "Real Property"). Schedule 3.15(a) sets forth a correct and complete list of all of the Hospital Entity's or its Affiliates' respective leasehold interests in and to all leases or subleases with respect to real property that is leased by the Hospital Entity or its Affiliates and used or held for use in connection with the Hospital or its operations (the "Real Property Leases") as of the date hereof.

(b)    All of the rental and other payments payable under each Real Property Lease by the Hospital Entity, the Subsidiary and the Hospital are current. No notice of default is pending or, to the Hospital Entity's Knowledge, threatened under any such Real Property Lease either by the landlord or by the tenant thereunder, and no event has occurred which, with the lapse of time or the giving of notice or both, would constitute a material default thereunder.

3.16    *Transactions with Affiliates.* Except as set forth in Schedule 3.16, neither Curae or any of its Affiliates (other than the Hospital Entity and the Subsidiary) nor any officers or managers of Curae and such Affiliates (other than the Hospital Entity and the Subsidiary): (a) has any interest in any property, real or personal, tangible or intangible, used in or pertaining to the Hospital or the Assets, or in any supplier, vendor or customer of the Hospital Entity, the Subsidiary, the Hospital or the Assets; (b) has any other contract, arrangement or understanding with the Hospital Entity or the Subsidiary; or (c) owes any indebtedness to, or is owed any indebtedness payable by, the Hospital Entity, the Subsidiary or the Hospital.

3.17    *Powers of Attorney.* Except as set forth on Schedule 3.17, neither the Hospital Entity nor the Subsidiary has entered into, granted or authorized, or become a party to, any power of attorney or proxy, whether limited or general, revocable or irrevocable.

3.18    *Bank Accounts*. Schedule 3.18 sets forth each of the bank accounts of the Hospital Entity and the Subsidiary and the authorized signatories with respect to such accounts (the "Hospital Bank Accounts"). Except for the Hospital Bank Accounts, there are no other bank accounts used in or necessary for the conduct of the Hospital's business and operations as now conducted.

4.    **REPRESENTATIONS AND WARRANTIES OF THE BUYER**. As of the date hereof, and, when read in light of any Schedules attached hereto, as of the Closing Date, the Buyer represents and warrants to Curae the following:

4.1    *Existence and Capacity*. The Buyer is a non-profit corporation, duly organized and validly existing in good standing under the laws of the State of Tennessee. The Buyer has the requisite power to enter into this Agreement, to perform its obligations hereunder, and to conduct its business as now being conducted.

1513047v6

**4.2** ***Powers; Consents; Absence of Conflicts With Other Agreements, Etc.*** The execution, delivery, and performance of this Agreement by the Buyer and all other agreements referenced herein, or ancillary hereto, to which the Buyer is a party, and the consummation by the Buyer of the transactions contemplated by this Agreement and the documents described herein, as applicable:

        ***(a)*** are within its corporate powers, are not in contravention of corporate law or of the terms of its organizational documents, and have been duly authorized by all appropriate corporate action;

        ***(b)*** except as provided in <u>Section 6.1</u>, do not require any approval or consent required to be obtained by the Buyer of, or filing required to be made by the Buyer with, any Governmental Authority bearing on the validity of this Agreement which is required by law or the regulations of any such Governmental Authority;

        ***(c)*** will neither conflict with, nor result in any breach or contravention of, or the creation of any lien, charge or encumbrance under, any indenture, agreement, lease, instrument or understanding to which it is a party or by which it is bound;

        ***(d)*** will not violate any statute, law, rule, or regulation of any Governmental Authority to which it may be subject; and

        ***(e)*** will not violate any judgment, decree, writ, or injunction of any court or Governmental Authority to which it may be subject.

**4.3** ***Binding Agreement***. This Agreement and all agreements to which the Buyer will become a party pursuant hereto are and will constitute the valid and legally binding obligations of the Buyer, respectively, and are and will be enforceable against it or them in accordance with the respective terms hereof and thereof.

**4.4** ***Availability of Funds***. The Buyer has the ability to obtain funds in cash in amounts equal to the Consideration by means of credit facilities or otherwise and will at the Closing have immediately available funds which will be sufficient to enable the Buyer to pay the Consideration.

**5.** **COVENANTS OF CURAE PRIOR TO CLOSING**. If applicable, between the date of this Agreement and the Closing:

**5.1** ***Information***. Curae shall afford to the officers and authorized representatives and agents (which shall include accountants, attorneys, bankers, and other consultants) of the Buyer full and complete access to and the right to inspect the plants, properties, books, and records of the Hospital, and will allow the Buyer reasonable access to the medical staff and personnel of the Hospital to confirm and establish relationships, and will furnish the Buyer with such additional financial and operating data and other information as to the business and properties of Curae which pertains to the Hospital or its operations as the Buyer may from time to time reasonably request. The Buyer's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of the Hospital. The Buyer agrees that no inspections shall take place and no employees or other personnel of the Hospital shall be contacted by the Buyer without the Buyer first providing reasonable notice to Curae and coordinating such inspection or contact with Curae.

**5.2** ***Operations***. Curae will not, and will cause the Hospital Entity not to, engage in any practice, take any action, or enter into any transaction outside the ordinary course of business.

1513047v6

**5.3** *Governmental Approvals*.   Curae shall (i) use reasonable efforts to obtain all governmental approvals (or exemptions therefrom) from any Governmental Authority necessary or required to allow Curae to perform its obligations under this Agreement; and (ii) assist and cooperate with the Buyer and its representatives and counsel in obtaining all governmental consents, approvals, and Licenses which the Buyer deems necessary or appropriate and in the preparation of any document or other material which may be required by any Governmental Authority as a predicate to or as a result of the transactions contemplated herein.

**5.4** *Efforts to Close*.   Curae shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in <u>Section 7</u> to the extent that Curae's action or inaction can control or influence the satisfaction of such conditions, so that the Closing will occur on or before the Closing Date.

**6.**     **COVENANTS OF THE BUYER PRIOR TO CLOSING**.   Between the date of this Agreement and the Closing:

**6.1** *Governmental Approvals*.   The Buyer shall (i) use reasonable efforts to obtain all governmental approvals (or exemptions therefrom) of any Governmental Authority necessary or required to allow the Buyer to perform its obligations under this Agreement; and (ii) assist and cooperate with Curae and its representatives and counsel in obtaining all governmental consents, approvals, and Licenses which Curae deems necessary or appropriate and in the preparation of any document or other material which may be required by any Governmental Authority as a predicate to or as a result of the transactions contemplated herein.

**6.2** *Efforts to Close*.   The Buyer shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in <u>Section 8</u> to the extent that the Buyer's action or inaction can control or influence the satisfaction of such conditions, so that the Closing will occur on or before the Closing Date.

**7.**     **CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER**.   Notwithstanding anything herein to the contrary, the obligation of the Buyer to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by the Buyer at the Closing:

**7.1** *Representations/Warranties*.   The representations and warranties of the Hospital Entity contained in this Agreement shall be true and correct in all material respects, except to the extent that the failure of any such representations and warranties to be true and correct would not, or would not be reasonably likely to, in the aggregate, have a material adverse effect on the results of operations, financial condition or business of the Hospital, taken as a whole.   Each and all of the terms, covenants, and conditions of this Agreement to be complied with or performed by Curae on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects.

**7.2** *Governmental Approvals*.   All material consents, authorizations, orders and approvals of (or filings or registrations with) any Governmental Authority or other party required in connection with the execution, delivery and performance of this Agreement shall have been obtained or made by Curae when so required, except for any documents required to be filed, or consents, authorizations, orders or approvals required to be issued, after the Closing Date.

**7.3** *Actions/Proceedings*.   No action or proceeding before a court or any other Governmental Authority shall have been instituted or threatened to restrain or prohibit the transactions herein contemplated, and no Governmental Authority shall have taken any other action or made any request of

1513047v6

any party hereto as a result of which the Buyer reasonably and in good faith deems it inadvisable to proceed with the transactions hereunder.

       **7.4**    *Closing Deliveries*.  Curae shall have delivered to the Buyer, in accordance with the terms of this Agreement, all contracts, agreements, instruments, and documents required to be delivered by Curae to the Buyer pursuant to <u>Section 2.2</u>.

**8.**      **CONDITIONS PRECEDENT TO OBLIGATIONS OF CURAE**.  Notwithstanding anything herein to the contrary, the obligations of Curae to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Curae at the Closing:

       **8.1**    *Representations/Warranties*.  The representations and warranties of the Buyer contained in this Agreement shall be true and correct in all material respects when made and, as of the Closing Date as though such representations and warranties had been made on and as of such Closing Date.  Each and all of the terms, covenants, and conditions of this Agreement to be complied with or performed by the Buyer on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects.

       **8.2**    *Governmental Approvals*.  All material consents, authorizations, orders and approvals of (or filings or registrations with) any Governmental Authority or other party required in connection with the execution, delivery and performance of this Agreement shall have been obtained or made by the Buyer when so required, except for any documents required to be filed, or consents, authorizations, orders or approvals required to be issued, after the Closing Date.

       **8.3**    *Actions/Proceedings*.  No action or proceeding before a court or any other Governmental Authority shall have been instituted or threatened to restrain or prohibit the transactions herein contemplated, and no Governmental Authority shall have taken any other action or made any request of any party hereto as a result of which Curae reasonably and in good faith deems it inadvisable to proceed with the transactions hereunder.

       **8.4**    *Insolvency*.  The Buyer shall not (i) be in receivership or dissolution, (ii) have made any assignment for the benefit of creditors, (iii) have admitted in writing its inability to pay its debts as they mature, (iv) have been adjudicated a bankrupt, or (v) have filed a petition in voluntary bankruptcy, a petition or answer seeking reorganization, or an arrangement with creditors under the federal bankruptcy law or any other similar law or statute of the United States or any state, nor shall any such petition have been filed against the Buyer.

       **8.5**    *Closing Deliveries*.  The Buyer shall have delivered to Curae, in accordance with the terms of this Agreement, all contracts, agreements, instruments and documents required to be delivered by the Buyer to Curae pursuant to <u>Section 2.3</u>.

       **8.6**    *Lien Releases*.  Curae shall have received satisfactory releases, discharges or satisfaction of (a) all guaranties, security interests and other Encumbrances with respect to the Hospital Entity, the Subsidiary and the Assets and (b) all other liabilities with respect to the Assumed Liabilities, including but not limited to, any Encumbrances with respect to, or liabilities owing or payable to, the USDA (to the extent related to the Hospital or the Assets).

**9.**      **ADDITIONAL AGREEMENTS.**

**9.1** *Termination Prior to Closing*.  Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time: (i) on or prior to the Closing Date by mutual, written consent of Curae and the Buyer; (ii) by the Buyer by written notice to Curae if any event occurs or condition exists which causes Curae to be unable to satisfy one or more conditions to the obligations of the Buyer to consummate the transactions contemplated by this Agreement as set forth in <u>Section 7</u>; (iii) by Curae by written notice to the Buyer if any event occurs or condition exists which causes the Buyer to be unable to satisfy one or more conditions to the obligation of Curae to consummate the transactions contemplated by this Agreement as set forth in <u>Section 8</u>; or (iv) by Curae or the Buyer if the Closing shall not have taken place on or before 11:59 p.m. central time on November 30, 2018 (which date may be extended by mutual agreement of Curae and the Buyer), provided that the right to terminate pursuant to this subsection (iv) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur by such date.

**9.2** *Post-Closing Access to Information*.  Curae and the Buyer acknowledge that subsequent to Closing each party may need access to information or documents in the control or possession of the other party for the purposes of concluding the transactions herein contemplated, the Hospital Entity's operation of the Hospital, audits, compliance with requirements of Governmental Authorities and regulations, and the prosecution or defense of third party claims. Accordingly, Curae and the Buyer agree that for a period of six (6) years after Closing each will, unless prohibited by law or regulation, make reasonably available to the other's agents, independent auditors, counsel, and/or Governmental Authorities upon written request and at the expense of the requesting party such documents and information as may be available relating to the Hospital for periods prior and subsequent to Closing to the extent necessary to facilitate concluding the transactions herein contemplated, the Hospital Entity's operation of the Hospital, audits, compliance with requirements of Governmental Authorities and regulations, and the prosecution or defense of claims.  For a period of six (6) years after the Closing, each party agrees that, prior to the destruction or disposition of any such books or records, each party shall provide not less than forty-five (45) days' prior written notice to the other party of such proposed destruction or disposal.  If such other party desires to obtain any of such documents or records, it may do so by notifying the first party in writing at any time prior to the date scheduled for such destruction or disposal.  In such event, the first party shall not destroy such documents and the parties shall then promptly arrange for the delivery of such documents to the other party, its successors or assigns.  All reasonable documented out-of-pocket expenses associated with the delivery of the requested documents shall be promptly paid by a requesting party to the other party.

**9.3** *Preservation and Access to Records After the Closing*.  After the Closing, the Buyer shall cause the Hospital Entity to, in the ordinary course of business and as required by law, keep and preserve in their original form all medical and other records of the Hospital existing as of the Closing. For purposes of this Agreement, the term "records" includes all documents, electronic data and other compilations of information in any form.  The Buyer acknowledges that as a result of entering into this Agreement and operating the Hospital Entity it will retain access to patient and other information which is subject to rules and regulations regarding confidentiality.  The Buyer agrees to cause the Hospital Entity to abide by any such rules and regulations relating to such Hospital Entity. The Buyer agrees to cause the Hospital Entity to maintain the patient and personnel records maintained at the Hospital after Closing in accordance with applicable law (including, if applicable, Section 1861(v)(i)(I) of the Social Security Act (42 U.S.C. § 1395(v)(l)(i)), the privacy requirements of HIPAA and applicable state requirements with respect to medical privacy, and requirements of relevant insurance carriers, all in a manner consistent with the maintenance of patient and personnel records generated at the Hospital after the Closing.  Upon reasonable notice, during normal business hours, at the sole cost and expense of Curae and upon the Hospital Entity's receipt of any legally required consents and authorizations, the Hospital Entity will afford to the representatives of Curae, including its counsel and accountants, full and complete access to, and copies of, the patient records transferred to the Hospital Entity at the Closing (including, without

limitation, access to patient records in respect of patients treated by the Hospital Entity at the Hospital). Upon reasonable notice, during normal business hours and at the sole cost and expense of Curae, Curae shall cause the Hospital Entity to make their officers and employees available to Curae at reasonable times and places after the Closing. In addition, Curae shall be entitled, at Curae's sole risk, to receive copies of any such patient records, but only for purposes of pending claims or litigation involving a patient to whom such records refer, as certified in writing prior to receipt by counsel retained by Curae in connection with such litigation and only upon the Hospital Entity's receipt of any legally required consents and authorizations. Any copy of a patient record so received from the Hospital shall be promptly returned to the Hospital Entity following its use by Curae. Any access to the Hospital, their records or the Hospital Entity's personnel granted to Curae in this Agreement shall be upon the condition that any such access be consistent with applicable law and not materially interfere with the business operations of the Hospital Entity.

9.4    *Tax and Medicare Effect*.  None of the parties (nor such parties' counsel or accountants) has made or is making any representations to any other party (nor such party's counsel or accountants) concerning any of the tax or Medicare effects of the transactions provided for in this Agreement as each party hereto represents that each has obtained, or may obtain, independent tax and Medicare advice with respect thereto and upon which it, if so obtained, has solely relied.

9.5    *Reproduction of Documents*.  This Agreement and all documents relating hereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) the documents delivered at the Closing, and (c) financial statements, certificates and other information previously or hereafter furnished to Curae or to the Buyer may, subject to the provisions of Section 11.9 hereof, be reproduced by Curae and by the Buyer by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process and Curae and the Buyer may destroy any original documents so reproduced.  Curae and the Buyer agree and stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial, arbitral or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by Curae or the Buyer in the regular course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

9.6    *Cooperation on Tax Matters*.  Following the Closing, the parties shall cooperate reasonably with each other and shall make available to the other, as reasonably requested and at the expense of the requesting party, and to any taxing Buyer, all information, records or documents relating to tax liabilities or potential tax liabilities of Curae for all periods on or prior to the Closing and any information which may be relevant to determining the amount payable under this Agreement, and shall preserve all such information, records and documents at least until the expiration of any applicable statute of limitations or extensions thereof.

9.7    *Cost Reports*.  Buyer, at its expense, shall prepare and timely file all cost reports required or permitted by law to be filed under the Medicare and Medicaid or other third-party payor programs and the State Health Agency for periods ending on or prior to the Closing Date or as a result of the consummation of the transactions described herein.

9.8    *Misdirected Payments, Etc.*  Curae and the Buyer covenant and agree to remit, with reasonable promptness (within five (5) business days after receipt) to the other any payments received, which payments are on or in respect of accounts or notes receivable owned by (or are otherwise payable to) the other.  In addition, and without limitation, in the event of a determination by any governmental or third-party payor that payments to Curae or the Hospital resulted in an overpayment or other determination that funds previously paid by any program or plan to Curae or the Hospital Entity must be repaid, Curae shall be responsible for repayment of said monies (or defense of such actions) if such

Case 3:18-bk-05665    Doc 461    Filed 11/15/18    Entered 11/15/18 15:32:58    Desc Main
Document      Page 34 of 44

overpayment or other repayment determination was for services rendered prior to the Effective Date and the Buyer shall be responsible for repayment of said monies (or defense of such actions) if such overpayment or other repayment determination was for services rendered after the Effective Date. Moreover, Curae and buyer covenant and agree that any low volume adjustment payments, DSH/UPL payments, pass through payments or Medicare/Medicaid bad debt payments received by Buyer for any service periods prior to the Effective Time, shall be paid to Curae and any such payment for any service period after the Effective Time shall be the property of Buyer.

9.9     *Employee Matters*.

(a)     As of the Effective Time, except for senior management, such as the CEO, CFO, and CNO, the Buyer shall cause the Hospital Entity to retain all active employees (including any employees who are on statutory family or medical leave, military leave, short-term disability, or other short-term leave of up to 90 days) who are in good standing as of the Effective Time without changes to their terms of employment. The Hospital Entity, in its sole discretion may choose to retain any senior management on terms and conditions which are mutually acceptable the Hospital Entity and such manager. All such employees who are retained by the Hospital Entity (together, the "the Buyer Employees") shall be credited with employment service with the Hospital Entity prior to the Effective Time for purposes of eligibility and vesting purposes (but not for purposes of benefit accrual) under the Buyer's employee benefit plans or programs (the "the Buyer Plans"), unless such service credit is not allowed pursuant to the express terms of any insurance policy (or policies) used to fund the benefits provided under such the Buyer Plans, in which case such service credit will not be allowed just for such insured plan(s). Notwithstanding anything contained herein to the contrary, this <u>Section 9.9(a)</u> shall not apply to any physician employee of the Hospital Entity or any Affiliate who has entered into an employment agreement with the Hospital Entity or any Affiliate and such persons shall not be deemed to be the Buyer Employees.

(b)     On the Closing Date, the Buyer shall cause the Hospital Entity to retain a sufficient number of employees on such terms that neither Curae, the Buyer, nor the Hospital Entity are required to give any notices pursuant to the Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. §2101 <u>et seq</u>. and/or the regulations thereunder. After the Effective Time, the Buyer shall cause the Hospital Entity to retain that number of employees as shall be necessary to comply with the WARN Act.

9.10     *Use of Controlled Substance Permits*. To the extent permitted by applicable law, the Hospital Entity shall continue to operate under its existing Licenses and registrations relating to controlled substances and the operations of pharmacies and laboratories. In furtherance thereof, if necessary Curae shall execute and deliver to the Buyer at or prior to the Closing a limited power of attorney in a form approved by Curae, in its sole discretion. The Buyer shall cause the Hospital Entity to apply for any additional Licenses and permits required by law as soon as reasonably possible before and after the Closing and shall diligently pursue such applications.

9.11     *Medical Staff Matters*. As a result of the Membership Interest substitution at Closing, without the consent of the medical staff of the Hospital, there will be no change or modification to the current staff privileges for physicians on the medical staff of the Hospital; provided, however, that the consummation of the transactions contemplated hereby will not limit the ability of the Hospital Entity or medical executive committee of the Hospital to grant, withhold or suspend medical staff appointments or clinical privileges in accordance with the terms and provisions of the medical staff bylaws. The Hospital Entity shall continue to use the current medical staff bylaws of the Hospital as the medical staff bylaws of the Hospital following the Closing, except to the extent that any modifications thereof are required to

comply with accreditation standards or legal or regulatory requirements, and except to the extent that modifications thereto may be proposed by the medical staff and agreed to by the Hospital Entity.

**9.12** *Transition Services Agreement*. At the Closing, Curae and the Buyer or an Affiliate will enter into the Transition Services Agreement.

**9.13** *Change of Officers/Directors with Medicare*. Promptly, and in any case within five (5) business days after the Closing, the Buyer shall, or shall cause the Hospital Entity to, change the officers and directors of the Hospital for Medicare purposes, effective as of the Closing Date.

**9.14** *Access to Records Including as to Recovery and Audit Information.* If any entity, Governmental Authority or person makes a claim, inquiry or request to the Buyer, Curae, or the Hospital Entity relating to operation of the Hospital prior to the Effective Time (including but not limited to a notice from a person responsible for retroactive payment denials, including recovery audit contractors) of their intent to review the Hospital Entity's claims with respect to the operation of the Hospital prior to the Effective Time, or otherwise seeks information pertaining to Curae or the Hospital Entity, the Buyer shall, and shall cause the Hospital Entity to: (i) comply with all requests from such entity or person in a timely manner; (ii) comply with all other applicable laws and regulations; (iii) forward to Curae all communications and/or documents sent to such person or entity or received from such person or entity within five (5) business days of the Buyer's or Hospital Entity's delivery or receipt of such communications and/or documents; and (iv) provide Curae and their agents and attorneys upon reasonable request with reasonable access to records, information and personnel necessary for any appeal or challenge regarding any such retroactive payment denials.

**9.15** *Use of Excluded Marks.* As of the Closing Date, the Buyer shall take all action necessary to change the names of the Hospital and the Assets so as not to include the Excluded Marks; provided, however, Curae or its assigns, from and after the Closing, shall grant a nonexclusive license to the Buyer to use (a) durable personal property items, within the Hospital, containing the Excluded Marks (such as bed sheets, laundry and cafeteria trays) through the useful life of such durable personal property, (b) any signage or advertisements containing the Excluded Marks on the exterior of the Hospital or in other locations for a period of ninety (90) days after the Closing (provided that the Buyer shall use reasonable efforts to remove or replace all such signage as soon as practicable following the Closing), and (c) any existing advertisements and listings in telephone directories for a period of not to exceed the date the next such directory is published. This nonexclusive license shall not apply to, and the Buyer after the Closing shall not use, any office supplies containing the Excluded Marks (such as letterhead, purchase order forms, bills and admitting forms). The Buyer shall not use the Excluded Marks in connection with any personal property acquired by the Buyer after the Closing.

**10. INDEMNIFICATION.**

**10.1** *Indemnification by the Buyer*. Subject to the limitations set forth in <u>Section 10.3</u> hereof, the Buyer shall defend, indemnify and hold harmless Curae and its Affiliates (other than the Subsidiary), and its and their respective officers, directors, employees or agents (collectively, "Curae Indemnified Parties"), from and against any and all losses, liabilities, damages, costs (including, without limitation, court costs and costs of appeal), fines, penalties, and expenses (including, without limitation, reasonable attorneys' fees and fees of expert consultants and witnesses), whether or not involving a third-party claim (collectively, "Losses") that such Curae Indemnified Party incurs as a result of, or with respect to (i) any misrepresentation or breach of warranty by the Buyer under this Agreement, (ii) any breach by the Buyer of, or any failure by the Buyer to perform, any covenant or agreement of, or required to be performed by, the Buyer under this Agreement, (iii) any of the Assumed Liabilities, or (iv) any claim made by a third party arising out of the operation of the Hospital by the Buyer following the Effective Date.

1513047v6

**10.2** *Limitations; Materiality Scrape*. For the purposes of determining an Indemnified Party's right to indemnification pursuant to this <u>Section 10</u> (including whether a representation, warranty, covenant or agreement has been breached or the amount of Losses related to any such breach), no effect shall be given to any materiality, material adverse effect or similar qualification in any representation, warranty, covenant or agreement.

**10.3** *Notice and Control of Litigation*. If any claim or liability is asserted in writing by a third party against a party entitled to indemnification under this <u>Section 10</u> (the "Indemnified Party") which would give rise to a claim under this <u>Section 10</u>, the Indemnified Party shall notify the person giving the indemnity (the "Indemnifying Party") in writing of the same within fifteen (15) days of receipt of such written assertion of a claim or liability. The Indemnifying Party shall have the right to defend a claim and control the defense, settlement, and prosecution of any litigation. If the Indemnifying Party, within ten (10) days after receipt of such written notice of such claim, fails to agree to defend such claim, the Indemnified Party shall (upon further notice to the Indemnifying Party) have the right to undertake the defense, compromise, or settlement of such claim on behalf of and for the account and at the risk of the Indemnifying Party, subject to the right of the Indemnifying Party to assume the defense of such claim at any time prior to settlement, compromise, or final determination thereof. Anything in this <u>Section 10.3</u> notwithstanding, (i) in the event that a proposed settlement requires the Indemnified Party to admit any wrongdoing or take or refrain from taking any action, then the proposed settlement shall not be entered into unless it is reasonably acceptable to both the Indemnifying Party and the Indemnified Party, and (ii) the Indemnifying Party shall not, without the written consent of the Indemnified Party, settle or compromise any claim or consent to the entry of any judgment which does not include as an unconditional term thereof the giving by the claimant to the Indemnified Party of a release from all liability in respect of such claim. The foregoing rights and agreements shall be limited to the extent of any requirement of any third-party insurer or indemnitor. All parties agree to cooperate fully as necessary in the defense of such matters. Should the Indemnified Party fail to notify the Indemnifying Party in the time required above, the indemnity with respect to the subject matter of the required notice shall be limited to the damages that would have resulted absent the Indemnified Party's failure to notify the Indemnifying Party in the time required above after taking into account such actions as could have been taken by the Indemnifying Party had it received timely notice from the Indemnified Party.

**10.4** *Notice of Claim*. If an Indemnified Party becomes aware of any breach of the representations or warranties of the Indemnifying Party hereunder or any other basis for indemnification under this <u>Section 10</u>, the Indemnified Party shall notify the Indemnifying Party in writing of the same within thirty (30) days after becoming aware of such breach or claim, specifying in detail the circumstances and facts which give rise to a claim under this <u>Section 10</u>. Should the Indemnified Party fail to notify the Indemnifying Party within the time frame required above, the indemnity with respect to the subject matter of the required notice shall be limited to the Losses that would have nonetheless resulted absent the Indemnified Party's failure to notify the Indemnifying Party in the time required above after taking into account such actions as could have been taken by the Indemnifying Party had it received timely notice from the Indemnified Party.

**10.5** *Mitigation; Alternative Arrangements*. The Indemnified Party shall take commercially reasonable steps to mitigate any Losses it may incur or allege to have incurred pursuant to this Agreement. The amount of any Losses subject to indemnification under this <u>Section 10</u> shall be calculated net of any proceeds actually received by the Indemnified Party under or pursuant to any insurance policy or program pursuant to which or under which such Indemnified Party or such Indemnified Party's Affiliate is a party or has rights (collectively, "Alternative Arrangements") on account of such Losses, and any such payments received by such Indemnified Party, in each case net of costs and expenses incurred in connection with any such recovery and any increase in premiums, as applicable. No Indemnified Party shall be obligated to institute litigation or take any action that would

reasonably be expected to adversely impact, affect or impair any claim that may be made by an Indemnified Party pursuant to this <u>Section 10</u>. In any case where an Indemnified Party recovers, under Alternative Arrangements, any amount in respect of a matter for which such Indemnified Party was indemnified pursuant to this <u>Section 10</u> by the Indemnifying Party and actually received payment under such indemnity, such Indemnified Party shall promptly pay to the person or persons that made such payment the amount so recovered (net of all costs and expenses of recovery including increased premiums, but in no event in excess of the amount the Indemnified Party received in connection therewith). Any request for indemnification of specific costs shall include invoices and supporting documents containing reasonably detailed information about the costs or Losses for which indemnification is being sought.

    **10.6** *Exclusive Remedy*. From and after the Closing, the representations and warranties contained in or made pursuant to this Agreement shall be terminated and extinguished upon the earlier of the end of the Survival Period (hereinafter defined) or any termination of this Agreement. Thereafter, none of Curae, the Hospital Entity, the Buyer or any shareholder, partner, officer, director, principal or Affiliate of any of the preceding shall be subject to any liability of any nature whatsoever with respect to any such representation or warranty, absent intentional misrepresentation or fraud by a party. Moreover, the sole and exclusive remedy for any breach or inaccuracy, or alleged breach or inaccuracy, of any representation and warranty made by Curae, the Hospital Entity or the Buyer shall be the remedies provided by this <u>Section 10</u> other than for (a) actions for specific performance or other equitable remedies or (b) Losses arising out of, incidental to or relating to intentional misrepresentation or fraud by a party.

**11.    MISCELLANEOUS.**

    **11.1** *Additional Assurances*. The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the request of a party, the other party or parties shall execute such additional instruments and take such additional actions as are consistent with this Agreement and are necessary or convenient to consummate the transactions contemplated hereby, with the requesting party bearing the out-of-pocket costs and expenses incurred by the other party related thereto.

    **11.2** *Consented Assignment*. Anything contained herein to the contrary notwithstanding, (a) this Agreement shall not constitute an agreement to assign any claim, right, contract, license, lease, commitment, sales order, or purchase order (each, a "Restricted Item") if an attempted assignment or transfer thereof without the consent of the other party thereto would constitute a breach thereof or in any material way adversely affect the rights of Curae or the Buyer thereunder, unless such consent is obtained, (b) the Parties will cooperate with each other and continue to exercise their respective commercially reasonable efforts to obtain any such required consent necessary for the assignment or transfer of any such item, and (c) pending receipt of any such required consent, or in the event such required consent cannot be obtained, Curae shall, to the maximum extent permitted by law, hold such Restricted Item in trust for the Buyer, the Hospital Entity and/or the Hospital, as applicable, and act as the Buyer's agent in order to obtain for the Buyer the benefits thereunder and the Buyer and Curae shall cooperate with each other in any reasonable and lawful arrangements designed to provide the Buyer the benefits of the use of the Restricted Item, as well as the corresponding duties and obligations under such Restricted Item (including any applicable payment obligations for periods following the Closing in which the Buyer receives the benefits thereof during such periods). Once a required consent for a Restricted Item is obtained, such Restricted Item shall be assigned, transferred, conveyed and/or delivered to the Buyer or the Hospital Entity, as applicable, and the obligations under such Restricted Item shall be received and assumed by the Buyer or the Hospital Entity, from and after the effective date of any such required consent.

1513047v6

Case 3:18-bk-05665    Doc 461    Filed 11/15/18    Entered 11/15/18 15:32:58    Desc Main
Document    Page 38 of 44

**11.3    *Consents, Approvals and Discretion***.   Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by a party, or whenever a party must or may exercise discretion, the parties agree that such consent or approval shall not be unreasonably withheld or delayed and such discretion shall be reasonably exercised.

**11.4    *Legal Fees and Costs***.   In the event a party elects to incur legal expenses to enforce or interpret any provision of this Agreement by judicial proceedings, the prevailing party in such proceedings (as determined by the court) will be entitled to recover such legal expenses, including, without limitation, reasonable attorneys' fees, costs, and necessary disbursements at all court levels, in addition to any other relief to which such prevailing party shall be entitled.

**11.5    *Choice of Law***.   The parties agree that this Agreement shall be governed by and construed in accordance with the laws of the State of Alabama, without regard to conflict of laws or choice of laws principles that would require application of the laws of a state/jurisdiction other than the State of Alabama.

**11.6    *Benefit/Assignment***.   Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors, and assigns.   No party may assign this Agreement without the prior written consent of the other parties, which consent shall not be unreasonably withheld; provided, however, that any party may, without the prior written consent of the other parties, assign its rights and delegate its duties hereunder to one or more Affiliates (as defined in Section 11.17).

**11.7    *No Brokerage***.   The Buyer and Curae each represent and warrant to the other that it has not engaged a broker in connection with the transactions described herein.   Each party agrees to be solely liable for and obligated to satisfy and discharge all Losses arising out of claims for fees or commissions of brokers employed or alleged to have been employed by such party.

**11.8    *Cost of Transaction***.   Whether or not the transactions contemplated hereby shall be consummated, the parties agree as follows: (i) Curae shall pay the fees, expenses, and disbursements of Curae and its agents, representatives, accountants, and legal counsel incurred in connection with the subject matter hereof and any amendments hereto; (ii) the Buyer shall pay the fees, expenses, and disbursements of the Buyer and its agents, representatives, accountants and legal counsel incurred in connection with the subject matter hereof and any amendments hereto; and (iii) the Buyer shall pay for any title work, surveys, any environmental engineering reports, licensure application fees, recording fees, transfer taxes, and mechanical, structural, electrical and roofing engineering costs and any other costs incurred by or at the request of the Buyer in furtherance of the Closing.

**11.9    *Confidentiality***.

**(a)**    It is understood by the parties hereto that the information, documents, and instruments delivered to the Buyer by Curae and its agents and the information, documents, and instruments delivered to Curae by the Buyer and its agents are of a confidential and proprietary nature. Each of the parties hereto agrees that prior to the Closing it will maintain the confidentiality of all such confidential information, documents, or instruments delivered to it by the other party hereto or their agents in connection with the negotiation of this Agreement or in compliance with the terms, conditions, and covenants hereof and will only disclose such information, documents, and instruments to its duly authorized officers, members, directors, representatives, and agents (including consultants, attorneys, and accountants of each party) and applicable Governmental Authorities in connection with any required notification or application for approval or exemption therefrom. Each of the parties hereto further agrees

Case 3:18-bk-05665    Doc 461    Filed 11/15/18    Entered 11/15/18 15:32:58    Desc Main
Document       Page 39 of 44

that if the transactions contemplated hereby are not consummated, it will return all such documents and instruments and all copies thereof in its possession to the other party hereto.

  **(b)**    Curae acknowledges that the success of transactions contemplated under this Agreement after the Closing depends upon the continued preservation of the confidentiality of certain information possessed by Curae or its Affiliates, agents and representatives, that the preservation of the confidentiality of such information by Curae is an essential premise of the bargain between Curae and the Buyer, and that the Buyer would be unwilling to enter into this Agreement in the absence of this Section 11.9.  Accordingly, Curae hereby agrees that Curae will not, and Curae will cause its Affiliates, agents and representatives not to, at any time on or after the Closing Date, directly or indirectly, without the prior written consent of the Buyer, disclose or use any confidential or proprietary information involving or relating to the Assets, the Hospital or the operations thereof; provided, however, that the information subject to the foregoing provisions of this sentence will not include any information generally available to, or known by, the public (other than as a result of disclosure in violation hereof); and provided, further, that the provisions of this Section 11.9 will not prohibit any retention of copies of records or disclosure (a) required by any applicable legal requirement so long as reasonable prior notice is given of such disclosure and a reasonable opportunity is afforded to contest the same or (b) made in connection with the enforcement of any right or remedy relating to this Agreement.

  **(c)**    Each of the parties hereto recognizes that any breach of this Section 11.9 would result in irreparable harm to the other party to this Agreement and its Affiliates (as defined in Section 11.17 below) and that therefore either Curae or the Buyer shall be entitled to an injunction to prohibit any such breach or anticipated breach, without the necessity of posting a bond, cash, or otherwise, in addition to all of its other legal and equitable remedies. Nothing in this Section 11.9, however, shall prohibit the use of such confidential information, documents, or information for such governmental filings as in the opinion of Curae's counsel or the Buyer's counsel are required by law or governmental regulations or are otherwise required to be disclosed pursuant to applicable state law.

  **11.10**  *Public Announcements*.  Curae and the Buyer mutually agree that no party hereto shall release, publish, or otherwise make available to the public in any manner whatsoever any information or announcement regarding the transactions herein contemplated without the prior written consent of Curae and the Buyer, except for information and filings reasonably necessary to be directed to Governmental Authorities to fully and lawfully effect the transactions herein contemplated or required in connection with securities and other laws.

  **11.11**  *Waiver of Breach*.  The waiver by any party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.  Any waiver of a breach or violation of any provision of this Agreement must be in writing and signed by the party waiving such breach or violation to be effective.

  **11.12**  *Notice*.  Any notice, demand, or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by receipted overnight delivery, or five (5) days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

Curae:              Curae Health, Inc.
                    1721 Midpark Rd, Ste B200
                    Knoxville, Tennessee 37921
                    Attn: Stephen N. Clapp

1513047v6

Case 3:18-bk-05665    Doc 461    Filed 11/15/18    Entered 11/15/18 15:32:58    Desc Main
Document      Page 40 of 44

With a simultaneous copy to:

Egerton, McAfee, Armistead & Davis, P.C.
900 S. Gay Street, 14th Floor
Knoxville, Tennessee 37902
Attn: Stephen A. McSween, Esq.

the Buyer:      The Dava Foundation Inc.
6 Castlewood Court
Nashville, Tennessee 37215
Attn: Bappa Mukherji

or to such other address, and to the attention of such other person or officer as any party may designate, with copies thereof to the respective counsel thereof as notified by such party.

**11.13** *Severability*. In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice, or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

**11.14** *Gender and Number*. Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine, and neuter, and the number of all words herein shall include the singular and plural.

**11.15** *Divisions and Headings*. The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

**11.16** *Survival*. All of the representations, warranties, covenants, and agreements made by the Parties in this Agreement or pursuant hereto in any certificate, instrument, agreement or document shall survive the consummation and closing of the transactions described herein, and shall not be deemed merged into any instruments or agreements delivered at the Closing or thereafter. The representations and warranties contained in or made pursuant to Articles 3 and 4 of this Agreement shall survive the Closing for a period of one (1) year following the Closing Date (the "Survival Period"); provided, however, that: (a) representations and warranties constituting Fundamental Representations shall survive the Closing indefinitely; and (b) the representations and warranties in Sections 3.8 (Taxes) shall survive the Closing and continue in force and effect thereafter until the date that is thirty (30) days after the expiration of the last statute of limitations applicable thereto. For purposes of this Agreement, "Fundamental Representations" means the representations and warranties set forth in Sections 3.1 (Existence and Capacity), 3.2 (Powers; Consents; Absence of Conflicts), 3.14 (Title to Assets), 4.1 (Existence and Capacity), 4.2 (Powers; Consents; Absence of Conflicts), and 4.3 (Binding Agreement). Notwithstanding anything to the contrary in the foregoing, if an Indemnified Party delivers written notice to an Indemnifying Party of an indemnification claim on or before the close of business before the end of the Survival Period, any such claim, and the representations and warranties, or covenants and obligations, as applicable, on which such claim is based, shall survive (solely for purposes of such claim or series of related claims) until such claim is resolved or judicially determined.

**11.17** *Affiliates*. As used in this Agreement, the term "Affiliate" means, as to the entity in question, any person or entity that directly or indirectly controls, is controlled by or is under common control with, the entity in question and the term "control" means possession, directly or indirectly, of the

1513047v6

power to direct or cause the direction of the management and policies of an entity whether through ownership of voting securities, by contract or otherwise.

**11.18** *Waiver of Jury Trial*. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO DEMAND THAT ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE RELATIONSHIPS OF THE PARTIES HERETO BE TRIED BY JURY. THIS WAIVER EXTENDS TO ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY ARISING FROM ANY SOURCE INCLUDING, BUT NOT LIMITED TO, THE CONSTITUTION OF THE UNITED STATES OR ANY STATE THEREIN, COMMON LAW OR ANY APPLICABLE STATUTE OR REGULATIONS. EACH PARTY HERETO ACKNOWLEDGES THAT IT IS KNOWINGLY AND VOLUNTARILY WAIVING ITS RIGHT TO DEMAND TRIAL BY JURY.

**11.19** *Accounting Date*. The transactions contemplated hereby shall be effective for accounting purposes as of 12:01 a.m. on the day following the Closing Date, unless otherwise agreed in writing by Curae and the Buyer. The parties will use commercially reasonable efforts to cause the Closing to be effective as of a month end.

**11.20** *No Inferences*. Inasmuch as this Agreement is the result of negotiations between sophisticated parties of equal bargaining power represented by counsel, no inference in favor of, or against, either party shall be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such party.

**11.21** *Limited Third-Party Beneficiaries*. The terms and provisions of this Agreement are intended solely for the benefit of the Buyer, Curae, the Hospital Entity, and their respective Affiliates and their respective permitted successors or assigns, and it is not the intention of the parties to confer, and this Agreement shall not confer, third-party beneficiary rights upon any other person or entity except as expressly provided for in this Agreement.

**11.22** *Entire Agreement/Amendment*. This Agreement, together with the Schedules, agreements, certificates and other instruments to be delivered in connection with this Agreement, supersede all previous contracts and agreements and constitute the entire agreement of whatsoever kind or nature existing between or among the parties respecting the within subject matter, and no party shall be entitled to benefits other than those specified herein (or in the Schedules, agreements, certificates and other instruments to be delivered in connection herewith). As between or among the parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect. The parties specifically acknowledge that in entering into and executing this Agreement, the parties rely solely upon the representations and agreements contained in or provided for in connection with this Agreement (and the Schedules, agreements, certificates and other instruments to be delivered in connection herewith) and no others. All prior representations or agreements, whether written or verbal, not expressly incorporated herein are superseded, and no changes in or additions to this Agreement shall be recognized unless and until made in writing and signed by all parties hereto. This Agreement may be executed in two or more counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. Any executed counterpart may be delivered by a party via facsimile or electronic mail transmission and such executed counterpart shall have the same force and effect as an original.

**11.23** *Venue.* The parties expressly covenant and agree that jurisdiction and venue for any dispute, action, suit, claim, counterclaim, cross-claim or other proceeding under or with respect to this Agreement and any certificate, agreement, document or instrument delivered in connection herewith and the subject matter hereof and thereof shall be solely and exclusively in the state and federal courts sitting

and/or having jurisdiction in Franklin County, Alabama (the "Alabama Courts"), and each party knowingly and voluntarily hereby submits and consents to the jurisdiction of the Alabama Courts over such party. As such, each party agrees that the Alabama Courts shall have *in personam* jurisdiction over it and consents to service of process in any manner authorized by Alabama Law.

**11.24** ***Time Period for Completing Schedules and Exhibits.*** Notwithstanding anything herein to the contrary, the parties shall complete the schedules and exhibits to this Agreement, as well as any blanks to be filled in, in a mutually satisfactory manner on or before the Closing Date.

*[Signatures on Following Page]*

1513047v6

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their authorized officers, all as of the date first above written.

**CURAE HEALTH, INC.**

By: _____

Title: _____

("Curae")

**THE DAVA FOUNDATION INC.**

By: _____

Title: _____

(the "Buyer")