# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Curae Health, Inc., *et al.*[1] | ) | Case No. 18-05665 |
| | ) | |
| 1721 Midpark Road, Suite B200 | ) | Judge Walker |
| Knoxville, TN 37921 | ) | |
| Debtors. | ) | Jointly Administered |

**NOTICE OF FILING OF THE (1) REVISED ASSET PURCHASE AGREEMENT FOR THE SALE OF THE PANOLA HOSPITAL AND (2) REDLINE OF REVISED ASSET PURCHASE AGREEMENT OF THE PANOLA HOSPITAL**

The above captioned debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned jointly administered chapter 11 cases (these "**Chapter 11 Cases**"), hereby submit this notice of filing of exhibits ("**Notice of Exhibits**").

On November 6, 2018, Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Bidding Procedures for the Sale of Panola Medical Center, (II) Authorizing the Sale of Panola Medical Center Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (III) Approving Stalking Horse Purchaser, Break-up Fee, and Overbid Protections, (IV) Establishing Certain Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (V) Scheduling an Auction, (VI) Scheduling a Hearing and Objections Deadlines With Respect to the Sale of Panola Medical*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); and Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); Clarksdale Regional Physicians, LLC (5311).

*Center, (VII) Approving the Form and Manner of Notice Thereof, and (VIII) Granting Related Relief* (Docket No. 401) (the "**Sale Procedures Motion**").[2]

On November 27, 2018, the Court held a hearing on the Sale Procedures Motion (the "**Sale Procedures Hearing**"). In connection with the Sale Procedures Hearing, the Debtors filed a revised asset purchase agreement with the Court (the "**Panola APA**") [Docket No. 498]. At the Sale Procedures Hearing, the Court, *inter alia*, approved the Sale Procedures Motion and set a sale hearing for January 11, 2019 (the "**Sale Hearing**").

On January 2, 2019, Progressive Medical Management of Batesville, Inc. (the "**Purchaser**") filed its *Limited Objection of Progressive Medical management of Batesville, LLC Relating to the Sale of the Proposed Purchased Assets of Panola Medical Center* (the "**Limited Objection**") [Docket No. 608].

Prior to the Sale Hearing, the Debtors, the Committee, Midcap Financial Trust, ServisFirst Bank, and the Purchaser agreed to certain revisions to the Panola APA to resolve the Limited Objection. At the Sale Hearing, the parties announced certain additional revisions to the Panola APA on the record. Attached hereto as Exhibit 1 is a clean version of the revised Panola APA, and attached hereto as Exhibit 2 is a redline showing changes from the Panola APA, as it was filed in connection with the Sale Procedures Hearing, to the revised Panola APA.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Sale Procedures Motion.

66785783.2

Dated: January 14, 2018          Respectfully submitted,
        Nashville, Tennessee

**POLSINELLI PC**

*/s/ Michael Malone*
Michael Malone
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

-and-

David E. Gordon (Admitted *Pro Hac Vice*)
Caryn E. Wang (Admitted *Pro Hac Vice*)
1201 West Peachtree Street NW, Suite 1100
Atlanta, Georgia
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

*Counsel to the Debtors and*
*Debtors in Possession*

3

**Exhibit 1**
Revised Panola APA (Clean Version)

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**Batesville Regional Medical Center, Inc.**

**Batesville Regional Physicians, LLC**

**Curae Health, Inc.**

**AND**

**Progressive Medical Management of Batesville LLC**

**Panola Physicians Group, LLC**

**Dated as of January 10, 2019**

1516150v16
66204274.2
5903236 v2
66204274.3

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ............................................................................................. 1

    1.1    Certain Definitions ............................................................................ 1

    1.2    Other Definitional and Interpretive Matters .................................... 9

ARTICLE II PURCHASE AND SALE OF ASSETS ..................................................... 11

    2.1    Sale of Assets .................................................................................. 11

    2.2    Purchase of Assets .......................................................................... 11

    2.3    Excluded Liabilities ........................................................................ 11

    2.4    Excluded Assets .............................................................................. 12

    2.5    Nonassignable Assets ...................................................................... 12

    2.6    Method of Conveyance .................................................................... 12

    2.7    Assumed Contracts ......................................................................... 12

    2.8    Assumption of Liabilities ................................................................ 13

    2.9    Taxes and Assessments ................................................................... 13

    2.10    Purchaser's Deposit ......................................................................... 13

    2.11    Purchase Price ................................................................................. 14

    2.12    Order of the Bankruptcy Court ....................................................... 14

    2.13    Closing ............................................................................................ 14

    2.14    Medicare, Medicaid and Commercial Carrier Provider Agreements ................. 14

    2.15    Closing Payments ............................................................................ 15

    2.16    Closing Deliveries of Seller ............................................................ 15

    2.17    Closing Deliveries of Purchaser ..................................................... 16

    2.18    Further Conveyances and Assumptions .......................................... 17

    2.19    Inventory and Prepaid Expenses. .................................................... 17

    2.20    Employee Matters. .......................................................................... 17

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER .............................. 18

    3.1    Corporate Existence and Power of Seller ....................................... 18

    3.2    Validity and Enforceability of Agreement ...................................... 18

    3.3    Consents; Waivers and Approvals .................................................. 18

    3.4    No Conflict ...................................................................................... 18

    3.5    Rights to Acquire Assets ................................................................. 19

| | | | |
|---|---|---|---|
| 3.6 | Title to and Adequacy of the Assets | ................................................... | 19 |
| 3.7 | Government Reimbursement Participation; Health Care Law Compliance | ........ | 19 |
| 3.8 | Existing Medicare and Medicaid Provider Agreements | ..................................... | 21 |
| 3.9 | Intangible Property | ......................................................................... | 21 |
| 3.10 | Hill Burton | ................................................................................. | 21 |
| 3.11 | Medical Staff | ............................................................................... | 21 |
| 3.12 | Compliance with Laws; Permits | ....................................................... | 21 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF PURCHASER | ..................... | 22 |
| 4.1 | Corporate Existence of Purchaser | ..................................................... | 22 |
| 4.2 | Validity and Enforceability of Agreement | ........................................... | 23 |
| 4.3 | Authorization and Authority | ............................................................ | 23 |
| 4.4 | No Conflict | ................................................................................. | 23 |
| 4.5 | Ability to Consummate Transaction | ................................................... | 23 |
| 4.6 | Solvency | ..................................................................................... | 23 |
| 4.7 | Litigation and Arbitration | ............................................................... | 23 |
| 4.8 | Brokers and Intermediaries | ............................................................. | 24 |
| ARTICLE V | CERTAIN COVENANTS AND AGREEMENTS OF SELLER AND PURCHASER | ................................................................................. | 24 |
| 5.1 | Access and Information | ................................................................... | 24 |
| 5.2 | Authorizations | ............................................................................. | 26 |
| 5.3 | Conduct of Business | ...................................................................... | 26 |
| 5.4 | Commercially Reasonable Efforts | ..................................................... | 28 |
| 5.5 | Adequacy of Purchaser's Review | ...................................................... | 28 |
| 5.6 | Tax Matters | ................................................................................. | 29 |
| 5.7 | Announcement | ............................................................................. | 29 |
| 5.8 | Post-Closing Business Operations Commitment | ..................................... | 30 |
| 5.9 | Risk of Loss; Casualty Loss | ............................................................ | 30 |
| 5.10 | Bankruptcy Actions | ...................................................................... | 30 |
| 5.11 | DISCLAIMERS | ............................................................................ | 30 |
| 5.12 | Further Assurances | ....................................................................... | 31 |

| | | | |
|---|---|---|---|
| 5.13 | Confidentiality | | 31 |
| 5.14 | Acceptance and Discharge | | 33 |
| 5.15 | Cooperation | | 33 |
| 5.16 | Surrender of License | | 33 |
| 5.17 | Removal of Certain Liens | | 33 |
| 5.18 | Insurance | | 33 |
| 5.19 | Final Cost Report | | 33 |

ARTICLE VI CONDITIONS TO PURCHASER'S AND SELLER'S OBLIGATIONS ........... 33

| | | | |
|---|---|---|---|
| 6.1 | Entry of the Bid Procedures Order | | 34 |
| 6.2 | Entry of the Sale Order | | 34 |
| 6.3 | No Injunctions | | 34 |
| 6.4 | Compliance with Applicable Law | | 34 |
| 6.5 | Consents | | 35 |

ARTICLE VII CONDITIONS TO PURCHASER'S OBLIGATIONS ................................... 35

| | | | |
|---|---|---|---|
| 7.1 | Representations and Warranties of Seller | | 35 |
| 7.2 | Schedules | | 35 |
| 7.3 | Documents | | 35 |
| 7.4 | Performance of Obligations | | 35 |
| 7.5 | No Changes to Business | | 35 |
| 7.6 | Release of Liens | | 35 |
| 7.7 | Consents | | 35 |
| 7.8 | FIRPTA Affidavit | | 36 |

ARTICLE VIII CONDITIONS TO SELLER'S OBLIGATIONS ........................................... 36

| | | | |
|---|---|---|---|
| 8.1 | Representations and Warranties of Purchaser | | 36 |
| 8.2 | Performance of this Agreement | | 36 |
| 8.3 | Payment of Purchase Price and Assumption of Liabilities and Assumed Contracts | | 36 |
| 8.4 | Documents | | 36 |

ARTICLE IX SURVIVAL ................................................................................................. 36

| | | | |
|---|---|---|---|
| 9.1 | Survival | | 36 |

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document        Page 8 of 142

# TABLE OF CONTENTS
(continued)

ARTICLE X LIMITED AGREEMENT TERMINATION RIGHTS ........................................ 37

    10.1   Termination of Agreement.................................................................. 37

    10.2   Procedure for Termination ................................................................ 37

    10.3   Effects of Termination ...................................................................... 37

ARTICLE XI MISCELLANEOUS .................................................................................. 38

    11.1   Assignment; Binding Agreement....................................................... 38

    11.2   Post-Closing Cooperation ................................................................. 38

    11.3   Expenses ............................................................................................ 39

    11.4   Entire Agreement and Modification .................................................. 39

    11.5   Severability ....................................................................................... 39

    11.6   Waiver............................................................................................... 39

    11.7   Counterparts...................................................................................... 39

    11.8   Headings; Interpretation.................................................................... 39

    11.9   Governing Law ................................................................................. 40

    11.10  Bankruptcy Court Jurisdiction ......................................................... 40

    11.11  Notices .............................................................................................. 40

    11.12  Effectiveness ..................................................................................... 41

    11.13  No Third Party Beneficiaries. ........................................................... 41

    11.14  Time Period For Completing Schedules and Exhibits........................ 41

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>") is made as of the 10th day of January, 2019, by and among Batesville Regional Medical Center, Inc., a Tennessee non-profit corporation (with BRP, "<u>Seller</u>"), Batesville Regional Physicians, LLC, a Tennessee limited liability company ("<u>BRP</u>"), Curae Health, Inc., a Tennessee non-profit corporation ("<u>Curae</u>"), Progressive Medical Management of Batesville LLC, a Mississippi limited liability company ("<u>PMM</u>") and Panola Physicians Group, LLC, an LLC organized in the state of Mississippi ("<u>PPG</u>" collectively with PMM, "<u>Purchaser</u>" and collectively with PMM, Seller and Curae, the "<u>Parties</u>").

## WITNESSETH:

WHEREAS, on August 24, 2018, Seller filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court and currently Seller is a debtor-in-possession in its Bankruptcy Case entitled to exercise all the rights and powers provided for in Section 1107 of the Bankruptcy Code;

WHEREAS, Seller presently owns and operates the Hospital, provides hospital services and other health care programs and services at the Hospital; and operates the Other Businesses;

WHEREAS, Seller desires to sell to Purchaser all right, title, and interest of Seller and its bankruptcy estate in, to, and under the Assets and to assign to Purchaser the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code;

WHEREAS, Purchaser desires to purchase from Seller all right, title, and interest of Seller and its bankruptcy estate in, to, and under the Assets and to assume the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to entry of the Sale Order.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     **Certain Definitions**.  For purposes of this Agreement, defined terms used herein have the meanings specified in this Section 1.1.

"<u>Action</u>" means any suit, action, Claim, hearing, administrative action, demand, demand letter, Governmental investigation, notice of violation, or proceeding arising out of any

1516150v16

66204274.2
5903236 v2
66204274.3

1

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document    Page 10 of 142

violation or alleged violation of any Law or any breach or alleged breach of any Contract or Order.

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Person referred to. In this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of securities, by contract, or otherwise.

"Agreement" means this Agreement, as hereafter amended, supplemented, or otherwise modified.

"Assessed Cost Report Liability" means the aggregate liability as finally determined and assessed by any Healthcare Program arising from any Cost Reports ending prior to the Effective Time.

"Assets" has the meaning ascribed to it in Section 2.1 herein, provided that (whether or not expressly stated) for all purposes of this Agreement, Assets always exclude Excluded Assets.

"Assignment of Lease" has the meaning ascribed to it in Section 2.6.

"Assumed Contracts" has the meaning ascribed to in Section 2.7.

"Assumed Liabilities" has the meaning ascribed to it in Section 2.8(a).

"Authorizations" means all Healthcare Regulatory Consents, Permits, licenses, certificates, grants, or other authorizations of Governmental Authorities.

"Bankruptcy Case" means the case commenced by Seller and its Affiliates under chapter 11 of the Bankruptcy Code, styled *In re Curae Health, Inc et al case #18-05665*, pending before the Bankruptcy Court.

"Bankruptcy Code" means title 11 of the United States Code Section 101, et seq. (11 U.S.C. § 101, *et seq.*).

"Bankruptcy Court" means the United States Bankruptcy Court for the Middle District of Tennessee and, to the extent of the withdrawal of any reference made pursuant to 28 U.S.C. § 157, the United States District Court for the Middle District of Tennessee with jurisdiction over Seller's Bankruptcy Case.

"Bid Procedures Order" means a Final Order of the Bankruptcy Court in substantially the form attached as Exhibit D approving the procedures for the sale of Seller's assets; provided that any modifications thereto must be satisfactory to the Purchaser in its sole discretion.

"Bill of Sale" has the meaning ascribed to it in Section 2.6.

1516150v16

66204274.2
5903236 v2
66204274.3

2

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document     Page 11 of 142

"Billing Services" has the meaning ascribed to it in the Transition Services Agreement between Purchaser and Seller.

"Books and Records" includes, without limitation, books, ledgers, files, reports, records, inventory data, accounts receivable records, accounts payable records, vendor lists, financing records, personnel and payroll records and other business books and records (including without limitation documents), regardless of the form of and the medium on which such books and records are maintained.

"Break-Up Fee" has the meaning ascribed to it in Section 6.1.

"Business" means the Hospital, the services and programs provided thereat, and the Other Businesses.

"Business Day" means any day of the year, other than Saturday or Sunday, on which national banking institutions in Mississippi are open to the public for conducting business and are not permitted, required, or authorized to close.

"Business Confidential Information" has the meaning ascribed to it in Section 5.15(b).

"Business Records" has the meaning ascribed to it in Section 5.1(e).

"Casualty" has the meaning ascribed to it in Section 5.10.

"Claims" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia*, any and all deeds of trust, Liens, mortgages, assessments, security interests, encumbrances, claims, defenses, demands, damages, causes of action, offset rights, setoff rights, recoupment rights, interests, debts, obligations, guaranties, options, commitments, product liability claims (relating to all products sold or produced prior to the Closing), warranty claims, claims of employees or former employees or their beneficiaries or dependents, including but not limited to, severance or termination payments, pension or employee benefit claims, Taxes, all tort or contractual claims and any claims or obligations arising from Environmental Law, whether absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, known or unknown, in law or in equity, including, without limitation, any claims predicated upon any theory of successor liability or any similar theory, and all Liabilities or guaranties of any kind or nature, arising from or in any way connected with any action or inaction of Seller, arising prior to the Closing Date but excluding the Permitted Encumbrances.

"CLIA" means Clinical Laboratory Improvement Amendments (CLIA) of 1988, which are United States federal regulatory standards that apply to all clinical laboratory testing performed on humans in the United States.

"Closing" means the consummation of the transactions contemplated by this Agreement.

1516150v16

66204274.2
5903236 v2
66204274.3

3

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document     Page 12 of 142

"Closing Date" means such date following the satisfaction of each Party's conditions to Closing or, where permitted, waiver by each Party of the other Party's conditions to Closing as set forth in Articles VI, VII and VIII to this Agreement, as shall be selected by the Parties, but in no event later than March 1, 2019, or such later date as the Parties may in writing agree; provided that if the Closing shall not have occurred by such outside date and this Agreement shall not have been terminated in accordance with its terms by Purchaser based on an uncured material breach hereunder by Seller, then Seller shall have the right to extend the outside closing date for an additional sixty (60) days.

"CMS" means the Centers for Medicare & Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means the Official Committee of Unsecured Creditors established in the Bankruptcy Case.

"Committee Parties" means the Committee, the Committee's successors, any estate representative, any liquidating trust relating to the Seller and each of their respective professionals.

"Contract" means any contract, agreement, arrangement, understanding, lease, indenture, note, bond, evidence of indebtedness, license, sublicense, undertaking, binding commitment or instrument, or purchase order entered into or made by or on behalf of Seller in connection with the Business.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Court" means any court, administrative or regulatory body, Government agency, arbitration or mediation panel or similar body.

"Cure Payments" means the amounts, if any, determined by the Bankruptcy Court to be necessary to cure defaults, if any, under each Assumed Contract.

"Data Room" has the meaning ascribed to it in Section 1.2(a)(viii) herein.

"Deed" has the meaning ascribed to it in Section 2.6.

"Debtors" mean Curae Health, Inc., Amory Regional Medical Center, Inc., Batesville Regional Medical Center, Inc., Clarksdale Regional Medical Center, Inc., Amory Regional Physicians, LLC, Batesville Regional Physicians, LLC, and Clarksdale Regional Physicians, LLC.

"Deposit" has the meaning ascribed to it in Section 2.10(a).

"Dispute" has the meaning ascribed to it in Section 11.10(a)

1516150v16

66204274.2
5903236 v2
66204274.3

4

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document     Page 13 of 142

"Effective Time" means the effective time of the Closing, which shall be as of 12:00:01 a.m. prevailing Eastern Time, on the day of the Closing Date.

"Environmental Law" means any federal, state or local statute, law, regulation, code, ordinance, or rule of common law currently in effect relating to the protection or pollution of the environment or natural resources, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 *et seq.*), the Clean Water Act (33 U.S.C. § 1251 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*) the Toxic Substances Control Act (15 U.S.C. § 2601 *et seq.*), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 *et seq.*), The Medical Waste Tracking Act (42 U.S.C. § 6992 *et seq.*), the Oil Pollution Act (33 U.S.C. § 2701 *et seq.*), the Emergency Planning and Community Right to Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), and the Occupational Safety Health Act (29 U.S.C. § 651 *et seq.*).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Excluded Assets" means: (1) all accounts receivable of Seller and all other rights to receive payment for goods or services provided prior to the Effective Time; (2) all bank accounts, cash and cash equivalents, marketable securities and other investments of Seller; (3) any rights, Claims, counterclaims, third party Claims or causes of action of Seller against any Person and any actions under Chapter 5 of the Bankruptcy Code, including, without limitation, under Sections 510, 542, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code; (4) all claims and/or causes of actions that Seller has brought and/or may bring against any Person relating to any Excluded Asset and/or Excluded Liabilities, including, without limitation, all claims and/or causes of action that Seller may bring against (i) any current or former director, officer, employee, professional or consultant of Seller; (ii) against CHS and any of its affiliates, employees or agents and (iii) against any pre-petition lenders of Seller; and (5) all those assets of the Seller that are set forth on Schedule 1 attached hereto.

"Excluded Liabilities" means each and every Liability, obligation, debt, or commitment of the Business or Seller, as principal, or a successor of any kind or nature (provided Seller shall take no action causing or resulting in Purchaser being deemed to be a successor owner or operator of the Business for purposes of any Environmental Law), whether absolute or contingent, accrued or unaccrued, asserted or unasserted, known or unknown, liquidated or unliquidated, due or to become due, or otherwise, other than the Assumed Liabilities.

"Excluded Records" means (a) any materials about employees, disclosure of which would violate Law, (b) any materials that are subject to a Privilege or requirement to maintain confidentiality or (c) any Patient Records but only to the extent access to Patient Records is prohibited by Law.

"Exhibits" means the exhibits provided for and referred to in this Agreement.

1516150v16

66204274.2

5903236 v2

66204274.3

5

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document    Page 14 of 142

"Final Cost Report Liability" means the amounts necessary, if any, to satisfy liability incurred as a result of the filing of any Cost Report including, without limitation, the Assessed Cost Report Liability.

"FIRPTA" means the Foreign Investment in Real Property Tax Act.

"Government" or "Governmental" means or refers to the United States of America, any other nation or sovereign state, any federal, bilateral or multilateral governmental authority, state, possession, territory, county, district, city or other governmental unit or subdivision, and any branch, agency, or judicial body of any of the foregoing.

"Governmental Authority" means (i) any federal, state, county, municipal or other local Government or Governmental authority, including, without limitation, any regulatory or administrative agency, commission, department, board, bureau, agency, instrumentality or Court and (ii) any arbitrator or arbitral body of any Government.

"Health Care Laws" means, all applicable laws of any Governmental Authority regulating health services or payment, including, but not limited to, the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Stark Law (42 U.S.C. § 1395nn), the Anti-Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the exclusion laws (42 U.S.C. § 1320a-7), the civil monetary penalty laws (42 U.S.C. § 1320a-7a), the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. §§ 1320d-1320d-8), the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the Social Security Act), the Food, Drug and Cosmetic Act (21 U.S.C.§§ 301 et seq.), the Prescription Drug Marketing Act of 1987, the Deficit Reduction Act of 2005, the Controlled Substances Act (21 U.S.C. §§ 801 et seq.), the regulations promulgated pursuant to such laws, and any other law, regulation, guidance document, manual provision, program memorandum, opinion letter, or other issuance of any Governmental Authority with legally binding effect which regulates kickbacks, patient or program charges, recordkeeping, claims process, documentation requirements, medical necessity, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded from government health care programs, quality, safety, privacy, security, pharmacy practice, licensure, accreditation or any other aspect of providing health care.

"Healthcare Programs" shall have the meaning set forth in Section 3.8 of this Agreement.

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Authority as shall be required to be obtained by such party in order for such party to consummate the transactions contemplated of it by this Agreement in compliance with all applicable Law relating to health care or healthcare services of any kind, to the extent necessary, under or through CLIA, CMS, DEA, and any other approvals, authorizations, waivers, Orders, licenses, or Permits of any Governmental Authority required to consummate the transactions contemplated hereby and for Purchaser to operate the Business.

1516150v16

66204274.2

5903236 v2

66204274.3

6

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document      Page 15 of 142

"Hospital" means the hospitals operated by Batesville Regional Medical Center, Inc. located in Panola County, Mississippi, known as Panola Medical Center and Panola Medical Center West and operated in connection with the Business.

"Knowledge" means (a) as to Seller, the actual knowledge, after due inquiry, of those senior leadership team members of the Business listed on part 1 of Schedule 2 and (b) as to Purchaser, the actual knowledge, after due inquiry, of the senior leadership team members of Purchaser's ultimate parent company listed on Part 2 of Schedule 2.

"Law" means any statute, law, code, treaty, ordinance, rule, regulation, instrument, directive, decree, agreement, policy, Order, consent decrees and consent orders, or injunction of or with any Government, Governmental Authority, quasi-Governmental Authority, or Court, and includes, without limitation, all judicial and administrative interpretations thereof, and all rules or regulations of any regulatory or self-regulatory authority compliance with which is required by Law.

"Liabilities" means debts and liabilities, whether known or unknown, contingent or absolute, liquidated or unliquidated, and whether or not required to be reflected on the financial statements of a business, whether arising under any Contract, Law, Lien, Order or otherwise.

"Lien" means any lien, security interest, mortgage, deed of trust, option, lease, tenancy, occupancy, covenant, condition, easement, agreement, royalty, pledge, hypothecation, charge, claim or other encumbrance.

"Nonassignable Asset" shall have the meaning set forth in Section 2.5 of this Agreement.

"Mississippi Regulations" means the Mississippi General Statutes as well as the rules and regulations imposed by the Mississippi Department of Health.

"Order" means any order, judgment, writ, injunction, award or decree of any Court or Governmental Authority.

"Ordinary Course of Business" means with respect to the Business, the ordinary course of commercial operations customarily engaged in by the Business reasonably consistent with past practices.

"Other Businesses" means the outpatient, ancillary, and other healthcare businesses incident to the operation of the Hospital set forth in Schedule 3 attached hereto, including, without limitation, the behavioral health services offered by the Hospital in the Panola Medical Center West building located at 155 Keating Road, Batesville, Mississippi, including inpatient and outpatient adult psychiatric and chemical dependency services and the professional outpatient services provided by BRP.

"Patient Records" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or

1516150v16

66204274.2
5903236 v2
66204274.3

7

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document   Page 16 of 142

behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996 and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164.

"<u>Permits</u>" means any approvals, authorizations, consents, licenses, permits, provider numbers, including, without limitation, Medicare and Medicaid provider/supplier numbers, National Provider Identifier, and agreements, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Authority.

"<u>Permitted Encumbrances</u>" means (i) the Assumed Liabilities and other obligations assumed by Purchaser under this Agreement, (ii) those Liens or exceptions listed on or described in Schedule 4 attached hereto, and (iii) Liens imposed pursuant to any Assumed Contract.

"<u>Permitted Parties</u>" has the meaning ascribed to it in Section 5.1(e).

"<u>Person</u>" means any natural person, any corporation, partnership, limited liability company, limited liability partnership, joint venture, trust, association, company, or other legal entity, and any Government or Governmental Authority.

"<u>Privilege</u>" means the attorney-client privilege (including the common interest privilege) or the attorney work product doctrine.

"<u>Privileged Materials</u>" means any materials that are protected by or the subject of a Privilege.

"<u>Provider Agreements</u>" means Seller's existing provider agreements with the Medicare and Medicaid programs.

"<u>Purchased Intellectual Property Licenses</u>" means those licenses of the Seller included within the Assets.

"<u>Purchase Price</u>" has the meaning ascribed to it in Section 2.11(a).

"<u>Purchaser</u>" has the meaning set forth in the Preamble to this Agreement.

"<u>Real Property</u>" means each parcel of real property included in the Assets, including, without limitation, all rights of way, easements, facilities and other improvements and fixtures thereon and appurtenances thereto and all rights associated therewith, to the extent owned or leased by Seller, as set forth in Schedule 5 attached hereto.

"<u>Relating to</u>" means arising from, in connection with or otherwise relating to. "<u>Relates to</u>" and "<u>relate to</u>" have corresponding meanings.

"<u>Sale Hearing</u>" means the hearing(s) on the Sale Motion held before the Bankruptcy Court.

1516150v16

66204274.2
5903236 v2
66204274.3

8

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document    Page 17 of 142

"Sale Motion" means the Debtor's Motion for (I) an Order (A) Establishing Bid Procedures Related to the Sale of the Debtor's Assets, (B) Scheduling a Hearing to Consider the Proposed Sale and Approving the Form and Manner of Notice Thereof, (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, and (D) Granting Related Relief, and (II) an Order (A) Approving the Proposed Sale, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief filed on November 6, 2018 [Docket No. ___].

"Sale Order" has the meaning ascribed to it in Section 6.2.

"Schedules" means the schedules provided for and referred to in this Agreement.

"Seller" has the meaning set forth in the Preamble to this Agreement.

"Seller's Affidavit" has the meaning ascribed to it in Section 2.6.

"Seller's Confidential Information" has the meaning ascribed to it in Section 5.13(a).

"Tax" or "Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes under Section 4979 of the Code, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Taxing Authority" means any Government or Governmental Authority responsible for the imposition or collection of any Tax.

"Title Company" means _____.

"Transferred Business Records" has the meaning ascribed to it in Section 5.1(f).

"Transfer Taxes" means all excise, sales, use, transfer (including Real Property transfer or gains), value added, stamp, documentary, filing, recording and similar Taxes and fees which may be imposed or assessed as a result of the transactions effected pursuant to this Agreement together with any interest, additions, penalties with respect thereto and any interest in respect of such additions or penalties. Income taxes do not constitute Transfer Taxes.

## 1.2 **Other Definitional and Interpretive Matters**.

(a) Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

1516150v16

66204274.2
5903236 v2
66204274.3

9

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document    Page 18 of 142

(i)     Calculation of Time Periods.  When calculating the period before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars.  Any reference in this Agreement to "$" means United States dollars.

(iii)     Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)     Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)     Including.  The word "including" means "including, without limitation," and "includes" and "include" have corresponding meanings, and such words shall not be construed to limit any general statement to the specific or similar items or matters immediately following it.

(viii)     Made Available to Purchaser.  The phrase "made available to Purchaser" means, for all purposes of this Agreement, made available to Purchaser through posting in Seller's electronic data room (the "Data Room"), via email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

(b)     No Construction Against Drafter.  No presumption, burden of proof, burden of persuasion or similar method of interpretation or standard shall arise or otherwise apply favoring or disfavoring any Party (including, without limitation, the draftsperson) by virtue of the authorship of any one or more provisions of this Agreement, including in any arbitration or litigation proceeding.

# ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1 **Sale of Assets**. At the Closing and as of the Effective Time but in all events subject to the approval of the Bankruptcy Court by and through the Sale Order, Seller agrees, upon and subject to the terms and conditions hereinafter set forth, to sell, transfer, convey, assign and deliver or cause to be sold, transferred, conveyed, assigned and delivered to Purchaser, all right, title and interest of Seller and Seller's bankruptcy estate in, to and under all of the assets and properties and associated rights and interests, real, personal and mixed, tangible and intangible, of whatever kind, owned by Seller or Seller's Affiliates (no matter where located, including without limitation, on leased property) including, without limitation, all of the assets and properties used in or related to the Hospital, including the eight (8) acre parcel adjacent to the Hospital Property, and the Business, but excluding the Excluded Assets (collectively, after excluding the Excluded Assets, the "Assets"). The Assets shall include, to the extent transferrable, all Patient Records (Seller and its representatives shall continue to have access to all Patient Records as necessary to respond to governmental or other inquiries or issues, to defend malpractice claims, and for other reasonable legitimate reason upon request) but excluding any Excluded Documents. The Assets shall also include all of Seller's membership interests in Mississippi LTAC Holdings, LLC, a Delaware limited liability company, ("LTAC Holdings"), and Mississippi Alzheimer Holdings, LLC, a Delaware limited liability company ("Alzheimer Holdings"). None of the Excluded Assets will be conveyed to Purchaser.

2.2 **Purchase of Assets**. Purchaser agrees to purchase the Assets upon and subject to the terms, conditions and provisions set forth herein and pursuant to the terms in the Sale Order.

2.3 **Excluded Liabilities**. Except for the Permitted Encumbrances, the Assets shall be transferred pursuant to the Sale Order and Section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances.

(a) Purchaser shall not assume, satisfy, discharge, or otherwise be responsible for any Excluded Liabilities. Purchaser shall at the Closing, assume the Assumed Liabilities pursuant to the terms of Section 2.8 of this Agreement.

(b) Purchaser shall not assume, satisfy, discharge, or otherwise be responsible for any Liabilities of Seller related to any pension or retirement plans or programs.

(c) Subject to, and consistent with the Sale Order, Purchaser shall not be responsible for any Liabilities of Seller related to Seller's participation in the Healthcare Programs, including any liability or obligation for overpayments, recapture, recoupment, or set off for previously paid or reimbursed amounts.

(d) The Parties hereto further agree that, as between Purchaser and Seller, all the Excluded Liabilities shall remain the sole, exclusive obligation and responsibility of Seller.

1516150v16

66204274.2
5903236 v2
66204274.3

11

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document   Page 20 of 142

(e)     Notwithstanding the foregoing, Purchaser shall be responsible for all Liabilities applicable to and incurred with respect to the period after the Effective Time that relate to the Business, the Hospital or Purchaser's post-Closing ownership or operation of the Assets; provided, however, that no statement made in this Agreement shall be deemed to allocate or attribute any Liability or obligation to Purchaser which has been released pursuant to the Sale Order.  To the extent this Section 2.3(e) conflicts with any other provision of this Agreement, this Section 2.3(e) controls.

2.4     **Excluded Assets**.  Nothing herein contained shall be deemed to obligate Seller to sell, transfer, assign, or convey any Excluded Asset, as described on Schedule 1, to Purchaser. The Seller shall retain all right, title, and interest to, in and under the Excluded Assets. To the extent this Section 2.4 conflicts with any other provision of this Agreement, this Section 2.4 controls.

2.5     **Nonassignable Assets.**  To the extent that the assignment of any Asset shall require the consent of any other party and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset") nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained.

2.6     **Method of Conveyance**.  The sale, transfer, conveyance, assignment, and delivery by Seller of the Assets to Purchaser hereunder shall be effected on the Closing Date by delivery by Seller of: (a) an instrument of conveyance, substantially in the form of Exhibit A, conveying to Purchaser all right, title, and interest of Seller in and to the Real Property, such title to be free and clear of all Liens pursuant to Section 363 of the Bankruptcy Code, except for Permitted Encumbrances (the "Deed"); (b) an affidavit of Seller, which shall be to Seller's Knowledge, issued to Purchaser and to the Title Company (if Purchaser elects, at Purchaser's sole cost and expense, to obtain title insurance), substantially in the form of Exhibit B ("Seller's Affidavit"), if necessary; and (c) assignments(s) and bill(s) of sale and such other instruments of conveyance in the form of Exhibit C (collectively, "Bill of Sale") conveying all right, title, and interest of Seller in all Assets that comprise tangible or intangible personal property, including separate assignment(s) of any U.S. trademark registrations and applications, if any, included within the purchased intellectual property in a form suitable for recording with the U.S. Patent and Trademark Office, all to the fullest extent permitted by Law, free and clear of any and all Liens, except for Permitted Encumbrances.

2.7     **Assumed Contracts**.  On and after the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their terms, all obligations (i) arising after the Effective Time with respect to executory contracts and unexpired leases identified on Schedule 2.7 (the "Assumed Contracts"). Purchaser shall be responsible for all Cure Payments with respect to the Assumed Contracts, which Cure Payments shall be paid by Purchaser at the Closing or upon the entry of a Court Order determining any disputed Cure Payments.  Except for the Assumed Contracts, Purchaser shall not assume and shall not be responsible for any of Seller's contracts or leases.

2.8 **Assumption of Liabilities**.

(a) As of the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their respective terms: (i) all Cure Payments; and (ii) all Liabilities of the Hospital or the Business (the "Assumed Liabilities") accruing from and after the Effective Time incurred in connection with or otherwise relating to the Assets or the Business.

(b) Notwithstanding anything to the contrary in this Agreement, (i) Purchaser shall consult with Seller and the Committee with respect to the terms of the assumption of the Assumed Contracts provided that Purchaser shall not modify any terms thereof without the prior written consent of Seller and the Committee if such modification would be or could reasonably be expected to be adverse to Seller in any respect, and (ii) the rights of each of Seller and the Committee to object to such terms are expressly preserved and reserved. In addition, the rights of the Committee to object to any assumption of Assumed Contracts is expressly preserved and reserved as to any assumption that the Committee reasonably concludes is not in the best interests of the Debtors or the Debtors' estate, including any assumption that may or will discharge the obligations of a counterparty with respect to preferences.

(c) Debtor shall not assume any contracts and/or assign any contracts to Purchaser unless Purchaser agrees.

2.9 **Taxes and Assessments**. The Liability for payment of accrued but unbilled or unpaid Taxes (including, but not limited to, real estate taxes, personal property tax, ad valorem tax and similar non-income Taxes) and other assessments relating to, or arising out of the ownership or transfer of, the Assets or the Assumed Contracts (including, but not limited to any water, sewer and other municipal charges owed to any Governmental Authority), imposed on a periodic basis beginning before and ending after the Effective Time or as a result of the consummation of the transactions evidenced by this Agreement or otherwise, shall be paid by Seller at the Closing, provided that Seller has received at Closing the Purchase Price required to be paid by Purchaser pursuant to Section 2.11. All Taxes and other assessments shall be listed on Schedule 6, which shall be prepared and delivered at Closing. If any Taxes or other assessments paid by Seller at any time on or prior to the Closing Date are attributable in whole or in part to any period following the Closing, then the Purchase Price payable at Closing shall be increased to adjust for the prior payment of such Taxes and assessments by Seller attributable to the post-closing period.

2.10 **Purchaser's Deposit**.

(a) Upon entry of the Bid Procedures Order, Purchaser shall pay to Seller a deposit in the amount of $150,000 (the "Deposit") to be held in escrow by Seller or Seller's agent in accordance with the terms of this Agreement.

(b) Upon entry of the Sale Order, Seller and Purchaser shall have the obligation to consummate the Closing pursuant to and subject to the terms of this Agreement and the Sale Order. If Purchaser fails to consummate the purchase of the Assets on or before March

1516150v16
13
66204274.2
5903236 v2
66204274.3
Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document      Page 22 of 142

1, 2019 (unless such failure arises from Seller's uncured material breach and unless Seller, in consultation with the Committee, and Purchaser agree to extend such deadline in writing), Seller, in consultation with the Committee, is authorized but not required to effect the sale of the Assets to one or more third parties as soon as is commercially reasonable subject to further Orders of the Bankruptcy Court. If Purchaser fails to consummate the purchase of Assets hereunder through no fault of its own or as a result of final due diligence efforts being different than as relayed to Purchaser at the time of this Agreement, Seller shall not consummate any transaction unless the Deposit is repaid to Purchaser. If Purchaser fails to consummate the transaction as a result of Purchaser's uncured material default, the entire Deposit and all accrued interest thereon will be retained by Seller.

2.11 **Purchase Price**.

(a) In consideration of the sale, transfer, conveyance, and assignment of the Assets to Purchaser, Purchaser shall at Closing: (i) assume the Assumed Liabilities, (ii) pay or deliver to Seller cash by wire transfer of immediately available funds in the amount of $2,500,000 (the "Cash Purchase Price"); (iii) assume the liabilities described in Sections 2.7 and 2.8 on the terms contained therein; (iv) make the Cure Payments; (v) pay the amount required under Section 2.9; (vi) pay the amount required under Section 2.19; and (vii) pay all Transfer Taxes due in connection with the closing of the transactions contemplated herein (collectively, the "Purchase Price").

(b) The Parties agree to report this transaction for federal, state, and local Tax purposes consistently and in accordance with this Section 2.11.

2.12 **Order of the Bankruptcy Court**. Seller and Purchaser shall take all reasonable steps and use all reasonable efforts necessary or appropriate in order (a) to obtain the Sale Order from the Bankruptcy Court authorizing the Seller to sell the Assets to the Purchaser; and (b) to consummate the transactions contemplated by the Sale Order.

2.13 **Closing**. The Closing shall take place at 10:00 a.m., prevailing Central Time, on the Closing Date at the offices of Seller's bankruptcy counsel, or at such other time and place as the Parties may agree in writing. The Closing shall be deemed to have occurred and to be effective as between the parties as of the Effective Time. Seller will own, control the management of, and operate the Business until immediately prior to the Effective Time.

2.14 **Medicare, Medicaid and Commercial Carrier Provider Agreements**. Purchaser shall seek to have assigned to Purchaser all current and valid provider contracts of Seller with the Medicare, Medicaid, TRICARE and Commercial programs, including, without limitation, the Provider Agreements, subject to the Government's and Commercial Carriers approval of Seller's assignment and Purchaser's assumption thereof. Seller shall provide Purchaser with information and other assistance as may be reasonably requested by Purchaser with respect to its request to assume the Provider Agreements.

(a) Upon the Effective Time, to the extent permitted by applicable laws and subject to execution of the Transition Services Agreement in all respects satisfactory to

1516150v16

66204274.2
5903236 v2
66204274.3

14

Case 3:18-bk-05665 Doc 662 Filed 01/15/19 Entered 01/15/19 09:02:58 Desc Main
Document Page 23 of 142

Purchaser, Seller, Midcap Funding IV Trust, and the Official Committee of Unsecured Creditors (the "Committee"), Purchaser may use Seller's National Provider Identifier and Medicare/Medicaid provider/supplier numbers and provider/supplier agreements to submit claims to the Part A and Part B Medicare Administrative Contractor and the Mississippi Department of Medicaid, (the "Payors") for health care services provided after the Effective Date (the "Billing Services"). Purchaser and a credit-worthy entity acceptable to the Seller and the Committee will indemnify and hold harmless the Seller and its bankruptcy estate from any and all claims, demands and liabilities of any kind or nature arising from or relating to the Transition Services Agreement, including, without limitation, the Purchaser's use of the Seller's provider agreements and numbers.

(b)     Seller agrees not to take any action to change its EFT/bank account information used by Payors to deposit monies to be paid as a result of the Billing Services (any such monies deposited to be referred to herein as a "Payment"). Seller acknowledges and agrees that any Payments deposited into the Seller's bank account for Billing Services for services provided after the Effective Time shall be the property of Purchaser, subject to the Seller's right to setoff or recoup any amounts owed by the Purchaser under this Agreement.

(c)     In the event Seller receives notice of any adjustment to any Payments related to Billing Services, Seller agrees to inform Purchaser and send a copy of such notice to Purchaser by overnight mail or electronic transmission no later than three (3) business days after receipt of such notice.

(d)     Whenever a Payor sends notice to or requests information from Seller regarding a claim for services rendered after the Closing Date, Seller shall send a copy of such notice or inform Purchaser of such request by overnight mail or electronic transmission no later than three (3) business days after receipt of such notice or request.

2.15    **Closing Payments**.  No later than five (5) Business Days prior to the Closing Date, Seller shall provide to Purchaser, in writing, Seller's calculation of the Closing payments due as of the Effective Time based on the payment of the Purchase Price, as set forth in Section 2.12, and the estimated apportionment of Taxes and assessments.  If within three (3) Business Days following receipt of such calculation, Purchaser has not given Seller written notice of its good faith objection to Seller's calculations, then the transaction shall close based on Seller's calculations.  If Purchaser gives such notice of objection, then the Parties will work together in good faith to resolve the estimated apportionment of Taxes and assessments provided that if they are unable to agree, the Parties shall close and the disputed amount shall be appropriately escrowed.

2.16    **Closing Deliveries of Seller**.  At the Closing, in addition to any other documents, assignments, certificates, letters, orders, or agreements described in Section 2.6 or otherwise required to be delivered pursuant to the terms of this Agreement, and the satisfaction of all the conditions set forth in Articles VI and VIII, Seller shall deliver to Purchaser the following:

(a)     copies of the resolutions of all corporate bodies of Seller necessary to authorize the transactions contemplated hereby, authorizing the sale of the Assets and the

1516150v16
66204274.2
5903236 v2
66204274.3
15

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document    Page 24 of 142

execution and delivery of this Agreement by Seller and the consummation by Seller of the transactions contemplated hereby, certified by the Secretary or an Assistant Secretary of Seller;

(b) a true and complete copy of the certificate of incorporation of Seller, certified by the State of Tennessee, a true and complete copy of the bylaws of Seller, certified by an authorized officer, and a certificate of good standing of Seller from the State of Tennessee, together with a certificate by the Secretary or Assistant Secretary of Seller that the certificate of incorporation of Seller has not been amended since the date of the certification by the State of Tennessee described above and that nothing has occurred since the date of issuance of the certificate of good standing that would adversely affect Seller's corporate existence or good standing;

(c) certificates from the Secretary or Assistant Secretary of Seller as to the incumbency and signatures of each officer of Seller executing this Agreement and any other documents required under this Agreement;

(d) a certified copy of the final, non-appealable Sale Order authorizing and ratifying the execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated hereby;

(e) a certificate of an officer of Seller certifying to Purchaser (a) compliance in all material respects with Seller's covenants set forth in this Agreement, (b) that all of the conditions contained in Articles VI and VII have been satisfied except those, if any, waived in writing by Purchaser, and (c) that all of the representations and warranties set forth in Article III and the matters set forth in the Schedules are true and correct in all material respects as of the Closing Date;

(f) a duly executed Seller's Affidavit in a form acceptable to the Title Company;

(g) a duly executed FIRPTA Affidavit;

(h) a transition services agreement, substantially in the form attached hereto as Exhibit E (the "Transition Services Agreement"), duly executed by Curae; and

(i) copies of Seller's most recent Cost Reports as filed with the Medicare and Medicaid programs.

2.17 **Closing Deliveries of Purchaser**. At the Closing, in addition to any other documents otherwise required to be delivered by Purchaser pursuant to the terms of this Agreement and the satisfaction of all other conditions set forth in Articles VI and VII, Purchaser shall deliver to Seller the following:

(a) the payment of the Cash Purchase Price, by wire transfer of immediately available funds, pursuant to Section 2.11 herein;

(b)     a true and complete copy of Purchaser's organizational documents and, if applicable, a certificate of good standing of Purchaser from the State of Mississippi, together with a certificate by an authorized officer of Purchaser that the certificate of formation of Purchaser has not been amended since the date of the certification described above and that nothing has occurred since the date of issuance of the certificate of good standing that would adversely affect Purchaser's existence or good standing;

(c)     certificates from an authorized officer of Purchaser as to the incumbency and signatures of each officer of Purchaser executing this Agreement and any other documents required under this Agreement;

(d)     a certificate of an officer of Purchaser certifying to Seller (a) compliance in all material respects with Purchaser's covenants set forth in this Agreement, (b) that all of the conditions contained in Articles VI and VII have been satisfied except those, if any, waived in writing by Purchaser, and (c) that all of the representations and warranties set forth in Article IV are true and correct in all material respects as of the Closing Date;

(e)     the Transition Services Agreement, duly executed by Purchaser (or an Affiliate of Purchaser); and

(f)     copies of the resolutions of all corporate bodies of Purchaser necessary to authorize the transactions contemplated hereby, authorizing the purchase of the Assets and the execution and delivery by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby, certified by an authorized signatory of Purchaser.

2.18   **Further Conveyances and Assumptions**.  From time to time following Closing, each Party shall, and shall cause their respective Affiliates to execute, acknowledge, and deliver all such further conveyances, notices, assumptions, releases, and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate (i) to assure fully to Purchaser and its successors and permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers, and privileges intended to be conveyed to Purchaser under this Agreement and (ii) to assure fully to Seller and its successors and permitted assigns, the assumption of the Assumed Liabilities and other obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated herein.  Without limiting the generality of the foregoing, if Seller receives any Assets or payments related to the Assets after the Closing Date, it will promptly turn over same to Purchaser.

2.19   **Inventory and Prepaid Expenses**.  Seller has prepared and delivered to Purchaser a balance sheet of the Hospital as of December 31, 2018, which includes an amount for inventory and prepaid expenses (the "Inventory and Prepaid Expenses").  In addition to the Purchase Price, Purchaser shall pay or deliver to Seller cash by wire transfer of immediately available funds in the amount of the Inventory and Prepaid Expenses.

2.20   **Employee Matters**.  As of the Effective Time, Purchaser shall hire substantially all of the employees of Seller, working at or for the Hospital and shall assume and be responsible

1516150v16

66204274.2
5903236 v2
66204274.3

17

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document   Page 26 of 142

for, and shall timely pay, perform, and discharge in accordance with their respective terms all obligations owed to employees of Curae and/or Seller in connection with their employment at the Hospital prior to the Closing Date for accrued sick leave, vacation pay, leave of absence and paid time off, benefits accrued for future use and, in addition to the foregoing, any other material fringe benefit plan, program, agreement or arrangement expressly assumed hereunder by Purchaser.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby makes the following representations and warranties, subject to any exceptions included in Seller's Disclosure Schedule:

3.1    **Corporate Existence and Power of Seller**.  Seller is a non-profit corporation duly organized, validly existing, and in good standing under the laws of the State of Tennessee. Subject to the provisions of the Bankruptcy Code, the Seller has the corporate power to enter into this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.  Seller has all necessary power and authority to enter into this Agreement and all other documents that the Seller is required to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

3.2    **Validity and Enforceability of Agreement**.  Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes a legal, valid, and binding obligation of Purchaser, this Agreement constitutes, and all documents required to be executed and delivered at Closing by Seller hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Seller, enforceable against it in accordance with their respective terms, subject to general principles of equity.

3.3    **Consents; Waivers and Approvals**.  Except for the approval of the Bankruptcy Court as required by Section 363 of the Bankruptcy Code and approvals relating to the Healthcare Regulatory Consents, no consent, waiver, approval, authorization, license or order of, registration or filing with, or notice to, any Governmental Authority or any other Person is necessary to be obtained, made or given by Seller in connection with the execution and delivery of this Agreement, the performance by Seller of its obligations hereunder or the consummation by Seller of the transactions contemplated hereby.

3.4    **No Conflict**.  Subject to the issuance of the Sale Order and approvals relating to the Healthcare Regulatory Consents and the transfer of the Provider Agreements, the execution and delivery by Seller of this Agreement and the other agreements, documents and instruments required to be executed and delivered by Seller pursuant to this Agreement and the consummation by Seller of the transactions contemplated hereby or thereby, and compliance by Seller with any of the provisions hereof or thereof, will not:

(a)    conflict with or result in a breach of any provision of any organizational document of Seller; or

1516150v16

66204274.2
5903236 v2
66204274.3

18

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document      Page 27 of 142

(b)     violate (with or without the giving of notice or the lapse of time or both) any Law or any Order to which Seller, the Assets, or the Business is subject to.

3.5     **Rights to Acquire Assets**.  Except for Ordinary Course of Business transactions involving the disposition of personal property that are not, individually or in the aggregate, material to the Seller, there are no agreements, options, or other rights to which Seller is a party pursuant to which a Claim exists that Seller is, or may become, obligated to sell or grant any Lien in any of the Assets.  Notwithstanding the foregoing, Seller acknowledges and agrees that the Assets shall be transferred pursuant to the Sale Order and Section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances other than the Permitted Encumbrances.

3.6     **Title to and Adequacy of the Assets**.  Seller owns each of the Assets and, subject to the approval of this Agreement by the Bankruptcy Court, title to the Assets will be transferred free and clear of any Liens by Order of the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code, except for Permitted Encumbrances.  The Assets and the Real Property comprise all items used in the operation of the Hospital and the Business except for (i) Contracts that require consents to the transfer of Contracts made available to Purchaser prior to the date hereof that have not been obtained, (ii) Authorizations that are not transferrable or not transferrable without a consent that has not been obtained, and (iii) the Provider Agreements.

3.7     **Government Reimbursement Participation; Health Care Law Compliance**.

(a)     To the Knowledge of Seller, Seller's operation of the Business is and, during the three (3) year period prior to the Closing Date, has been in substantial compliance with all Health Care Laws.  Seller has not received notice of, and there are no pending or, to the Knowledge of Seller, threatened legal proceedings relating to violations by Seller of any Health Care Law.

(b)     Schedule 3.7(b) sets forth a complete list of Seller's Health Care Permits. Seller has not: (i) received notice and has no Knowledge that any such Governmental Authority is considering limiting, suspending, terminating, adversely amending or revoking any such Health Care Permit; and (ii) received notice of any deficiencies requiring corrective action plans that have not been completed and accepted by the Governmental Authority.  All such Health Care Permits are valid and in full force and effect and Seller is in substantial compliance with the terms and conditions of all such Health Care Permits and with the applicable Health Care Laws and rules and regulations of the Governmental Authorities having jurisdiction with respect to such Health Care Permits, except to the extent that any violation with respect to any of the foregoing has not resulted and is not reasonably likely to result in a material adverse effect.

(c)     Seller meets all of the material requirements of participation and payment of, and where applicable is a party to valid provider, supplier or other participation agreements for payment by, Medicare, Medicaid, any other state or federal government health care programs, any private insurance company, health maintenance organization, preferred provider organization, managed care organization, government contracting agency, or any other public or private third party payor program ("Programs") to the extent Seller bills or receives

1516150v16

66204274.2
5903236 v2
66204274.3

19

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document    Page 28 of 142

reimbursement from a particular Program. There are no legal proceedings pending or, to the Knowledge of Seller, threatened which would be reasonably likely to result in a revocation, suspension, termination, probation, restriction, limitation, or non-renewal of any Program supplier or other participation agreement or result in the exclusion of Seller or any of its directors, officers, employees or agents from any Program. To the Knowledge of Seller, neither Seller, nor, its officers, directors or managing employees (as defined in 42 U.S.C. §1320a-5(b)) have engaged in any activities which are cause for civil penalties or mandatory or permissive exclusion from any Program.

(d)     To the Knowledge of Seller, all material reports, documents, claims, applications, and notices required to be filed, maintained or furnished to any Governmental Authority, under any Program have been so filed, maintained or furnished and all such reports, documents, claims, applications and notices were complete and correct in all material respects on the date filed (or were corrected or supplemented by a subsequent filing).

(e)     Neither Seller's rights, nor, to the Knowledge of Seller, the right of any licensed professional or other individual employed by Seller to receive reimbursements pursuant to any Government Program or Private Program have been terminated, suspended or materially limited as a result of any investigation or action whether by any federal or state Governmental Authority or other third party. Schedule 3.7(e) sets forth a true, complete and accurate description of inspections, investigations, surveys, audits, monitoring or other form of review conducted by any Governmental Authority, professional review organization, accrediting organization or certifying agency based upon any alleged improper activity related to any Health Care Law or Program during the three (3) year period prior to the Closing Date.

(f)     Except as disclosed to Purchaser, Seller does not have any reimbursement or payment rate appeals, disputes or contested positions currently pending before any Governmental Authority or any administrator of any Private Programs outside the ordinary course of Seller's Business.

(g)     Seller is certified for participation and reimbursement under Titles XVIII and XIX of the Social Security Act and has current provider agreements for such Government Programs and with such Private Programs, including any private insurance program under which it directly or indirectly is presently receiving payments. Set forth in Schedule 3.7(g) is a true, correct, complete and accurate list, with respect to Seller, of all provider numbers under all Government Programs.

(h)     Except as set forth on Schedule 3.7(h), during the one (1) year period prior to the Closing Date, Seller has timely filed all reports required to be filed and timely filed all claims or billings prior to the date hereof in accordance with the Government and Private Programs, all fiscal intermediaries and other insurance carriers or reimbursement programs; and all such reports and billings are true, complete and accurate in all material respects and have been prepared in substantial compliance with all applicable Health Care Laws relating to reimbursement and payment. During the one (1) year period prior to the Closing Date, except as set forth on Schedule 3.7(h), Seller has paid or caused to be paid all known and undisputed refunds, overpayments, discounts or adjustments which have become due pursuant to such

1516150v16

66204274.2
5903236 v2
66204274.3

20

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document      Page 29 of 142

reports and billings and, except as disclosed to Purchaser, to the Knowledge of Seller, has no liability under any Government or Private Program for any refund, overpayment, discount or adjustment pursuant to such reports. To the Knowledge of Seller, there are no other reports or claims or billings required to be filed by Seller in order to be paid under any Government Program or Private Program for services rendered in connection with the Business, except for reports not yet due. Except as set forth on Schedule 3.7(h), to the Knowledge of Seller, there are no unresolved investigations, audits or proposed adjustments pending on behalf of any Government or private programs.

3.8     **Existing Medicare and Medicaid Provider Agreements**.  Seller is eligible to receive payment under Titles XVIII and XIX of the Social Security Act, is a "provider" under the Provider Agreements with the Medicare and Medicaid programs (collectively, the "Healthcare Programs") through the applicable intermediaries, and is in material compliance of applicable conditions of participation and payment required by such Healthcare Programs.

3.9     **Intangible Property.**  Schedule 3.9 contains a list of all Intangible Property owned or used by, or developed for, Seller, in each case, which is primarily used in the Business. In the immediately preceding year, Seller has not received any written claims or assertions made by others that Seller has infringed any intellectual property rights of any third party in the preceding two-year period, and there has been no such infringement by Seller during such period.  To Seller's Knowledge, no third party is infringing on rights of Seller with respect to the Intangible Property listed on Schedule 3.9.  All issued patents and registered trademarks, copyrights and service marks owned by Seller are recorded on the public record in the name of Seller.  Except as set forth in Schedule 3.9 and except for Permitted Liens, Seller has clear and unencumbered title to, or otherwise have the right to use, the Intangible Property listed on Schedule 3.9, and, to Seller's Knowledge, such title or right has not been challenged by others in writing in the last year.  True and complete copies of all documentation relating to the Intangible Property listed in Schedule 3.9 have been delivered or made available to Purchaser.**Hill Burton**. Seller has not received any loans, grants, or loan guarantees pursuant to, or currently has any outstanding unfulfilled obligations arising from, the Hill-Burton Act, 42 U.S.C. § 291a, et seq.

3.11     **Medical Staff**.  To Seller's Knowledge, (i) no member of the medical staff of the Hospital has been excluded from participating in Medicare or any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) and (ii) none of the Seller's or Hospital's current officers, directors or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)), has been excluded from Medicare or any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) or been subject to sanction pursuant to 42 U.S.C. §1320a-7a or 1320a-8 or been convicted of a crime described at 42 U.S.C. §1320a-7b.

3.12     **Compliance with Laws; Permits**.

(a)     The Hospital is duly licensed and authorized by all applicable Governmental Authorities including, but not limited to, the State of Mississippi, to operate all of its health care and medical services.

1516150v16

66204274.2
5903236 v2
66204274.3

(b)     Seller is duly licensed and authorized by all applicable Governmental Authorities to own and operate the Hospital and its related health care and medical services.

(c)     Seller has all permits that are necessary to enable it to own, lease or otherwise hold the Assets and to enable it to operate the Business as currently conducted.  All such permits are in full force and effect.  To the Knowledge of Seller, no proceedings are pending or threatened where the remedy sought is to revoke or materially modify any such permit, materially restrict any renewal of any such permit or deny the right to transfer any such permit that is permitted to be transferred with consent.

(d)     To Seller's Knowledge, Seller is in compliance in all material respects with all applicable Laws respecting the Business.  There are no charges of a material violation of a Law pending or, to the Knowledge of Seller, threatened against Seller.

(e)     To Seller's Knowledge, Seller's ownership and operation of the Business and the Assets are and have been in substantial compliance with all Environmental Laws, except where failure to be in such compliance would not have a material adverse effect on the Seller's Business or Assets.  There is not now pending or, to Seller's Knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Business or the Assets.  To Seller's Knowledge, there is not any radon, asbestos or PCBs or any condition with respect to surface soil, subsurface soil, ambient air, surface waters, groundwaters, leachate, run-on or run-off, stream or other sediments, wetlands or similar environmental media on, in, under, above, from or off any of the Real Property, which radon, asbestos, PCBs or condition does or may: (i) require investigation and/or remedial or corrective action pursuant to applicable Environmental Laws on or off such Real Property by Seller or any other owner or occupant thereof; (ii) require compliance by Seller with Environmental Laws; or (iii) result in any claim for personal injury, property damage or natural resources damage or any other proceeding against Purchaser or any of its Affiliates by any Governmental Authority or other Person pursuant to Environmental Laws.  To Seller's Knowledge, no portion of the Real Property has been used as a dump or landfill or a storage, recycling or disposal facility for any hazardous substance, other than for the storage and disposal of medical waste in connection with the ordinary course operation of the Business.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the following representations and warranties:

4.1     **Corporate Existence of Purchaser**.  Purchaser is a statutory entity created by the State of Mississippi pursuant to Miss. Code. Ann. §79-29-101, et. seq., validly existing, and in good standing in the State of Mississippi, and Purchaser is duly authorized to conduct business in Mississippi. Purchaser has all necessary power and authority to enter into this Agreement and all other documents that the Purchaser is required to execute and deliver hereunder, to perform its

1516150v16
66204274.2
5903236 v2
66204274.3

22

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document      Page 31 of 142

obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

4.2     **Validity and Enforceability of Agreement**.  Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes, and all documents executed and delivered by Purchaser at Closing hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Purchaser, enforceable against it in accordance with their respective terms, except as enforcement hereof may be limited by general principles of equity.

4.3     **Authorization and Authority**.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized, approved and ratified by all necessary action on the part of Purchaser.  Purchaser has full authority to enter into and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.

4.4     **No Conflict**.  Neither the execution and delivery by Purchaser of this Agreement nor the performance by Purchaser of its obligations hereunder, (a) (i) violates or breaches the terms of or causes a default under any legal requirement applicable to Purchaser, (ii) contravenes the certificate of incorporation or bylaws or the certificate of formation and operating agreement or other organizational documents of Purchaser, or (iii) violates or breaches the terms or causes a default under any contract, indenture, evidence of indebtedness or other commitment to which Purchaser is a party or by which it or its properties is bound, or (b) will, with or without the passage of time, the giving of notice or the taking of any action by a third person, have any of the effects set forth in this subsection, except to the extent that any such matter would reasonably be expected to have a material adverse change with regard to Purchaser.

4.5     **Ability to Consummate Transaction**.  Purchaser has or will have sufficient immediately available funds and/or access to credit facilities necessary to consummate the purchase of the Assets and perform of its obligations under this Agreement.

4.6     **Solvency.**  Purchaser is solvent.  The consummation of the transactions provided for in this Agreement will not render Purchaser insolvent.  There are no conditions, obligations or commitments of Purchaser, or Claims against Purchaser, which will or could be reasonably expected to render Purchaser insolvent.

4.7     **Litigation and Arbitration**.

(a)     There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser, including any before any Governmental Authority or any arbitration panel, that seeks to prevent the consummation of the transactions contemplated by this Agreement.

(b)     There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, directors, or other senior executives, and there are no existing facts relating to any

Person referred to in this Section 4.7(b), that may cause any required Health Care Regulatory Consent or other consent to the transactions contemplated hereby to not be given.

(c)     There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, directors, or other senior executives or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby. Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, or senior executives are not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.

4.8     **Brokers and Intermediaries**.  Neither Purchaser nor any of its Affiliates has employed any broker, finder, advisor or intermediary that is entitled, in connection with the consummation of the transactions contemplated hereby, to a broker's, finder's, or similar fee or commission.  Provided, however, the Parties acknowledge and agree that, to the extent allowed by Order of the Bankruptcy Court, the Operational and Strategic Advisor fees and any success fees payable by the Debtor to Morgan Stanley & Co. LLC shall be paid from the cash proceeds of the Sale.

## ARTICLE V
## CERTAIN COVENANTS AND AGREEMENTS OF SELLER AND PURCHASER

5.1     **Access and Information**.

(a)     Purchaser agrees to retain and maintain all employee and medical records as required under all applicable laws and regulations.

(b)     Before the Closing and to the extent permitted by Law, and except as required to preserve any Privilege, Seller will provide Purchaser and its representatives with reasonable access during normal business hours, to all of the assets, properties, facilities, employees, medical staff members, agents, accountants, and books and records of Seller and will furnish or make available to Purchaser and its representatives during such period all such information and data concerning Seller in its possession or control as Purchaser reasonably may request; *provided, however*, (i) such access shall be coordinated through such persons as may be designated in writing by Seller for such purpose, and (ii) Seller shall be entitled to participate in and be present during any meeting with any of the physicians on the Hospital medical staff, or with employees, agents, accountants and other representatives.  Purchaser's access shall include IT access to allow Purchaser to prepare to transition/preserve any electronic data as may be customary or required.

1516150v16

66204274.2

5903236 v2

66204274.3

24

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document     Page 33 of 142

(c) Before the Closing, Seller shall permit Purchaser to engage in discussions and negotiations with Seller's vendors for the purpose of negotiating the terms of contracts between Purchaser and such vendors in connection with Purchaser's purchase of the Assets.

(d) Before the Closing, Seller shall grant Purchaser and its representatives reasonable access to Seller's employees within the Hospital for the purpose of administering the hiring process as to such employees. Thus, by way of example and without limitation, except to the extent prohibited by applicable Law, Seller will grant reasonable access to enable Purchaser and its representatives to disseminate documents and information to such employees; collect documents and information from such employees; interview such employees and their supervisors and managers; investigate the backgrounds, experience, education, qualifications and work records of such employees; offer employment to such employees; and hire such employees. Purchaser agrees to conduct all such activities in compliance with applicable Law.

(e) After the Closing, Purchaser shall permit, for a period of not less than six (6) years, each of the Seller, any direct or indirect successor to the Seller and their respective professionals, and the Committee Parties (collectively, the "Permitted Parties") access to all Books and Records that are in connection with or that otherwise relate to the Hospital (including the Business) prior to the Closing and/or to Seller and that are in the control or the possession of Purchaser or any of its Affiliates or their respective agents or representatives except for Excluded Records (collectively, "Business Records") for the purposes of (i) pursuing, assessing, settling, or otherwise dealing with any Excluded Assets, (ii) pursuing, assessing, defending, settling, or otherwise dealing with (including, without limitation, exercising rights and remedies with respect to) any Claim, Action, or cause of action, including, without limitation, any objection or motion, that any Permitted Party has the right to pursue, (iii) performing and/or otherwise dealing with any obligations of the Seller pursuant to this Agreement, including the Excluded Liabilities, (iv) assisting any one or more of the Permitted Parties in connection with or otherwise relating to the Claims reconciliation process relating to Seller, including, without limitation, with respect to Claims against any Person, including, without limitation, assessing, resolving, settling, and/or otherwise dealing with priority and administrative Claims and any other general unsecured Claims that accrue prior to the Closing Date and (v) without limiting the generality of the immediately preceding clauses (i) through (iv), otherwise administering Seller's estate including, without limitation, the preparation and confirmation of a plan relating to Seller and the preparation of a disclosure statement relating to Seller, and compliance with any subpoena, document request, or order of any court compelling any Permitted Party to produce documents to third parties, winding down Seller's estate, preparing or filing tax returns and causing audits to be performed and/or for any other reasonable purpose.

(f) The right of access for the Permitted Parties shall include, without limitation, (a) (i) the right of such Permitted Party to copy at the Permitted Party's premises or the Hospital at each requesting Permitted Party's expense, such documents and records as they may request in furtherance of any of the purposes referred to in Section 5.1(e) and (ii) Purchaser's copying and delivering, at the Permitted Party's cost, to such Permitted Party such documents and records as may be requested, but only to the extent as to this clause (ii) such Permitted Party furnishes Purchaser with reasonable written descriptions of the materials to be so copied. Purchaser shall not dispose of or destroy any of the Business Records transferred to

Purchaser ("Transferred Business Records") before the seventh anniversary of the Closing Date and will provide the Permitted Parties and the Bankruptcy Court pursuant to a filing with the Bankruptcy Court with at least ninety (90) days written notice before doing so and will provide each Party that requests copies of any Transferred Business Records within such ninety (90) day period copies of all requested Transferred Business Records at the cost of the requesting Permitted Party.

(g)　　Subsequent to the Closing Date, Purchaser will cooperate with each of the Permitted Parties relating to all matters in connection with the administration of the Seller's estate, including without limitation, in connection with all Claims, Actions, and causes of action relating to the Excluded Assets or Excluded Liabilities that any Permitted Party elects to pursue, dispute, or defend. Without limiting the generality of the preceding sentence, Purchaser shall use commercially reasonable efforts to make reasonably available to Seller employees of the Business who became employees of Purchaser to assist Seller in connection with the administration of Seller's estate, including, without limitation, in connection with Excluded Assets and/or Excluded Liabilities.

(h)　　Seller shall provide to Purchaser at the Closing or as soon thereafter as is reasonably possible all appropriate books and records and other documents in the possession or control of Seller, its representatives or its agents relating to the operations of the Hospital, the Assets being sold pursuant to this Agreement and the transactions contemplated hereby. Such books, records, and documents shall include, but are not limited to, patient records, all paper and electronic financial, operational, administrative, research, regulatory reporting, maintenance, and HR records.

5.2　　**Authorizations**. Purchaser shall use its commercially reasonable efforts to promptly obtain all Authorizations required to enable Purchaser to purchase the Assets and/or operate the Hospital. Purchaser shall provide to Seller and the Committee a weekly report as to the status of obtaining such Authorizations. Seller agrees to execute and deliver such instruments and documents reasonably satisfactory to Seller, and to take all such other and further actions reasonably satisfactory to Seller, that Purchaser cannot take or cause to be taken by any Person other than Seller, that are required to enable Purchaser to obtain such Authorizations or transfer such Authorizations from Seller to Purchaser,　provided that Seller shall not be obligated to undertake any material Liabilities or other obligations, individually or in the aggregate, relating to such obligations. Notwithstanding the foregoing, Purchaser shall not be obligated to consent to the imposition of materially burdensome conditions on Purchaser or its lenders in order to obtain the Authorizations it being specifically understood and agreed that conditions required under the Mississippi Regulations (or any Federal corollary) shall not constitute a materially burdensome condition.

5.3　　**Conduct of Business**.

(a)　　Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall:

1516150v16

66204274.2
5903236 v2
66204274.3

Case 3:18-bk-05665　　Doc 662　　Filed 01/15/19　　Entered 01/15/19 09:02:58　　Desc Main
Document　　Page 35 of 142

(i)	operate the Business in the Ordinary Course of Business in all material respects;

(ii)	use commercially reasonable efforts to (A) maintain the Assets in good working order and condition consistent (including inventory) with past practices, including but not limited to paying when due all reasonable maintenance expenses necessary to maintain the current state of the Assets until Closing, normal wear and tear excepted, and (B) maintain the insurance coverage currently in place for Seller's operations with respect to the Assets or obtain comparable replacement coverage;

(iii)	perform when due all undisputed post-petition obligations under its contracts, including Purchased Intellectual Property Licenses, and leases of Real Property or personalty to the extent of available funds;

(iv)	comply in all material respects with all Laws and Orders pertaining to the Business and the Assets;

(v)	accurately maintain the books and records of the Business consistent with past practice;

(vi)	without being obligated to make any payment to any Person to preserve any goodwill or relationship, and subject to changes incident to Seller's bankruptcy filing and related intention to sell its assets, use commercially reasonable efforts reasonably consistent with past practices to preserve the goodwill thereof and Seller's relationships with the patients, employees, physicians, suppliers, and others with whom it deals; and

(vii)	perform all undisputed post-petition obligations under Excluded Contracts and timely pay, perform, and discharge in accordance with their respective terms the undisputed post-petition Excluded Liabilities to the extent of available funds.

(b)	Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall not:

(i)	make or enter into any Contract that would be required to be assumed by Purchaser to operate Seller's Business;

(ii)	permit any Person other than Seller or an Affiliate of Seller to manage its Assets or Business;

(iii)	other than in the Ordinary Course of Business, (A) increase the annual level of compensation of any employee or other Person who works in the Business, (B) grant any bonus, similar benefit, or increase in other direct or indirect compensation to any employee or other Person who works in the Business, (C) with respect to any employee or other Person who works in the Business, increase the coverage or benefits available under any (or create any new) employee benefits plan, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition, or similar agreement (or amend any such

1516150v16

66204274.2

5903236 v2

66204274.3

agreement) with any employee or other Person who works in the Business, except, as to each of clauses (A) through (D), as required by applicable Law from time to time in effect, by any employee benefits plan maintained or sponsored by Seller or by any existing Contract or CBA made available to Purchaser that the Seller is a party to or bound by;

(iv)     subject any of the Assets to any Lien, other than (A) any Permitted Encumbrances or (B) as approved by Order of the Bankruptcy Court;

(v)      other than pursuant to an existing Contract made available to Purchaser, acquire or lease any material assets that would be Assets or sell, assign, license, transfer, convey, lease, or otherwise dispose of any of the Assets, provided that any other removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets;

(vi)     cancel or compromise any material debt or claim or waive or release any material right of Seller that constitutes an Asset, except in the Ordinary Course of Business;

(vii)    permit or allow relocation of (other than within the Hospital or the Hospital's owned Real Property), any services or programs of the Business; or

(viii)   other than in the Ordinary Course of Business or pursuant to an existing Contract made available to Purchaser, remove from the Real Property any furniture, equipment, or other tangible personal property used in the Ordinary Course of Business; provided further that any other removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets.

5.4     **Commercially Reasonable Efforts**.  Each Party shall use its commercially reasonable efforts to fulfill or cause the fulfillment of the conditions of the Closing, including, without limitation, the execution and delivery of all agreements contemplated hereunder to be so executed and delivered provided that it shall be the responsibility of Purchaser to obtain the Authorizations and any required consents with respect to the assumption of the Assumed Contracts and satisfy conditions required under the Mississippi Regulations.

5.5     **Adequacy of Purchaser's Review**.  Purchaser agrees that it (a) had a full and complete opportunity to conduct due diligence regarding the Assets prior to making its offer and does not require further due diligence, and (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its bid and executing and delivering this Agreement.  For purposes of clarity, Purchaser agrees that Purchaser did not rely upon any written or oral statements, representations, promises, warranties, or guaranties of any kind or nature, including, without limitation, any that are express, implied, arise by operation of law, or that may for any other reason be deemed to apply to the Assets or the completeness of any information provided in connection therewith other than Seller's representations and warranties that are contained in Article 3 of this Agreement.

1516150v16

66204274.2

5903236 v2

66204274.3

28

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document      Page 37 of 142

5.6     **Tax Matters**.

(a)     Purchaser shall be responsible for the payment of all Transfer Taxes whether or not payable by Seller as a matter of law.  Purchaser shall promptly reimburse Seller for its share of all Transfer Taxes paid by Seller (if any) upon receipt of reasonable documentation evidencing such amount.  Purchaser and Seller will cooperate in the timely preparation and filing of any Tax return that must be filed in connection with any Transfer Taxes.  Any such Taxes or fees resulting from any subsequent transfer of the acquired Assets or Assumed Contracts shall be borne by Purchaser.

(b)     After the Closing Date, Seller and Purchaser shall, and shall cause their respective Affiliates to:

(i)     assist the other Party and its Affiliates in preparing any tax returns that such Party is responsible for preparing and filing relating to the Assets, the Excluded Assets or the Business;

(ii)     cooperate fully in preparing for any tax audit relating to or arising out of the ownership or use of the Assets or the Business;

(iii)     make available to the other Party and its Affiliates and to any Taxing Authority as reasonably requested all information, Books and Records, and documents relating to Taxes arising out of the conduct of the Business or the ownership or use of the Assets; and

(iv)     furnish the other Party with copies of all correspondence received from any Taxing Authority in connection with any tax audit relating to the conduct of the Business or the ownership or use of the Assets with respect to any such taxable period.

5.7     **Announcement**.  Other than confirming information that is already a part of the public record or that is contained in filings a Party hereafter makes with the Bankruptcy Court, Seller will not issue any press release or otherwise make any public statement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of Purchaser(which consent shall not be unreasonably withheld or delayed), except as may be required by applicable Law or the applicable regulations of any exchange or Government agency.  Subject to the last sentence of this Section 5.7, if Seller is required by Law or pursuant to applicable regulations of any Government agency or exchange to issue a press release or otherwise make any public statement or disclosure with respect to this Agreement and the transactions contemplated hereby, Seller will use commercially reasonable efforts to promptly notify Purchaser so that Purchaser may seek a protective order or other appropriate remedy, and in the event that no such protective order or other remedy is obtained, Seller may make such disclosure as Purchaser is advised in writing by counsel as may be required by Law or pursuant to applicable regulations of any Government agency or exchange.  The preceding sentence shall not apply to any filing that Seller reasonably concludes may be required to be made with, or is appropriate to be made with, the Bankruptcy Court.

1516150v16

66204274.2
5903236 v2
66204274.3

29

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document     Page 38 of 142

5.8     **Post-Closing Business Operations Commitment.**  Purchaser shall operate the Hospital as an acute care hospital with an open and accessible emergency department and medical/surgical services for a period of not less than five (5) years after the Closing Date.

5.9     **Risk of Loss; Casualty Loss**.  All risk of loss or damage to or destruction of the Assets, in whole or in part, shall be and remain with Seller until the Effective Time and from and after the Effective Time, the risk of loss or damages to or destruction of the Assets in whole or in part shall be and remain with Purchaser.  If, between the date of this Agreement and the Closing, any of the Assets having a value in excess of $500,000, individually or in the aggregate, shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause (the "Casualty"), individually or in the aggregate, then, with respect to a loss in value in excess of $500,000 (a) Purchaser shall have the option to acquire such Assets on an "as is" basis and take an assignment, without representation, warranty or recourse, from Seller of any insurance proceeds payable to Seller in respect of the Casualty (excluding proceeds under any directors or officers insurance policies) or (b) Seller shall have the option exercisable on or before the Closing Date by the delivery of written notice thereof to Purchaser (i) to fix such Casualty within sixty (60) days after the Closing Date, or (ii) pay Purchaser the loss in value arising from such Casualty, and if Seller does not elect within twenty (20) days of the occurrence of the Casualty an option set forth in (b)(i) or (b)(ii) above, then Seller shall be deemed to have elected the option in clause (b)(ii).

5.10    **Bankruptcy Actions**.

(a)     Seller and Purchaser acknowledge that this Agreement and the sale of the Assets are subject to Bankruptcy Court approval and entry of the Bid Procedures Order and Sale Order.

(b)     If an appeal is taken or a stay pending appeal is requested, with respect to the Bid Procedures Order or Sale Order, Seller shall promptly notify Purchaser of such appeal or stay request.  Seller shall promptly provide to Purchaser a copy of the related notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from such order.  In the event of an appeal of the Bid Procedures Order or Sale Order, Seller shall, at its own expense, be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.

(c)     From and after the date hereof, Seller shall not take any action that is intended to reverse, void, materially modify, or stay the Bid Procedures Order or Sale Order.

(d)     Seller will provide Purchaser with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) related to the Assets, the Business, or any appeal as described in paragraph 5.10(b), prior to the filing thereof in the Bankruptcy Case, except any involving adversarial matters between Seller and Purchaser.

5.11    **DISCLAIMERS**.   EXCEPT   FOR   THE   REPRESENTATIONS   AND WARRANTIES   IN   ARTICLE   3,   SELLER   MAKES   NO   REPRESENTATIONS   OR

WARRANTIES OF ANY KIND OR NATURE TO PURCHASER, EXPRESS OR IMPLIED, WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED HEREBY. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, OR EXCEPT AS EXPRESSLY SET FORTH IN THE SALE ORDER, THE ASSETS TO BE SOLD AND TRANSFERRED HEREUNDER SHALL BE SOLD (A) IN THEIR THEN EXISTING PHYSICAL CONDITION, WITH ALL DEFECTS, IF ANY, AND SUBJECT TO WEAR AND TEAR FROM THE DATE HEREOF TO THE CLOSING DATE AND (B) ON AN "AS IS, WHERE IS" BASIS

5.12 **Further Assurances**. Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated herein and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate same. Without limiting the generality of the foregoing, promptly after the discovery by Seller of any item included within the definition of Assets but not transferred, conveyed, or assigned to Purchaser, (x) Seller will deliver written notice to Purchaser of the existence and non-transfer, non-conveyance, or non-assumption of such item and provide Purchaser with all the information in Seller's possession about and with access to such item in Seller's possession as Purchaser may reasonably request, and (y) if requested by Purchaser, Seller shall use commercially reasonable efforts to transfer, convey, or assign to Purchaser such item in the manner and on the terms and conditions as applicable to an Asset.

5.13 **Confidentiality**.

(a) From and after the date hereof, Purchaser shall maintain in confidence, including that it shall not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Seller's Confidential Information relating to or obtained from Seller; provided, however, the foregoing restriction shall not apply to any disclosure by Purchaser of Seller's Confidential Information to any Affiliate of Purchaser or to its lenders and legal and financial advisors. For purposes of this Section 5.13, "Seller's Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Assets, the Assumed Liabilities, the Business, the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that Seller's Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Purchaser or its agents or other representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller, provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate Seller's Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written documents or evidence maintained by Purchaser to have been independently developed by Purchaser; and provided further, that upon the Closing, the restrictions contained in this Section 5.13 shall not apply to confidential or proprietary information related primarily to the Assets, the Assumed Liabilities or the Business. Purchaser may disclose Seller's Confidential Information to those who need to know it for the purpose of

1516150v16

66204274.2
5903236 v2
66204274.3

effectuating the transactions contemplated herein and who agree to keep it confidential. Purchaser shall instruct such Persons having access to Seller's Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom it has transmitted Seller's Confidential Information subject to the confidentiality obligations herein becomes legally compelled, including, but not limited to, through an action brought pursuant to Miss. Code Ann. §§ 25-59-27, as amended (Mississippi Public Records Act), to disclose any of such Confidential Information, Purchaser shall provide Seller with notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Seller waives compliance with the provisions of this Section 5.13(a), Purchaser shall furnish only that portion of Seller's Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed. Purchaser shall have no liability to Seller with respect to the disclosure of Seller's Confidential Information ordered by a court of competent jurisdiction pursuant to Miss. Code Ann. §§ 25-59-27, as amended, or other applicable law, or required by law or regulatory or accrediting agencies.

(b) From and after the date on which the Sale Order is entered, unless this Agreement is terminated, Seller shall maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating the Business in the Ordinary Course of Business prior to the Closing Date, (ii) any investigations by any Governmental Authority or any filings with the Bankruptcy Court, (iii) compliance activities prior to or after the Closing related to periods occurring prior to the Closing Date; (iv) any legal proceedings; (v) enforcing any rights or other claims of Seller under this Agreement or otherwise; and (vi) performing any obligations of Seller under this Agreement. For purposes of this Section 5.13(b), "Business Confidential Information" means any information that is confidential or proprietary in nature that is related to Purchaser or to the Assets, the Assumed Liabilities or the Business, other than information primarily pertaining to the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Seller (other than in connection with filings with the Bankruptcy Court), (ii) becomes available to Seller on a non-confidential basis from a source other than Purchaser, provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully received by Seller from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure. Seller may disclose Business Confidential Information to those who need to know it for the purpose of effectuating the transactions contemplated herein and who agree to keep it confidential subject to the same confidentiality obligations herein. Seller shall instruct such Persons having access to Business Confidential Information of such obligation of confidentiality. If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information (other than in connection with filings with the Bankruptcy Court), Seller shall provide Purchaser with prompt notice prior to making

1516150v16
66204274.2
5903236 v2
66204274.3

32

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document   Page 41 of 142

any disclosure so that Purchaser may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Purchaser waives compliance with the provisions of this Section 5.13(b), Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.

(c)     The obligations contained in this Section 5.13 shall survive the Closing and are in addition to any separate confidentiality agreements between Seller and Purchaser.

5.14     **Acceptance and Discharge**.  Except to the extent, if at all, Liabilities of Seller to Purchaser are specifically stated herein to survive the Closing, (i) Seller shall cease to have any Liability of any kind or nature relating to its representations and warranties hereunder and/or covenants and agreements to be performed prior to the Effective Time, and (ii) Seller will, without any further writing or other act by Purchaser, at such time be fully and forever, irrevocably and unconditionally, released and discharged from all such Liabilities.

5.15     **Cooperation**.  Seller and Purchaser agree to reasonably cooperate with each other in good faith from the date hereof up through and following the Closing Date, in any effort to satisfy all further conditions, undertakings and agreements contemplated by this Agreement to be effected after the Closing.

5.16     **Surrender of License**.  Following the Closing and in accordance with the timing and other requirements of applicable Law, Seller shall surrender all licenses and operating certificates issued to it relating to the Business, except for the licenses and operating certificates transferred to Purchaser pursuant to this Agreement.

5.17     **Removal of Certain Liens**.  If any Liens other than Permitted Encumbrances encumber any Assets, Seller shall have the right, within thirty (30) days of Seller's receiving Purchaser's written notice of any such Lien, to cause such Lien to be removed.

5.18     **Insurance**.  Neither Purchaser nor Seller shall have an obligation to purchase tail director and officer insurance coverage or tail professional liability insurance coverage.

5.19     **Final Cost Report.**  Purchaser shall file or cause to be filed on Seller's behalf, at Purchaser's sole cost, the final Cost Reports for the period prior to the Closing for the portion of 2019 required to be filed with the Medicare or Medicaid programs or any other Third-Party Payor or Governmental Body as a result of the consummation of the contemplated transactions. Any payments owed and paid to Seller for final settled Cost Reports for any periods prior to Closing are acknowledged as part of the Excluded Assets and are not conveyed to Purchaser by this Agreement.  All Cost Reports shall be prepared in accordance with applicable Law and consistent with past practices.

**ARTICLE VI**
**CONDITIONS TO PURCHASER'S AND SELLER'S OBLIGATIONS**

1516150v16

66204274.2
5903236 v2
66204274.3

33

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document      Page 42 of 142

The obligations of the Parties to consummate the transaction provided for in this Agreement shall be subject to the satisfaction of the following conditions on or before the Closing Date:

6.1     **Entry of the Bid Procedures Order**. The Bankruptcy Court shall have entered the Bid Procedures Order substantially in the form attached hereto as Exhibit B and in all respects in form and substance reasonably satisfactory to the Parties and the Committee, and which provides, among other things, that in the event Purchaser is not in breach of this Agreement, the Bankruptcy Court approves a sale of all or some of the Assets to a buyer other than Purchaser, Seller shall be required to pay to Purchaser out of the proceeds of the sale of the Assets to a buyer other than Purchaser a break-up fee in the amount of $100,000 (the "Break-Up Fee").

6.2     6.2     **Entry of the Sale Order**. The Bankruptcy Court shall have entered a sale order in form and substance reasonably satisfactory to the Parties and the Committee (the "Sale Order"), which approves this Agreement and the consummation of the transactions contemplated hereby in their entirety; and which provides for the following rulings and/or findings: (a) Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; (b) timely, adequate, and sufficient notice of the sale was provided; (c) the Assets to be transferred to the Purchaser are property of the bankruptcy estate and Seller has all requisite authority and approval to transfer the Assets; (d) the total consideration to be realized by the Seller represents fair consideration and reasonably equivalent value in the context of any state or federal law governing the rights of creditors; (e) the conveyance and assignment of the Assets pursuant to this Agreement is a legal, valid, and effective transfer of the Assets to the Purchaser, and will vest the Purchaser with all right, title, and interest of the Seller in and to the Assets free and clear of all Liens, Claims, interests and encumbrances except for those (i) liabilities to be assumed by Purchaser pursuant to this Agreement and (ii) Permitted Encumbrances, and (f) neither the Seller nor the Purchaser has engaged in any conduct that would cause or permit the Agreement, or the transfers contemplated thereby, to be avoided under Bankruptcy Code section 363(n).   In addition, unless waived by Purchaser in writing in its sole discretion, the Sale Order shall have become a final, non-appealable order.

6.3     **No Injunctions**.   No injunction or restraining Order (whether temporary, preliminary or permanent) of any Governmental Authority shall exist against Purchaser or Seller that prevents the transactions contemplated hereby and approved in the Bid Procedures Order or Sale Order.   No other Governmental Authority shall have enacted, issued, promulgated, enforced, or entered any statute, rule, regulation, or non-appealable judgment which prohibits or renders illegal the consummation of the Closing or the transactions provided for herein and approved in the Sale Order.

6.4     **Compliance with Applicable Law**. To the extent required by Law, the filing and waiting period requirements relating to any and all approvals necessary under the Healthcare Regulatory Consents and any other applicable Law, if necessary, relating to consummation of the Closing or the transactions provided for herein shall have been duly complied with and/or such approvals shall have been obtained on or before the Closing Date.

1516150v16

66204274.2
5903236 v2
66204274.3

34

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document     Page 43 of 142

6.5    **Consents**.  Purchaser shall have obtained (or shall have had transferred to it) those Healthcare Regulatory Consents and other Authorizations that Purchaser is required to apply for and/or obtain in order to operate the Business, it being specifically understood and agreed that Purchaser shall be required to satisfy conditions required under the Mississippi Regulations.

# ARTICLE VII
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligations of Purchaser to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Purchaser, in its sole discretion, to waive any one or more of the conditions set forth below:

7.1    **Representations and Warranties of Seller**.  The representations and warranties of Seller contained in this Agreement, taken as a whole, shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made only as of a specified date, in which case the accuracy of such representation or warranty shall be measured as of such date, and except to the extent of changes permitted by the terms of this Agreement.

7.2    **Schedules**.  The matters set forth on the Schedules shall be true and correct in all material respects on the Closing Date, except to the extent of changes permitted by the terms of this Agreement.

7.3    **Documents**.  Purchaser shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing, together with copies of all other documents and certificates to be executed and delivered by Seller at Closing.

7.4    **Performance of Obligations**.  Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date.

7.5    **No Changes to Business**.  Since the date of this Agreement, there shall have been no material changes to the Business or Assets that, in the aggregate, have had a material adverse effect on the Business, excluding adverse changes that (i) were projected to occur in any forecast or budget provided by Seller and/or (ii) relate to a disclosed proposed sale of all or substantially all of Seller's assets, thereby leaving Seller without an operating business.

7.6    **Release of Liens**.  All Liens on the Assets shall have been released, satisfied or otherwise removed or discharged pursuant to Bankruptcy Court order or otherwise, except for the Permitted Encumbrances.

7.7    **Consents**.  Purchaser shall have obtained (or shall have had transferred to it) those Healthcare Regulatory Consents and other Authorizations, including any judicial proceedings and appeals related thereto, which Purchaser is required to apply for and obtain in

1516150v16
66204274.2
5903236 v2
66204274.3
35

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document    Page 44 of 142

order to operate the Business, it being specifically understood and agreed that Purchaser shall be required to satisfy conditions required under the Mississippi Regulations.

7.8     **FIRPTA Affidavit**.  Seller shall deliver to Purchaser a non-foreign affidavit dated as of the Closing Date and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code so that Purchaser is exempt from withholding any portion of the Purchase Price thereunder (the "FIRPTA Affidavit").

## ARTICLE VIII
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Seller, in its sole discretion to waive any one or more of the conditions set forth below:

8.1     **Representations and Warranties of Purchaser**.   The representations and warranties of Purchaser contained in this Agreement, taken as a whole, shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date, and except to the extent of changes permitted by the terms of this Agreement.

8.2     **Performance of this Agreement**.  Purchaser shall have materially performed or complied with all of the obligations to be performed or complied with by it under the terms of this Agreement on or prior to the Closing Date.  The Purchaser shall have delivered to the Seller a certificate signed by a duly authorized officer of the Purchaser, dated as of the Closing Date, to the foregoing effect.

8.3     **Payment of Purchase Price and Assumption of Liabilities and Assumed Contracts**.  Seller shall receive from Purchaser on the Closing Date the Purchase Price pursuant to Section 2.12 of this Agreement and Purchaser shall have assumed the Assumed Liabilities pursuant to a document that is reasonably satisfactory to Seller.

8.4     **Documents**.  Seller shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing and copies of all such other documents and certificates executed and delivered hereunder.

## ARTICLE IX
## SURVIVAL

9.1     **Survival**.  Articles II, V, IX, X and XI, and all defined terms used therein, shall survive the Closing, except to the extent (if at all) that such survival is expressly limited herein. The representations and warranties of the Parties shall expire upon the consummation of the Closing.

1516150v16

66204274.2
5903236 v2
66204274.3

36

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document      Page 45 of 142

## ARTICLE X
## LIMITED AGREEMENT TERMINATION RIGHTS

10.1    **Termination of Agreement**.  This Agreement and the transactions contemplated hereby may be terminated prior to the Closing Date only as follows:

(a)    by mutual written consent of Purchaser and Seller;

(b)    except as otherwise provided in this Agreement, by either Party if the Closing shall not have occurred on or before the Closing Date;

(c)    by Purchaser if any of the conditions to the obligations of Purchaser to close set forth in Article VII shall have become incapable of fulfillment other than because of a breach by Purchaser of any covenant or agreement contained in this Agreement and such condition is not waived by Purchaser;

(d)    by Purchaser if there is a material breach by Seller, as determined by the Bankruptcy Court, of the representations and warranties, taken as a whole, or of any material covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Purchaser to Seller of such breach;

(e)    by Seller if any of the conditions to the obligations of Seller to close set forth in Article VIII shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement and such condition is not waived by Seller;

(f)    by Seller if there is a material breach by Purchaser, as determined by the Bankruptcy Court, of the representations and warranties, taken as a whole, or of any material covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Seller to Purchaser of such breach; or

(g)    by Seller or Purchaser if the Bankruptcy Court fails to approve this Agreement and enter the Sale Order by February 15, 2019, subject to Seller's right to extend the date of Closing as provided in the definition of Closing Date.

10.2    **Procedure for Termination**.  If this Agreement is terminated by Purchaser or Seller, or both, pursuant to Section 10.1, written notice thereof shall forthwith be given to the other party and, upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 10.1) the transactions contemplated hereunder shall be abandoned and this Agreement shall terminate to the extent and with the effect provided in Section 10.3, without further action by the parties.

10.3    **Effects of Termination**.  If this Agreement is validly terminated as provided herein, then each party shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to

1516150v16

66204274.2
5903236 v2
66204274.3

any party; provided, however, that (i) the obligations of the parties set forth in Article XI of this Agreement and, to the extent necessary to effectuate the foregoing enumerated provisions, Article I of this Agreement, shall survive any such termination and shall be enforceable in accordance with their terms, and (ii) if this Agreement is terminated as provided herein, each party shall upon request redeliver or destroy as soon as practicable any or all documents, work papers and other material of the other party relating to its business or affairs or the transactions contemplated hereunder, whether obtained before or after the execution hereof, to the party furnishing the same, other than any material which is of public record. Nothing in this Section 10.3 shall relieve the parties of any Liability for a breach of this Agreement prior to the date of termination or alter the right of Seller to retain the Deposit if permitted to do so pursuant to this Agreement. Notwithstanding the foregoing, no attorneys' fees reasonably incurred by a party in connection with the transactions contemplated herein, or out-of-pocket expense reimbursement or other fees, shall be payable to any party upon termination of this Agreement pursuant to Section 10.1.

## ARTICLE XI
## MISCELLANEOUS

11.1    **Assignment; Binding Agreement**.

(a)    Except as set forth in Section 11.1(c), neither this Agreement nor any rights or obligations of a Party hereunder may be assigned or delegated without the other Party's prior written consent. Any purported assignment or delegation without such consent shall be void. Provided, however, Purchaser may assign any or all of its rights under this Agreement, provided that it remains responsible for performance hereunder.

(b)    This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the Parties hereto and to their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights, remedies, obligations, or Liabilities.

(c)    Purchaser shall have the right to assign its rights and obligations under this Agreement including, without limitation, its right to acquire all or any portion of the Assets to its Affiliates, any successor to Purchaser, and/or to its lender if a sale/leaseback transaction is used to finance the transactions contemplated by this Agreement. Notwithstanding any transfer permitted by this Section 11.1(c), Purchaser shall remain liable to Seller with respect to its obligations under this Agreement.

11.2    **Post-Closing Cooperation**.  From time to time after the Closing, Seller will execute and deliver, or cause to be executed and delivered, such documents to Purchaser as Purchaser shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, the transfer of the Assets to Purchaser.  From time to time after the Closing, Purchaser will execute and deliver, or cause to be executed and delivered, such documents to Seller as Seller shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, Purchaser's assumption of the Assumed Liabilities.  From and after the

Closing, Seller shall use its commercially reasonable efforts to deliver to Purchaser all such books, reports and other documents that constitute or relate to Assets (which may be redacted to the extent not relevant to the Assets) as may be requested by Purchaser which were not delivered on or before the Closing Date, and to assist the Purchaser in obtaining any Authorizations not obtained by Purchaser prior to the Closing.

11.3 **Expenses**.  Except as set forth in this Agreement, each Party shall pay the fees and expenses of its respective counsel, accountants, and other experts and shall pay all other expenses incurred by it in connection with the negotiation, preparation, and execution of this Agreement and the consummation of the transactions contemplated hereby.

11.4 **Entire Agreement and Modification**.  This Agreement, including any Exhibits and Schedules attached hereto and thereto and any other documents hereby required to be delivered at the Closing, and any confidentiality agreement previously executed by Seller and Purchaser or Purchaser's Affiliate, constitute the entire agreement between the Parties and supersede all prior discussions, negotiations, or agreements relating to the subject matter of this Agreement.  No changes of, additions to, or other modifications of this Agreement shall be valid unless the same is in writing and signed by the Parties.

11.5 **Severability**.  If any provision of this Agreement shall be determined to be contrary to Law and unenforceable by any Court, the remaining provisions shall be severable and enforceable in accordance with their terms.  To the extent any provision of this Agreement is enforceable in part but not in whole, such provision shall be enforced to the maximum extent permitted by applicable Law.

11.6 **Waiver**.  Any of the conditions to Closing set forth in this Agreement, except for those set forth in Article VI, may be waived at any time prior to or at the Closing hereunder by the Party entitled to the benefit thereof.  Any such waiver shall only be effective if it is in writing and signed by the Party to be charged with such waiver.  The failure of any Party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any other breach of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such Party thereafter to enforce each and every such provision.  No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach or non-compliance.

11.7 **Counterparts**.  This Agreement may be executed in multiple counterparts, by the Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  All signatures of the Parties to this Agreement may be transmitted by email or facsimile, and such email or facsimile of signature will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces and will be binding upon such Party.

11.8 **Headings; Interpretation**.  The table of contents and article and section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

11.9 **Governing Law**. This Agreement shall be construed and interpreted according to the Laws of the State of Mississippi, without regard to the application of the choice of law principles thereof. All of the conveyance documents executed and delivered pursuant to the terms hereof shall be governed by and interpreted according to the Laws of the State of Mississippi, without regard to the application of the choice of law principles thereof.

11.10 **Bankruptcy Court Jurisdiction**.

(a) Purchaser and Seller agree that the Bankruptcy Court shall have exclusive jurisdiction over all disputes, Claims, and other controversies (collectively, "Disputes") and other matters relating to (a) the interpretation and enforcement of this Agreement or any document executed pursuant hereto; (b) the Assets; (c) the Assumed Liabilities and other obligations assumed by the Purchaser under this Agreement; and (d) any obligations surviving Closing, as long as the Bankruptcy Court reserves such jurisdiction, and Purchaser expressly consents to and agrees not to contest such exclusive jurisdiction.

(b) The parties shall jointly request that the Bankruptcy Court reserve jurisdiction to consider Disputes arising under this Agreement even after the closing of the Bankruptcy Case. To the extent allowed under existing and controlling law in the Fourth Circuit as of the Closing Date, the parties consent to the jurisdiction of the Bankruptcy Court to hear all such Disputes and to enter final order with respect to all matters and issues raised therein.

11.11 **Notices**. All notices, requests, demands and other communications hereunder shall be deemed to have been duly given if the same shall be in writing and shall be delivered or sent (a) by personal delivery against a receipted copy, (b) by certified mail, return receipt requested, or (c) by e-mail if the addressee confirms receipt of the e-mail, and addressed as set forth below:

| If to Purchaser to: | If to Seller, to: |
|---|---|
| Progressive Medical Management of Batesville LLC<br>P.O. Box 2547<br>Oxford, MS  38655<br>Attn: Quentin Whitwell | Curae Health, Inc<br>1721 Midpark Road suite B200<br>Knoxville, TN  37921<br>Attention: Steve Clapp, CEO |
| With copies to: | With copies to: |
| Wise Carter Child & Caraway, P.A.<br><br>P.O. Box 651<br>Jackson, MS 39205-0651<br>Attn: Victoria R. Bradshaw | Egerton, McAfee Armistead &<br>Davis, P.C.<br>P.O. Box 2047<br>Knoxville, TN 37901<br>Attention: Stephen McSween, Esq. |

A Party may change the address to which notices hereunder are to be sent to it by giving notice of such change of address in the manner provided above. Any notice delivered personally shall

be deemed to have been given on the date it is so delivered, or upon attempted delivery if acceptance of delivery is refused.

11.12 **Effectiveness**. This Agreement shall be effective only when duly signed by Seller in accordance with the order of the Bankruptcy Court approving the sale to Purchaser.

11.13 **No Third Party Beneficiaries**. Except as otherwise provided herein with respect to the Committee, nothing expressed or referred to in this Agreement will be construed to give any person other than the Parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except as such rights as shall inure to a successor or permitted assignee pursuant to this Agreement.

11.14 **Time Period For Completing Schedules and Exhibits.** Notwithstanding anything herein to the contrary, the Parties shall complete the attached Exhibits and Schedules, as well as any blanks to be filled in, in a mutually satisfactory manner on or before the Closing Date.

*[Signature Page Follows]*

1516150v16

66204274.2
5903236 v2
66204274.3

41

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document     Page 50 of 142

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

SELLER:

Batesville Regional Medical Center, Inc.

By:_____
Print Name: Stephen N. Clapp
Title: President

Batesville Regional Physicians, LLC

By:_____
Print Name: Stephen N. Clapp
Title: President

CURAE:

Curae Health, Inc.

By:_____
Print Name: Stephen N. Clapp
Title: President

*[Signature Page Continued on Next Page]*

1516150v16

66204274.2
5903236 v2
66204274.3

42

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document     Page 51 of 142

*[Cont'd – Signature Page to Asset Purchase Agreement]*

PURCHASER:

Progressive Medical Management of
Batesville LLC

By:_____
Print Name: Dr. Kenneth Williams
Title:  Authorized Signatory

Panola Physicians Group, LLC

By:_____
Print Name: Dr. Kenneth Williams
Title:  Authorized Signatory

1516150v16

43

66204274.2

5903236 v2

66204274.3

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document      Page 52 of 142

## Schedules and Exhibits

| | |
|---|---|
| Schedule 1 | Excluded Assets |
| Schedule 2 | Senior Leadership Team and Managers of the Business and Purchaser's Ultimate Parent Company |
| Schedule 3 | List of Other Businesses |
| Schedule 4 | List of Permitted Encumbrances |
| Schedule 5 | List of Real Property |
| Schedule 6 | Taxes and Assessments |
| Schedule 2.7 | Assumed Contracts |
| Schedule 3.7(b) | Health Care Permits |
| Schedule 3.7(e) | Inspections, Investigations, Audits, Etc. |
| Schedule 3.7(g) | Provider Numbers |
| Schedule 3.7(h) | Reports; Refunds, Overpayments, Discounts or Adjustments; Unresolved Investigations |
| Schedule 3.9 | Intangible Property |
| | |
| Exhibit A | Form of Deed |
| Exhibit B | Form of Seller's Affidavit |
| Exhibit C | Form of Bill of Sale and Assignments |
| Exhibit D | Bid Procedures Order |
| Exhibit E | Transition Services Agreement |

1516150v16

66204274.2

5903236 v2

66204274.3

44

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document    Page 53 of 142

# SCHEDULE 1

## Excluded Assets

"Excluded Assets" means (in addition to and not as a limitation of the definition of Excluded Assets set forth in Section 1.1 of this Agreement) the following assets, properties, interests, and rights of Seller:

(a)     all insurance policies and all rights to proceeds thereunder, including, without limitation, any director or officer insurance policies relating to any matter, event or circumstance occurring on or prior to the Closing Date, except as otherwise provided for in Section 5.10;

(b)     the residual rights in and proceeds of any employee benefits plans;

(c)     all Contracts, Permits, and other assets that require a consent (taking into consideration the provisions of the Bankruptcy Code), to transfer same unless (i) such written consent is obtained and (ii) the Purchaser assumes all liabilities arising thereunder, including all Cure Payments, if applicable (it being understood that Seller shall not be required to obtain or attempt to obtain any such consent);

(d)     all rights or documents relating to any Excluded Liability or other Excluded Asset;

(e)     any rights or remedies provided to Seller under this Agreement and applicable Law and each other document executed in connection with the Closing;

(f)     all rights relating to all applications for grants, subsidies or similar payments filed prior to the Effective Time, including all proceeds of grants awarded (including awards made and/or grant funds provided after the Closing);

(g)     any (i) personnel files for employees of Seller who are not hired by Purchaser; (ii) other books and records that Seller is required by Law to retain; provided, however, that except as prohibited by Law and subject to Article 5, Purchaser shall have the right, at Purchaser's sole expense, to receive or make copies of any portions of such retained books and records that relate to the Business as conducted before the Closing or that relate to any of the Assets; (iii) documents which Seller is not permitted to transfer pursuant to any contractual obligation owed to any third party; (iv) documents primarily related to any Excluded Assets; and (v) documents necessary to prepare tax returns (Purchaser shall be entitled to a copy of such documents referred to in this clause (v)). With respect to documents necessary to prepare cost reports, which shall be specified in writing by the Purchaser, the Purchaser shall receive the original document (to the extent such original can reasonably be located by Seller) and Seller shall be entitled to retain a copy of such documents for any period ending on or prior to the Closing Date;

(h)     all of Seller's deposits and other prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

1516150v16

66204274.2
5903236 v2
66204274.3

45

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document      Page 54 of 142

(i)     any assets disposed of or consumed in the ordinary course of business (except any disposed of or consumed in breach of the provisions of this Agreement) during the period between the date hereof and the Closing Date;

(j)     Seller's minute book and similar corporate records;

(k)     any payments from, and all rights to payments that may become due from, Medicare or Medicaid programs based on adjustments to cost reports covering services prior to the Effective Time, including the Final Cost Reports;

(l)     any Privilege that relates to any Excluded Asset or any Excluded Liability; and

(m)     All funds with respect to the Debtors' self-funded (i) insurance, (ii) benefits, or (iii) similar programs.

1516150v16

66204274.2
5903236 v2
66204274.3

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document      Page 55 of 142

# SCHEDULE 2

## Part 1

## Senior Leadership and Managers of the Business

## Part 2

## Senior Leadership and Managers of Purchaser's Ultimate Parent Company

**SCHEDULE 3**

**Other Businesses**

| *Property Name* | *Location* |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

1516150v16

66204274.2
5903236 v2
66204274.3

# SCHEDULE 4

## Permitted Encumbrances

1516150v16

66204274.2

5903236 v2

66204274.3

**SCHEDULE 5**

**Real Property**

| Address | Parcel No. |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

1516150v16

66204274.2

5903236 v2

66204274.3

50

# SCHEDULE 6

## Taxes and Assessments

1516150v16

66204274.2

5903236 v2

66204274.3

# SCHEDULE 2.7

## Assumed Contracts

**SCHEDULE 3.7(b)**

**Health Care Permits**

1516150v16

66204274.2

5903236 v2

66204274.3

53

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document   Page 62 of 142

# SCHEDULE 3.7(e)

**Inspections, Investigations, Audits, Etc.**

1516150v16

66204274.2

5903236 v2

66204274.3

54

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document    Page 63 of 142

**SCHEDULE 3.7(g)**

**Provider Numbers**

1516150v16

66204274.2

5903236 v2

66204274.3

**SCHEDULE 3.7(h)**

**Reports**


**Refunds, Overpayments, Discounts or Adjustments**


**Unresolved Investigations**

1516150v16

66204274.2

5903236 v2

66204274.3

56

Case 3:18-bk-05665   Doc 662   Filed 01/15/19   Entered 01/15/19 09:02:58   Desc Main
Document   Page 65 of 142

**SCHEDULE 3.9**

**Intangible Property**

1516150v16

66204274.2

5903236 v2

66204274.3

**EXHIBIT A**

**Form of Deed**

1516150v16

66204274.2

5903236 v2

66204274.3

**EXHIBIT B**

**Form of Seller's Affidavit**

**EXHIBIT C**

**Form of Bill of Sale and Assignments**

**EXHIBIT D**

**Bid Procedures Order**

1516150v16

61

66204274.2

5903236 v2

66204274.3

Case 3:18-bk-05665    Doc 662    Filed 01/15/19    Entered 01/15/19 09:02:58    Desc Main
Document    Page 70 of 142

**EXHIBIT E**

**Transition Services Agreement**

1516150v16

66204274.2

5903236 v2

66204274.3

**<u>Exhibit 2</u>**
Revised Panola APA (Redline Version)

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**Batesville Regional Medical Center, Inc.**

**Batesville Regional Physicians, LLC**

**Curae Health, Inc.**

**AND**

**Progressive Medical Management of Batesville LLC**

**Panola Physicians Group, LLC**

**Dated as of ~~November ___, 2018~~January 10, 2019**

1516150v10~~5~~
66204274.2
5903236 v2
66204274.3

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINITIONS ..................................................................... 1

    1.1    Certain Definitions ................................................................... 1

    1.2    Other Definitional and Interpretive Matters .............................. 10

ARTICLE II PURCHASE AND SALE OF ASSETS .................................. 11

    2.1    Sale of Assets ......................................................................... 11

    2.2    Purchase of Assets .................................................................. 11

    2.3    Excluded Liabilities ................................................................ 11

    2.4    Excluded Assets ...................................................................... 12

    2.5    Nonassignable Assets .............................................................. 12

    2.6    Method of Conveyance ............................................................ 12

    2.7    Assumed Contracts ................................................................. 13

    2.8    Assumption of Liabilities ........................................................ 13

    2.9    Taxes and Assessments ........................................................... 13

    2.10    Purchaser's Deposit ............................................................... 14

    2.11    Purchase Price ...................................................................... 14

    2.12    Order of the Bankruptcy Court ............................................... 14

    2.13    Closing ................................................................................. 14

    2.14    Medicare, Medicaid and Commercial Carrier Provider Agreements ................. 15

    2.15    Closing Payments ................................................................... 15

    2.16    Closing Deliveries of Seller ..................................................... 16

    2.17    Closing Deliveries of Purchaser ............................................... 17

    2.18    Further Conveyances and Assumptions ..................................... 17

    2.19    Inventory and Prepaid Expenses .............................................. 18

    2.20    Employee Matters. ................................................................. 18

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ........... 18

    3.1    Corporate Existence and Power of Seller .................................. 18

    3.2    Validity and Enforceability of Agreement .................................. 18

    3.3    Consents; Waivers and Approvals ............................................ 19

    3.4    No Conflict ........................................................................... 19

    3.5    Rights to Acquire Assets ......................................................... 19

Field Code Changed

1516150v1~0~6
66204274.2
66204274.3

-i-

3.6     Title to and Adequacy of the Assets ................................................... 19

3.7     Government Reimbursement Participation; Health Care Law Compliance ........ 19

3.8     Existing Medicare and Medicaid Provider Agreements ..................................... 21

3.9     Intangible Property. ........................................................................... 21

3.10    Hill Burton ........................................................................................... 22

3.11    Medical Staff ....................................................................................... 22

3.12    Compliance with Laws; Permits ............................................................ 22

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER .................... 23

4.1     Corporate Existence of Purchaser .......................................................... 23

4.2     Validity and Enforceability of Agreement .............................................. 23

4.3     Authorization and Authority .................................................................. 23

4.4     No Conflict ........................................................................................... 23

4.5     Ability to Consummate Transaction ...................................................... 24

4.6     Solvency ............................................................................................... 24

4.7     Litigation and Arbitration ..................................................................... 24

4.8     Brokers and Intermediaries ................................................................... 24

ARTICLE V CERTAIN COVENANTS AND AGREEMENTS OF SELLER AND PURCHASER ............................................................................................. 25

5.1     Access and Information .......................................................................... 25

5.2     Authorizations ...................................................................................... 27

5.3     Conduct of Business ............................................................................. 27

5.4     Commercially Reasonable Efforts ......................................................... 29

5.5     Adequacy of Purchaser's Review .......................................................... 29

5.6     Tax Matters .......................................................................................... 29

5.7     Announcement ..................................................................................... 30

5.8     Post-Closing Business Operations Commitment .................................... 30

5.9     Risk of Loss; Casualty Loss ................................................................. 30

5.10    Bankruptcy Actions .............................................................................. 31

5.11    DISCLAIMERS .................................................................................... 31

5.12    Further Assurances ............................................................................... 31

Field Code Changed

| | | |
|---|---|---|
| 5.13 | Confidentiality | 32 |
| 5.14 | Acceptance and Discharge | 33 |
| 5.15 | Cooperation | 33 |
| 5.16 | Surrender of License | 34 |
| 5.17 | Removal of Certain Liens | 34 |
| 5.18 | Insurance | 34 |
| 5.19 | Final Cost Report | 34 |
| ARTICLE VI | CONDITIONS TO PURCHASER'S AND SELLER'S OBLIGATIONS | 34 |
| 6.1 | Entry of the Bid Procedures Order | 34 |
| 6.2 | Entry of the Sale Order | 34 |
| 6.3 | No Injunctions | 35 |
| 6.4 | Compliance with Applicable Law | 35 |
| 6.5 | Consents | 35 |
| ARTICLE VII | CONDITIONS TO PURCHASER'S OBLIGATIONS | 35 |
| 7.1 | Representations and Warranties of Seller | 35 |
| 7.2 | Schedules | 36 |
| 7.3 | Documents | 36 |
| 7.4 | Performance of Obligations | 36 |
| 7.5 | No Changes to Business | 36 |
| 7.6 | Release of Liens | 36 |
| 7.7 | Consents | 36 |
| 7.8 | FIRPTA Affidavit | 36 |
| ARTICLE VIII | CONDITIONS TO SELLER'S OBLIGATIONS | 36 |
| 8.1 | Representations and Warranties of Purchaser | 36 |
| 8.2 | Performance of this Agreement | 37 |
| 8.3 | Payment of Purchase Price and Assumption of Liabilities and Assumed Contracts | 37 |
| 8.4 | Documents | 37 |
| ARTICLE IX | SURVIVAL | 37 |
| 9.1 | Survival | 37 |

Field Code Changed

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE X LIMITED AGREEMENT TERMINATION RIGHTS ......................................... 37

    10.1   Termination of Agreement.......................................................... 37

    10.2   Procedure for Termination ......................................................... 38

    10.3   Effects of Termination ............................................................... 38

ARTICLE XI MISCELLANEOUS ............................................................................... 39

    11.1   Assignment; Binding Agreement............................................... 39

    11.2   Post-Closing Cooperation .......................................................... 39

    11.3   Expenses .................................................................................... 39

    11.4   Entire Agreement and Modification ........................................... 39

    11.5   Severability ............................................................................... 40

    11.6   Waiver........................................................................................ 40

    11.7   Counterparts .............................................................................. 40

    11.8   Headings; Interpretation............................................................. 40

    11.9   Governing Law .......................................................................... 40

    11.10  Bankruptcy Court Jurisdiction ................................................... 40

    11.11  Notices ....................................................................................... 41

    11.12  Effectiveness.............................................................................. 41

    11.13  No Third Party Beneficiaries..................................................... 41_41

    11.14  Time Period For Completing Schedules and Exhibits............................... 42

1516150v106

66204274.2

66204274.3

-iv-

**ASSET PURCHASE AGREEMENT**

This Asset Purchase Agreement (this "Agreement") is made as of the 10th day of November, 2018 January, 2019, by and among Batesville Regional Medical Center, Inc., a Tennessee non-profit corporation (with BRP, "Seller"), Batesville Regional Physicians, LLC, a Tennessee limited liability company ("BRP"), Curae Health, Inc., a Tennessee non-profit corporation ("Curae"), and Progressive Medical Management of Batesville LLC, a Mississippi limited liability company ("PMM") and Panola Physicians Group, LLC, an LLC organized in the state of Mississippi ("PPG" collectively with PMM, "Purchaser") and collectively with PMM, Seller and Curae, the "Parties").

**WITNESSETH:**

WHEREAS, on August 24, 2018, Seller filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court and currently Seller is a debtor-in-possession in its Bankruptcy Case entitled to exercise all the rights and powers provided for in Section 1107 of the Bankruptcy Code;

WHEREAS, Seller presently owns and operates the Hospital, provides hospital services and other health care programs and services at the Hospital; and operates the Other Businesses, and owns the Other Assets;

WHEREAS, Seller desires to sell to Purchaser all right, title, and interest of Seller and its bankruptcy estate in, to, and under the Assets and to assign to Purchaser the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code;

WHEREAS, Purchaser desires to purchase from Seller all right, title, and interest of Seller and its bankruptcy estate in, to, and under the Assets and to assume the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to entry of the Sale Order.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1   **Certain Definitions**.  For purposes of this Agreement, defined terms used herein have the meanings specified in this Section 1.1.

"Action" means any suit, action, Claim, hearing, administrative action, demand, demand letter, Governmental investigation, notice of violation, or proceeding arising out of any violation or alleged violation of any Law or any breach or alleged breach of any Contract or Order.

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Person referred to. In this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of securities, by contract, or otherwise.

"Agreement" means this Agreement, as hereafter amended, supplemented, or otherwise modified.

"Assessed Cost Report Liability" means the aggregate liability as finally determined and assessed by any Healthcare Program arising from any Cost Reports ending prior to the Effective Time.

"Assets" has the meaning ascribed to it in Section 2.1 herein, provided that (whether or not expressly stated) for all purposes of this Agreement, Assets always exclude Excluded Assets.

"Assignment of Lease" has the meaning ascribed to it in Section 2.6.

"Assumed Contracts" has the meaning ascribed to in Section 2.7.

"Assumed Liabilities" has the meaning ascribed to it in Section 2.8(a).

"Authorizations" means all Healthcare Regulatory Consents, Permits, licenses, certificates, grants, or other authorizations of Governmental Authorities.

"Bankruptcy Case" means the case commenced by Seller and its Affiliates under chapter 11 of the Bankruptcy Code, styled *In re Curae Health, Inc et al case #18-05665*, pending before the Bankruptcy Court.

"Bankruptcy Code" means title 11 of the United States Code Section 101, et seq. (11 U.S.C. § 101, *et seq.*).

"Bankruptcy Court" means the United States Bankruptcy Court for the Middle District of Tennessee and, to the extent of the withdrawal of any reference made pursuant to 28 U.S.C. § 157, the United States District Court for the Middle District of Tennessee with jurisdiction over Seller's Bankruptcy Case.

"Bid Procedures Order" means a Final Order of the Bankruptcy Court in substantially the form attached as Exhibit ~~B~~D approving the procedures for the sale of Seller's assets; provided that any modifications thereto must be satisfactory to the ~~Buyer~~Purchaser in its sole discretion.

1516150v1~~0~~6

66204274.2
5903236 v2
66204274.3

"Bill of Sale" has the meaning ascribed to it in Section 2.6.

"Billing Services" has the meaning ascribed to it in ~~Section 2.15~~the Transition Services Agreement between Purchaser and Seller.

"Books and Records" includes, without limitation, books, ledgers, files, reports, records, inventory data, accounts receivable records, accounts payable records, vendor lists, financing records, personnel and payroll records and other business books and records (including without limitation documents), regardless of the form of and the medium on which such books and records are maintained.

"Break-Up Fee" has the meaning ascribed to it in Section 6.1.

"Business" means the Hospital, the services and programs provided thereat, and the Other Businesses.

"Business Day" means any day of the year, other than Saturday or Sunday, on which national banking institutions in Mississippi are open to the public for conducting business and are not permitted, required, or authorized to close.

"Business Confidential Information" has the meaning ascribed to it in Section 5.15(b).

"Business Records" has the meaning ascribed to it in Section 5.1(e).

"Casualty" has the meaning ascribed to it in Section 5.10.

"Claims" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia*, any and all deeds of trust, Liens, mortgages, assessments, security interests, encumbrances, claims, defenses, demands, damages, causes of action, offset rights, setoff rights, recoupment rights, interests, debts, obligations, guaranties, options, commitments, product liability claims (relating to all products sold or produced prior to the Closing), warranty claims, claims of employees or former employees or their beneficiaries or dependents, including but not limited to, severance or termination payments, pension or employee benefit claims, Taxes, all tort or contractual claims and any claims or obligations arising from Environmental Law, whether absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, known or unknown, in law or in equity, including, without limitation, any claims predicated upon any theory of successor liability or any similar theory, and all Liabilities or guaranties of any kind or nature, arising from or in any way connected with any action or inaction of Seller, arising prior to the Closing Date but excluding the Permitted Encumbrances.

"CLIA" means Clinical Laboratory Improvement Amendments (CLIA) of 1988, which are United States federal regulatory standards that apply to all clinical laboratory testing performed on humans in the United States.

"Closing" means the consummation of the transactions contemplated by this Agreement.

1516150v10~~9~~

3

66204274.2

5903236 v2
66204274.3

"Closing Date" means such date following the satisfaction of each Party's conditions to Closing or, where permitted, waiver by each Party of the other Party's conditions to Closing as set forth in Articles VI, VII and VIII to this Agreement, as shall be selected by the Parties, but in no event later than ~~February 1, 2019~~ March 1, 2019, or such later date as the Parties may in writing agree; provided that if the Closing shall not have occurred by such outside date and this Agreement shall not have been terminated in accordance with its terms by Purchaser based on an uncured material breach hereunder by Seller, then Seller shall have the right to extend the outside closing date for an additional sixty (60) days.

"CMS" means the Centers for Medicare & Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means the Official Committee of Unsecured Creditors established in the Bankruptcy Case.

"Committee Parties" means the Committee, the Committee's successors, any estate representative, any liquidating trust relating to the Seller and each of their respective professionals.

"Contract" means any contract, agreement, arrangement, understanding, lease, indenture, note, bond, evidence of indebtedness, license, sublicense, undertaking, binding commitment or instrument, or purchase order entered into or made by or on behalf of Seller in connection with the Business.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Court" means any court, administrative or regulatory body, Government agency, arbitration or mediation panel or similar body.

"Cure Payments" means the amounts, if any, determined by the Bankruptcy Court to be necessary to cure defaults, if any, under each Assumed Contract.

"Data Room" has the meaning ascribed to it in Section 1.2(a)(viii) herein.

"Deed" has the meaning ascribed to it in Section 2.6.

"Debtors" mean Curae Health, Inc., Amory Regional Medical Center, Inc., Batesville Regional Medical Center, Inc., Clarksdale Regional Medical Center, Inc., Amory Regional Physicians, LLC, Batesville Regional Physicians, LLC, and Clarksdale Regional Physicians, LLC.

"Deposit" has the meaning ascribed to it in Section 2.10(a).

~~"DMA" has the meaning ascribed to it in Section 2.15.~~

4

1516150v10 6

66204274.2
5903236 v2
66204274.3

"<u>Dispute</u>" has the meaning ascribed to it in Section 11.10(a)

"<u>Effective Time</u>" means the effective time of the Closing, which shall be as of 12:00:01 a.m. prevailing Eastern Time, on the day of the Closing Date.

"<u>Environmental Law</u>" means any federal, state or local statute, law, regulation, code, ordinance, or rule of common law currently in effect relating to the protection or pollution of the environment or natural resources, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 *et seq.*), the Clean Water Act (33 U.S.C. § 1251 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*) the Toxic Substances Control Act (15 U.S.C. § 2601 *et seq.*), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 *et seq.*), The Medical Waste Tracking Act (42 U.S.C. § 6992 *et seq.*), the Oil Pollution Act (33 U.S.C. § 2701 *et seq.*), the Emergency Planning and Community Right to Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), and the Occupational Safety Health Act (29 U.S.C. § 651 *et seq.*).

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974.

"<u>Excluded Assets</u>" means: (1) all accounts receivable of Seller and all other rights to receive payment for goods or services provided prior to the Effective Time; (2) all bank accounts, cash and cash equivalents, marketable securities and other investments of Seller; (3) any rights, Claims, counterclaims, third party Claims or causes of action of Seller against any Person and any actions under Chapter 5 of the Bankruptcy Code, including, without limitation, under Sections 510, 542, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code; (4) all claims and/or causes of actions that Seller has brought and/or may bring against any Person relating to any Excluded Asset and/or Excluded Liabilities, including, without limitation, all claims and/or causes of action that Seller may bring against (i) any current or former director, officer, employee, professional or consultant of Seller; (ii) against CHS and any of its affiliates, employees or agents and (iii) against any pre-petition lenders of Seller; and (5) all those assets of the Seller that are set forth on Schedule 1 attached hereto.

"<u>Excluded Liabilities</u>" means each and every Liability, obligation, debt, or commitment of the Business or Seller, as principal, or a successor of any kind or nature (provided Seller shall take no action causing or resulting in Purchaser being deemed to be a successor owner or operator of the Business for purposes of any Environmental Law), whether absolute or contingent, accrued or unaccrued, asserted or unasserted, known or unknown, liquidated or unliquidated, due or to become due, or otherwise, other than the Assumed Liabilities.

"<u>Excluded Records</u>" means (a) any materials about employees, disclosure of which would violate Law, (b) any materials that are subject to a Privilege or requirement to maintain confidentiality or (c) any Patient Records but only to the extent access to Patient Records is prohibited by Law.

"Exhibits" means the exhibits provided for and referred to in this Agreement.

"Final Cost Report Liability" means the amounts necessary, if any, to satisfy liability incurred as a result of the filing of any Cost Report including, without limitation, the Assessed Cost Report Liability.

"FIRPTA" means the Foreign Investment in Real Property Tax Act.

"Government" or "Governmental" means or refers to the United States of America, any other nation or sovereign state, any federal, bilateral or multilateral governmental authority, state, possession, territory, county, district, city or other governmental unit or subdivision, and any branch, agency, or judicial body of any of the foregoing.

"Governmental Authority" means (i) any federal, state, county, municipal or other local Government or gGovernmental authority, including, without limitation, any regulatory or administrative agency, commission, department, board, bureau, agency, instrumentality or Court and (ii) any arbitrator or arbitral body of any Government.

"Health Care Laws" means, all applicable laws of any Governmental Authority regulating health services or payment, including, but not limited to, the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Stark Law (42 U.S.C. § 1395nn), the Anti-Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the exclusion laws (42 U.S.C. § 1320a-7), the civil monetary penalty laws (42 U.S.C. § 1320a-7a), the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. §§ 1320d-1320d-8), the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the Social Security Act), the Food, Drug and Cosmetic Act (21 U.S.C.§§ 301 et seq.), the Prescription Drug Marketing Act of 1987, the Deficit Reduction Act of 2005, the Controlled Substances Act (21 U.S.C. §§ 801 et seq.), the regulations promulgated pursuant to such laws, and any other law, regulation, guidance document, manual provision, program memorandum, opinion letter, or other issuance of any Governmental Authority with legally binding effect which regulates kickbacks, patient or program charges, recordkeeping, claims process, documentation requirements, medical necessity, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded from government health care programs, quality, safety, privacy, security, pharmacy practice, licensure, accreditation or any other aspect of providing health care.

"Healthcare Programs" shall have the meaning set forth in Section 3.8 of this Agreement.

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Authority as shall be required to be obtained by such party in order for such party to consummate the transactions contemplated of it by this Agreement in compliance with all applicable Law relating to health care or healthcare services of any kind, to the extent necessary, under or through CLIA, CMS, DEA, and any other approvals, authorizations, waivers,

66204274.2
5903236 v2
66204274.3

Orders, licenses, or Permits of any Governmental Authority required to consummate the transactions contemplated hereby and for Purchaser to operate the Business.

"Hospital" means the hospitals operated by Batesville Regional Medical Center, Inc. located in Panola County, Mississippi, known as Panola Medical Center and Panola Medical Center West and operated in connection with the Business.

"Knowledge" means (a) as to Seller, the actual knowledge, after due inquiry, of those senior leadership team members of the Business listed on part 1 of Schedule 2 and (b) as to Purchaser, the actual knowledge, after due inquiry, of the senior leadership team members of Purchaser's ultimate parent company listed on Part 2 of Schedule 2.

"Law" means any statute, law, code, treaty, ordinance, rule, regulation, instrument, directive, decree, agreement, policy, Order, consent decrees and consent orders, or injunction of or with any Government, Governmental Authority, quasi-Governmental Authority, or Court, and includes, without limitation, all judicial and administrative interpretations thereof, and all rules or regulations of any regulatory or self-regulatory authority compliance with which is required by Law.

"Liabilities" means debts and liabilities, whether known or unknown, contingent or absolute, liquidated or unliquidated, and whether or not required to be reflected on the financial statements of a business, whether arising under any Contract, Law, Lien, Order or otherwise.

"Lien" means any lien, security interest, mortgage, deed of trust, option, lease, tenancy, occupancy, covenant, condition, easement, agreement, royalty, pledge, hypothecation, charge, claim or other encumbrance.

"Nonassignable Asset" shall have the meaning set forth in Section 2.5 of this Agreement.

"Mississippi Regulations" means the Mississippi General Statutes as well as the rules and regulations imposed by the Mississippi ~~Division~~Department of Health ~~Service Regulation.~~.

"Order" means any order, judgment, writ, injunction, award or decree of any Court or Governmental Authority.

"Ordinary Course of Business" means with respect to the Business, the ordinary course of commercial operations customarily engaged in by the Business reasonably consistent with past practices.

~~"Other Assets" means and refers to [TBD].~~

"Other Businesses" means the outpatient, ancillary, and other healthcare businesses incident to the operation of the Hospital set forth in Schedule 3 attached hereto, including, without limitation, ~~[REFERENCE TO PSYCHIATRIC UNIT],~~the behavioral health

1516150v10~~9~~
66204274.2
5903236 v2
66204274.3

services offered by the Hospital in the Panola Medical Center West building located at 155 Keating Road, Batesville, Mississippi, including inpatient and outpatient adult psychiatric and chemical dependency services and the professional outpatient services provided by BRP.

"Patient Records" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996 and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, including, without limitation, Medicare and Medicaid provider/supplier numbers, National Provider Identifier, and agreements, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Authority.

"Permitted Encumbrances" means (i) the Assumed Liabilities and other obligations assumed by Purchaser under this Agreement, (ii) those Liens or exceptions listed on or described in Schedule 5.4 attached hereto, and (iii) Liens imposed pursuant to any Assumed Contract.

"Permitted Parties" has the meaning ascribed to it in Section 5.1(e).

"Person" means any natural person, any corporation, partnership, limited liability company, limited liability partnership, joint venture, trust, association, company, or other legal entity, and any Government or Governmental Authority.

"Privilege" means the attorney-client privilege (including the common interest privilege) or the attorney work product doctrine.

"Privileged Materials" means any materials that are protected by or the subject of a Privilege.

"Provider Agreements" means Seller's existing provider agreements with the Medicare and Medicaid programs.

"Purchased Intellectual Property Licenses" means those licenses of the Seller included within the Assets.

"Purchase Price" has the meaning ascribed to it in Section 2.1211(a).

"Purchaser" has the meaning set forth in the Preamble to this Agreement.

"Real Property" means each parcel of real property included in the Assets, including, without limitation, all rights of way, easements, facilities and other improvements and fixtures thereon and appurtenances thereto and all rights associated therewith, to the extent owned or leased by Seller, as set forth in Schedule 6.5 attached hereto.

1516150v106

8

66204274.2
5903236 v2
66204274.3

"Relating to" means arising from, in connection with or otherwise relating to. "Relates to" and "relate to" have corresponding meanings.

"Sale Hearing" means the hearing(s) on the Sale Motion held before the Bankruptcy Court.

"Sale Motion" means the Debtor's Motion for (I) an Order (A) Establishing Bid Procedures Related to the Sale of the Debtor's Assets, (B) Scheduling a Hearing to Consider the Proposed Sale and Approving the Form and Manner of Notice Thereof, (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, and (D) Granting Related Relief, and (II) an Order (A) Approving the Proposed Sale, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief filed on November —,6, 2018 [Docket No. ___].

"Sale Order" has the meaning ascribed to it in Section 6.1.2.

"Schedules" means the schedules provided for and referred to in this Agreement.

"Seller" has the meaning set forth in the Preamble to this Agreement.

"Seller's Affidavit" has the meaning ascribed to it in Section 2.6.

"Seller's Confidential Information" has the meaning ascribed to it in Section 5.1513(a).

"Survey" has the meaning ascribed to it in Section 2.19.

"Tax" or "Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes under Section 4979 of the Code, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Taxing Authority" means any Government or Governmental Authority responsible for the imposition or collection of any Tax.

"Title Company" has the meaning ascribed to it in Section 2.19.means

"Title Report" has the meaning ascribed to it in Section 2.19.

"Transferred Business Records" has the meaning ascribed to it in Section 5.1(f).

"<u>Transfer Taxes</u>" means all excise, sales, use, transfer (including Real Property transfer or gains), value added, stamp, documentary, filing, recording and similar Taxes and fees which may be imposed or assessed as a result of the transactions effected pursuant to this Agreement together with any interest, additions, penalties with respect thereto and any interest in respect of such additions or penalties. Income taxes do not constitute Transfer Taxes.

1.2     **Other Definitional and Interpretive Matters**.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Periods. When calculating the period before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars. Any reference in this Agreement to "$" means United States dollars.

(iii)     Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)     Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)     Including. The word "including" means "including, without limitation," and "includes" and "include" have corresponding meanings, and such words shall not be construed to limit any general statement to the specific or similar items or matters immediately following it.

(viii)   Made Available to Purchaser.   The phrase "made available to Purchaser" means, for all purposes of this Agreement, made available to Purchaser through posting in Seller's electronic data room (the "Data Room"), via email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

(b)      No Construction Against Drafter.   No presumption, burden of proof, burden of persuasion or similar method of interpretation or standard shall arise or otherwise apply favoring or disfavoring any Party (including, without limitation, the draftsperson) by virtue of the authorship of any one or more provisions of this Agreement, including in any arbitration or litigation proceeding.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1      **Sale of Assets**.   At the Closing and as of the Effective Time but in all events subject to the approval of the Bankruptcy Court by and through the Sale Order, Seller agrees, upon and subject to the terms and conditions hereinafter set forth, to sell, transfer, convey, assign and deliver or cause to be sold, transferred, conveyed, assigned and delivered to Purchaser, all right, title and interest of Seller and Seller's bankruptcy estate in, to and under all of the assets and properties and associated rights and interests, real, personal and mixed, tangible and intangible, of whatever kind, owned by Seller or Seller's Affiliates (no matter where located, including without limitation, on leased property) including, without limitation, all of the assets and properties used in or related to the Hospital, the Business including the eight (8) acre parcel adjacent to the Hospital Property, and the Other AssetsBusiness, but excluding the Excluded Assets (collectively, after excluding the Excluded Assets, the "Assets").   The Assets shall include, to the extent transferrable, all Patient Records (Seller and its representatives shall continue to have access to all Patient Records as necessary to respond to governmental or other inquiries or issues, to defend malpractice claims, and for other reasonable legitimate reason upon request) but excluding any Excluded Documents.   The Assets shall also include all of Seller's membership interests in Mississippi LTAC Holdings, LLC, a Delaware limited liability company, ("LTAC Holdings"), and Mississippi Alzheimer Holdings, LLC, a Delaware limited liability company ("Alzheimer Holdings").   None of the Excluded Assets will be conveyed to Purchaser.

2.2      **Purchase of Assets**.   Purchaser agrees to purchase the Assets upon and subject to the terms, conditions and provisions set forth herein and pursuant to the terms in the Sale Order.

2.3      **Excluded Liabilities**.   Except for the Permitted Encumbrances, the Assets shall be transferred pursuant to the Sale Order and Section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances.

(a)      Purchaser shall not assume, satisfy, discharge, or otherwise be responsible for any Excluded Liabilities.   Purchaser shall at the Closing, assume the Assumed Liabilities pursuant to the terms of Section 2.8 of this Agreement.

66204274.2
5903236 v2
66204274.3

(b)     Purchaser shall not assume, satisfy, discharge, or otherwise be responsible for any Liabilities of Seller related to any pension or retirement plans or programs.

(c)     Subject to, and consistent with the Sale Order, Purchaser shall not be responsible for any Liabilities of Seller related to Seller's participation in the Healthcare Programs, including any liability or obligation for overpayments, recapture, recoupment, or set off for previously paid or reimbursed amounts.

(d)     The Parties hereto further agree that, as between Purchaser and Seller, all the Excluded Liabilities shall remain the sole, exclusive obligation and responsibility of Seller.

(e)     Notwithstanding the foregoing, Purchaser shall be responsible for all Liabilities applicable to and incurred with respect to the period after the Effective Time that relate to the Business, the Hospital or Purchaser's post-Closing ownership or operation of the Assets; provided, however, that no statement made in this Agreement shall be deemed to allocate or attribute any Liability or obligation to Purchaser which has been released pursuant to the Sale Order.  To the extent this Section 2.3(e) conflicts with any other provision of this Agreement, this Section 2.3(e) controls.

2.4     **Excluded Assets**.  Nothing herein contained shall be deemed to obligate Seller to sell, transfer, assign, or convey any Excluded Asset, as described on Schedule 1, to Purchaser. The Seller shall retain all right, title, and interest to, in and under the Excluded Assets. To the extent this Section 2.4 conflicts with any other provision of this Agreement, this Section 2.4 controls.

2.5     **Nonassignable Assets.**  To the extent that the assignment of any Asset shall require the consent of any other party and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset") nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained.

2.6     **Method of Conveyance**.  The sale, transfer, conveyance, assignment, and delivery by Seller of the Assets to Purchaser hereunder shall be effected on the Closing Date by delivery by Seller of: (a) an ~~assign~~strument of ~~deed~~conveyance, substantially in the form of Exhibit A, conveying to Purchaser all right, title, and interest of Seller in and to the Real Property, such title to be free and clear of all Liens pursuant to Section 363 of the Bankruptcy Code, except for Permitted Encumbrances (the "Deed"); (b) an affidavit of Seller, which shall be to Seller's Knowledge, issued to Purchaser and to the Title Company (if Purchaser elects, at Purchaser's sole cost and expense, to obtain title insurance), substantially in the form of Exhibit B ("Seller's Affidavit"), if necessary; and (c) assignments(s) and bill(s) of sale and such other instruments of conveyance in the form of Exhibit C (collectively, "Bill of Sale") conveying all right, title, and interest of Seller in all Assets that comprise tangible or intangible personal property, including separate assignment(s) of any U.S. trademark registrations and applications, if any, included within the purchased intellectual property in a form suitable for recording with

1516150v10~~6~~
66204274.2
5903236 v2
66204274.3

the U.S. Patent and Trademark Office, all to the fullest extent permitted by Law, free and clear of any and all Liens, except for Permitted Encumbrances.

2.7 **Assumed Contracts**. On and after the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their terms, all obligations (i) arising after the Effective Time with respect to executory contracts and unexpired leases identified on Schedule 2.7 (the "Assumed Contracts"). Purchaser shall be responsible for all Cure Payments with respect to the Assumed Contracts, which Cure Payments shall be paid by Purchaser at the Closing, or upon the entry of a Court Order determining any disputed Cure Payments. Except for the Assumed Contracts, Purchaser shall not assume and shall not be responsible for any of Seller's contracts or leases.

2.8 **Assumption of Liabilities**.

(a) As of the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their respective terms: (i) all Cure Payments; (ii) all Liabilities arising under Section 2.14; and (iiand (ii) all Liabilities of the Hospital or the Business (the "Assumed Liabilities") accruing from and after the Effective Time incurred in connection with or otherwise relating to the Assets or the Business.

(b) Notwithstanding anything to the contrary in this Agreement, (i) Purchaser shall consult with Seller and the Committee with respect to the terms of the assumption of the Assumed Contracts provided that Purchaser shall not modify any terms thereof without the prior written consent of Seller and the Committee if such modification would be or could reasonably be expected to be adverse to Seller in any respect, and (ii) the rights of each of Seller and the Committee to object to such terms are expressly preserved and reserved. In addition, the rights of the Committee to object to any assumption of Assumed Contracts is expressly preserved and reserved as to any assumption that the Committee reasonably concludes is not in the best interests of the Debtors or the Debtor's' estate, including any assumption that may or will discharge the obligations of a counterparty with respect to preferences.

(c) Debtor shall not assume any contracts and/or assign any contracts to Purchaser unless Purchaser agrees.

2.9 **Taxes and Assessments**. The Liability for payment of accrued but unbilled or unpaid Taxes (including, but not limited to, real estate taxes, personal property tax, ad valorem tax and similar non-income Taxes) and other assessments relating to, or arising out of the ownership or transfer of, the Assets or the Assumed Contracts (including, but not limited to any water, sewer and other municipal charges owed to any Governmental Authority), imposed on a periodic basis beginning before and ending after the Effective Time or as a result of the consummation of the transactions evidenced by this Agreement or otherwise, shall be paid by Seller at the Closing, provided that Seller has received at Closing the purchase pricePurchase Price required to be paid by Purchaser pursuant to this Section 2.11. All Taxes and other assessments shall be listed on Schedule 76, which shall be prepared and delivered at Closing. If any Taxes or other assessments paid by Seller at any time on or prior to the Closing Date are attributable in whole or in part to any period following the Closing, then the Purchase Price

1516150v10v6

66204274.2
5903236 v2
66204274.3

payable at Closing shall be increased to adjust for the prior payment of such Taxes and assessments by Seller attributable to the post-closing period.

2.10 **Purchaser's Deposit**.

(a) Upon entry of the Bid Procedures Order, Purchaser shall pay to Seller a deposit in the amount of $150,000 (the "Deposit") to be held in escrow by Seller or Seller's agent in accordance with the terms of this Agreement.

(b) Upon entry of the Sale Order, Seller and Purchaser shall have the obligation to consummate the Closing pursuant to and subject to the terms of this Agreement and the Sale Order. If Purchaser fails to consummate the purchase of the Assets on or before March 1, 2019 (unless such failure arises from Seller's uncured material breach and unless Seller, in consultation with the Committee, and Purchaser agree to extend such deadline in writing), Seller, in consultation with the Committee, is authorized but not required to effect the sale of the Assets to one or more third parties as soon as is commercially reasonable subject to further Orders of the Bankruptcy Court. If Purchaser fails to consummate the purchase of Assets hereunder through no fault of its own or as a result of final due diligence efforts being different than as relayed to Purchaser at the time of this Agreement, Seller shall not consummate any transaction unless the Deposit is repaid to Purchaser. If Purchaser fails to consummate the transaction as a result of Purchaser's uncured material default, the entire Deposit and all accrued interest thereon will be retained by Seller.

2.11 **Purchase Price**.

(a) In consideration of the sale, transfer, conveyance, and assignment of the Assets to Purchaser, Purchaser shall at Closing: (i) assume the Assumed Liabilities, (ii) pay or deliver to Seller cash by wire transfer of immediately available funds in the amount of $2,500,000 (the "Cash Purchase Price"); (iii) assume the liabilities described in Sections 2.7 and 2.8 on the terms contained therein; (iv) make the Cure Payments; (v) pay the amount required under Section 2.9; (vi) pay the amount required under Section 2.19; and (vii) pay all Transfer Taxes due in connection with the closing of the transactions contemplated herein (collectively, the "Purchase Price").

(b) The Parties agree to report this transaction for federal, state, and local Tax purposes consistently and in accordance with this Section 2.11.

2.12 **Order of the Bankruptcy Court**. Seller and Purchaser shall take all reasonable steps and use all reasonable efforts necessary or appropriate in order (a) to obtain the Sale Order from the Bankruptcy Court authorizing the Seller to sell the Assets to the Purchaser; and (b) to consummate the transactions contemplated by the Sale Order.

2.13 **Closing**. The Closing shall take place at 10:00 a.m., prevailing Central Time, on the Closing Date at the offices of Seller's bankruptcy counsel, or at such other time and place as the Parties may agree in writing. The Closing shall be deemed to have occurred and to be

1516150v10v9

66204274.2
5903236 v2
66204274.3

14

effective as between the parties as of the Effective Time.  Seller will own, control the management of, and operate the Business until immediately prior to the Effective Time.

2.14    **Medicare, Medicaid and Commercial Carrier Provider Agreements**.  Purchaser shall seek to have assigned to Purchaser all current and valid provider contracts of Seller with the Medicare, Medicaid, TRICARE and Commercial programs, including, without limitation, the Provider Agreements, subject to the Government's and Commercial Carriers approval of Seller's assignment and Purchaser's assumption thereof.   Seller shall provide Purchaser with information and other assistance as may be reasonably requested by Purchaser with respect to its request to assume the Provider Agreements. ~~Purchaser shall be solely liable for any and all amounts that are or may become due in connection with the assignment of such Provider Agreements.~~

(a)    Upon the Effective ~~Date~~Time, to the extent permitted by applicable laws and subject to execution of ~~an Operations Transfer~~the Transition Services Agreement ~~(the "OTA")~~ in all respects satisfactory to Purchaser, Seller, Midcap Funding IV Trust, and the Official Committee of Unsecured Creditors (the "Committee"), Purchaser may use Seller's National Provider Identifier and Medicare/Medicaid provider/supplier numbers and provider/supplier agreements to submit claims to the Part A and Part B Medicare Administrative Contractor and the Mississippi Department of Medicaid, (the "Payors") for health care services provided after the Effective Date (the "Billing Services").   Purchaser and a credit-worthy entity acceptable to the Seller and the Committee will indemnify and hold harmless the Seller and its bankruptcy estate from any and all claims, demands and liabilities of any kind or nature arising from or relating to the ~~OTA~~Transition Services Agreement, including, without limitation, the Purchaser's use of the Seller's provider agreements and numbers.

(b)    Seller agrees not to take any action to change its EFT/bank account information used by Payors to deposit monies to be paid as a result of the Billing Services (any such monies deposited to be referred to herein as a "Payment").  Seller acknowledges and agrees that any Payments deposited into the Seller's bank account for Billing Services for services provide~~d~~s after the Effective ~~Date~~Time shall be the property of Purchaser, subject to the Seller's right to setoff or recoup any amounts owed by the Purchaser under this Agreement.

(c)    In the event Seller receives notice of any adjustment to any Payments related to Billing Services, Seller agrees to inform Purchaser and send a copy of such notice to Purchaser by overnight mail or electronic transmission no later than three (3) business days after receipt of such notice.

(d)    Whenever a Payor sends ~~other~~ notice to or requests information from Seller regarding a claim for services rendered after the Closing Date, Seller shall send a copy of such notice or inform Purchaser of such request by overnight mail or electronic transmission no later than three (3) business days after receipt of such notice or request.

2.15    **Closing Payments**.  No later than five (5) Business Days prior to the Closing Date, Seller shall provide to Purchaser, in writing, Seller's calculation of the Closing payments due as of the Effective Time based on the payment of the Purchase Price, as set forth in Section

2.12, and the estimated apportionment of Taxes and assessments. If within three (3) Business Days following receipt of such calculation, Purchaser has not given Seller written notice of its good faith objection to Seller's calculations, then the transaction shall close based on Seller's calculations. If Purchaser gives such notice of objection, then the Parties will work together in good faith to resolve the estimated apportionment of Taxes and assessments provided that if they are unable to agree, the Parties shall close and the disputed amount shall be appropriately escrowed.

2.16 **Closing Deliveries of Seller**. At the Closing, in addition to any other documents, assignments, certificates, letters, orders, or agreements described in Section 2.6 or otherwise required to be delivered pursuant to the terms of this Agreement, and the satisfaction of all the conditions set forth in Articles VI and VIII, Seller shall deliver to Purchaser the following:

(a) copies of the resolutions of all corporate bodies of Seller necessary to authorize the transactions contemplated hereby, authorizing the sale of the Assets and the execution and delivery of this Agreement by Seller and the consummation by Seller of the transactions contemplated hereby, certified by the Secretary or an Assistant Secretary of Seller;

(b) a true and complete copy of the certificate of incorporation of Seller, certified by the State of ~~Mississippi~~Tennessee, a true and complete copy of the bylaws of Seller, certified by an authorized officer, and a certificate of good standing of Seller from the State of ~~Mississippi~~Tennessee, together with a certificate by the Secretary or Assistant Secretary of Seller that the certificate of incorporation of Seller has not been amended since the date of the certification by the State of ~~Mississippi~~Tennessee described above and that nothing has occurred since the date of issuance of the certificate of good standing that would adversely affect Seller's corporate existence or good standing;

(c) certificates from the Secretary or Assistant Secretary of Seller as to the incumbency and signatures of each officer of Seller executing this Agreement and any other documents required under this Agreement;

(d) a certified copy of the final, non-appealable Sale Order authorizing and ratifying the execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated hereby;

(e) a certificate of an officer of Seller certifying to Purchaser (a) compliance in all material respects with Seller's covenants set forth in this Agreement, (b) that all of the conditions contained in Articles VI and VII have been satisfied except those, if any, waived in writing by ~~Seller~~Purchaser, and (c) that all of the representations and warranties set forth in Article III and the matters set forth in the Schedules are true and correct in all material respects as of the Closing Date;

(f) a duly executed Seller's Affidavit in a form acceptable to the Title Company;

(g) a duly executed FIRPTA Affidavit; ~~and~~

66204274.2
5903236 v2
66204274.3

(h)     a transition services agreement, substantially in the form attached hereto as Exhibit E (the "Transition Services Agreement"), duly executed by Curae; and

(h)(i)     copies of Seller's most recent Cost Reports as filed with the Medicare and Medicaid programs.

2.17     **Closing Deliveries of Purchaser**.     At the Closing, in addition to any other documents otherwise required to be delivered by Purchaser pursuant to the terms of this Agreement and the satisfaction of all other conditions set forth in Articles VI and VII, Purchaser shall deliver to Seller the following:

(a)     the payment of the Cash Purchase Price, by wire transfer of immediately available funds, pursuant to Section 2.1211 herein;

(b)     a true and complete copy of Purchaser's organizational documents and, if applicable, a certificate of good standing of Purchaser from the State of Mississippi, together with a certificate by an authorized officer of Purchaser that the certificate of formation of Purchaser has not been amended since the date of the certification described above and that nothing has occurred since the date of issuance of the certificate of good standing that would adversely affect Purchaser's existence or good standing;

(c)     certificates from an authorized officer of Purchaser as to the incumbency and signatures of each officer of Purchaser executing this Agreement and any other documents required under this Agreement;

(d)     a certificate of an officer of Purchaser certifying to Seller (a) compliance in all material respects with Purchaser's covenants set forth in this Agreement, (b) that all of the conditions contained in Articles VI and VII have been satisfied except those, if any, waived in writing by Purchaser, and (c) that all of the representations and warranties set forth in Article IV are true and correct in all material respects as of the Closing Date; and

(e)     the Transition Services Agreement, duly executed by Purchaser (or an Affiliate of Purchaser); and

(e)(f)     copies of the resolutions of all corporate bodies of Purchaser necessary to authorize the transactions contemplated hereby, authorizing the purchase of the Assets and the execution and delivery by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby, certified by an authorized signatory of Purchaser.

2.18     **Further Conveyances and Assumptions**.     From time to time following Closing, each Party shall, and shall cause their respective Affiliates to execute, acknowledge, and deliver all such further conveyances, notices, assumptions, releases, and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate (i) to assure fully to Purchaser and its successors and permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers, and privileges intended to be conveyed to Purchaser under this Agreement and (ii) to assure fully to Seller and its successors and permitted assigns, the

assumption of the Assumed Liabilities and other obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated herein. Without limiting the generality of the foregoing, if Seller receives any Assets or payments related to the Assets after the Closing Date, it will promptly turn over same to Purchaser.

2.19 **Inventory and Prepaid Expenses**. Seller has prepared and delivered to Purchaser a balance sheet of the Hospital as of ~~September 30~~December 31, 2018, which includes an amount for inventory and prepaid expenses (the "Inventory and Prepaid Expenses"). In addition to the Purchase Price, Purchaser shall pay or deliver to Seller cash by wire transfer of immediately available funds in the amount of the Inventory and Prepaid Expenses.

2.20 **Employee Matters**. As of the Effective Time, Purchaser shall hire substantially all of the employees of Seller, working at or for the Hospital and shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their respective terms all obligations ~~of~~owed to employees of Curae and/or Seller in connection with their employment at the Hospital prior to the Closing Date for~~:~~ accrued ~~bonus or other incentive compensation, deferred compensation, severance pay, change in control, retention, salary continuation,~~ sick leave, vacation pay, leave of absence, and paid time off, ~~loan, educational assistance, legal assistance, and~~benefits accrued for future use and, in addition to the foregoing, any other material fringe benefit plan, program, agreement or arrangement expressly assumed hereunder by Purchaser.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby makes the following representations and warranties, subject to any exceptions included in Seller's Disclosure Schedule:

3.1 **Corporate Existence and Power of Seller**. Seller is a non-profit corporation duly organized, validly existing, and in good standing under the laws of the State of ~~Mississippi~~Tennessee. Subject to the provisions of the Bankruptcy Code, the Seller has the corporate power to enter into this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby. Seller has all necessary power and authority to enter into this Agreement and all other documents that the Seller is required to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

3.2 **Validity and Enforceability of Agreement**. Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes a legal, valid, and binding obligation of Purchaser, this Agreement constitutes, and all documents required to be executed and delivered at Closing by Seller hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Seller, enforceable against it in accordance with their respective terms, subject to general principles of equity.

3.3    **Consents; Waivers and Approvals**.  Except for the approval of the Bankruptcy Court as required by Section 363 of the Bankruptcy Code and approvals relating to the Healthcare Regulatory Consents, no consent, waiver, approval, authorization, license or order of, registration or filing with, or notice to, any Governmental Authority or any other Person is necessary to be obtained, made or given by Seller in connection with the execution and delivery of this Agreement, the performance by Seller of its obligations hereunder or the consummation by Seller of the transactions contemplated hereby.

3.4    **No Conflict**.  Subject to the issuance of the Sale Order and approvals relating to the Healthcare Regulatory Consents and the transfer of the Provider Agreements, the execution and delivery by Seller of this Agreement and the other agreements, documents and instruments required to be executed and delivered by Seller pursuant to this Agreement and the consummation by Seller of the transactions contemplated hereby or thereby, and compliance by Seller with any of the provisions hereof or thereof, will not:

(a)    conflict with or result in a breach of any provision of any organizational document of Seller; or

(b)    violate (with or without the giving of notice or the lapse of time or both) any Law or any Order to which Seller, the Assets, or the Business is subject to.

3.5    **Rights to Acquire Assets**.  Except for Ordinary Course of Business transactions involving the disposition of personal property that are not, individually or in the aggregate, material to the Seller, there are no agreements, options, or other rights to which Seller is a party pursuant to which a Claim exists that Seller is, or may become, obligated to sell or grant any Lien in any of the Assets.  Notwithstanding the foregoing, Seller acknowledges and agrees that the Assets shall be transferred pursuant to the Sale Order and Section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances other than the Permitted Encumbrances.

3.6    **Title to and Adequacy of the Assets**.  Seller owns each of the Assets and, subject to the approval of this Agreement by the Bankruptcy Court, title to the Assets will be transferred free and clear of any Liens by Order of the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code, except for Permitted Encumbrances.  The Assets and the Real Property comprise all items used in the operation of the Hospital and the Business except for (i) Contracts that require consents to the transfer of Contracts made available to Purchaser prior to the date hereof that have not been obtained, (ii) Authorizations that are not transferrable or not transferrable without a consent that has not been obtained, and (iii) the Provider Agreements.

3.7    **Government Reimbursement Participation; Health Care Law Compliance**.

(a)    To the Knowledge of Seller, Seller's operation of the Business is and, during the three (3) year period prior to the Closing Date, has been in substantial compliance with all Health Care Laws.  Seller has not received notice of, and there are no pending or, to the Knowledge of Seller, threatened legal proceedings relating to violations by Seller of any Health Care Law.

(b)     Schedule 3.7(b) sets forth a complete list of Seller's Health Care Permits. Seller has not: (i) received notice and has no Knowledge that any such Governmental Authority is considering limiting, suspending, terminating, adversely amending or revoking any such Health Care Permit; and (ii) received notice of any deficiencies requiring corrective action plans that have not been completed and accepted by the Governmental Authority.  All such Health Care Permits are valid and in full force and effect and Seller is in substantial compliance with the terms and conditions of all such Health Care Permits and with the applicable Health Care Laws and rules and regulations of the Governmental Authorities having jurisdiction with respect to such Health Care Permits, except to the extent that any violation with respect to any of the foregoing has not resulted and is not reasonably likely to result in a material adverse effect.

(c)     Seller meets all of the material requirements of participation and payment of, and where applicable is a party to valid provider, supplier or other participation agreements for payment by, Medicare, Medicaid, any other state or federal government health care programs, any private insurance company, health maintenance organization, preferred provider organization, managed care organization, government contracting agency, or any other public or private third party payor program ("Programs") to the extent Seller bills or receives reimbursement from a particular Program.  There are no legal proceedings pending or, to the Knowledge of Seller, threatened which would be reasonably likely to result in a revocation, suspension, termination, probation, restriction, limitation, or non-renewal of any Program supplier or other participation agreement or result in the exclusion of Seller or any of its directors, officers, employees or agents from any Program.  To the Knowledge of Seller, neither Seller, nor, its officers, directors or managing employees (as defined in 42 U.S.C. §1320a-5(b)) have engaged in any activities which are cause for civil penalties or mandatory or permissive exclusion from any Program.

(d)     To the Knowledge of Seller, all material reports, documents, claims, applications, and notices required to be filed, maintained or furnished to any Governmental Authority, under any Program have been so filed, maintained or furnished and all such reports, documents, claims, applications and notices were complete and correct in all material respects on the date filed (or were corrected or supplemented by a subsequent filing).

(e)     Neither Seller's rights, nor, to the Knowledge of Seller, the right of any licensed professional or other individual employed by Seller to receive reimbursements pursuant to any Government Program or Private Program has~~ve~~ been terminated, suspended or materially limited as a result of any investigation or action whether by any federal or state Governmental Authority or other third party.  Schedule 3.7(e) sets forth a true, complete and accurate description of inspections, investigations, surveys, audits, monitoring or other form of review conducted by any Governmental Authority, professional review organization, accrediting organization or certifying agency based upon any alleged improper activity related to any Health Care Law or Program during the three (3) year period prior to the Closing Date.

(f)     Except as disclosed to Purchaser, Seller does not have any reimbursement or payment rate appeals, disputes or contested positions currently pending before any Governmental Authority or any administrator of any Private Programs outside the ordinary course of Seller's Business.

1516150v10~~9~~

66204274.2
5903236 v2
66204274.3

(g)     Seller is certified for participation and reimbursement under Titles XVIII and XIX of the Social Security Act and has current provider agreements for such Government Programs and with such Private Programs, including any private insurance program under which it directly or indirectly is presently receiving payments.  Set forth in Schedule 3.7(g) is a true, correct and, complete and accurate list, with respect to Seller, of all provider numbers under all Government Programs.

(h)     During Except as set forth on Schedule 3.7(h), during the one (1) year period prior to the Closing Date, Seller has timely filed all reports required to be filed and timely filed all claims or billings prior to the date hereof in accordance with the Government and Private Programs, all fiscal intermediaries and other insurance carriers or reimbursement programs; and all such reports and billings are true, complete and accurate in all material respects and have been prepared in substantial compliance with all applicable Health Care Laws relating to reimbursement and payment. During the one (1) year period prior to the Closing Date, and except as set forth on Schedule 3.7(h), Seller has paid or caused to be paid all known and undisputed refunds, overpayments, discounts or adjustments which have become due pursuant to such reports and billings and, except as disclosed to Purchaser, to the Knowledge of Seller, has no liability under any Government or Private Program for any refund, overpayment, discount or adjustment pursuant to such reports. To the Knowledge of Seller, there are no other reports or claims or billings required to be filed by Seller in order to be paid under any Government Program or Private Program for services rendered in connection with the Business, except for reports not yet due.  Except as set forth on Schedule 3.7(h), to the Knowledge of Seller, there are no unresolved investigations, audits or proposed adjustments pending on behalf of any Government or private programs.

3.8     **Existing Medicare and Medicaid Provider Agreements**.  Seller is eligible to receive payment under Titles XVIII and XIX of the Social Security Act, is a "provider" under the Provider Agreements with the Medicare and Medicaid programs (collectively, the "Healthcare Programs") through the applicable intermediaries, and is in material compliance of applicable conditions of participation and payment required by such Healthcare Programs.

3.9     **Intangible Property.**  Schedule 3.9 contains a list of all Intangible Property owned or used by, or developed for, Seller, in each case, which is primarily used in the Business. In the immediately preceding year, Seller has not received any written claims or assertions made by others that Seller has infringed any intellectual property rights of any third party in the preceding two-year period, and there has been no such infringement by Seller during such period.  To Seller's Knowledge, no third party is infringing on rights of Seller with respect to the Intangible Property listed on Schedule 3.9.  All issued patents and registered trademarks, copyrights and service marks owned by Seller are recorded on the public record in the name of Seller.  Except as set forth in Schedule 3.10 9 and except for Permitted Liens, Seller has clear and unencumbered title to, or otherwise have the right to use, the Intangible Property listed on Schedule 3.9, and, to Seller's Knowledge, such title or right has not been challenged by others in writing in the last year.  True and complete copies of all documentation relating to the Intangible Property listed in Schedule 3.9 have been delivered or made available to Purchaser.

1516150v10 6

21

66204274.2
5903236 v2
66204274.3

3.10 **Hill Burton**. Seller has not received any loans, grants, or loan guarantees pursuant to, or currently has any outstanding unfulfilled obligations arising from, the Hill-Burton Act, 42 U.S.C. § 291a, et seq.

3.11 **Medical Staff**. To Seller's Knowledge, (i) no member of the medical staff of the Hospital has been excluded from participating in Medicare or any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) and (ii) none of the Seller's or Hospital's current officers, directors or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)), has been excluded from Medicare or any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) or been subject to sanction pursuant to 42 U.S.C. §1320a-7a or 1320a-8 or been convicted of a crime described at 42 U.S.C. §1320a-7b.

3.12 **Compliance with Laws; Permits**.

(a) The Hospital is duly licensed and authorized by all applicable Governmental Authorities including, but not limited to, the State of Mississippi, to operate all of its health care and medical services.

(b) Seller is duly licensed and authorized by all applicable Governmental Authorities to own and operate the Hospital and its related health care and medical services.

(c) Seller has all permits that are necessary to enable it to own, lease or otherwise hold the Assets and to enable it to operate the Business as currently conducted. All such permits are in full force and effect. To the Knowledge of Seller, no proceedings are pending or threatened where the remedy sought is to revoke or materially modify any such permit, materially restrict any renewal of any such permit or deny the right to transfer any such permit that is permitted to be transferred with consent.

(d) To Seller's Knowledge, Seller is in compliance in all material respects with all applicable Laws respecting the Business. There are no charges of a material violation of a Law pending or, to the Knowledge of Seller, threatened against Seller.

(e) To Seller's Knowledge, Seller's ownership and operation of the Business and the Assets are and have been in substantial compliance with all Environmental Laws, except where failure to be in such compliance would not have a material adverse effect on the ~~Debtor's~~Seller's Business or Assets. There is not now pending or, to Seller's Knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Business or the Assets. To Seller's Knowledge, there is not any radon, asbestos or PCBs or any condition with respect to surface soil, subsurface soil, ambient air, surface waters, groundwaters, leachate, run-on or run-off, stream or other sediments, wetlands or similar environmental media on, in, under, above, from or off any of the Real Property, which radon, asbestos, PCBs or condition does or may: (i) require investigation and/or remedial or corrective action pursuant to applicable Environmental Laws on or off such Real Property by Seller or any other owner or occupant thereof; (ii) require compliance by Seller with Environmental Laws; or (iii) result in any claim

1516150v10v9
66204274.2
5903236 v2
66204274.3

for personal injury, property damage or natural resources damage or any other proceeding against Purchaser or any of its Affiliates by any Governmental Authority or other Person pursuant to Environmental Laws. To Seller's Knowledge, no portion of the Real Property has been used as a dump or landfill or a storage, recycling or disposal facility for any hazardous substance, other than for the storage and disposal of medical waste in connection with the ordinary course operation of the Business.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the following representations and warranties:

4.1 **Corporate Existence of Purchaser**. Purchaser is a statutory entity created by the State of Mississippi pursuant to ~~NCGS § 116-37,~~ Miss. Code. Ann. §79-29-101, et. seq., validly existing, and in good standing in the State of Mississippi, and Purchaser is duly authorized to conduct business in Mississippi. Purchaser has all necessary power and authority to enter into this Agreement and all other documents that the Purchaser is required to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

4.2 **Validity and Enforceability of Agreement**. Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes, and all documents executed and delivered by Purchaser at Closing hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Purchaser, enforceable against it in accordance with their respective terms, except as enforcement hereof may be limited by general principles of equity.

4.3 **Authorization and Authority**. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized, approved and ratified by all necessary action on the part of Purchaser. Purchaser has full authority to enter into and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.

4.4 **No Conflict**. Neither the execution and delivery by Purchaser of this Agreement nor the performance by Purchaser of its obligations hereunder, (a) (i) violates or breaches the terms of or causes a default under any legal requirement applicable to Purchaser, (ii) contravenes the certificate of incorporation or bylaws or the certificate of formation and operating agreement or other organizational documents of Purchaser, or (iii) violates or breaches the terms or causes a default under any contract, indenture, evidence of indebtedness or other commitment to which Purchaser is a party or by which it or its properties is bound, or (b) will, with or without the passage of time, the giving of notice or the taking of any action by a third person, have any of the effects set forth in this subsection, except to the extent that any such matter would reasonably be expected to have a material adverse change with regard to Purchaser.

4.5     **Ability to Consummate Transaction**.  Purchaser has or will have sufficient immediately available funds and/or access to credit facilities necessary to consummate the purchase of the Assets and perform of its obligations under this Agreement.

4.6     **Solvency.**  Purchaser is solvent.  The consummation of the transactions provided for in this Agreement will not render Purchaser insolvent.  There are no conditions, obligations or commitments of Purchaser, or Claims against Purchaser, which will or could be reasonably expected to render Purchaser insolvent.

4.7     **Litigation and Arbitration**.

(a)     There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser, including any before any Governmental Authority or any arbitration panel, that seeks to prevent the consummation of the transactions contemplated by this Agreement.

(b)     There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, directors, or other senior executives, and there are no existing facts relating to any Person referred to in this Section 4.7(b), that may cause any required Health Care Regulatory Consent or other consent to the transactions contemplated hereby to not be given.

(c)     There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, directors, or other senior executives or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.  Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, or senior executives are not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.

4.8     **Brokers and Intermediaries**.  Neither Purchaser nor any of its Affiliates has employed any broker, finder, advisor or intermediary that is entitled, in connection with the consummation of the transactions contemplated hereby, to a broker's, finder's, or similar fee or commission.  Provided, however, the Parties acknowledge and agree that, to the extent allowed by Order of the Bankruptcy Court, the Operational and Strategic Advisor fees and any success fees payable by the Debtor to Morgan Stanley & Co. LLC shall be paid from the cash proceeds of the Sale.

**ARTICLE V**
**CERTAIN COVENANTS AND AGREEMENTS OF SELLER AND PURCHASER**

5.1     **Access and Information**.

(a)     Purchaser agrees to retain and maintain all employee and medical records as required under all applicable laws and regulations.

(b)     Before the Closing and to the extent permitted by Law, and except as required to preserve any Privilege, Seller will provide Purchaser and its representatives with reasonable access during normal business hours, to all of the assets, properties, facilities, employees, medical staff members, agents, accountants, and books and records of Seller and will furnish or make available to Purchaser and its representatives during such period all such information and data concerning Seller in its possession or control as Purchaser reasonably may request; *provided, however*, (i) such access shall be coordinated through such persons as may be designated in writing by Seller for such purpose, and (ii) Seller shall be entitled to participate in and be present during any meeting with any of the physicians on the Hospital medical staff, or with employees, agents, accountants and other representatives.  Purchaser's access shall include IT access to allow Purchaser to prepare to transition/preserve any electronic data as may be customary or required.

(c)     Before the Closing, Seller shall permit Purchaser to engage in discussions and negotiations with Seller's vendors for the purpose of negotiating the terms of contracts between Purchaser and such vendors in connection with Purchaser's purchase of the Assets.

(d)     Before the Closing, Seller shall grant Purchaser and its representatives reasonable access to Seller's employees within the Hospital for the purpose of administering the hiring process as to such employees.  Thus, by way of example and without limitation, except to the extent prohibited by applicable Law, Seller will grant reasonable access to enable Purchaser and its representatives to disseminate documents and information to such employees; collect documents and information from such employees; interview such employees and their supervisors and managers; investigate the backgrounds, experience, education, qualifications and work records of such employees; offer employment to such employees; and hire such employees. Purchaser agrees to conduct all such activities in compliance with applicable Law.

(e)     After the Closing, Purchaser shall permit, for a period of not less than six (6) years, each of the Seller, any direct or indirect successor to the Seller and their respective professionals, and the Committee Parties (collectively, the "Permitted Parties") access to all Books and Records that are in connection with or that otherwise relate to the Hospital (including the Business) prior to the Closing and/or to Seller and that are in the control or the possession of Purchaser or any of its Affiliates or their respective agents or representatives except for Excluded Records (collectively, "Business Records") for the purposes of (i) pursuing, assessing, settling, or otherwise dealing with any Excluded Assets, (ii) pursuing, assessing, defending, settling, or otherwise dealing with (including, without limitation, exercising rights and remedies with respect to) any Claim, Action, or cause of action, including, without limitation, any objection or motion, that any Permitted Party has the right to pursue, (iii) performing and/or otherwise dealing with

1516150v10̶9̶
66204274.2
5903236 v2
66204274.3

any obligations of the Seller pursuant to this Agreement, including the Excluded Liabilities, (iv) assisting any one or more of the Permitted Parties in connection with or otherwise relating to the Claims reconciliation process relating to Seller, including, without limitation, with respect to Claims against any Person, including, without limitation, assessing, resolving, settling, and/or otherwise dealing with priority and administrative Claims and any other general unsecured Claims that accrue prior to the Closing Date and (v) without limiting the generality of the immediately preceding clauses (i) through (iv), otherwise administering Seller's estate including, without limitation, the preparation and confirmation of a plan relating to Seller and the preparation of a disclosure statement relating to Seller, and compliance with any subpoena, document request, or order of any court compelling any Permitted Party to produce documents to third parties, winding down Seller's estate, preparing or filing tax returns and causing audits to be performed and/or for any other reasonable purpose.

(f)     The right of access for the Permitted Parties shall include, without limitation, (a) (i) the right of such Permitted Party to copy at the Permitted Party's premises or the Hospital at each requesting Permitted Party's expense, such documents and records as they may request in furtherance of any of the purposes referred to in Section 5.1(e) and (ii) Purchaser's copying and delivering, at the Permitted Party's cost, to such Permitted Party such documents and records as may be requested, but only to the extent as to this clause (ii) such Permitted Party furnishes Purchaser with reasonable written descriptions of the materials to be so copied.  Purchaser shall not dispose of or destroy any of the Business Records transferred to Purchaser ("Transferred Business Records") before the seventh anniversary of the Closing Date and will provide the Permitted Parties and the Bankruptcy Court pursuant to a filing with the Bankruptcy Court with at least ninety (90) days written notice before doing so and will provide each Party that requests copies of any Transferred Business Records within such ninety (90) day period copies of all requested Transferred Business Records at the cost of the requesting Permitted Party.

(g)     Subsequent to the Closing Date, Purchaser will cooperate with each of the Permitted Parties relating to all matters in connection with the administration of the Seller's estate, including without limitation, in connection with all Claims, Actions, and causes of action relating to the Excluded Assets or Excluded Liabilities that any Permitted Party elects to pursue, dispute, or defend.  Without limiting the generality of the preceding sentence, Purchaser shall use commercially reasonable efforts to make reasonably available to Seller employees of the Business who became employees of Purchaser to assist Seller in connection with the administration of Seller's estate, including, without limitation, in connection with Excluded Assets and/or Excluded Liabilities.

(h)     Seller shall provide to Purchaser at the Closing or as soon thereafter as is reasonably possible all appropriate books and records and other documents in the possession or control of Seller, its representatives or its agents relating to the operations of the Hospital, the Assets being sold pursuant to this Agreement and the transactions contemplated hereby.  Such books, records, and documents shall include, but are not limited to, patient records, all paper and electronic financial, operational, administrative, research, regulatory reporting, maintenance, and HR records.

1516150v10<del>6</del>

66204274.2
5903236 v2
66204274.3

5.2     **Authorizations**.   Purchaser shall use its commercially reasonable efforts to promptly obtain all Authorizations required to enable Purchaser to purchase the Assets and/or operate the Hospital.  Purchaser shall provide to Seller and the Committee a weekly report as to the status of obtaining such Authorizations. Seller agrees to execute and deliver such instruments and documents reasonably satisfactory to Seller, and to take all such other and further actions reasonably satisfactory to Seller, that Purchaser cannot take or cause to be taken by any Person other than Seller, that are required to enable Purchaser to obtain such Authorizations or transfer such Authorizations from Seller to Purchaser,  provided that Seller shall not be obligated to undertake any material Liabilities or other obligations, individually or in the aggregate, relating to such obligations.  Notwithstanding the foregoing, Purchaser shall not be obligated to consent to the imposition of materially burdensome conditions on Purchaser or its lenders in order to obtain the Authorizations it being specifically understood and agreed that conditions required under the Mississippi Regulations (or any Federal corollary) shall not constitute a materially burdensome condition.

5.3     **Conduct of Business**.

(a)     Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall:

(i)     operate the Business in the Ordinary Course of Business in all material respects;

(ii)     use commercially reasonable efforts to (A) maintain the Assets in good working order and condition consistent (including inventory) with past practices, including but not limited to paying when due all reasonable maintenance expenses necessary to maintain the current state of the Assets until Closing, normal wear and tear excepted, and (B) maintain the insurance coverage currently in place for Seller's operations with respect to the Assets or obtain comparable replacement coverage;

(iii)     perform when due all undisputed post-petition obligations under its contracts, including Purchased Intellectual Property Licenses, and leases of Real Property or personalty to the extent of available funds;

(iv)     comply in all material respects with all Laws and Orders pertaining to the Business and the Assets;

(v)     accurately maintain the books and records of the Business consistent with past practice;

(vi)     without being obligated to make any payment to any Person to preserve any goodwill or relationship, and subject to changes incident to Seller's bankruptcy filing and related intention to sell its assets, use commercially reasonable efforts reasonably consistent with past practices to preserve the goodwill thereof and Seller's relationships with the patients, employees, physicians, suppliers, and others with whom it deals; and

1516150v10v9

27

66204274.2
5903236 v2
66204274.3

(vii)    perform all undisputed post-petition obligations under Excluded Contracts and timely pay, perform, and discharge in accordance with their respective terms the undisputed post-petition Excluded Liabilities to the extent of available funds.

(b)    Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall not:

(i)    make or enter into any Contract that would be required to be assumed by Purchaser to operate Seller's Business;

(ii)    permit any Person other than Seller (to include Dana Weston although she is not or an employee Affiliate of the Debtor) Seller to manage its Assets or Business;

(iii)    other than in the Ordinary Course of Business, (A) increase the annual level of compensation of any employee or other Person who works in the Business, (B) grant any bonus, similar benefit, or increase in other direct or indirect compensation to any employee or other Person who works in the Business, (C) with respect to any employee or other Person who works in the Business, increase the coverage or benefits available under any (or create any new) employee benefits plan, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition, or similar agreement (or amend any such agreement) with any employee or other Person who works in the Business, except, as to each of clauses (A) through (D), as required by applicable Law from time to time in effect, by any employee benefits plan maintained or sponsored by Seller or by any existing Contract or CBA made available to Purchaser that the Seller is a party to or bound by;

(iv)    subject any of the Assets to any Lien, other than (A) any Permitted Encumbrances or (B) as approved by Order of the Bankruptcy Court;

(v)    other than pursuant to an existing Contract made available to Purchaser, acquire or lease any material assets that would be Assets or sell, assign, license, transfer, convey, lease, or otherwise dispose of any of the Assets, provided that any other removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets;

(vi)    cancel or compromise any material debt or claim or waive or release any material right of Seller that constitutes an Asset, except in the Ordinary Course of Business;

(vii)    permit or allow relocation of (other than within the Hospital or the Hospital's owned Real Property), any services or programs of the Business; or

(viii)    other than in the Ordinary Course of Business or pursuant to an existing Contract made available to Purchaser, remove from the Real Property any furniture, equipment, or other tangible personal property used in the Ordinary Course of Business;

1516150v10 6

28

66204274.2
5903236 v2
66204274.3

provided further that any other removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets.

5.4 **Commercially Reasonable Efforts**. Each Party shall use its commercially reasonable efforts to fulfill or cause the fulfillment of the conditions of the Closing, including, without limitation, the execution and delivery of all agreements contemplated hereunder to be so executed and delivered provided that it shall be the responsibility of Purchaser to obtain the Authorizations and any required consents with respect to the assumption of the Assumed Contracts and satisfy conditions required under the Mississippi Regulations.

5.5 **Adequacy of Purchaser's Review**. Purchaser agrees that it (a) had a full and complete opportunity to conduct due diligence regarding the Assets prior to making its offer and does not require further due diligence, and (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its bid and executing and delivering this Agreement~~, and (c)~~. For purposes of clarity, Purchaser agrees that Purchaser did not rely upon any written or oral statements, representations, promises, warranties, or guaranties of any kind or nature, including, without limitation, any that are express, ~~are~~ implied, arise by operation of law, or that may ~~otherwise~~for any other reason be deemed to apply~~, regarding~~ to the Assets~~,~~ or the completeness of any information provided in connection therewith ~~except, as to clauses (b) and (c), solely for~~other than Seller's representations and warranties that are contained in Article 3 of this Agreement.

5.6 **Tax Matters**.

(a) Purchaser shall be responsible for the payment of all Transfer Taxes ~~(~~whether or not payable by Seller as a matter of law~~), including that~~. Purchaser shall promptly reimburse Seller for its share of all Transfer Taxes paid by Seller (if any) upon receipt of reasonable documentation evidencing such amount. Purchaser and Seller will cooperate in the timely preparation and filing of any Tax return that must be filed in connection with any Transfer Taxes. Any such Taxes or fees resulting from any subsequent transfer of the acquired Assets or Assumed Contracts shall be borne by Purchaser.

(b) After the Closing Date, Seller and Purchaser shall, and shall cause their respective Affiliates to:

(i) assist the other Party and its Affiliates in preparing any tax returns that such Party is responsible for preparing and filing relating to the Assets, the Excluded Assets or the Business;

(ii) cooperate fully in preparing for any tax audit relating to or arising out of the ownership or use of the Assets or the Business;

(iii) make available to the other Party and its Affiliates and to any Taxing Authority as reasonably requested all information, Books and Records, and documents relating to Taxes arising out of the conduct of the Business or the ownership or use of the Assets; and

(iv)    furnish the other Party with copies of all correspondence received from any Taxing Authority in connection with any tax audit relating to the conduct of the Business or the ownership or use of the Assets with respect to any such taxable period.

5.7    **Announcement**.  Other than confirming information that is already a part of the public record or that is contained in filings a Party hereafter makes with the Bankruptcy Court, Seller will not issue any press release or otherwise make any public statement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of Purchaser(which consent shall not be unreasonably withheld or delayed), except as may be required by applicable Law or the applicable regulations of any exchange or Government agency.  Subject to the last sentence of this Section 5.7, if Seller is required by Law or pursuant to applicable regulations of any Government agency or exchange to issue a press release or otherwise make any public statement or disclosure with respect to this Agreement and the transactions contemplated hereby, Seller will use commercially reasonable efforts to promptly notify Purchaser so that Purchaser may seek a protective order or other appropriate remedy, and in the event that no such protective order or other remedy is obtained, Seller may make such disclosure as Purchaser is advised in writing by counsel as may be required by Law or pursuant to applicable regulations of any Government agency or exchange.  The preceding sentence shall not apply to any filing that Seller reasonably concludes may be required to be made with, or is appropriate to be made with, the Bankruptcy Court.

5.8    **Post-Closing Business Operations Commitment.**  Purchaser shall operate the Hospital as an acute care hospital with an open and accessible emergency department and medical/surgical services for a period of not less than five (5) years after the Closing Date.

5.9    **Risk of Loss; Casualty Loss**.  All risk of loss or damage to or destruction of the Assets, in whole or in part, shall be and remain with Seller until the Effective Time and from and after the Effective Time, the risk of loss or damages to or destruction of the Assets in whole or in part shall be and remain with Purchaser.  If, between the date of this Agreement and the Closing, any of the Assets having a value in excess of $500,000, individually or in the aggregate, shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause (the "<u>Casualty</u>"), individually or in the aggregate, then, with respect to a loss in value in excess of $500,000 (a) Purchaser shall have the option to acquire such Assets on an "as is" basis and take an assignment, without representation, warranty or recourse, from Seller of any insurance proceeds payable to Seller in respect of the Casualty (excluding proceeds under any directors or officers insurance policies) or (b) Seller shall have the option exercisable on or before the Closing Date by the delivery of written notice thereof to Purchaser (i) to fix such Casualty within sixty (60) days after the Closing Date, or (ii) pay Purchaser the loss in value arising from such Casualty, and if Seller does not elect within twenty (20) days of the occurrence of the Casualty an option set forth in (b)(i) or (b)(ii) above, then Seller shall be deemed to have elected the option in clause (b)(ii).

5.10	**Bankruptcy Actions**.

(a)	Seller and Purchaser acknowledge that this Agreement and the sale of the Assets are subject to Bankruptcy Court approval and entry of the Bid Procedures Order and Sale Order.

(b)	If an appeal is taken or a stay pending appeal is requested, with respect to the Bid Procedures Order or Sale Order, Seller shall promptly notify Purchaser of such appeal or stay request.  Seller shall promptly provide to Purchaser a copy of the related notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from such order.  In the event of an appeal of the Bid Procedures Order or Sale Order, Seller shall, at its own expense, be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.

(c)	From and after the date hereof, Seller shall not take any action that is intended to reverse, void, materially modify, or stay the Bid Procedures Order or Sale Order.

(d)	Seller will provide Purchaser with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) related to the Assets, the Business, or any appeal as described in paragraph 5.11~~11~~10(b), prior to the filing thereof in the Bankruptcy Case, except any involving adversarial matters between Seller and Purchaser.

5.11	**DISCLAIMERS**.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE TO PURCHASER, EXPRESS OR IMPLIED, WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED HEREBY.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, OR EXCEPT AS EXPRESSLY SET FORTH IN THE SALE ORDER, THE ASSETS TO BE SOLD AND TRANSFERRED HEREUNDER SHALL BE SOLD (A) IN THEIR THEN EXISTING PHYSICAL CONDITION, WITH ALL DEFECTS, IF ANY, AND SUBJECT TO WEAR AND TEAR FROM THE DATE HEREOF TO THE CLOSING DATE AND (B) ON AN "AS IS, WHERE IS" BASIS

5.12	**Further Assurances**.  Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated herein and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate same.  Without limiting the generality of the foregoing, promptly after the discovery by Seller of any item included within the definition of Assets but not transferred, conveyed, or assigned to Purchaser, (x) Seller will deliver written notice to Purchaser of the existence and non-transfer, non-conveyance, or non-assumption of such item and provide Purchaser with all the information in Seller's possession about, and with access to such item in Seller's possession as Purchaser may reasonably request, and (y) if requested by Purchaser, Seller shall use commercially reasonable efforts to transfer, convey, or assign to Purchaser such item in the manner and on the terms and conditions as applicable to an Asset.

1516150v10~~9~~

66204274.2
5903236 v2
66204274.3

5.13    **Confidentiality**.

(a)    From and after the date hereof, Purchaser shall maintain in confidence, including that it shall not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Seller's Confidential Information relating to or obtained from Seller; provided, however, the foregoing restriction shall not apply to any disclosure by Purchaser of Seller's Confidential Information to any Affiliate of Purchaser or to its lenders and legal and financial advisors.  For purposes of this Section 5.~~15~~13, "Seller's Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Assets, the Assumed Liabilities, the Business, the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that Seller's Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Purchaser or its agents or other representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller, provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate Seller's Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written documents or evidence maintained by Purchaser to have been independently developed by Purchaser; and provided further, that upon the Closing, the restrictions contained in this Section 5.~~15~~13 shall not apply to confidential or proprietary information related primarily to the Assets, the Assumed Liabilities or the Business.  Purchaser may disclose Seller's Confidential Information to those who need to know it for the purpose of effectuating the transactions contemplated herein and who agree to keep it confidential. Purchaser shall instruct such Persons having access to Seller's Confidential Information of such obligation of confidentiality.  If Purchaser or anyone to whom ~~they~~it has transmitted Seller's Confidential Information subject to the confidentiality obligations herein becomes legally compelled, including, but not limited to, through an action brought pursuant to ~~N.C.G.S. 132-9~~Miss. Code Ann. §§ 25-59-27, as amended (Mississippi Public Records Act), to disclose any of such Confidential Information, Purchaser shall provide Seller with notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, or Seller waives compliance with the provisions of this Section 5.~~15~~13(a), Purchaser shall furnish only that portion of Seller's Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed. Purchaser shall have no liability to Seller with respect to the disclosure of Seller's Confidential Information ordered by a court of competent jurisdiction pursuant to ~~N.C.G.S. 132-9~~Miss. Code Ann. §§ 25-59-27, as amended, or other applicable law, or required by law or regulatory or accrediting agencies.

(b)    From and after the date on which the Sale Order is entered, unless this Agreement is terminated, Seller shall maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating the Business in the Ordinary Course of Business prior to the Closing Date, (ii) any investigations by any

1516150v1~~10~~9
66204274.2
5903236 v2
66204274.3

Governmental Authority or any filings with the Bankruptcy Court, (iii) compliance activities prior to or after the Closing related to periods occurring prior to the Closing Date; (iv) any legal proceedings; (v) enforcing any rights or other claims of Seller under this Agreement or otherwise; and (vi) performing any obligations of Seller under this Agreement. For purposes of this Section 5.~~15~~13(b), "Business Confidential Information" means any information that is confidential or proprietary in nature that is related to Purchaser or to the Assets, the Assumed Liabilities or the Business, other than information primarily pertaining to the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Seller (other than in connection with filings with the Bankruptcy Court), (ii) becomes available to Seller on a non-confidential basis from a source other than Purchaser, provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully received by Seller from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure. Seller may disclose Business Confidential Information to those who need to know it for the purpose of effectuating the transactions contemplated herein and who agree to keep it confidential subject to the same confidentiality obligations herein. Seller shall instruct such Persons having access to Business Confidential Information of such obligation of confidentiality. If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information (other than in connection with filings with the Bankruptcy Court), Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Purchaser waives compliance with the provisions of this Section 5.~~15~~13(b), Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.

(c)     The obligations contained in this Section 5.~~15~~13 shall survive the Closing and are in addition to any separate confidentiality agreements between Seller and Purchaser.

5.14    **Acceptance and Discharge**. Except to the extent, if at all, Liabilities of Seller to Purchaser are specifically stated herein to survive the Closing, (i) Seller shall cease to have any Liability of any kind or nature relating to its representations and warranties hereunder and/or covenants and agreements to be performed prior to the Effective Time, and (ii) Seller will, without any further writing or other act by Purchaser, at such time be fully and forever, irrevocably and unconditionally, released and discharged from all such Liabilities.

5.15    **Cooperation**. Seller and Purchaser agree to reasonably cooperate with each other in good faith from the date hereof up through and following the Closing Date, in any effort to satisfy all further conditions, undertakings and agreements contemplated by this Agreement to be effected after the Closing.

5.16     **Surrender of License**.  Following the Closing and in accordance with the timing and other requirements of applicable Law, Seller shall surrender all licenses and operating certificates issued to it relating to the Business, except for the licenses and operating certificates transferred to Purchaser pursuant to this Agreement.

5.17     **Removal of Certain Liens**.  If any Liens other than Permitted Encumbrances encumber any Assets, Seller shall have the right, within thirty (30) days of Seller's receiving Purchaser's written notice of any such Lien, to cause such Lien to be removed.

5.18     **Insurance**.  Neither Purchaser nor Seller shall have an obligation to purchase tail director and officer insurance coverage or tail professional liability insurance coverage.

5.19     **Final Cost Report.**  Purchaser shall file or cause to be filed on Seller's behalf, at Purchaser's sole cost, the final Cost Reports for the period prior to the Closing for the portion of 2019 required to be filed with the Medicare or Medicaid programs or any other Third-Party Payor or Governmental Body as a result of the consummation of the contemplated transactions. Any payments owed and paid to Seller for final settled Cost Reports for any periods prior to Closing are acknowledged as part of the Excluded Assets and are not conveyed to Purchaser by this Agreement.  ~~Purchaser shall assume and be responsible for Final Cost Report Liability incurred as a result of the filing of any of said reports or as a result of filing any previous Cost Report for periods prior to the Closing.~~  All Cost Reports shall be prepared in accordance with applicable Law and consistent with past practices.

**ARTICLE VI**
**CONDITIONS TO PURCHASER'S AND SELLER'S OBLIGATIONS**

The obligations of the Parties to consummate the transaction provided for in this Agreement shall be subject to the satisfaction of the following conditions on or before the Closing Date:

6.1     **Entry of the Bid Procedures Order**. The Bankruptcy Court shall have entered the Bid Procedures Order substantially in the form attached hereto as Exhibit B and in all respects in form and substance reasonably satisfactory to the Parties and the Committee, and which provides, among other things, that in the event Purchaser is not in breach of this Agreement, the Bankruptcy Court approves a sale of all or some of the Assets to a buyer other than Purchaser, Seller shall be required to pay to Purchaser out of the proceeds of the sale of the Assets to a buyer other than Purchaser a break-up fee in the amount of $100,000 (the "Break-Up Fee").

6.2     6.2     **Entry of the Sale Order**.  The Bankruptcy Court shall have entered a sale order in form and substance reasonably satisfactory to the Parties and the Committee (the "Sale Order"), which approves this Agreement and the consummation of the transactions contemplated hereby in their entirety; and which provides for the following rulings and/or findings: (a) Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; (b) timely, adequate, and sufficient notice of the sale was provided; (c) the Assets to be transferred to the Purchaser are property of the bankruptcy estate and Seller has all requisite authority and approval

66204274.2
5903236 v2
66204274.3

to transfer the Assets; (d) the total consideration to be realized by the Seller represents fair consideration and reasonably equivalent value in the context of any state or federal law governing the rights of creditors; (e) the conveyance and assignment of the Assets pursuant to this Agreement is a legal, valid, and effective transfer of the Assets to the Purchaser, and will vest the Purchaser with all right, title, and interest of the Seller in and to the Assets free and clear of all Liens, Claims, interests and encumbrances except for those (i) liabilities to be assumed by Purchaser pursuant to this Agreement and (ii) Permitted Encumbrances, and (f) neither the Seller nor the Purchaser has engaged in any conduct that would cause or permit the Agreement, or the transfers contemplated thereby, to be avoided under Bankruptcy Code section 363(n). In addition, unless waived by Purchaser in writing in its sole discretion, the Sale Order shall have become a final, non-appealable order.

6.3 **No Injunctions**. No injunction or restraining Order (whether temporary, preliminary or permanent) of any Governmental Authority shall exist against Purchaser or Seller that prevents the transactions contemplated hereby and approved in the Bid Procedures Order or Sale Order. No other Governmental Authority shall have enacted, issued, promulgated, enforced, or entered any statute, rule, regulation, or non-appealable judgment which prohibits or renders illegal the consummation of the Closing or the transactions provided for herein and approved in the Sale Order.

6.4 **Compliance with Applicable Law**. To the extent required by Law, the filing and waiting period requirements relating to any and all approvals necessary under the Healthcare Regulatory Consents and any other applicable Law, if necessary, relating to consummation of the Closing or the transactions provided for herein shall have been duly complied with and/or such approvals shall have been obtained on or before the Closing Date.

6.5 **Consents**. Purchaser shall have obtained (or shall have had transferred to it) those Healthcare Regulatory Consents and other Authorizations that Purchaser is required to apply for and/or obtain in order to operate the Business, it being specifically understood and agreed that Purchaser shall be required to satisfy conditions required under the Mississippi Regulations.

## ARTICLE VII
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligations of Purchaser to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Purchaser, in its sole discretion, to waive any one or more of the conditions set forth below:

7.1 **Representations and Warranties of Seller**. The representations and warranties of Seller contained in this Agreement, taken as a whole, shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made only as of a specified date, in which case the accuracy of such representation or warranty shall be measured as of such date, and except to the extent of changes permitted by the terms of this Agreement.

7.2    **Schedules**.  The matters set forth on the Schedules shall be true and correct in all material respects on the Closing Date, except to the extent of changes permitted by the terms of this Agreement.

7.3    **Documents**.  Purchaser shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing, together with copies of all other documents and certificates to be executed and delivered by Seller at Closing.

7.4    **Performance of Obligations**.  Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date.

7.5    **No Changes to Business**.  Since the date of this Agreement, there shall have been no material changes to the Business or Assets that, in the aggregate, have had a material adverse effect on the Business, excluding adverse changes that (i) were projected to occur in any forecast or budget provided by Seller and/or (ii) relate to a disclosed proposed sale of all or substantially all of Seller's assets, thereby leaving Seller without an operating business.

7.6    **Release of Liens**.  All Liens on the Assets shall have been released, satisfied or otherwise removed or discharged pursuant to Bankruptcy Court order or otherwise, except for the Permitted Encumbrances.

7.7    **Consents**.  Purchaser shall have obtained (or shall have had transferred to it) those Healthcare Regulatory Consents and other Authorizations, including any judicial proceedings and appeals related thereto, which Purchaser is required to apply for and obtain in order to operate the Business, it being specifically understood and agreed that Purchaser shall be required to satisfy conditions required under the Mississippi Regulations.

7.8    **FIRPTA Affidavit**.  Seller shall deliver to Purchaser a non-foreign affidavit dated as of the Closing Date and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code so that Purchaser is exempt from withholding any portion of the Purchase Price thereunder (the "FIRPTA Affidavit").

**ARTICLE VIII**
**CONDITIONS TO SELLER'S OBLIGATIONS**

The obligations of Seller to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Seller, in its sole discretion to waive any one or more of the conditions set forth below:

8.1    **Representations and Warranties of Purchaser**.  The representations and warranties of Purchaser contained in this Agreement, taken as a whole, shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be

1516150v10<del>6</del>

66204274.2
5903236 v2
66204274.3

true in all material respects as of such date, and except to the extent of changes permitted by the terms of this Agreement.

8.2    **Performance of this Agreement**.  Purchaser shall have materially performed or complied with all of the obligations to be performed or complied with by it under the terms of this Agreement on or prior to the Closing Date.  The Purchaser shall have delivered to the Seller a certificate signed by a duly authorized officer of the Purchaser, dated as of the Closing Date, to the foregoing effect.

8.3    **Payment of Purchase Price and Assumption of Liabilities and Assumed Contracts**.  Seller shall receive from Purchaser on the Closing Date the Purchase Price pursuant to Section 2.12 of this Agreement and Purchaser shall have assumed the Assumed Liabilities pursuant to a document that is reasonably satisfactory to Seller.

8.4    **Documents**.  Seller shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing and copies of all such other documents and certificates executed and delivered hereunder.

**ARTICLE IX**
**SURVIVAL**

9.1    **Survival**.  ~~Sections [TBD],~~Articles II, V, IX, X and XI, and all defined terms used therein, shall survive the Closing, except to the extent (if at all) that such survival is expressly limited herein.  The representations and warranties of the Parties shall expire upon the consummation of the Closing.

**ARTICLE X**
**LIMITED AGREEMENT TERMINATION RIGHTS**

10.1    **Termination of Agreement**.  This Agreement and the transactions contemplated hereby may be terminated prior to the Closing Date only as follows:

(a)    by mutual written consent of Purchaser and Seller;

(b)    except as otherwise provided in this Agreement, by either Party if the Closing shall not have occurred on or before the Closing Date;

(c)    by Purchaser if any of the conditions to the obligations of Purchaser to close set forth in Article VII shall have become incapable of fulfillment other than because of a breach by Purchaser of any covenant or agreement contained in this Agreement and such condition is not waived by Purchaser;

(d)    by Purchaser if there ~~shall be~~is a material breach by Seller, as determined by the Bankruptcy Court, of the representations and warranties, taken as a whole, or of any material covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Purchaser to Seller of such breach;

37

(e)    by Seller if any of the conditions to the obligations of Seller to close set forth in Article VIII shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement and such condition is not waived by Seller;

(f)    by Seller if there is a material breach by Purchaser, as determined by the Bankruptcy Court, of the representations and warranties, taken as a whole, or of any material covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Seller to Purchaser of such breach; or

(g)    by Seller or Purchaser if the Bankruptcy Court fails to approve this Agreement and enter the Sale Order by ~~November 30, 2018~~February 15, 2019, subject to Seller's right to extend the date of Closing as provided in the definition of Closing Date.

10.2    **Procedure for Termination**.  If this Agreement is terminated by Purchaser or Seller, or both, pursuant to Section 10.1, written notice thereof shall forthwith be given to the other party~~,~~ and, upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 10.1) the transactions contemplated hereunder shall be abandoned and this Agreement shall terminate to the extent and with the effect provided in Section 10.3, without further action by the parties.

10.3    **Effects of Termination**.  If this Agreement is validly terminated as provided herein, then each party shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party; provided, however, that (i) the obligations of the parties set forth in Article XI of this Agreement~~,~~ and, to the extent necessary to effectuate the foregoing enumerated provisions, Article I of this Agreement, shall survive any such termination and shall be enforceable in accordance with their terms, and (ii) if this Agreement is terminated as provided herein, each party shall upon request redeliver or destroy as soon as practicable any or all documents, work papers and other material of the other party relating to its business or affairs or the transactions contemplated hereunder, whether obtained before or after the execution hereof, to the party furnishing the same, other than any material which is of public record.  Nothing in this Section 10.3 shall relieve the parties of any Liability for a breach of this Agreement prior to the date of termination or alter the right of Seller to retain the Deposit if permitted to do so pursuant to this Agreement.  Notwithstanding the foregoing, no attorneys' fees reasonably incurred by a party in connection with the transactions contemplated herein, or out-of-pocket expense reimbursement or other fees, shall be payable to any party upon termination of this Agreement pursuant to Section 10.1.

## ARTICLE XI
## MISCELLANEOUS

11.1    **Assignment; Binding Agreement**.

(a)    Except as set forth in Section 11.1(c), neither this Agreement nor any rights or obligations of a Party hereunder may be assigned or delegated without the other Party's prior written consent. Any purported assignment or delegation without such consent shall be void. Provided, however, Purchaser may assign any or all of its rights under this Agreement, provided that it remains responsible for performance hereunder.

(b)    This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the Parties hereto and to their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights, remedies, obligations, or Liabilities.

(c)    Purchaser shall have the right to assign its rights and obligations under this Agreement including, without limitation, its right to acquire all or any portion of the Assets to its Affiliates, any successor to Purchaser, and/or to its lender if a sale/leaseback transaction is used to finance the transactions contemplated by this Agreement. Notwithstanding any transfer permitted by this Section 11.1(c), Purchaser shall remain liable to Seller with respect to its obligations under this Agreement.

11.2    **Post-Closing Cooperation**. From time to time after the Closing, Seller will execute and deliver, or cause to be executed and delivered, such documents to Purchaser as Purchaser shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, the transfer of the Assets to Purchaser. From time to time after the Closing, Purchaser will execute and deliver, or cause to be executed and delivered, such documents to Seller as Seller shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, Purchaser's assumption of the Assumed Liabilities. From and after the Closing, Seller shall use its commercially reasonable efforts to deliver to Purchaser all such books, reports and other documents that constitute or relate to Assets (which may be redacted to the extent not relevant to the Assets) as may be requested by Purchaser which were not delivered on or before the Closing Date, and to assist the Purchaser in obtaining any Authorizations not obtained by Purchaser prior to the Closing.

11.3    **Expenses**. Except as set forth in this Agreement, each Party shall pay the fees and expenses of its respective counsel, accountants, and other experts and shall pay all other expenses incurred by it in connection with the negotiation, preparation, and execution of this Agreement and the consummation of the transactions contemplated hereby.

11.4    **Entire Agreement and Modification**. This Agreement, including any Exhibits and Schedules attached hereto and thereto and any other documents hereby required to be delivered at the Closing, and any confidentiality agreement previously executed by Seller and Purchaser or Purchaser's Affiliate, constitute the entire agreement between the Parties and

1516150v10<del>6</del>

66204274.2
5903236 v2
66204274.3

supersede all prior discussions, negotiations, or agreements relating to the subject matter of this Agreement. No changes of, additions to, or other modifications of this Agreement shall be valid unless the same is in writing and signed by the Parties.

11.5 **Severability**. If any provision of this Agreement shall be determined to be contrary to Law and unenforceable by any Court, the remaining provisions shall be severable and enforceable in accordance with their terms. To the extent any provision of this Agreement is enforceable in part but not in whole, such provision shall be enforced to the maximum extent permitted by applicable Law.

11.6 **Waiver**. Any of the conditions to Closing set forth in this Agreement, except for those set forth in Article VI, may be waived at any time prior to or at the Closing hereunder by the Party entitled to the benefit thereof. Any such waiver shall only be effective if it is in writing and signed by the Party to be charged with such waiver. The failure of any Party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any other breach of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such Party thereafter to enforce each and every such provision. No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach or non-compliance.

11.7 **Counterparts**. This Agreement may be executed in multiple counterparts, by the Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. All signatures of the Parties to this Agreement may be transmitted by email or facsimile, and such email or facsimile of signature will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces and will be binding upon such Party.

11.8 **Headings; Interpretation**. The table of contents and article and section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

11.9 **Governing Law**. This Agreement shall be construed and interpreted according to the Laws of the State of Mississippi, without regard to the application of the choice of law principles thereof. All of the conveyance documents executed and delivered pursuant to the terms hereof shall be governed by~~and continued~~ and interpreted according to the Laws of the State of Mississippi, without regard to the application of the choice of law principles thereof.

11.10 **Bankruptcy Court Jurisdiction**.

(a) Purchaser and Seller agree that the Bankruptcy Court shall have exclusive jurisdiction over all disputes, Claims, and other controversies (collectively, "Disputes") and other matters relating to (a) the interpretation and enforcement of this Agreement or any document executed pursuant hereto; (b) the Assets; (c) the Assumed Liabilities and other obligations assumed by the Purchaser under this Agreement; and (d) any obligations surviving Closing, as long as the Bankruptcy Court reserves such jurisdiction, and Purchaser expressly consents to and agrees not to contest such exclusive jurisdiction.

(b)     The parties shall jointly request that the Bankruptcy Court reserve jurisdiction to consider Disputes arising under this Agreement even after the closing of the Bankruptcy Case.  To the extent allowed under existing and controlling law in the Fourth Circuit as of the Closing Date, the parties consent to the jurisdiction of the Bankruptcy Court to hear all such Disputes and to enter final orders with respect to all matters and issues raised therein.

11.11  **Notices**.  All notices, requests, demands and other communications hereunder shall be deemed to have been duly given if the same shall be in writing and shall be delivered or sent (a) by personal delivery against a receipted copy, (b) by certified mail, return receipt requested, or (c) by e-mail if the addressee confirms receipt of the e-mail, and addressed as set forth below:

If to Purchaser to:                      If to Seller, to:

Progressive Medical Management of Batesville LLC        Curae Health, Inc
~~800 College Hill Road suite 520~~ P.O. Box 2547
   1721 Midpark Road suite B200
~~P.O. Box 2547~~                          ~~Oxford, MS  38655~~
Knoxville, TN  37921
~~Oxford, MS  38655~~                      ~~Attn: Quentin Whitwell~~
   Attention: Steve Clapp, CEO
~~Attn:  Quentin Whitwell~~


With copies to:_____          With copies to:

Wise Carter Child & Caraway, P.A.     Egerton, McAfee Armistead & Davis, P.C.
P.O. Box 651                                                 P.O. Box 2047
Jackson, MS 39205-0651                Knoxville, TN 37901
Attn: Victoria R. Bradshaw                Attention: Stephen McSween, Esq.

A Party may change the address to which notices hereunder are to be sent to it by giving notice of such change of address in the manner provided above.  Any notice delivered personally shall be deemed to have been given on the date it is so delivered, or upon attempted delivery if acceptance of delivery is refused.

11.12  **Effectiveness**.  This Agreement shall be effective only when duly signed by Seller in accordance with the order of the Bankruptcy Court approving the sale to Purchaser.

11.13 **No Third Party Beneficiaries**. Except as otherwise provided herein with respect to the Committee, nothing expressed or referred to in this Agreement will be construed to give any person other than the  Parties to this Agreement any legal or equitable right, remedy or claim

1516150v10~~9~~
66204274.2
5903236 v2
66204274.3

under or with respect to this Agreement or any provision of this Agreement, except as such rights as shall inure to a successor or permitted assignee pursuant to this Agreement, provided the Morehead Memorial Hospital Foundation, Inc. shall be an express third-party beneficiary hereof solely for the purpose of enforcing Purchaser's obligations under Section 2.12(b) of this Agreement on behalf of Seller or any successor thereto.

11.14 **Time Period For Completing Schedules and Exhibits.** Notwithstanding anything herein to the contrary, the Parties shall complete the attached Exhibits and Schedules, as well as any blanks to be filled in, in a mutually satisfactory manner on or before the Closing Date.

*[Signature Page Follows]*

1516150v106

66204274.2

5903236 v2

66204274.3

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

SELLER:

Batesville Regional Medical Center, Inc.

By:_____
Print Name: Stephen N. Clapp
Title: President

Batesville Regional Physicians, LLC

By:_____
Print Name: Stephen N. Clapp
Title: President

CURAE:

Curae Health, Inc.

By:_____
Print Name: Stephen N. Clapp
Title: President

*[Signature Page Continued on Next Page]*

1516150v10v6

66204274.2

5903236 v2
66204274.3

43

*[Cont'd – Signature Page to Asset Purchase Agreement]*

PURCHASER:

Progressive Medical Management of
Batesville LLC

By:_____
Print Name: Dr. Kenneth Williams
Title:  Authorized Signatory

Panola Physicians Group, LLC

By:_____
Print Name: Dr. Kenneth Williams
Title:  Authorized Signatory

1516150v10v6

66204274.2

5903236 v2
66204274.3

44

## Schedules and Exhibits

| | |
|---|---|
| Schedule 1 | Excluded Assets |
| Schedule 2 | Senior Leadership Team and Managers of the Business and Purchaser's Ultimate Parent Company |
| Schedule 3 | List of Other Businesses |
| ~~Schedule 4~~ | ~~Other Assets~~ |
| ~~Schedule 5~~ | List of Permitted Encumbrances |
| Schedule 6̶5̶ | List of Real Property |
| Schedule 7̶6̶ | Taxes and Assessments |
| Schedule 2.7 | Assumed Contracts |
| Schedule 3.8̶ | ~~Subsidiaries~~7(b)     Health Care Permits |
| Schedule 3.7(e) | Inspections, Investigations, Audits, Etc. |
| Schedule 3.7(g) | Provider Numbers |
| Schedule 3.7(h) | Reports; Refunds, Overpayments, Discounts or Adjustments; Unresolved Investigations |
| Schedule 3.9 | Intangible Property |
| | |
| Exhibit A | Form of Deed |
| Exhibit B | Form of Seller's Affidavit |
| Exhibit C | Form of Bill of Sale and Assignments |
| | |
| Exhibit D | Bid Procedures Order |
| Exhibit E | Transition Services Agreement |

1516150v10̶6̶

66204274.2

5903236 v2

66204274.3

**SCHEDULE 1**

**Excluded Assets**

"Excluded Assets" means (in addition to and not as a limitation of the definition of Excluded Assets set forth in Section 1.1 of this Agreement) the following assets, properties, interests, and rights of Seller:

(a)     all insurance policies and all rights to proceeds thereunder, including, without limitation, any director or officer insurance policies relating to any matter, event or circumstance occurring on or prior to the Closing Date, except as otherwise provided for in Section 5.10;

(b)     the residual rights in and proceeds of any employee benefits plans ~~that are not transferred to Seller~~;

(c)     all Contracts, Permits, and other assets that require a consent (taking into consideration the provisions of the Bankruptcy Code), to transfer same unless (i) such written consent is obtained and (ii) the Purchaser assumes all liabilities arising thereunder, including all Cure Payments, if applicable (it being understood that Seller shall not be required to obtain or attempt to obtain any such consent);

(d)     all rights or documents relating to any Excluded Liability or other Excluded Asset;

(e)     any rights or remedies provided to Seller under this Agreement and applicable Law and each other document executed in connection with the Closing;

(f)     all rights relating to all applications for grants, subsidies or similar payments filed prior to the Effective Time, including all proceeds of grants awarded (including awards made and/or grant funds provided after the Closing);

(g)     any (i) personnel files for employees of Seller who are not hired by Purchaser; (ii) other books and records that Seller is required by Law to retain; provided, however, that except as prohibited by Law and subject to Article 5, Purchaser shall have the right, at Purchaser's sole expense, to receive or make copies of any portions of such retained books and records that relate to the Business as conducted before the Closing or that relate to any of the Assets; (iii) documents which Seller is not permitted to transfer pursuant to any contractual obligation owed to any third party; (iv) documents primarily related to any Excluded Assets; and (v) documents necessary to prepare tax returns (Purchaser shall be entitled to a copy of such documents referred to in this clause (v)). With respect to documents necessary to prepare cost reports, which shall be specified in writing by the Purchaser, the Purchaser shall receive the original document (to the extent such original can reasonably be located by Seller) and Seller shall be entitled to retain a copy of such documents for any period ending on or prior to the Closing Date;

(h)     all of Seller's deposits and other prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

1516150v10~~9~~
66204274.2
5903236 v2
66204274.3

(i)     any assets disposed of or consumed in the ordinary course of business (except any disposed of or consumed in breach of the provisions of this Agreement) during the period between the date hereof and the Closing Date;

(j)     Seller's minute book and similar corporate records;

(k)     any payments from, and all rights to payments that may become due from, Medicare or Medicaid programs based on adjustments to cost reports covering services prior to the Effective Time, including the Final Cost Reports;

(l)     any Privilege that relates to any Excluded Asset or any Excluded Liability; and

(m)     All funds with respect to the Debtors' self-funded (i) insurance, (ii) benefits, or (iii) similar programs.

1516150v10 6

47

66204274.2

5903236 v2

66204274.3

**SCHEDULE 2**

**Part 1**

**Senior Leadership and Managers of the Business**

**Part 2**

**Senior Leadership and Managers of Purchaser's Ultimate Parent Company**

**SCHEDULE 3**

**Other Businesses**

| Property Name | Location |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

1516150v106

66204274.2

5903236 v2

66204274.3

49

**SCHEDULE 4**

~~Other Assets~~

| ~~Address~~ | ~~Parcel No.~~ |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

1516150v10v9
66204274.2
5903236 v2
66204274.3

**SCHEDULE 5**

**Permitted Encumbrances**

1516150v10v9

66204274.2

5903236 v2

66204274.3

1516150v10v6

66204274.2

5903236 v2

66204274.3

52

## SCHEDULE 5

## ~~SCHEDULE 6~~

### Real Property

| Address | Parcel No. |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

1516150v10/6

66204274.2

5903236 v2

66204274.3

~~SCHEDULE 7~~

SCHEDULE 6

**Taxes and Assessments**

1516150v106

66204274.2

5903236 v2

66204274.3

**SCHEDULE 2.7**

**Assumed Contracts**

**SCHEDULE 3.7(b)**

**Health Care Permits**

1516150v10v9

66204274.2
5903236 v2
66204274.3

**SCHEDULE 3.7(e)**

**Inspections, Investigations, Audits, Etc.**

1516150v10<u>6</u>

66204274.2
5903236 v2
66204274.3

57

**SCHEDULE 3.7(g)**

**Provider Numbers**

**SCHEDULE 3.7(h)**

**Reports**


**Refunds, Overpayments, Discounts or Adjustments**


**Unresolved Investigations**

1516150v10v9

66204274.2

5903236 v2

66204274.3

**SCHEDULE 3.9**

~~Subsidiaries~~

**Intangible Property**

1516150v1~~0~~6

66204274.2

5903236 v2

66204274.3

**EXHIBIT A**

**Form of Deed**

1516150v10~~6~~

66204274.2

5903236 v2

66204274.3

61

**EXHIBIT B**

**Form of Seller's Affidavit**

1516150v10̶6̶

66204274.2

5903236 v2

66204274.3

**EXHIBIT C**

**Form of Bill of Sale and Assignments**

1516150v10v9

66204274.2
5903236 v2
66204274.3

**EXHIBIT D**

**Bid Procedures Order**

1516150v106

66204274.2

5903236 v2

66204274.3

**EXHIBIT E**

**Transition Services Agreement**

1516150v10v6

66204274.2

5903236 v2
66204274.3